David H. Botter
Thomas S. Kessler
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| Mega Newco Limited,[1] | Case No. 24-12031 (MEW) |
| Debtor in a Foreign Proceeding | |

**VERIFIED PETITION FOR**
**(I) RECOGNITION OF FOREIGN PROCEEDING,**
**(II) RECOGNITION OF FOREIGN REPRESENTATIVE,**
**(III) RECOGNITION OF SANCTION ORDER AND RELATED SCHEME**
**AND (IV) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

---

[1]      The last four identifying digits of the registered number are 6024 and with registered address at Suite 1, 7th Floor 50 Broadway London SW1H 0DB, United Kingdom.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................................... ii

RELIEF REQUESTED............................................................................................................... 1

BACKGROUND ........................................................................................................................ 3

    A.    General Background and History.......................................................................... 3

    B.    Mega's Capital Structure ..................................................................................... 4

    C.    Events Precipitating Commencement of the English Scheme Proceeding........... 6

    D.    The Current English Scheme Proceeding and Foreign Representative
        Appointment ..................................................................................................... 7

JURISDICTION AND VENUE ............................................................................................... 18

REQUIRED DISCLOSURES ................................................................................................... 18

BASIS FOR RELIEF REQUESTED........................................................................................ 19

    A.    The Debtor is Eligible to be a "Debtor" Under Chapter 15 of the
        Bankruptcy Code ............................................................................................. 20

    B.    The English Scheme Proceeding is a Foreign Proceeding of Mega and the
        Petitioner is the Duly-Authorized Foreign Representative Thereof and has
        Properly Petitioned this Court for Recognition ................................................. 22

    C.    The Court Should Find that the English Scheme Proceeding Is a "Foreign
        Main Proceeding" ............................................................................................. 29

    D.    In the Alternative, the Court Should Find that the English Scheme
        Proceeding is at Least a Foreign Nonmain Proceeding of the Debtor ............... 32

    E.    Enforcement of the Sanction Order and Scheme and Related Relief ................. 34

WAIVER OF STAY IS APPROPRIATE.................................................................................. 53

NOTICE.................................................................................................................................... 53

RESERVATION OF RIGHTS ................................................................................................. 55

CONCLUSION......................................................................................................................... 56

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Can. S. Ry. Co. v. Gebhard*,
109 U.S. 527 (1883)............................................................................................. 40

*Collins v. Oilsands Quest Inc.*,
484 B.R. 593 (Bankr. S.D.N.Y. 2012)................................................................. 29

*CT Inv. Mgmt. Co., LLC v. Cozumel Caribe, S.A. de C.V.*
*(In re Cozumel Caribe, S.A., de C.V.)*,
482 B.R. 96 (Bankr. S.D.N.Y. 2012)................................................................... 40

*Cunard S.S. Co. v. Salen Reefer Servs. AB*,
773 F.2d 452 (2d Cir. 1985)........................................................................ 40, 41, 42

*Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*,
737 F.3d 238 (2d Cir. 2013)........................................................................... 20–21

*Finanz AG Zurich v. Banco Economico S.A.*,
192 F.3d 240 (2d Cir. 1999)............................................................................. 38, 41

*Harrington v. Purdue Pharma L. P.*,
144 S. Ct. 2071 (2024)....................................................................................... 45

*In re ABC Learning Ctrs. Ltd.*,
445 B.R. 318 (Bankr. D. Del. 2010).................................................................... 27

*In re Agrokor D.D.*,
591 B.R. 163 (Bankr. S.D.N.Y. 2018)................................................................. 45

*In re Americanas, S.A.*,
No. 23-10092, 2024 WL 3506637 (Bankr. S.D.N.Y. July 22, 2024)................................ 45

*In re Ashapura Minechem Ltd.*,
480 B.R. 129 (Bankr. S.D.N.Y. 2012)................................................................. 25

*In re Atlas Shipping A/S*,
404 B.R. 726 (Bankr. S.D.N.Y. 2009).................................................................. 36,42

*In re Avanti Commc'ns. Grp. PLC*,
582 B.R. 603 (Bankr. S.D.N.Y. 2018) ................................................................. *passim*

*In re B.C.I. Fins. Pty Ltd.*,
583 B.R. 288 (Bankr. S.D.N.Y. 2018) ................................................................. 21

*In re Bd. of Dirs. of Multicanal S.A.*,
314 B.R. 486 (Bankr. S.D.N.Y. 2004) ................................................................. 46

*In re Bd. of Dirs. of Telecom Arg., S.A.*,
528 F.3d 162 (2d Cir. 2008) ................................................................. 37, 49

*In re Bd. of Dirs. of Telecom Arg., S.A.*,
No. 05-17811 (BRL), 2006 WL 686867 (Bankr. S.D.N.Y. Feb. 24, 2006) ...................... 51

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
374 B.R. 122 (Bankr. S.D.N.Y. 2007) ................................................................. 22–23, 33

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
389 B.R. 325 (S.D.N.Y. 2008) ................................................................. 33

*In re Berau Cap. Res. Pte. Ltd.*,
540 B.R. 80 (Bankr. S.D.N.Y. 2015) ................................................................. 21, 22

*In re Betcorp Ltd.*,
400 B.R. 266 (Bankr. D. Nev. 2009) ................................................................. 27, 28

*In re Brit. Am. Ins. Co. Ltd.*,
425 B.R. 884 (Bankr. S.D. Fla. 2010) ................................................................. 30, 32, 33, 34

*In re CGG S.A.*,
579 B.R. 716 (Bankr. S.D.N.Y. 2017) ................................................................. 36, 37

*In re Climate Control Mech. Servs.*,
570 B.R. 678 (Bankr. M.D. Fla. 2017) ................................................................. 51

*In re Condor Ins. Ltd. (Tacon v. Petroquest Res., Inc.)*
601 F.3d 319 (5th Cir. 2010) ................................................................. 51

*In re Creative Fin. Ltd.*,
543 B.R. 498 (Bankr. S.D.N.Y. 2016) ................................................................. 33, 34

*In re Fairfield Sentry Ltd.*,
714 F.3d 127 (2d Cir. 2013) ................................................................. 19, 29, 30, 31

*In re Fairfield Sentry Ltd.*,
No. 10 Civ. 7311 (GBD), 2011 WL 4357421 (S.D.N.Y. Sept. 16, 2011) .......................... 33

*In re Globo Comunicacoes e Participacoes S.A.*,
317 B.R. 235, 249 (S.D.N.Y. 2004) .................................................................................... 21

*In re Inversora Eléctrica de Buenos Aires S.A.*,
560 B.R. 650 (Bankr. S.D.N.Y. 2016) ................................................................................ 22

*In re JSC BTA Bank*,
434 B.R. 334 (Bankr. S.D.N.Y. 2010) ................................................................................ 31

*In re Lyondell Chem. Co.*,
402 B.R. 571 (Bankr. S.D.N.Y. 2009) ................................................................................ 49

*In re Magyar Telecom B.V.*,
No. 13-13508-SHL, 2013 WL 1039994 (Bankr. S.D.N.Y. Dec. 11, 2013) ...................... 44

*In re Metcalfe & Mansfield Alt. Invs.*,
421 B.R. 685 (Bankr. S.D.N.Y. 2010) ........................................................................... 44, 52

*In re Millard*,
501 B.R. 644 (Bankr. S.D.N.Y. 2013) ................................................................................ 51

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
458 B.R. 63 (Bankr. S.D.N.Y. 2011) ...................................................................... 29, 33, 34

*In re MMG LLC*,
256 B.R. 544 (Bankr. S.D.N.Y. 2000) ................................................................................ 49

*In re Mod. Land (China) Co., Ltd.*,
641 B.R. 768 (Bankr. S.D.N.Y. 2022) ................................................................................ 40

*In re OAS S.A.*,
533 B.R. 83 (Bankr. S.D.N.Y 2015) ............................................................................... 24, 51

*In re Ocean Rig UDW Inc.*,
570 B.R. 687 (Bankr. S.D.N.Y. 2017) ................................................................................ 22

*In re Octaviar Admin. Pty Ltd.*,
511 B.R. 361 (Bankr. S.D.N.Y. 2014) ................................................................................ 21

*In re Oi Brasil Holdings Cooperatief U.A.*,
578 B.R. 169 (Bankr. S.D.N.Y. 2017) ................................................................................ 37

*In re Oi S.A.*,
587 B.R. 253 (Bankr. S.D.N.Y. 2018)...................................................................... 37–38

*In re Paper I Partners, L.P.*,
283 B.R. 661 (Bankr. S.D.N.Y. 2002)...................................................................... 21

*In re Poymanov*,
571 B.R. 24 (Bankr. S.D.N.Y. 2017)........................................................................ 21

*In re Rede Energia S.A.*,
515 B.R. 69 (Bankr. S.D.N.Y. 2014)............................................................... 36, 37, 49

*In re Serviços de Petróleo Constellation S.A.*,
600 B.R. 237 (Bankr. S.D.N.Y. 2019)............................................................. 24, 31, 32

*In re Sino-Forest Corp.*,
501 B.R. 655 (Bankr. S.D.N.Y. 2013)....................................................... 36, 44, 50, 51

*In re SPhinX, Ltd.*,
351 B.R. 103 (Bankr. S.D.N.Y. 2006)..................................................................... 30, 31

*In re Toft*,
453 B.R. 186 (Bankr. S.D.N.Y. 2011)..................................................................... 40, 51

*In re Tri-Cont'l Exch. Ltd.*,
349 B.R. 627 (Bankr. E.D. Cal. 2006)..................................................................... 31

*In re Vitro, S.A.B. de C.V.*,
470 B.R. 408 (Bankr. N.D. Tex. 2012)..................................................................... 24

*In re Vitro S.A.B de C.V.*,
701 F.3d 1031 (5th Cir. 2012) ............................................................................. 35, 46

*Phoenix Four, Inc. v. Strategic Res. Corp.*,
446 F. Supp. 2d 205 (S.D.N.Y. 2006)..................................................................... 29

*Victrix S.S. Co. S.A., v. Salen Dry Cargo A.B.*,
825 F.2d 709 (2d Cir. 1987)................................................................................... 42

## Rules and Statutes

11 U.S.C. § 109(a) ............................................................................................... 20

11 U.S.C. § 101.............................................................................................. 20, 23, 24

11 U.S.C. § 105(a) ........................................................................................... 37

11 U.S.C. § 304 ............................................................................................... 35

11 U.S.C. § 1501(a)(1) .................................................................................... 40

11 U.S.C. § 1502 ............................................................................... 25, 28, 29, 33

11 U.S.C. § 1506 ............................................................................................. 51

11 U.S.C. § 1507(b) ................................................................................... 36, 40

11 U.S.C. § 1516(c) ......................................................................................... 29

11 U.S.C. § 1517 ........................................................................... 22, 23, 24, 29

11 U.S.C. § 1521 ....................................................................................... 35, 49

## Other Authorities

Amended Standing Order of Reference, *In re Standing Order of Reference Re: Title 11*,
No. 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) .................................................. 18

1.      Mr. Ignacio Javier Gonzalez Delgadillo (the "Petitioner" or the "Foreign Representative") by and through the undersigned counsel, respectfully submits this Verified Petition for Recognition of the English Scheme Proceeding, Recognition of Foreign Representative, Recognition of the Scheme and Related Relief (the "Verified Petition") in the above-captioned Chapter 15 case (the "Chapter 15 Case") in respect of Mega Newco Limited ("Mega" or "Debtor") in the scheme of arrangement proceeding (the "English Scheme Proceeding") in the High Court Of Justice Business And Property Courts Of England and Wales (the "English Court") pursuant to Part 26 of the Companies Act 2006, as modified (the "Companies Act") represents as follows:

## RELIEF REQUESTED

2.      Pursuant to this Verified Petition, the Foreign Representative respectfully requests, pursuant to sections 105(a), 1504, 1507, 1509, 1510, 1515, 1517, 1520, 1521, 1522, and 1525(a) of title 11 of the United States Code (the "Bankruptcy Code"), entry of an order substantially in the form attached hereto as Exhibit A (the "Proposed Order" and, when as entered, the "Order"):

(a)     finding that (i) the Debtor is eligible to be a debtor under Chapter 15 of the Bankruptcy Code, (ii) the Foreign Representative is the duly appointed "foreign representative" of the Debtor within the meaning of section 101(24) of the Bankruptcy Code and (iii) the Foreign Representative is authorized to act on behalf of the Debtor for the purposes of the Chapter 15 Case;

(b)     (i) granting recognition of the English Scheme Proceeding as a "foreign main proceeding" (as defined in section 1502(4) of the Bankruptcy Code) of the Debtor (as defined herein), pursuant to section 1517 of the Bankruptcy Code, all relief included therewith as provided in section 1520 of the Bankruptcy Code, and related relief under section 1521(a), or (ii) alternatively, should the Court decline to recognize the English Scheme Proceeding as the Debtor's foreign main proceeding, grant appropriate relief to the same extent such relief would be granted pursuant to section 1520(a) of the Bankruptcy Code had the proceeding been recognized as a foreign main proceeding;

(c)     entrusting the Foreign Representative with the power to administer, realize, and distribute all assets of the Debtor within the territorial jurisdiction of the United States;

(d)      recognizing and enforcing the English Scheme Proceeding and the scheme of arrangement (the "<u>Scheme</u>")[2] proposed pursuant to Part 26 of the Companies Act between Mega and the Scheme Creditors (as defined herein) in the United States and giving full force and effect to and granting comity in the territorial jurisdiction of the United States to the English Scheme Proceeding, the Scheme and the and the order of the High Court sanctioning the Scheme (the "<u>Sanction Order</u>")[3] and finding that each is binding on all creditors whose claims against Mega were subject to the English Scheme Proceeding and the Scheme, including the releases set forth in the Scheme (the "<u>Releases</u>");

(e)      permanently enjoining all entities (as that term is defined in section 101(15) of the Bankruptcy Code) other than the Petitioner and his expressly authorized representatives and agents from (i) commencing or taking any action that is in contravention with or would interfere with or impede the administration, implementation, and/or consummation of the Scheme, the Sanction Order, or the terms of the Proposed Order and (ii) taking any action, including, without limitation, commencing or continuing any action or legal proceeding (including, without limitation, bringing suit in any court, arbitration, mediation, or any judicial or quasi-judicial, administrative or regulatory action, proceeding or process whatsoever), and including action by way of counterclaim, and from seeking discovery of any nature related to the foregoing, to recover or offset any debt or claims that are extinguished, novated, cancelled, discharged, or released under the Scheme, the Sanction Order, or as a result of English law against Mega, Mega, Operadora De Servicios Mega, S.A. De C.V., Sofom, E.R. (the "<u>Parent</u>" or in its capacity as the holding period escrow agent, the "<u>Holding Period Escrow Agent</u>"), the Petitioner or their property located in the territorial jurisdiction of the United States;

(k)      authorizing the (i) the Parent in its capacity as such and in its capacity as the Holding Period Escrow Agent, (ii) the Information Agent, (iii) the Settlement Agent, (iv) the Existing Notes Trustee (as defined herein), (v) UMB Bank N.A. (the "<u>New Notes Indenture Trustee</u>"), (vi) CiBanco, S.A., Institución de Banca Múltiple, (the "<u>New Notes Mexican Trustee</u>") and (vii) Mega (together, the "<u>Authorized Parties</u>") to take any and all actions necessary to give effect to the terms of the Scheme and transactions contemplated thereby;

(n)      waiving the 14-day stay of effectiveness of the Proposed Order; and

(o)      granting such other and further relief as the Court deems just and proper (collectively, the "<u>Relief Requested</u>").

---

[2]      A true and correct copy of the proposed Scheme of Arrangement (the "<u>Scheme</u>") is attached hereto as <u>Exhibit C</u>.  A true and correct copy of the Deed of Release is attached hereto as <u>Exhibit G</u>.  A true and correct copy of the Explanatory Statement is attached hereto as <u>Exhibit D</u>.  All capitalized terms used but not defined herein shall have the meaning ascribed to them in the Scheme, the Deed of Release or the Explanatory Statement.

[3]      A true and correct copy of the current draft of the Sanction Order is attached hereto as <u>Exhibit H</u>.

The relief requested in this Verified Petition is without prejudice to any additional relief the Foreign Representative may request.

3.      In support of this request, the Petitioner relies upon and incorporates by reference: *(a) the Declaration of Mr. Ignacio Javier Gonzalez Delgadillo in Support of the Verified Petition for (i) Recognition of Foreign Proceeding, (ii) Recognition of Foreign Representative, (iii) Recognition of Sanction Order and Related Scheme, and (iv) Related Relief Under Chapter 15 of the Bankruptcy Code and Additional First Day Filings* (the "<u>Foreign Representative Declaration</u>") and *(b) the Declaration of Ms. Polina Lyadnova in Support of the Verified Petition for (I) Recognition of Foreign Proceeding, (II) Recognition of Foreign Representative, (III) Recognition of Sanction Order and Related Scheme, and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code and Additional First Day Filings* (the "<u>English Counsel Declaration</u>"), which have been filed contemporaneously herewith.

## **<u>BACKGROUND</u>**

### A.      <u>General Background and History</u>

i.    *Overview*

4.      Mega is a private company incorporated in England and Wales and is a direct subsidiary of the Parent (together with the Parent and the other subsidiaries of the Parent, the "<u>Group</u>").  Mega has no substantial operations of its own.

5.      The Group is a leading Mexican regulated multiple purpose financial provider, based in Guadalajara, Jalisco, with more than 20 years of operating experience.  It specializes in four main business lines:  leases, lending, auto loans, and factoring.  In addition to its headquarters located in Guadalajara, the Group has other branches throughout Mexico, located in Mexico City, Puebla, Querétaro, and Leon, and one additional office located in San Diego, California.

6.      The Group offers leases for machinery and equipment, transportation vehicles (including cargo and passenger vehicles), and other capital assets used in a variety of industries in Mexico.  It also provides financing to small and medium-sized businesses for the acquisition of durable goods and equipment (such as greenhouses and macro-tunnels), as well as liquidity and financing solutions for their working capital needs.  The Group's auto loans business line is based in San Diego, California, and specializes in loans for the purchase of pre-owned personal vehicles. The Group's operations are regulated by the *Comisión Nacional Bancaria y de Valores*, the National Banking and Securities Commission, and supervised by *The Bank of Mexico*, Mexico's central bank.

7.      Mega is an obligor under the Existing Notes (as defined herein), that are denominated in U.S. dollars.

**B.      Mega's Capital Structure**

  i.   *Mega's Liabilities[4]*

    a.   Existing Notes

8.      The Parent and, as discussed below, Mega, are liable in respect of certain notes with an interest rate of 8.250%, due February 11, 2025, issued by the Parent pursuant to an indenture dated 11 February 2020 (as supplemented, the "Existing Notes Indenture"), between amongst others, the Parent and Wilmington Trust, National Association (the "Existing Notes Trustee") in its capacity as trustee under the Existing Notes Indenture (the "Existing Notes" as amended or supplemented from time to time).  The Existing Notes are governed by New York law.

---

[4]      For the avoidance of doubt, nothing herein constitutes or shall be construed as an admission of any purported liability with respect to any obligation, including financial indebtedness or claims, for which the Debtor reserves all rights and defenses.

9.      As of October 31, 2024, the aggregate principal amount outstanding under the Existing Notes was USD 350,758,000.  Certain Existing Noteholders who are related to the Parent control USD 28,069,000 in principal amount of the outstanding Existing Notes.

10.     The Existing Notes rank equally with the unsecured indebtedness of the Parent (except those obligations preferred by operation of law) and are senior to any subordinated indebtedness of the Parent.

11.     Mega was incorporated on September 30, 2024 in preparation for proposing the Scheme.  On October 31, 2024, Mega executed a deed poll (the "Deed Poll") and on November 1, 2024, the second supplemental indenture (the "Second Supplemental Indenture") to the Indenture, pursuant to which (i) it agreed to be bound by all the terms and conditions of the Existing Notes as if it were an original party thereto and (ii) it acknowledged that it will be jointly and severally liable with the Parent for all obligations and liabilities under the Existing Notes.  The Deed Poll is governed by English law and the Second Supplemental Indenture is governed by New York law (the law governing the Indenture and the Existing Notes).  Following execution of the Deed Poll and the Second Supplemental Indenture, all creditors under the Existing Notes (the "Scheme Creditors") have the right to claim against Mega in respect of any obligations under the Existing Notes.

12.     Further, Mega and the Parent entered into a deed of contribution on October 31, 2024 (the "Deed of Contribution"), pursuant to which Mega has irrevocably and unconditionally agreed to pay to the Parent, by way of contribution, an amount that is equal to Mega's share of the amount of any payment made by the Parent in respect of any obligation under the Existing Notes. Following execution of the Deed of Contribution, the Parent has a right of contribution against Mega in respect of payments made by it under the Existing Notes.

13.     The guarantee and obligations under the Deed of Contribution provided by Mega are unsecured and rank equally with unsecured indebtedness of Mega and are senior to all subordinated indebtedness of Mega (except those obligations preferred by operation of law).

**C.    Events Precipitating Commencement of the English Scheme Proceeding**

i.   *Financial Distress*

14.     Despite the Parent's efforts to comply with its financial obligations, adverse economic conditions beyond the Group's control have impaired the Parent's business and caused significant operational challenges, which has resulted in the Group facing severe liquidity constraints.

15.     Numerous factors have contributed to this impairment.  The global economy has recently experienced a period of volatility and has been adversely affected by a worldwide increase in inflation, loss of confidence in the financial sector, disruptions in the credit markets, reduced business activity, and erosion of consumer confidence.  Rising inflationary pressures in the aftermath of the COVID-19 crisis have set the tone for the U.S. Federal Reserve, and central banks around the world, to tighten their monetary policies at a fast pace throughout 2022 and 2023.

16.     The non-banking financial sector in Mexico has faced significant headwinds in recent years.  Several companies in the sector have seen their ability to meet their payment obligations compromised, leading to diminished investor confidence in the sector.  Crédito Real, Tangelo, Alpha Credit, and Unifin all have pursued restructuring processes.  Despite the Group's strong portfolio and robust risk management practices, funding sources have been severely diminished.  This situation was further worsened by the rising interest rate environment, where potential refinancing options for the Group's debt became exceedingly expensive.

17.     Historically, the sector was funded through bullet-maturity loans, which created a mismatch between the maturity schedules of the institutions' loan portfolios and the maturity dates of their debt.  This forced companies to constantly seek refinancing for these bullet loans to alleviate the timing discrepancy between cash receipts and debt repayment.  When the Group encountered this common industry challenge, it was unable to successfully refinance its USD notes due to the previously mentioned sector headwinds.

18.     The Group has funded its operations through debt issuances in foreign currency and implemented a hedging strategy to mitigate the impact of USD/MXN exchange rate fluctuations. However, in the past few years, market conditions were such that the appreciation of the Mexican Peso against the U.S. Dollar triggered multiple margin calls on the Group's derivative positions, further pressuring the Group's liquidity.

ii.   *Restructuring Process*

19.     Due to these macro and micro economic factors, which led to, in part, defaults under the Existing Notes, Mega has undertaken a restructuring via the English Scheme Proceeding, as supported by this proceeding.  Once consummated, the restructuring will mitigate the risk of any member of the Group having to file for any formal insolvency or bankruptcy proceedings, on a protective basis or otherwise; leave in place a more sustainable capital structure, providing the Group with a strengthened balance sheet and a level of debt that it is capable of servicing going forward; provide necessary liquidity for the Group to allow it to continue to rebuild its business and operations; and allow the Group to obtain new funding to finance its ongoing working capital requirements.

**D.     The Current English Scheme Proceeding and Foreign Representative Appointment**

20.     The key terms of the Scheme,[5] which is part of a larger restructuring being effectuated by the Parent, are described below.

      i.  *New Refinancing Facility*

21.     In connection with the restructuring, the Parent entered into, on September 18, 2024, a new secured facility agreement (the "New Refinancing Facility") with Banco Nacional Bancomext de Comercio Exterior.  The proceeds of the New Refinancing Facility will be drawn down by the Parent contemporaneously with the issuance of the New Notes (as described below). The proceeds of the New Refinancing Facility will be used to fund the cash payments to be made to creditors as part of the restructuring (including payments to be made to Scheme Creditors pursuant to the Redemption Option (as described below)).

      ii.  *New Notes*

22.     Pursuant to the terms of the New Refinancing Facility, the Parent is obliged to obtain additional funding (to enable the restructuring of its existing debt, incur restructuring related expenses as well as for origination purposes) from other sources in the total amount of Ps.1,227,000,000 (or its equivalent in other currencies) (for the purposes of the commitments related to New Notes agreed to be equal to USD 61,237,630 (using the USD/MXN exchange rate as of November 6, 2024)) (the "New Notes Base Amount").

23.     To satisfy the additional funding requirement the Parent will issue new notes on or before the Restructuring Effective Date in accordance with the Implementation Deed (the "New Notes**").

      i.  Tranche 1:

---

[5]     This is a summary of the Scheme.  For a complete description of all of the terms and conditions of the Scheme, a true and correct copy of the Scheme is attached hereto as Exhibit C.

a)    Tranche 1 in the amount of USD 10,000,000 will be subscribed in full for cash by an Affiliate of existing creditors of the Parent (the "Participating T1 New Noteholder") pursuant to a commitment letter entered into between the Parent, Mega and the Participating T1 New Noteholder on November 11, 2024. The Participating T1 New Noteholder will be entitled to a 2% commitment fee based on the amount of its commitment (the fee may be deducted from the subscription amount of the relevant person).

ii.  Tranche 2:

a)    Each eligible holder of the Existing Notes will be entitled to subscribe by validly submitting their New Notes Election Form by the Election Deadline (as defined herein) (each such subscribing eligible holder, a "Participating T2 New Noteholder") in cash for New Notes in an amount equal to its pro rata portion of an aggregate amount of Tranche 2 in the amount of USD 51,237,630, such amount being the "Total Cash Component", calculated by reference to such Participating T2 New Noteholder's holding of Existing Notes as a proportion of the aggregate holdings of Existing Notes held by all holders of the Existing Notes at the Record Date being that Participating T2 New Noteholder's "New Notes Subscription Amount". The minimum Tranche 2 New Notes Subscription Amount shall be such that as a result of the cash subscription and the New Notes Roll-Up (described below) the relevant Participating T2 New Noteholder receives New Notes in a principal amount at least equal to USD 150,000.

b)    Such Participating T2 New Noteholder shall also receive, in exchange for the amount of Existing Notes equal to its New Notes Subscription Amount, an additional amount of New Notes at an exchange ratio of 3.5 New Notes for every 1 Existing Note.

c)    Accordingly, for every U.S. dollar of cash used by a Participating T2 New Noteholder to subscribe for the New Notes that Participating T2 New Noteholder will receive:

1.    1 U.S. dollar of principal amount of New Notes (in exchange for cash); and

2.    3.5 U.S. dollars of principal amount of New Notes (in exchange for its Existing Notes); and

3.    1 U.S. dollar of the principal amount of Existing Notes held by the relevant Participating T2 New Noteholder will be extinguished (the "New Notes Roll-Up").

24.     Each Participating T2 New Noteholder will be entitled to elect the Redemption Option or Equity Option (as detailed below) in relation to the remaining unexchanged portion of its Existing Notes only.

25.     The holders of the Existing Notes are requested to confirm their election to subscribe for the New Notes by the Voting Instruction Deadline, 5:00 p.m. (New York time) on December 9, 2024 (the "Voting Instruction Deadline").  However, Scheme Creditors' elections to participate in New Notes will only become binding on the Election Deadline.

26.     In order to be eligible to be a Participating T2 New Noteholder, each holder of the Existing Notes shall (i) provide representations and confirmations confirming that they are not and they do not act on behalf or at the direction of a Sanctioned Person and subscription to and their receipt of New Notes and payment by them for the New Notes are in compliance with Sanctions; and (ii) provide customary representations with respect to their status for the purposes of any applicable securities laws.

### iii. Tranche 2 New Notes Backstop Commitment

27.     Members of an ad hoc group of holders of the Existing Notes (the "Ad Hoc Group" and the members thereof, the "Backstop Parties"), who collectively hold approximately 28.2% of the Existing Notes provided, pursuant to a commitment letter dated November 11, 2024, a commitment to backstop in cash an amount of New Notes equal to the Total Cash Component *less* (a) the aggregate principal amount of New Notes elected to be subscribed for by the Participating T2 New Noteholders, and (b) the aggregate principal amount of Existing Notes elected to be converted into the Parent's equity pursuant to the Equity Option.  The Parent may elect not to draw down on the backstop commitments to the extent the additional funding requirement under the New Refinancing Facility is satisfied through other means.

28.     Each Backstop Party's individual backstop commitment will be on a pro rata basis calculated by reference to that Backstop Party's holding of Existing Notes as a proportion of the aggregate holdings of Existing Notes held by all the Backstop Parties as of the date of the backstop commitment letter.

29.     Each Backstop Party shall be entitled to a backstop fee equal to 5% of its pro rata share of the backstop commitment ("Backstop Fee"), regardless of whether the backstop commitment is used in full or in part only.  The backstop fee shall be payable to each Backstop Party at the time of issuance of the New Notes and may be deducted from the amount payable by that Backstop Party to subscribe for its allocation of New Notes (either as a Participating T2 New Noteholder or pursuant to the backstop commitment).

iv.  *Treatment of Existing Notes*

30.     Existing Noteholders shall be entitled to elect by the election deadline (5:00 p.m. (EST) on December 16, 2024, the "Election Deadline") one of the following two options in respect of their Existing Notes:

a.  under the Redemption Option, the Parent and Mega will discharge all liabilities under relevant holder's Existing Notes (including any accrued and unpaid interest) in full on or before the Restructuring Effective Date for cash in USD at 45% of those Existing Notes' par value (inclusive of accrued and unpaid interest, such cash amount being the "Cash Entitlement"); or

b.  under the Equity Option (the "Equity Option"), liabilities under the relevant holder's Existing Notes (including any accrued and unpaid interest) shall be, on or before the Restructuring Effective Date, assigned to the Parent and such liabilities shall be converted into New Shares in the Parent  (with the same rights as the

Parent's existing shares) at par for a price per share (being USD 23.83) determined by the Parent's sole director and approved by the Parent's shareholders based on report prepared for the Parent by 414 Capital Inc.; *provided that* the current controlling shareholders of the Parent retain at least 75% of the Parent's share capital post such conversion, in each case, redemption and/or exchange shall be made in full and final discharge of Mega's and the Parent's obligations under the Existing Notes.

31.    On and from the Restructuring Effective Date, the Existing Notes and any documentation relating thereto shall be cancelled and be of no effect.

32.    The cash consideration paid or payable by Mega and the Parent pursuant to the Redemption Option shall be funded out of the proceeds of the New Refinancing Facility, New Notes and/or Mega's and the Parent's own cash.

33.    The Redemption Option shall be deemed to automatically apply to (1) any Existing Notes in respect of which no election has been made by the holders thereof by the Election Deadline; and (2) any Existing Notes owned, held or controlled by or on behalf of a Sanctioned Person, provided that in such case, the amount paid to redeem those Existing Notes shall be paid to and shall be held by the Parent in its capacity as the Holding Period Escrow Agent on the terms set out below so as to ensure compliance with Sanctions.

34.    To the extent the amount of Existing Notes in respect of which Equity Option has been elected is such that the aggregate amount of New Shares in the Parent will be such that the current controlling shareholders' ownership in the Parent is at or below 75% of the Parent's voting share capital, the Redemption Option will be applied to the relevant proportion of the Existing Notes automatically on a pro rata basis amongst the electing holders of the relevant Existing Notes

to ensure that the amount of New Shares in the Parent issued to third parties will be such that the current controlling shareholders' ownership in the Parent is at 75% of the Parent's voting share capital following the Restructuring Effective Date.

35.     To be eligible to elect the Equity Option, Existing Noteholders must provide customary representations with respect to their status for the purposes of any applicable securities laws.

36.     Pursuant to the terms of the Scheme and the English Scheme Proceeding, no Sanctioned Person may receive any funds or economic resources or any other benefit pursuant to the restructuring and always in accordance with Sanctions, including obtaining guidance or authorization by the relevant Sanctions Authorities, as is agreed to be necessary between the legal advisors to Mega and the Parent and the Ad Hoc Group for the purposes of implementing the restructuring, including a valid license from OFAC.

### v. *Scheme Consideration*

37.     The final amounts of the relevant Scheme Consideration for each Existing Noteholder, and the formulae underlying such amounts will be as set out in the Allocations Spreadsheet, which the Information Agent will complete promptly after the Election Deadline.

### vi. *Holding Period Escrow*

38.     To the extent that any Cash Entitlements are attributable to Non-Eligible Existing Noteholders, such Cash Entitlements shall instead be transferred to the Holding Period Escrow Agent to be held in escrow (the "Holding Period Escrow").

39.     Any Scheme Creditor who is a Sanctioned Person may deliver evidence to Mega showing that it is eligible to receive the Cash Entitlement and has ceased to be a Sanctioned Person. Upon Mega being sufficiently satisfied that such Scheme Creditor is entitled to receive (and Mega

and the Holding Period Escrow Agent become entitled to make) the relevant distribution in compliance with applicable Sanctions, Mega shall instruct the Holding Period Escrow Agent to transfer to such Scheme Creditor (subject always to compliance with Sanctions) the Cash Entitlement.

40.     At any time before the first anniversary of the Restructuring Effective Date (the "Holding Period Escrow Expiry Date"), upon any Non-Eligible Existing Noteholder delivering sufficient evidence to the Parent (as determined by the Parent in its sole and absolute discretion) showing that it is not or is no longer subject to Sanctions and/or is or becomes entitled to receive (and the Parent and the Holding Period Escrow Agent are or become entitled to make) the relevant distribution in compliance with Sanctions and provides such other representations and confirmations as may be required to confirm its eligibility, the Holding Period Escrow Agent shall transfer to such holder (subject always to compliance with Sanctions) the cash amount attributable to such Non Eligible Holder.

41.     To the extent that, prior to the Holding Period Escrow Expiry Date, a Non-Eligible Existing Noteholder provided a confirmation that it is a Sanctioned Person, the Holding Period Escrow Agent will continue to hold the monies attributable to such holder's Existing Notes and at any time after the Holding Period Escrow Expiry Date and upon such holder delivering sufficient evidence to the Parent (as determined by the Parent in its sole and absolute discretion) showing that it is no longer subject to Sanctions and/or becomes entitled to receive (and the Parent and the Holding Period Escrow Agent become entitled to make) the relevant distribution in compliance with Sanctions (subject always to a perpetuity period of 20 years following the Restructuring Effective Date and within no more than two months after the relevant Sanctions being lifted or the Non-Eligible Existing Noteholder otherwise ceasing to be subject to Sanctions or becoming

entitled to receive (and the Parent and Holding Period Escrow Agent becoming entitled to make) (the "SP Holding Period") the relevant distribution in compliance with Sanctions), the Holding Period Escrow Agent shall transfer to such holder (subject always to compliance with Sanctions) the Cash Entitlement attributable to such Holder.

42.     The Holding Period Escrow Agent will hold the cash amounts transferred to it pursuant to the Scheme in accordance with the Holding Period Escrow Agreement.

43.     On and from the Holding Period Escrow Expiry Date or, if applicable the last day of the SP Holding Period, to the extent that any cash amounts comprised in the Holding Period Escrow has not been validly claimed or received by the relevant Scheme Creditor in accordance with the Holding Escrow Period Agreement, that Scheme Creditor's entitlement to receive cash amounts comprised in the Holding Period Escrow shall be cancelled and the corresponding cash amounts shall be transferred by the Holding Period Escrow Agent to the Parent to be used at the Parent's discretion.

                vii. *English Scheme Proceeding*

44.     The Scheme is an integral part of a broader restructuring of Parent's debt which, although not directly occurring in the Scheme, is premised on the transactions contemplated by the Scheme.[6]  Much like a proceeding under Chapter 11 of the Bankruptcy Code, the Scheme is necessary to enable approval of the modifications of the Existing Notes embodied in the restructuring without requiring the unanimous consent of the Existing Noteholders.  The Scheme will permit the cram-down of non-participating or dissenting creditors if the majorities set forth in Part 26 of the Companies Act vote to approve the Scheme.

---

[6]     For further description of the broader restructuring, *see* Exhibit D.

45.    Mega filed the CPR Part 8 Claim Form to commence the English Scheme Proceeding on November 14, 2024.[7]  A hearing (the "Convening Hearing") occurred on November 21, 2024, pursuant to which an order of the English Court (the "Convening Order") was issued convening a meeting ("Scheme Meeting") of the Scheme Creditors for the purpose of considering and, if thought fit, approving the Scheme.  The Scheme Meeting will occur on December 11, 2024.  At the Scheme Meeting, Scheme Creditors will be able to attend in person or through counsel and make representations, although they are not obligated to do so.  Scheme Creditors can raise issues as to the jurisdiction of the English Court to sanction the Scheme or to raise any other issue in relation to the constitution of the Scheme Meeting or which might otherwise affect the conduct of such Scheme Meeting ("Creditor Issues").  While Scheme Creditors can raise Creditor Issues at a later court hearing to sanction the Scheme anticipated to be held on or around December 13, 2024 (the "Sanction Hearing"), the English Court would expect them to show good reason why they did not raise such issues at the Convening Hearing.

46.    Following registration of the order of the English Court at the Sanction Hearing with the UK Registrar of Companies, a Scheme Document will become effective and an Implementation Deed will be entered into to give effect to the principal steps of the Scheme.  In addition, a deed of release will be entered into by, among others, the Parent, Mega and the Released Parties[8] and will provide waivers and releases limited in scope to liabilities that a Released Party

---

[7]    A true and correct copy of the CPR Part 8 Claim Form is attached hereto as Exhibit B.

[8]    The Released Parties include (i) Mega, (ii) the Parent in all capacities, (iii) the Existing Notes Trustee in its capacity as trustee under the Existing Notes Indenture (as defined herein), (iv) DTC in its capacity as depository under the Existing Notes Indenture, (v) Kroll Issuer Services Limited, in its capacity as information and settlement agent in relation to the Scheme, (vi) Cede & Co. in its capacity as nominee for the DTC as a registered holder of a global note in respect of the Existing Notes, (vii) UMB Bank, N.A. in its capacity as the New Notes Settlement Agent, (viii) the Scheme Creditors, (ix) each member of the Ad Hoc Group (as defined herein), and (x) the Advisor Released Parties (as defined in the Deed of Release).  The Released Parties also include any of the Released Parties' current and former Affiliates or Related Entities (as defined in the Deed of Release), and each such person's and its Affiliates' and Related

16

has or may have to a Scheme Creditor in relation to, or arising out of or in connection with, the preparation, negotiation, or implementation of the Scheme and the specific steps described in the Scheme for its implementation (the "Deed of Release"). *See* Exhibit G. The Scheme contains a release of any and all claims of the Scheme Creditors subject to the Scheme (in essence being claims under the Existing Notes) against the Parent and Mega. In addition, the Scheme will, among other things, contain provisions preventing Scheme Creditors from exercising any rights, remedies, powers or discretions in contradiction of the provisions of the Scheme (including any action to commence any enforcement or other legal process against any member of the Group).

47.    Pursuant to a duly executed resolution of appointment issued by Mega's sole director dated November 15, 2024 (the "Resolution"), the Foreign Representative has been (i) appointed to act as the foreign representative of Mega's English Scheme Proceeding for purposes of this Chapter 15 Case pursuant to the Convening Order,[9] and (ii) authorized to commence this Chapter 15 Case.[10]

**E.    Connections to the United States**

48.    The Existing Notes Indenture, which governs the Existing Notes that will be compromised under the Scheme, is governed by New York law. The Debtor also has assets in the United States in the form of interests in a $300,000 retainer with the office of Cleary Gottlieb Steen

---

Entities' (and their Affiliates') current and former officers, managers, directors, predecessors, successors, assigns, principals, employees, agents, managed accounts or funds, management companies, fund advisers, investment managers or advisors (and any entity and its Affiliates which: (i) is managed or advised by such person's investment manager or advisor; or (ii) such person manages or advises in its capacity as investment manager or advisor (the "Affiliates")), advisory board members, financial advisers, partners, accountants, attorneys, investment bankers, consultants, representatives and other professionals, each in their capacity as such.

[9]    See Exhibit E.

[10]    A true and correct copy of the Resolution authorizing the commencement of the Chapter 15 Case and appointing the Foreign Representative is attached hereto as Exhibit F.

& Hamilton LLP, which is being held in a client trust account located in New York (the "Retainer Account").

## JURISDICTION AND VENUE

49.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. § 1501 as well as the Amended Standing Order of Reference, *In re Standing Order of Reference Re: Title 11*, No. 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.) (the "Amended Standing Order").

50.     This Chapter 15 Case has been properly commenced in accordance with sections 1504, 1509(a), and 1515 of the Bankruptcy Code by the filing of the Verified Petition seeking recognition of the English Scheme Proceeding as a foreign main proceeding.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

51.     Venue is proper in this District pursuant to 28 U.S.C. § 1410 as the Debtor's only U.S. assets are located within New York County and thus within this District.  The Debtor is also party to the Existing Notes Indenture, which is governed by New York law.  The statutory bases for relief are sections 105(a), 1504, 1507, 1509, 1510, 1515, 1517, 1520, 1521, 1522, and 1525 of the Bankruptcy Code.

## REQUIRED DISCLOSURES

52.     The Petitioner hereby provides the following disclosures in accordance with Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"):

- the following disclosure identifies for the Court any corporation, other than a governmental unit, that directly or indirectly owns 10% or more of any class of the Debtor's equity interests:

  a.   100% of Mega's equity is directly owned by the Parent.

- Other than the Verified Petition, the Debtor does not have a pending petition with this Court for relief under any chapter of the Bankruptcy Code.

- The English Scheme Proceeding is the only foreign proceeding, as that term is defined in section 101(23) of the Bankruptcy Code, of the Debtor presently open at the time of commencement of this Chapter 15 Case.

- Aside from the Petitioner with respect to the Chapter 15 Case (and Cleary Gottlieb Steen & Hamilton LLP (London) (together, "English Counsel") with respect to the English Scheme Proceeding), no other persons are presently authorized to administer foreign proceedings of the Debtor at this time.

- Mega is not party to any litigation in the United States that either is pending or for which the period for further appeal has not run as of the date of the commencement of this Chapter 15 Case.

**BASIS FOR RELIEF REQUESTED**

53.     The Court should grant the Verified Petition and recognize the English Scheme Proceeding as the foreign main proceeding for Mega.  Chapter 15 of the Bankruptcy Code was specifically designed to assist foreign representatives such as the Petitioner in the performance of his or her duties.  A central goal of Chapter 15 is to "'provide effective mechanisms for dealing with cases of cross-border insolvency,' while promoting international cooperation, legal certainty, fair and efficient administration of cross-border insolvencies, protection and maximization of debtors' assets, and the rescue of financially troubled businesses." *In re Fairfield Sentry Ltd.*, 714 F.3d 127, 132 (2d Cir. 2013) (quoting 11 U.S.C. § 1501(a)).  Each of the procedural requirements of section 1515 of the Bankruptcy Code are satisfied, as is set out in section A below.  Notably, the Petitioner is the duly appointed "foreign representative" of the English Scheme Proceeding

with respect to the Debtor, and it is well-established that English scheme proceedings are considered "foreign proceedings" for the purposes of Chapter 15. Further, the Debtor's COMI unquestionably is in England and Wales, given that the Debtor is incorporated in England and Wales.

54.     In the alternative, although Mega is confident that the English Scheme Proceeding is a foreign main proceeding within the definition of section 1502(4) of the Bankruptcy Code, if this Court declines to recognize the English Scheme Proceeding as the foreign main proceeding, Mega is eligible for nonmain recognition and relief, on the basis set out in section C below, to ensure a comprehensive restructuring of the Group's indebtedness.

55.     Further, the Court should recognize and enforce the English Scheme Proceeding, Scheme and Sanction Order. *See* <u>Exhibit C</u>, <u>Exhibit H</u>. Section 1521(a) of the Bankruptcy Code confers "exceedingly broad" discretion upon this Court to recognize and enforce the Scheme and effectuate the goals of Chapter 15 of the Bankruptcy Code. This discretion should be used to enforce the Scheme as it is in the best interest of the Debtor's creditors and other stakeholders.

**A.      <u>The Debtor is Eligible to be a "Debtor" Under Chapter 15 of the Bankruptcy Code</u>**

56.     The Debtor qualifies as a "debtor" as that term is defined in section 1502(a)(1) of the Bankruptcy Code because it is an "entity," which includes corporations. *See* 11 U.S.C. §§ 101(15) (definition of "entity," which includes a "person") and 101(41) (definition of "person," which includes a "corporation"). The Debtor is incorporated in England and Wales as a private limited company, which is a corporation under English law. *See* English Counsel Declaration ¶ 2.

57.     The Debtor has property in the United States for purposes of being eligible under section 109(a) of the Bankruptcy Code, which requires that a debtor must either reside or have a domicile, a place of business or property in the United States. 11 U.S.C. § 109(a); *see Drawbridge*

*Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238 (2d Cir. 2013) (holding that section 109(a) applies to Chapter 15 debtors). Section 109(a) of the Bankruptcy Code does not require a specific quantum of property in the United States, nor does it state when or for how long that property must be located within the United States. *See In re Berau Cap. Res. Pte. Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015). Accordingly, courts in this District have required that the debtor have only nominal property in the United States to be eligible to file a Chapter 15 case. *See, e.g., In re B.C.I. Fins. Pty Ltd.*, 583 B.R. 288, 293 (Bankr. S.D.N.Y. 2018) ("[C]ourts that have construed the 'property' requirement in Section 109 with respect to foreign corporations and individuals have found the eligibility requirement satisfied by even a minimal amount of property located in the United States.") (internal citations omitted); *In re Globo Comunicacoes e Participacoes S.A.*, 317 B.R. 235, 249 (S.D.N.Y. 2004) ("For a foreign corporation to qualify as a debtor under Section 109, courts have required only nominal amounts of property to be located in the United States, and have noted that there is 'virtually no formal barrier' to having federal courts adjudicate debtors' bankruptcy proceedings.") (internal citations omitted); *In re Paper I Partners, L.P.*, 283 B.R. 661, 674 (Bankr. S.D.N.Y. 2002) ("There is no statutory requirement as to the property's minimum value.") (citing *In re McTague*, 198 B.R. 428, 432 (Bankr. W.D.N.Y. 1996).

58.     Here, the Debtor meets the flexible threshold for having property in the United States as required under section 109(a) because it owns the funds in the Retainer Account that are held in New York. *See, e.g.*, *In re Poymanov*, 571 B.R. 24, 30 (Bankr. S.D.N.Y. 2017) ("A debtor's funds held in a retainer account in the possession of counsel to a foreign representative constitute property of the debtor in the United States and satisfy the eligibility requirements of section 109(a).") (internal citations omitted); *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 372–374 (Bankr. S.D.N.Y. 2014) (noting the "line of authority that support the fact that prepetition deposits

or retainers can supply 'property' sufficient to make a foreign debtor eligible to file in the United States" and holding that cash in a client trust account maintained by U.S. counsel to the foreign representative satisfied section 109(a)). Moreover, the Debtor is issuer under the Existing Notes Indenture, which is governed by New York law. *See, e.g., In re Avanti Commc'ns. Grp. PLC*, 582 B.R. 603, 613 (Bankr. S.D.N.Y. 2018) (holding that debt documents governed by New York law and containing New York forum selection clauses satisfied the eligibility requirements under section 109(a)); *In re Ocean Rig UDW Inc*., 570 B.R. 687, 700 (Bankr. S.D.N.Y. 2017) (same); *In re Berau*, 540 B.R. at 82–84 (same). Accordingly, the Debtor is eligible to be a Chapter 15 debtor.

**B.** **The English Scheme Proceeding is a Foreign Proceeding of Mega and the Petitioner is the Duly-Authorized Foreign Representative Thereof and has Properly Petitioned this Court for Recognition**

59. Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, the Court shall enter an order recognizing a foreign proceeding if (i) the petition meets the requirements of section 1515 of the Bankruptcy Code; (ii) the foreign representative applying for recognition is a person or body; and (iii) such foreign proceeding is a foreign main proceeding or nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code. *See* 11 U.S.C. § 1517(a); *In re Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 653 (Bankr. S.D.N.Y. 2016). These foregoing requirements are satisfied with respect to the Scheme, the English Scheme Proceeding, the Petitioner and the Verified Petition.

      i.   *The Verified Petition satisfies the requirements of section 1515 of the Bankruptcy Code*

60. Each of the procedural requirements of section 1515 of the Bankruptcy Code are satisfied. First, the Petitioner properly commenced the Chapter 15 Case in accordance with sections 1504 and 1509(a) of the Bankruptcy Code by filing the Verified Petition. *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 127 (Bankr.

S.D.N.Y. 2007) (hereinafter "Bear Stearns I"), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008) (hereinafter

"Bear Stearns II").   Second, the Petitioner has submitted all documents and other information

required by section 1515(b) of the Bankruptcy Code:  a certified copy of the a certified copy of the

Convening Order permitting Mega to convene a meeting of the Scheme Creditors and appointing

the foreign representative.[11]   Finally, the Petitioner has submitted in this Verified Petition all

information required by section 1515(c) of the Bankruptcy Code (*i.e.*, a statement by the Petitioner

identifying any other foreign proceedings known to the Petitioner with respect to Mega), together

with all other required disclosures regarding the Debtor in accordance with Bankruptcy Rules

1007(a)(4) and 7007.1.   *See supra* ¶ 52.   Accordingly, the requirements of section 1515 of the

Bankruptcy Code are satisfied.

> ii.   *The Petitioner is Mega's duly-appointed "foreign representative" of the English Scheme Proceeding*

61.     Section 1517(a) of the Bankruptcy Code also requires that a foreign representative

applying for recognition be a person or body.  *See* 11 U.S.C. § 1517(a)(2).  Here, the Petitioner is

an individual, which is included in the term "person," 11 U.S.C. § 101(41), who has been duly (i)

appointed to act as Mega's foreign representative in respect of the English Scheme Proceeding for

purposes of the Chapter 15 Case, and (ii) authorized to commence the Chapter 15 Case.   *See*

Exhibit F.  As explained in the English Counsel Declaration, the Companies Act authorizes the

Debtor to administer the reorganization of its assets and affairs, and to run its business during the

course of the English Scheme Proceeding.  English Counsel Decl. ¶ 29.  On November 15, 2024,

Mega's sole director duly appointed the Petitioner to serve as the foreign representative in this

Chapter 15 Case in conjunction with the English Scheme Proceeding, and on November 21, 2024,

---

[11]      A true and correct copy of the Convening Order is attached hereto as Exhibit E.

the English Court further made an order appointing the Petitioner as the foreign representative in conjunction with the English Scheme Proceeding and thus sections 101(24) and 1517(a)(2) of the Bankruptcy Code are satisfied.  *See In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 270 (Bankr. S.D.N.Y. 2019) (finding a foreign representative appointed pursuant to resolution of the debtors' boards is a proper "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code meeting the requirements of 1517(a)(2) of the Bankruptcy Code); Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief, *In re Oi S.A.*, No. 16-11791 (Bankr. S.D.N.Y. July 22, 2016), ECF No. 38; *In re OAS S.A.*, 533 B.R. 83, 93–95 (Bankr. S.D.N.Y 2015) (holding that the Bankruptcy Code does not require the judicial authorization or appointment of the foreign representative).[12]

### iii. *The English Scheme Proceeding is a foreign proceeding*

62.    The English Scheme Proceeding is a "foreign proceeding," as required under section 1517(a) of the Bankruptcy Code.  *See* 11 U.S.C. § 1517(a)(1) (requiring as a condition to the entry of a recognition order, the English Scheme Proceeding must be a foreign main proceeding or nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code).  A "foreign proceeding" is (i) a collective judicial or administrative proceeding under a law relating to insolvency or adjustment of debt; (ii) pending in a foreign country; (iii) in which the assets and affairs of the debtor are subject to control or supervision of a foreign court; and (iv) for the purpose of reorganization or liquidation.  *See* 11 U.S.C. § 101(23).  Some bankruptcy courts have separated the four statutory factors into seven elements, including "(i) [the existence of] a proceeding; (ii)

---

[12]    *See also In re Vitro, S.A.B. de C.V.,* 470 B.R. 408 (Bankr. N.D. Tex. 2012), *aff'd*, 701 F.3d 1031 (5th Cir. 2012) (holding that an individual appointed as foreign representative by the debtor's board in anticipation of a Mexican concurso proceeding, which contemplates self-management by the debtor during the proceeding similar to that of a debtor-in-possession, fit within the scope of the Bankruptcy Code's definition of "foreign representative," and recognizing the individual as the foreign representative).

that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign country; (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (vii) which proceeding is for the purpose of reorganization or liquidation." *In re Ashapura Minechem Ltd.*, 480 B.R. 129, 136 (Bankr. S.D.N.Y. 2012) (quoting *In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)). The Bankruptcy Code defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding." 11 U.S.C. § 1502(3).

63.    The English Scheme Proceeding meets all four or seven elements of the foreign proceeding test. First, the Scheme meets the definition of a "proceeding." In this case, the statutory framework is Part 26 of the Companies Act, which sets forth the requirements for Mega to petition the English Court to initiate and implement a process by which the rights of its Scheme Creditors may be adjusted by way of a compromise or arrangement. *See* English Counsel Declaration ¶¶ 1, 12. The Scheme will take place in England and Wales and is subject to the provisions of the Companies Act. Mega will be under the supervision and direction of the English Court up to and including final approval of the Scheme by entry of an order sanctioning the Scheme. *Id.* In light of the fact that the US Bankruptcy Court has granted Chapter 15 recognition to scheme of arrangement proceedings under laws similar to and including the Companies Act, including to scheme of arrangement proceedings in England and Wales and other countries that follow the English law tradition, it is virtually certain that the Scheme will qualify as a "proceeding" under section 101(23). *See, e.g.*, Order Granting Recognition and Related Relief, *In re KCA Deutag UK Fin. PLC*, No. 20-12433 (Bankr. S.D.N.Y. Nov. 6, 2020), ECF No. 24; Order (1) Recognizing Foreign Proceeding, (2) Giving Effect to Scheme and Sanction Order, and (3)

Granting Related Relief, *In re New Look Fin. PLC*, No. 20-12297 (Bankr. S.D.N.Y. Oct. 29, 2020),

ECF No. 19; Order Granting (I) Recognition of Foreign Main Proceeding, (II) Recognition of

Foreign Representative, (III) Recognition of Sanction Order and Related Scheme, and (IV) Related

Relief Under Chapter 15 of the Bankruptcy Code, *In re Codere Fin. 2 (UK) Ltd.*, No. 20-12151

(Bankr. S.D.N.Y., Oct. 9, 2020), ECF No. 12; Order Granting (I) Recognition of Foreign Main

Proceeding, (II) Recognition of Foreign Representative, (III) Recognition of Sanction Order and

Related Scheme, and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code, *In re Matalan

Fin. PLC*, No. 20-11749 (Bankr. S.D.N.Y. Sep. 2, 2020), ECF No. 16; Order Granting Petition for

Recognition of Foreign Main Proceeding and Request for Related Relief, *In re HEMA UK I Ltd.*,

No. 20-11936 (Bankr. S.D.N.Y. Sep. 14, 2020), ECF No. 11; Order Recognizing Foreign

Proceeding and United Kingdom Scheme of Arrangement and Granting Related Relief, *In re Lecta

Paper UK Ltd.*, No. 19-13990 (Bankr. S.D.N.Y. Feb. 4, 2020), ECF No. 12; Order Recognizing

Foreign Proceeding and Granting Related Relief, *In re New Look Secured Issuer PLC*, No. 19-

11005 (Bankr. S.D.N.Y. May 3, 2019), ECF No. 14; Order Granting Petition for Recognition of

Foreign Main Proceeding and Motion for Related Relief, *In re New World Res. N.V.*, No. 14-12226

(Bankr. S.D.N.Y. Sept. 9, 2014), ECF No. 20; Order Granting Petition for Recognition of Foreign

Main Proceeding and Motion for Related Relief, *In re Magyar Telecom B.V.*, No. 13-13508, 2013

WL 10399944 (Bankr. S.D.N.Y. Dec. 11, 2013), ECF No. 26; Order Granting Motion Pursuant

to Bankruptcy Codes Sections 1521 and 105(a) and Fed. R. Bankr. P. 7065 for Permanent. Inj. and

Related Relief, *In re Highlands Ins. Co. (U.K.) Ltd. (in administration)*, No. 07-13970 (Bankr.

S.D.N.Y. Aug. 18, 2009), ECF No. 40.[13]

---

[13]     *See also* Order Granting Petition for Recognition of Foreign Main Proceeding and Motion for Related Relief,
*In re Swissport Fuelling Ltd.*, No. 20-12990 (Bankr. D. Del. Dec. 11, 2020), ECF No. 38; Order Granting Petition for
(I) Recognition as Foreign Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under

64.     Second, the English Scheme Proceeding is judicial in nature.  A proceeding is deemed "judicial[ ] in nature" under section 101(23) where the proceeding is subject to review by a court.  *Betcorp Ltd.*, 400 B.R. at 280–81; *accord In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010).  An order of the English Court is required in order to convene a scheme meeting of affected creditors and the English Court must sanction (approve) a scheme before the scheme can become effective.  *See* English Counsel Declaration ¶ 30.  Because the procedures established by the Companies Act mean that involvement and oversight of the English Court is required to implement a scheme of arrangement procedure, the Scheme clearly qualifies as "judicial in nature" under section 101(23).

65.     Third, the English Scheme Proceeding is "collective." Collective proceedings may include a variety of collective proceedings.  See *ABC Learning Ctrs. Ltd.*, 445 B.R. at 328 ("A proceeding is collective if it considers the rights and obligations of all creditors.") (citing *Betcorp Ltd.,* 400 B.R. at 281); *In re Avanti*, 582 B.R. at 614 ("The UK Proceeding [a scheme of arrangement] fits the definition of a "foreign proceeding" in section 101(23) of the Bankruptcy Code as a collective proceeding for the adjustment of debt supervised by a judicial authority.").  The English Scheme Proceeding is collective because it is conducted for the benefit of Mega's creditors and other stakeholders as a whole and provides due process to all parties whose rights and interests will be affected.  It also concerns all creditors under the Existing Notes.

---

Chapter 15 of the Bankruptcy Code, *In re Selecta Fin. UK Ltd. and Selecta Grp. B.V.*, No. 20-34947 (Bankr. S.D. Tex. Oct. 30, 2020), ECF No. 61; Order Granting Petition for Recognition of Foreign Main Proceeding and Motion for Related Relief, *In re Swissport Fuelling Ltd.*, No. 20-11524 (Bankr. D. Del. July 6, 2020), ECF No. 37; Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief, *In re Syncreon Auto. (U.K.) Ltd.*, No. 19-11702 (Bankr. D. Del. Sep. 11, 2019), ECF No. 37; Order Recognizing Foreign Proceeding and Granting Related Relief, *In re Stripes US Holding, Inc.*, No. 18-12388 (Bankr. D. Del. Nov. 13, 2018), ECF No. 23; Order Recognizing Foreign Proceeding and Granting Additional Relief, *In re hibu, Inc.*, No. 14-70323 (Bankr. E.D.N.Y. Feb. 27, 2014), ECF No. 29.

66.     Fourth, the English Scheme Proceeding is in a foreign country.  It is taking place in England and Wales, all before the English Court.  There can be no dispute that this element of the section 101(23) analysis is satisfied.

67.     Fifth, the English Scheme Proceeding is under a law "relating to insolvency or adjustment of debt."  The Companies Act is the law that governs an arrangement or compromise that may be proposed to be entered into by a company with its creditors or members or any class of creditors or members.  In this context, the Companies Act functions as a law relating to adjustment of debt.  *See* English Counsel Declaration ¶¶ 12, 13.

68.     Sixth, the assets and affairs of Mega are subject to the control or supervision of a foreign court.  Section 1502(3) defines "foreign court" as a "judicial or other authority competent to control or supervise a foreign proceeding."  11 U.S.C. § 1502(3).  By virtue of the applicable provisions of the Companies Act, the English Court has direct supervisory authority over the Scheme.  *See* English Counsel Declaration ¶ 17.  In light of the direct involvement of the English Court in considering the applications to convene the Scheme Meetings and entering the Convening Order and the requirement that the English Court ultimately sanction (approve) the Scheme, the Scheme certainly meets this element of the section 101(23) analysis.

69.     Seventh, and finally, the English Scheme Proceeding is for the purpose of reorganization.  Courts will often look to the debtor's own description of the proceeding to determine whether they are for the purpose of reorganization or liquidation.  *Betcorp Ltd.,* 400 B.R. at 284–85 (noting that directors' minutes stated that winding-up was for the purpose of liquidation).  This Petition itself clearly states that the purpose of the English Scheme Proceeding is for the purpose of reorganization.[14]

---

[14]     See *supra* ¶ 19.

**C.**    **The Court Should Find that the English Scheme Proceeding Is a
"Foreign Main Proceeding"**

70.    The English Scheme Proceeding is also the "foreign main proceeding" of the

Debtor because it is pending in England and Wales, which is Mega's COMI.  *See* 11 U.S.C. §

1502(4); 11 U.S.C. § 1517(b)(1) (a foreign main proceeding is the foreign proceeding subject to

the petition "pending in the country where the debtor has the center of its main interests").

      i.    *A COMI analysis under U.S. law focuses on where a debtor's business
         interests are principally centered*

71.    Neither the Bankruptcy Code nor the UNCITRAL Model Law on Cross-Border

Insolvency (the "Model Law") defines COMI.  However, there is a rebuttable presumption that a

debtor's COMI is its "registered office."  11 U.S.C. § 1516(c).  Where any "evidence to the

contrary" is presented, courts must "examine all of the evidence to determine where [debtor's]

center of main interest lies."  *Collins v. Oilsands Quest Inc.*, 484 B.R. 593, 595 (Bankr. S.D.N.Y.

2012).

72.    A COMI analysis looks at the debtor's substantive "locus of operations"—the

center of its operations, purpose, function, and activities, among others.  *See Phoenix Four, Inc. v.

Strategic Res. Corp.*, 446 F. Supp. 2d 205, 214–15 (S.D.N.Y. 2006).  Some courts interpret COMI

to mean "principal place of business" to guide their COMI analysis.  *See, e.g.*, *In re Millennium

Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 72 (Bankr. S.D.N.Y. 2011).  However, the

Second Circuit has noted "[g]iven Congress's choice to use COMI instead of 'principal place of

business,' that concept [of principal place of business] does not control the analysis.  But to the

extent that the concepts are similar, a court may certainly consider a debtor's 'nerve center,'

including from where the debtor's activities are directed and controlled."  *See In re Fairfield Sentry

Ltd.*, 714 F.3d 127, 138 n.10 (2d Cir. 2013).

73.     Courts in this Circuit employ a list of nonexclusive factors adopted from *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006) to rebut the "registered office" presumption or, where the presumption does not govern, to determine the location of a debtor's "locus of operations" for purposes of establishing its COMI.  They include:

> "[T]he location of the debtor's headquarters; the location of those who actually manage the debtor (which conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes."
>
> *Fairfield Sentry*, 714 F.3d at 137 (citing *SPhinX, Ltd.*, 351 B.R. at 117).

74.     The Court of Appeals for the Second Circuit added as additional possible factors "the location of headquarters, decision-makers, assets, creditors, and the law applicable to most disputes."  *Id.* at 130.  These factors, the Court of Appeals reasoned, are "in the public domain" and thus "ascertainable [and] not easily subject to tactical removal."  *Id.* at 136–38 (noting the "importance of factors that indicate regularity and ascertainability"); *see also In re Brit. Am. Ins. Co. Ltd.*, 425 B.R. 884, 912 (Bankr. S.D. Fla. 2010) (finding that the "location of a debtor's COMI should be readily ascertainable by third parties").

75.     Mega's registered office is in England and Wales.  Thus, Mega is entitled to the "registered office" presumption codified in section 1516(c) of the Bankruptcy Code that its COMI is in England and Wales.  There is no relevant evidence to rebut this presumption and, in any event, an evaluation of the hallmark COMI factors further supports the presumption and a finding of Megas's COMI in England and Wales.

76.     In addition, Mega is party to the Deed Poll, Deed of Contribution, and the Standstill and Lock-Up Agreement dated November 11, 2024 between the Parent, Mega, and certain Existing Noteholders (referred to as the Consenting Noteholders therein), which are each governed by English law.

77.     Mega has no substantial operations.  The Group, excluding Mega, is headquartered in Mexico.  However, recognition under Chapter 15 does not consider the COMI of the Group but is limited to consideration of the specific entity that is the debtor in a foreign proceeding.  *Servicos de Petróleo Constellation S.A.*, 600 B.R. at 279 ("…each debtor entity must be considered, rather than making a top-down decision on the basis of the COMI of the parent company of the group."). Consequently, the evidence supports the Mega's English COMI and no evidence refutes the presumption that the Mega's COMI is in England and Wales.

78.     In determining COMI, courts in this district have considered several factors denominated in the case of *In re SphinX, Ltd.*,[15] decided in the year after the 2005 effective date of Chapter 15 but cautioned that "[t]his nonexclusive list [in *SphinX*] is a helpful guide, but consideration of these specific factors is neither required nor dispositive."  *In re Fairfield Sentry Ltd.*, 714 F.3d 127, 137 (2d Cir. 2013).  Fairfield Sentry also held that (a) the proper date to measure a debtor's COMI is the date of the filing of the Chapter 15 petition and (b) consideration of Chapter 15's international origin, as mandated by section 1508, warrants reference to "the EU Regulation enacting the European Union Convention on Insolvency [which] explains that COMI 'should correspond to the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties.'"  *Id.* at 138 (citation omitted).  *See also In re Tri-Cont'l Exch. Ltd.*, 349 B.R. 627, 633 (Bankr. E.D. Cal. 2006); *In re JSC BTA Bank*, 434 B.R. 334, 340 (Bankr. S.D.N.Y. 2010) ("Section 1508 represents an instruction to take into account

---

[15]     *In re SphinX, Ltd.,* 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006) ("Various factors, singly or combined, could be relevant to such a determination: the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.")

more than the words used within a particular section of Chapter 15 . . . This is the one chapter of the Bankruptcy Code predicated on the concept of international cooperation and that encourages bankruptcy courts to look beyond the shores of the United States for interpretative guidance."). Similarly, U.S. bankruptcy courts have also held a debtor's center of main interests to be the location that third parties would objectively consider to be the location where the debtor is conducting the administration of its affairs.  *See*, *e.g., Serviços de Petróleo S.A.*, 600 B.R. at 274 (considering, inter alia, third party expectations and expectations of creditors); *In re Brit. Am. Ins. Co.*, 425 B.R. at 912 ("The location of a debtor's COMI should be readily ascertainable by third parties").  The facts supporting Mega's English COMI demonstrate that its COMI is ascertainable by third parties**.**

**D.**      **In the Alternative, the Court Should Find that the English Scheme Proceeding is at Least a Foreign Nonmain Proceeding of the Debtor**

79.      As demonstrated above, the English Scheme Proceeding should be recognized as the "foreign main proceeding."  Nevertheless, should this Court conclude that the English Scheme Proceeding is not the foreign main proceeding, the Foreign Representative submits that, in the alternative, (i) the English Scheme Proceeding should be recognized as a "foreign nonmain proceeding" within the meaning of section 1502(5) of the Bankruptcy Code and that, consequently, (ii) pursuant to section 1517(b)(2) of the Bankruptcy Code, discretionary relief should be granted, namely, the application of a protective stay to the full extent set forth in section 362 of the Bankruptcy Code with respect to Mega and its U.S.-located property.  11 U.S.C. §§ 1517(b)(2), 1521(a)(6).

        i.  *The factors for recognition of foreign nonmain proceedings under U.S.*
*law*

80.    Courts recognize a foreign proceeding as a "foreign nonmain proceeding" where

the debtor has an "establishment" in the foreign country where the proceeding is pending.

"Establishment" is defined in the Bankruptcy Code as "any place of operations where the debtor

carries out a nontransitory economic activity." 11 U.S.C. § 1502(2). Unlike COMI, Chapter 15

of the Bankruptcy Code provides no evidentiary presumption as to whether a debtor has an

establishment in a particular jurisdiction. *Bear Stearns II*, 389 B.R. 325, 338 (S.D.N.Y. 2008).

Thus, whether an "establishment" exists in a particular location is "essentially a factual question,"

*id.*, and the petitioner bears the burden of proof. *Brit. Am.*, 425 B.R. at 915.

81.    The Bankruptcy Code does not define "nontransitory economic activity," and, as a

Bankruptcy Court in this District has noted, "[t]here is relatively little U.S. authority construing

the term 'establishment' as it is used in Chapter 15." *Millennium Glob.*, 458 B.R. at 84. Courts

have interpreted the meaning of "establishment" in the context of the purpose of Chapter 15 and the

Model Law, and by looking to the meaning ascribed to such term by foreign courts. *See, e.g.*,

*Millennium Glob.*, 458 B.R. at 84 n.49; *Bear Stearns I*, 374 B.R. 122, 131 n. 12 (Bankr. S.D.N.Y.

2007). The limited number of U.S. courts to consider the question have determined a debtor has an

"establishment" in a place where it has operations, conducts business, or otherwise carries out a

nontransitory economic activity in that jurisdiction. *See, e.g.*, *In re Fairfield Sentry Ltd.*, No. 10 Civ.

7311 (GBD), 2011 WL 4357421, at *10 n.8 (S.D.N.Y. Sept. 16, 2011) (describing an establishment

as "a local place of business"); *Bear Stearns I*, 374 B.R. at 131; *In re Creative Fin. Ltd.*, 543 B.R.

498, 520 (Bankr. S.D.N.Y. 2016); *British Am.*, 425 B.R. at 916. Several factors "contribute to

identifying an establishment: the economic impact of the debtor's operations on the market, the

maintenance of a 'minimum level of organization' for a period of time, and the objective appearance

to creditors whether the debtor has a local presence." *Millennium Glob.*, 458 B.R. at 85. A showing of economic impact of the debtor's activities on the local market involves a "showing of a local effect on the marketplace," *Creative Fin.*, 543 B.R. at 520; *British Am.*, 425 B.R. at 915 (same), evidenced by, among other things, "retain[ing] local counsel and [a] commitment of capital to local banks." *Millennium Glob.*, 458 B.R. at 85.

> ii. *The Debtor has an establishment in England and Wales and therefore qualifies for foreign nonmain recognition*

82.     If the Court were to find that England and Wales is not Mega's COMI, the Court should still find that Mega has an establishment in England and Wales for purposes of Chapter 15 recognition. The Petitioner submits that the foregoing evidence in support of finding that Mega's COMI is in England and Wales also provides conclusive evidence that Mega has an establishment in that jurisdiction. *See supra* ¶¶ 70–78.

**E.     Enforcement of the Sanction Order and Scheme and Related Relief**

83.     The Foreign Representative respectfully seeks entry of an order recognizing and enforcing the Scheme and entrusting to the Foreign Representative the administration, realization, and distribution of the Debtor's and Parent's assets within the territorial jurisdiction of the United States, in each case, pursuant to sections 1521(a) and (b), 1507 and 105 of the Bankruptcy Code. The explanatory statement containing an explanation of the terms of the Scheme and additional background with respect to the English Scheme Proceeding (the "Explanatory Statement") is annexed as Exhibit D.[16]

---

[16]     *See supra* Section ¶¶ 108–110.

i.   *Applicable Standards*

a.   Section 1521(a)

84.     Section 1521(a) of the Bankruptcy Code confers "exceedingly broad" discretion upon this Court to recognize and enforce the Scheme and effectuate the goals of Chapter 15.  *In re Avanti Commc'ns. Grp. PLC*, 582 B.R. 603, 612 (Bankr. S.D.N.Y. 2018) (citing Hon. Leif M. Clark, Ancillary and Other Cross-Border Insolvency Cases Under Chapter 15 of the Bankruptcy Code, § 7[2], at 70 (2008)).   Section 1521(a) of the Bankruptcy Code provides that, upon recognition of a foreign proceeding, a Court may grant "any appropriate relief," including staying the commencement or continuation of individual actions concerning the debtor's assets, rights, obligations, or liabilities; staying execution against the debtor's assets; suspending the right to transfer, encumber, or otherwise dispose of any assets of the debtor; and, with limited exceptions, granting any additional relief that may be available to a debtor-in-possession.  *See* 11 U.S.C. § 1521(a).  Notably, section 1521(a) does not purport to provide an exhaustive list of available relief and courts have found that relief may still be "appropriate" within the meaning of section 1521(a) without being enumerated therein, so long as it was available under Chapter 15's predecessor statute, 11 U.S.C. § 304.  *See In re Vitro* S.A.B. de CV, 701 F.3d 1031, 1054 (5th Cir. 2012). Courts routinely rely on section 1521(a) to grant full force and effect to a foreign debtor's confirmed reorganization plan.  *See, e.g.,* Order Pursuant to §§ 105(a), 1507(a), 1521(a) and 1525(a) (I) Enforcing the Odebrecht Finance Ltd. Plan and (II) Related Relief, *In re Odebrecht S.A.*, No. 19-12731 (MEW) (Bankr. S.D.N.Y Dec. 30, 2020) (relying on Section 1521(a) to grant full force and effect to an Scheme); Order Granting Certain Relief Related to Recognition of Foreign Main Proceeding, *In re PT Berlian Laju Tanker Tbk*, No. 13-10901 (SMB) (Bankr. S.D.N.Y. Jan. 8, 2015), ECF No. 43 (relying on Section 1521(a) to grant full force and effect to a

PKPU plan); *In re CGG S.A.*, 579 B.R. 716, 719 (Bankr. S.D.N.Y. 2017) ("Appropriate relief under section 1521 includes enforcing a foreign confirmation order.").

85.    In assessing whether to grant relief under section 1521(a), courts are compelled to consider whether "the interests of the creditors [and other interested entities, including the debtor,] are sufficiently protected." 11 U.S.C. § 1521(b). Although the Bankruptcy Code does not expressly define "sufficiently protected," the legislative history indicates that relief should be granted unless "it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors." H.R. Rep. No. 109 31, pt. 1, at 116 (2005). As a result, courts typically have focused on the procedural fairness of the foreign proceeding in order to determine whether creditors are sufficiently protected. See, e.g., In re Metcalfe & Mansfield Alt. Invs., 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010). As detailed below, these procedural requirements are satisfied by the English Scheme Proceeding.

### b.  Section 1507

86.    In addition to section 1521(a), section 1507(a) provides that courts may provide "additional assistance" to a foreign representative under the Bankruptcy Code or other applicable U.S. law. 11 U.S.C. § 1507(a). In determining whether to provide additional assistance under this title, courts must adhere to the "principles of comity" and weigh the following five factors:

> (1) just treatment of all holders of claims against or interests in the debtor's property; (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding; (3) prevention of preferential or fraudulent dispositions of property of the debtor; (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

> 11 U.S.C. § 1507(b).

87.     Although the interplay between the relief available under sections 1507 and 1521 is "far from clear," *see In re Atlas Shipping A/S*, 404 B.R. 726, 741 (Bankr. S.D.N.Y. 2009), courts in this Circuit follow a three-part analysis to assess which provision to use in granting relief in cases brought under Chapter 15 of the Bankruptcy Code. *In re Rede Energia S.A.*, 515 B.R. 69, 90–91 (Bankr. S.D.N.Y. 2014) (quoting *Vitro S.A.B*, 701 F.3d at 1054). Courts first consider whether the relief sought is within the express categories of relief available under Section 1521. *Id*. If not, courts consider whether the relief sought falls within the more general "any appropriate relief" provision of section 1521(a), which involves determining whether the relief in question would have been available under the now-repealed Section 304 of the Bankruptcy Code, or otherwise under U.S. law. *Id*. If the relief was not so available, courts will then turn to section 1507 to determine whether, after consideration of the factors identified in section 1507(b)(1)–(5), such relief is appropriate. *Id*.; *see also In re Sino-Forest Corp.*, 501 B.R. 655, 663 n.3 (Bankr. S.D.N.Y. 2013).

c.  Section 105(a)

88.     In addition to sections 1507 and 1521, courts also have broad authority under section 105(a) to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105(a) provides the court the "discretion to accommodate the unique facts of a case consistent with the policies or directives set by the other applicable substantive provisions of the Bankruptcy Code." *In re Oi Brasil Holdings Cooperatief U.A.*, 578 B.R. 169, 201 (Bankr. S.D.N.Y. 2017), *reconsideration denied*, 582 B.R. 358 (Bankr. S.D.N.Y. 2018). Under this section, the standard for appropriate action is whether the exercise of discretion would contravene another section of the Bankruptcy Code. *Id*.

    ii.  *Analysis*

      a.  Enforcement of the Scheme and Sanction Order Is Relief Available Under Section 1521

89.    It is well established that, although enforcement of a foreign reorganization plan and judgment is not within the specifically enumerated forms of relief available under section 1521(a), it is squarely within the broader "any appropriate relief" provision. *See In re Oi S.A.,* 587 B.R. 253, 265 (Bankr. S.D.N.Y. 2018); *Rede Energia*, 515 B.R. at 93; *see also CGG*, 579 B.R. at 719 ("Appropriate relief under section 1521 includes enforcing a foreign confirmation order."). This is true because such relief is available both under Section 304 and under existing U.S. law, in particular chapter 11 of the Bankruptcy Code. *See, e.g., In re Bd. of Dirs. of Telecom Arg., S.A.*, 528 F.3d 162, 174–75 (2d Cir. 2008) (Sotomayor, then-C.J.) (confirming an Argentine reorganization plan under then-operative section 304); *see also Rede Energia*, 515 B.R. at 93–94 (citing section 304 and collecting citations under chapter 11 that, collectively, authorize the discharge of debt administered by a confirmed plan and the enjoining of actions in contravention of a confirmed plan and holding that such relief is therefore "proper under Section 1521"); *see Oi S.A.*, 587 B.R. at 266 (same). As a result, there can be little doubt that the Relief Requested by the Petitioner falls within the scope of the Court's authority under Section 1521.

90.    As discussed above, in determining whether a request for relief under section 1521 is proper, courts consider whether the interests of creditors and interested parties have been sufficiently protected which, in turn, calls for an analysis of the procedural fairness of the process that led to the plan or order in question. The Court of Appeals for the Second Circuit considers the following "'indicia of procedural fairness': (1) whether creditors of the same class are treated equally in the distribution of assets; (2) whether the liquidators are considered fiduciaries and are held accountable to the court; (3) whether creditors have the right to submit claims which, if

denied, can be submitted to a bankruptcy court for adjudication; (4) whether the liquidators are required to give notice to the debtors['] potential claimants; (5) whether there are provisions for creditors meetings; (6) whether a foreign country['s] insolvency laws favor its own citizens; (7) whether all assets are marshalled before one body for centralized distribution; and (8) whether there are provisions for an automatic stay and for the lifting of such stays to facilitate the centralization of claims." *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 249 (2d Cir. 1999).  As these indicia make clear, this analysis turns on a general sense of fairness rather than any requirement that a foreign plan was confirmed in accordance with U.S. law.  *See, e.g., id.* (holding that English insolvency proceeding was procedurally fair despite not requiring individualized notice to creditors).

91.    The record before the Court firmly establishes that the English Scheme Proceeding, that will lead to the creation and ultimate approval of the Scheme sufficiently protects the interests of all creditors and interested parties according to these indicia.  For example:

    i.  Consensual approval of the English Scheme Proceeding requires votes from a majority in number (i.e. more than 50%) representing at least 75% in value of the Scheme Creditor (or each class of creditors) present and voting, either in person or by proxy at the Scheme Meeting.  English Counsel Declaration ¶ 33.

    ii.  Creditors were given access to information and a meaningful opportunity to be heard in the English Scheme Proceeding.  English Counsel Declaration ¶ 14.

    iii.  Scheme Creditors have the right to appeal orders of the High Court, including orders in respect of sanctioning the Scheme within a certain period of time following the sanction hearing and are requested to raise the possibility of the appeal with the judge prior to the sanction order being made.  English Counsel Declaration ¶ 28.

    iv.  The Scheme has only one class of Scheme Creditors and therefore there will be no different treatment between certain unsecured creditors. English Counsel Declaration ¶ 16.

92.     The English Scheme Proceeding will follow the above procedures and provide, among other protections, extensive notice to all creditors; multiple opportunities for creditors to participate in discussions with Mega and other stakeholders with respect to their claims and the Scheme; a mechanism for challenging the treatment of their claims presided over by the supervising judge; the right to object to the Scheme; a right to vote on the Scheme; and a right to appeal the Scheme's confirmation. *See* English Counsel Declaration ¶¶ 6, 26–28. Further, courts in this district have previously held enforcement of English reorganization plans with similar procedures as proper under sections 1521 and 1507 of the Bankruptcy Code. *See In re Avanti*, 582 B.R. at 618 (recognizing and enforcing U.K. scheme of arrangement and finding that "[t]he proceedings under UK law in the UK courts afford creditors a full and fair opportunity to be heard in a manner consistent with US due process standards").

> b.  The General Principles of Comity Motivating Chapter 15 Support the Relief Requested

93.     In addition to the Relief Requested being appropriate under the "any appropriate relief" provision of section 1521(a), the "principles of comity" enshrined in section 1507(b) also support such relief for all the reasons described above. 11 U.S.C. § 1507(b) (instructing the court to make determinations "consistent with the principles of comity"); *In re Toft*, 453 B.R. 186, 190 (Bankr. S.D.N.Y. 2011). One of the underlying objectives of Chapter 15 is to encourage comity and cooperation between courts of the United States, trustees, debtors, and the courts and other competent authorities of foreign countries involved in cross-border insolvency cases. 11 U.S.C. § 1501(a)(1); *see also CT Inv. Mgmt. Co., LLC v. Cozumel Caribe, S.A. de C.V. (In re Cozumel Caribe, S.A., de C.V.)*, 482 B.R. 96, 113 (Bankr. S.D.N.Y. 2012) ("A central tenet of Chapter 15 is the importance of comity in cross-border insolvency proceedings."). Moreover, the Supreme Court of the United States has long recognized the necessity of giving effect to foreign

restructuring plans to further the goal of comity.  *Can. S. Ry. Co. v. Gebhard*, 109 U.S. 527, 539 (1883).

94.     In this Court, "[c]omity will be granted to the decision or judgment of a foreign court if it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated," *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 457 (2d Cir. 1985) (relying on *Hilton v. Guyot*, 159 U.S. 113, 202–03 (1895)), including where the foreign court order has the effect of compromising or extinguishing debt governed by New York law.  *See In re Mod. Land (China) Co., Ltd.*, 641 B.R. 768 (Bankr. S.D.N.Y. 2022) ("Provided that the foreign court properly exercises jurisdiction over the foreign debtor in an insolvency proceeding, and the foreign court's procedures comport with broadly accepted due process principles, a decision of the foreign court approving a scheme or plan that modifies or discharges New York law governed debt is enforceable.").  The comity inquiry rests on the tenets of due process and procedural fairness, *Cunard*, 773 F.2d at 457, and the Second Circuit has focused on the following non-exclusive list of factors as indicia thereof: (1) whether creditors of the same class are treated equally in the distribution of assets; (2) whether the liquidators are considered fiduciaries and are held accountable to the court; (3) whether creditors have the right to submit claims which, if denied, can be submitted to a bankruptcy court for adjudication; (4) whether the liquidators are required to give notice to the debtors['] potential claimants; (5) whether there are provisions for creditors meetings; (6) whether a foreign country's insolvency laws favor its own citizens; (7) whether all assets are marshalled before one body for centralized distribution; and (8) whether there are provisions for an automatic stay and for the lifting of such stays to facilitate the centralization of claims. *Finanz AG Zurich*, 192 F.3d at 249.

The hallmarks of procedural fairness under the Second Circuit's test in *Finanz* are also present in

the English Scheme Proceeding:

> i.  the English Scheme Proceeding involves extensive notice procedures. Specifically, the Companies Act requires that give notice of the intended promotion of the Scheme to all such scheme creditors so as to give them the opportunity to attend the initial hearing to raise any objections related to the proposed classification of the affected scheme creditors or any issues relating to the jurisdiction of the High Court to hear the scheme. English Counsel Declaration ¶ 14, 33;

> ii. each class of creditors included within the scheme is required to approve the scheme. The class test is based on similarity or dissimilarity of legal rights of the scheme creditors against the debtor company, both as they exist before the scheme and pursuant to the terms of the scheme. The class test is not based upon a similarity of economic interests or objectives. Creditors whose rights are so dissimilar that they cannot consult together with a view to their common interest must be placed into separate classes for voting purposes and must be given separate meetings to consider and vote on the scheme. In the proposed Scheme, only one class of creditors is affected. English Counsel Declaration ¶ 15;

> iii. consensual approval of the English Scheme Proceeding requires votes from a majority in number (i.e. more than 50%) representing at least 75% in value of the Scheme Creditor (or each class of creditors) present and voting, either in person or by proxy at the Scheme Meeting. English Counsel Declaration ¶ 33; and

> iv. the English Scheme Proceeding is a collective mechanism where all assets and debts are marshalled before and subject to the oversight of the High Court. English Counsel Declaration ¶ 12.

95.     In sum, principles of comity support granting the relief requested. Federal courts

generally extend comity "whenever the foreign court had proper jurisdiction and enforcement does

not prejudice the rights of United States citizens or violate domestic public policy." *See Victrix*

*S.S. Co. S.A., v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987) (citing *Hilton v. Guyot*,

159 U.S. at 202-03); *see also Cunard*, 773 F.2d at 456–57; *Atlas Shipping*, 404 B.R. at 733. Courts

have routinely found that the Companies Act is consistent with U.S. policy and provides creditors

meaningful protections similar to those provided under U.S. law. *See supra* ¶¶ 110–112. The

English Scheme Proceeding is not contrary or prejudicial to the interests of creditors in the United

States. The doctrine of comity therefore supports the granting of permanent relief enforcing the

Scheme and the Sanction Order under sections 105(a), 1507, and/or 1521.

> c. Direction, Releases and Exculpation of Released Parties and Authorization
> of Authorized Parties

96. Pursuant to sections 105(a), 1507(a), and 1521(a) of the Bankruptcy Code, the

Foreign Representative seeks additional assistance from the Court in authorizing and directing the

Released Parties and Authorized Parties to carry out all administrative actions required of them

pursuant to the Scheme and Sanction Order or that are necessary to consummate the terms of the

Scheme and Sanction Order.

97. In accordance with the Scheme, which requires that the Proposed Order include

authorization for the cancellation of Existing Notes and full payment of fees and expenses for the

Existing Notes Trustee specifically, the Foreign Representative seeks assistance from the Court in

authorizing and directing the Authorized Parties to take all actions necessary to promptly (a)

memorialize and mechanically implement the cancellation of the Existing Notes as contemplated

by the Scheme, (b) take any further actions necessary to effect the release of the Existing

Noteholders' interests under the indenture governing the Existing Notes (the "Indenture") (c)

discharge and terminate the Existing Notes and (d) issue the New Notes. By providing this relief,

the Court will give the Released Parties clear authorization under U.S. law to carry out the

requirements of the Scheme in accordance with the Companies Act and the Sanction Order. The

Foreign Representative also requests that the Released Parties be released of and exculpated for

liability for actions or omissions in connection with the consummation of the Scheme (other than

acts or omissions that are determined by a final order to have constituted gross negligence or

fraud). Releasing and exculpating the Released Parties is appropriate to prevent interference with

the consummation of the Scheme, and in particular the cancellation of the Existing Notes and the issuance of the New Shares and the New Notes. Similar relief has been granted in other Chapter 15 cases. *See, e.g.,* Order (I) Granting Full Force and Effect in the United States to the Brazilian EJ Plan and (II) Granting Related Relief, *In re Andrade Gutierrez Engenharia S.A.*, No. 22-11425 (MG) (Bankr. S.D.N.Y Dec. 2, 2022), ECF No. 41; Order Granting Recognition of the Brazilian RJ Proceeding and Certain Related Relief, *In re U.S.J. – Açúcar e Álcool* S.A., No. 22-10320 (DSJ) (Bankr. S.D.N.Y. Apr. 14, 2022), ECF No. 21; Order Granting Foreign Representatives' Motion Pursuant to Sections 105(a), 1507, 1509(b)(2)-(3), 1521(a) and 1525(a) of the Bankruptcy Code for an Order Giving Full Force and Effect to Cayman Scheme of Arrangement, *In re Luckin Coffee Inc. (In Provisional Liquidation)*, No. 21-10228 (MG) (Bankr. S.D.N.Y. Dec. 17, 2021), ECF No. 83; Order Granting (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representatives, (III) Recognition of Sanction Order and Related Scheme, and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code, *In re Digicel Grp. One Ltd.*, No. 20-11207 (SCC) (Bankr. S.D.N.Y. June 17, 2020), ECF No. 29; Order (I) Granting Full Force and Effect in the United States to the Brazilian Reorganization Plan and (II) Granting Related Relief, *In re Oi S.A.* et al., No. 16-11791 (SHL) (Bankr. S.D.N.Y. June 15, 2018), ECF No. 277; Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief, *In re TBK PT Bumi Res*., No. 17-10115 (MKV) (Bankr. S.D.N.Y. Mar. 17, 2017), ECF No. 17; *In re Metcalfe & Mansfield Alt. Invs*., 421 B.R. 685, 699–700 (Bankr. S.D.N.Y. 2010); *Sino-Forest Corp.,* 501 B.R. at 663, 666; *In re Magyar Telecom B.V.,* No. 13-13508-SHL, 2013 WL 1039994 (Bankr. S.D.N.Y. Dec. 11, 2013); *In re Avanti*, 582 B.R. at 618.

98.     In April 2018, Judge Glenn, elaborated on the reasoning that supports enforcement

of third-party releases and related injunctions in the *Avanti* decision.   Significantly, he relied on

the following discussion of English authority presented to him in a declaration of English counsel:

> …third-party nondebtor releases are common in schemes sanctioned under UK law, particularly for releases of affiliate guarantees of the debt that is being adjusted by the scheme. *See In re T & N Ltd and others (No 4) [2006] EWHC 1447 (Ch)* (David Richards , J.) (holding that a scheme did not necessarily prohibit the alteration of third-party rights, in this case, creditors' rights to pursue asbestos claims against insurers); *Re Lehman Brothers International (Europe) (in administration) (No 2) [2009] EWCA Civ 1161* (following *T & N*, Patten LJ held (at paragraph 63) that it was "entirely logical to regard the court's jurisdiction as extending to approving a scheme which varies or releases creditors' claims against the company on terms which require them to bring into account and release rights of action against third-parties designed to recover the same loss.  The release of such third-party claims is merely ancillary to the arrangement between the company and its own creditors."); *In Re La Seda de Barcelona SA [2010] EWHC 1364 (Ch)* (Proudman J applied *T & N* and *Lehman* and concluded that a third-party subsidiary guarantor could be released pursuant to a deed of release executed on behalf of scheme creditors).
>
> Based on that discussion of English law, Judge Glenn concluded as follows:
>
> The Court concludes that schemes of arrangements sanctioned under UK law that provide third-party nondebtor guarantor releases should be recognized and enforced under Chapter 15 of the Bankruptcy Code.  Avanti's Scheme Creditors had a full and fair opportunity to vote on, and be heard in connection with, the Scheme. *See* Angel Declaration, ¶¶ 12, 17–18.  The proceedings under UK law in the UK courts afford creditors a full and fair opportunity to be heard in a manner consistent with US due process standards. . .
>
> The failure of a US bankruptcy court to enforce the Guarantor Releases could result in prejudicial treatment of creditors to the detriment of the Debtor's reorganization efforts and prevent the fair and efficient administration of the Restructuring. Principles of comity permit a US bankruptcy court to recognize and enforce the Scheme.
>
> 582 B.R. at 618–19.[17]

---

[17]     Judge Glenn subsequently renewed and reiterated his view that foreign restructuring plans that include third-party releases are entitled to comity if creditors had a full and fair opportunity to vote and be heard.  *In re Agrokor D.D.*, 591 B.R. 163, 189–190 (Bankr. S.D.N.Y. 2018).

99.     The Supreme Court's recent decision in *Harrington v. Purdue Pharma L. P.* does not compel a different result.  144 S. Ct. 2071 (2024).  In Purdue, the Supreme Court held that Chapter 11 of the Bankruptcy Code did not authorize nonconsensual, third-party releases.  In doing so, the Supreme Court was careful to ground its ruling on whether such releases were statutorily authorized, expressly limiting its ruling to the Chapter 11:

> Confining ourselves to the question presented, we hold only that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants.[18]

100.     Although, to the Foreign Representative's knowledge, no Court has specifically addressed the implication of the Supreme Court's decision in *Purdue* to the Chapter 15 recognition of foreign insolvency plans with comparable releases, at least two courts have enforced plans that granted substantially similar releases following the Supreme Court's decision in *Purdue*.  *See In re Americanas, S.A.*, No. 23-10092, 2024 WL 3506637 (Bankr. S.D.N.Y. July 22, 2024); Order (I) Recognizing and Enforcing the Ancillary Order, (II) Approving the Procedure Governing Closing of Chapter 15 Cases and (III) Granting Ancillary Relief, *In re Nexii Bldg. Sols. Inc.*, No. 24-10026 (Bankr. D. Del. July 22, 2024), ECF No. 66.[19]

101.     Following a decision from the District Court in *Purdue* which, like the Supreme Court, ruled that nonconsensual third party releases were not authorized by Chapter 11, Judge Beckerman noted that in a Chapter 15 case, principles of comity determine whether third party releases should be enforced:  "Principles of enforcement of foreign judgments in comity in Chapter 15 cases strongly counsel approval of enforcement in the United States of third-party, non-debtor

---

[18]     *Purdue*, 144 S. Ct. at 2076.

[19]     There is a pending dispute over the recognition of a Hong Kong scheme which proposes to grant third-party releases.  The hearing on the matter has been adjourned indefinitely.  *See* Notice of Adjournment of Recognition Hearing, *Yuzhou Grp. Holdings Co. Ltd.*, No. 24-11441 (LGB) (Bankr. S.D.N.Y. Sept. 27, 2024), ECF No. 11.

release and injunction provisions even if those provisions could not be entered in a plenary Chapter 11 case" (citing the *Metcalfe & Mansfield* decision).  *See* Hrg. Tr. at 19, *In re Huachen Energy, Ltd.,* No. 22-10005 (Bankr. S.D.N.Y. Feb. 3, 2022), ECF No. 20; Order Recognizing Foreign Proceeding and Granting Additional Relief, *In re Huachen Energy, Ltd.,* No. 22-10005 (Bankr. S.D.N.Y. Feb. 2, 2022), ECF No. 19.  Judge Beckerman's observation falls squarely in line with long-established principles of Chapter 15, which permit Bankruptcy Courts to approve a foreign plan of reorganization even where that same plan would be subject to challenge if it were proposed in a plenary Chapter 11 proceeding.  *See In re Avanti Commc'ns. Grp. PLC*, 582 B.R. 603, 618 (Bankr. S.D.N.Y. 2018) ("[T]hird-party releases in Chapter 15 cases have received a different analysis than in chapter 11 cases, focusing primarily on the foreign court's authority to grant such relief."); *In re Vitro S.A.B de C.V.*, 701 F.3d 1031, 1053 (5th Cir. 2012) (acknowledging that Chapter 15's "heavy emphasis on comity" made it "not necessary, nor to be expected, that the relief requested by a foreign representative be identical to, or available under, United States law"); *In re Bd. of Dirs. of Multicanal S.A.*, 314 B.R. 486, 506 (Bankr. S.D.N.Y. 2004) ("[C]ases do not require that a distribution in a foreign proceeding match the distribution that would be available in a hypothetical U.S. case, or that U.S. creditors receive the precise recovery or treatment to which they would be entitled under Chapter 11").  Therefore, Chapter 15 permits the enforcement of third-party releases granted in foreign proceedings, assuming that such third-party releases were permitted under the governing law of the foreign proceedings and there were no improprieties in the conduct of the foreign proceedings.

102.    The releases proposed by the Scheme are necessary and fundamental to the restructuring embodied in the Scheme and the broader restructuring the Scheme supports.  Certain fundamental releases (of claims of Scheme Creditors against Mega and the Parent in respect of the

Existing Notes) are affected by the operation of the Scheme and further Mega will be authorized

by the Scheme to enter into and deliver the Deed of Release (as a deed, if applicable) on behalf of

each Scheme Creditor.  The threshold for Mega being authorized by Scheme Creditors to do so is

the approval by a majority in number (i.e. more than 50%) representing at least 75% in value of

the Scheme Creditor (or each class of creditors) present and voting, either in person or by proxy at

the Scheme Meeting.  Scheme Creditors are advised of the effect of the releases in the Explanatory

Statement, the releases were specifically addressed in the convening hearing and the Scheme

Creditors are advised that the specific purpose of the Scheme on which they are being asked to

vote will provide for (among other things) the release of their claims under the Existing Notes

against the Parent and the grant of a power of attorney to Mega to irrevocably and unconditionally

authorize it to enter into the Deed of Release.  In other words, all Scheme Creditors subject to the

releases will have notice of the releases, the ability to vote on the Scheme (aside from Sanctioned

Persons) and an opportunity to object to the English Court.  *See* English Counsel Declaration ¶ 32.

103.    The Scheme shall, with effect from, and subject to the occurrence of, the

Restructuring Effective Date, satisfy, waive and release, fully and absolutely, all claims of Scheme

Creditors.  The waivers and releases are also limited in scope to liabilities that a Released Party

has or may have to a Scheme Creditor in relation to, or arising out of or in connection with, the

preparation, negotiation or implementation of the Scheme and the specific steps described in the

Scheme for its implementation.  Such releases will prevent Scheme Creditors from initiating

proceedings against a Released Party in respect of those liabilities but shall not apply in respect of

certain excluded liabilities described therein (including, but not limited to, liabilities arising from

fraud, gross negligence, or willful misconduct).  Mega considers that the inclusion of these waivers

and releases in the Scheme and the scope of such waivers and releases are, in each case, customary

and appropriate in the context of the Scheme. These releases are an integral part of the implementation of the Scheme, providing a mechanism for the Scheme Creditors to affect the release the claims of Scheme Creditors against the Parent as well as Mega in exchange for the Scheme Creditors receiving their Scheme consideration. If the releases provided by the Deed of Release and Scheme were not implemented, this would undermine its core purpose to extinguish the claims of the Scheme Creditors under the Existing Notes in exchange for receipt of their Scheme consideration. The releases are therefore necessary to give commercial effect to the compromise in the Scheme. Importantly, when determining whether to grant the Sanction Order, the English Court was directed specifically to consider these same facts and circumstances. *See* English Counsel Declaration ¶ 33.

104. The Foreign Representative also seeks to eliminate any ambiguity as to whether the Authorized Parties are appropriately authorized to take all actions necessary and appropriate to consummate the restructuring transactions provided by the Scheme. The Authorized Parties include (i) the Parent in its capacity as such and in its capacity as the Holding Period Escrow Agent, (ii) the Information Agent, (iii) the Settlement Agent, (iv) the Existing Notes Trustee, (v) the New Notes Trustee (vi) the New Notes Mexican Trustee, and (vii) Mega. The Proposed Order will give clear authority for the Authorized Parties to carry out the provisions of the Scheme to ensure its efficient implementation.

> d. Enforcement of the Scheme Meets the Standards for Injunctive Relief

105. Pursuant to section 1521(e) of the Bankruptcy Code, the generally applicable standards for obtaining injunctive relief apply to requests for relief under paragraphs (1) (staying certain individual actions), (2) (staying execution against the debtor's assets), (3) (suspending certain transfers of the debtor's property), or (6) (extending preliminary relief initially granted

pursuant to section 1519) of section 1521(a) of the Bankruptcy Code.  11 U.S.C. § 1521(e).  To

obtain such relief the movant must show that: (a) there is success on the merits, (b) there is an

imminent irreparable harm to the debtor's assets in the absence of an injunction, (c) the balance of

harms tips in favor of the petitioner, and (d) the public interest weighs in favor of an injunction.

*See In re Lyondell Chem. Co.*, 402 B.R. 571, 588–89 (Bankr. S.D.N.Y. 2009) (citing *In re Calpine*

*Corp.*, 354 B.R. 45 (Bankr. S.D.N.Y. 2006), *aff'd*, 365 B.R. 401 (Bankr. S.D.N.Y. 2007)).  "As a

rule . . . irreparable harm exists whenever local creditors of the foreign debtor seek to collect their

claims or obtain preferred positions to the detriment of the other creditors."  *In re MMG LLC*, 256

B.R. 544, 555 (Bankr. S.D.N.Y. 2000).  Courts have therefore readily granted permanent

injunctive relief to enforce foreign restructuring plans and discharges.  *In re Bd. of Dirs. of Telecom*

*Arg.*, 528 F.3d 162 (2d Cir. 2008) (affirming bankruptcy court decision granting full force and

effect to Argentine plan); *In re Rede Energia*, 515 B.R. 69, 93 (Bankr. S.D.N.Y. 2014) ("The

request by the Foreign Representative that the Court (i) enforce the [Scheme] and the Confirmation

Decision and (ii) enjoin acts in the U.S. in contravention of the Confirmation Decision is relief of

a type that courts have previously granted under section 304 of the Bankruptcy Code and other

applicable U.S. law.") (citing *Bd. of Dirs. of Telecom Arg.*, 528 F.3d at 174–76); *In re Sino-Forest*

*Corp.*, 501 B.R. 655, 665 (Bankr. S.D.N.Y. 2013) (granting permanent injunctive relief to enforce

Canadian plan).

106.    As part of the Relief Requested herein, Mega respectfully requests that this Court

permanently enjoin all creditors bound by the Scheme from (i) commencing or taking any action

against Mega, the Parent or their assets within the territorial jurisdiction of the United States that

would interfere with or impede the implementation of the Scheme and (ii) taking any action against

Mega, the Parent or their assets within the territorial jurisdiction of the United States to recover or

offset any debt or claims that are extinguished, novated, cancelled, discharged, or released under the Scheme, the Sanction Order, or as a result of English law. Pursuant to Clause 2 of the Scheme, the Scheme shall be binding and enforceable on Mega and Scheme Creditors, and on their respective assigns and successors. English Counsel Declaration ¶ 30.

107.   The standard for injunctive relief is met here. Mega, an English company, commenced the English Scheme Proceeding to effectuate a comprehensive restructuring of its debt. The Scheme will be ratified by the English Court and will be administered pursuant to the Companies Act and in accordance with English law. There is substantial risk that Mega could suffer immediate and irreparable harm if parties attempt to take actions asserting discharged claims in U.S. courts or otherwise take actions in the United States to seek to recover debts against Mega that were administered by the Scheme. Such actions would be clear circumventions of the Scheme. Defending against such actions would deplete Mega's assets and could affect its ability to operate as a going concern, which is necessary in order to provide the contemplated creditor recoveries under the Scheme. The injunctive relief requested by Mega would not cause undue hardship or prejudice to its U.S.-based creditors, who had an opportunity to submit claims, seek adjudication of those claims, vote on the Scheme and appeal the Sanction Order. Furthermore, the Scheme was developed and presented with the support of Mega's principal financial creditors, including the Ad Hoc Group, which holds approximately 36.2% of the Notes. This support was specifically outlined in the Standstill and Lock-Up Agreement, executed on November 11, 2024, by the Ad Hoc Group, Mega, and the Parent, among others.

      e.   The English Scheme Proceeding and Scheme are Consistent with the Public Policy of the United States

108.   The Court may also deny a request for any relief that would be "manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. This public policy exception is

narrowly construed.  *Sino-Forest Corp.*, 501 B.R. at 665 (explaining that section 1506's "public policy exception is narrowly construed"); *In re Toft*, 453 B.R. 186, 195 (Bankr. S.D.N.Y. 2011) ("[T]hose courts that have considered the public policy exception codified in [section] 1506 have uniformly read it narrowly and applied it sparingly"); *In re Millard*, 501 B.R. 644, 651–52 (Bankr. S.D.N.Y. 2013) (refusing to invoke section 1506 because no showing had been made that the foreign insolvency law was "repugnant to U.S. law"); s*ee also In re Climate Control Mech. Servs.*, 570 B.R. 678, 707 (Bankr. M.D. Fla. 2017).  Thus, "even the absence of certain procedural or constitutional rights will not itself be a bar under § 1506."  *In re OAS S.A.*, 533 B.R. 83, 104 (Bankr. S.D.N.Y 2015) (quoting *Vitro S.A.B.*, 701 F.3d at 1069).

109.    Importantly, the result achieved in a foreign proceeding does not have to be identical to that in the United States.  *See In re Bd. of Dirs. of Telecom Arg., S.A.,* No. 05-17811 (BRL), 2006 WL 686867, at *25 (Bankr. S.D.N.Y. Feb. 24, 2006), *aff'd sub nom.*, 528 F.3d 162 ("Comity does not require that the foreign law be a carbon copy of our law; rather, [it] must not be repugnant to American laws and policies.") (internal citations and quotation marks omitted).  Therefore, a foreign representative should not be denied comity simply because the relief obtained in the foreign proceeding would not be available in the United States.  *See In re Condor Ins. Ltd., (Tacon v. Petroquest Res., Inc.)* 601 F.3d 319, 327 (5th Cir. 2010).  Rather, "[t]he key determination. . . is whether the procedures used [in the foreign proceeding] meet our fundamental standards of fairness."  *Metcalfe &* Mansfield, 421 B.R. at 697.

110.    Here, the English Scheme Proceeding and Scheme are consistent with the public policy of the United States.  As discussed above at ¶¶ 85–92, the English Scheme Proceeding provides robust procedural protections to creditors, including opportunities to object, appeal, negotiate, and vote on a final plan and this Court has repeatedly found that the English Scheme

Proceeding meets our fundamental standards of fairness and accords with the course of civilized jurisprudence.

### WAIVER OF STAY IS APPROPRIATE

111.    The Foreign Representative respectfully requests that, to the extent applicable, the Court cause the Proposed Order to become effective immediately upon entry, notwithstanding the 14-day stay of effectiveness of the order imposed by operation of the Bankruptcy Code or the Bankruptcy Rules, including Bankruptcy Rules 1018, 3020(e), 6004(h), 7062 and 9014.  Such a waiver is appropriate in these circumstances to allow the Debtor to proceed immediately with consummation of the Scheme and execution of the Group's restructuring.   English Counsel Declaration ¶ 6.  The Group believes that it is critical for the Group to implement its restructuring as soon as possible to maintain confidence with its suppliers and customers.    Further delay in implementing the restructuring could result in loss of market confidence, which may seriously impact the viability of the Group's business.  *Id.*  For these reasons, granting a waiver of the 14-day stay of effectiveness period is appropriate so that the Scheme can be implemented as soon as possible.

112.    Courts in this District routinely provide full or partial waivers of the 14-day stay of effectiveness period in Chapter 15 cases.  Order Recognizing Foreign Proceeding and Granting Related Relief, *In re Lehman Brothers Int'l (Europe) (in administration)*, No. 18-11470 (SCC) (Bankr. S.D.N.Y. June 19, 2018), ECF No. 15; Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief, *In re Avanti Commc'ns. Grp. PLC*, No. 18- 10458 (MG)(Bankr. S.D.N.Y. Apr. 6, 2018), ECF No. 15; Order Granting Petition for Recognition of Foreign Main Proceeding and Motion for Related Relief, *In re Bibby Offshore Servs. PLC*, No. 17–13588 (MG) (Bankr. S.D.N.Y. Jan. 18, 2018), ECF No. 16; Order Recognizing and Enforcing

the Order of the French Court Sanctioning the Safeguard Plan and Granting Related Relief, *In re CGG S.A.*, No. 17-11636 (MG) (Bankr. S.D.N.Y. Dec. 21, 2017), ECF No. 25; Order (I) Recognizing and Enforcing Approved Schemes of Arrangement; (II) Authorizing Procedures for Closing Chapter 15 Cases; and (III) Deeming Motion to be Foreign Representative's Final Report Under Bankruptcy Rule 5009(c), *In re Boart Longyear Ltd.*, No. 17-11156 (MEW) (Bankr. S.D.N.Y. Aug. 30, 2017), ECF No. 45; Order Recognizing and Enforcing Order of Canadian Court Sanctioning and Approving CCAA Plan, *In re Pacific Expl. & Prod. Corp.*, No. 16-11189 (JLG) (Bankr. S.D.N.Y. Oct. 3, 2016), ECF No. 31; Order Recognizing and Enforcing Order of the Reykjavík District Court Confirming Composition and Granting Related Relief, *In re Landsbanki Islands HF.*, No. 08-14921 (RDD) (Bankr. S.D.N.Y. Mar. 17, 2016), ECF No 65; Order Granting Recognition, Enforcement of Canadian Orders and Related Relief, *In re Metcalfe & Mansfield Alternative Invs.*, No. 09-16709 (MG) (Bankr. S.D.N.Y. Jan. 5, 2010), ECF No. 28; Order Granting Recognition and Enforcement of Canadian Sanction Order and Related Relief, *In re Quebecor World Inc.*, No. 08-13814 (JMP) (Bankr. S.D.N.Y. July 1, 2009), ECF No 12.

## **NOTICE**

113.    Notice of the Verified Petition has been provided to the parties (the "Notice Parties") set forth in Exhibit I annexed hereto (the "Notice List").  Contemporaneously with this Verified Petition, the Petitioner has filed an *Application Pursuant to Federal Rules of Bankruptcy Procedure 2002 and 9007 for an Order Scheduling Hearing and Specifying Form and Manner of Service of Notice, and Granting Related Relief* and will provide such other or further notice as the Court directs in accordance with the order entered on that motion.

## **RESERVATION OF RIGHTS**

114.    The Petitioner hereby reserves their right to supplement this Verified Petition with additional or supplemental pleadings prior to the hearing on the Verified Petition.

## **NO PRIOR REQUEST**

115.    No previous request for the relief requested herein has been made to this or any other court.

*[The remainder of this page is left blank intentionally]*

## <u>CONCLUSION</u>

WHEREFORE, the Petitioner respectfully requests that the Court: (i) grant the Verified Petition and enter the Proposed Order annexed hereto as <u>Exhibit A</u>, recognizing the English Scheme Proceeding as the foreign main proceeding for the Debtor and granting the requested relief in connection therewith, and (ii) grant such other and further relief as the Court deems just and proper.

Dated: November 25, 2024
       New York, New York

           CLEARY GOTTLIEB STEEN & HAMILTON LLP

           By: <u>/s/ *David H. Botter*</u>
               David H. Botter
               Thomas S. Kessler
               One Liberty Plaza
               New York, New York 10006
               T: 212-225-2000
               F: 212-225-3999
               (tkessler@cgsh.com)
               (dbotter@cgsh.com)

               *Attorneys for the Foreign Representative*
               *of Mega Newco Limited*

## **VERIFICATION OF CHAPTER 15 PETITION**

Pursuant to 28 U.S.C. § 1746, I, Ignacio Javier Gonzalez Delgadillo, declare under penalty of perjury under the laws of the United States of America as follows:

I am the authorized foreign representative of the Debtor with respect to the English Scheme Proceeding for purposes of the Chapter 15 Case. I declare under penalty of perjury that the factual contents of the foregoing Verified Petition as well as the factual contents of each of the attachments and appendices thereto are true and accurate to the best of my knowledge, information, and belief, and I respectfully represent as follows:

- I am the sole director at Mega.

- On November 15, 2024, Mega's sole director among other things, (i) appointed me as the foreign representative of the English Scheme Proceeding for the Debtor and authorized me to file the Verified Petition and to act on its behalf in the Chapter 15 Case (each, a "Resolution of Appointment"), and (ii) authorized the commencement of the English Scheme Proceeding and the Chapter 15 Case with respect to the Debtor (all such resolutions and other authorizations or consents, collectively, together with the Resolutions of Appointment, the "Resolutions"). Accordingly, I am fully authorized to take related action as the Foreign Representative.

Unless otherwise indicated, all facts set forth in this Verified Petition are based upon: (a) my review of relevant information, data and documents (including oral information) furnished to me by the Debtor's officers, directors, employees and professionals; or (b) my analyses of the information I have received on the Debtor's operations and financial condition. I have also been kept abreast of major discussions with stakeholders, including the Parent's and Mega's primary financial creditors. I am an individual over the age of 18. If I am called to testify, I will do so competently and based on the facts set forth herein.

Executed at Guadalajara, Jalisco, Mexico
Dated: November 25, 2024

Respectfully Submitted,

_____
Ignacio Javier Gonzalez Delgadillo
Director
Mega Newco Limited
Judicial and Authorized Foreign
Representative of the Debtor

## Exhibit A

**Proposed Order**

David H. Botter
Thomas S. Kessler
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 15 |
| Mega Newco Limited,[1] | Case No. 24-12031 (MEW) |
| Debtor in a Foreign Proceeding | |

**ORDER GRANTING**
**(I) RECOGNITION OF FOREIGN PROCEEDING,**
**(II) RECOGNITION OF FOREIGN REPRESENTATIVE,**
**(III) RECOGNITION OF SANCTION ORDER AND RELATED SCHEME**
**AND (IV) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

Upon the verified petition (the "Verified Petition")[2] of Mr. Ignacio Javier Gonzalez

Delgadillo as foreign representative (the "Petitioner"), in the above-captioned Chapter 15 case (the

"Chapter 15 Case") in respect of the Mega Newco Limited ("Mega" or "Debtor") in the scheme

of arrangement proceeding (the "English Scheme Proceeding") in the High Court Of Justice

Business And Property Courts Of England and Wales (the "English Court") pursuant to Part 26 of

the Companies Act 2006, as modified (the "Companies Act") for entry of a final order (this

---

[1]     The last four identifying digits of the registered number are 6024 and with registered address at First Floor
Templeback, 10 Temple Back, Bristol, BS1 6FL, United Kingdom.

[2]     Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the
Verified Petition

"Order"), pursuant to sections 105(a), 1507, 1509(b), 1515, 1517, 1520(a) and 1521(a)(1)–(2) of title 11 of the United States Code, 11 U.S.C. sections 101, *et seq.* (the "Bankruptcy Code") (i) granting recognition of the English Scheme Proceeding as a "foreign main proceeding" of the Debtor (ii) finding that the Foreign Representative is the duly appointed "foreign representative" of the Debtor within the meaning of section 101(24) of the Bankruptcy Code and that the Foreign Representative is authorized to act on behalf of the Debtor for purposes of the Chapter 15 Case; (iii) entrusting the Foreign Representative with the power to administer, realize, and distribute all assets of the Debtor within the territorial jurisdiction of the United States; (iv) recognizing and granting full force and effect within the territorial jurisdiction of the United States to the Scheme and the English Sanction Order and granting certain related relief, (v) authorizing the Authorized Parties to take any and all actions necessary to give effect to the terms of the Scheme and transactions contemplated thereby, (vi) exculpating and releasing the Released Parties from any liability for any action or inaction taken in furtherance of, and/or in accordance with this Order or the Scheme, except for any liability arising from any action or inaction constituting gross negligence or fraud as determined by this Court, and (vii) granting such other relief as the Court deems just and proper; and this Court having reviewed the Verified Petition and the statements of counsel with respect to the Verified Petition at a hearing before this Court (the "Hearing"); and all objections to the Verified Petition (if any) having been withdrawn or overruled; and this Court having determined that the legal and factual bases set forth in the Verified Petition and all other pleadings and papers in this case establish just cause to grant the relief ordered herein, and after due deliberation therefor,

**THIS COURT HEREBY FINDS AND DETERMINES THAT**:

A.      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P) and this Court has the statutory and constitutional authority to issue a final ruling with respect to this matter.  Venue for this proceeding is proper before this Court pursuant to 28 U.S.C. § 1410.

C.      The Petitioner is the duly appointed "foreign representative" of the Debtor within the meaning of section 101(24) of the Bankruptcy Code and has standing to make the requests set forth in the Verified Petition.

D.      The Debtor has property located in this District, and therefore, the Debtor is "eligible" to be a debtor in this Chapter 15 Case pursuant to sections 109 and 1501 of the Bankruptcy Code.

E.      The Chapter 15 Case was properly commenced pursuant to sections 1504, 1509 and 1515 of the Bankruptcy Code, and the Petitioner has complied with section 1515.

F.      Due, sufficient, timely and proper notice of the Verified Petition and Hearing have been provided in accordance with the *Order Pursuant to Federal Rules of Bankruptcy Procedures 2002 and 9007 Scheduling Hearing and Specifying Form and Manner of Service and Notice*, ECF

No. _____ (the "Scheduling Order") and in compliance with the requirements of Bankruptcy Rule 2002(q), and no other or further notice need be provided.

G.    The English Scheme Proceeding is a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code.

H.    The English Scheme Proceeding is entitled to recognition by this Court pursuant to section 1517 of the Bankruptcy Code.

I.    England and Wales is the center of main interests of the Debtor, and, accordingly, the English Scheme Proceeding is a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code and is entitled to recognition as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code.

J.    The Petitioner and the Debtor, as applicable, are entitled to the relief available pursuant to section 1520 of the Bankruptcy Code and to additional assistance and discretionary relief pursuant to sections 1507 and 1521(a) of the Bankruptcy Code, to the extent set forth in this Order and subject to the limitations set forth in this Order.

K.    The injunctive relief set forth in this Order is appropriate and necessary to prevent the risk that the English Scheme Proceeding may be thwarted by the actions of particular creditors, a result inimical to the purposes of Chapter 15 of the Bankruptcy Code as set forth in section 1501(a) of the Bankruptcy Code.  Such actions could put in peril the Debtor's ability to successfully restructure.

L.    Each of the injunctions contained in this Order (i) is within the Court's jurisdiction, (ii) is necessary and appropriate to the success of the English Scheme Proceeding, (iii) confers material benefits on, and is in the best interests of, the Debtor, and its creditors, and (iv) is important to the overall objectives of the Debtor's restructuring.

M.      The terms of the Scheme, and the process for solicitation of consents to and confirmation of the Scheme, in each case before the English Court, provided creditors and parties in interest with appropriate due process and were not manifestly contrary to U.S. public policy.

N.      The Petitioner and the English Court are entitled to the Court's cooperation under section 1525(a) in implementing the Scheme in the form of relief granted by this Order on the terms provided herein.

O.      The relief granted hereby (a) is essential to the success of the English Scheme Proceeding and Scheme, including, without limitation, because the Scheme requires entry of this Order, (b) is an integral element of the English Scheme Proceeding and the Scheme, and is integral to their effectuation and (c) confers material benefits on and is in the best interest of the Debtor, its creditors, and parties in interest.

P.      The relief sought by the Verified Petition will not cause undue hardship or inconvenience to any party in interest and, to the extent that any hardship or inconvenience may result to such parties, it is outweighed by the benefits of the relief requested to Mega, its estate and creditors.

Q.      The relief granted herein is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States, and warranted pursuant to sections 105, 362, 1504, 1507, 1509, 1515, 1517, 1520, 1521 and 1525 of the Bankruptcy Code.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT**:

1. The petition for recognition and other relief requested in the Verified Petition are hereby granted, and any objections or responses thereto that have not been withdrawn or resolved are overruled with prejudice.

2.      The Petitioner is the duly appointed "foreign representative" of the Debtor within

the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of the

Debtor in the Chapter 15 Case.

3.      The English Scheme Proceeding is granted recognition as a foreign main

proceeding pursuant to section 1517 of the Bankruptcy Code.

4.      All relief and protection afforded to a foreign main proceeding pursuant to section

1520 of the Bankruptcy Code is hereby granted to the English Scheme Proceeding, the Debtor, the

Debtor's assets located within the territorial jurisdiction of the United States, as applicable,

including the application of section 362 of the Bankruptcy Code, which bars actions against the

Debtor and/or property of the Debtor located within the territorial jurisdiction of the United States.

The Foreign Representative is entitled to the protections contained in sections 306 and 1510 of the

Bankruptcy Code.

5.      To the extent not provided by section 1520 of the Bankruptcy Code, all creditors of

the Debtor are enjoined pursuant to section 1521 of the Bankruptcy Code from (i) disposing of or

otherwise taking any action against any property of the Debtor located within the territorial

jurisdiction of the United States and (ii) taking any action to obtain possession of or exercise

control over any property of the Debtor located within the territorial jurisdiction of the United

States, in each case, subject to enforcement actions taken under the New Notes issued as part of

the Scheme.

6.      Subject to the terms of this Order, the Sanction Order and the Scheme (and all

exhibits and annexes to the Scheme), including, for the avoidance of doubt and subject, as

applicable, to the occurrence of the Restructuring Effective Date, the releases set forth in the

Scheme and the Deed of Release and confirmed by the Sanction Order, and any amendments and

modifications to the Scheme (solely to the extent made in accordance with the terms thereof) and all annexes to the Scheme (subject to all terms, conditions, and limitations set forth therein) are hereby recognized, granted comity, and given full force and effect within the territorial jurisdiction of the United States and for purposes of U.S. law to the same extent that they are given effect in England and Wales, and each is binding, including on all creditors of Mega and any of their respective successors and assigns, shareholders, and any other holders of claims or interests in the Debtor and any of their successors or assigns and all persons having notice of the Verified Petition.

7.    The Petitioner is authorized to carry out any and all ministerial actions that are required of him to effectuate the Scheme or that are otherwise necessary and appropriate to consummate the Scheme and not inconsistent with the Scheme or the terms hereof.

8.    Subject to paragraphs 10 through 16 of this Order, from and after the Scheme Effective Date, all entities (as that term is defined in section 101(15) of the Bankruptcy Code), including all creditors, shareholders, and any other holders of claims against or interests in Mega, subject to this Court's jurisdiction are permanently enjoined from (i) commencing, continuing or taking any action that is in contravention with, inconsistent with or would interfere with or impede the administration, implementation and/or consummation of the Scheme, the Sanction Order or the terms of this Order, (ii) taking any action against the Debtor or its property located in the territorial jurisdiction of the United States to recover or offset any debt or claims that are extinguished, novated, cancelled, discharged or released under the Scheme and the Sanction Order, (iii) taking or continuing any act to create, perfect, or enforce a lien or other security interest, set off, or other claim against the Debtor or any of its property, in each case, with respect to the Existing Notes cancelled or discharged, as applicable, under the Scheme, and (iv) commencing, continuing or taking any action, including, without limitation, commencing or continuing any

action or legal, judicial, administrative, regulatory or similar proceeding or seeking discovery in connection therewith, whether directly or by way of counterclaim, to recover or offset any debt or claims, in each case, that are extinguished, novated, cancelled, discharged or released under the Scheme or the Sanction Order, against (x) Mega or its respective property located in the territorial jurisdiction of the United States, (y) such parties released under the Scheme and the Deed of Release to the extent of the releases therein or, (z) solely in their capacities as such, the Authorized Parties, or the Foreign Representative; *provided* that, for the avoidance of doubt, the foregoing shall not enjoin or otherwise prevent any party from (a) enforcing the Scheme, which remains fully enforceable against all applicable parties, according to its respective terms, (b) subject to the terms of the Sanction Order, pursuing any rights or remedies granted to that entity pursuant to the Scheme according to its respective terms and (c) pursuing any rights or remedies granted to that entity pursuant to the New Notes and the rights and obligations set forth in such agreements and instruments described in this clause (c) shall not be canceled, compromised, impaired, or otherwise modified by the terms of this Order.  No action may be taken within the territorial jurisdiction of the United States to confirm or enforce any award or judgement that would otherwise be in violation of this Order without first obtaining leave of this Court.

9.      In no event shall this Order prevent the implementation of any amendments or modification to the Scheme or the New Notes that may be agreed upon by and among Mega, the Parent and the applicable creditors and approved by the English Court (or as otherwise permitted under applicable law).  Nothing in this Order or otherwise any aspect of this Chapter 15 Case shall confer jurisdiction on this Court or any other court of the United States, or any State or other jurisdiction therein, with respect to the New Notes.

10.     The releases set forth in the Scheme and the Deed of Release and confirmed by the Sanction Order shall be granted comity and shall be enforced in the United States on the terms set forth therein, including as to timing of effectiveness of the same.  Accordingly, subject to paragraph 16 of this Order, following the Scheme Effective Date, the assertion of any claim in the territorial jurisdiction of the United States against any person or entity released pursuant to the Scheme or the English Scheme Proceeding) is barred.  The proposed terms of the releases as set forth in the Scheme and the Deed of Release are attached hereto as <u>Exhibit C</u> and <u>Exhibit G</u>.

11.     The Authorized Parties are authorized to take any and all lawful actions necessary to give effect to and implement the Scheme and the Sanction Order and the transactions contemplated thereunder, including, without limitation, cancellation and discharge of the Existing Notes, subject to the terms and conditions of the documents under which they have been appointed to act.  Further, the Authorized Parties are hereby authorized to take any other lawful action as instructed by, and at the expense of, the Debtor that may be necessary to cancel the Existing Notes.

12.     Subject to the continuing effectiveness of the Scheme and Sanction Order as of and from the Scheme Effective Date the Scheme Creditor's claims and rights related to the Existing Notes shall be deemed satisfied, discharged, and cancelled automatically and of no further force or effect, *provided however* that nothing in this Order shall affect (a) any contractual indemnification rights of the Authorized Parties and (b) any rights of the Authorized Parties to be paid fees and expenses (including, for the avoidance of doubt, legal fees) contractually owed thereto and any other amounts contractually owing thereto that are not discharged pursuant to the Scheme or Sanction Order, including fees and expenses incurred after the date hereof.  Upon cancellation of the Existing Notes, all remaining positions on account of the Existing Notes on the

books and records of the Existing Notes Trustee and the Depository Trust Company ("DTC") shall be terminated following the issuance of the New Notes.

13.     The Existing Notes Trustee, including their agents, attorneys, successors and assigns, are authorized and directed to provide DTC with the customary documentation accepted by it, as applicable, in order to cancel and remove the Existing Notes from DTC's records, as contemplated by the Scheme.

14.     The Authorized Parties shall incur no liability and be exculpated and released from any liability for any action or inaction taken in furtherance of this Order, except for any liability arising from any action or inaction constituting gross negligence, actual fraud, or willful misconduct as, in each case as finally determined by this Court.

15.     Notwithstanding any other provision of this Order the injunctions granted herein shall not be effective until the occurrence of the Effective Date, and nothing herein shall enjoin any of the following matters:

(a)     any action by any person or entity in the English Scheme Proceeding that is consistent with English law, including appeals in England and Wales related thereto;

(b)     the pursuit by any person or entity of any rights or remedies granted to that entity pursuant to the Scheme or the enforcement of any terms of the Scheme and the Sanction Order;

(c)     any action or transaction that is permitted under the terms of the Scheme and the Sanction Order;

(d)     the implementation and enforcement of any agreement contemplated by and entered into in connection with the Scheme; or

(e)    the pursuit by any person or entity of any rights or remedies granted to that entity pursuant to the New Notes.

16.    Mega is authorized to use any property and to continue operating any businesses within the territorial jurisdiction of the United States.

17.    No action taken by the Foreign Representative in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of the Scheme or any order entered in this Chapter 15 Case or in any adversary proceedings or contested matters in connection therewith, shall be deemed to constitute a waiver of the immunity afforded the Foreign Representative pursuant to sections 306 and 1510 of the Bankruptcy Code.

18.    Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon entry; (b) other than as expressly provided in this Order, the Petitioner is not subject to any stay of the implementation, enforcement, or realization of the relief granted in this Order; and (c) the Petitioner is authorized and empowered, and may, in his discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of the Scheme and this Order, including using or disposing of any of Mega's assets located in the territorial jurisdiction of the United States.

19.    A copy of this Order, confirmed to be true and correct, shall be served, within seven business days of entry of this Order, in accordance with this Court's Scheduling Order, with such service being good and sufficient service and adequate notice for all purposes.

20.    This Court shall retain jurisdiction with respect to all matters arising from or relating to the interpretation, implementation, enforcement, amendment or modification of this Order.

Dated: New York, New York
_____, 2024

_____

THE HON. MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE

## **Exhibit B**

**CPR Part 8 Claim Form**



**Claim Form
(CPR Part 8)**

| | |
|---|---|
| **In the** | High Court of Justice<br>Business and Property Courts of England and Wales<br>Insolvency and Companies List (ChD) |
| **Claim no.** | |
| **Fee Account no.** | |
| **Help with Fees - Ref no. (if applicable)** | H W F - |

**Claimant**

Mega Newco Limited
Suite 1, 7th Floor 50 Broadway, London, United Kingdom, SW1H 0DB

SEAL

**Defendant(s)**

N/A

**Does your claim include any issues under the Human Rights Act 1998?**   ☐ Yes   ☒ No

**Details of claim** (see also overleaf)

At the first hearing of the Claim Form, the Claimant seeks the following relief (to be more particularly described in the draft order to be filed with the Court prior to the hearing of the claim (the "**Draft Order**"):

1. An order that the Claimant be at liberty pursuant to section 896 of the Companies Act 2006 to convene a meeting (the "**Scheme Meeting**") of certain of its creditors ("**Scheme Creditors**") to be held on 12 December 2024 (or such other date as the Claimant may notify to the Scheme Creditors) for the purpose of considering, and if thought fit approving, with or without modifications, a scheme of arrangement proposed to be made between the Claimant and the Scheme Creditors under Part 26 of the Companies Act 2006 (the "**Scheme**").

2. Directions for the method of convening the Scheme Meeting.

3. An order that the chairperson of the Scheme Meeting (the "**Chairperson**") shall be Polina Lyadnova of Cleary Gottlieb Steen & Hamilton LLP, or, if for any reason she is unable to act James Armshaw of Cleary Gottlieb Steen & Hamilton LLP and a direction that the Chairperson shall file a copy of a report of the results of the Scheme Meeting with this Court.

| Defendant's name and address | N/A | | £ |
|---|---|---|---|
| | | Court fee | 308 |
| | | Legal representative's costs | |
| | | Issue Date | |

For further details of the courts www.gov.uk/find-court-tribunal.
When corresponding with the Court, please address forms or letters to the Manager and always quote the claim number.

[EMEA_ACTIVE 303540949_4]

Claim no.

## Details of claim (continued)

4.  At a subsequent hearing to be fixed by the Court (after the hearing to consider the convening of the Scheme Meeting) an order to sanction the Scheme pursuant to section 899 of the Companies Act 2006, or such further or other relief as the Court thinks fit.

5.  Liberty to apply.

6.  Such further directions and/or relief as the Court sees fit.

Part 8 of the Civil Procedure Rules ("**CPR**") applies to this claim which is made pursuant to CPR Part 49, Practice Direction 49A, paragraph 15.

The Claimant will rely on (i) the First Witness Statement of José Guillermo Romo Romero; (ii) the First Witness Statement of Alessandro Zorza of Kroll Issuer Services Limited as Information Agent, (iii) the First Witness Statement of Chase Kaniecki, (iv) the Expert Report of Daniel Glosband, and (v) the Expert Report of José Gabriel Mendoza González in support of this claim. The Claimant intends to file this evidence in advance of the first hearing of this Claim Form.

Cleary Gottlieb Steen & Hamilton LLP
2 London Wall Place
London, England, EC2Y 5AU
plyadnova@cgsh.com; and
jarmshaw@cgsh.com

Claimant's or claimant's legal representative's address to which documents should be sent if different from overleaf. If you are prepared to accept service by DX, fax or e-mail, please add details.

[l

## Statement of Truth

I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

☐ **I believe** that the facts stated in these particulars of claim are true.

☒ **The Claimant believes** that the facts stated in these particulars of claim are true. **I am authorised** by the claimant to sign this statement.

**Signature**

☐ Claimant

☐ Litigation friend (where claimant is a child or a Protected Party)

☒ Claimant's legal representative (as defined by CPR 2.3(1))

**Date**

| Day | Month | Year |
|-----|-------|------|
| 14 | 11 | 2024 |

Full name

Polina Lyadnova

Name of claimant's legal representative's firm

Cleary Gottlieb Steen & Hamilton LLP

If signing on behalf of firm or company give position or office held

Partner

Find out how HM Courts and Tribunals Service uses personal information you give them when you fill in a form: https://www.gov.uk/government/organisations/hm-courts-and-tribunals-service/about/personal-information-charter

[

**<u>Exhibit C</u>**

**English Scheme of Arrangement**

Claim No. CR-2024-006908

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**INSOLVENCY AND COMPANIES LIST (ChD)**


**IN THE MATTER OF MEGA NEWCO LIMITED**

**– and –**

**IN THE MATTER OF THE COMPANIES ACT 2006**


**SCHEME OF ARRANGEMENT**

(Pursuant to Part 26 of the Companies Act 2006)

– between –


**Mega Newco Limited**

– and –

**The Scheme Creditors**

as defined herein

**TABLE OF CONTENTS**

1.      Definitions and Interpretation ................................................................................... 1

2.      Application of the Scheme and the Scheme Effective Date ..................................... 14

3.      Consideration ........................................................................................................... 15

4.      Grant of Authority to Execute the Implementation Documents .............................. 15

5.      Scheme Mechanics................................................................................................... 19

6.      Releases ................................................................................................................... 25

7.      Ratifications and Confirmations ............................................................................. 26

8.      Modifications of the Scheme or Waiver of the Scheme Conditions........................ 28

9.      General Scheme Provisions .................................................................................... 28

10.     Costs......................................................................................................................... 32

11.     Stamp Duty Indemnity............................................................................................. 33

12.     Announcements ....................................................................................................... 33

13.     Governing Law and Jurisdiction ............................................................................. 33

Schedule 1      Deed of Release ............................................................................................. 35

Schedule 2      Implementation Deed...................................................................................... 36

Schedule 3      Note Purchase and Placement Agreement ..................................................... 37

1.      **Definitions and Interpretation**

1.1     **Definitions**

In this Scheme, the following expressions will have the following meaning:

"**Account Holder**" means any person recorded directly in the records of a Clearing System as holding an interest in any Existing Notes in an account with the relevant Clearing System either for its own account or on behalf of its client, including members of, or participants and account holders in, the Clearing Systems;

"**Account Holder Letter**" means the account holder letter to be made available with the Explanatory Statement;

"**Ad Hoc Group**" means the means the Ad Hoc group of Existing Noteholders, represented by the Ad Hoc Group Advisors;

"**Ad Hoc Group's Advisors**" means Latham & Watkins (London) LLP, Sainz Abogados and Tecnologias Cuentas por Cobrar;

"**Affiliate**" means with respect to a person, any other person who, directly or indirectly, is in control of, or is controlled by, or is under common control with, such person and for the purposes of this definition, "**control**" will mean the power, direct or indirect, to:

(a)     vote on more than 50 per cent. of the securities having ordinary voting power for the election of directors of such person; or

(b)     direct or cause the direction of the management and policies of such person whether by contract or otherwise;

"**Agents**" means the Information Agent, the Cash Settlement Agent, the New Notes Settlement Agent and the Holding Period Escrow Agent.

"**Allocations Spreadsheet**" means the confidential allocations spreadsheet prepared by the Information Agent for the Scheme Company and its Advisors documenting (among other distributions and payments) the final (i) Scheme Consideration Entitlements, comprising (A) the New Shares Entitlements; and (B) the Cash Entitlements; and (ii) the New Notes Entitlements, if applicable, in each case for each Scheme Creditor, as calculated in accordance with Clause 5.3 (*Calculation of Scheme Creditor Entitlements*) of this Scheme;

"**Allowed Proceedings**" means any Proceeding by a Scheme Creditor in respect of an Excluded Scheme Claim;

"**Backstop Commitment**" means the commitment by each Backstop Party to subscribe for New Notes as set out in the Backstop Commitment Letter;

"**Backstop Commitment Letter**" means the commitment letter entered into between the Backstop Parties, the Scheme Company and the Issuer on 11 November 2024;

"**Backstop Parties**" means each Scheme Creditor that has entered into the Backstop Commitment Letter;

"**Bankruptcy Event**" means:

(a)     the entry by a court of competent jurisdiction of: (i) a decree or order for relief in respect of any member of the Group in an involuntary case or proceeding under any Bankruptcy Law or (ii) a decree or order (A) adjudging any member of the Group a bankrupt or insolvent, (B) approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of, or in respect of, any member of the Group

under any Bankruptcy Law, (C) appointing a Custodian of any member of the Group or of any substantial part of the property of any member of the Group, or (D) ordering the winding-up or liquidation of the affairs of any member of the Group, and in each case, the continuance of any such decree or order for relief or any such other decree or order unstayed and in effect for a period of 60 consecutive calendar days; or

(b)     (i) the commencement by any member of the Group of a voluntary case or proceeding under any Bankruptcy Law or of any other case or proceeding to be adjudicated a bankrupt or insolvent, (ii) the consent by any member of the Group to the entry of a decree or order for relief in respect of any member of the Group in an involuntary case or proceeding under any Bankruptcy Law or to the commencement of any bankruptcy or insolvency case or proceeding against any member of the Group, (iii) the filing by any member of the Group of a petition or answer or consent seeking reorganization or relief under any Bankruptcy Law, (iv) the consent by any member of the Group to the filing of such petition or to the appointment of or taking possession by a Custodian of any member of the Group or of any substantial part of the property of any member of the Group, (v) the making by any member of the Group of an assignment for the benefit of creditors, (vi) the admission by any member of the Group in writing of its inability to pay its debts generally as they become due, (vii) the approval by stockholders of any member of the Group of any plan or proposal for the liquidation or dissolution of any member of the Group, (viii) the declaration of *concurso mercantil* or *quiebra* by the Company, and (ix) the taking of corporate action by any member of the Group in furtherance of any action referred to in clauses (i) through (viii) above,

excluding any arrangement, reorganisation or restructuring pursued in order to implement the Restructuring in accordance with the terms of this Scheme and the Implementation Documents, including, but not limited to, this Scheme and any Chapter 15 Proceeding;

"**Bankruptcy Law**" means Title 11, U.S. Code or any similar U.S. federal, state or non-U.S. law for the relief of debtors, including the Mexican *Ley de Concursos Mercantiles*;

"**Book Entry Interest**" means beneficial interest in a Global Note (as defined in the Existing Notes Indenture) held by or through members of, or participants and account holders in, the Clearing Systems and held through and shown on, and transferred only through, records maintained in book entry form by the Clearing Systems;

"**Business Day**" means a day (other than a Saturday or Sunday or any other day on which banking institutions are authorised or required by law to close) on which banks are open for general business in London, New York and Mexico (*provided that* the availability of internet banking shall not constitute being open for general business);

"**Cash Entitlement**" means, in respect of each Redemption Option Scheme Creditor, its entitlement to receive, as consideration under this Scheme, cash in such amount as calculated in accordance with Clause 5.3(a)(ii)(A) of this Scheme;

"**Cash Settlement Agent**" means Kroll Issuer Services Limited, a private company incorporated in England and Wales with registered number 05098454, whose registered office is at The Shard, 32 London Bridge Street London, England, SE1 9SG (or any successor in title) in its capacity as cash settlement agent in relation to this Scheme;

"**Cash Settlement Escrow Account**" means the account in the name of the Cash Settlement Agent into which:

(a)     each Participating T2 New Noteholder shall fund its Subscription Amount;

(b)     the Participating T1 New Noteholder shall fund its New Notes commitment; and

(c)     each Backstop Party shall fund its allocation of the Backstop Commitment,

in each case in accordance with the Implementation Steps;

"**Cash Settlement Escrow Agreement**" means the escrow agreement to be entered into between the Issuer, the Scheme Company and the Cash Settlement Agent in relation to the Cash Settlement Escrow Account, in the form agreed between the Group's Counsels and the Ad Hoc Group's Advisors and made available on the Scheme Website;

"**Chapter 15 Proceeding**" means a proceeding under chapter 15 of title 11 of the United States Code;

"**Claim**" means, in relation to a person, any claim, allegation, cause or right of action, proceeding, suit or demand made against the person concerned, however it arises and whether it is present or future, fixed or ascertained, actual or contingent;

"**Clearing Systems**" means DTC, Clearstream Banking S.A. or Euroclear Bank SA/NV (as applicable to the relevant Account Holder) and its nominees and successors, acting through itself or a depositary and any other system designed for similar or analogous proceedings;

"**Companies Act**" means the UK Companies Act 2006;

"**Confirmations**" has the meaning given to it in Clause 5.9(a)(iii);

"**Connected Parties**" means, in relation to a person, any of its current and former Affiliates or Related Entities, and each such person's and its Affiliates' and Related Entities' (and their Affiliates') current and former officers, managers, directors, predecessors, successors, assigns, principals, employees, agents, managed accounts or funds, management companies, fund Advisors, investment managers or advisors (and any entity and its Affiliates which: (i) is managed or advised by such person's investment manager or advisor; or (ii) such person manages or advises in its capacity as investment manager or advisor), advisory board members, financial Advisors, partners, accountants, attorneys, investment bankers, consultants, representatives and other professionals, each in their capacity as such;

"**Court**" means the High Court of Justice of England and Wales;

"**Custodian**" means any receiver, trustee, assignee, liquidator, *conciliador*, *síndico*, *sequestrator* or similar official under any Bankruptcy Law;

"**Deed of Release**" means the deed of release and waiver substantially in the form set out in Schedule 1 (*Deed of Release*) of this Scheme to be entered into on or about the date of this Scheme amongst, inter alia, the Scheme Company, the Issuer, the Existing Notes Trustee, the Agents and the Scheme Creditors (acting by the Scheme Company pursuant to the authority conferred upon the Scheme Company by the Scheme Creditors under the Scheme Document);

"**Designated Recipient**" means any person (who is not a Sanctioned Person) appointed by a Scheme Creditor (provided that such Scheme Creditor is not a Sanctioned Person) under an Account Holder Letter and/or New Notes Election Form which is validly completed and submitted to the Information Agent on behalf of that Scheme Creditor prior to the Election Deadline, to (i) receive that Scheme Creditor's Scheme Consideration Entitlements, and/or (ii) fund and/or receive that Scheme Creditor's New Notes Entitlement, if it is a Participating T2 New Noteholder, pursuant to the terms of this Scheme and the Implementation Deed; *provided that* if either (A) that Scheme Creditor's Scheme Consideration Entitlement comprises New Shares; and/or (B) that Scheme Creditor is a Participating T2 New Noteholder with a New Notes Entitlement, then such person must also not be a Disqualified Person;

"**Disqualified Person**" means a person who is:

(a)     resident or located or domiciled in, or subject to the laws of, any jurisdiction where the offer to issue to, the sale or subscription, the exercise or other form of acceptance by,

the delivery of or possession by, such person of any New Shares or New Notes and/or the possession or distribution of any offering material prepared in relation thereto is prohibited by law or regulation or would, or would be likely to, result in the Scheme Company or any of its Affiliates being required to comply with any filing, registration, disclosure or onerous requirement in such jurisdiction (as may be determined by the Scheme Company in its sole discretion); or

(b)     resident, located or domiciled in any Member State of the European Economic Area ("**EEA**") or in the United Kingdom ("**UK**"), and is not a "Qualified Investor" within the meaning of Article 2 of Regulation (EU) 2017/1129, as amended (including as it forms part of United Kingdom domestic law pursuant to the European Union (Withdrawal) Act 2018, as amended, the "**Prospectus Regulation**") as further set out in the Account Holder Letter, and with respect to whom the Scheme Company or the Issuer, acting in their sole discretion, has determined that an offer to such a person would not constitute either an offer (i) to no more than 149 natural or legal persons (other than Qualified Investors) in each Member State of the EEA or in the UK, or (ii) where the denomination per unit received by such person would amount to at least EUR 100,000; or

(c)     none of the following: (i) a QIB (within the meaning of Rule 144A under the US Securities Act), (ii) an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3), (7), (8), (9), (12) or (13) of Regulation D under the US Securities Act, or (iii) a non-US Person acquiring New Shares and/or New Notes in an offshore transaction (within the meaning of Regulation S under the US Securities Act).

"**DTC**" means The Depository Trust Company;

"**Election Deadline**" means 5.00 p.m. (New York time) on the third (3rd) Business Day following the date of the Scheme Meeting.

"**Enforcement Action**" means:

(a)     the acceleration of any sum payable under the Existing Notes Indenture or the making of any declaration that any sum payable under the Existing Notes Indenture is due and payable or payable on demand;

(b)     the making of any demand against the Scheme Company under the guarantee or any surety provided under the Existing Notes Indenture;

(c)     the suing for, commencing or joining of any legal or arbitration proceedings against the Scheme Company (including in its capacity as guarantor under the Existing Notes Indenture) or the Issuer to recover any sums payable under the Existing Notes Indenture;

(d)     exercising (or causing the Existing Notes Trustee to exercise) any other enforcement remedies set forth in the Existing Notes Indenture, including the making of any demand against any the Scheme Company as the guarantor in respect of the Existing Notes Indenture;

(e)     exercising (or causing the Existing Notes Trustee to exercise) any other enforcement remedies at law or in equity with respect to the Existing Notes or the guarantee granted by the Scheme Company in respect of the Existing Notes; and

(f)     petitioning for, applying for, or voting for any Insolvency Proceeding in respect of the Scheme Company or the Issuer,

except that the taking of any action falling within paragraphs (a) to (f) above which is necessary (but only to the extent necessary) to preserve the validity, existence or priority of claims in

respect of the Existing Notes, including the registration of such claims before any court or governmental authority and the bringing, supporting or joining of proceedings to prevent any loss of the right to bring, support or join proceedings by reason of applicable limitation periods shall not constitute Enforcement Action;

"**Equity Option**" means the option for a Scheme Creditor to elect that all of its Scheme Claims are finally discharged in full by Liabilities in respect of the Existing Notes held by it being assigned to the Issuer in consideration for a number of New Shares equal to the Settlement Amount divided by USD23.83 (being the price per share determined by the Issuer's board of directors and approved by the Issuer's shareholders based on the Equity Valuation Report converted into USD using the FX Rate); *provided that* if the total number of New Shares required to be issued to all Scheme Creditors electing the Equity Option (other than a Related Party Existing Noteholder) exceeds the Equity Option Cap, the Issuer shall be required to issue to such Scheme Creditors only the number of New Shares constituting the Equity Option Cap (distributed amongst such Scheme Creditors pro rata to their Settlement Amounts) and the Redemption Option shall apply to the part of the Settlement Amount in respect of which no New Shares are allocated;

"**Equity Option Cap**" means the number of New Shares that can be issued pursuant to the Equity Option such that following the issuance the controlling shareholder of the Issuer retains no less than 75% of the Issuer's issued share capital, being 2,793,049 of New Shares;

"**Equity Option Scheme Creditor**" means each Scheme Creditor that elects to receive the Scheme Consideration pursuant to the Equity Option under its Account Holder Letter;

"**Equity Valuation Report**" means the report dated 17 November 2024 prepared for the Issuer by 414 Capital Inc. regarding the equity value of the Issuer;

"**Excluded Scheme Claim**" means any Claim which arises:

(a)     as a result of the failure by any person to comply with, or perform its obligation(s) under, the Lock-Up Agreement, this Scheme or an Implementation Document;

(b)     under the Scheme and/or any Implementation Document which may arise or accrue in relation to acts, omissions, events and/or circumstances occurring, or which are done after the Restructuring Effective Date;

(c)     from fraud or gross negligence by a Released Party;

(d)     in respect of any Liability of the Scheme Company (including in its capacity as guarantor under the Existing Notes Indenture) or the Issuer to the Existing Notes Trustee for compensation and/or indemnity or otherwise to the Existing Notes Trustee in its capacity as such pursuant to the Existing Notes Indenture;

(e)     under or in respect of any fees payable to any of the Ad Hoc Group's Advisors;

(f)     under or in respect of any Scheme Creditor's obligations under this Scheme; or

(g)     under or in respect of any New Shares, the New Notes and/or the transaction documentation relating to the New Notes, including the New Notes Mexican Trust Agreement;

"**Existing Noteholder**" means any person that is the ultimate beneficial owner of the Existing Notes;

"**Existing Notes**" means the 8.250 per cent. senior notes due 11 February 2025 (ISIN: USP73699BH55) issued by the Issuer and guaranteed by the Scheme Company pursuant to the Existing Notes Indenture;

"**Existing Notes Indenture**" means the indenture originally dated 11 February 2020 as amended pursuant to supplemental indentures dated 30 March 2021 and 1 November 2024 in relation to the Existing Notes and made between the Issuer as issuer and the Existing Notes Trustee as notes trustee (as amended or supplemented from time to time);

"**Existing Notes Trustee**" means Wilmington Trust, National Association, as notes trustee under the Existing Notes Indenture;

"**Explanatory Statement**" means the explanatory statement dated 21 November 2024 relating to this Scheme which was required to be issued to the Scheme Creditors, together with this Scheme, pursuant to section 897 of the Companies Act;

"**FX Rate**" means the USD / MXN exchange rate of 20.0367 Ps per USD.

"**Group**" means the Issuer and its direct and indirect subsidiaries from time to time, including the Scheme Company;

"**Group's Counsels**" means Cleary Gottlieb Steen and Hamilton LLP and Mijares Angoitia Cortés y Fuentes, S.C.;

"**Group's Advisors**" means the Group's Counsels and Group's Financial Advisors;

"**Group's Financial Advisors**" means Houlihan Lokey, Inc. and Blink Capital Solutions;

"**Holding Period**" means the period from the Restructuring Effective Date until the Holding Period Escrow Expiry Date.

"**Holding Period Escrow Agent**" means the Issuer in its capacity as escrow agent under the Holding Period Escrow Agreement;

"**Holding Period Escrow Agreement**" means the escrow agreement to be entered into on or prior to the Restructuring Effective Date between the Scheme Company, the Information Agent and the Holding Period Escrow Agent, in the form agreed between the Group's Counsels and the Ad Hoc Group's Advisors and made available on the Scheme Website;

"**Holding Period Escrow Expiry Date**" means 5.00 p.m. (New York time) on the date falling 365 days after the Restructuring Effective Date;

"**Holding Period Escrow Party**" has the meaning given to it in Clause 5.9(a) of this Scheme;

"**Implementation Deed**" means the agreement to be entered into by, amongst others, the Scheme Company, the Issuer, the Agents, and the Scheme Creditors in accordance with the terms of this Scheme, governing the implementation of the Restructuring, in the form attached to this Scheme at Schedule 2 (*Implementation Deed*);

"**Implementation Documents**" means each of the following documents in the form agreed pursuant to the terms of the Implementation Deed:

(a)     the Implementation Deed and any ancillary documents referred to therein;

(b)     the documentation required to issue the New Shares, including the form of New Shares nominative certificates;

(c)     the documentation required to issue the New Notes, including:

      (i)     the Note Purchase and Placement Agreement;

      (ii)    the New Notes Indenture;

      (iii)   New Notes Mexican Trust Agreement;

(d)     the Deed of Release;

(e)     the New Notes Settlement Agreement;

(f)     the Cash Settlement Escrow Agreement;

(g)     the Holding Period Escrow Agreement; and

(h)     any other document, agreement, deed, instrument of transfer, resolution, consent, undertaking, certificate, notice or form that is designated as an Implementation Document pursuant to the Implementation Deed, which is scheduled to, referred to in and/or contemplated in any Implementation Document or is otherwise necessary or reasonably desirable to support, facilitate, implement or otherwise give effect to the Restructuring or which is referred to in, or contemplated by, and in the forms agreed to in accordance with the terms of the Lock-Up Agreement and the Implementation Deed;

"**Implementation Steps**" has the meaning given to it in the Implementation Deed;

"**Information Agent**" means Kroll Issuer Services Limited, a private company incorporated in England and Wales with registered number 05098454, whose registered office is at The Shard, 32 London Bridge Street London, England, SE1 9SG (or any successor in title) in its capacity as information agent in relation to this Scheme;

"**Insolvency Proceeding**" means any corporate action or legal proceedings taken in relation to:

(a)     a Mexican *concurso mercantil*, the suspension of payments, a moratorium of any indebtedness, winding-up, bankruptcy, liquidation, dissolution, administration, receivership, administrative receivership, judicial composition or reorganisation (by way of voluntary arrangement, scheme or otherwise) with respect to the Scheme Company or the Issuer;

(b)     a composition, conciliation, compromise or arrangement with the creditors generally of the Scheme Company or the Issuer or an assignment by the Scheme Company or the Issuer of its assets for the benefit of its creditors generally or the Scheme Company or the Issuer becoming subject to a distribution of its assets;

(c)     the appointment of a Mexican *conciliador*, liquidator, receiver, administrator, administrative receiver, compulsory manager or other similar officer in respect of the Scheme Company or the Issuer or any of its assets; or

(d)     any procedure or step in any jurisdiction analogous to those set out in paragraphs (a) to (c) above, and

excluding, for the avoidance of doubt, the Scheme, or any ancillary or parallel proceedings thereto, including, but not limited to, any proceedings to implement or effect cross-border or parallel recognition or implementation of the Restructuring or of the Scheme to the extent required or desirable;

"**International Facilities**" has the meaning given to this term in the Explanatory Statement.

"**Issuer**" means Operadora de Servicios Mega, S.A. de C.V., SOFOM, E.R., a company incorporated under the laws of Mexico, with its registered office at Av. Patria 1501, Jardines Universidad, 45110 Zapopan, Jalisco, Mexico;

"**Liability**" means any debt, liability or obligation whatsoever, whether it is present, future, prospective or contingent, whether or not its amount is fixed or undetermined, whether or not it involves the payment of money or the performance of an act or obligation, and whether it arises at common law, in equity or by statute, in England and Wales or in any other jurisdiction, or in any other manner whatsoever, but such expression does not include any liability which is

7

barred by statute or is otherwise unenforceable or arises under a contract which is void or, being voidable, has been duly avoided, and "**Liabilities**" will be construed accordingly;

"**Lock-Up Agreement**" means the lock-up agreement (including the term sheet appended at Schedule 2 (*Restructuring Terms*) thereto) between, among others, the Scheme Company, the Issuer and certain Existing Noteholders, dated 11 November 2024;

"**Lock-Up Fee**" means, in relation to a Locked-Up Noteholder, such amount as is equal to 1 per cent. of the aggregate principal amount of that Locked-Up Noteholder's Locked-Up Notes and excluding (for the avoidance of doubt) any Existing Notes sold, transferred, assigned or otherwise disposed of by that Locked-Up Noteholder after the date of the Scheme Meeting;

"**Lock-Up Fee Entitlement**" means the entitlement of each Locked-Up Noteholder to its Lock-Up Fee;

"**Locked-Up Noteholder**" means each Existing Noteholder that is party to the Lock-Up Agreement as at the date of the Scheme Meeting;

"**Locked-Up Notes**" means at any time, in relation to a Locked-Up Noteholder, the aggregate principal amount of all Existing Notes held by that Locked-Up Noteholder as at the Voting Instruction Deadline;

"**Longstop Date**" means:

(a)     11.59 p.m. (London time) on 28 February 2025; or

(b)     such later time as may be agreed in writing between the Issuer and the Majority Consenting Creditors (as defined in the Lock-Up Agreement) or, following the Scheme Effective Date, the Majority Scheme Creditors, subject to approval by the Majority International Lenders;

"**Majority International Lenders**" means lenders under the International Facilities, who in aggregate hold 50% or more of the participations in the International Facilities (by value).

"**Majority Scheme Creditors**" means Scheme Creditors (other than Sanctioned Persons) whose holdings of the Existing Notes constitute at the relevant time more than 50 per cent. of the aggregate principal amount of the Existing Notes held at the relevant time by the Scheme Creditors (other than Sanctioned Persons), excluding the Existing Notes Trustee and the Registered Holder Nominee;

"**New Notes**" means the new notes to be issued by the Issuer on or before the Restructuring Effective Date in accordance with the terms of the Scheme and to be governed by the New Notes Indenture;

"**New Notes Cash Cap**" means USD 51,237,630;

"**New Notes Election Form**" means the New Notes election form to be made available with the Explanatory Statement;

"**New Notes Entitlement**" means in respect of any Participating T2 New Noteholder, its entitlement to subscribe for and receive New Notes in such amount as is calculated in accordance with Clause 5.3(a)(i) of this Scheme;

"**New Notes Indenture**" means the indenture to be entered into by the Issuer and the New Notes Indenture Trustee pursuant to the Note Purchase and Placement Agreement governing the terms of the New Notes in the form agreed between the Group's Counsels and the Ad-Hoc Group's Advisors and made available on the Scheme Website;

"**New Notes Indenture Trustee**" means UMB BANK, N.A., in its capacity as trustee under the New Notes Indenture;

"**New Notes Mexican Trustee**" means CIBanco, S.A., Institución de Banca Múltiple,  in  its capacity  as Mexican trustee pursuant to the New Notes Mexican Trust Agreement;

"**New Notes Mexican Trust Agreement**" means the Mexican trust agreement to be entered into by the New Notes Mexican Trustee, the Issuer and the New Notes Indenture Trustee in accordance with the New Notes Indenture in the form agreed between the Group's Counsels and the Ad-Hoc Group's Advisors and made available on the Scheme Website;

"**New Notes Settlement Agent**" means UMB BANK, N.A., in its capacity as settlement agent in respect of the New Notes;

"**New Notes Settlement Agreement**" means the settlement agreement to be entered into between the Issuer, the Scheme Company and the New Notes Settlement Agent in relation to the settlement and delivery of the New Notes, in the form agreed between the Group's Counsels and the Ad Hoc Group's Advisors and made available on the Scheme Website;

"**New Shares**" means the voting shares in the Issuer (with the same rights as the Issuer's existing shares) to be issued on or before the Restructuring Effective Date in accordance with the terms of the Scheme.

"**New Shares Entitlement**" means, in respect of each Equity Option Scheme Creditor, its entitlement to receive as consideration under this Scheme, New Shares in such amount as calculated in accordance with Clause 5.3(a)(ii)(B) of this Scheme;

"**Non-Electing Scheme Creditor**" means each Scheme Creditor that does not make any valid election in relation to the Equity Option or Redemption Option under the Scheme (including as a result of being a Sanctioned Person);

"**Note Purchase and Placement Agreement**" means the note purchase and placement agreement to be entered into in accordance with the Implementation Deed in relation to the placement of the New Notes to certain New Note purchasers, including the Participating T2 New Noteholders, in the form attached to this Scheme at Schedule 3 (*Note Purchase and Placement Agreement*);

"**Participating T2 New Noteholder**" means each holder of the Existing Notes who elects to subscribe for the New Notes by validly submitting the New Notes Election Form on or before the Election Deadline and who accedes (or whose Designated Recipient, if applicable, accedes) to the Note Purchase and Placement Agreement in its capacity as such; *provided that* such holder (and its Designated Recipient, if applicable) is not a Disqualified Person nor a Sanctioned Person and *further provided that* a holder of the Existing Notes shall only be entitled to subscribe for the New Notes to the extent that (i) the principal amount of New Notes constituting its New Notes Entitlement would at least equal US$150,000 and integral multiples of US$1,000 thereafter (rounded down to the nearest US$1,000) or it designates a Designated Recipient to receive its New Notes Entitlement who, together with any other New Notes Entitlements it is entitled to, would receive New Notes with a principal amount at least equal to US$150,000 and integral multiples of US$1,000 thereafter (rounded down to the nearest US$1,000);

"**Proceeding**" means any process, action or other legal proceeding (including, without limitation, any demand, arbitration, alternative dispute resolution, judicial review, adjudication, execution, seizure, distraint, forfeiture, re-entry, lien, enforcement of judgment or enforcement of any security) in any jurisdiction whatsoever;

"**Record Date**" means 5.00 p.m. (New York time) on 2 December 2024;

9

"**Redemption Option**" means the option for a Scheme Creditor to elect that all of its Scheme Claims are finally settled and discharged in full in exchange for payment by the Issuer of an amount in cash in USD equal to 45% of the Settlement Amount of such Scheme Creditor;

"**Redemption Option Scheme Creditor**" means each:

(a)    Scheme Creditor that elects the Redemption Option under its Account Holder Letter;

(b)    Non-Electing Scheme Creditor;

(c)    a Scheme Creditor that by operation of the Equity Option Cap is allocated Redemption Option in respect of part of its Settlement Amount, but only in respect of such part;

(d)    Scheme Creditor that is or becomes a Disqualified Person as at the date on which the Scheme Consideration is required to be paid pursuant to the Implementation Deed; and

(e)    Scheme Creditor that is or becomes a Sanctioned Person as at the date on which the Scheme Consideration is required to be paid pursuant to the Implementation Deed;

"**Registered Holder Nominee**" means Cede & Co. in its capacity as the registered holder of the global note with respect to the Existing Notes as nominee for DTC;

"**Registrar of Companies**" means the registrar of companies for England and Wales, as described in section 1060 of the Companies Act 2006;

"**Related Entity**" means, in relation to an entity (the "**First Entity**"), an entity (or any of its Affiliates) which is managed or advised by the same investment manager or investment Advisor as the First Entity (or its Affiliates) or by a different investment manager or investment Advisor which is an Affiliate of the investment manager or investment Advisor of the First Entity (or its Affiliates);

"**Related Party Existing Noteholder**" means certain Existing Noteholders who are related to the Issuer.

"**Released Parties**" has the meaning given to it in the Deed of Release;

"**Relevant Default**" has the meaning given to it in the Lock-Up Agreement;

"**Restructuring**" means the financial restructuring of the Group relating to the financial obligations of the Scheme Company and the Issuer, including in respect of the Existing Notes and certain other indebtedness of the Issuer, as more fully detailed in Part 3 of the Explanatory Statement;

"**Restructuring Effective Date**" means the time at which the Scheme Company notifies Scheme Creditors (via the Information Agent) and the Existing Notes Trustee that all conditions set out in the Implementation Deed have been fulfilled or waived in accordance with the terms of this deed and all of the conditions precedent under the Implementation Documents have been fulfilled or waived in accordance with their terms and the Restructuring is implemented and has become effective in accordance with the Implementation Deed following the occurrence of each of the Implementation Steps;

"**Sanctioned Country**" means a country or territory that is subject to comprehensive Sanctions (currently, Crimea, Cuba, Iran, North Korea, Syria, and those portions of the Donetsk People's Republic or Luhansk People's Republic regions (and such other regions) of Ukraine over which any Sanctions Authority imposes country or territory wide comprehensive Sanctions).

"**Sanctioned Custodian**" means an Account Holder, an intermediary or custodian that is a person falling under paragraphs (a) to (c) of the definition of a Sanctioned Person;

"**Sanctioned Person**" means a person that is:

(a) listed on any Sanctions List, or is otherwise the target of any Sanctions (including, without limitation, by reason of ownership, control or agency (as such terms are defined by the relevant Sanctions or Sanctions Authority) by or with one or more persons listed on a Sanctions List);

(b) located or ordinarily resident in or organized under the laws of any Sanctioned Country;

(c) with which the Issuer, the Ad Hoc Group, the Issuer's advisors or the Ad Hoc Group's Advisors, the Existing Notes Trustee, the New Notes Indenture Trustee, the New Notes Mexican Trustee or any Agent in respect of the Restructuring or the Existing Notes is prohibited pursuant to any Sanctions from dealing or otherwise engaging in any transaction contemplated by the terms of the Existing Notes, the Existing Notes Indenture, the Scheme, the Implementation Documents and/or the Restructuring;

(d) whose Existing Notes are held through a Sanctioned Custodian, but only if the dealing or other engagement in respect of the Existing Notes of such Scheme Creditor in connection with the Scheme or the Restructuring (and excluding for the avoidance of doubt any payments by the Issuer made through the Clearing Systems) are required to be conducted through such Sanctioned Custodian; or

(e) acting on behalf of or at the direction of a person falling within paragraphs (a) through (d) above,

provided that "**Sanctioned Person**" will exclude those that are solely identified on, or otherwise solely subject to the restrictions under, the 'Sectoral Sanctions Identifications List' of the U.S. Department of the Treasury's Office of Foreign Assets Control or any equivalent list maintained by any other Sanctions Authority, provided that such restrictions would not in any other way restrict or prohibit transactions, activities or other dealings contemplated in connection with the Scheme or the Restructuring;

"**Sanctions**" means economic or financial sanctions, laws, regulations or trade embargoes or similar measures implemented, administered or enforced by any of the Sanctions Authorities;

"**Sanctions Authority**" means:

(a) the U.S. Department of the Treasury's Office of Foreign Assets Control and the U.S. Department of State;

(b) the United Nations Security Council;

(c) the European Union or any member state thereof, or any governmental authority of the same; or

(d) the United Kingdom (or any governmental authority of the same, including without limitation in respect of the United Kingdom, His Majesty's Treasury and the Department for Business and Trade);

"**Sanctions Licence Requirements**" means any requirements of (i) the license to be granted in relation to the Restructuring by the U.S. Department of the Treasury's Office of Foreign Assets Control; and (ii) the General Licence – Bond amendments and restructurings for non-Designated Persons (INT/2023/2824812) issued by the Office of Financial Sanctions Implementation of His Majesty's Treasury;

"**Sanctions List**" means any of the lists of specifically designated persons or entities (or equivalent) maintained by a Sanctions Authority, each as amended, supplemented or substituted from time to time;

"**Scheme**" means the scheme of arrangement proposed pursuant to Part 26 of the Companies Act between the Scheme Company  (in its capacity as the guarantor under the Existing Notes

Indenture) and the Scheme Creditors (as creditors of the Scheme Company) in the form set out herein, with or subject to any modification, addition or condition which the Court may think fit to approve or impose, as appropriate in accordance with the terms of this Scheme and Clause 8 (*Modifications of the Scheme or Waiver of the Scheme Conditions*);

"**Scheme Claim**" means any Claim in respect of any Liability of the Scheme Company (including in its capacity as guarantor under the Existing Notes Indenture or otherwise in respect of the Existing Notes) or the Issuer, owed to any of the Scheme Creditors and/or the Existing Notes Trustee arising directly or indirectly out of or in relation to the Existing Notes Indenture as a result of an obligation or Liability of the Scheme Company or the Issuer incurred, or as a result of an event occurring or an act done, on or before the Restructuring Effective Date, and together with any Claim previously held by a Scheme Creditor which may be owed to the Scheme Company (including in its capacity as guarantor under the Existing Notes Indenture or otherwise in respect of the Existing Notes) and the Issuer in each case, directly or indirectly out of, or which otherwise results from, the Restructuring or any Implementation Step being taken in accordance with the terms of the Implementation Deed (including, for the avoidance of doubt, any interest accruing on, or accretions arising in respect of, such Claims up to and including the Restructuring Effective Date) other than an Excluded Scheme Claim;

"**Scheme Company**" means Mega Newco Limited, a company incorporated under the laws of England and Wales and registered under number 15986024 and with its registered address at Suite 1, 7th Floor 50 Broadway London SW1H 0DB;

"**Scheme Conditions**" means:

(a)     the occurrence of the Scheme Registration Time;

(b)     confirmation being received from HM Revenue & Customs that the Scheme Sanction Order is not subject to stamp duty;

(c)     notification by the Scheme Company to the Scheme Creditors (via the Information Agent) and the Existing Notes Trustee that the foregoing conditions set out at (a) – (b) have been fulfilled or waived in accordance with Clause 8 (*Modifications of the Scheme or Waiver of the Scheme Conditions*) of the Scheme;

"**Scheme Consideration**" has the meaning given to it in Clause 5.1(a) (*Entitlement to Scheme Consideration*);

"**Scheme Consideration Entitlement**" means in respect of each Scheme Creditor, its entitlement to receive its Cash Entitlement and/or its New Shares Entitlement;

"**Scheme Creditor Entitlements**" means any New Notes Entitlements and Scheme Consideration Entitlements of a Scheme Creditor;

"**Scheme Creditors**" means the Existing Noteholders, the Existing Notes Trustee and the Registered Holder Nominee;

"**Scheme Effective Date**" means the date on which the Scheme Registration Time occurs and the Scheme Company notifies the Scheme Creditors (via the Information Agent) and the Existing Notes Trustee that each of the Scheme Conditions has been fulfilled or waived in accordance with Clause 8 (*Modifications of the Scheme or Waiver of the Scheme Conditions*);

"**Scheme Meeting**" means any meeting of the Scheme Creditors convened with the permission of the Court pursuant to section 896 of the Companies Act to consider, and if thought fit, to approve this Scheme, including any adjournment thereof;

"**Scheme Registration Time**" means the time at which a certificated copy of the Scheme Sanction Order is delivered to the Registrar of Companies for registration;

12

"**Scheme Sanction Hearing**" means the hearing at which the Court issues the Scheme Sanction Order;

"**Scheme Sanction Order**" means an order of the Court sanctioning this Scheme under section 899 of the Companies Act;

"**Scheme Standstill**" has the meaning given to it in Clause 9.1(a) of this Scheme;

"**Scheme Website**" means the website set up for the Scheme Creditors by the Information Agent at https://deals.is.kroll.com/grupomega;

"**Settlement Amount**" means, in respect of a Scheme Creditor, an aggregate amount of principal of the Existing Notes held by such Scheme Creditor as at the Record Date (i) *less* the Subscription Amount; and (ii) *plus* accrued and unpaid interest thereon as at the relevant date of payment or delivery of the Scheme Consideration pursuant to the Implementation Deed, as the case may be.

"**Settlement Funds Flow**" has the meaning given to it in the Implementation Deed;

"**SP Holding Period**" means, with respect to a Holding Period Escrow Party that is a Sanctioned Person, the period of 60 days commencing from the date that such Holding Period Escrow Party ceases to be a Sanctioned Person or on which such Holding Period Escrow Party becomes entitled to receive (and the Issuer and the Holding Period Escrow Agent become entitled to make) distributions of the funds held in the Holding Period Escrow in compliance with Sanctions, but in any event not exceeding 20 years following the Restructuring Effective Date;

"**Subscription Amount**" has the meaning given to it in Clause 5.3(a)(i)(A) of this Scheme;

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same);

"**Total New Notes Commitments**" means the total aggregate amount of New Notes that Scheme Creditors elect to subscribe for by validly submitting New Notes Election Forms;

"**Trustees**" means the Existing Notes Trustee, any New Notes Mexican Trustee and any New Notes Indenture Trustee;

"**Undertaking**" means an undertaking from any Undertaking Transaction Party, dated on or before the date of the Scheme Sanction Hearing to, amongst other things, be bound by, and perform the terms of, this Scheme and the Implementation Documents to which it is a party insofar as they relate to it;

"**Undertaking Transaction Party**" means the Issuer, each Agent and each of the Trustees;

"**US Securities Act**" means the US Securities Act of 1933, as amended; and

"**Voting Instruction Deadline**" means 5.00 p.m. (New York time) on 9 December 2024.

1.2    In this Scheme, unless the context otherwise requires or otherwise expressly provides:

(a)    to the extent that there is any conflict or inconsistency between the terms of this Scheme and the Explanatory Statement, the terms of this Scheme will prevail;

(b)    references to Clauses and Schedules are references to the Clauses of, and Schedules to, this Scheme and a reference to "this Scheme" includes a reference to each of the Schedules to this Scheme;

(c) the Agents, the Trustees, the Scheme Company or any other person will be construed as to include its successors in title, permitted assigns and permitted transferees;

(d) references to a person include references to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

(e) references to a statute or statutory provision include the same as subsequently modified, amended, supplemented or re-enacted from time to time;

(f) references to an agreement, deed or document will be deemed also to refer to such agreement, deed or document as amended, supplemented, restated, verified, replaced and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto, provided that such amendment, supplement, restatement, verification, replacement and/or novation has, to the extent it relates to an Implementation Document or this Scheme, been made in accordance with the terms of such Implementation Document and/or this Scheme (as applicable);

(g) references to an agreement, deed or document will include any schedules, annexes and appendices to such agreement, deed or document;

(h) references to (or to any specified provision of) this Scheme will be construed as references to this Scheme as in force for the time being;

(i) the singular includes the plural and vice versa and words importing one gender will include all genders;

(j) "including" or "include" means including or include without limitation;

(k) "or" is not exclusive;

(l) headings to Clauses and Schedules are for ease of reference only and will not affect the interpretation of this Scheme;

(m) unless otherwise stated, all references in this Scheme to times are to London time;

(n) where any amount is specified in this Scheme (including in any definition) in respect of any Scheme Consideration or New Notes, that amount is subject to rounding in accordance with the terms of this Scheme;

(o) any references to any Scheme Consideration or New Notes being issued or delivered to a Scheme Creditor shall be treated for all purposes as references to that person being issued with or delivered directly, or indirectly through one or more intermediaries, the relevant Scheme Consideration or New Notes in accordance with the rules and procedures of the Clearing System;

(p) references to Existing Notes being held by an Existing Noteholder shall be treated for all purposes as references to the Book Entry Interest or Book Entry Interests held by the relevant Existing Noteholder;

(q) "$", "US$" or "USD" means the US dollar, the lawful currency for the time being of the United States of America; and

(r) "MXN" means the Mexican Pesos, the lawful currency for the time being of the United Mexican States.

## 2.    Application of the Scheme and the Scheme Effective Date

2.1    The compromises and arrangements effected by this Scheme will:

(a) apply to all Scheme Claims and bind all Scheme Creditors (and each of their respective successors and assigns) and the Scheme Company;

(b) subject to the terms of its respective Undertaking, bind each Undertaking Transaction Party (and its respective successors and assigns); and

(c) bind each other person that has undertaken to be bound by the terms of this Scheme and their respective successors and assigns.

2.2 Subject to Clause 2.4 below and Clause 9.2 (*Termination*), the terms of this Scheme will become effective and binding on the Scheme Effective Date.

2.3 The Scheme Company shall promptly notify the Scheme Creditors that the Scheme Effective Date has occurred and promptly thereafter shall execute and deliver the Implementation Deed based on the authorities granted to it pursuant to this Scheme.

2.4 The arrangements effected by this Scheme shall apply to all Scheme Creditors and all of their respective rights, title and interests to Scheme Claims and will be subject to the compromises and arrangements set out in this Scheme pursuant to the terms of the Implementation Deed and at the time specified for the relevant Implementation Step in such Implementation Deed.

**3.    Consideration**

The authorities, instructions, undertakings, releases (including the releases given pursuant to the Deed of Release), ratifications, and waivers given by the Scheme Creditors in favour of the Scheme Company (including its capacity as guarantor of the Existing Notes Indenture), the Issuer and the Released Parties, where applicable, are given by each Scheme Creditor in consideration of the rights provided to each Scheme Creditor under this Scheme and pursuant to the Implementation Documents and by the Existing Notes Trustee pursuant to the Scheme Sanction Order and the instruction given to it pursuant to Clause 4.2(a) (*Undertaking Transaction Parties' Authority*).

**4.    Grant of Authority to Execute the Implementation Documents**

**4.1    Scheme Company's Authority to Execute the Implementation Documents**

(a) On and from the Scheme Effective Date, each Scheme Creditor (on its own behalf and on behalf of any Designated Recipient) in consideration for its rights accruing to it under this Scheme hereby irrevocably authorises, appoints and instructs the Scheme Company acting reasonably (acting by its directors, officers or other duly appointed representatives) as its true and lawful agent and attorney (and as agent and attorney of such person to whom such Scheme Creditor has assigned or transferred any of its Scheme Claims where such transfers are recognised by the Scheme Company in accordance with Clause 9.6 (*Assignments or Transfers*)) to, for and on behalf of each such Scheme Creditor:

(i) Enter into, execute and deliver (whether as a deed or otherwise) for and on behalf of each such Scheme Creditor each Implementation Document to which the Scheme Creditors (or any of them) are (or is) expressed to be a party;

(ii) agree on its behalf any amendments to the Implementation Documents to which such Scheme Creditor is expressed to be a party, which the Scheme Company deems (acting reasonably and in good faith) to be:

(A) necessary or reasonably desirable to give effect to, or reflect the terms of, this Scheme and/or the transactions to be entered into in order to effect the Restructuring; or

15

(B)    necessary to correct any manifest error (that could reasonably be expected to be considered such by all of the parties to that Implementation Document); or

(C)    minor or technical in nature and, in each case would not (i) impose any additional obligation on, nor (ii) materially, adversely or disproportionately affect the rights of, any of the Scheme Creditors in any manner that is not otherwise contemplated by this Scheme or the Implementation Documents;

(iii)    agree on its behalf any amendments to the Implementation Documents to which such Scheme Creditor is expressed to be a party that the Scheme Company may, acting reasonably and in good faith, deem necessary or desirable in order to:

(A)    ensure that the information and categories of information contained or referred to in any formula, schedule, annex or similar, lists of parties, signature blocks, parties' provision, notice details, bank account details, legal entity names or registration numbers, blanks or placeholders in any Implementation Documents reflect the correct relevant information and categories of information as of the applicable date;

(B)    insert the Scheme Consideration Entitlements, the New Notes Entitlements, the Lock-Up Fee Entitlements and any other relevant allocations of the Scheme Creditors where required in the Implementation Documents, in each case as calculated in accordance with the terms of this Scheme and the Implementation Deed;

(C)    subject to the approval rights set forth in Clause 8 (*Modifications of the Scheme or Waiver of the Scheme Conditions*), take into account any modification of, or addition to, this Scheme and/or the Implementation Documents approved or imposed by the Court in accordance with that Clause 8 (*Modifications of the Scheme or Waiver of the Scheme Conditions*);

(D)    ensure that the Implementation Documents are duly executed and delivered in accordance with the Implementation Deed; and/or

(E)    ensure that the Implementation Documents are legal, valid, binding and enforceable upon the parties to them in accordance with this Scheme and the Implementation Deed,

provided in each case that the Implementation Documents shall (where applicable) otherwise remain substantially in the forms appended to the Explanatory Statement or, if later, made available on the Scheme Website, and further provided that such amendments do not directly or indirectly materially change any right or obligation of or impose an additional obligation (by reference to such rights or obligations as are contemplated at the date of the Explanatory Statement) on any Scheme Creditor and do not materially adversely affect a Scheme Creditor;

(iv)    enter into, execute and deliver (whether as a deed or otherwise) for and on behalf of such Scheme Creditor, any document, notice or instruction (including giving instructions to the Trustees and the Agents) as may be necessary or reasonably desirable (acting reasonably and in good faith) to give effect to the

16

instruction under this Clause 4 (*Grant of Authority to Execute the Implementation Documents*); and

(v) enter into, execute and deliver (whether as a deed or otherwise) any other document and give any other notice, confirmation, consent, order, instruction (including giving instructions to the Trustees and the Agents) or direction, or take any other action, as may be necessary in the discretion of the Scheme Company (acting reasonably), to release all Scheme Claims (in accordance with and at the times set out in, the Implementation Deed) and/or to otherwise give effect to this Scheme, the Implementation Steps, the Implementation Documents and/or the Restructuring, provided in each case that any such document:

(A) is consistent in all material respects with the terms of the Lock-Up Agreement and the Implementation Deed; and

(B) would not (i) impose any additional obligation on, nor (ii) materially, adversely or disproportionately affect the rights of, any of the Scheme Creditors in any manner that is not otherwise contemplated by this Scheme or the Implementation Documents.

(b) Notwithstanding anything to the contrary in this Scheme:

(i) the documents referred to above (other than the Implementation Deed) will only be released and delivered from escrow and become effective in accordance with their respective terms and as provided for in, and in accordance with the terms of, the Implementation Deed, whereupon they will become unconditionally and irrevocably binding on all Scheme Creditors and each of the other parties thereto;

(ii) the releases contained in the Deed of Release shall only become effective at the time set out in the Implementation Deed which shall not, for the avoidance of doubt, occur prior to the occurrence of the Restructuring Effective Date; and

(iii) the Scheme Company shall use all reasonable endeavours, insofar as practicable, to ensure that the calculations, allocations and entitlements in respect of each individual Scheme Creditor be kept confidential to that individual Scheme Creditor.

## 4.2    Undertaking Transaction Parties' Authority

(a) Subject to Clause 2.4 (*Application of the Scheme and the Scheme Effective Date*) and Clause 9.2 (*Termination*) and pursuant to the Undertaking executed by the applicable Undertaking Transaction Party, on and from the Scheme Effective Date, each Scheme Creditor (on behalf of itself and, if applicable, its Designated Recipient) hereby authorises and instructs:

(i) each Undertaking Transaction Party to enter into, execute and deliver (whether as a deed or otherwise) and perform, each Implementation Document to which it is expressed to be a party; *provided that* such Implementation Documents (other than the Implementation Deed) will only become effective in accordance with their respective terms and as provided in, and in accordance with the terms of, the Implementation Deed, whereupon they will become unconditionally and irrevocably binding on all such Undertaking Transaction Parties and each of the other parties thereto;

(ii) each Undertaking Transaction Party, to take all steps and do all other things necessary or reasonably desirable (acting reasonably and in good faith) to give

effect to the Restructuring and otherwise to enter into, execute and deliver (whether as a deed or otherwise) all such documents that the Scheme Company or the relevant Undertaking Transaction Party reasonably considers necessary to give effect to the Restructuring, without limitation to the generality of the foregoing; *provided that*:

    (A)    any such documents will not become effective prior to the Restructuring Effective Date (unless, in accordance with the terms of the Implementation Deed, it is necessary for them to become effective earlier in order to effect the Restructuring), whereupon they will be unconditionally and irrevocably binding on all such Undertaking Transaction Parties and each of the other parties thereto; and

    (B)    any such document is consistent with the Lock-Up Agreement and the Implementation Deed;

    (iii)    each Undertaking Transaction Party to authorise, appoint and instruct the Scheme Company to perform the obligations of that Undertaking Transaction Party under this Clause 4.2(a) (*Undertaking Transaction Parties' Authority*) to implement the Scheme; and

    (iv)    each Undertaking Transaction Party to act and rely, without further verification, on any written instruction from the Scheme Company (acting on behalf of all Scheme Creditors pursuant to the authority granted to it under Clause 4.1(a) (*Scheme Company's Authority to Execute the Implementation Documents*)) to take any action referred to in this Clause 4.2(a) (*Undertaking Transaction Parties' Authority*) or Clause 7.5 (*Further Assurance*) which instruction certifies that any such action required of such Undertaking Transaction Party is in compliance with such provision(s), this Scheme and the Implementation Deed; and

    (v)    the Existing Notes Trustee to give and make the ratifications, releases, undertakings and other matters referred to in Clause 6 (*Releases*) and Clause 7 (*Ratifications and Confirmations*) at the time specified for the corresponding Implementation Step in the Implementation Deed.

(b)    Each Undertaking Transaction Party shall have no liability to the Scheme Company, any Scheme Creditor, any of its or their respective Affiliates or any Connected Parties of any of them for any action taken, document executed or any inaction or omission by it pursuant to the authorisation and instruction set out in Clause 4.2(a) (*Undertaking Transaction Parties' Authority*) or in relying and acting on any instruction given to it in accordance with this Scheme, except as a result of its fraud, gross negligence or wilful misconduct.

4.3    **Undertaking of the Company and the Scheme Company**

Each of the Issuer and the Scheme Company undertakes to, and shall procure that any other relevant entity in the Group shall, take all steps and enter into, execute, deliver and perform all such documents, agreements, notices, confirmations, consents and orders as are necessary or reasonably desirable to give effect to this Scheme or the Restructuring, including the Implementation Documents and the documentary conditions precedent to them, in accordance with the terms thereof and in compliance with applicable Sanctions laws and the Sanctions Licence Requirements.

4.4    **Nature of Authorities and Obligations**

(a)    The authorities, appointments and instructions granted in this Clause 4 (*Grant of Authority to Execute the Implementation Documents*) will be treated, for all purposes

whatsoever and without limitation, as having been granted by deed and the Scheme Company will be entitled to delegate the authority granted and conferred by this Clause 4 (*Grant of Authority to Execute the Implementation Documents*) to any duly authorised officer of the Scheme Company or any other member of the Group as it may consider necessary or reasonably desirable (acting reasonably and in good faith) to implement the Scheme.

(b)     Each Scheme Creditor will be bound by and will comply with, each of its obligations under each Implementation Document provided that it has been executed by the Scheme Company on its behalf in accordance with this Clause 4 (*Grant of Authority to Execute the Implementation Documents*).

(c)     The appointment of the Scheme Company under Clause 4.1 (*Scheme Company's Authority to Execute the Implementation Documents*) as agent:

(i)      is independent from the appointment of the Scheme Company under such clause as attorney; and

(ii)     will be effective in spite of any defect in the appointment as attorney and *vice versa*.

(d)     The authorities, appointments and instructions granted in this Clause 4 (*Grant of Authority to Execute the Implementation Documents*) shall automatically expire on the earlier of:

(i)      the termination of the Scheme under Clause 9.2 (*Termination*);

(ii)     on the Restructuring Effective Date (save, in respect of any actions or steps required to be taken following the Restructuring Effective Date in accordance with the Implementation Deed);

(iii)    the Longstop Date; and

(iv)     in relation to each Implementation Document, the date on which that Implementation Document is fully executed by each party to it.

## 5.      Scheme Mechanics

### 5.1     Entitlement to Scheme Consideration

By virtue of and in accordance with this Scheme, the Implementation Deed and the Implementation Documents (subject to each becoming effective in accordance with their respective terms and, in the case of the Implementation Documents other than the Implementation Deed, the terms of the Implementation Deed), and subject to the other provisions of this Scheme, in consideration for releasing their Scheme Claims:

(a)     each Redemption Option Scheme Creditor (or its Designated Recipient) will be entitled to the rights and benefits allocated to a Redemption Option Scheme Creditor under this Scheme and the Implementation Documents, and will accordingly be entitled to receive its Cash Entitlement; and

(b)     each Equity Option Scheme Creditor (or its Designated Recipient) will be entitled to the rights and benefits allocated to an Equity Option Scheme Creditor under this Scheme and the Implementation Documents, and will accordingly be entitled to receive its New Shares Entitlement,

(this Clause 5.1(a) and (b) above, together, the "**Scheme Consideration**").

### 5.2     Entitlement to New Notes

By virtue of and in accordance with this Scheme, the Implementation Deed and the Implementation Documents (each of which shall become effective in accordance with the Implementation Steps set out in the Implementation Deed), and subject to the other provisions of this Scheme and the Implementation Documents, each Participating T2 New Noteholder (and/or its Designated Recipient, if applicable) will be entitled to the rights and benefits allocated to a Participating T2 New Noteholder under the Note Purchase and Placement Agreement and the Implementation Documents and will therefore be entitled to subscribe for and receive (or designate a Designated Recipient to subscribe for and receive) its New Notes Entitlement and, subject to compliance with its funding obligation in relation to its New Notes Entitlement in accordance with the Note Purchase and Placement Agreement, shall be issued an amount of New Notes equal to its New Notes Entitlement.

5.3    **Calculation of Scheme Creditor Entitlements**

(a)    The Scheme Creditor Entitlements of each Scheme Creditor shall be calculated in accordance with this Clause 5.3(a) and the amounts of such entitlements so calculated shall be recorded in the Allocations Spreadsheet:

(i)    the New Notes Entitlement of each Participating T2 New Noteholder shall be equal to:

(A)    the principal amount of the New Notes such Participating T2 New Noteholder elects to subscribe for in cash pursuant to the New Notes Election Form validly delivered on or before the Election Deadline, but in any event not exceeding its pro rata portion of the New Notes Cash Cap calculated on the basis of such Participating T2 New Noteholder's holding of the Existing Notes as at the Record Date and subject to Clause 5.4, such amount being that Participating T2 New Noteholder's "**Subscription Amount**"; plus

(B)    principal amount of the New Notes equal to the Subscription Amount multiplied by 3.5,

*provided that*:

(1)    a Participating T2 New Noteholder shall only be entitled to receive (or have its Designated Recipient receive) the New Notes Entitlement if such Participating T2 New Noteholder (or its Designated Recipient) complies with its funding obligations in respect of its Subscription Amount and otherwise subject to the terms and conditions of the Note Purchase and Placement Agreement; and

(2)    New Notes will be issued in minimum denominations of US$150,000 and US$1,000 increments thereafter and rounded down to the nearest multiple of US$1,000.

(ii)    The Scheme Consideration Entitlement of each Scheme Creditor shall be calculated on the following basis:

(A)    each Redemption Option Scheme Creditor's Cash Entitlement shall be equal to:

(1)    such Redemption Option Scheme Creditor's Settlement Amount multiplied by

(2)    0.45.

(B)    each Equity Option Scheme Creditor's New Shares Entitlement shall be equal to:

    (1)    such Equity Option Scheme Creditor's Settlement Amount divided by

    (2)    USD23.83;

    *provided that*:

    (I)    To the extent that the amount of an Equity Option Scheme Creditor's New Shares Entitlement is not a whole number, any fractional entitlement shall be rounded down to the nearest whole New Share; and

    (II)    if the total number of New Shares required to be issued to all Equity Option Scheme Creditors (other than a Related Party Existing Noteholder) exceeds the Equity Option Cap, then:

    the Equity Option Scheme Creditor's New Shares Entitlement shall be equal to its pro rata share of the Equity Option Cap calculated by reference to the Settlement Amounts of all Equity Option Scheme Creditors (other than a Related Party Existing Noteholder); and

    the Redemption Option shall apply to the party of the Equity Option Scheme Creditor's Settlement Amount in respect of which no New Shares are allocated.

(b)    Following the population of the Allocation Spreadsheet in accordance with Clause 5.3(a) above, the Scheme Company (or the Group's Advisors on its behalf) shall deliver a copy of the proposed final version of the Allocation Spreadsheet to the Ad Hoc Group's Advisors.

## 5.4    Backstop Commitment

If the Scheme Company and the Issuer resolve to call upon the Backstop Commitment, the Issuer and the Scheme Company will send a New Notes Funding Notice to each of the Backstop Parties (with a copy to the Information Agent) no later than three Business Days following the Election Deadline and the relevant New Notes Entitlement of that Backstop Party (also being a Participating T2 New Noteholder) shall be increased by taking into account any Subscription Amount that is actually subscribed for by the Backstop Parties pursuant to the Backstop Commitment Letter.

## 5.5    Payment of Lock-Up Fee

In accordance with the Implementation Steps set out in the Implementation Deed, each Scheme Creditor that is a Locked-Up Noteholder will be entitled to receive and shall (unless the Scheme Creditor is, or becomes prior to the relevant payment date, a Sanctioned Person) be paid, at the time specified in the Implementation Deed, its Lock-Up Fee Entitlement in cash (subject to and in accordance with the terms of the Lock-Up Agreement, including the condition that such Existing Noteholder votes in favour of the Scheme at the Scheme Meeting) and each such Scheme Creditor's Lock-Up Fee Entitlement will be set out in the Settlement Funds Flow to be agreed between the Ad Hoc Group's Advisors and the Group's Advisors in accordance with the Implementation Deed.

5.6    **Receipt of Scheme Creditor Entitlements and Appointment of a Designated Recipient**

(a)    The procedure and timing for the issuance of each Scheme Creditor's Scheme Consideration Entitlement, each Participating T2 New Noteholder's New Notes Entitlement and each Locked-Up Noteholder's Lock-Up Fee Entitlement shall be as set out in the Implementation Deed and, in particular, in the corresponding Implementation Step.

(b)    Each Scheme Creditor:

    (i)    shall only receive its Scheme Consideration Entitlement in accordance with the terms of the Implementation Deed if:

        (A)    it has duly elected to do so by validly completing, executing and delivering to the Information Agent an Account Holder Letter (including, without limitation, making all relevant elections) by the Election Deadline;

        (B)    it has, to the extent such Scheme Creditor is due to receive New Shares, delivered all "know your customer" information;

        (C)    it is able to give the Confirmations and the Scheme Company (acting reasonably and in good faith) considers such Confirmations to be correct and accurate;

        (D)    it is, to the extent such Scheme Creditor is due to receive New Shares, not a Disqualified Person; and

        (E)    it is not a Sanctioned Person.

    (ii)    shall only receive its respective New Notes Entitlement in accordance with the terms of the Implementation Deed:

        (A)    it has duly elected to do so by validly completing, executing and delivering to the Information Agent a New Notes Election Form (including, without limitation, making all relevant elections and providing all "know your customer" information required to be delivered thereunder) by the Election Deadline;

        (B)    it is able to give the Confirmations and the Scheme Company (acting reasonably and in good faith) considers such Confirmations to be correct and accurate;

        (C)    it (and if applicable its Designated Recipient) complies with its obligations under the Note Purchase and Placement Agreement;

        (D)    to the extent that its New Notes Entitlement is comprised of New Notes with a principal amount at least equal to US$150,000 and integral multiples of US$1,000 thereafter (rounded down to the nearest US$1,000) or it designates a Designated Recipient to receive its New Notes Entitlement, who together with any other New Notes Entitlements it is entitled to, would receive New Notes with a principal amount at least equal to US$150,000 and integral multiples of US$1,000 thereafter (rounded down to the nearest US$1,000);

        (E)    it is not a Disqualified Person; and

        (F)    it is not a Sanctioned Person.

    (iii)    will be entitled to appoint a Designated Recipient to receive its Scheme Consideration and/or to fund and/or receive the New Notes under and in accordance with its Account Holder Letter and/or New Notes Election Form, as the case may be; *provided that*:

        (A)    each of the following relevant parties has validly completed, executed and delivered to the Information Agent an Account Holder Letter and/or a New Notes Election Form by the Election Deadline:

            (1)    the Scheme Creditor, in order to make such election; and

            (2)    its Designated Recipient; and

        (B)    such Designated Recipient has validly completed, executed and delivered any and all such documents and agreements (including proxies and powers of attorney) and has provided all such other information as may be required or requested of it to enable the issuance of the relevant Scheme Consideration and/or New Notes to it in accordance with the Implementation Steps and has acceded to the Note Purchase and Placement Agreement.

    (c)    No Scheme Creditor or other person will have any entitlements to Scheme Consideration or New Notes other than pursuant to this Clause 5 (*Scheme Mechanics*) of this Scheme.

**5.7**    **Discrepancies in the Scheme Creditor Entitlements and the New Notes Entitlements**

Where there is any discrepancy between a Scheme Creditor's Scheme Creditor Entitlements (a) as calculated in accordance with Clause 5.3(a) (*Calculation of Scheme Creditor Entitlements*) of this Scheme, and (b) as set out in the Allocation Spreadsheet, such allocations and/or entitlements as calculated in accordance with the provisions of Clause 5.3(a) (*Calculation of Scheme Creditor Entitlements*) shall prevail.

**5.8**    **Existing Notes Cancellation**

In accordance with the Implementation Steps set out in Implementation Deed and the other Implementation Documents:

    (a)    the Scheme Company shall, on behalf of each Scheme Creditor, pursuant to the authority granted under Clause 4.1 (Scheme *Company's Authority to Execute the Implementation Documents*), execute and deliver a written order in accordance with the Implementation Deed to direct DTC to:

        (i)    instruct the Clearing Systems to debit the Book Entry Interests relating to the Existing Notes from the custody account of each Scheme Creditor (or its Account Holder, as applicable); and

        (ii)    authorise the cancellation of the Book Entry Interests in respect of the Existing Notes (and, if required by DTC, the Existing Notes Trustee shall agree to such cancellation pursuant to the authority granted under Clauses 4.1 (*Scheme Company's Authority to Execute the Implementation Documents*) and 4.2(a) (*Undertaking Transaction Parties' Authority*);

    (b)    the Existing Notes shall be cancelled, such cancellation to be binding on all Scheme Creditors;

    (c)    no Scheme Creditor, the Existing Notes Trustee or any other person will have any further claims in respect of the Existing Notes;

(d)     the Existing Notes Indenture shall be terminated and be of no further effect (save in respect of the Issuer's indemnity in favour of the Existing Notes Trustee); and

(e)     each Scheme Creditor will grant releases and covenants not to sue in favour of the Scheme Company, the Issuer and the Released Parties in accordance with Clause 6 (*Releases*).

5.9     **Holding Period Escrow**

(a)     If a Scheme Creditor:

(i)      is a Sanctioned Person;

(ii)     has not (or its Designated Recipient has not (as, and if, applicable)) delivered to the Information Agent a valid Account Holder Letter (including, without limitation, all "know your customer" information required to be delivered thereunder) by the Election Deadline;

(iii)    is unable (or its Designated Recipient is unable (as, and if, applicable)) to give the necessary confirmations included in the Account Holder Letter as to its eligibility to receive the Scheme Consideration (or any part of benefit thereof) (the "**Confirmations**"); or

(iv)    gives (or its Designated Recipient gives (as, and if, applicable)) any Confirmation or Confirmations which the Scheme Company (acting reasonably and in good faith) considers to be incorrect or inaccurate,

it shall be considered a "**Holding Period Escrow Party**" and its Scheme Consideration Entitlements and its Lock-Up Fee Entitlement (if applicable) to which it is entitled pursuant to Clause 5.1 (*Entitlement to Scheme Consideration*) and Clause 5.4 (*Payment of Lock-Up Fee*), respectively, will be distributed to the Holding Period Escrow Agent on the Restructuring Effective Date, to be held in escrow in accordance with the Holding Period Escrow Agreement.

(b)     The Holding Period Escrow Agent will hold the Scheme Consideration and any Lock-Up Fee issued to it in accordance with the terms of this Scheme and the Holding Period Escrow Agreement.

(c)     If, during the Holding Period, a Holding Period Escrow Party which is not a Sanctioned Person delivers a valid Account Holder Letter to the Information Agent (in respect of which, for the avoidance of doubt, the Scheme Company and the Holding Period Escrow Agent (in each of their sole discretion) consider the Confirmations therein to be accurate and correct) then, subject to and in accordance with the terms and conditions of the Holding Period Escrow Agreement, the Scheme Consideration and Lock-Up Fee (if applicable) issued to the Holding Period Escrow Agent for it as Holding Period Escrow Party will be, to the extent such distribution can be made in compliance with Sanctions, distributed to the relevant Holding Period Escrow Party.

(d)     To the extent that, during the Holding Period, a Holding Period Escrow Party provides a confirmation that it is a Sanctioned Person, the Holding Period Escrow Agent will continue to hold the monies attributable to such Holding Period Escrow Party's Scheme Consideration after the Holding Period Escrow Expiry Date, subject to paragraph (f) below.

(e)     Subject to paragraph (d) above, on the Holding Period Escrow Expiry Date, in accordance with the Holding Period Escrow Agreement:

(i)    Any Holding Period Escrow Party which has not validly claimed or received its entitlement in accordance with the Holding Period Escrow Agreement and/or which has not been identified prior to the end of the Holding Period as a Sanctioned Person, will have no entitlement to receive the relevant portion of Scheme Consideration or Lock-Up Fee (if applicable) held by the Holding Period Escrow Agent; and

(ii)    The Holding Period Escrow Agent will, subject to and in accordance with the Holding Period Escrow Agreement, in all instances provided that doing so would be in accordance with Sanctions or applicable laws and regulations:

(A)    at the request of the Scheme Company distribute the relevant part of the Scheme Consideration and any Lock-Up Fee (if applicable) to the Scheme Company (or at the Scheme Company's direction to another member of the Group); or

(B)    if the action described in paragraph (A) above cannot practicably be taken, retain the Scheme Consideration and any Lock-Up Fee in the Holding Period Escrow until such time as it becomes practicable to take such action in respect of such amounts (whereupon the Holding Period Escrow Agent shall take the relevant action).

(f)    Where a Holding Period Escrow Party ceases to be a Sanctioned Person or and/or otherwise becomes entitled to receive (and the Issuer and the Escrow Agent become entitled to make) the relevant distribution in compliance with Sanctions, after the Holding Period Escrow Expiry Date, in each case to the extent not prohibited by Sanctions:

(i)    that Holding Period Escrow Party shall be entitled to claim their Scheme Consideration Entitlement and Lock-Up Fee Entitlement, if applicable, during the SP Holding Period applicable to that Holding Period Escrow Party; and

(ii)    on and from the expiry of such SP Holding Period, to the extent that any Escrow Property has not been validly claimed by the relevant Holding Period Escrow Party in accordance with the Scheme, that Holding Period Escrow Party shall (except, for the avoidance of doubt in the circumstances described in sub-clause 5.8(e)(ii)(B)) have no entitlement to receive the Escrow Property previously held by the Holding Period Escrow Agent.

## 6. Releases

6.1    In accordance with the Implementation Steps set out in the Implementation Deed, each Scheme Creditor shall, at the time set out in the Implementation Steps, irrevocably authorise and instruct the Scheme Company and the Existing Notes Trustee (acting by its directors, officers or other duly appointed representatives) on its own behalf and on behalf of the Scheme Creditors under the authority granted in Clause 4.1 (*Scheme Company's Authority to Execute the Implementation Documents*) to enter into, execute and deliver as a deed (or otherwise) on its behalf, the Deed of Release, which will become effective and unconditionally and irrevocably binding upon all Scheme Creditors (and any person who acquires any interest in a Scheme Claim after the Record Date) on, and subject to the occurrence of, the Restructuring Effective Date in accordance with the timing and sequencing set out in the Implementation Deed. The authority granted under this Clause 6.1 shall be treated, for all purposes whatsoever and without limitation, as having been granted by deed.

6.2    This Scheme shall, with effect from, and subject to the occurrence of, the Restructuring Effective Date, satisfy, waive and release, fully and absolutely, all Scheme Claims.

6.3     For the avoidance of doubt, and notwithstanding anything to the contrary in this Clause 6 (*Releases*) or the Deed of Release, nothing in this Clause 6 (*Releases*) or the Deed of Release shall release, waive or discharge any party from any obligation it may have under this Scheme or any Implementation Document with respect to any step or action required to be undertaken, or procured to be undertaken, by it on or following the Restructuring Effective Date, in accordance with the terms of this Scheme or such Implementation Documents.

## 7.     Ratifications and Confirmations

### 7.1     General

In consideration for the receipt of its Scheme Consideration (as applicable):

(a)     each Scheme Creditor hereby, on and from the Scheme Effective Date irrevocably ratifies and confirms everything which the Scheme Company (including in its capacity as guarantor under the Existing Notes Indenture) and the Issuer, and their respective directors, managers, officers or other duly appointed representatives and the Undertaking Transaction Parties may lawfully do or cause to be done or cause or purport to be done, in each case to the extent compliant with the terms of this Scheme and the Implementation Documents;

(b)     each Scheme Creditor hereby, on and from, and subject to the occurrence of, the Restructuring Effective Date, irrevocably:

(i)     confirms that its entitlement to and allocation of the Scheme Consideration is accepted in full and final settlement of all Scheme Claims as satisfied, waived and released on and subject to the terms of this Scheme; and

(ii)     undertakes to the Released Parties to treat all Scheme Claims as having been released fully and absolutely and, in the case of the Existing Notes, as having been cancelled, pursuant to Clause 5.8 (*Existing Notes Cancellation*) and the authority granted under Clause 4.1 (*Scheme Company's Authority to Execute the Implementation Documents*) and this Clause 7.1 (*General*), in each case in accordance with and subject to Clause 6 (*Releases*).

### 7.2     Matters Relating to Undertaking Transaction Parties

With effect from, and subject to the occurrence of, the Restructuring Effective Date, each Scheme Creditor acknowledges, confirms and irrevocably ratifies all actions taken by each Undertaking Transaction Party pursuant to the Scheme, the Implementation Steps and/or any of the Implementation Documents including (without limitation):

(a)     each Undertaking Transaction Party having executed and delivered an Undertaking in connection with the Scheme;

(b)     the Existing Notes Trustee having agreed not to vote in relation to the Scheme; and

(c)     any steps taken or to be taken by the Existing Notes Trustee to effect the exchange of the Existing Notes in accordance with the Implementation Steps and/or any of the Implementation Documents.

### 7.3     Covenant Not to Sue

(a)     Subject to Clause 6 (*Releases*) above, each Scheme Creditor and the Existing Notes Trustee pursuant to the instruction given to it as an Undertaking Transaction Party under Clause 4.2(a) (*Undertaking Transaction Parties' Authority*) hereby covenants with the Scheme Company (including in its capacity as guarantor under the Existing Notes Indenture), the Issuer and each Released Party for the benefit of the Released

Parties and their respective Connected Parties, on and from, and subject to the occurrence of, the Restructuring Effective Date, not to commence, take or continue or support any person commencing, taking or continuing or instruct any person to commence, take or continue any Proceedings, other than Allowed Proceedings, against any Released Party or their respective Connected Parties in respect of any Liability of or Claim against the relevant Released Parties or their respective Connected Parties in relation to or in connection with or in any way arising out of the Scheme Claims.

(b)     For the avoidance of doubt, subject to any existing contractual restrictions, a Scheme Creditor may commence an Allowed Proceeding after the Restructuring Effective Date.

7.4     **Turnover**

(a)     Each Scheme Creditor shall hold on trust for the benefit of the Scheme Company, the Issuer, the Released Parties and/or any other member of the Group (as applicable) any recovery made against such person and received by such Scheme Creditor after the Restructuring Effective Date, pursuant to any Liability or Claim released pursuant to Clause 6 (*Releases*) above or the Deed of Release, in breach of Clause 7.3 (*Covenant Not to Sue*), and the Scheme Creditor will turn over any such recovery to the Scheme Company, the Issuer, the Released Parties and/or any other member of the Group (as applicable) promptly upon receipt without set-off, counterclaim or deduction unless required by law.

(b)     To the extent that the asset comprising the recovery cannot be held on trust by the relevant Scheme Creditor that received such recovery, such Scheme Creditor will pay to the Scheme Company, the Issuer, the Released Parties and/or any other member of the Group (as applicable) the Released Party an amount equal to that recovery promptly following a written demand being made by the relevant Scheme Company, Issuer, the Released Parties and/or any other member of the Group (as applicable) without set-off, counterclaim or deduction unless required by law.

(c)     For the avoidance of doubt, nothing in this Clause 7.4 (*Turnover*) shall require any Scheme Creditor to turnover any proceeds or other recovery arising as a result of an Allowed Proceeding.

7.5     **Further Assurance**

On and from the Scheme Effective Date, each Scheme Creditor undertakes to the Scheme Company, and the Scheme Company undertakes to each Scheme Creditor and its directors, officers and other duly appointed representatives, to provide such further assistance (at the sole cost of the Scheme Company) as may be reasonably required and reasonably requested by the Scheme Company or a Scheme Creditor (as applicable) to implement this Scheme and the Restructuring, provided that:

(a)     such actions are consistent with this Scheme, the Lock-Up Agreement, the Implementation Deed and the Implementation Documents; and

(b)     in each case the Scheme Company or Scheme Creditor (as applicable) must notify and consult in good faith, with (to the extent the Scheme Creditor or Scheme Company (as applicable) responds to the notice) the relevant Scheme Creditor or Scheme Company (as applicable) at least three (3) Business Days prior to the date on which any steps are required to be taken by the relevant Scheme Creditor or Scheme Company (as applicable) in accordance with this Clause 7.5.

**8.    Modifications of the Scheme or Waiver of the Scheme Conditions**

8.1    Subject to Clause 8.2 below, the terms of this Scheme (including the Scheme Conditions) can only be modified or waived with the prior written consent of the Scheme Company and the Majority Scheme Creditors.

8.2    The Scheme Company may, at any Court hearing to sanction this Scheme and to the extent practicable after consultation with the Ad Hoc Group's Advisors, consent on behalf of itself and all Scheme Creditors to any modification of, or addition to, or waiver of, this Scheme (including the Scheme Conditions) and/or any of the Implementation Documents or any terms and conditions which, in the case the Court may think fit to approve or impose which is necessary for the implementation of the Restructuring, *provided that* such modification, addition, term or condition or waiver, does not materially adversely affect the economic treatment, any legal right or material obligation or other interest of any Scheme Creditor under this Scheme or any other Implementation Document or impose any additional material obligation on a Scheme Creditor, as compared to the treatment of the Scheme Company or other Scheme Creditors under the Scheme or any Implementation Document, unless the affected Scheme Creditor consents to that modification.

**9.    General Scheme Provisions**

9.1    **Scheme Standstill**

(a)    With effect from the Scheme Effective Date and until the Restructuring Effective Date (or, if earlier, the date on which this Scheme terminates in accordance with Clause 9.2 (*Termination*)), no Scheme Creditor shall:

(i)    take any Enforcement Action;

(ii)    direct or encourage any other person to take any Enforcement Action; or

(iii)    vote, allow any proxy to vote or instruct another relevant person to vote (to the extent that it is legally entitled to instruct that person to vote), in favour of any Enforcement Action,

in respect of either (i) any Relevant Default, or (ii) any other default arising under the Existing Notes Indenture as a result of this Scheme, the Restructuring or the implementation thereof, each being a "**Scheme Standstill Default**" (the "**Scheme Standstill**").

(b)    The standstill in Clause 9.1 (*Scheme Standstill*) above is temporary and shall only apply to the Scheme Standstill Defaults until the termination of this Scheme in accordance with Clause 9.2 (*Termination*). Upon the termination of this Scheme, such standstill shall terminate and all rights and remedies which would have been available to the Scheme Creditors had the Scheme Standstill not been granted shall become immediately available and the Scheme Creditors will be immediately entitled to take and/or vote in favour of taking any Enforcement Action in respect of any of the Scheme Standstill Defaults.

9.2    **Termination**

(a)    This Scheme will terminate:

(i)    if the Restructuring Effective Date does not occur on or before the Longstop Date;

(ii)    if the Implementation Deed terminates in accordance with its terms (other than as a result of the occurrence of the Restructuring Effective Date); or

28

(iii)    upon the occurrence of a Bankruptcy Event,

and the terms of, and the obligations on the Scheme Company and the Scheme Creditors under or pursuant to, this Scheme shall lapse and the execution, delivery or release of any deed, document or agreement in accordance with, or pursuant to this Scheme will be rescinded (insofar as legally possible) and deemed never to have become effective, and all arrangements provided by this Scheme shall be of no effect and the rights and obligations of each relevant Scheme Creditor and the Scheme Company (including but not limited to those under the Existing Notes Indenture) will not be affected and will be reinstated and remain in full force and effect, such that each Scheme Creditor and the Scheme Company will be put back into the position it was in prior to the date on which such deed, document or agreement was executed, delivered or released (as applicable), and the Scheme Company and each Scheme Creditor will, and will if required instruct the Existing Notes Trustee to, and will use its best efforts to procure that any necessary other party will, execute such documents and perform such acts and things as may be necessary or desirable in order to do so.

(b)    If any of the Implementation Steps do not occur prior to the Longstop Date, or if any termination of this Scheme in accordance with Clause 9.2(a) (*Termination*) occurs, to the extent permitted by applicable law all Implementation Steps under or pursuant to the Implementation Deed and/or this Scheme, will not or will be deemed not to have occurred.

(c)    To the extent permitted by law, all relevant parties agree to take such steps as are necessary and/or desirable to reverse any such Implementation Steps that have already occurred in order to restore the parties to the position they were in before the Implementation Steps occurred, provided that no party shall be required to incur any material out-of-pocket costs or expenses.

9.3    **Effect of Termination**

Notwithstanding Clause 9.2 (*Termination*), the termination of this Scheme will not limit the effectiveness of Clause 1 (*Definitions and Interpretation*), Clause 9.1(b) (*Scheme Standstill*) Clause 9.2 (*Termination*), this Clause 9.3, Clause 10 (*Costs*) or Clause 13 (*Governing Law and Jurisdiction*).

9.4    **Provision of Information and Confidentiality**

(a)    Any Account Holder Letters and New Notes Election Forms submitted by or on behalf of Scheme Creditors and/or their Designated Recipients (as applicable) will be submitted in accordance with the instructions set out in the relevant Account Holder Letter or New Notes Election Form and will provide the Scheme Company and the Information Agent with such information as may be reasonably required to enable the Scheme Consideration Entitlements and the New Notes Entitlements to be calculated and issued, subject at all times to the confidentiality requirements set out in the Account Holder Letter and the New Notes Election Form.

(b)    Whether an Account Holder Letter has been validly completed shall be determined by the Information Agent at its discretion (acting reasonably), provided that, if the Information Agent determines that an Account Holder Letter has not been validly completed, it shall promptly prepare a written statement of its reasons for doing so and send that statement by electronic mail to the party that provided such Account Holder Letter.

9.5   **Record Date**

For the purposes of voting on this Scheme and calculating the Scheme Creditor Entitlements, all Scheme Claims will be determined by the Information Agent (on behalf of the Scheme Company) as at the Record Date.

9.6   **Assignments or Transfers**

(a)   The Scheme Company will be under no obligation to recognise any assignment or transfer of any Scheme Claims and/or any other rights, benefits or interests in the Existing Notes after the Record Date for the purposes of this Scheme (or the Scheme Consideration), other than any assignment or transfer which occurs pursuant to the Implementation Deed or any of the other Implementation Documents, and has no obligations hereunder to any person other than the Scheme Creditors, provided that, where the Scheme Company has received from the relevant parties notice in writing of such assignment or transfer prior to the Restructuring Effective Date, the Scheme Company may, in its sole discretion and subject to the production of such other evidence in relation to such assignment or transfer as it may reasonably request and subject further to any other terms and conditions which the Scheme Company may reasonably consider necessary, agree to recognise such assignment or transfer for the purposes of determining entitlements under this Scheme, subject always to Clause 9.6(c) below.

(b)   Each Scheme Creditor acknowledges and agrees that, in the event that any Scheme Creditor transfers or assigns a Scheme Claim in accordance with Clause 9.6(a) above, the Scheme Company may, on or prior to the Restructuring Effective Date, make such minor mechanical or technical amendments to the Implementation Documents, in each case to the extent necessary solely to reflect the change in ownership of a Scheme Claim. Each Scheme Creditor authorises the Scheme Company to consent to and enter into any amendment to the Deed of Release and the Implementation Documents which are made in accordance with this Clause 9.6(b).

(c)   Any assignee or transferee of interests in the Scheme Claims so recognised by the Scheme Company will be bound by the terms of this Scheme and the Implementation Documents as Scheme Creditors.

9.7   **Performance on Days other than a Business Day**

If any obligation is to be performed under the terms of this Scheme on a date other than a Business Day, the relevant obligation will be performed on the next Business Day.

9.8   **Exercise of Discretion**

Where, under or pursuant to any provision of this Scheme, a matter is to be determined by the Scheme Company, it will be determined by the directors of the Scheme Company in their discretion in such manner as they may consider fair and reasonable and after consultation with the Ad Hoc Group's Advisors. If any difficulty arises in determining any such matter either generally or in any particular case or in ensuring the result described above, it shall be resolved by consultation between the Group's Advisors and the Ad Hoc Group's Advisors, in such manner as the directors of the Scheme Company shall consider to be fair and reasonable and that decision shall, insofar as permitted by law, be final and binding on all concerned.

9.9   **Severability**

If at any time any provision of this Scheme is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of that provision under the law of any other jurisdiction nor the legality, validity or enforceability

of any other provision of this Scheme under the law of that jurisdiction will in any way be affected or impaired thereby.

9.10    **Notice**

(a)    Any notice or other written communication to be given under or in relation to this Scheme (other than any Account Holder Letter or New Notes Election Form, which shall be delivered in accordance with the instructions contained therein) will be given in writing and will be deemed to have been duly given if it is delivered by hand, is posted on the Scheme Website (in relation to any notice or written communication to be given to the Scheme Creditors only) or is sent by email, courier or pre-paid first class post (or by air mail or international courier where it is delivered to a different country from that in which it is posted) as follows:

(i)    in the case of a notice to be given to the Scheme Company, to:

| | |
|---|---|
| Address: | c/o Cleary Gottlieb Steen & Hamilton LLP<br>2 London Wall<br>London, EC2Y 5AU |
| Attention: | Polina Lyadnova / David Botter |
| Email: | team-mega_restructuring-cgshonly@cgsh.com |

(ii)    in the case of a notice to be given to the Existing Notes Trustee:

| | |
|---|---|
| Address: | Wilmington Trust, National Association<br>50 South Sixth Street, Suite 1290<br>Minneapolis, MN 55402 |
| Attention: | Barry Somrock / Emilia Gazzuolo |
| Email: | bsomrock@WilmingtonTrust.com<br>egazzuolo@WilmingtonTrust.com |

With copies to:

| | |
|---|---|
| Address: | c/o Reed Smith LLP<br>1201 N Market St #1500<br>Wilmington, DE 19801 |
| Attention: | Kurt Gwynne / Jason D. Angelo |
| Email: | kgwynne@reedsmith.com<br>jangelo@reedsmith.com |

(iii)    in the case of the Information Agent or Cash Settlement Agent:

| | |
|---|---|
| Address: | Kroll Issuer Services Limited<br>The Shard<br>32 London Bridge Street<br>London<br>SE1 9SG |
| Attention: | Alessandro Zorza |
| Phone: | + 44 20 7704 0880 |
| Email: | grupomega@is.kroll.com |

(iv)    in the case of the Ad Hoc Group or the Ad Hoc Group's Advisors:

| | |
|---|---|
| Address: | Latham & Watkins (London) LLP |
| | 99 Bishopsgate |
| | London, EC2M 3XF |
| Attention: | Bruce Bell and Pedro Rufino Carvalho |
| Email: | projectmaestro.lwteam@lw.com |

(v)    in the case of any other person, any address set forth for that person in any agreement entered into in connection with this Scheme.

(b)    Any notice or other written communication to be given under this Scheme (other than any Account Holder Letter or New Notes Election Form, which is to be delivered in accordance with the instructions contained therein) will be given in writing and will be deemed to have been served:

(i)    if delivered by hand or courier, on the Business Day of receipt, or if such receipt occurs after 5.00 p.m. in the place of receipt, the following Business Day;

(ii)    if delivered by email or electronically (including by way of posting on the Scheme Website), on the Business Day it is received (or, if posted on the Scheme Website, accessible) in readable form, or if such receipt occurs (or access is provided) after 5.00 p.m. in the relevant place, the following Business Day; and

(iii)    if sent by pre-paid first-class post (or airmail or international courier), on the second Business Day after posting if the recipient is in the country of dispatch, otherwise on the fifth (5th) Business Day after posting.

(c)    In proving service, it will be sufficient proof, in the case of a notice sent by pre-paid first-class post (or airmail or international courier), that the envelope was properly stamped, addressed and placed in the post.

(d)    The accidental omission to send any notice, written communication or other document in accordance with this Clause 9.10 or the non-receipt of any such notice by any Scheme Creditor, will not affect the provisions of any of this Scheme.

(e)    The Scheme Company will not be responsible for any:

(i)    non-receipt by a Scheme Creditor of any notices or other written communications, and the non-receipt of any such notice or other written communications by any Scheme Creditor will not impact the effectiveness of the notice or other written communication or otherwise affect the provisions of the Scheme; or

(ii)    loss or delay in the transmission of any notices or other documents posted by any Scheme Creditor, which shall be posted at the risk of such Scheme Creditor.

## 10.    Costs

10.1    The Scheme Company will pay in full all costs, charges, expenses and disbursements (including any applicable VAT) incurred by it in connection with the negotiation, preparation and implementation of this Scheme as and when they arise, including, but not limited to the costs of holding the meetings of Scheme Creditors as convened by the Court, the costs of obtaining

the sanction of the Court and the costs of placing any notices (if any) required by this Scheme and any other costs that are provided for under the Implementation Deed.

10.2    The Scheme Company will pay in full all costs, charges, expenses and disbursements (including any applicable VAT) incurred by the Advisors in connection with the negotiation, preparation and implementation of this Scheme, the Implementation Documents and the wider Restructuring, and any other costs that are provided for under the Implementation Deed, in accordance with the Settlement Funds Flow as at the time specified in the Implementation Deed.

## 11.    Stamp Duty Indemnity

11.1    The Scheme Company shall bear the cost of all stamp duty, stamp duty reserve tax, registration or similar Taxes payable as a result of the transfer of the New Shares and/or the issuance of the New Notes to the Scheme Creditors or their respective Designated Recipients, if applicable (or the Holding Period Escrow Agent, as the case may be).

11.2    The Scheme Company shall pay to a Scheme Creditor, Designated Recipient or the Holding Period Escrow Agent (as applicable) an amount equal to any stamp duty, stamp duty reserve tax, registration or similar Tax payable by such Scheme Creditor, Designated Recipient or the Holding Period Escrow Agent (as applicable) as a result of the Issuer failing to comply with its obligations under Clause 11.1 (*Stamp Duty Indemnity*) above.

## 12.    Announcements

Except as required by applicable law or regulation, the Scheme Company shall not, and shall procure that no other member of the Group will, make any public announcement regarding the Restructuring which names any Scheme Creditor (or from which the identity of a Scheme Creditor can be discerned) unless the contents of that announcement have been agreed by such Scheme Creditor, acting reasonably.

## 13.    Governing Law and Jurisdiction

13.1    This Scheme and any non-contractual obligations arising out of or in connection with this Scheme will be governed by, and construed in accordance with, the laws of England and Wales.

13.2    The Court shall have exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute which may arise out of or in connection with the Explanatory Statement or any provision of this Scheme, or the implementation thereof, or out of any action taken or omitted to be taken under this Scheme or any non-contractual obligations arising out of or in connection with this Scheme and, for such purposes the Scheme Creditors irrevocably submit to the jurisdiction of the Court. The parties expressly waive any other jurisdiction which they may be entitled to claim by reason of their present or future domicile or otherwise.

13.3    Nothing in this Clause 13 will:

(a)    affect the validity of other provisions determining governing law and jurisdiction as between the Scheme Company and any of their Scheme Creditors in respect of any of the Existing Notes Indenture, any Implementation Document or any other agreement made between the Scheme Company and any of the Scheme Creditors, whether contained in any contract or otherwise; or

(b)    prevent the Scheme Company or Released Party from relying upon the provisions of the Scheme in any foreign court or in any foreign proceedings.

13.4    The terms of this Scheme and the obligations imposed on the Scheme Company and the Scheme Creditors (and, for the avoidance of doubt, those terms and obligations which may be construed

33

as being imposed on any Undertaking Transaction Party) hereunder will take effect subject to any prohibition or condition imposed by law.

## Exhibit D

**English Explanatory Statement**

**THIS EXPLANATORY STATEMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION.**

**THIS DOCUMENT COMPRISES AN EXPLANATORY STATEMENT FOR THE PURPOSES OF SECTION 897 OF THE COMPANIES ACT 2006**. It is being sent to persons who are believed to be Scheme Creditors and any other person with an interest in the Existing Notes at the date of this Explanatory Statement. If you have assigned, sold, or otherwise transferred, or intend to assign, sell or otherwise transfer, your interests as a Scheme Creditor before the Record Date, you must forward a copy of this Explanatory Statement to the person or persons to whom you have assigned, sold or otherwise transferred, or assign, sell or otherwise transfer, your interests as a Scheme Creditor except that such documents should not be forwarded or transmitted without the consent of the Scheme Company into any jurisdiction where to do so might constitute a violation of local securities law or regulation, including, but not limited to, the United States.

If you are in any doubt as to the contents of this Explanatory Statement or what action you should take, you are recommended to seek your own independent financial, legal and tax advice immediately from your financial, legal and/or tax advisor who, if you are taking advice in the UK, is authorised pursuant to FSMA or by an appropriate regulatory body, or from another appropriately authorised independent advisor if you are in a territory outside the UK.

Copies of this Explanatory Statement can be obtained by Scheme Creditors, free of charge, by contacting the Information Agent at *grupomega@is.kroll.com* or via the Scheme Website (*https://deals.is.kroll.com/grupomega*).

This Explanatory Statement is accompanied by voting instructions including for completing the Account Holder Letter. It is important that you read this Explanatory Statement carefully for information about the Scheme and that you complete and return the Account Holder Letter which accompanies this Explanatory Statement.

1

## EXPLANATORY STATEMENT TO THE SCHEME OF ARRANGEMENT

(pursuant to Part 26 of the Companies Act 2006)

between

**Mega Newco Limited**
(the "**Scheme Company**")

**And**

**the Scheme Creditors**
(as defined in this Explanatory Statement)

**Dated 21 November 2024**

The Record Date for determining the value of Scheme Claims is 5:00 p.m. (New York time) on 2 December 2024.

A meeting of the Scheme Creditors to consider the Scheme is expected to be held at 2.00 p.m. (London time) on 11 December 2024 at the offices of Cleary Gottlieb Steen & Hamilton LLP at 2 London Wall Place, London, EC2Y 5AU, UK, with a live videoconference link. The notice convening the Scheme Meeting is set out at Appendix 3 (*Notice of Scheme Meeting*) to this Explanatory Statement, and a validly completed Account Holder Letter should be submitted online via the Scheme Website or emailed in portable document format (PDF) to the Information Agent prior to 5:00 p.m. (New York time) on 9 December 2024 (being the Voting Instruction Deadline).

More detailed instructions about actions to be taken by the Scheme Creditors preceding the Scheme Meeting are set out in Appendix 1 (*Instructions to Scheme Creditors and any Person with an Interest in the Existing Notes*) to this Explanatory Statement and summarised in Section 6 (*Summary of actions to be taken by Scheme Creditors*) of Part 1 (*Notice to Scheme Creditors*) of this Explanatory Statement.

**Whether or not you intend to attend and/or vote at the Scheme Meeting, you are requested to complete, execute and return the Account Holder Letter which accompanies this Explanatory Statement in accordance with the instructions printed thereon as soon as possible and by no later than 5:00 p.m. (New York time) on 9 December 2024.**

If the Scheme is approved by the Scheme Creditors, a hearing before the Court will be necessary in order to sanction the approved Scheme. All persons who are Scheme Creditors at the Record Date are entitled to attend the Sanction Hearing in person or through counsel (unless otherwise precluded from doing so by applicable Sanctions or other applicable law or regulation) to support or oppose the sanctioning of the Scheme. It is expected that the Sanction Hearing for the Scheme will be held on 13 December 2024. Further important information is set out in Section 1 (*Important Notice*) to Part 1 (*Notice to Scheme Creditors*) of this Explanatory Statement.

The statements contained in this Explanatory Statement are made as at the date of this Explanatory Statement, unless another time is specified in relation to them, and delivery of this Explanatory Statement shall not give rise to any implication that there has not been any change in the information set out in this Explanatory Statement since that date.

2

Nothing contained in this Explanatory Statement shall constitute a warranty or guarantee of any kind, express or implied, and nothing contained in this Explanatory Statement shall constitute any admission of any fact or liability on the part of the Scheme Company or any Affiliate of the Scheme Company with respect to any asset to which it or they may be entitled or any claim against it or them. Without prejudice to the generality of the foregoing, nothing in the Scheme or this Explanatory Statement or the distribution thereof evidences to any person, or constitutes any admission by the Scheme Company, that a liability is owed to any person in respect of any claim or that any person is or may be a Scheme Creditor. The failure to distribute this Explanatory Statement to any Scheme Creditor shall not constitute an admission by the Scheme Company that such person is not a Scheme Creditor.

No person has been authorised by the Scheme Company to make any representations concerning the Scheme which are inconsistent with the statements contained in this Explanatory Statement and, if made, such representations may not be relied upon as having been so authorised. This Explanatory Statement is issued solely in connection with the Scheme.

# TABLE OF CONTENTS

PART 1 NOTICE TO SCHEME CREDITORS .......................................................................... 5

PART 2 INFORMATION ON THE GROUP .......................................................................... 25

PART 3 BACKGROUND TO AND OVERVIEW OF THE RESTRUCTURING ................................... 30

PART 4 SUMMARY OF THE PROPOSED SCHEME .......................................................... 46

PART 5 ADDITIONAL INFORMATION RELATING TO THE SCHEME ........................................... 51

PART 6 RISK FACTORS .......................................................................................... 69

PART 7 THE SCHEME ............................................................................................ 76

PART 8 DEFINITIONS ............................................................................................ 77

APPENDIX 1 - INSTRUCTIONS TO SCHEME CREDITORS AND ANY PERSON WITH AN
INTEREST IN THE EXISTING NOTES ........................................................................ 96

APPENDIX 2 - ACCOUNT HOLDER LETTER .............................................................. 110

APPENDIX 3 - NOTICE OF SCHEME MEETING .......................................................... 161

APPENDIX 4 – FINANCIAL ANALYSIS ..................................................................... 165

# PART 1

# NOTICE TO SCHEME CREDITORS

1.     **IMPORTANT NOTICE**

**Unless the context requires otherwise, all capitalized terms used in this Explanatory Statement will have the meanings set out in Part 8 (*Definitions*).**

**The appendices to this Explanatory Statement form an integral part of this Explanatory Statement and any reference to this Explanatory Statement is a reference to this Explanatory Statement including all of its appendices.**

*Important Information*

1.1     This Explanatory Statement has been prepared in connection with a proposal in relation to a scheme of arrangement under Part 26 of the Companies Act 2006 (the "**Act**") between the Scheme Company and the Scheme Creditors. Nothing in this Explanatory Statement or any other document issued with or appended to it should be relied on for any purpose other than to make a decision on the Scheme. In particular and without limitation, nothing in this Explanatory Statement or any other document issued with or appended to it should be relied on in connection with the purchase, sale, transfer, acquisition, disposition of other transaction in respect of any securities.

1.2     The information contained in this Explanatory Statement has been prepared based upon information available to the Scheme Company as at the date of this Explanatory Statement. The delivery of this Explanatory Statement does not imply that, unless otherwise stated, the information herein is correct as at any time subsequent to the date of this Explanatory Statement. Save as otherwise agreed, or as required by law, the Scheme Company does not have any obligation whatsoever to update or revise any of the information, forward-looking statements or the conclusions contained herein or to reflect new events or circumstances or to correct any inaccuracies which may become apparent subsequent to the date of this Explanatory Statement. To the best of the Scheme Company's knowledge, information and belief, the information contained in this Explanatory Statement is in accordance with the facts in all material respects and does not omit anything likely to affect the import of such information in any material respects. The Scheme Company has taken all reasonable steps to ensure that this Explanatory Statement contains the material information reasonably necessary to enable the Scheme Creditors to make an informed decision about the effect of the Scheme on them.

1.3     None of the Scheme Creditors or the Existing Notes Trustee has authorised the content of this Explanatory Statement or any part of it, neither does any such party accept any responsibility or liability for the accuracy, completeness or reasonableness of the statements contained within it.

1.4     None of the Scheme Company's financial and legal advisors, the Existing Notes Trustee, the Agents, the Ad Hoc Group or the Ad Hoc Group Advisors has verified that the statements and information contained in this Explanatory Statement is in accordance with the relevant facts or that this Explanatory Statement omits anything likely to affect the import of such information and each of those persons expressly disclaims responsibility or liability for such statements and information.

1.5     No Scheme Creditor is entitled to rely on the Group Advisors, the Agents, the Existing Notes Trustee, the Ad Hoc Group or the Ad Hoc Group Counsel in connection with any investigation of the accuracy of any information contained in this Explanatory Statement or its investment decision (including any decision in connection with the Scheme). Scheme Creditors may have been provided with additional information from the Agents, the Existing Notes Trustee, the Ad Hoc Group, the Ad Hoc Group Counsel and/or the Group Advisors, however each Scheme Creditor may only rely on the information contained or incorporated in this Explanatory Statement for the purpose of making a decision on the Scheme.

1.6     Notwithstanding the foregoing, the Group Financial Advisors allow the Scheme Company to rely on the analysis they have conducted on the potential impact on recoveries of Scheme Creditors as

discussed in Section 4 (*Consequences if the Scheme is not Successful*) of Part 4 (*Summary of the Proposed Scheme*) of this Explanatory Statement.

1.7     Nothing contained in this Explanatory Statement shall be deemed to be a forecast, projection or estimate of the Scheme Company's or the Group's future financial performance except where otherwise specifically stated. The financial information included in this Explanatory Statement has not been audited or reviewed by the Group's auditors or any external party and are subject to change. As a result, Scheme Creditors should not place undue reliance on such information.

1.8     This Explanatory Statement includes forward-looking statements. All statements, other than statements of historical fact, included in this Explanatory Statement regarding the financial condition of the Group or regarding future events or prospects are forward-looking statements. The words "aim", "anticipate", "believe", "continue", "estimate", "expect", "future", "help", "intend", "may", "plan", "shall", "should", "will" or the negative or other variations of them as well as other statements regarding matters that are not historical fact, are or may constitute forward-looking statements. These forward-looking statements are based on management's current view with respect to future events and financial performance. These views reflect the reasonable judgment of management but involve a number of risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialise, or should underlying assumptions prove incorrect, actual results may differ materially from those predicted in the forward-looking statements and from past results, performance or achievements. All forward-looking statements contained in this Explanatory Statement are qualified in their entirety by this cautionary statement and you should not place undue reliance on such statements.

1.9     In this Explanatory Statement, references to "**USD**" or "**US$**" are to the lawful currency of the United States and references to "**Ps.**" or "**MXN**" are to the lawful currency of Mexico.

1.10    The summary of the principal provisions of the Scheme contained in this Explanatory Statement is qualified in its entirety by reference to the Scheme, the full text of which is set out in Part 7 (*The Scheme*) of this Explanatory Statement. Each Scheme Creditor is advised to read and consider carefully the text of the Scheme in full. This Explanatory Statement has been prepared solely to assist the Scheme Creditors to understand, and to consider how to vote on, the Scheme.

1.11    The Scheme Creditors should not construe the contents of this Explanatory Statement as legal, tax, financial or other advice, and should consult with their own professional advisors as to the matters described in this Explanatory Statement.

1.12    If this Explanatory Statement has been sent to you in an electronic form, you are reminded that documents transmitted via this medium may be altered or changed during the process of transmission and consequently neither the Scheme Company nor any of its directors, officers, employees, agents or Affiliates accept any liability or responsibility whatsoever in respect of any difference between the Explanatory Statement distributed to you in electronic format version available to you on request from the Information Agent. The Information Agent is the agent of the Scheme Company and owes no duty to any Scheme Creditor, express or implied.

1.13    The distribution of this Explanatory Statement may be restricted by law or regulation in certain jurisdictions. Neither the Scheme Company nor the Information Agent represents that this Explanatory Statement may be lawfully distributed in compliance with any applicable registration or other requirements in any such jurisdiction, or pursuant to an exemption available thereunder, or assume any responsibility for facilitating such distribution. Persons into whose possession this Explanatory Statement comes are requested to inform themselves about, and to observe, any such restrictions. Failure to comply with any such restrictions could result in a violation of the laws of such jurisdictions.

1.14    You are reminded that this Explanatory Statement has been delivered to you on the basis that you are a person into whose possession it may be lawfully delivered in accordance with the laws of the jurisdiction in which you are located and you may not nor are you authorised to deliver this Explanatory Statement or any part of it to any other person other than to a person or persons to whom you have assigned, sold or otherwise transferred your interests as a Scheme Creditor before the

Record Date. If you are not the intended recipient to whom this Explanatory Statement has been delivered, please notify the sender immediately and destroy this Explanatory Statement.

1.15    The distribution of this Explanatory Statement to or in certain jurisdictions may be restricted by law or regulation in certain jurisdictions and persons into whose possession this Explanatory Statement comes are requested to inform themselves about, and to observe, any such restrictions. Failure to comply with any such restrictions could result in a violation of the laws of such jurisdictions.

1.16    This Explanatory Statement is not a prospectus within the meaning of Article 3(1) of the EU or UK Prospectus Regulation, or a prospectus equivalent document.

1.17    **In the event of a conflict between the information and terms described in this Explanatory Statement and the Scheme or Implementation Documents, the terms of the Scheme or Implementation Documents (as applicable) shall prevail. Each Scheme Creditor and any other person with an interest in the Existing Notes is advised to read and consider carefully the text of the Scheme Document in full.**

*Other jurisdictions*

1.18    The implications of the Scheme for Scheme Creditors who are resident in or citizens of jurisdictions other than the UK may be affected by the laws of the relevant jurisdiction. Such overseas Scheme Creditors should inform themselves about and observe any applicable legal requirements. Any person outside the UK who is resident in, or who has a registered address in, or is a citizen of, an overseas jurisdiction and who is to receive information pursuant to the Scheme should consult his or her professional advisors and satisfy himself or herself as to the full observance of the laws of the relevant jurisdiction in connection with the Scheme, including obtaining any requisite governmental or other consents, observing any other requisite formalities and paying any issue, transfer or other taxes due in such jurisdiction.

1.19    **THIS EXPLANATORY STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITIES. NONE OF THE SECURITIES REFERRED TO IN THIS EXPLANATORY STATEMENT MAY BE SOLD, ISSUED OR TRANSFERRED IN ANY JURISDICTION, INCLUDING THE UNITED STATES, IN CONTRAVENTION OF SANCTIONS OR APPLICABLE LAW.**

1.20    **THE SECURITIES PROPOSED TO BE ISSUED PURSUANT TO THE SCHEME HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT") WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION, AND MAY NOT BE OFFERED, SOLD OR RESOLD IN THE UNITED STATES EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE U.S. SECURITIES ACT.**

1.21    **THE EXISTING NOTES AND THE NEW NOTES HAVE NOT BEEN AND WILL NOT BE REGISTERED WITH THE MEXICAN NATIONAL SECURITIES REGISTRY (*REGISTRO NACIONAL DE VALORES*),MAINTAINED BY THE MEXICAN NATIONAL BANKING AND SECURITIES COMMISSION (*COMISIÓN NACIONAL BANCARIA Y DE VALORES*) (THE "CNBV"), AND, THEREFORE, NEITHER THE EXISTING NOTES NOR THE NEW NOTES MAY BE OFFERED OR SOLD PUBLICLY IN MEXICO. THE INFORMATION CONTAINED HEREIN HAS NOT BEEN REVIEWED OR AUTHORIZED BY THE CNBV.**

1.22    **NOTHING IN THIS EXPLANATORY STATEMENT CONSTITUTES AN OFFER OF SECURITIES FOR SALE IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO.**

1.23    **THE SECURITIES REFERRED TO HEREIN WILL ONLY BE ISSUED (1) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE U.S. SECURITIES ACT, OR (2) TO QUALIFIED**

**INSTITUTIONAL BUYERS ("QIBs") (WITHIN THE MEANING OF RULE 144A UNDER THE U.S. SECURITIES ACT) OR INSTITUTIONAL ACCREDITED INVESTORS (WITHIN THE MEANING OF RULE 501(A)(1), (2), (3), (7), (8), (9), (12) or (13) of REGULATION D UNDER THE U.S. SECURITIES ACT).**

1.24 **THE SCHEME CREDITORS MUST RELY ON THEIR OWN EXAMINATION OF THE TERMS OF THE SCHEME, INCLUDING THE MERITS AND RISKS INVOLVED. ALL SCHEME CREDITORS SHOULD CONSULT THEIR OWN LEGAL, FINANCIAL AND TAX ADVISORS WITH RESPECT TO LEGAL, FINANCIAL AND TAX CONSEQUENCES OF THE SCHEME IN THEIR PARTICULAR CIRCUMSTANCES. THE EXISTING NOTES TRUSTEE MAKES NO REPRESENTATION OR WARRANTY WITH RESPECT TO THE ACCURACY OR COMPLETENESS OF THIS EXPLANATORY STATEMENT AND EXPRESS NO OPINION WHATSOEVER AS TO THE MERITS OF THE PROPOSALS AS PRESENTED TO THE EXISTING NOTEHOLDERS IN THIS EXPLANATORY STATEMENT. THIS EXPLANATORY STATEMENT IS BEING DELIVERED TO EXISTING NOTEHOLDERS SOLELY AT THE INSTIGATION OF THE SCHEME COMPANY WITHOUT THE PRIOR APPROVAL OR CONSENT OF THE EXISTING NOTES TRUSTEE. THE EXISTING NOTES TRUSTEE THEREFORE MAKES NO ASSESSMENT OF THE IMPACT OF THE PROPOSALS AS PRESENTED TO EXISTING NOTEHOLDERS EITHER AS A CLASS OR AS INDIVIDUALS.**

1.25 **THIS EXPLANATORY STATEMENT WILL NOT BE FILED WITH THE SEC, ANY U.S. STATE SECURITIES AUTHORITY OR THE SECURITIES AUTHORITY OF ANY OTHER JURISDICTION, AND WE DO NOT EXPECT THAT THE IMPLEMENTATION DOCUMENTS WILL BE REVIEWED BY THE SEC, ANY U.S. STATE SECURITIES AUTHORITY OR THE SECURITIES AUTHORITY OF ANY OTHER JURISDICTION AND NONE OF THEM HAS OR WILL APPROVE, DISAPPROVE, PASS JUDGMENT UPON OR ENDORSE THE MERITS OR FAIRNESS OF THE SCHEME NOR THE ACCURACY, ADEQUACY OR COMPLETENESS OF THIS EXPLANATORY STATEMENT OR THE IMPLEMENTATION DOCUMENTS. THE SECURITIES REFERRED TO HEREIN HAVE NOT BEEN APPROVED OR RECOMMENDED BY ANY U.S. FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENCE IN THE UNITED STATES.**

*Sanctions*

1.26 Any activities, transactions, dealings and other steps taken in respect of or contemplated under the Scheme shall be in compliance with all applicable Sanctions, including securing any Required Sanctions Licences. Nothing in this Explanatory Statement is intended to or shall contravene any applicable Sanctions and any Required Sanctions Licences. To comply with the relevant Sanctions, the Issuer applied for a U.S. Department of the Treasury's Office of Foreign Assets Control ("**OFAC**") Licence on 30 September 2024.

1.27 The Issuer and Scheme Company do not expect to apply for any other licences or authorisations pursuant to Sanctions other than an OFAC Licence. If there is a change in the applicable Sanctions, the Scheme Company will notify Scheme Creditors via the Scheme Website.

1.28 If, in advance of the Scheme Meeting, the Issuer does not receive any Required Sanctions Licence on terms that would authorise the Scheme Company to proceed with the Scheme Meeting, the Scheme Company will defer the Scheme Meeting until such time as the Required Sanctions Licence has been received on terms that would authorise the Scheme Company to proceed with the Scheme Meeting. The Scheme Company will notify Scheme Creditors of any extensions to the time and date of the Scheme Meeting via the Scheme Website, the Issuer's Website, the Clearing Systems and the SGX-ST.

1.29 Certain risks associated with the Sanctions are described in Part 6 (*Risk Factors*) of this Explanatory Statement.

1.30    The Scheme Company is not inviting, requesting, requiring nor directing that any person take any action which is prohibited or otherwise restricted by Sanctions or by any order or direction of any governmental or regulatory authority or Sanctions Authority.

1.31    The Scheme Company is aware that certain Scheme Creditors may be Sanctioned Persons, or act for, on behalf of or at the direction of a Sanctioned Person. The Scheme Company is also aware that certain Scheme Creditors hold (or may hold) their interests in the Existing Notes through Sanctioned Persons. Scheme Creditors that are Sanctioned Persons, or act for, on behalf of or at the direction of a Sanctioned Person, and/or who submit their Account Holder Letter through (for example, where the Scheme Creditor holds their interests in the Existing Notes through a Sanctioned Person), by, on behalf of or at the direction of, and/or appoint as their representative or proxy, a Sanctioned Person may be subject to limitations under Sanctions on their abilities to attend, participate in and/or vote at the Scheme Meeting (whether in person, or by the representative or proxy).

1.32    For the avoidance of doubt, a Scheme Creditor who is not a Sanctioned Person that holds its Existing Notes through a Sanctioned Custodian will not be considered a Sanctioned Person.

## 2.    IMPORTANT SECURITIES LAW NOTICE

2.1    **NONE OF THE SECURITIES OR ANY RIGHT OR INTEREST HEREIN REFERRED TO IN THIS EXPLANATORY STATEMENT WILL BE OFFERED, SOLD, ISSUED OR TRANSFERRED IN ANY JURISDICTION IN CONTRAVENTION OF SANCTIONS OR APPLICABLE LAW.**

2.2    If the Scheme is implemented in accordance with its terms and other conditions precedent to the Restructuring (as set out in this Scheme Document and Implementation Deed) are satisfied, the New Notes and New Shares will be issued in accordance with the Scheme Document and Implementation Deed.

2.3    Neither this Explanatory Statement nor any part hereof constitutes an offer to distribute, issue or sell, or a solicitation of an offer to subscribe for or purchase, the New Notes or New Shares or any other securities or right or interest therein in any jurisdiction in which such distribution, issue, sale or solicitation is not permitted and neither this Explanatory Statement nor any part hereof may be used for or in connection with an offer to, or the solicitation by, any person in any jurisdiction or in any circumstances in which such offer or solicitation is not authorised or to any person to whom it is unlawful to make such offer or solicitation. Accordingly, neither the Scheme Consideration nor any other securities may be offered or sold directly or indirectly and neither this Explanatory Statement nor any part hereof nor any prospectus, offering circular, form of application, advertisement, other offering or solicitation materials nor other information may be issued, distributed or published in any country or jurisdiction except in circumstances that will result in compliance with all applicable laws, orders, rules and regulations.

2.4    No component of the Scheme Consideration issued pursuant to the Restructuring has been or will be registered under any relevant securities laws of the European Economic Area, the UK, Mexico, the United States or other relevant jurisdictions. No public offering of securities will be made in the European Economic Area, the UK, Mexico or other relevant jurisdictions.

*U.S. Securities Laws*

2.5    None of the New Notes or New Shares has been or will be registered under the U.S. Securities Act, or under the securities laws of any state or other jurisdiction of the United States, and, subject to certain exceptions described herein, may not be offered, sold, resold, transferred, distributed or delivered, directly or indirectly, in, into or from the United States. The New Notes and New Shares are being offered and sold (i) outside the United States in reliance on Regulation S under the U.S. Securities Act, (ii) in reliance on Section 4(a)(2) of the U.S. Securities Act to a limited number of QIBs (within the meaning of Rule 144A under the U.S. Securities Act) and (iii) to institutional accredited investors (within the meaning of Rule 501(a)(1), (2), (3), (7), (8), (9), (12) or (13) of Regulation D under the U.S. Securities Act), in each case, who have duly executed an Account Holder

Letter or on whose behalf an Account Holder Letter has been duly executed. There will be no public offer of the New Notes or New Shares in the United States and the New Notes and New Shares as applicable will only be issued and sold in transaction exempt from the registration requirements under the U.S. Securities Act.

2.6     Neither the SEC nor any state securities commission in the United States has approved or disapproved of the Restructuring, including the Scheme, this Explanatory Statement, the New Notes, the New Shares, or passed upon the adequacy or accuracy of the information contained in this Explanatory Statement. Any representation to the contrary is a criminal offence in the United States. The information disclosed in this Explanatory Statement is not necessarily the same as that which would have been disclosed if this Explanatory Statement had been prepared for the purpose of complying with the registration requirements of the U.S. Securities Act or in accordance with the laws and regulations of any state of the United States.

2.7     Scheme Creditors in the United States should note that the New Notes and New Shares issued in relation to the Scheme will relate to the securities of a foreign incorporated company with limited liability, and the Scheme will be governed by English law. Moreover, the Scheme will be subject to the disclosure requirements and practices applicable in the UK to Scheme of arrangement, which differ from the requirements of the U.S. securities laws.

2.8     Enforcement of judgments by investors under the U.S. securities laws may be affected adversely by the fact that the Issuer and the Scheme Company are organised under the laws of a jurisdiction other than the United States, that their officers and directors are residents of other countries and that all or a substantial portion of their assets may be located outside the United States. As a result, it may be difficult for a Scheme Creditor in the United States to effect service of process within the United States upon the Issuer and the Scheme Company and their officers and directors, or to realise against them upon judgments of courts of the United States under U.S. securities laws. In addition, Scheme Creditors in the United States should not assume that the courts of England and Wales: (a) would enforce judgments of U.S. courts obtained in actions against the Issuer and the Scheme Company under the U.S. securities laws; or (b) would enforce, in original actions, liabilities against such persons under the U.S. securities laws.

*Other Securities Laws*

2.9     Any offer of transferable securities in connection with the Scheme (for the purposes of this section, the "**Scheme Securities**") within any Member State of the European Economic Area or in the UK (each a "**Relevant State**") will be made pursuant to an exemption under the EU or UK Prospectus Regulation from the requirement to publish a prospectus for the offer of transferable securities to the public. In any Relevant State, the offer of Scheme Securities are only addressed to and directed at: (i) qualified investors in that Relevant State within the meaning of the EU or UK Prospectus Regulation ("**Qualified Investors**") (as summarised below), (ii) no more than 149 natural or legal persons (other than Qualified Investors) per Relevant State, or (iii) any natural or legal persons (other than Qualified Investors) that are able to subscribe for a minimum denomination of at least EUR 100,000 per unit of any security offered as part of the Scheme Securities. In relation to each Relevant State, no offer of the Scheme Securities may be made to the public at any time other than pursuant to any of the above exemptions under the EU or UK Prospectus Regulation.

2.10    Qualified Investors include (in summary): (i) an entity required to be authorised or regulated to operate in the financial markets, such as (among others) an investment firm, credit institution or an asset manager; (ii) a large undertaking meeting certain quantitative thresholds relating to balance sheet, net turnover and own funds; (iii) a national or regional government, a public body that manages public debt (excluding local authorities), a central bank or an international or supranational institution; or (iv) any other institutional investor whose main activity is to invest in financial instruments.

2.11    This Explanatory Statement and any document related thereto is not, and should not be construed as, an invitation or inducement to engage in investment activity in relation to any securities. Any person in the UK should note that (A) this Explanatory Statement is issued to Scheme Creditors and any other person with an interest in the Existing Notes in the UK in reliance on Article 43 of the Financial

Promotion Order and (B) the information contained in this Explanatory Statement or any documents related thereto is otherwise intended only for use by, and may only be relied upon, by persons who are at the relevant time: (i) investment professionals within the meaning of Article 19(5) of the Financial Promotion Order; (ii) high net worth undertakings within the meaning of Article 49(2)(a) to (d) of the Financial Promotion Order; or (iii) persons to whom the communication may otherwise lawfully be communicated ("**Permitted Persons**" and each a "**Permitted Person**"). Any person in the UK that is not a Permitted Person is not, for the purposes of any investment or investment decision, an intended recipient of the information contained in this Explanatory Statement or any document related thereto and should not use, or rely upon, such information in any way. This Explanatory Statement should not be distributed, communicated to, or directed at any person in the UK other than a Permitted Person.

2.12    An approved prospectus within the meaning of the EU or UK Prospectus Regulation is not required in connection with the Scheme because no securities will be offered pursuant to the Scheme to, or to the order, or for the account or benefit, of any person that is a Disqualified Person.

2.13    New Notes and New Shares will not be distributed pursuant to the Scheme to, or to the order, or for the account or benefit, of any person that constitutes a Sanctioned Person or any other person where such distribution would be prohibited by any applicable law or regulation, or so prohibited except after compliance with conditions or requirements that are unduly onerous. To the extent that such a prohibition applies, the Redemption Option shall automatically be deemed to apply to such person.

3.    **RISK FACTORS**

**THE ATTENTION OF THE SCHEME CREDITORS AND ANY OTHER PERSON WITH AN INTEREST IN THE EXISTING NOTES IS DRAWN TO CERTAIN RISKS ASSOCIATED WITH THE SCHEME THAT ARE SET OUT OR REFERRED TO IN PART 6 (*RISK FACTORS*) OF THIS EXPLANATORY STATEMENT.**

*Legal, tax and financial advice*

3.1    Neither the Scheme Creditors nor any other person with an interest in the Existing Notes should construe the contents of this Explanatory Statement as legal, tax or financial advice.

3.2    This Explanatory Statement has been prepared without taking into account the objectives, financial situation or needs of any particular recipient of it, and consequently the information contained in this Explanatory Statement may not be sufficient or appropriate for the purpose for which a recipient might use it. Any such recipients should conduct their own due diligence and consider the appropriateness of the information in this Explanatory Statement having regard to their own objectives, financial situations and needs. Scheme Creditors and any other person with an interest in the Existing Notes, are recommended to consult their own professional Advisors as to legal, tax, financial or other matters relevant to the action that they should take in relation to the Scheme, or the implications/consequences of those actions.

3.3    This Explanatory Statement does not discuss the tax consequences for Scheme Creditors or the Group arising from the implementation of the Scheme or the Restructuring. Scheme Creditors are liable for their own taxes and have no recourse to the Scheme Company, any other member of the Group, the Agents, the Existing Notes Trustee, the New Indenture Trustee or any other entity or person named in this Explanatory Statement with respect to taxes arising in connection with the Scheme. Scheme Creditors who are in any doubt as to the effect of the implementation of the Scheme are urged to consult their own professional Advisors regarding the possible tax consequences under the laws of the jurisdictions that apply to them

*Other jurisdictions*

3.4    The implications of the Scheme for Scheme Creditors and any other person with an interest in the Existing Notes who are residents or citizens of jurisdictions other than the UK, may be affected by the laws or regulations of the relevant jurisdictions. Such overseas Scheme Creditors and any other person with an interest in the Existing Notes should inform themselves about and observe any applicable legal and regulatory requirements. Any person outside the UK who is resident in, or who has a registered address in, or is a citizen of, an overseas jurisdiction and who is to receive information pursuant to the Scheme should consult independent professional Advisors and satisfy themselves as to the full observance of the laws and regulations of the relevant jurisdiction in connection with the Scheme, including obtaining any requisite governmental or other consents, observing any other requisite formalities and paying any issue, transfer or other taxes due in such jurisdiction.

3.5    **SCHEME CREDITORS AND ANY OTHER PERSON WITH AN INTEREST IN THE EXISTING NOTES SHOULD CONSULT THEIR OWN PROFESSIONAL ADVISORS WITH RESPECT TO THE MATTERS DESCRIBED IN THIS DOCUMENT, INCLUDING THE LEGAL, FINANCIAL AND TAX CONSEQUENCES OF THE SCHEME IN THEIR PARTICULAR CIRCUMSTANCES.**

## 4.    EXPECTED TIMETABLE OF PRINCIPAL EVENTS

**Existing Noteholders and any other persons with an interest in the Existing Notes should observe any deadlines set by any institution or settlement system through which they hold interests in the Existing Notes to ensure that any voting instructions given by them are taken into account at the Scheme Meeting. The Scheme Company strongly urges each Noteholder to contact its relevant Account Holder or Intermediary as soon as possible to ensure they are aware of this Explanatory Statement and the process and timetable set out in it.**

| Event | Time and/or date |
|---|---|
| **Convening Hearing**<br><br>Hearing at which the Scheme Company will apply to the Court for permission to convene the Scheme Meeting | 21 November 2024 |
| **Record Date**<br><br>Time and date on which the Scheme Company determines the Scheme Claims of each Scheme Creditor | 5:00 p.m. (New York time) on 2 December 2024 |
| **Custody Instructions Deadline**<br><br>Latest date and time for Scheme Creditors holding their Existing Notes through Euroclear and Clearstream and not holding through a Sanctioned Custodian to instruct their Account Holder to submit Custody Instructions to block their Existing Notes for the purposes of delivery of Account Holder Letters containing voting instructions for the purpose of the Scheme Meeting[1] | 5:00 p.m. (New York time) on 4 December 2024 |
| **Voting Instruction Deadline**<br><br>Latest time and date for receipt of validly completed Account Holder Letters by the Information Agent in order for Existing Noteholders' voting instructions to be taken into account for the purpose of the Scheme Meeting[2]<br><br>Only Existing Noteholders who are the beneficial owners of the Existing Notes at the Voting Instruction Deadline will be entitled to vote on the Scheme, unless the Scheme Company, in its sole and absolute discretion, elect to recognise a transfer of the Existing Notes thereafter | 5:00 p.m. (New York time) on 9 December 2024 |

---

[1] Existing Noteholders that are not Sanctioned Persons holding the Existing Notes through Sanctioned Custodians or otherwise not through Euroclear or Clearstream are not required to block their Existing Notes by the Custody Instructions Deadline, and instead will be required to provide proof of holdings, together with undertakings not to dispose of their interests or otherwise trade their Existing Notes until the conclusion of the Sanction Hearing.

[2] Please see Part 1 (*Notice to Scheme Creditors*), Section 6 (*Summary of actions to be taken by Scheme Creditors*) and Appendix 1 (*Instructions To Scheme Creditors and any Person with an Interest in the Existing Notes*) to this Explanatory Statement. Account Holders are encouraged to obtain whatever information or instructions they require from Existing Noteholders in sufficient time to allow them to return their valid Account Holder Letters to the Information Agent as soon as possible after the Scheme Company has issued this Explanatory Statement. Please note that the relevant Clearing Systems and/or Intermediaries may have earlier deadlines that Existing Noteholders and Account Holders may be required to comply with. Voting instructions may not be taken into account in respect of any Account Holder Letter received after the Voting Instruction Deadline, being 5:00pm (New York time) on 9 December 2024. Scheme Creditors and Account Holders requiring any assistance in completing Account Holder Letters should contact the Information Agent. All relevant documents can be accessed on the Scheme Website.

| (Anticipated) **Scheme Meeting**[3] <br><br> Meetings convened between the Scheme Company and Scheme Creditors at which Scheme Creditors will vote (in person, via videoconference link, or by proxy) on the Scheme | 2:00 p.m. (London time) on 11 December 2024 |
|---|---|
| (Anticipated) **Sanction Hearing** <br><br> Hearing at which the Court will be requested to sanction the Scheme by the Court | 13 December 2024 |
| (Anticipated) **Scheme Registration Time** <br><br> Time and date on which an office copy of the Sanction Order is delivered to the Registrar of Companies | 5:00 p.m. (London time) on the date of the Sanction Hearing |
| **Scheme Effective Date** <br><br> The date on which the Scheme Registration Time occurs and the Scheme Company notifies the Scheme Creditors (via the Information Agent) and the Existing Notes Trustee that each of the Scheme Conditions has been fulfilled or waived in accordance with the Scheme Document. | The date on which the Scheme Company files the Sanction Order at the Registrar of Companies. |
| (Anticipated) **Election Deadline** <br><br> Latest date and time for Existing Noteholders to submit their elections to receive the Redemption Option or Equity Option and to participate in the New Notes (by completing and submitting the New Notes Election Form contained within the Account Holder Letter) | 5:00p.m. (New York time) on 16 December 2024 (being the date three (3) Business Days following the Scheme Meeting) |
| **Restructuring Effective Date** <br><br> Date on which the Scheme Company notifies the Scheme Creditors and the other affected stakeholders that the Restructuring has been implemented (in accordance with the Scheme and the Implementation Deed) | As soon as practicable after the Scheme Effective Date in accordance with the Scheme Document, Implementation Deed and other Implementation Documents, as notified by the Scheme Company |
| **Longstop Date** <br><br> Latest time by which the Restructuring Effective Date shall occur. | 11.59 p.m. (London time) on 28 February 2025; or <br><br> such later time as may be agreed in writing between the Issuer and the Majority Consenting Noteholders (as defined in the Lock-Up Agreement) or, following the Scheme Effective Date, the Majority Scheme Creditors, subject to approval by the Majority International Lenders. |

**The Scheme Meeting will be held at 2.00 p.m. (London time) on 11 December 2024 (or such later date as the Scheme Company may decide and notify to Scheme Creditors) at the offices of Cleary Gottlieb Steen & Hamilton LLP at 2 London Wall Place, London, EC2Y 5AU, UK, with a live videoconference link.**

**It should be noted that these times and dates are indicative only and will depend upon a number of different factors. If one event is delayed, it is likely that this will have the effect of delaying all subsequent steps, including the Scheme Effective Date and the anticipated date for commencement of**

---

[3] The Scheme Meeting will commence at the time stated. More detail concerning valuation of claims for the purposes of voting and admission of claims for the purpose of the Scheme Meeting is set out in paragraph 8 (*Assessment of Scheme Claims for Voting Purposes*) of Appendix 1 (*Instructions to Scheme Creditors and any Person with an Interest in the Existing Notes*) to this Explanatory Statement.

**implementation of the Restructuring. Even if all Scheme-related dates occur in accordance with the above timetable, it is possible that the Restructuring Effective Date will be delayed in any event.**

**5.    ARE YOU A SCHEME CREDITOR?**

5.1    You have been sent this Explanatory Statement because you are thought to be a Scheme Creditor or any other person with an interest in the Existing Notes.

5.2    Please determine whether you are an Existing Noteholder, an Account Holder, a DTC Participant or an Intermediary in respect of an interest or interests in the Existing Notes or any other person with an interest in the Existing Notes. You may fall within more than one of these capacities depending on the circumstances applying to you. An overview of each of these various capacities is set out on the following page to assist your understanding of the structure of the Existing Notes and the interface with the Clearing Systems.

5.3    For the purposes of the Scheme, the following persons have interests in the Existing Notes:

(a)    **Existing Noteholders**: You are an Existing Noteholder if you hold (or as the case may be, held), an ultimate economic or beneficial interest as principal in the Existing Notes through DTC as at the Record Date, including through an Account Holder, a DTC Participant or an Intermediary. Examples of Existing Noteholders include:

(i)    a person who holds such an interest for their own account;

(ii)    a trustee who is holding such an interest as part of the assets of the trust which it administers; and

(iii)    an executor or personal representative where the estate of the deceased contains such an interest which was held for the deceased's own account.

If you are an Existing Noteholder, please read this Explanatory Statement carefully and follow the instructions set out in Section 6 (*Summary of actions to be taken by Scheme Creditors*) of Part 1 (*Notice to Scheme Creditors*) of this Explanatory Statement and Appendix 1 (*Instructions To Scheme Creditors and any Person with an Interest in the Existing Notes*) to this Explanatory Statement.

If you are an Existing Noteholder that is not an Account Holder or DTC Participant, you should contact your Account Holder (provided that they are not a Sanctioned Person)[4] or DTC Participant through any Intermediaries, if applicable (provided that they are not a Sanctioned Person)[5] to ensure that your Account Holder or DTC Participant takes the appropriate action described in this Explanatory Statement.

(b)    **Account Holders:** You are an Account Holder if you are recorded as holding a Book-Entry Interest in the Existing Notes in an account with any of the Clearing Systems or, as the context requires, are or were recorded as holding such an interest in such account at the Record Date.

If you are an Account Holder, you should promptly forward a copy of this Explanatory Statement to any persons on whose behalf you hold an interest in the Existing Notes except that it should not be forwarded or transmitted without the consent of the Issuer or the Scheme Company into any jurisdiction where to do so might constitute a violation of local securities law or regulation, or could cause the Issuer and the Scheme Company to be in breach of Sanctions.

(c)    **Intermediaries:** You are an Intermediary if you hold an interest in the Existing Notes on behalf of another person or, as the context requires, if you hold or held such an interest at the Record Date, and in either case you are not or (as appropriate) were not an Account Holder in respect of that interest. Examples of Intermediaries are brokers, investment

---

[4] For information if you are an Existing Noteholder holding Existing Notes through a Sanctioned Custodian, please see paragraph 6.1, of Section 6,  Part 1..

[5] For information if you are an Existing Noteholder holding Existing Notes through a Sanctioned Custodian, please see 6.1, of Section 6,  Part 1.

managers and nominee companies. If you are an Intermediary, you should promptly forward a copy of this Explanatory Statement to all persons on whose behalf you hold an interest in the Existing Notes except that it should not be forwarded or transmitted without the consent of the Issuer or the Scheme Company into any jurisdiction where to do so might constitute a violation of local securities law or regulation, or could cause the Issuer or Scheme Company to be in breach of Sanctions.

If the Existing Noteholder holds through Euroclear or Clearstream and is unable to instruct their Account Holder to block their Existing Notes (e.g., because their Account Holder or another Intermediary is a Sanctioned Person), you will need to provide the Existing Noteholder with a STAC or other proof of holding.

(d)     **DTC Participants**: You are a DTC Participant if you hold a securities account with DTC. Account Holders in DTC will be DTC Participants. If you are a DTC Participant, you should promptly forward a copy of this Explanatory Statement to all persons on whose behalf you hold an interest in the Existing Notes except that it should not be forwarded or transmitted without the consent of the Issuer or Scheme Company into any jurisdiction where to do so might constitute a violation of local securities law or regulation, including, or could cause the Issuer or Scheme Company to be in breach of Sanctions.

(e)     The Registered Holder Nominee and the Existing Notes Trustee.

5.4     The below diagram after paragraph 5.12 illustrates the relationship between certain persons with interests in the Existing Notes, which are held in global form through the Clearing Systems.

**FOR THE PURPOSES OF THE SCHEME, THE EXISTING NOTEHOLDERS, THE EXISTING NOTES TRUSTEE AND THE REGISTERED HOLDER NOMINEE ARE THE SCHEME CREDITORS.**

5.5     Account Holders are not Scheme Creditors unless and to the extent that they are Existing Noteholders. However, the assistance of Account Holders may be required, in accordance with their custodial duties, to assist Scheme Creditors with completing and submitting their Account Holder Letters and/or Custody Instructions. However, as described in Section 6 (*Summary of actions to be taken by Scheme Creditors*) of Part 1 (*Notice to Scheme Creditors*) of this Explanatory Statement and Appendix 1 (*Instructions To Scheme Creditors and any Person with an Interest in the Existing Notes*) to this Explanatory Statement, the assistance of Account Holders will be required, in accordance with their custodial duties, to assist Scheme Creditors with completing their Account Holder Letters by providing them the Custody Instruction Reference Number as obtained from the Clearing System when blocking the Existing Notes upon receipt of the Scheme Creditor's instruction to do so.

5.6     The Existing Notes Indenture does not expressly empower or authorise the Existing Notes Trustee to vote in respect of any claim, or claims, of any Existing Noteholder in any plan of reorganisation, arrangement, adjustment or composition affecting the Existing Notes or the rights of any Existing Noteholder (or otherwise, consent, accept or adopt any such plan of reorganisation, arrangement, adjustment or composition). Pursuant to the Convening Order, the Existing Notes Trustee is not permitted to exercise any voting rights in respect of the Existing Notes at the Scheme Meeting. The Registered Holder Nominee (in accordance with its customary practices) is not expected to exercise any voting rights in respect of the Existing Notes at the Scheme Meeting. Accordingly, the Existing Noteholders will be the only persons that will vote at the Scheme Meeting.

5.7     Account Holder Letters are required for the purposes of voting on the Scheme in respect of Existing Noteholders. Scheme Creditors are referred to Appendix 1 (*Instructions To Scheme Creditors and any Person with an Interest in the Existing Notes*) to this Explanatory Statement for more information. A form of Account Holder Letter is enclosed at Appendix 2 (*Account Holder Letter*) to this Explanatory Statement.

5.8     **If you are an Existing Noteholder that is not an Account Holder, you should contact your Account Holder (through any Intermediaries, if applicable) to ensure that your Account Holder takes the appropriate action described in this Explanatory Statement.**

5.9     In determining whether a particular person is the ultimate beneficial owner, and therefore an Existing Noteholder, entitled to a particular principal amount of the Existing Notes, each of the Issuer, the Scheme Company, the Existing Notes Trustee and the Information Agent may rely on such evidence and/or information and/or certification as it shall, in its absolute discretion, think fit and, if it does so rely, such evidence and/or information and/or certification shall, in the absence of manifest error, be conclusive and binding on all concerned.

5.10    Only Scheme Claims are subject to the Scheme and, for the avoidance of doubt, the claims of the Registered Holder Nominee, the Existing Notes Trustee and any Account Holder through whom an interest in the Existing Notes is held, which correspond to the Scheme Claims of Existing Noteholders, will be compromised under the Scheme.

5.11    Only Existing Noteholders who are the beneficial owners of the Existing Notes at the Record Date will be entitled to vote on the Scheme, unless the Scheme Company, in its sole and absolute discretion, elects to recognise a transfer of the Existing Notes after the Record Date.

5.12    For further information on the action to be taken by Scheme Creditors, see Section 6 (*Summary of actions to be taken by Scheme Creditors*) of Part 1 (*Notice to Scheme Creditors*) of this Explanatory Statement and Appendix 1 (*Instructions To Scheme Creditors and any Person with an Interest in the Existing Notes*) to this Explanatory Statement.

## INTERESTS IN THE EXISTING NOTES IN GLOBAL FORM HELD THROUGH CLEARING SYSTEMS

### Registered Holder Nominee

*Cede & Co., as nominee for DTC*

The Global Note representing interests in the Existing Notes are registered in the name of Cede & Co., as nominee for DTC

### DTC (Registered Holder)

Certain interests in the Existing Notes are held in DTC as Book-Entry Interests in the accounts of Account Holders who are DTC Participants

### DTC Participant

*(For example, a bank or brokerage house, with a securities account at DTC)*

The Book-Entry Interests are held by a DTC Participant either for its own account (in which case, it is the beneficial owner of and/or the owner of the ultimate economic interest in the relevant Existing Notes) or as custodian for the Existing Noteholder (in which case, it is not the holder of the ultimate economic interest in the relevant Existing Notes)

### Account Holders

*(For example, a bank or brokerage house, with a securities account at a Clearing System)*

Each Account Holder holds interests in the Existing Notes either for its own or as trustee or agent for the relevant Existing Noteholder. A Euroclear or Clearstream Account Holder are persons who have accounts with Euroclear or Clearstream.

### Intermediary

*(For example, a bank or brokerage house which does not have an account with a Clearing System)*

There may be one or more Intermediaries between an Account Holder and an Existing Noteholder

### Existing Noteholder

The beneficial owner of and/or the owner of the ultimate economic interest in the relevant Existing Notes

### Voting

Each Existing Noteholder will be entitled to attend and vote (or to direct a duly authorised proxy to attend and vote on its behalf) at the Scheme Meeting

6.      **SUMMARY OF ACTIONS TO BE TAKEN BY SCHEME CREDITORS**

**THE SOLE DIRECTOR OF THE SCHEME COMPANY UNANIMOUSLY SUPPORTS THE PROPOSALS SET OUT IN THIS EXPLANATORY STATEMENT, BELIEVING THAT ENTRY INTO THE ARRANGEMENTS CONTEMPLATED BY THE SCHEME ARE IN THE BEST INTERESTS OF THE SCHEME COMPANY, THE GROUP, AND THE SCHEME CREDITORS.**

**ACCORDINGLY, THE SOLE DIRECTOR OF THE SCHEME COMPANY SEEKS YOUR SUPPORT FOR THE SCHEME AND RECOMMENDS THAT YOU VOTE IN FAVOUR OF THE SCHEME AT THE SCHEME MEETING.**

ALL SCHEME CREDITORS MUST ALSO READ Appendix 1 (*Instructions to Scheme Creditors and any Person with an Interest in the Existing Notes*), A SUMMARY OF WHICH IS BELOW.

**Existing Noteholders are invited to vote at the Scheme Meeting by completing and delivering or directing their Account Holder to complete and submit, to the Information Agent, an Account Holder Letter.**

*Sanctions*

6.1     The Account Holder Letter is only to be completed by or on behalf of Scheme Creditors who are not Sanctioned Persons, and are not acting for, on behalf of, at the direction of or through Sanctioned Persons.

6.2     An Existing Noteholder may be requested to provide additional information and documents to confirm it is not and it is not acting on behalf of, or at the direction of, a Sanctioned Person. The Group's Advisors will conduct screening in respect of all Existing Noteholders (and their Account Holders) submitting the Account Holder Letters and the Scheme Company may, at its discretion, refuse to accept any Account Holder Letters if such screening results are unsatisfactory or the additional documents and information to confirm the status of the Existing Noteholders (and its Account Holder) are not provided on time or at all.

6.3     Scheme Creditors who are, or are acting for, on behalf of, at the direction of or through Sanctioned Persons are not permitted to vote at the Scheme Meeting, whether in person or by proxy or to participate in the New Notes.

6.4     Scheme Creditors who are not Sanctioned Persons but who hold their interests in the Notes through Sanctioned Custodians can, subject to submitting a validly completed Account Holder Letter before the Voting Instruction Deadline, participate or vote at the Scheme Meeting (provided that they do not submit their Account Holder Letter, or participate or vote at the Scheme Meeting through a Sanctioned Custodian.

6.5     For the avoidance of doubt, a Scheme Creditor shall not be a Sanctioned Person solely because it holds its interests in the Existing Notes through a Sanctioned Custodian.

6.6     The Scheme Company will hold the Scheme Meeting after the Issuer has received the OFAC Licence or written confirmation from OFAC that a licence or authorisation is not required. The Issuer applied for the OFAC Licence on 30 September 2024. If the OFAC Licence is not received before 11 December 2024 on terms that would authorise the Scheme Company to proceed with the Scheme Meeting, the Scheme Company will postpone the Scheme Meeting and defer the Voting Instruction Deadline and the Record Date accordingly.

6.7     Sanctioned Persons will receive the Redemption Option by default.

*Scheme Meeting*

6.8     Before the Scheme can become effective and binding on the Scheme Company and the Scheme Creditors, a resolution to approve the Scheme must be approved by the Scheme Creditors by the requisite majority required by section 899 of the Companies Act 2006. This requisite majority is a

majority in number (i.e. more than 50% representing at least 75%). in value of the Scheme Creditors who, being so entitled, are present and vote (either in person or by proxy) at the Scheme Meeting.

6.9    The Scheme Creditors will constitute a single class for the purpose of the Scheme and will therefore vote on the Scheme at the Scheme Meeting of the Scheme Creditors.

6.10    Based on the anticipated timetable, the Scheme Meeting has been ordered by the Court to take place at the offices of Cleary Gottlieb Steen & Hamilton LLP at 2 London Wall Place, London, EC2Y 5AU, UK, with a live videoconference link, on 11 December 2024 and will commence at 2:00 p.m. (London time), or such other time or date as the Scheme Company may decide and notify to Scheme Creditors.

6.11    Instructions to Scheme Creditors are set out at Appendix 1 (*Instructions To Scheme Creditors and any Person with an Interest in the Existing Notes*). A formal notice of the Scheme Meeting is set out at Appendix 3 (*Notice of Scheme Meeting*).

6.12    If the requisite majorities of Scheme Creditors at the Scheme Meeting do not approve the Scheme , then the Scheme Company will not be able to implement the Scheme .

*Completion of Account Holder Letters*

6.13    A form of the Account Holder Letter is enclosed at Appendix 2 (*Account Holder Letter*) to this Explanatory Statement.

6.14    Scheme Creditors are strongly urged to ensure that their Account Holders complete and submit their Account Holder Letters online via the Scheme Website at https://deals.is.kroll.com/grupomega as soon as possible or by email in pdf form to grupomega@is.kroll.com and in any event, no later than the Voting Instruction Deadline, being 5:00 p.m. (New York time) on 9 December 2024.

6.15    A separate Account Holder Letter must be completed in respect of each separate beneficial owner of the Existing Notes.

6.16    The Registered Holder Nominee holds the global note in DTC. Existing Noteholders either hold their Existing Notes via:

(a)    DTC, either directly (as a DTC Participant) or through an intermediary who is a DTC Participant; or

(b)    Euroclear or Clearstream (through a DTC Participant who is holding the Existing Notes for Euroclear or Clearstream), either directly (as a Euroclear or Clearstream Account Holder) or through an intermediary who is a Euroclear or Clearstream Account Holder. Certain Existing Noteholders may hold their Existing Notes in Euroclear or Clearstream through a Sanctioned Custodian.

<u>Existing Noteholders with an interest in the Existing Notes held via Euroclear or Clearstream only</u>

6.17    This section does not apply to Existing Noteholders who hold their Existing Notes through a Sanctioned Custodian. Please refer to 6.21 onwards below.

6.18    In order to vote at the Scheme Meeting, Existing Noteholders with an interest in the Existing Notes held via Euroclear or Clearstream must have blocked their Existing Notes (through their Account Holder if the Existing Noteholder is not itself an Account Holder).

6.19    Existing Noteholders will receive notice of the elections required by the Account Holder Letter from their Account Holders (if the Existing Noteholder is not itself an Account Holder). An Existing Noteholder must confirm its consent to this notification, following which the Account Holder must submit an electronic instruction to Euroclear or Clearstream by no later than the Custody Instructions Deadline. The electronic instruction confirmation will generate a Custody Instruction Reference Number which must be included when completing and submitting the Account Holder Letter. Once

the electronic instruction is submitted, the relevant notes will be blocked in Euroclear and/or Clearstream. The block will be in effect until released:

(a)    if the Scheme is approved at the Scheme Meeting and sanctioned at the Sanction Hearing and the Restructuring Effective Date occurs, on the Restructuring Effective Date (with the Existing Notes being assigned and subsequently cancelled in accordance with the Scheme);

(b)    if the Scheme is not approved at the Scheme Meeting, promptly following the conclusion of the Scheme Meeting;

(c)    if the Scheme is approved at the Scheme Meeting but not sanctioned at the Sanction Hearing, promptly following the conclusion of the Sanction Hearing; or

(d)    if the Scheme is approved at the Scheme Meeting and sanctioned at the Sanction Hearing, but the Scheme and/or Implementation Deed are terminated in accordance with their terms before the occurrence of the Restructuring Effective Date.

6.20    An Account Holder Letter in respect of an Existing Noteholder with an interest in the Existing Notes held via Euroclear or Clearstream will not be complete or valid without the inclusion of a Custody Instruction Reference Number.

<u>Existing Noteholders with an interest in the Existing Notes held via DTC or a Sanctioned Custodian</u>

6.21    Existing Noteholders holding their Existing Notes through DTC or a Sanctioned Custodian will not need to submit Custody Instructions by the Custody Instructions Deadline. Instead, these Existing Noteholders will undertake not to trade, sell, transfer or otherwise dispose of their interests in the Existing Notes. This undertaking will be effective until released:

(a)    if the Scheme is approved at the Scheme Meeting and sanctioned at the Sanction Hearing and the Restructuring Effective Date occurs, on the Restructuring Effective Date (with the Existing Notes being assigned and subsequently cancelled in accordance with the Scheme, the Implementation Deed and other relevant Implementation Documents);

(b)    if the Scheme is not approved at the Scheme Meeting, promptly following the conclusion of the Scheme Meeting;

(c)    if the Scheme is approved at the Scheme Meeting but not sanctioned at the Sanction Hearing, promptly following the conclusion of the Sanction Hearing; or

(d)    if the Scheme is approved at the Scheme Meeting and sanctioned at the Sanction Hearing, but the Restructuring Effective Date does not occur before the Longstop Date, promptly following the Longstop Date.

<u>Additional requirements where Existing Notes are held via a Sanctioned Custodian</u>

6.22    If you are an Existing Noteholder holding the Existing Notes via a Sanctioned Custodian, you must prepare sufficient supporting evidence to allow the Information Agent to reliably establish your identity, your holdings in the Existing Notes and the date on which the evidence was generated. The evidence can be in the form of a STAC, including (i) the full name or legal entity name of the Scheme Creditor; (ii) the security and/or ISIN held; (iii) the aggregate amount of the Existing Notes held as at the Record Date; and (iv) the date on which the STAC was provided. If you are unable to obtain a STAC, you should contact the Information Agent to seek to agree an approach to submit other proofs of holdings to the Information Agent's satisfaction.

<u>Information applicable to all Existing Noteholders</u>

6.23    Each Existing Noteholder who wishes to vote at the Scheme Meeting must ensure that it, or if it is not an Account Holder and it does not hold its Existing Notes via a Sanctioned Custodian, its Account Holder completes and submits to the Information Agent a valid Account Holder Letter in order to vote at the Scheme Meeting. **For the purposes of voting, Account Holder Letters must be**

**delivered to and received by the Information Agent before the Voting Instruction Deadline, being 5.00 p.m. (New York time) on 9 December 2024.**

6.24    The delivery of an Account Holder Letter to the Information Agent will not prevent the Existing Noteholder who completed it from subsequently attending and voting in person at the Scheme Meeting if it so wishes.

6.25    An Existing Noteholder who wishes to attend the Scheme Meeting should complete an Account Holder Letter, indicating in it that the Existing Noteholder intends to attend the Scheme Meeting. Each Scheme Creditor or its proxy who wishes to attend the Scheme Meeting, and has indicated the same in its Account Holder Letter, will be required to register its attendance by emailing the Information Agent at least one hour prior to the commencement of the Scheme Meeting.

6.26    A proxy need not be a Scheme Creditor. Existing Noteholders are encouraged to appoint a proxy to attend the Scheme Meeting in the event that they are unable to attend. Scheme Creditors may appoint the Chair as their proxy.

6.27    Proof of personal identity and corporate authority will be required to attend the Scheme Meeting. Please see the Account Holder Letter enclosed at Appendix 2 (*Account Holder Letter*) to this Explanatory Statement for details of what is acceptable.

6.28    Only those Scheme Creditors who are Scheme Creditors as at the Record Date are entitled to attend and vote, either in person or by proxy, at the Scheme Meeting.

6.29    It is important that as many votes as possible are cast at the Scheme Meeting so that the Court may be satisfied that there is a fair representation of opinion of Scheme Creditors. You are therefore strongly urged to submit or to direct your Account Holder to submit the relevant parts of your Account Holder Letter as soon as possible and by no later than the Voting Instruction Deadline.

6.30    Completed Account Holder Letters for the purposes of voting at the Scheme Meeting should be submitted to the Information Agent only. Account Holder Letters should not in any circumstances be delivered to any of the Registered Holder, Registered Holder Nominee, the Existing Notes Trustee, the Issuer or the Scheme Company, or any of its advisors, or any other person. None of the Registered Holder, Registered Holder Nominee, the Existing Notes Trustee, the Issuer or the Scheme Company or any member of the Group or any of their respective Affiliates, officers, directors or employees or any other person will be under any duty to give notification of any defects, irregularities or delays in any Account Holder Letter, nor will any of such entities or persons incur any liability for failure to give such notification.

*Chair's discretion*

6.31    *Valid Account Holder Letter* – If a Scheme Creditor does not submit the Custody Instructions before the Custody Instructions Deadline (if applicable) and/or a Scheme Creditor does not submit a validly completed Account Holder Letter before the Voting Instruction Deadline, the Scheme Creditor may submit a completed Account Holder Letter to the Information Agent prior to the commencement of the Scheme Meeting. The Chair of the Scheme Meeting will be entitled, in their sole discretion, to permit a Scheme Creditor in respect of which a completed Account Holder Letter has not been delivered prior to the Voting Instruction Deadline to vote at the Scheme Meeting, if that Scheme Creditor provides evidence of its holdings as at the Record Date and evidence of its identity and corporate authority (if applicable) satisfactory to the Scheme Company and/or the Group Counsel and the Chair.

6.32    *Amendment of voting instructions* – An Account Holder Letter which has been submitted to and received by the Information Agent prior to the Voting Instruction Deadline may be amended by a Scheme Creditor (or if not an Account Holder, by an Account Holder on its behalf) by submitting an updated Account Holder Letter to the Information Agent at any time prior to the Voting Instruction Deadline. If an updated Account Holder Letter is received after the Voting Instruction Deadline, the Chair may (in their sole discretion) accept such updated Account Holder Letter.

6.33    *Value of Scheme Claims* – The value of the Scheme Claims of each Existing Noteholder in respect of the Existing Notes will be calculated as at the Record Date based on information confidentially provided to the Scheme Company by the Information Agent. This information will be used by the Chair to determine whether the Scheme is approved at the Scheme Meeting. Accordingly, Existing Noteholders do not need to take any action in respect of confirming the amount of their Scheme Claims other than providing the details requested in the Account Holder Letter.

**Completed Account Holder Letters for the purposes of voting should be submitted to the Information Agent so as to be received by the Information Agent as soon as possible and in any event before the Voting Instruction Deadline, being by 5:00 p.m. (New York time) on 9 December 2024.**

# PART 2

## INFORMATION ON THE GROUP

In order to assist Scheme Creditors in considering the Scheme, this section sets out information about the Group and its business.

**1.      DESCRIPTION OF THE GROUP'S BUSINESS**

1.1     The Issuer is a *sociedad anónima de capital variable* (variable capital stock corporation), *sociedad financiera de objeto multiple, entidad regulada* (regulated multiple purpose corporation) organized under the laws of Mexico, incorporated and existing under the laws of Mexico and with registered main address at Av. Patria 1501, Jardines Universidad, 45110 Zapopan, Jalisco, Mexico.

1.2     The Scheme Company is a private company limited by shares incorporated in England and Wales under registered number 15986024 and with registered address at Suite 1, 7th Floor 50 Broadway London SW1H 0DB, United Kingdom. The Scheme Company has no substantial operations of its own. The Scheme Company is a direct subsidiary of the Issuer.

1.3     The Group is a leading Mexican regulated multiple purpose financial provider, based in Guadalajara, Jalisco, with more than 20 years of operating experience. It specialises in four main business lines: leases, lending, auto loans and factoring. In addition to its headquarters located in Guadalajara, the Group has other branches throughout Mexico, located in Mexico City, Puebla, Querétaro, and Leon, and one additional office located in San Diego, California.

1.4     The Group offers leases for machinery and equipment (including computer numerical control (CNC) machines and bending machines), transportation vehicles (including cargo and passenger vehicles) and other capital assets used in a variety of industries in Mexico. The Group also provides financing to small and medium-sized businesses for the acquisition of durable goods and equipment (such as greenhouses and macro-tunnels), as well as liquidity and financing solutions for their working capital needs. The Group's auto loans business line is based in San Diego, California, and specialises in loans for the purchase of pre-owned personal vehicles.

**2.      The Group's operations are regulated by the CNBV and CONDUSEF.**

**3.      GROUP STRUCTURE**

3.1     Ignacio Javier Gonzalez Delgadillo is the sole director of the Scheme Company. The sole director does not have any material interests that effect the proposed Restructuring.

3.2     José Guillermo Romo Romero ("**JGRR**"), José Guillermo Romo de la Peña, Octavio Rubio Limón, Karen Lavonne Mauch, Juan Jaime Petersen Farah, Eduardo Michelsen Delgado are the directors of the Issuer. JGRR, as the Related Party Existing Noteholder controls certain of the Existing Notes – this interest does not effect the proposed Restructuring.

3.3     The Group's corporate organisation is shown in the following indicative structure chart:



## 4.    GROUP FINANCING ARRANGEMENTS

4.1    The Group's existing financing arrangements include the following:[6]

(a)    the Existing Notes issued by the Issuer and guaranteed by the Scheme Company;

(b)    the Cebures;

(c)    the Mexican Facilities; and

(d)    the International Facilities.

*The Existing Notes*

4.2    The purpose of the Scheme is to implement a restructuring of the Existing Notes as part of the wider Restructuring. Further details on the Existing Notes are as follows:.

(a)    The Issuer and the Scheme Company are liable in respect of the Existing Notes being the 8.250% senior notes due 11 February 2025 issued by the Issuer pursuant to an indenture dated 11 February 2020, between amongst others, the Issuer and the Existing Notes Trustee (as amended and supplemented by the First Supplemental Indenture and the Second Supplemental Indenture).

(b)    The Existing Notes rank equally with the unsecured indebtedness of the Issuer (except those obligations preferred by operation of law) and will be senior to any subordinated indebtedness of the Issuer.

(c)     The Scheme Company was incorporated on 30 September 2024 in preparation for proposing the Scheme. On 31 October 2024, the Scheme Company executed a deed poll (the "**Deed Poll**"), pursuant to which (i) it agreed to be bound by all the terms and conditions of the Existing Notes Indenture as if it were an original party thereto and (ii) it acknowledged that it will be jointly and severally liable with the Issuer for all obligations and liabilities under the Indenture. Following execution of the Deed Poll, the Scheme Creditors have the right to claim against the Scheme Company in respect of any obligations under the Existing Notes.

(d)     The Scheme Company and the Issuer (together, the "**Companies**") entered into a deed of contribution on 31 October 2024 (the "**Deed of Contribution**"), pursuant to which the Scheme Company has irrevocably and unconditionally agreed to pay to the Issuer by way of contribution an amount that is equal to the Scheme Company's share of the amount of any payment made by the Issuer in respect of any obligation under the Existing Notes. Following execution of the Deed of Contribution, the Issuer has a right of contribution against the Scheme Company in respect of payments made under the Existing Notes.

(e)     In addition, on 1 November 2024, the Scheme Company executed the Second Supplemental Indenture pursuant to which it acceded to the Existing Notes Indenture as a guarantor. The Second Supplemental Indenture is governed by New York law.

(f)     The guarantee and obligations under the Deed of Contribution provided by the Scheme Company are unsecured and rank equally with unsecured indebtedness of the Scheme Company and are senior to all subordinated indebtedness of the Scheme Company (except those obligations preferred by operation of law).

(g)     The net proceeds from the Existing Notes were used for general corporate purposes.

(h)     As at 31 October 2024 the aggregate principal amount outstanding under the Existing Notes was US$350,758,000. Certain Related Party Existing Noteholders control US$28,069,000 in principal amount of the outstanding Existing Notes.

4.3     The Group is also financed by the following third-party indebtedness:

*Cebures*

(a)     The Issuer is the issuer of the Mexican law governed Ps. 3,000,000,000 floating rate senior notes (*certificados bursátiles*) due 2027 (the Cebures) pursuant to the terms of the relevant global title governing the Cebures.

(b)     The net proceeds from the issuance of the Cebures were used to finance and invest in sustainable projects, in accordance with the 2021 Green Bond Principles, 2021 Social Bond Principles and 2021 Sustainability Bond Guidelines set forth by the International Capital Markets Association.

(c)     As at 31 October 2024, the aggregate amount outstanding under the Cebures (including principal and accrued interest) was Ps. 3,000,000,000.

(d)     As at the date of this Explanatory Statement, the Issuer has a number of defaults outstanding under the Cebures, including cross default resulting from defaults across the Issuer's indebtedness, unauthorized change of auditor, delay or failure to comply with certain reporting obligations and information requirements, and failure to comply with certain financial ratios.

*Bilateral Facilities: Mexican Facilities*

4.4     The Mexican Facilities comprise eight (8) facilities, each with a different lender. These are working capital facilities and term loans, some of which are secured by pledges over certain lease contracts of the Issuer.

4.5    The Mexican Facilities comprise the following facility agreements:

(a)    Credit Agreement dated 26 May 2017, as amended on 4 September 2018, 20 May 2020, 5 August 2020 and 27 May 2021, between the Issuer and HSBC México with a drawn balance as at 30 June 2024 of MXN$1,262,183,479.90 (approximately US$63,109,174.00), and a final repayment date of 31 May 2029, subject to automatic renewals of one-year periods upon each anniversary thereof conditioned upon the compliance with certain requirements;

(b)    Promissory Note dated 13 September 2024 issued by the Issuer in favour of HSBC Mexico for a principal amount of MXN200,000,000 (approximately US$10,000,000), and a final repayment date of 12 November 2024;

(c)    Credit Agreement dated 21 May 2013, as amended on 19 December 2014, 15 July 2016, 30 November 2016, 16 June 2017, 27 June 2018 and 20 November 2020, between the Issuer and Scotiabank, with a drawn balance as at 30 June 2024 of MXN58,674,333.12 (approximately US$2,933,716.66), and a final repayment date in February 2026;

(d)    Credit Agreement dated 12 August 2014, as amended on 23 November 2018, 1 November 2019 and 10 March 2023, between the Issuer and Bancomext, with a drawn balance as at 30 June 2024 of MXN960,929,466.93 (approximately US$48,046,473.35), and a final repayment date of 30 September 2029;

(e)    Credit Agreement dated 12 August 2019 between the Issuer and Banco del Bajío, with a drawn balance as at 30 June 2024 of MXN67,784,099.96 (approximately US$3,389,205.00), and a final repayment date of 12 August 2029;

(f)    Credit Agreement dated 7 January 2022 between the Issuer and Banco Santander, with a drawn balance as at 30 June 2024 of MXN40,590,901.97 (approximately US$2,029,545.10), and a final repayment date of 7 January 2027;

(g)    Credit Agreement dated 30 August 2022 between the Issuer and Banco INVEX, with a drawn balance as at 30 June 2024 of MXN165,530,168.23 (approximately US$8,276,508.41), and a final repayment date in September 2026; and

(h)    Credit Agreement dated 22 August 2022 between the Issuer and Huruma, with a drawn balance as at 30 June 2024 of EUR8,000,000 (approximately US$10,394,560), and a final repayment date of 22 August 2025.

4.6    As at 30 June 2024, the aggregate amount outstanding under the Mexican Facilities was approximately Ps. 2,556,506,331.36, equivalent to approximately US$127,825,316.57.

*Bilateral Facilities: International Facilities*

4.7    The International Facilities comprise twelve (12) facilities, each with a different lender. These are primarily used by the Issuer to extend credit to its customers.

4.8    The International Facilities comprise of the following facility agreements and term loans:

(a)    term loan facility agreement dated 8 November 2021 between BlueOrchard and the Issuer providing for:

i.    US$10,000,000 term loan amortising over 48 months; and

ii.    US$10,000,000 term loan amortising over 48 months,

with an aggregate drawn balance as at 30 June 2024 of US$11,442,980.

(b)    term loan dated 28 June 2021 between Micro, Small & Medium Enterprises Bonds and the Issuer, with a drawn balance as at 30 June 2024 of MXN115,000,000 (approximately US$5,750,000) and a final repayment date of 1 July 2024;

(c)    term loan dated 30 December 2021 between Symbiotics acting with respect to its SEB Microfinance Fund VII and the Issuer with a drawn balance as at 30 June 2024 of MXN20,200,000 (approximately US$1,010,000) and a final repayment date of 24 June 2024;

(d)    amortising term loan dated 30 December 2021 between Symbiotics acting with respect to its Global Financial Inclusion Fund and the Issuer with a drawn balance as at 30 June 2024 of MXN10,100,000 (approximately US$505,000) and a final repayment date of 30 December 2024;

(e)    amortising term loan dated 30 December 2021 between Symbiotics acting with respect to its Global Microfinance Fund and the Issuer with a drawn balance as at 30 June 2024 of MXN20,200,000 (approximately US$1,010,000) and a final repayment date of 30 December 2024;

(f)    US$2,000,000 amortising term loan dated 24 March 2021 between ResponsAbility and the Issuer, with a drawn balance as at 30 June 2024 of US$400,000 and a final repayment date of 2 April 2024;

(g)    amortising term loan facility agreement dated 17 September 2021 and amended on 29 March 2023 between Eco-Business Fund and the Issuer providing for:

        i.    US$15,000,000 term loan amortising over 18 months with a drawn balance as at 30 June 2024 of US$7,500,000; and

        ii.    US$15,000,000 term loan amortising over 18 months with a drawn balance as at 30 June 2024 of US$7,500,000.

(h)    US$20,000,000 credit facility dated 31 January 2022 between PROPARCO and the Issuer, with a drawn balance as at 30 June 2024 of US$20,000,000 and a final repayment date of 30 July 2025. In July 2024, PROPARCO transferred the loan to Cleardusk;

(i)    credit facility dated 2 November 2021, as amended on 6 November 2023, between Triodos and the Issuer, with an outstanding amount of US$8,600,000, and a final repayment date of 19 September 2026;

(j)    credit facility dated 5 December 2018, as amended and restated on 6 November 2023, between Legal Owner Triodos B.V. as owner of Triodos Fair Share Fund and the Issuer, with an outstanding amount of US$ 5,000,000, and a final repayment date of 6 November 2028,

(k)    US$15,000,000 amortising term loan facility dated 26 March 2021 and amended on 23 June 2022 between Global Climate Partnership Fund and the Issuer, with a drawn balance as at 30 June 2024 of US$14,500,000 and a final repayment date of 30 March 2026; and

(l)    US$2,500,000 term loan facility dated 30 March 2021, between Microfinance Enhancement Facility SA, SICAV-SIF (managed by ResponsAbility Investments AG) and the Issuer, with a drawn balance as at 30 June 2024 of US$500,000 and a final repayment date of 2 April 2024.

4.9    As at 30 June 2024, the aggregate amount outstanding under the International Facilities was approximately US$83,717,980.

4.10    The Scheme will only impact the Existing Notes and does not propose to compromise any claims of any holders under the Cebures, creditors under the Mexican Facilities or the International Facilities. Amendments and waivers under the terms of the Cebures, Mexican Facilities and the restructuring of the International Facilities will form part of the Restructuring and will be a condition precedent to implementation of the Scheme and vice versa (as described at Section 2 (*Steps taken by the Group)*, Part 3 (*Background to and Overview of the Restructuring)*, paragraphs 2.12 and 2.15) below).

# PART 3

# BACKGROUND TO AND OVERVIEW OF THE RESTRUCTURING

## 1.    BACKGROUND TO THE RESTRUCTURING

*Challenges to the Business*

1.1    Despite the Issuer's efforts to comply with its financial obligations, adverse economic conditions beyond the Group's control have impaired the Issuer's business and caused significant operational challenges, which has resulted in the Group facing severe liquidity constraints.

1.2    Numerous factors have contributed to this impairment, (i) the global economic impact of the COVID-19 pandemic, (ii) reduced funding sources, (iii) a mismatch between the maturities of assets and liabilities, and (iv) obligations related to currency hedges on the U.S. Dollar-denominated debt.

1.3    To explain some of the above factors in turn:

(a)    **Global Economy:** the global economy has recently experienced a period of volatility and has been adversely affected by a worldwide increase in inflation, loss of confidence in the financial sector, disruptions in the credit markets, reduced business activity, and erosion of consumer confidence. Rising inflationary pressures in the aftermath of the COVID-19 crisis have set the tone for the U.S. Federal Reserve, and central banks around the world, to tighten their monetary policies at a fast pace throughout 2022 and 2023;

(b)    **Sector Headwinds and Sources of Funding:** the non-banking financial sector in Mexico has faced significant headwinds in recent years. Several companies in the sector have seen their ability to meet their payment obligations compromised, leading to diminished investor confidence in the sector. Credito Real, Tangelo, Alpha Credit, and Unifin, previous leaders in the sector, all have pursued restructuring processes. Despite the Group's strong portfolio and robust risk management practices, funding sources have been severely diminished. This situation is further worsened by a rising interest rate environment, where potential refinancing options for the Group's debt have become exceedingly expensive;

(c)    **Mismatch between Maturities:** historically, the sector was funded through bullet-maturity loans, which created a mismatch between the maturity schedules of the institutions' loan portfolios and the maturity dates of their debt. This forced companies to constantly seek refinancing for these bullet loans to alleviate the timing discrepancy between cash receipts and debt repayment. When the Group encountered this common industry challenge, it was unable to successfully refinance its international notes due to the previously mentioned sector headwinds; and

(d)    **Dollar Exposure:** the Group has funded its operations through debt issuance in foreign currency, and implemented a hedging strategy to mitigate the impact of USD/MXN exchange rate fluctuations. However, in the past few years, market conditions were such that the appreciation of the Mexican Peso against the US Dollar triggered multiple margin calls on the Group's derivative positions, further pressuring the company's liquidity.

*Existing Notes Failed Consent Solicitation*

1.4    In light of the Existing Notes Maturity Date, on 13 October 2023, the Issuer launched an offer to exchange its Existing Notes for a combination of newly issued notes due 2028 and cash consideration of US$70 million, to be distributed pro rata amongst participants depending on the noteholder participation levels. The newly issued notes would have amended debt covenant ratios, interest rate payment mechanics and redemption provisions vis-à-vis the Existing Notes. The exchange offer was conditional upon the participation of more than 50% of the holders of principal amount of Existing Notes outstanding and the funding of a US$70 million intercompany loan by the Issuer's controlling shareholder (for purposes of funding the cash portion of the exchange consideration). Concurrently with the offer to exchange and to incentivize the holders to participate, the Issuer solicited consents

to amend and remove substantially all of the restrictive covenants in the Existing Notes. However, less than 35% of the Existing Noteholders participated in the exchange offer and so the required threshold was not met of more than 50% of the holders of the principal amount of the Existing Notes outstanding. Therefore, on 13 November 2023, the Issuer terminated the exchange offer.

*Liquidity Constraints*

1.5     A decrease of cash receipts has severely impacted the Group's cash flow. At 30 June 2024, the Group had cash and cash equivalents of Ps. $670,282,842.32 (approximately US$33,514,142), approximately US$29,261,250.65 less than in comparison to 30 June 2023.

1.6     As a result of the abovementioned factors, the Issuer has defaulted on certain of its indebtedness, as further elaborated below.

1.7     In addition, the Group is projected to have insufficient funds to repay the Existing Notes (including accrued and Unpaid Interest and additional amounts (if any) thereon) in full on the Existing Notes Maturity Date.

*Defaults*

1.8     As at the date of this Explanatory Statement, there are a number of outstanding defaults under the Existing Notes, the International Facilities, the Mexican Facilities and the Cebures and certain further defaults may be triggered by launching of the Scheme and the Chapter 15 Petition. These include:

    (a)     Existing Notes

        (i)     defaults for failure to pay principal, interest or any other amounts; and

        (ii)     cross-defaults.

    (b)     International Facilities

        (i)     defaults for failure to pay principal, interest or any other amounts;

        (ii)     defaults as a consequence of delays in the delivery of financial statements;

        (iii)     breaches of certain financial ratios;

        (iv)     defaults triggered by the Issuer's commencement of negotiations with creditors and/or in relation to the Scheme and related proceedings; and

        (v)     defaults in reporting obligations and information requirements.

    (c)     Mexican Facilities

        (i)     defaults for failure to pay principal, interest or any other amounts;

        (ii)     defaults as a consequence of delays in the delivery of financial statements;

        (iii)     defaults triggered by the Issuer's commencement of negotiations with creditors and/or in relation to the Scheme and related proceedings; and

        (iv)     defaults in reporting obligations and information requirements.

    (d)     Cebures

        (i)     defaults in relation to the appointment of the Issuer's auditor;

        (ii)     breaches of certain financial ratios;

(iii)    defaults in reporting obligations and information requirements; and

(iv)    cross-defaults.

## 2.    STEPS TAKEN BY THE GROUP

2.1    The Group has taken steps to stabilise its liquidity position and manage its long-term debt obligations by undertaking the Restructuring, including the Scheme.

*Negotiations in relation to the Restructuring*

2.2    On 12 August 2024, the Issuer announced that, following a strategic review of its capital structure, it was in the process of engaging with its creditors.

2.3    On 23 August 2024, the Issuer entered into a non-disclosure agreement with the Ad Hoc Group of certain holders of the Existing Notes, who collectively hold approximately 28.2% of the Existing Notes, to facilitate discussions regarding the Scheme.

*Lock-Up Agreement*

2.4    The Scheme Company, the Issuer, the Ad Hoc Group and the Related Party Existing Noteholders (acting by the Issuer's controlling shareholder) entered into the Lock-Up Agreement to support the implementation of the Scheme on 11 November 2024. Appended to the Lock-Up Agreement is a term sheet in a form agreed between the Scheme Company, the Issuer and the Ad Hoc Group.

2.5    The Lock-Up Agreement was made available to all Scheme Creditors on the Scheme Website on 11 November 2024 and an announcement regarding the entry into the Lock-Up Agreement and the proposal of the Scheme was distributed on 11 November 2024 through the Scheme Website, the Issuer's Website, Clearing Systems and the SGX-ST.

2.6    All Scheme Creditors that are not Sanctioned Persons are invited to accede to the Lock-Up Agreement any time before the Scheme Meeting by completing an accession deed substantially in the form scheduled to the Lock-Up Agreement and by delivering an accession deed to the Issuer in accordance with the terms of the Lock-Up Agreement.

2.7    Under the terms of the Lock-Up Agreement, each of the parties undertake to:

(a)    use all reasonable endeavours to implement the steps necessary to implement the Scheme, including providing information and executing documents;

(b)    in the case of the Consenting Noteholders, not take any enforcement action against the Group; and

(c)    use reasonable endeavours to implement the Scheme as soon as reasonably practicable, and to enter into negotiations with a view to agreeing the necessary restructuring documents in a form anticipated by the term sheet for the Scheme.

2.8    Under the terms of the Lock-Up Agreement, each Existing Noteholder who is a party to the Lock-Up Agreement prior to the Scheme Meeting and (in accordance with their undertaking thereunder) votes in favour of the Scheme shall be entitled to receive a fee in an amount equal to 1% of the aggregate principal amount of Existing Notes held by such Consenting Noteholder as at the Voting Instruction Deadline and subject to the Lock-Up Agreement (the "**Lock-Up Fee**"), which shall be paid by the Scheme Company to such Consenting Noteholder in accordance with the Implementation Steps.

*Bilateral Facilities Negotiations*

2.9    By 22 July 2024, the Issuer had in place confidentiality arrangements with all of the Mexican Facilities Lenders to facilitate discussions regarding the Restructuring.

2.10    As of the date of this Explanatory Statement, the International Facilities Lenders have provided their in principle agreement to the terms of the restructuring of the International Facilities (subject to agreeing the security package and customary conditions, including obtaining the necessary internal committee approvals, conducting limited due diligence, and agreeing final definitive documents).

2.11    The Issuer plans to obtain waivers of any events of default that may have occurred under the Mexican Facilities and consents, to the extent necessary, to permit the implementation of the Restructuring.

2.12    The restructuring of the International Facilities and any waivers and consents required under the Mexican Facilities are condition precedents to implementation of the Scheme and vice versa.

*Cebures Restructuring Negotiations*

2.13    The Issuer is currently engaged in discussions with the holders of the Cebures to obtain waivers in relation to the outstanding defaults under the Cebures and amend the terms of the Cebures as necessary to permit implementation of the Restructuring.

2.14    Between 9 September and 12 September 2024, the Issuer entered into non-disclosure agreements with certain holders of the Cebures to facilitate discussions regarding the Restructuring.

2.15    The waivers and amendments in relation to the Cebures are a condition precedent to implementation of the Scheme and vice versa.

3.    **OVERVIEW OF THE RESTRUCTURING AND THE SCHEME**

3.1    The Scheme Company considers that the Restructuring, of which the Scheme will form an integral part, will:

(a)    mitigate the risk of any member of the Group having to file for any formal insolvency or bankruptcy proceedings, on a protective basis or otherwise;

(b)    leave in place a more sustainable capital structure, providing the Group with a strengthened balance sheet and a level of debt that it is capable of servicing going forward;

(c)    provide necessary liquidity for the Group to allow it to continue to rebuild its business and operations; and

(d)    allow the Group to obtain new funding to finance its ongoing working capital requirements.

3.2    The key aspects of the Restructuring are described below. The Restructuring will cover (i) the Existing Notes, (ii) the Cebures, and (iii) the International Facilities.

*New Refinancing Facility*

3.1    In connection with the restructuring the Issuer entered into on 18 September 2024 a new secured facility agreement (the "**New Refinancing Facility**") with Bancomext. The proceeds of the New Refinancing Facility will be drawn down by the Issuer contemporaneously with the issuance of the New Notes (as described below). The proceeds of the New Refinancing Facility will be used to fund the cash payments to be made to creditors as part of the Restructuring (including payments to be made to Scheme Creditors pursuant to the Redemption Option (as described below)).

3.2    A summary of the key terms of the New Refinancing Facility is set out at paragraph 3.26 below.

*New Notes*

3.1    Pursuant to the terms of the New Refinancing Facility, the Issuer is obliged to obtain additional funding (to enable the Restructuring of its existing debt, incur restructuring related expenses as well as for origination purposes) from other sources in the total amount of Ps.1,227,000,000 (or its equivalent in other currencies) (for the purposes of the commitments related to New Notes agreed to

be equal to USD 61,237,630 (using the USD/MXN exchange rate as of 6 November 2024) (the "**New Notes Base Amount**").

3.2   To satisfy the additional funding requirement the Issuer will issue new notes on or before the Restructuring Effective Date in accordance with the Implementation Deed  (the "**New Notes**").  .

3.3   A summary of the key terms of the New Notes is set out at paragraph 3.27 below.

3.4   **Tranche 1:**

(a)   Tranche 1 in the amount of USD10,000,000 will be subscribed in full for cash by an Affiliate of existing creditors of the Issuer (the "**Participating T1 New Noteholder**") pursuant to a commitment letter entered into between the Issuer, the Scheme Company and the Participating T1 New Noteholder on 11 November 2024.  The Participating T1 New Noteholder will be entitled to a 2% commitment fee based on the amount of its commitment (fee may be deducted from the subscription amount of the relevant person).

3.5   **Tranche 2**

(a)   Each eligible holder of the Existing Notes will be entitled to subscribe by validly submitting their New Notes Election Form by the Election Deadline (each such subscribing eligible holder, a "**Participating T2 New Noteholder**") in cash for New Notes in an amount equal to its pro rata portion of an aggregate amount of Tranche 2 in the amount of USD 51,237,630, such amount being the "**Total Cash Component**", calculated by reference to such Participating T2 New Noteholder's holding of Existing Notes as a proportion of the aggregate holdings of Existing Notes held by all holders of the Existing Notes as at the Record Date , being that Participating T2 New Noteholder's "**Tranche 2 New Notes Subscription Amount**".  The minimum Tranche 2 New Notes Subscription Amount shall be such that as a result of the New Notes Roll-Up the relevant Participating T2 New Noteholder receives New Notes in a principal amount at least equal to US$150,000.

(b)   Such Participating T2 New Noteholder shall also receive, in exchange for the amount of Existing Notes equal to its New Notes Subscription Amount, an additional amount of New Notes at an exchange ratio of 3.5 New Notes for every 1 Existing Note.

(c)   Accordingly, for every U.S. dollar of cash used by a Participating T2 New Noteholder to subscribe for the New Notes that Participating T2 New Noteholder will receive:

(i)   1 U.S. dollar of principal amount of New Notes (in exchange for cash); and

(ii)   3.5 U.S. dollars of principal amount of New Notes (in exchange for its Existing Notes); and

1 U.S. dollar of the principal amount of Existing Notes held by the relevant Participating T2 New Noteholder will be extinguished,

(the "**Tranche 2 New Notes Roll-Up**").

(d)   Each Participating T2 New Noteholder will be entitled to elect the Redemption Option or Equity Option (as detailed below) in relation to the remaining unexchanged portion of its Existing Notes only.

(e)   The holders of the Existing Notes are requested to confirm their election to subscribe for the New Notes by the Voting Instruction Deadline, 5:00 p.m. (New York time) on 9 December 2024. However, Scheme Creditors' elections to participate in New Notes will only become binding on the Election Deadline.

(f)    In order to be eligible to be a Participating T2 New Noteholder, each holder of the Existing Notes shall:

    (i)    provide representations and confirmations confirming that they are not and they do not act on behalf or at the direction of a Sanctioned Person and subscription to and their receipt of New Notes and payment by them for the New Notes are in compliance with Sanctions;

    (ii)    provide customary representations with respect to their status for the purposes of any applicable securities laws; and

## 3.6    Tranche 2 New Notes Backstop Commitment

(a)    Certain members of the Ad Hoc Group (collectively, the "**Backstop Parties**") provided, pursuant to a commitment letter dated 11 November 2024, a commitment to backstop in cash an amount of New Notes equal to the Total Cash Component *less* (a) the Tranche 2 New Notes Subscription Amounts subscribed for by the Participating T2 New Noteholders, and (b) the aggregate principal amount of Existing Notes elected to be converted into the Issuer's equity pursuant to the Equity Option (as defined below). The Issuer may elect not to draw down on the backstop commitments to the extent the additional funding requirement under the New Refinancing Facility is satisfied through other means.

(b)    Each Backstop Party's individual backstop commitment will be on a pro rata basis calculated by reference to that Backstop Party's holding of Existing Notes as a proportion of the aggregate holdings of Existing Notes held by all the Backstop Parties as of the date of the backstop commitment letter.

(c)    Each Backstop Party shall be entitled to a backstop fee of 5% of its pro rata share of the backstop of the Total Cash Component ("**Backstop Fee**"), regardless of whether the backstop commitment is used in full or in part only.  The backstop fee shall be payable to each Backstop Party at the time of issuance of the New Notes and may be deducted from the amount payable by that Backstop Party to subscribe for its allocation of New Notes (either as a Participating T2 New Noteholder or pursuant to the backstop commitment).

*Treatment of Existing Notes*

3.7    Any Existing Notes owned, held or controlled by, on behalf of or where the relevant holder acts at the direction of a Sanctioned Person on or prior to completion of the Restructuring, shall be restructured on terms such that no Sanctioned Person may receive any funds or economic resources or any other benefit pursuant to the restructuring and always in accordance with Sanctions, including obtaining guidance or authorization by the relevant Sanctions Authorities, as is agreed to be necessary between the legal advisors to the Companies and the Ad Hoc Group for the purposes of implementing the Restructuring, including a valid license from OFAC.

3.8    Existing Noteholders shall be entitled to elect by the Election Deadline, though their elections do not become binding until the Election Deadline (5:00 p.m. (New York time) on 16 December 2024) one of the following two options in respect of their Existing Notes:

(a)    under the Redemption Option, the Companies will discharge all liabilities under relevant holder's Existing Notes (including any accrued and unpaid interest) in full on or before the Restructuring Effective Date for cash in USD at 45% of those Existing Notes' par value (inclusive of accrued and unpaid interest, such cash amount being the "**Cash Entitlement**"); or

(b)    under the Equity Option, liabilities under the relevant holder's Existing Notes (including any accrued and unpaid interest) shall be, on or before the Restructuring Effective Date, assigned to the Issuer and such liabilities shall be converted into New Shares in the Issuer (with the same rights as the Issuer's existing shares) at par for a price per share (being USD23.83) determined by the Issuer's board of directors and approved by the Issuer's shareholders based

on report prepared for the Issuer by 414 Capital Inc. at Appendix 4 (*Financial Analysis*); *provided that* the current controlling shareholders of the Issuer retain at least 75% of the Issuer's share capital post such conversion,

in each case, redemption and/or exchange shall be made in full and final discharge of the Companies' obligations under the Existing Notes.

3.9    On and from the time specified in the Implementation Steps, the Existing Notes and any documentation relating thereto shall be cancelled and be of no effect.

3.10   The cash consideration paid or payable by the Companies pursuant to the Redemption Option shall be funded out of the proceeds of the New Refinancing Facility, New Notes and/or the Companies' own cash.

3.11   The Redemption Option shall be deemed to automatically apply to (1) any Existing Notes in respect of which no election has been made by the holders thereof by the Election Deadline; and (2) any Existing Notes owned, held or controlled by or on behalf of a Sanctioned Person, provided that in such case, the amount paid to redeem those Existing Notes shall be paid to and shall be held by the Issuer in its capacity as the **Holding Period Escrow Agent** on the terms set out below so as to ensure compliance with Sanctions.

3.12   To the extent the amount of Existing Notes in respect of which Equity Option has been elected is such that the aggregate amount of New Shares in the Issuer will be such that the current controlling shareholders' ownership in the Issuer is at or below 75% of the Issuer's voting share capital, the Redemption Option will be applied to the relevant proportion of the Existing Notes automatically on a pro rata basis amongst the electing holders of the relevant Existing Notes to ensure that the amount of New Shares in the Issuer issued to third parties will be such that the current controlling shareholders' ownership in the Issuer is at 75% of the Issuer's voting share capital following the Restructuring Effective Date.

3.13   To be eligible to elect the Equity Option, Existing Noteholders must provide customary representations with respect to their status for the purposes of any applicable securities laws.

*International Facilities*

3.14   International Facilities Lenders will have an option (exercisable up to the Election Deadline) to:

(a)    under the first option, have all liabilities under the relevant International Facility discharged, on or before the Restructuring Effective Date, in cash in the currency of the relevant International Facility at 47.5% of the par value in full and final discharge of the Issuer's obligations under the relevant International Facility plus any accrued and unpaid interest thereon (the "**International Facilities Redemption Option**"); or

(b)    under the second option, have principal payment terms under the relevant International Facility, with effect from the Restructuring Effective Date, amended such that each and every principal repayment instalment that has fallen due or will fall due under the relevant International Facility from (and including) December 2023 until (and including) December 2026 shall be deferred by 11 full months from the original due date of the relevant instalment and be due and payable in 17 equal monthly instalments thereafter; provided that any monthly instalments that would, as a result of this deferral, fall due prior to the Restructuring Effective Date, shall only become payable, and shall be paid, on the first interest payment date immediately following the Restructuring Effective Date. Any repayment instalments falling due under the relevant International Facility after (and excluding) December 2026 shall be payable on their original due date (the "**International Facilities A&E Option**"); or

(c)    under the third option and subject to customary representations with respect to their status for the purposes of any applicable securities laws, have liabilities under the relevant International Facility (including any accrued and unpaid interest) exchanged, on or before

the Restructuring Effective Date, at par for the New Notes in full and final discharge of the Issuer's obligations under the relevant International Facility, provided that:

    (i)    the total principal amount of the New Notes to be issued to all electing lenders under the International Facilities shall never exceed USD30,000,000. To the extent the aggregate amount of the New Notes issuable pursuant to this option exceeds USD30,000,000, USD30,000,000 of the New Notes shall be distributed on a pro rata basis amongst the electing lenders with the remaining amount of liabilities of such lenders being treated, at the election of the relevant lender, per the terms of the International Facilities Redemption Option or the International Facilities A&E Option; and

    (ii)    any interest that has accrued but has not become due on the exchange date shall be exchanged for New Notes; provided, however that if the aggregate amount of any such accrued interest of a lender under an International Facility is less than USD150,000, such interest shall be paid in cash,

    (the "**International Facilities New Notes Option**").

(d)    Each of the International Facilities Options may be combined so that International Lenders may elect one of these for a specified portion of its International Facility and another for another portion.

(e)    Claims under the International Facilities retained following the restructuring as a result of exercising the International Facilities A&E Option shall be secured by security over 50% of the Issuer's residual rights (to be deposited in an independent trust upon the payment in full of the New Refinancing Facility and the release from the trust set up under the terms of the New Refinancing Facility) in the collateral package under the New Refinancing Facility to be shared by the lenders under the International Facilities pro rata and on a *pari passu* basis, but such that the collateral ratio never exceeds 1.2x of the then outstanding principal amount under the International Facility that elect the second option above.

(f)    Any defaults outstanding under the International Facilities shall be fully and finally waived and the terms of the International Facilities shall be amended as necessary to permit implementation of the restructuring (including incurrence of the New Refinancing Facility and the issuance of New Notes).

*Cebures*

3.15    As stated above, the Issuer is currently in discussions with the holders of the Cebures to restructure the liabilities under the Cebures with the aim of concluding such discussions on or before the Scheme Meeting. The terms proposed to the holders of the Cebures holders are as follows:

(a)    Any defaults outstanding under the Cebures shall be fully and finally waived and the terms of the Cebures shall be amended as necessary to permit implementation of the restructuring (including incurrence of the New Refinancing Facility and issuance of New Notes).

(b)    Claims under the Cebures shall be secured by security over 50% of the Issuer's residual rights (to be deposited in an independent trust upon the payment in full of the New Refinancing Facility and/or the release from the trust set up under the terms of the New Refinancing Facility) in the collateral package under the New Refinancing Facility, but such that the collateral ratio never exceeds 1.2x of the then outstanding principal amount under the Cebures.

(c)    Each holder of the Cebures will receive, on or before the Restructuring Effective Date, a waiver fee in an amount to be agreed.

3.16    To the extent any of the above terms are changed such that they may adversely affect the Scheme Creditors' rights under the Restructuring, the Issuer will notify the Scheme Creditors in advance of the Scheme Meeting.

*Mexican Facilities*

3.17    The Issuer is currently in discussions with the lenders under the Mexican Facilities to obtain the necessary waivers under the Mexican Facilities to allow for the Restructuring.

*Scheme Consideration*

3.18    The final amounts of the relevant Scheme Consideration for each Existing Noteholder, and the formulae underlying such amounts will be as set out in the Allocations Spreadsheet, which the Information Agent will complete promptly after the Election Deadline.

*Holding Period Escrow*

3.19    To the extent that any Cash Entitlements are attributable to Non-Eligible Existing Noteholders, such Cash Entitlements shall instead be transferred to the Holding Period Escrow Agent to be held in escrow (the "**Holding Period Escrow**").

3.20    Any Scheme Creditor who is a Sanctioned Person may deliver evidence to the Scheme Company showing that it is eligible to receive the Cash Entitlement and has ceased to be a Sanctioned Person. Upon the Scheme Company being sufficiently satisfied that such Scheme Creditor is entitled to receive (and the Scheme Company and the Holding Period Escrow Agent become entitled to make) the relevant distribution in compliance with applicable Sanctions, the Scheme Company shall instruct the Holding Period Escrow Agent to transfer to such Scheme Creditor (subject always to compliance with Sanctions) the Cash Entitlement.

3.21    Upon any Non-Eligible Existing Noteholder delivering sufficient evidence to the Scheme Company showing that it was an Existing Noteholder at the Record Date and is entitled to receive the relevant distribution in compliance with Sanctions and other applicable law, the Scheme Company shall instruct the Holding Period Escrow Agent to transfer the relevant Cash Entitlement to such Non-Eligible Existing Noteholder.

3.22    At any time before the first anniversary of the Restructuring Effective Date (the "**Holding Period Escrow Expiry Date**"), upon any Non-Eligible Existing Noteholder delivering sufficient evidence to the Issuer (as determined by the Issuer in its sole and absolute discretion) showing that it is not or is no longer subject to Sanctions and/or becomes entitled to receive (and the Issuer and the Holding Period Escrow Agent become entitled to make) the relevant distribution in compliance with Sanctions and provides such other representations and confirmations as may be required to confirm its eligibility, the Holding Period Escrow Agent shall transfer  to such holder (subject always to compliance with Sanctions) the cash amount attributable to such Non Eligible Holder.

3.23    To the extent that, prior to the Holding Period Escrow Expiry Date, a Non-Eligible Existing Noteholder provided a confirmation that it is a Sanctioned Holder, the Holding Period Escrow Agent will continue to hold the monies attributable to such holder's Existing Notes and at any time after the Holding Period Escrow Expiry Date and upon such holder delivering sufficient evidence to the Issuer (as determined by the Issuer in its sole and absolute discretion) showing that it is no longer subject to Sanctions and/or becomes entitled to receive (and the Issuer and the Holding Period Escrow Agent become entitled to make) the relevant distribution in compliance with Sanctions (subject always to a perpetuity period of 20 years following the Restructuring Effective Date and within no more than two months after the relevant Sanctions being lifted or the Non-Eligible Existing Noteholder otherwise ceasing to be subject to Sanctions or becoming entitled to receive (and the Issuer and Holding Period Escrow Agent becoming entitled to make) (the "**SP Holding Period**") the relevant distribution in compliance with Sanctions), the Holding Period Escrow Agent shall transfer to such holder (subject always to compliance with Sanctions) the Cash Entitlement attributable to such Holder.

3.24    The Holding Period Escrow Agent will hold the cash amounts transferred to it pursuant to the Scheme in accordance with the Holding Period Escrow Agreement.

3.25    On and from the Holding Period Escrow Expiry Date or, if applicable the last day of the SP Holding Period, to the extent that any cash amounts comprised in the Holding Period Escrow has not been validly claimed or received by the relevant Scheme Creditor in accordance with the Holding Escrow Period Agreement, that Scheme Creditor's entitlement to receive cash amounts comprised in the Holding Period Escrow shall be cancelled and the corresponding cash amounts shall be transferred by the Holding Period Escrow Agent to the Issuer to be used at the Issuer's discretion.

*Summary of terms of the New Refinancing Facility*

3.26    The key terms of the New Refinancing Facility are as follows:

| Borrower | The Issuer |
|---|---|
| Lender | Bancomext |
| Amount | Up to Ps. 2,227,000,000<br>The additional funding requirement of raising not less than USD equivalent amount of Ps. 1,227,000,000 will be satisfied by issuing New Notes and/or converting the Existing Notes into equity per the Equity Option |
| Currency | Mexican Pesos |
| Maturity | Up to 5 years from initial disbursement, subject to turbo amortization out of the proceeds of the trust described below (paid on a monthly basis). |
| Interest Rate | 28-day TIIE plus an applicable margin to be agreed prior to the borrowing, payable monthly in cash. Indicative applicable margin under executed term sheet is 1.6% per annum, but actual margin agreed may vary depending on market conditions. |
| Collateral | Trust to be established to which the rights in respect of the eligible loan portfolio(s) shall be contributed. All borrowers under such loan portfolio(s) will make payments on their loans directly to the trust for the lenders' benefit and repayments will be made out of those collections.<br><br>Collateral ratio: 1.2x to be maintained at all times while the amounts under the facility are outstanding.<br><br>Eligible loan portfolios: Stage 1 portfolios, targeted at MSMEs and large companies with business, commercial and service activities that have collateral (payment commitments must be current). |
| Equity contribution | Evidence of a capital contribution by the Issuer's shareholders in the amount of Ps. 1,000,000,000 no later than 31 December 2024 (in cash or by way of converting the Existing Notes into the Issuer's equity). |
| Ranking | Senior secured financing. |
| Key Covenants | Customary for transactions of this type. |
| Conditions precedent | Customary for transactions of this type, including obtaining all the authorisations, consents and waivers required in connection with the restructuring, the Scheme becoming effective in |

| | |
|---|---|
| | respect of the Existing Notes, the waivers of existing defaults under the Issuer's existing debt instruments and the consents under the Cebures and the International Facilities. |
| **Governing law** | Mexican law |
| **Jurisdiction** | Mexican federal courts located in Mexico City |

*Summary of terms of the New Notes*

3.27    The key terms of the New Notes are as follows:

| | |
|---|---|
| **Issuer** | The Issuer |
| **Amount** | Tranche 1 New Notes: USD10,000,000 divided by 100% *minus* the original issue discount, where the original issue discount is equal to 30%. <br><br> New Notes: USD 51,237,630 cash component plus the amount of any New Notes issued in exchange for the claims under the Existing Notes pursuant to the terms of the restructuring. <br><br> Tranche 3 New Notes: the amount outstanding under the International Facilities, lenders under which elect to participate in the New Notes, but no more than USD 30,000,000. |
| **Currency** | USD-denominated |
| **Maturity** | 5 years |
| **Amortisation** | Principal amount of the New Notes to be redeemed each year after the issuance of the New Notes in accordance with the following amortization schedule (repayments to be made in 4 equal quarterly instalments each year in aggregate equal to the percentage set out below for the relevant year): <br> • During year 1: 5% of the initial principal amount of New Notes; <br> • During year 2: 10% of the initial principal amount of New Notes; <br> • During year 3: 20% of the initial principal amount of New Notes; <br> • During year 4: 30% of the initial principal amount of New Notes; and <br> • During year 5: the remaining 35% of the initial principal amount of New Notes. <br><br> Any redemption or repurchase of the New Notes will be applied to reduce principal instalments in the inverse order of their maturity. The redemption date for each instalment will be the same date as an interest payment date. |
| **Mandatory Repurchase Offers** | Change of Control: Same as the Existing Notes, except that clause (a) of the definition of "Change of Control" to be modified so that a "Change of Control Triggering Event" would occur if the Permitted Holders cease to beneficially own (within the meaning of Rule 13d-3 under the U.S. Securities Exchange Act, or any successor provision) at least 50.1% of the total voting shares in the Issuer. "Permitted Holders" definition as per Existing Notes Indenture. <br><br> Asset Sale Offer: Same as the Existing Notes, subject to the asset sale covenant adjustments set forth in the Covenants section below. |

| | |
|---|---|
| **Optional Redemption** | Optional Redemption:  Same as the Existing Notes, except the New Notes will be optionally redeemable at prices based on the Make-Whole Amount until the third anniversary of the issuance date, and thereafter at the following redemption prices, plus accrued and unpaid interest to the date of the redemption:<br>• Year 4:  104%; and<br>• Year 5:  100%.<br><br>Equity Clawback: Same as the Existing Notes (with a redemption price of 108% of par, plus accrued and unpaid interest).<br><br>Optional redemption premium shall be payable upon acceleration of the New Notes as a result of an event of default. |
| **Cash Coupon** | 8% per annum, payable quarterly in cash. |
| **Ranking** | Senior secured. |
| **Collateral** | Irrevocable trust in form and substance satisfactory to the Ad Hoc Group to be established to which the rights in respect of the eligible receivables will be assigned.  Payors in respect of the receivables will make payments directly to the trust.<br><br>No liens securing indebtedness over eligible receivables forming part of the trust permitted (and for avoidance of doubt, the New Notes Indenture will be a "closed indenture", such that no additional notes will be permitted to be issued thereunder). No exemption for liens securing "equal and ratable" debt with the same collateral to apply to receivables forming part of the trust.<br><br>The Ad Hoc Group will appoint the Mexican trustee (*fiduciario*) and a Master Servicer (*administrador*). The Master Servicer will enter into an administration agreement with the trust.<br><br>*Eligible receivables*: subject to satisfaction of paragraph (c) of the Restructuring Conditions and any additional eligibility criteria required by the Ad Hoc Group in consultation with the Master Servicer, receivables forming part of the trust must comply with the following eligibility criteria (subject to additional due diligence of the proposed portfolio):<br>• No less than 80% of the receivables forming part of the trust must be comprised of category 1 receivables and the remaining must be comprised of category 2 receivables, in each case based on CNBV portfolio description policies;<br>• Contracts underlying the receivables forming part of the trust shall be on the following terms:<br>   o Payments denominated in MXN;<br>   o Maturity not to exceed the maturity of the New Notes by more than a number of months to be agreed;<br>   o Rights under the contracts to be free of any liens, encumbrances or ownership limitations, including as a result of any factoring or conditional assignment and shall be freely assignable/transferrable;<br>• No payment defaults by the relevant debtor for more than a number of days to be agreed; and<br>Concentration limits: to be agreed. |

*Collateral ratio*:

"**Original Collateral Ratio**" means, as of any date of determination, the ratio of: (a) the value of eligible receivables held by the independent trust as of such date (in U.S. dollars based on the prevailing exchange rate as of such date) to (b) the initial principal amount outstanding under the New Notes as of their issue date.

"**Current Collateral Ratio**" means, as of any date of determination, the ratio of (a) the value of eligible receivables held by the independent trust as of such date (in U.S. dollars based on the prevailing exchange rate as of such date) to (b) the total amount outstanding under the New Notes as of such date, giving effect to any amortization, redemption or repurchase of the New Notes on or prior to such date.

The "**Collateral Ratio Requirement**" means that, as of any date of determination, either (1) the Original Collateral Ratio is at least 0.75x or (2) the Current Collateral Ratio is at least 1.20x. For avoidance of doubt, the Collateral Coverage Requirement will be satisfied if the test under either clause (1) or clause (2) is met (or if both tests are met).

If: (a) any eligible receivables cease to meet the eligibility criteria; or (b) the Collateral Ratio Requirement is not satisfied (including, in each case, as a result of movement in the applicable exchange rate), the Issuer shall within 25 Business Days of the relevant testing date for the Collateral Ratio Requirement assign such amount of additional eligible receivables to the trust, and complete any formalities in connection therewith (including providing notice to debtors under the pledged receivables and registration with the Mexican Registry) as is required to remedy non-compliance with the Collateral Ratio Requirement. No default or event of default shall occur as a result of such failure to meet the Collateral Ratio Requirement as long as the Issuer is in compliance with such top up obligations prior to the expiration of such 25 Business Day period.

The Issuer shall be entitled to request release and retransfer of any assets (other than cash) being part of the trust, provided that no default or event of default is outstanding under the New Notes at the time of the release and retransfer and further provided that following such release and transfer the Current Collateral Ratio is at or above 1.2x.

Any cash in the trust, after the application of the waterfall, shall be transferred to the Issuer on a monthly basis, provided no default or event of default is outstanding under the New Notes at the time of the transfer and to the extent that following such transfer the Current Collateral Ratio is at or above 1.2x.

*Waterfall*: to be ran monthly as follows:
- Payment of (a) taxes in connection with trust and pledged receivables, (b) fees of the New Notes Indenture Trustee and the New Notes Mexican Trustee; and (c) other trust expenses; and
- 100% of coupon and principal due on the next payment date.

Collateral Ratio Requirement and all eligibility and other requirements of the trust to be tested and certified on a monthly basis.

| | |
|---|---|
| | *Release of Collateral*: consent of Holders of at least 75% in aggregate principal amount of the New Notes then Outstanding (defined as per the Existing Notes Indenture) will be required to release all or substantially all of the collateral from the liens securing the New Notes.<br><br>*Events of Default*: customary events of default relating to collateral to include (a) if any provision under the security documents becomes invalid, illegal or unenforceable; (b) if any lien securing the collateral ceases to exist or ceases to give the collateral agent a first priority security interest on the collateral; subject to a 30-day cure period after written notice of any of such events to the Issuer from the New Notes trustee or the Holders of at least 25% in aggregate principal amount of New Notes outstanding; or (c) Issuer disputes the validity of or repudiates any security document. |
| **New    Notes Indenture** | The New Notes Indenture will be substantively the same as the Existing Notes Indenture, with customary modifications to reflect that the New Notes are secured (including to reflect the result of the due diligence at paragraph (c) of the Restructuring Conditions and to reflect technical or other conforming changes in order to implement the provisions of the Restructuring).<br><br>Except as specified below or elsewhere in this summary, or as necessary to implement the terms of the Restructuring, the New Notes Indenture will contain the same covenants as the Existing Notes, save as specified below:<br><br>- *Debt incurrence*: Permitted debt to include debt incurred pursuant to the terms of the restructuring and:<br>    o General basket not to exceed the greater of USD 30 million and 6.5% of consolidated tangible assets;<br>    o Remove capital securities (subordinated debt) from the permitted refinancing debt exemption (to avoid duplicate exemptions) and expressly provide that any refinancing of capital securities (and not only refinancings out of the proceeds of senior debt) shall be permitted if such refinancing is as a result of a capital securities redemption event; or that  a credit rating downgrade does not occur primarily as a result of a voluntary refinancing of capital securities; and<br>    o Debt incurred in connection with Receivables Transactions (defined as per the Existing Indenture) not exceeding 20% of consolidated tangible assets (**"Receivables Transactions Debt Basket"**).<br>    o The New Notes Indenture will be a "closed indenture" and will not permit the issuance of any additional notes thereunder.<br><br>- *Restricted payments*:<br>    o Builder basket (all clauses thereof) will be deleted.<br>    o An exception will be added for a customary management incentive plan (provided that the Board of Directors has approved such plan, and the aggregate amount of equity interests that may be awarded or reserved for issuance under such plan may not exceed more than 10% of the outstanding voting or economic equity interests of the Issuer, determined on a fully-diluted basis); and<br>    o General basket USD 5 million per year will be deleted.<br><br>- *Liens*: |

|  |  |
|---|---|
|  | o  Basket for Liens on accounts receivable and/or assets securing obligations under the Receivables Transactions up to a certain limit to be replaced with a basket for Liens on accounts receivable and/or related assets securing Indebtedness incurred pursuant to the Receivables Transaction Debt Basket.<br><br>-  *Guarantor release*:  a guarantor not to be released merely as a result of becoming not wholly owned, but if there is a disposition of its equity to a third party such that the relevant entity is no longer a subsidiary of the Issuer and in a transaction entered into for a bona fide business purpose and not for the purpose of obtaining guarantee release.<br><br>-  *Designation of Unrestricted Subsidiaries*:<br>　o  Unrestricted subsidiaries may only be designated using capacity under (i) the receivable transactions and lease securitization investment baskets; or (ii) the permitted business investment basket; and<br>　o  Requirements to designate an unrestricted subsidiary apply after designation (and not only at designation);<br>　o  Additional restriction for unrestricted subsidiaries to hold debt, or a lien on assets or equity, of the Issuer or a restricted subsidiary.<br><br>-  *Asset sales*:<br>　o  If net cash proceeds are to be used to repay the New Notes, the Issuer shall either (i) make a tender offer to repurchase the New Notes to all g Holders at a price not less than par plus accrued and unpaid interest (and if such offer is completed in accordance with its terms, such net proceeds shall be deemed to be applied in accordance with the covenant regardless of whether any notes are tendered) , or (ii) redeem the New Notes pursuant to the optional redemption provisions (and not the amortization provisions).<br>　o  Net cash proceeds may be used to repay senior debt; provided that unless such senior debt is secured debt, on the date of such repayment and at all times thereafter, the Current Collateral Ratio shall be at least 1.2x (tested and certified on a monthly basis).<br><br>The New Notes Indenture will contain no maintenance financial covenants, other than a covenant to satisfy the Collateral Ratio Requirement as provided above. |
| **Voting** | No votes may be cast in respect of any New Notes owned, held or controlled by or on behalf of a Sanctioned Person and such New Notes shall be disregarded from the aggregate outstanding principal amount of New Notes for the purpose of ascertaining whether any relevant voting threshold has been met. |
| **Clearance/Listing** | New Notes to be cleared through Euroclear, Clearstream and, if required, DTC, and the Issuer to use its commercially reasonable efforts to list the New Notes on a professional segment of Singapore Stock Exchange within 60 days of issuance.  Company to use commercially reasonable efforts to obtain ratings for the New Notes from at least one of S&P/Moody's/Fitch within 3 months of issuance, and thereafter to maintain at least one such rating. |

| | |
|---|---|
| **Miscellaneous** | Tranche 1 and Tranche 2 Notes to be placed pursuant to a customary note purchase agreement with terms of the New Notes to be set out in the New Notes Indenture.  Tranche 3 Notes to be issued to the electing lenders under the International Facilities pursuant to the terms of a restructuring agreement in respect thereof. <br><br> Tranche 1 New Notes, Tranche 2 New Notes and Tranche 3 Notes, once issued, to be fully fungible. |
| **Conditions Precedent** | Customary for transactions of this type, including obtaining all the authorisations, consents and waivers required in connection with the restructuring, the Scheme becoming effective in respect of the Existing Notes, the waivers of existing defaults under the Issuer's existing debt instruments and the consents under the Cebures and the International Facilities. |
| **Governing law** | New York |

# PART 4

## SUMMARY OF THE PROPOSED SCHEME

**1.     PURPOSE OF THE SCHEME**

1.1     The Scheme is necessary to implement a restructuring of the Existing Notes as part of the wider Restructuring.

*Requirement for unanimous consent*

1.2     Without a further implementation procedure, the terms of the Existing Notes Indenture would result in the consent of each Existing Noteholder being required to implement the restructuring in respect of all Existing Noteholders. In particular, the exchange of Existing Notes for the New Notes, New Shares and/or Cash Entitlements (as applicable) would have required the individual consent of each Existing Noteholder. Given the disparate holdings of the Existing Notes and the fact that certain Existing Noteholders may be or hold their Existing Notes through Sanctioned Persons, the Scheme Company does not consider that this level of consent would be achievable.

1.3     The Scheme enables the Scheme Company and the Issuer to implement the restructuring of the Existing Notes without requiring the unanimous consent of the Existing Noteholders.

*International recognition of the Scheme*

1.4     The exchange of the Existing Notes into New Notes, New Shares and/or Cash Entitlements (as applicable) would necessitate obtaining consent under the Existing Notes Indenture, which is governed by New York law and in respect of the Existing Notes which – to the understanding of the Issuer – are held by a wide range of international Existing Noteholders. Accordingly, the Scheme Company considers it essential to ensure that the Scheme as it impacts the Existing Notes, will be duly recognised in Mexico, the UK, the U.S. and any other relevant jurisdictions.

1.5     As further detailed in paragraph 7 of Part 5 of this Explanatory Statement, if the Scheme is successfully sanctioned, the Scheme Company will seek recognition of the Scheme under Chapter 15 of the U.S. Bankruptcy Code, and will seek permanent relief in the United States Bankruptcy Court for the Southern District of New York (or such other appropriate forum determined by the Scheme Company) enjoining Scheme Creditors from commencing or continuing any action or proceeding against any member of the Group or their successors in interests that are inconsistent with the Scheme in the United States. The combination of the Restructuring, the Scheme and the aforementioned actions in the U.S. will provide the Issuer and its Group with certainty that the Scheme will have valid effect in the relevant jurisdictions and avoid the risk of any future legal action by creditors seeking to enforce pre-Restructuring rights.

**2.     KEY ASPECTS OF THE SCHEME**

*Conditionality of the Scheme*

2.1     Even if Scheme Creditors vote in favour and approve the Scheme, the Scheme will only become effective if the following are fulfilled:

(a)     the occurrence of the Scheme Registration Time;

(b)     confirmation being received from HM Revenue & Customs that the Scheme Sanction Order is not subject to stamp duty;

(c)     notification by the Scheme Company to the Scheme Creditors (via the Information Agent) and the Existing Notes Trustee that the foregoing conditions set out at (a) and (b) have been fulfilled or waived in accordance with the Scheme Document.

2.2     Upon the satisfaction of the Scheme Conditions, the Scheme Company will issue a notice on the Issuer's Website, the SGX-ST and via the Clearing Systems confirming that the Scheme Conditions are satisfied on the Scheme Effective Date. The Scheme Company will also issue a notice on the Scheme Website via the Information Agent.

*Implementation of the Scheme and the Restructuring*

2.3     Once the Scheme becomes effective, the Issuer and the Scheme Company will enter into the Implementation Deed substantially in the form scheduled to the Scheme Document on behalf of themselves and each of the Scheme Creditors (pursuant to the power of attorney granted by the Scheme, as detailed below) along with the other parties to that deed.

2.4     The Implementation Deed will govern the implementation of the Restructuring. The Implementation Deed will be binding on, among others, all Scheme Creditors, the Issuer, the Scheme Company, the Existing Notes Trustee, the New Indenture Trustee, the Cash Settlement Agent, the New Notes Settlement Agent and the Information Agent.

2.5     The key elements of the Restructuring are inter-conditional. Therefore, even if the Scheme Conditions are satisfied and the Scheme becomes effective, the terms of the Scheme will only be finally implemented if and when certain conditions precedent to the completion of the Restructuring are satisfied or waived (in accordance with the Implementation Deed). Such conditions are detailed in full in the Implementation Deed.

2.6     The specific purpose of the Scheme on which Scheme Creditors are being asked to vote will provide for, among other things:

(a)     the grant of a power of attorney to the Issuer and the Scheme Company to irrevocably and unconditionally authorise them to enter into the Implementation Deed, the Deed of Release, and every other Implementation Document to which the Scheme Creditors, or any of them, is named as a party and, if applicable, complete, date and release the Implementation Documents in accordance with the Implementation Deed (as described in Section 3 (*Implementation Deed and Implementation Documents*) below); and

(b)     instructions to the Undertaking Transaction Parties to enter into, execute and deliver (whether as a deed or otherwise) the Implementation Documents to which each of them is named as a party.

2.7     In addition, the Scheme will, among other things, contain provisions preventing Scheme Creditors from exercising any rights, remedies, powers or discretions in contradiction of the provisions of the Scheme (including any action to commence any enforcement or other legal process against any member of the Group).

2.8     The operative terms of the Scheme and any non-contractual obligations arising out of or in connection with the Scheme shall be governed by, and construed in accordance with, English law.

Pursuant to the Scheme, the Scheme Creditors agree that the Court shall have exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute which arises out of or in connection with the terms of the Scheme or its implementation, or out of any action taken or omitted to be taken under the Scheme, or in connection with the administration of the Scheme and for such purposes the Scheme Creditors irrevocably submit to the jurisdiction of the Court, provided, however, that nothing in that agreement shall affect the validity of other provisions determining governing law and jurisdiction as between the Issuer, Scheme Company and any of the Scheme Creditors, whether contained in contract or otherwise.

**3.      IMPLEMENTATION DEED AND IMPLEMENTATION DOCUMENTS**

3.1     A form of the Implementation Deed is scheduled to the Scheme at Part 7 of this Explanatory Statement.

3.2     The Implementation Deed will, among other things:

   (a)      set out the steps required to implement the Restructuring; and

   (b)      set out the conditions precedent to the completion of the Restructuring.

3.3     The Implementation Deed will provide for the parties to sign the Implementation Documents, for their signatures to be held in escrow and then released in accordance with the Implementation Steps. The Implementation Steps will not commence until the Information Agent has confirmed in accordance with the terms of the Implementation Deed that the conditions precedent to the Restructuring set out in Schedule 2 (*Restructuring Conditions*) of the Implementation Deed have been satisfied (or waived).

3.4     As part of the Implementation Steps, each Scheme Creditor that is not a Sanctioned Person will receive and shall be issued its allocation (as determined by the Information Agent in the Allocations Spreadsheet) of Scheme Consideration and, subject to their compliance with their obligations under the Implementation Documents, each Participating T2 New Noteholder will receive its allocation of New Notes.

3.5     At the end of the Implementation Steps, the Scheme Company will notify the parties to the Implementation Deed of the occurrence of the Restructuring Effective Date. Upon such notification being provided, the Deed of Release shall become effective in accordance with its terms.

3.6     It is customary to append copies of the Implementation Deed and key Implementation Documents to the Explanatory Statement such that Scheme Creditors can review and consider the terms of the Implementation Documents that will be entered into on their behalf pursuant to the power of attorney granted by the Scheme, and understand the steps that must be taken pursuant to the Implementation Deed. As at the date of circulation of the Explanatory Statement, a number of Implementation Documents are unavailable to circulate to Scheme Creditors. Where it is not possible to append a draft of any Implementation Document, the Scheme Company's approach is to do the following:

   (a)      to the extent any such Implementation Document is not just technical or administrative in nature, set out the key commercial terms of the relevant Implementation Document in this Explanatory Statement; and

(b)    in advance of the Scheme Meeting, circulate copies of the relevant Implementation Documents (that have been negotiated with and agreed upon by the Majority Consenting Noteholders, and approved by the Existing Notes Trustee and/or the New Indenture Trustee to the extent applicable) to Scheme Creditors such that each Scheme Creditor is able to review the key Implementation Documents in advance of being asked to submit their Account Holder Letter by the Voting Instruction Deadline.

## 4.    CONSEQUENCES IF THE SCHEME IS NOT SUCCESSFUL

4.1    If the Scheme is not sanctioned the most likely alternative scenario (the "**Relevant Alternative**") is as follows:

(a)    the Restructuring cannot be implemented;

(b)    the Lock-Up Agreement will terminate on the occurrence of the Longstop Date (unless the Longstop Date is extended in accordance with the terms of Lock-Up Agreement);

(c)    on termination of the Lock-Up Agreement, the holders of the Existing Notes will be able to take enforcement actions on the basis of the outstanding defaults under the Existing Notes;

(d)    the International Facilities and Cebures will not be amended as contemplated by the Restructuring and the International Facilities lenders, Mexican Facilities lenders and holders of the Cebures will be able to take enforcement actions on the basis of the outstanding defaults thereunder; and

(e)    the New Refinancing Facility will not be available on the same terms as contemplated in the Restructuring or at all.

4.2    Given these circumstances and the Issuer and the Scheme Company's deteriorating liquidity position, there would be insufficient time to seek, and it is most unlikely that the Issuer and the Scheme Company would be able to obtain, the requisite level of creditor consent to implement any alternative transaction outside of an insolvency. Moreover, no alternative transaction currently exists for creditors to approve and implement and given the extensive period of time that management has spent seeking funding for the Group, the sole director of the Scheme Company considers it highly unlikely that the Issuer and the Scheme Company would be able to secure alternative funding to repay the Existing Notes on or prior to the Existing Notes Maturity Date.

4.3    The directors of the Issuer and the Scheme Company are therefore of the view that, if the Restructuring fails to be implemented, it is likely that the Issuer would cease to function as a going concern, resulting in it becoming necessary to place the Issuer and Scheme Company, and other members of the Group into an insolvency process.

4.4    In any event, the directors of each of the Issuer and the Scheme Company believe that the Restructuring, as it is proposed to be implemented, is in the best interests of the Group and its stakeholders as a whole as it would provide a better result for the Group and its stakeholders (including the Scheme Creditors) than that which would be achieved through an insolvency process.

*Estimated Outcomes for Scheme Creditors*

4.5    The Scheme Company has commissioned a number of reports regarding outcomes for Scheme Creditors that are annexed to this Explanatory Statement at Annex 4 (*Financial Analysis*):

    (a)    a report setting out the likely recoveries for Scheme Creditors if the Scheme is not successful (i.e. in an insolvency) prepared by Blink Capital Solutions;

    (b)    an equity valuation of the Group prepared by 414 Capital Inc; and

    (c)    a report comparing the relative value of the Redemption Option and the Equity Option prepared by Houlihan Lokey, Inc.

4.6    Based on the analysis in the report prepared by Blink Capital Solutions, the recovery rate of each of the Scheme Creditors in a liquidation scenario is estimated to be in the region of 30.79% which is less than the returns to Scheme Creditors in the Redemption Option and the Equity Option.

4.7    The Houlihan Lokey analysis confirmed that:

    (a)    The estimated return to Scheme Creditors under the Redemption Option would be 45%.

    (b)    The estimate return to Scheme Creditors under the Equity Option would be 55.54%, however, should equity value drop to zero, the return would be estimated to be 36.37%.

    (c)    Despite the higher nominal value of the Equity Option, the Redemption Option offers a better outcome and return than the Equity Option given that, amongst other things, the New Shares (a) lack the same liquidity as the Cash Entitlement, (b) Scheme Creditors receiving New Shares will likely only receive a small minority stake in the Issuer with limited shareholder rights, (c) the value of the New Shares is unpredictable and may fluctuate based on market and business conditions.

4.8    The Scheme therefore presents a better outcome for Scheme Creditors than if the Scheme is not successful and the Scheme Company considers it is in their interests to vote in favour of the Scheme.

50

# PART 5

# ADDITIONAL INFORMATION RELATING TO THE SCHEME

## 1.    OVERVIEW OF THE SCHEME

*This section contains a brief overview of the Scheme. The summary information contained herein does not purport to be complete and should be read in conjunction with, and is qualified in its entirety by references to, the more detailed information presented elsewhere in this Explanatory Statement and the Scheme.*

1.1    The proposed Scheme is to be effected by way of a scheme of arrangement of the Scheme Company under English law.

1.2    A scheme of arrangement is a statutory procedure provided for under Part 26 of the Companies Act 2006 allowing a company to enter into a compromise or arrangement with its creditors or members (or classes of creditors or members) and for the terms of that compromise or arrangement to bind non-consenting or dissenting minority creditors or members (as applicable). The Scheme being proposed is a creditors' scheme and so no further references are made below to the position of members under Part 26 of the Companies Act 2006.

1.3    If the Court is satisfied at the Convening Hearing that the Court has jurisdiction in relation to the proposed Scheme and that the proposed class or classes of Scheme Creditors for voting purposes have, prima facie, been correctly constituted and that there is no obvious "roadblock" to the Scheme being sanctioned, then the Court will order under section 896 of the Companies Act 2006 that the Scheme Meeting for the relevant class of creditors to be convened.

1.4    The Convening Hearing will take place on 21 November 2024 and Scheme Creditors will be informed of the precise time and location of the Convening Hearing via the Information Agent (and the details will also be made available via the Scheme Website), the Clearing Systems, and the SGX-ST (the exchange on which the Existing Notes are listed) as soon as the details have been confirmed by the Court.

1.5    The Scheme Company will draw any relevant issues raised by any Scheme Creditor to the Court's attention at the Convening Hearing. Scheme Creditors have the right to attend the Convening Hearing themselves or through counsel and to make representations at the Convening Hearing, although they are not obliged to do so.

1.6    A scheme of arrangement will take effect between a company and its creditors (or classes of creditors) and become binding on all the creditors to whom it applies if:

(a)    the scheme is approved by a majority in number (i.e. more than 50%) representing at least 75% in value of the creditors (or each class of creditors) present and voting, either in person or by proxy at the relevant scheme meeting;

(b)    at the sanction hearing, the scheme is subsequently sanctioned by the Court under section 899 of the Companies Act 2006; and

(c)    a copy of the order sanctioning the scheme is delivered to the Registrar of Companies for registration.

1.7   If a scheme of arrangement becomes effective, it will bind the scheme company and all scheme creditors according to its terms, including those scheme creditors who did not vote on the scheme or who vote against it. Accordingly, upon the Scheme becoming effective in accordance with its terms, all Scheme Creditors, including those who have not voted on the Scheme (including because they are a Non-Eligible Existing Noteholder), will be bound.

1.8   The actions required of the Scheme Creditors in connection with the Scheme are set out in detail in Appendix 1 (*Instructions to Scheme Creditors and any person with an interest in the Existing Notes*) to this Explanatory Statement, to which Scheme Creditors should refer.

1.9   In connection with the Scheme, this Part 5 (*Additional information relating to the Scheme*) of the Explanatory Statement sets out a summary of:

   (a)   the identity of the Scheme Creditors;

   (b)   class constitution of Scheme Creditors;

   (c)   the Scheme Meeting;

   (d)   the Scheme Conditions and when the Scheme will be effective;

   (e)   the exercise of the Court's jurisdiction in relation to the Scheme Company;

   (f)   recognition of the Scheme; and

   (g)   next steps.

## 2.   IDENTITY OF SCHEME CREDITORS

2.1   The Scheme is being proposed by the Scheme Company in respect of the Scheme Claims of the Scheme Creditors, being the Existing Noteholders (being the ultimate beneficial owners of the Existing Notes and persons with a right (in certain circumstances) to request that the Issuer issue a definitive note in respect of its interest in the Existing Notes) as at the Record Date. The Existing Noteholders are contingent creditors, whose economic interests will be affected by the Scheme, and therefore constitute creditors of the Scheme Company for the purposes of Part 26 of the Companies Act 2006. Votes cast by the eligible Existing Noteholders will be accounted for both value and numerosity requirements in relation to the Scheme.

2.2   To avoid double counting in respect of the Scheme Claims, the Existing Notes Trustee will not be permitted to exercise any voting rights to which it may be entitled as trustee in respect of the Existing Notes at the Scheme Meeting. As is customary, it is also not expected that the Registered Holder Nominee will exercise any voting rights to which it may be entitled as a Scheme Creditor at the Scheme Meeting. Accordingly, it is anticipated that the Existing Noteholders will be the only persons that will vote at the Scheme Meeting. Certain Existing Noteholders may be prohibited from exercising their voting rights by sanctions or applicable law or regulation. In particular, Existing Noteholders who are or act on behalf of or under the direction of Sanctioned Persons will not be entitled to vote at the Scheme Meeting.

2.3   The voting procedure for the Existing Noteholders will be in accordance with the steps specified in this Explanatory Statement and the customary procedures of DTC, Euroclear and Clearstream (as applicable). This has been established to ensure an orderly voting procedure and is considered

by the legal advisors to the Scheme Company to represent current market practice in this type of situation.

2.4     The creditors who will be bound by the terms of the Scheme, if they become effective, are referred to in the Scheme Document as the Scheme Creditors, being the Existing Noteholders, the Registered Holder Nominee and the Existing Notes Trustee. Existing Noteholders will be entitled to vote on the Scheme at the Scheme Meeting.

## 3.     CLASS CONSTITUTION

*Applicable principles*

3.1     For the purposes of voting on the Scheme, if the rights of Scheme Creditors affected by the Scheme are so different or would be affected so differently by the Scheme as to make it impossible for them to consult together with a view to their common interest, they must be divided into separate classes, based on their rights (going in and coming out of the Scheme) and the treatment of such rights, for the purposes of voting on the Scheme and separate voting meetings must be held for each class of creditors.

3.2     Under the terms of the Practice Statement, it is the responsibility of the Scheme Company to formulate the class or classes of creditors for the purpose of convening properly constituted meetings to consider and, if thought fit, vote in favour and approve the Scheme.

3.3     In the context of the most likely alternative to the Scheme, the Scheme Company has considered the present rights of the Scheme Creditors against the Scheme Company in the absence of the Scheme and the rights of the Scheme Creditors under the Scheme as proposed. Having taken legal advice (privilege in respect of which has not been waived), the Scheme Company has concluded that the Scheme Creditors constitute a single class for the purposes of voting on the Scheme.

3.4     The Scheme Company considers that the rights of the Scheme Creditors are not so dissimilar as to make it impossible for them to consult together with a view to their common interest in respect of the Scheme. The Scheme Company has made particular reference to the following factors and features of the Scheme in conducting this analysis:

(a)     the rights of Existing Noteholders;

(b)     the optionality afforded to Existing Noteholders under the Scheme;

(c)     the Scheme Creditors' entitlement to accede to the Lock-Up Agreement;

(d)     the Scheme Creditors' entitlement to participate in the New Notes;

(e)     the position of the Backstop Parties;

(f)     the costs coverage arrangement as regards the Ad Hoc Group Counsel;

(g)     the position of Existing Noteholders that are Sanctioned Persons; and

(h)     the position of the Related Party Existing Noteholders.

*Existing Notes*

3.5      The Scheme Company considers that the existing rights of the Existing Noteholders are materially the same, since they are all holders of the same Existing Notes, as issued by the Issuer and guaranteed by the Scheme Company, and therefore they each benefit from exactly the same rights against the Scheme Company.

3.6      In addition, if the Scheme becomes effective and the transactions contemplated by it are implemented, the rights conferred on the Scheme Creditors will be the same, in that all Scheme Creditors will receive consideration as part of the Scheme, with each Scheme Creditor being given the same right to elect the Redemption Option or the Equity Option in relation to their Existing Notes.

*Optionality*

3.7      As part of the Scheme, Scheme Creditors will be entitled to make certain elections in respect of their Existing Notes such that, if they make different elections, the Scheme will or may not result in an equivalent outcome for all Scheme Creditors. Certain Scheme Creditors who do not make an election or do not submit a validly completed Account Holder Letter by the Election Deadline or who are Sanctioned Persons will be entitled to the Redemption Option by default. Given that all election options are available to all Scheme Creditors on an equal basis (to the extent permitted by law and/or Sanctions), meaning that the rights afforded to each Scheme Creditor in respect of the election options are identical, the Scheme Company has concluded that this does not fracture the class.

*Lock-Up Agreement*

3.8      Certain Existing Noteholders will be party to the Lock-Up Agreement at the date of the Scheme Meeting whilst other Existing Noteholders will not. The Scheme Company does not consider that this means all Existing Noteholders cannot consult together with a view to their common interests. The Scheme Company notes the following:

(a)      it is well established that entry by creditors into a lock-up or voting agreement under which those creditors agree to vote in favour of a proposed scheme of arrangement will not in and of itself fracture the class for voting purposes;

(b)      each Scheme Creditor (excluding any Sanctioned Person) is entitled to accede to the Lock-Up Agreement prior to the Scheme Meeting and therefore become entitled to receive the Lock-Up Fee as a Consenting Noteholder; and

(c)      those Existing Noteholders who are party to the Lock-Up Agreement are treated under the Scheme in the same manner as those who are not party to that agreement, in that they will all have the same option to choose the consideration they receive under the Scheme by electing either the Redemption Option or the Equity Option.

3.9      The Issuer and the Scheme Company have agreed that any Scheme Creditor (excluding any Sanctioned Persons) that accedes to the Lock-Up Agreement before the Scheme Meeting and votes in favour of the Scheme at the Scheme Meeting will be entitled to receive payment of the Lock-Up Fee in accordance with the Implementation Steps. In this regard, the Scheme Company considers that the Lock-Up Fee does not fracture the class because:

(a)      the quantum of the Lock-Up Fee is not material in the context of the total amounts of the claims of the Scheme Creditors, the consideration under the Scheme and the likely

recoveries in the alternative scenario absent the Scheme, such that it is unlikely that a Scheme Creditor would be influenced in its decision to vote for or against the Scheme by the existence of the Lock-Up Fee;

(b)     the Scheme Company has invited all Existing Noteholders to accede to, or procure the accession to, the same arrangement by issuing a notice to all Existing Noteholders via the Clearing Systems, the Issuer's Website, SGX-ST and informing them that a copy of the Lock-Up Agreement, and instructions for accession, are available at the Scheme Website and from the Information Agent; and

(c)     Scheme Creditors will be entitled to accede to the Lock-Up Agreement up until the date of the Scheme Meeting – therefore, the right to accede to the Lock-Up Agreement will be open to all Existing Noteholders for a significant period of time.

3.10    The Scheme Company considers this minor additional benefit to be appropriate and beneficial in order to secure support for the Scheme from the Scheme Creditors, and thereby facilitate the delivery of a restructuring solution and maximise the prospects of a successful outcome by providing the Scheme Company with visibility over the levels of creditor support for the Scheme in advance of voting at the Scheme Meeting.

*Scheme Creditors' entitlement to participate in the New Notes*

3.11    All Existing Noteholders will be offered the right to subscribe, on a pro rata basis, to the New Notes.

3.12    There might be Non-Eligible Existing Noteholders who may be precluded by applicable securities laws or regulation from receiving the New Notes, or who may not be able to participate because their holdings of Existing Notes means that their New Notes Entitlement would be less than the specified minimum denomination of USD150,000.

3.13    The Scheme Company has concluded that the fact that certain Scheme Creditors may be precluded by applicable securities law or regulation from receiving the New Notes will not fracture the class. Any such Scheme Creditor will have the same legal rights as other Scheme Creditors in relation to the Scheme. The fact that certain Scheme Creditors are precluded from receiving the New Notes is a consequence of their personal characteristics, which should not be relevant to class composition. The Scheme Company notes that the identity of such persons can change at any time, including before or after the Scheme take effect.

*The position of the Backstop Parties*

3.14    The Backstop Parties agreed to backstop the New Notes in exchange for the Backstop Fee of 5% of the total amount of their Backstop Commitment. The Scheme Company has concluded that the terms of the Backstop Fee payable to the Backstop Parties does not have an impact on classification of Scheme Creditors for the purposes of the Scheme. This is because the Backstop Fee is payable in return for a commercial service reasonably required by the Companies and the level of fee is consistent with market fees for this service. The fee was also negotiated at arm's length between the Scheme Company and the Ad Hoc Group.

*Cost Coverage*

3.15    Under the Lock-Up Agreement, the Issuer and Scheme Company have agreed to pay the fees, costs and expenses reasonably incurred by the Ad Hoc Group Counsel in connection with the implementation of the Scheme and the Restructuring. Payment of these fees, costs and expenses is not conditional on the Scheme being sanctioned. All such fees, costs and expenses incurred by the Ad Hoc Group Counsel have been so incurred solely in connection with the negotiation, preparation and implementation of the Scheme and the Restructuring and accordingly would not have arisen if the Restructuring was not to take place. The Scheme Company notes that it is well established that the provision of such fees, costs and expenses, which does not confer any net benefit on the relevant Scheme Creditors, as is accordingly the case here, does not fracture a class.

*Noteholders that are Sanctioned Persons*

3.16    The Scheme Company has considered whether the fact that certain Scheme Creditors are precluded by applicable Sanctions from voting on the Scheme, electing the Redemption Option or Equity Option or participating in the New Notes will fracture the class. Scheme Creditors that are or act on behalf of or under the direction of Sanctioned Persons will not be able to vote or make any elections on the Scheme. In principle, any such Scheme Creditor will have the same legal rights as other Scheme Creditors to cast votes on the Scheme but their personal characteristics, which are not relevant to the analysis of class composition, make it unlawful for them to exercise the right to vote. The Scheme Company notes that the identity of such persons can change at any time, including before or after the Scheme Meeting.

3.17    The Scheme Company has therefore concluded that the fact that certain Scheme Creditors are not permitted to vote on the Scheme, make an election to receive the Redemption Option or the Equity Option or participate in the New Notes as a consequence of applicable Sanctions will not fracture the class. Scheme Creditors who are Sanctioned Persons will receive cash pursuant to the Redemption Option with the cash proceeds being placed into the Holding Period Escrow.

*Related Party Existing Noteholders*

3.18    The Scheme Company has concluded that the Related Party Existing Noteholders should form a single class with other Existing Noteholders. The fact that the Related Party Existing Noteholders are related to the Issuer is immaterial since all Existing Noteholders have the same rights against the Scheme Company under the Existing Notes and pursuant to the Scheme they would have the same rights to elect between the Redemption Option and the Equity Option. Overall, the Related Party Existing Noteholders' rights are not so dissimilar as to make it impossible for them to consult together with other Existing Noteholders with a view to the common interest of the class. To the extent that the Related Party Existing Noteholders have a different interest, then this a matter for the Court's discretion to sanction the Scheme at the Sanction Hearing.

*Conclusion*

3.19    Having considered the rights of Existing Noteholders and the likely alternative to the Scheme, the Scheme Company has concluded that it does not consider the differences in rights between any of the Scheme Creditors to be sufficiently material so as to fracture the class.

3.20    Accordingly, it is proposed that:

(a)    Scheme Creditors vote in a single class on the Scheme; and

(b)    one meeting of the Scheme Creditors be convened for the purposes of considering and, if the Scheme Creditors think fit, approving the Scheme.

## 4.    VOTING ON THE SCHEME AND MAKING ELECTIONS IN RELATION TO SCHEME CONSIDERATION AND THE NEW NOTES

*Voting on the Scheme*

4.1    The Existing Noteholders are contingent creditors of the Scheme Company, whose economic interests will be affected by the Scheme, and therefore constitute creditors of the Scheme Company for the purposes of Part 26 of the Companies Act 2006.

4.2    The Existing Noteholders (other than any Non-Eligible Existing Noteholder) as at the Record Date, as the beneficial owners of the Existing Notes, will be entitled to vote at the Scheme Meeting in respect of the Scheme, except where any Existing Noteholder is prohibited from voting their Existing Notes by applicable law or regulation (including as a result of being a Sanctioned Person).

4.3    In order to be eligible to vote at the Scheme Meeting, each Scheme Creditor will be required to, among other things, provide certain confirmations as to their eligibility. In particular, each Scheme Creditor will be required to confirm, among other things, that they are not and are not acting on behalf of or at the direction of a Sanctioned Person. For the avoidance of doubt, Scheme Creditors who are not Sanctioned Persons that hold their Existing Notes through a Sanctioned Custodian will not be considered a Sanctioned Person.

4.4    Existing Noteholders should refer to the detailed instructions in relation to voting at the Scheme Meeting set out in Section 6 (*Summary of Actions to be Taken by Scheme Creditors*) of Part 1 of this Explanatory Statement and at Appendix 1 (*Instructions to Scheme Creditors and any Person with an Interest in the Existing Notes*) to this Explanatory Statement. Scheme Creditors should be aware that they have previously been afforded an opportunity to raise any issues in relation to the constitution of the Scheme Meeting, pursuant to the Practice Statement Letter sent on 31 October 2024.

4.5    Pursuant to the Convening Order, the Scheme Meeting will be held on 11 December 2024 (or such other date as the Scheme Company may decide and notify to Scheme Creditors). The Scheme Meeting will take place at the offices of Cleary Gottlieb Steen & Hamilton LLP at 2 London Wall Place, London, EC2Y 5AU, United Kingdom, with a live videoconference link 2:00 p.m. (London time) on 11 December 2024 (or such other time or date as the Scheme Company may decide and notify to Scheme Creditors).

4.6    The notice of the Scheme Meeting is set out at Appendix 3 (*Notice of Scheme Meeting*) to this Explanatory Statement. Scheme Creditors that are Existing Noteholders as at the Record Date are entitled to attend and vote at the Scheme Meeting either in person or by proxy. If you cease to be a Scheme Creditor before the Record Date you will not be entitled to attend and vote at the Scheme Meeting. The Scheme Company is under no obligation to recognise any assignment or transfer of rights, benefits or interests in the Scheme Claims after the Record Date.

4.7    Each Existing Noteholder should ensure that it provides an indicative vote on the Scheme by completing and submitting (or procuring that its Account Holder has on its behalf completed and submitted) a valid Account Holder Letter to the Information Agent so that it is received by the

Information Agent before the Voting Instruction Deadline. Please read the instructions on the Account Holder Letter carefully before completing it.

4.8     Existing Noteholders may still attend (directly or via proxy) the Scheme Meeting regardless of whether they submit an Account Holder Letter by the Voting Instruction Deadline (provided that they register and provide all necessary confirmations set out in the Account Holder Letter to the Information Agent in advance). Existing Noteholders that attend the Scheme Meeting are entitled to vote (directly or via proxy) on the Scheme as they see fit and, to the extent they have already provided an indicative vote on the Scheme in their Account Holder Letter, they are not bound by that indicative vote when they vote at the Scheme Meeting.

4.9     The link to videoconference for the Scheme Meeting will be made available to all Scheme Creditors who have confirmed their participation in the Scheme Meeting in advance to the Information Agent. The Scheme Meeting will offer Scheme Creditors the opportunity, should they so wish, to join separate "virtual breakout" rooms to allow discussions to be held in the absence of the Scheme Company and the Information Agent.

4.10    Existing Noteholders may vote at the Scheme Meeting through a poll card that the Information Agent will send ahead of time. Scheme Creditors will return the poll card via email during the Scheme Meeting when the Chair indicates.

4.11    Each Existing Noteholder is a contingent creditor for the purpose of voting at the Scheme Meeting and the votes cast by or on behalf of Existing Noteholders will be taken into account both for value and numerosity purposes in relation to the Scheme.

*Elections in relation to Scheme Consideration and New Notes*

4.12    Each Existing Noteholder should ensure that it has completed and submitted (or it has procured that its Account Holder has on its behalf completed and submitted) its elections in relation to Scheme Consideration (i.e. electing to receive either the Redemption Option or the Equity Option) and participation in the New Notes  in their Account Holder Letter (including the New Notes Election Form contained within the Account Holder Letter). Each Existing Noteholder should also ensure that it delivers the necessary confirmations and documents to receive New Shares if it elects the Equity Option and/or receive New Notes if it elects to participate in the New Notes (as set out in the Account Holder Letter and the New Notes Election Form contained within the Account Holder Letter).

4.13    Each Existing Noteholder should ensure that it provides its indicative elections in its Account Holder Letter (including the New Notes Election Form contained in the Account Holder Letter if it elects to participate in the New Notes) by the Voting Instruction Deadline but the Existing Noteholders will be permitted to submit or amend their elections in relation to Scheme Consideration and participating in the New Notes up until the Election Deadline (after the Scheme Meeting).

## 5.    EFFECTIVENESS OF AND CONDITIONS TO THE SCHEME

*Sanction Hearing*

5.1     Under Part 26 of the Companies Act 2006, a scheme of arrangement becomes effective in accordance with its terms and is binding on the company and creditors subject to it when the order of the Court sanctioning the scheme of arrangement is delivered to the Registrar of Companies.

The Scheme Company expects that the Sanction Hearing will take place on or after 13 December 2024, after the requisite statutory majorities of the Scheme Creditors have approved the Scheme at the Scheme Meeting.

5.2  At the Sanction Hearing, the Scheme Company may consent on behalf of all Scheme Creditors to any modification of, or addition to, the Scheme or any term or condition which the Court may think fit to approve or impose and which would not, directly or indirectly, have a material adverse effect on the economic treatment or any legal right or material obligation of any Scheme Creditor under the Scheme.

*Scheme Effective Date*

5.3  Pursuant to the Scheme, following:

(a)  the delivery of a certified copy of the order sanctioning the Scheme to the Registrar of Companies;

(b)  the confirmation by HM Revenue & Customs that the Sanction Order will not be subject to stamp duty; and

(c)  notification by the Scheme Company to the Scheme Creditors (via the Information Agent) and the Existing Notes Trustee that the foregoing conditions have been fulfilled or waived in accordance with clause 8 (*Modifications of the Scheme or Waiver of the Scheme Conditions*) of the Scheme Document,

the Scheme Effective Date will occur.

5.4  As soon as reasonably practicable, after the Scheme Company determines that the Scheme Conditions have been satisfied or waived in accordance with the terms of the Scheme and the Scheme Effective Date has occurred, the Scheme Company shall promptly notify the Scheme Creditors through the Clearing Systems and the Scheme Website (via the Information Agent). The Scheme Company will also make an announcement on the Issuer's Website and the SGX-ST.

*Implementation of the Scheme*

5.5  The Scheme will become effective and legally binding on the Scheme Creditors on the Scheme Registration Time, in accordance with its terms (and subject to the conditions set out therein and in the Implementation Deed). Please refer to Part 7 (*The Scheme*) of this Explanatory Statement for the full terms of the Scheme.

5.6  Once the Scheme becomes effective, the Issuer and the Scheme Company will enter into the Implementation Deed substantially in the form scheduled to the Scheme Document on behalf of themselves and each of the Scheme Creditors (pursuant to the power of attorney granted by the Scheme, as detailed below) along with the other parties to that agreement.

5.7  The Implementation Deed is the operative document pursuant to which the Scheme will be implemented.

5.8  The Implementation Deed provides that:

(a) Implementation of the Restructuring will take place in accordance with the Implementation Steps. The Implementation Steps are set out in Clause 9 (*Implementation Steps*) of the Implementation Deed. The Restructuring Effective Date will occur at the end of the Implementation Steps. Failure to achieve any of the Restructuring Conditions and/or any of the Implementation Steps will mean that the conditions to the occurrence of the Restructuring Effective Date cannot be satisfied and the exchange (and subsequent cancellation) of the Existing Notes in consideration for the issuance of the Scheme Consideration cannot occur pursuant to the Scheme.

(b) Once the Implementation Deed has become effective but prior to commencement of the Implementation Steps, the Information Agent shall prepare the Allocations Spreadsheet and the Settlement Funds Flow:

   (i) The Allocation Spreadsheet shall set out each Scheme Creditor's applicable entitlement to Scheme Consideration (under the Redemption Option or Equity Option (as applicable) and New Notes.

   (ii) The Settlement Funds Flow shall set out all amounts payable by the Issuer and/or the Scheme Company in respect of the Restructuring including:

      1. the Existing Trustee's costs and expenses, including advisors' fees;

      2. the Ad Hoc Group's costs and expenses, including advisors' fees (including the Ad Hoc Group Advisors fees);

      3. the fees payable to:

         a. each Participating T1 New Noteholder under and in accordance with the relevant commitment letter;

         b. each Backstop Party under and in accordance with the Backstop Commitment Letter;

         c. each eligible Scheme Creditor in respect of its Lock-Up Fee Entitlement;

      4. each Redemption Option Scheme Creditor's Cash Entitlement;

      5. the cash entitlements payable to the lenders under the International Facilities; and

      6. the waiver fee due to the holders of the Cebures.

(c) In order for the Implementation Steps to commence, a number of conditions must be satisfied or waived. The Scheme Company plans to satisfy all of the Restructuring Conditions that can be satisfied prior to the Sanction Hearing, prior to the Sanction Hearing. The Restructuring Conditions include, without limitation:

   (i) The Scheme Effective Date having occurred.

   (ii) All conditions precedent under the New Refinancing Facility having been satisfied or waived, other than any Implementation Steps having been undertaken.

(iii)     All conditions precedent under sections 8 and 9 of the Note Purchase and Placement Agreement having been satisfied or waived, other than any Implementation Steps having been undertaken.

(iv)     Security trust for collateral for New Notes established.

(v)     Obtaining any waivers and consents that are required under the Issuer's material contracts, including the Mexican Facilities, as necessary, in respect of any existing defaults and the Restructuring.

(vi)     Guidance or authorisation by Sanctions Authorities, as deemed required for the purposes of implementing the Restructuring, having been obtained, including the OFAC Licence and the Restructuring being compliant with the requirements of General Licence – Bond amendments and restructurings for non-Designated Persons (INT/2023/2824812) issued by the Office of Financial Sanctions Implementation of His Majesty's Treasury.

(vii)     All Implementation Documents have become effective in accordance with their respective terms, other than those to take effect as part of the Implementation Steps.

(viii)     Evidence that the meetings to approve the waivers and amendments to the Cebures have been held and the required votes duly passed (with effectiveness of waivers/amendments only subject to the condition that the Scheme Effective Date occurs).

(ix)     Override agreement setting out the terms specified in paragraph 3.14 of Section 3 of Part 3 of the Explanatory Statement amongst the Issuer and each lender under the International Facilities having been signed and become effective (with effectiveness subject to the condition that the Scheme Effective Date occurs, certain implementation steps having occurred and all accrued and due interest thereon being paid in full) and elections by the lenders under the International Facilities having been made in respect of the options described in paragraph 3.14 of Section 3 of Part 3 of the Explanatory Statement.

(x)     Holding Period Escrow having been established by executing the Holding Period Escrow Agreement and the Holding Period Escrow Agent opening the Holding Period Escrow Account (as defined in the Holding Period Escrow Agreement).

(xi)     An order of the United States Bankruptcy Court for the Southern District of New York for recognition and enforcement of the Scheme (and the Scheme Sanction Order) under Chapter 15 of Title 11 of the United States Code.

(xii)     The Allocations Spreadsheet having been approved in writing by the Scheme Company and the Ad Hoc Group Advisors.

(xiii)     The Settlement Funds Flow having been approved in writing by the Scheme Company and the Ad Hoc Group Advisors.

*Longstop Date*

5.9     If the Restructuring Effective Date does not occur on or before the Longstop Date, being 11:59 p.m. (London time) on 28 February 2025 or such later date agreed between the Majority Consenting Noteholders and the Scheme Company, the terms of and the obligations on the parties under or pursuant to the Scheme and the Implementation Deed will lapse and all the compromises and arrangements provided by the Scheme will be of no effect.

*What will the Scheme do?*

5.10    The Scheme is a compromise and arrangements between the Scheme Company and the Scheme Creditors. The Scheme is set out in Part 7 (*The Scheme*) to this Explanatory Statement.

5.11    If approved, the Scheme will provide for, amongst other things:

   (a)    a compromise and release of all Scheme Claims of any Scheme Creditor, including in respect of all liabilities under the Existing Notes Indenture and any Scheme Claims which may be held, at any time, by any the Scheme Company or Issuer (or any other Subsidiary of the Scheme Company and Issuer) in respect of the Existing Notes, in each case, arising directly or indirectly out of, or resulting from, any Implementation Step being taken in accordance with the terms of the Implementation Deed;

   (b)    the issuance of the Scheme Consideration in exchange for the compromise and release of the Scheme Claims in accordance with the terms of the Implementation Deed; and

   (c)    an authority for the Issuer and the Scheme Company, on and from the Scheme Effective Date, to execute and (if applicable) deliver as a deed the Implementation Deed, the Deed of Release and other Implementation Documents to give effect to the above and the Scheme on behalf of each Scheme Creditor (as its agent and attorney).

*Authority to execute Implementation Documents on behalf of the Scheme Creditors*

5.12    The Scheme will irrevocably and unconditionally authorise and instruct the Scheme Company on behalf of the Scheme Creditors (including any person to whom a Scheme Creditor has transferred its rights in respect of the Existing Notes after the Record Date) on and from the Scheme Effective Date to enter into the Implementation Deed on behalf of the Scheme Creditors. The Implementation Deed will then give effect to the transaction summarised in this Explanatory Statement by authorising the relevant parties to execute the Implementation Documents.

5.13    The authorities of the Scheme Company, pursuant to the Scheme, to execute documents on behalf of the Scheme Creditors will take effect on and from the Scheme Effective Date. From and until that time, the Scheme Company (acting by its directors, officers or other duly appointed representatives) will be irrevocably authorised, instructed and appointed to, on behalf of each Scheme Creditor as its true and lawful agent and attorney (and as agent and attorney of such person to whom that Scheme Creditor has assigned or transferred its rights in any of its Scheme Claims where such transfer is recognised by the Scheme Company and each other party which it is expressed herein to act for and on behalf of), among other things, enter into, execute and (where applicable) deliver as a deed or otherwise, each of the Implementation Deed, the Implementation Documents and certain other documents required to effect the Scheme, in each case to which that Scheme Creditor (or any of them) is expressed to be a party.

5.14    On and from the Scheme Effective Date, the Undertaking Transaction Parties are irrevocably authorised and instructed to enter into, execute and (where applicable) deliver as a deed or

otherwise, the Implementation Deed, each of the Implementation Documents and certain other documents required to give effect to the Scheme, in each case, to which that Undertaking Transaction Party is expressed to be a party, provided that such documents (other than the Implementation Deed) will be executed in accordance with, and will only become effective in accordance with, the Implementation Deed and their respective terms in accordance with the Implementation Steps.

5.15    Therefore, although the Scheme Creditors are party to various Implementation Documents, the execution and delivery of those documents will be undertaken by the Scheme Company on behalf of the Scheme Creditors. Accordingly, no action is required by the Scheme Creditors in respect of the execution and delivery of those documents.

*Modifications to the Scheme*

5.16    The Scheme contains provisions for the Scheme Company at the Sanction Hearing to consent on behalf of itself and each of the Scheme Creditors (and any of their respective successors and assignees) to any modification of, addition to, or waiver of the Scheme (including the Scheme Conditions) and/or any of the Implementation Documents, or any terms and conditions, which the Court may think fit to approve or impose, provided that if any such modification would have a material adverse effect on (i) a Scheme Creditor, or (ii) Scheme Creditors as a whole, such modification will require the consent of the Majority Consenting Noteholders.

5.17    The Court will be unlikely to approve any modification of, or addition to, or impose a condition to, the Scheme which might be material to the interests of the Scheme Creditors unless the Scheme Creditors were informed of such modification, addition, or condition. It would be for the Court to decide, in its discretion, whether or not a further meeting of Scheme Creditors should be held in those circumstances. In any event, the Scheme will provide that, if any such proposed modification, addition, term, condition or waiver has a material adverse effect on the economic treatment or any legal right or material obligation of any Scheme Creditor (or impose any additional material obligation on a Scheme Creditor, as compared to the treatment of the Scheme Company or other Scheme Creditors under the Scheme or any Implementation Document), it will require the prior written consent of that Scheme Creditor.

*Releases*

5.18    Pursuant to the Scheme and the Deed of Release, the Scheme will effect on and from, and subject to the occurrence of, the Restructuring Effective Date, the full and absolute satisfaction, waiver and release of the Scheme Creditors' past, present and future claims against the Released Parties, arising out of or in connection with the preparation, negotiation, sanction, execution or implementation of, among other things, the Scheme and the Implementation Documents, including any acts of any Released Party or otherwise in carrying out the steps and transactions contemplated in the Scheme or the Implementation Documents in accordance with their terms.

5.19    The Scheme Company is authorised by the Scheme to enter into and deliver the Deed of Release (as a deed, if applicable) on behalf of each Scheme Creditor. Such waivers and releases are limited in scope to liabilities that a Released Party has or may have to a Scheme Creditor in relation to, or arising out of or in connection with, the preparation, negotiation or implementation of the Scheme and the specific steps described in the Scheme for its implementation. Such waivers and releases will prevent Scheme Creditors from initiating proceedings against a Released Party in respect of those liabilities, but shall not apply in respect of certain excluded liabilities described therein (including, but not limited to, liabilities arising from fraud, gross negligence or wilful

misconduct). The Scheme Company considers that the inclusion of these waivers and releases in the Scheme and the scope of such waivers and releases are, in each case, customary and appropriate in the context of the Scheme.

5.20    The Deed of Release can be found in Schedule 1 to the Scheme, at Part 7 to this Explanatory Statement.

*Sanctions - Required Sanctions Licences*

5.21    OFAC is the relevant U.S. governmental department responsible for the implementation and monitoring of sanctions imposed by the United States. The Scheme Company is aware that there are certain Existing Noteholders who are U.S. persons and that there are other U.S. persons involved in connection with the Scheme. The Issuer has been advised that it will require an OFAC Licence in respect of the Scheme. The Scheme Company considers that the OFAC Licence is required before the Scheme Meeting can be held (but need not have been obtained prior to the Convening Hearing).

5.22    The Issuer submitted an application to OFAC for the OFAC Licence on 30 September 2024. As at the date of this Explanatory Statement, the Issuer has not yet received the OFAC Licence. If the OFAC Licence is not received before the anticipated Scheme Meeting date on 11 December 2024, it will be necessary to postpone the Scheme Meeting (and, as a result, likely also postpone the following steps in the Scheme and the Restructuring).

5.23    The Scheme Company will, in the case of the UK, rely on the existing General Licence relating to Bond Amendments and Restructurings for non-Designated Persons, INT/2023/2824812, granted under regulation 64 of the Russia (Sanctions) (EU Exit) Regulations 2019, effective through 28 March 2025 (the "UK General Licence").   Under the UK General Licence, subject to the conditions listed therein, an issuer (such as the Issuer), which considers that it has or may have bondholders who are designated persons, may affect the terms of any bond restructuring or amendments agreed between itself and its bondholders, and a UK person may take any steps necessary to effect such restructuring or amendment, provided that:

(a)    as part of any such bond restructuring or amendments, no funds or economic resources (or any legal or equitable interests or rights therein) are made available, directly or indirectly, to or for the benefit of, a designated person; and

(b)    insofar as a designated person would have been (but for their designation) entitled to any funds or economic resources (or any legal or equitable interests or rights therein) under the terms of the bond restructuring or amendments, such funds or economic resources shall be frozen and not made available to that designated person, until such time as they are no longer designated.

The Restructuring will comply with the above conditions listed in the UK General Licence.

5.24    In the case of the EU sanctions, the Issuer will rely on the EC Opinions that maintain that, with respect to the "freezing of funds" of the blocked persons, changes to certain features of the frozen funds are "not precluded, provided that they do not affect the continuity of the asset freeze." According to EC Opinion of 27 May 2021 on the changes to the features of frozen funds (the **"EC Opinions"**),[7] changing the character and location of frozen funds would be incompatible

---

[7] https://finance.ec.europa.eu/system/files/2021-05/210527-frozen-funds-features-opinion_en.pdf

with the respective regulations imposing the asset freezes, "if it enables the funds to be used by anyone at any time while the EU restrictive measures are in force, or if it had the object or effect of circumventing the asset freeze." While the Restructuring will result in the change of the nature and location of the funds subject to the asset freeze, as the Existing Notes held by Sanctioned Person, if any, will be cancelled and these Sanctioned Persons will be allocated their Cash Entitlements, consistent with the EC Opinions such funds will not be made available to any Sanctioned Person and will be held by the Holding Period Escrow Agent, thus, guaranteeing the continuity of the asset freeze until the Sanctions are lifted or the relevant Existing Noteholders otherwise become eligible to receive their Cash Entitlements in accordance with Sanctions.

*Notices*

5.25    Any notice or other written communication to be given under or in relation to this Scheme (other than any Account Holder Letter, which shall be delivered in accordance with the instructions contained therein) will be given in writing and will be deemed to have been duly given if it is delivered by hand, is posted on the Scheme Website (in relation to any notice or written communication to be given to the Scheme Creditors only) or is sent by email, courier or pre-paid first class post (or by air mail or international courier where it is delivered to a different country from that in which it is posted) as follows:

    (a)    in the case of a notice to be given to the Scheme Company, to:

| | |
|---|---|
| Address: | Mega Newco Limited<br>Suite 1, 7th Floor<br>50 Broadway<br>London<br>SW1H 0DB |
| Attention: | The Director |
| Email: | Ignacio.Gonzalez@gfmega.com |

With copies to:

| | |
|---|---|
| Address: | c/o Cleary Gottlieb Steen & Hamilton LLP<br>2 London Wall<br>London, EC2Y 5AU |
| Attention: | Polina Lyadnova / David Botter |
| Email: | team-mega_restructuring-cgshonly@cgsh.com |

    (b)    in the case of a notice to be given to the Existing Notes Trustee:

| | |
|---|---|
| Address: | Wilmington Trust, National Association<br>50 South Sixth Street, Suite 1290<br>Minneapolis, MN 55402 |
| Attention: | Barry Somrock / Emilia Gazzuolo |
| Email: | bsomrock@WilmingtonTrust.com<br>egazzuolo@WilmingtonTrust.com |

With copies to:

| | | |
|---|---|---|
| Address: | c/o Reed Smith LLP | |
| | 1201 N Market St #1500 | |
| | Wilmington, DE 19801 | |
| Attention: | Kurt Gwynne / Jason D. Angelo | |
| Email: | kgwynne@reedsmith.com | |
| | jangelo@reedsmith.com | |

(c)     in the case of a notice to be given to the New Indenture Trustee or the New Notes Settlement Agent:

| | |
|---|---|
| Address: | UMB Bank, N.A. |
| | 555 San Felipe Street, Suite 870 |
| | Houston, TX 77056 |
| Attention: | Shazia Flores, Vice President |
| Email: | shazia.flores@umb.com |

(d)     in the case of the Information Agent or Cash Settlement Agent:

| | |
|---|---|
| Address: | Kroll Issuer Services Limited |
| | The Shard |
| | 32 London Bridge Street |
| | London |
| | SE1 9SG |
| Attention: | Alessandro Zorza |
| Phone: | + 44 20 7704 0880 |
| Email: | grupomega@is.kroll.com |

(e)     in the case of the Ad Hoc Group or the Ad Hoc Group Advisors:

| | |
|---|---|
| Address: | Latham & Watkins (London) LLP |
| | 99 Bishopsgate |
| | London, EC2M 3XF |
| Attention: | Bruce Bell and Pedro Rufino Carvalho |
| Email: | projectmaestro.lwteam@lw.com |

(f)     in the case of any other person: any address or email address set forth for that person in any agreement entered into in connection with the Scheme or the last known address or email address according to the Scheme Company.

5.26    Any notice or other written communication to be given under this Scheme (other than any Account Holder Letter or New Notes Election Form, which is to be delivered in accordance with

the instructions contained therein) will be given in writing and will be deemed to have been served:

(a)     if delivered by hand or courier, on the Business Day of receipt, or if such receipt occurs after 5.00 p.m. in the place of receipt, the following Business Day;

(b)     if delivered by email or electronically (including by way of posting on the Scheme Website), on the Business Day it is received (or, if posted on the Scheme Website or SGX-ST, accessible) in readable form, or if such receipt occurs (or access is provided) after 5.00 p.m. in the relevant place, the following Business Day; and

(c)     if sent by pre-paid first class post (or airmail or international courier), on the second Business Day after posting if the recipient is in the country of dispatch, otherwise on the fifth (5th) Business Day after posting.

5.27    In proving service, it will be sufficient proof, in the case of a notice sent by pre-paid first class post (or airmail or international courier), that the envelope was properly stamped, addressed and placed in the post.

5.28    The accidental omission to send any notice, written communication or other document in accordance with these provisions or the non-receipt of any such notice by any Scheme Creditor, will not affect the provisions of any of the Scheme.

5.29    The Scheme Company will not be responsible for any:

(a)     non-receipt by a Scheme Creditor of any notices or other written communications, and the non-receipt of any such notice or other written communications by any Scheme Creditor will not impact the effectiveness of the notice or other written communication or otherwise affect the provisions of the Scheme; or

(b)     loss or delay in the transmission of any notices or other documents posted by any Scheme Creditor, which shall be posted at the risk of such Scheme Creditor.

## 6.   JURISDICTION

6.1     The Scheme Company considers that the Court has jurisdiction in relation to the Scheme under Part 26 of the Companies Act 2006 for the following reasons:

(a)     the Scheme Company is a private company limited by shares incorporated under English law and is therefore a "company" for the purposes of Part 26 of the Companies Act 2006;

(b)     the Scheme is a "compromise or arrangement" between the Scheme Company and the Scheme Creditors; and

(c)     the Scheme Company acceded as a guarantor in respect of the Existing Notes, specifically by assuming all rights and obligations of a guarantor under the Existing Notes Indenture and Existing Notes. Further, the Scheme Company and the Issuer entered into the Deed of Contribution. The Deed of Contribution created a right of contribution by the Issuer against the Scheme Company, in respect of any payments

made by the Issuer under the Existing Notes. As such, the Scheme Company is in substance liable as a joint primary obligor in respect of the Existing Notes.

6.2    Given the foregoing, there is jurisdiction in relation to the Scheme. Further, as a matter of the Court's discretion, there is a sufficient connection with the jurisdiction.

## 7.    RECOGNITION

7.1    The Scheme Company will seek recognition of the Scheme under Chapter 15 of the U.S. Bankruptcy Code, and will seek permanent relief in the United States Bankruptcy Court for the Southern District of New York (or such other appropriate forum determined by the Scheme Company) enjoining Scheme Creditors from commencing or continuing any action or proceeding against any member of the Group or their successors in interests that are inconsistent with the Scheme in the United States.

7.2    To seek recognition of the Scheme in the United States, the Scheme Company, through its foreign representative to be appointed in accordance with the Scheme Company's bylaws (the "**Foreign Representative**"), will file a petition (the "**Chapter 15 Petition**") in the United States Bankruptcy Court for the Southern District of New York (the "**U.S. Bankruptcy Court**") seeking an order (i) recognising the Scheme as a foreign proceeding under Chapter 15 of Title 11 of the United States Code and (ii) providing that the Scheme and the Sanction Order are entitled to full force and effect in the United States in accordance with their terms for recognition and enforcement of the Scheme (and any order sanctioning the Scheme) under Chapter 15 of Title 11 of the United States Code (the "**FFE Order**").

7.3    Notice requirements under the U.S. Bankruptcy Code and Federal Rules of Bankruptcy Procedure require that parties in interest receive at least 21 days' notice of the hearing on the Foreign Representative's petition for recognition of the Scheme and motion seeking the entry of the FFE Order (the "**Chapter 15 Hearing**"). The Foreign Representative may file the Chapter 15 Petition prior to the date of the Sanction Hearing, so that the Chapter 15 Hearing may be scheduled immediately thereafter. This would allow the entry of the FFE Order, if granted by the U.S. Bankruptcy Court, to occur shortly after the entry of the Sanction Order.

7.4    The Scheme Company has obtained:

(a)    an opinion from an independent expert on Mexican law that the Scheme is likely to be recognised and given effect in Mexico, being the jurisdiction in which the Issuer is incorporated and a jurisdiction in which the Group has material assets; and

(b)    an opinion from an independent expert on certain matters of U.S. Federal law and New York law including whether the Scheme is likely to be recognised by the United States Bankruptcy Court for the Southern District of New York (or such other appropriate forum determined by the Scheme Company) as a 'foreign proceeding' under Chapter 15 of the U.S. Bankruptcy Code and, if sanctioned, will be given full force and effect in the United States.

## PART 6

## RISK FACTORS

*The Scheme is subject to a number of risks. Accordingly, Existing Noteholders should carefully consider the factors and risks associated with the Scheme, the Group's business and the industry in which the Group operates, together with all other information contained in and incorporated by reference into this Explanatory Statement, including, in particular, the risk factors described below, the risk factors set out in the original offering documentation for the Existing Notes and their personal circumstances prior to making any investment decision and voting on the Scheme. Some of the following factors relate principally to the Group's business. Other factors relate principally to the Scheme and the Scheme Consideration. The Group's business, prospects, financial condition and operations could be materially adversely affected by any of the risks described below. Moreover, except as set forth in the section below entitled 'Risks relating to the Scheme', these risk factors assume that the Scheme will be implemented and do not describe all of the risks that would be applicable to the Scheme Company should the Scheme not be implemented.*

*The sole director of the Scheme Company considers the following risks to be potentially significant or material to Scheme Creditors. However, the following is not an exhaustive list or explanation of all potential risks or uncertainties relating to the Restructuring or the Scheme and should be used as guidance only. Additional risks and uncertainties relating to the Group that are not currently known to the Group, or that it currently deems immaterial, may individually or cumulatively also have an adverse effect on the Scheme, the Restructuring, the Scheme Company and/or the Group or its business, prospects, financial condition and operations. The order in which risks are presented is not an indication of the likelihood of the risks actually materialising, of the potential significance of the risks or of the scope of any potential harm to the Group's financial condition, business, prospects and operations. No assurance can be given that all material risks relating to the Group are set out below.*

*Scheme Creditors should carefully consider these risk factors and the other information set out in this Explanatory Statement.*

*This Explanatory Statement also contains forward-looking statements that include risks and uncertainties. Actual results may differ from those anticipated in these forward-looking statements as a result of various factors, including the risks described below and elsewhere in this Explanatory Statement. If a Scheme Creditor is in any doubt about the action it should take, such Scheme Creditor is advised to consult appropriately authorised independent professional advisors.*

*All statements in this document are to be read subject to, and are qualified in their entirety by, the matters referred to below.*

1.      **RISKS RELATING TO THE GROUP**

***The Scheme Company has no revenue-generating operations of its own, and its ability make payments depends on support from the Issuer.***

The Scheme Company has no revenue-generating operations of its own, and its ability to service its indebtedness, including the Existing Notes, is entirely dependent upon the support from the Issuer. The Scheme Company conducts no business or operations and has no significant assets.

***The Issuer may not be able to refinance its existing or future debt obligations (including the Cebures) or renew the Bilateral Facilities on acceptable terms or at all.***

Following the implementation of the Scheme, the Issuer will have different types of corporate debt and credit facilities. The Issuer's ability to service corporate debt and credit facilities will depend upon the Group's ability to generate sufficient cash from operations, obtain additional equity or debt financing. This ability to obtain equity or debt financing on favourable terms or at all will depend on many factors outside of the Group's control, including then-prevailing conditions in the international credit and capital markets. In relation to the Bilateral Facilities, the Issuer is subject to the risk that it may not be able to renew such credit facilities on similar or better terms or at all. If the Issuer is unable to refinance its existing or future debt obligations or renew its existing or future credit facilities on acceptable terms or at all, there could be a material adverse effect on the Issuer's liquidity, financial condition and results of operations. If the Issuer is unable to find alternative financing, this may have an adverse effect on the Issuer's liquidity.

***The Group may be subject to currency fluctuations.***

The Group is subject to risks from changes in currency values. Changes in currency values (specifically US$:MXN Pesos) could have a material adverse effect on the Group's business, operating results, financial condition or prospects.

The functional currency of the Group is Mexican Pesos. The Group mainly receives revenues in Mexican Pesos and converts funds to foreign currencies to meet payment obligations which are contracted in currencies other than Mexican Pesos. Exchange rates between the Mexican Pesos and the U.S. dollar have fluctuated significantly in the past and may do so in the future.

2.      **RISKS RELATING TO THE SCHEME**

***Scheme Creditors are solely responsible for complying with the procedures set out in this Explanatory Statement and the Account Holder Letter (including the New Notes Election Form), including 'know your customer' and Sanctions screening procedures.***

Scheme Creditors are solely responsible for complying with all of the procedures for voting at the Scheme Meeting, including, but not limited to, obtaining access to the Scheme Website, submitting (or if not an Account Holder, procuring that their Account Holder submits on their behalf) a validly completed Account Holder Letter (including the New Notes Election Form if they intend to participate in the New Notes – see risk factor "*Scheme Creditors are solely responsible for complying with the procedures set out in the New Notes Election Form (contained within the Account Holder Letter)*") in accordance with the instructions and information provided in this Explanatory Statement and in the Account Holder Letter, including providing the confirmations, representations, warranties and undertakings set out therein and providing the identification information for the Scheme Creditor, its representative or proxy or any person who owns or directly or indirectly controls or is the ultimate beneficial owner of the Scheme Creditor, its representative

or proxy (unless it has nominated the Chair as its proxy) and such other information or documentation that the Scheme Company reasonably requests for any "know your customer" and/or other anti-money laundering checks or to otherwise support compliance with Sanctions, in each case before the Voting Instruction Deadline. Information on voting at the Scheme Meeting is set out at Section 6 (*Summary of actions to be taken by Scheme Creditors*) of Part 1 (*Notice to Scheme Creditors*) of this Explanatory Statement, Appendix 1 (*Instructions to Scheme Creditors and any Person with an interest in the Existing Notes*) to this Explanatory Statement and in the Account Holder Letter. Scheme Creditors holding their Existing Notes through Euroclear or Clearstream and not otherwise through a Sanctioned Person are required to instruct their Account Holder (through Intermediaries, if applicable) to block their Existing Notes by the Custody Instructions Deadline.

Scheme Creditors that are Sanctioned Persons, or are acting for, on behalf of, at the direction of or through a Sanctioned Person cannot participate or vote at the Scheme Meeting. Accordingly, Scheme Creditors should promptly provide their Account Holder Letter to enable appropriate screening to be conducted, and promptly provide any additional information requested by the Information Agent or the Scheme Company (or the Group Advisors), including in respect of the Scheme Creditor, or if it has duly authorised a representative or appointed a proxy to attend the Scheme Meeting on its behalf, the representative or proxy, and any person who owns or directly or indirectly controls or is the ultimate beneficial owner of the Scheme Creditor, its representative or proxy. Failure to do so may result in delays in screening the Scheme Creditor, their Account Holder Letter not being validly completed and may result in the Scheme Creditor being precluded from participating and/or voting at the Scheme Meeting.

None of the Issuer, Scheme Company, the Existing Notes Trustee, the Agents or the Group Advisors or any of their respective Affiliates, directors, officers, employees or agents assume any responsibility for informing the Existing Noteholders of irregularities with respect to compliance with such procedures.

***Scheme Creditors are solely responsible for complying with the procedures set out in the New Notes Election Form (contained within the Account Holder Letter)***

Scheme Creditors are solely responsible for complying with all of the procedures for participating in the New Notes including, but not limited to, obtaining access to the Scheme Website, submitting (or if not an Account Holder, procuring that their Account Holder submits on their behalf) a validly completed New Notes Election Form (contained within the Account Holder Letter) in accordance with the instructions and information provided in this Explanatory Statement and in the Account Holder Letter, including providing the confirmations, representations, warranties and undertakings set out therein and providing the identification information for the Scheme Creditor, its representative or proxy or any person who owns or directly or indirectly controls or is the ultimate beneficial owner of the Scheme Creditor, its representative or proxy (unless it has nominated the Chair as its proxy) and such other information or documentation that the Scheme Company reasonably requests for any "know your customer" or other anti-money laundering checks or to otherwise support compliance with Sanctions, in each case before the Election Deadline. Further information on the New Notes Election Form is set out in the Account Holder Letter in Appendix 2 (*Account Holder Letter*) to this Explanatory Statement . If Scheme Creditors have not (or if not an Account Holder, their Account Holder has not on their behalf) submitted a validly completed New Notes Election Form (and all documents required thereby) by the Election Deadline, the Scheme Creditor will not be able to participate in the New Notes.

Scheme Creditors that are Sanctioned Persons, or are acting for, on behalf of, at the direction of or through a Sanctioned Person cannot participate in the New Notes. Accordingly, Scheme Creditors should promptly provide their Account Holder Letter (containing the New Notes Election Form) to enable appropriate screening to be conducted, and promptly provide any additional information requested by the Information Agent or the Scheme Company (or the Group Advisors), including in respect of the Scheme Creditor, or if

it has duly authorised a representative or appointed a proxy to submit the New Notes Election Form on its behalf, the representative or proxy, and any person who owns or directly or indirectly controls or is the ultimate beneficial owner of the Scheme Creditor, its representative or proxy. Failure to do so may result in delays in screening the Scheme Creditor, the New Notes Election Form not being validly completed and the Scheme Creditor being precluded from participating in the New Notes.

None of the Issuer, Scheme Company, the Existing Notes Trustee, the Agents or the Group Advisors or any of their respective Affiliates, directors, officers, employees or agents assume any responsibility for informing the Existing Noteholders of irregularities with respect to compliance with such procedures.

***Scheme Creditors are responsible for assessing the merits of the Scheme.***

Each Scheme Creditor is responsible for independently assessing the merits of the Scheme. This Explanatory Statement has been prepared without taking into account the objectives, financial situation or needs of any particular Scheme Creditor and, consequently, the information contained in this Explanatory Statement may not be sufficient or appropriate for the purpose for which a Scheme Creditor might use it. Any such Scheme Creditor should conduct their own due diligence and consider the appropriateness of the information in this Explanatory Statement having regard to their own objectives, financial situations and needs, and making an assessment of how this Explanatory Statement and the Scheme will affect them.

Scheme Creditors should consult their own tax, accounting, financial, legal and other advisors regarding the suitability to themselves of the tax, accounting and other consequences of participating or declining to vote in favour of in the Scheme. Each Scheme Creditor must determine, based on its own independent review and such professional advice as it deems appropriate under the circumstances, that participation in the Scheme is fully consistent with its objectives and condition, complies and is fully consistent with all internal policies, guidelines and restrictions applicable to it, and is a fit, proper and suitable action for it. Scheme Creditors are solely liable for any taxes and similar or related payments imposed under the laws of any applicable jurisdiction arising in connection with the Restructuring or the Scheme.

***The Group requires an OFAC Licence in advance of the Scheme Meeting; if the OFAC Licence is not received on terms that would authorise the Scheme Company to proceed with the Scheme Meeting before 11 December 2024, the Scheme Meeting will be postponed, and the Scheme Company may determine not to proceed with the Scheme.***

The Scheme Company has identified that a number of Existing Noteholders or the Account Holder, Intermediary, custodian or other participant in the Clearing Systems through which Existing Noteholders hold their Existing Notes are subject to economic sanctions which impose asset freezes, including over their Existing Notes. As a result of such asset freezes, the Scheme Company considers that it requires the OFAC Licence for U.S. persons who are Existing Noteholders and other U.S. persons involved in connection with the Scheme and the Restructuring. The Scheme Company considers that the OFAC Licence is required before the Scheme Meeting can be held. As at the date of the Explanatory Statement, the Issuer has not received the OFAC Licence. OFAC may determine to issue the OFAC Licence, or issue such licence or authorisation on terms, or decline to issue an OFAC Licence. If the Issuer does not receive the OFAC Licence, or such licence or authorisations from OFAC on terms that would authorise the Scheme Company to proceed with the Scheme Meeting by 11 December 2024, the Scheme Company will postpone the Scheme Meeting by notice to Scheme Creditors via the Scheme Website, the Clearing Systems, the Issuer's Website and the SGX-ST. The Scheme Meeting may be postponed one or more times, and if the OFAC Licence, or such licence or authorisations from OFAC on terms that would authorise the Scheme Company to proceed with the Scheme Meeting is not received in advance of the Existing Notes Maturity Date, the Scheme may not proceed.

***Effectiveness of the Scheme requires the approval of Scheme Creditors.***

Pursuant to Part 26 of the Companies Act 2006, the Scheme requires approval of a majority in number representing 75% in value of the single class of Scheme Creditors present and voting either by the Scheme Creditor attending in person or via videoconference link personally or by proxy at the Scheme Meeting ordered to be convened by the Court. If the requisite majority of Scheme Creditors present and voting do not approve the Scheme at the Scheme Meeting, the Scheme will not proceed.

***Scheme Creditors may challenge the Scheme***

Scheme Creditors may challenge the Scheme (including the proposed class composition for the Scheme Meeting) by making submissions at the Scheme Convening Hearing and Sanction Hearing and/or writing to the Court.

***Effectiveness of the Scheme requires the sanction of the Court.***

In order for the Scheme to become effective, it must also receive the sanction of the Court and the Sanction Order must be lodged with the Registrar of Companies. Thereafter, the Scheme shall become effective and binding on all Scheme Creditors (including Existing Noteholders that either did not vote or voted against the Scheme at the Scheme Meeting or who could not vote because they are a Non-Eligible Existing Noteholder).

The Scheme will not be sanctioned by the Court unless the Court is satisfied, amongst other things, that the Scheme is inherently fair, that an intelligent and honest person being a member of the class of Scheme Creditors concerned and acting in respect of his/her own interest might reasonably approve it, and that all statutory and procedural requirements have been fulfilled. There can be no assurance that the Court will determine that the Scheme is inherently fair and/or that an intelligent and honest person being a member of the class concerned and acting in respect of his/her own interest might reasonably approve it, or that the Court will not conclude that there are other reasons why the Scheme should not be sanctioned. If the Court does not sanction the Scheme, the Scheme will not become effective and the Scheme will not proceed.

The Court may also, at the Sanction Hearing, modify, add to or waive any term or condition of the Scheme (including the Scheme Conditions) and/or any of the other Implementation Documents as the Court may think fit. The Scheme Company may consent to such modification, addition or waiver on behalf of itself and all Scheme Creditors, provided that the modification, addition or waiver does not materially affect the economic treatment or any legal right or material obligation of any Scheme Creditor under the Scheme or any other Implementation Document (unless the Scheme Creditor consents) or impose any additional material obligation on a Scheme Creditor, as compared to the treatment of the Scheme Company or other Scheme Creditors under the Scheme or any Implementation Document. If the Court seeks to modify, add to or waive any term or condition of the Scheme or the Implementation Documents in such manner which the Scheme Company considers materially affects the economic treatment or any legal right or material obligation of a Scheme Creditor under the Scheme or any other Implementation Documents, the Scheme Company may not consent to such modification, addition or waiver and the Sanction Order would not be made, the Scheme will not become effective and the Scheme will not proceed.

A person with an interest in the Scheme (whether a Scheme Creditor or otherwise) may attend or be represented at the Sanction Hearing, and may make representations, including that the Scheme should not be approved, and/or may appeal against the granting of the Sanction Order. Such objections at the Sanction Hearing or appeal against the granting of the Sanction Order may delay obtaining the Sanction Order and/or implementation of the Scheme. It is also possible that as a result of the objections and/or appeal against the

granting of the Sanction Order, no Sanction Order is made or the Sanction Order is reversed, in which case the Scheme will not proceed.

***The Scheme may not be recognised or enforced in Mexico or New York.***

Although Scheme Company has sought and obtained reports from independent experts in Mexico (being the jurisdiction of incorporation of the Issuer) and New York (being the governing law of the Existing Notes Indenture) as to the likely recognition of the Scheme in its jurisdiction, there is a possibility that the courts in Mexico and/or New York will not recognise the Scheme. If the courts in those jurisdictions decline to recognise the Scheme, the Scheme may not be enforceable by or against a Scheme Creditor, the Issuer or Scheme Company in Mexico and/or New York (as applicable).

***The Scheme may be varied after the Sanction Hearing.***

After the Sanction Hearing, the terms of the Scheme or any Implementation Document may be amended or waived with the consent of the Scheme Company and the Majority Scheme Creditors (as defined in the Scheme Document), provided that such amendment or waiver does not materially adversely affect the economic treatment or any legal right or material obligation of any Scheme Creditor under the Scheme or any other Implementation Document (unless such Scheme Creditor consents) or impose any additional material obligation on a Scheme Creditor, as compared to the treatment of the Scheme Company or other Scheme Creditors under the Scheme or any Implementation Document.

***Adverse publicity relating to the Scheme may negatively affect the Group's customer and supplier relationships and/or the market perception of the Group's business.***

Adverse publicity relating to the Scheme may negatively impact the Group's customer and supplier relationships (including financial and insurance institutions) and/or the market perception of its business.

Existing suppliers may also choose not to do business with the Group, may demand quicker payment terms and/or may not extend normal trade credit. The Group may find it difficult to obtain new or alternative suppliers.

***The Scheme may not be completed in accordance with the timeline envisaged by this Explanatory Statement.***

Factors unknown to the Scheme Company or the Group as at the date of this Explanatory Statement may result in delays to the completion of the Scheme, including but not limited to the Issuer obtaining the OFAC Licence.

## 3.    RISKS RELATING TO THE RESTRUCTURING

***The Restructuring, if implemented, may be insufficient.***

Whether or not the Scheme and the Restructuring is successful, there is a risk that delivery by the Group of the Restructuring may be insufficient to address the Group's requirements or deliver the projected benefits, either because of factors beyond its control or internal factors relating to the Group.

The Group's ability to deliver upon its future development strategies and implement its business plan will also be influenced by external factors which may mean that the underpinning internal assumptions of the Group may be incorrect and negatively impact the Group's performance ). If the Group's assumptions prove to be materially incorrect either individually or in aggregate, there is a risk that this would impact the

Group's business, operating results, financial condition, prospects and its ability to achieve the targets set out in its business plan.

There remain a number of further actions that the Group needs to undertake in order to be able to deliver its strategy under its future business plan. The successful development and implementation of the Group's strategy may require subjective and complex judgements including those relating to a range of factors which are not within the Group's control or influence, for example, forecasts of economic conditions. In addition, unanticipated events may adversely affect the Group's actual results of operations in future periods, whether or not the assumptions in its business plan otherwise prove to be correct.

### *Discussions with holders of the Cebures remain ongoing*

The Restructuring is subject to the Issuer reaching an agreement regarding amendments to the International Facilities and the Cebures. Whilst discussions with holders of the Cebures remain ongoing, they have not concluded and there is no guarantee that an agreement will be reached with the holders of the Cebures on the terms set out in this Explanatory Statement or at all.

### *Completion of the Restructuring is subject to a number of conditions which are outside of the Scheme Company's control.*

The Scheme forms part of the Restructuring, which comprises a number of inter-conditional steps and transactions. Completion of the Restructuring remains subject to a number of conditions that remain outstanding as of the date of this Explanatory Statement and which may be outside of the control of the Scheme Company, including:

- the approval of the Scheme by a majority in number representing not less 75% by value of the Noteholders that attend and vote at the Scheme Meeting;

- the sanction of the Scheme by the Court; and

- obtaining the OFAC Licence.

**<u>Exhibit E</u>**

**Convening Order**

21 Nov 2024

CLAIM NO. CR-2024-006908

CR-2024-006908

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**INSOLVENCY AND COMPANIES LIST (ChD)**

**Before: Mr Justice Meade**

**Dated: 21 November 2024**

**IN THE MATTER OF MEGA NEWCO LIMITED**

**AND IN THE MATTER OF THE COMPANIES ACT 2006**

---

**ORDER**

---

**UPON THE APPLICATION** by Part 8 Claim Form (the "**Claim Form**") dated 14 November 2024 of Mega Newco Limited, whose registered office is at Suite 1, 7th Floor 50 Broadway, London, United Kingdom, SW1H 0DB and registered number 15986024 (the "**Scheme Company**").

**AND UPON HEARING** Mr Tom Smith KC and Mr Jamil Mustafa, Counsel for the Scheme Company.

**AND UPON READING** the Claim Form and the evidence filed in support.

**AND UPON** the Court recording that in this Order the abbreviations, words and phrases shall have the meanings ascribed to them in the Explanatory Statement hereinafter mentioned.

**IT IS HEREBY ORDERED AND DIRECTED THAT:**

1    The Scheme Company shall be at liberty to convene a meeting of its Scheme Creditors (the "**Scheme Meeting**") for the purpose of considering and, if thought fit, approving (with or without modification) a scheme of arrangement proposed to be made under Part 26 of the Companies Act 2006.

1

2      The Scheme Meeting convened pursuant to paragraph 1 of this order shall be held at the offices of
       Cleary Gottlieb Steen & Hamilton LLP at 2 London Wall, London EC2Y 5AU at 2.00 pm London
       time on 11 December 2024 with any adjournment as may be appropriate, or on such date and time as
       the Scheme Company may notify to the Scheme Creditors, with a live video conference link.

3      The notice of the Scheme Meeting ("**Scheme Meeting Notice**") shall be substantially in the form set
       out at Appendix 3 to the statement required to be required to be furnished pursuant to section 897 of
       the Companies Act 2006 (the "**Explanatory Statement**").

4      At least 20 days before the date of the Scheme Meeting, a copy of the Scheme Meeting Notice shall
       be circulated to the Scheme Creditors by:

   (a)     publication of it on a website created and administered by the Information Agent
           (https://deals.is.kroll.com/grupomega) (the "**Scheme Website**") for the purpose of
           disseminating information to Scheme Creditors regarding the Scheme;

   (b)     publication of it on the website of Operadora de Servicios Mega, S.A. de C.V., SOFOM,
           E.R. (https://www.gfmega.com);

   (c)     circulation to Scheme Creditors via the applicable clearing systems; and

   (d)     circulation to Scheme Creditors via publication on Singapore Exchange Securities Trading
           Limited (SGX-ST).

5      As soon as reasonably practicable after the making of this Order, a copy of the Scheme Document,
       the Explanatory Statement, Notice of Scheme Meeting, the Account Holder Letter and drafts of the
       principal and other related documents that will document the terms of the Scheme (together, the
       "**Scheme Documents**") shall be made available to Scheme Creditors on the Scheme Website and
       notice shall be given by the Information Agent, in the same manner as 4(a) through (d) above to all
       Scheme Creditors known to the Scheme Company as at the date of this Order that the Scheme
       Documents may be accessed via the Scheme Website.

6      Until the date of the Scheme Meeting, electronic copies of the Scheme Documents shall be made
       available for the Scheme Creditors free of charge via the Scheme Website or by email on request to
       the Information Agent at grupomega@is.kroll.com until the date of the Scheme Meeting.

7      The Scheme Documents shall be distributed in the form or substantially in the form of the drafts

submitted to the Court.

8      Unless the Court orders otherwise, the accidental omission to serve any Scheme Creditor the Scheme Meeting Notice or any of the Scheme Documents or the non-receipt of the Scheme Meeting Notice or the Scheme Documents shall not invalidate the proceedings at the Scheme Meeting, or any resolutions passed thereat.

9      In order to vote on the Scheme Meeting and attend the Scheme Meeting in person (or, if a corporation, by a duly authorised representative) or by proxy, Scheme Creditors must ensure that a valid Account Holder Letter is completed and lodged with the Information Agent in accordance with the instructions set out in the Explanatory Statement:

      (a)     online at the Scheme Website; or

      (b)     by email in PDF form to the Information Agent at grupomega@is.kroll.com,

      by no later than the Voting Instruction Deadline at 5:00 p.m. New York time on 9 December 2024.

10    Subject to paragraph 9, Scheme Creditors as at the Record Date (5:00 p.m. New York time on 2 December 2024) will be entitled to vote at the Scheme Meeting.

11    A Scheme Creditor may appoint one person as their proxy, and, if the appointee is not the Information Agent or the Chairperson, may provide in the appointment that the appointee may vote in the appointee's absolute discretion. Any person appointed as proxy for a Scheme Creditor may attend and speak at the Scheme Meeting.

12    Polina Lyadnova of Cleary Gottlieb Steen & Hamilton LLP, or, if for any reason she is unable to act James Armshaw of Cleary Gottlieb Steen & Hamilton LLP, shall be appointed as the chairperson(s) of the Scheme Meeting (the "**Chairperson**").

13    The Chairperson shall:

      (a)     oversee voting;

      (b)     be at liberty, but shall be under no obligation, to accept otherwise incomplete or late notices of Scheme Claims at his or her discretion after the date fixed in the notices (but, for the avoidance of doubt, provided that any such notice of claim is received before the Scheme Meeting is closed).

3

(c)     be at liberty to rely on the electronic confirmations or signatures on the notices of Scheme Claims as a warranty that the signatory (or person submitting such confirmation) has been duly authorised by the relevant Scheme Creditor to sign and submit the notice of Scheme Claim on behalf of that Scheme Creditor without further investigation;

(d)     be at liberty, but shall be under no obligation, to permit the attendance of persons who are not entitled to attend and vote at the Scheme Meeting unless an objection is taken by (or by a person appointed to vote by proxy for) a Scheme Creditor entitled to attend and vote at the Scheme Meeting, but such a person shall not be entitled to speak or vote at the Scheme Meeting without the permission of the Chairperson;

(e)     be at liberty to adjourn the Scheme Meeting to the same or another venue and/or platform, provided that, if adjourned, the Scheme Meeting recommences as soon as reasonably practicable thereafter.

14   The Existing Notes Trustee (and Registered Holder Nominee) (each as defined in the Scheme Document) shall not be permitted to vote at the Scheme Meeting and the Chairperson shall be at liberty to disregard any purported vote in relation to the Scheme by the Existing Notes Trustee (and the Registered Holder Nominee).

15   Scheme Creditors who are Sanctioned Persons, are owned or controlled by Sanctioned Persons, or act on behalf or at the direction of Sanctioned Persons shall not be permitted to vote at the Scheme Meeting and the Chairperson shall be at liberty to disregard any purported vote in relation to the Scheme by any such Scheme Creditors.

16   For the purpose of determining whether the statutory majorities of Scheme Creditors voting for the Scheme proposed by the Scheme Company have been achieved, the Chairperson shall value the claim of each Scheme Creditor. The Chairperson will retain overall discretion in this regard, and will act on information available to him or her. The valuation will be for voting purposes only and will not constitute an admission of the existence or amount of a claim for the purposes of the Scheme and will not bind the Scheme Company or the Scheme Creditor concerned for any other purpose.

17   The Scheme Company and/or the Chairperson shall have permission to apply for such further directions in this matter as they may consider necessary or appropriate.

18   The Chairperson shall file a report on the Scheme Meeting and the voting at the Scheme Meeting prior to the hearing of any application for sanction of the Scheme (assuming the required statutory

majorities are obtained at the Scheme Meeting).

19      Pursuant to rule 5.4D(2) of the Civil Procedure Rules, at least three clear days' notice shall be given to the Scheme Company of any application made by a person for permission under rule 5.4C of the Civil Procedure Rules to obtain a copy of a document from the court records in this matter.

        **AND IT IS DECLARED THAT** Mr Ignacio Javier Gonzalez Delgadillo has been appointed

   (a)   as the Scheme Company's foreign representative (as defined in Section 101(24) of the U.S. Bankruptcy Code) for the purposes of any ancillary proceeding to the Scheme under Chapter 15 of the Bankruptcy Code before a United States Bankruptcy Court; and

   (b)   as representative for the Scheme Company in any proceedings undertaken to recognize the Scheme under the laws of Mexico.

        **AND IT IS FURTHER ORDERED THAT:**

20      The Claim Form be adjourned for further hearing.

21      If the Scheme is approved at the Scheme Meeting by the required statutory majority, the Part 8 Claim Form shall be restored and a further Court hearing at which the Scheme Company shall seek the sanction by the Court of the Scheme shall be listed on 13 December 2024 with a hearing time estimate of one day.

22      There be permission to apply in respect of this Order.

**Service of the order**

The Court has provided a sealed copy of this order to the serving party: Cleary Gottlieb Steen & Hamilton LLP at 2 London Wall, EC2Y 4AU London (United Kingdom). *Ref: P Lyadnova; J Armshaw*

**DATED:**

**Exhibit F**

**Resolution Authorizing Chapter 15 Filing and Appointment of Foreign Representative**

Company No: 15986024

**MEGA NEWCO LIMITED**
(the "**Company**")

Date: 15 November 2024

**Written Resolution**

1. **PREAMBLE**

1.1 The undersigned, being at the date hereof the sole director of the Company entitled to receive notice of a meeting of the directors of the Company (the "**Director**"), hereby passes the following resolutions and agrees that such resolutions shall be for all purposes as valid and effective as if the same had been passed at a meeting of the directors of the Company duly convened and held.

2. **DIRECTORS' DUTIES AND DECLARATION OF INTERESTS**

2.1 The Director acknowledges that he must comply with his directors' duties, including those set out in sections 171-177 of the Companies Act 2006 (the "**Companies Act**"), and that in addition to the general duty to act, in good faith, in a manner which would be most likely to promote the success of the Company for the benefit of its members as a whole, he must have regard (amongst other matters) to each of the factors listed in section 172 of the Companies Act, to the extent relevant to the resolutions to be passed.

2.2 The Director also acknowledges the obligations under the Companies Act and the articles of association of the Company to:

(a) declare the nature and extent of their interests (direct or indirect) in any proposed or existing transaction or arrangement with the Company; and

(b) update any declaration of interests which has become inaccurate or incomplete.

2.3 The Director hereby declares the nature and extent of his interests in accordance with the duty imposed by section 182 of the Companies Act in any existing transactions or arrangements or section 177 of the Companies Act in any proposed transactions or arrangements with the Company which are relevant to the resolution, and which he is required to disclose in accordance with the Company's articles of association, namely that he has no personal interest in the matters of the resolutions.

3. **BACKGROUND**

3.1 The Company is a wholly-owned subsidiary of Operadora de Servicios Mega, S.A. de C.V., SOFOM, E.R., (the "**Issuer**") a *sociedad anónima de capital variable, sociedad financiera de objeto multiple, entidad regulad*a organised and existing under the laws of the United Mexican States.

3.2 The Issuer has engaged in discussions with its creditors with a view to agreeing terms of the restructuring of the Issuer's liabilities (the "**Restructuring**").

3.3 To facilitate the Restructuring, the Company is proposing a scheme of arrangement pursuant to Part 26 of the Companies Act 2006 (the "**Scheme**"), in relation to the 8.250 per cent. senior notes due 11 February 2025.

1

4.      **PURPOSE OF RESOLUTIONS**

4.1     In the context of implementing the Scheme and facilitating the implementation of the Restructuring, of which the Scheme forms an integral part, it has been proposed that the Company approve or ratify (as applicable) the following documents:

   (a)     the Scheme document;

   (b)     the Explanatory Statement under s. 897 of the Companies Act 2006 and the documents annexed thereto.

   (c)     the application to the Court for permission to convene a meeting of the Scheme Creditors including the Claim Form (CPR Part 8) (the "**Application**");

   (d)     the witness statement of José Guillermo Romero Romo ("**JGRR**"), a director of the Issuer, in support of the Application (the "**Convening Witness Statement**");

   (e)     the draft order for directions and granting leave to convene a meeting of the Scheme Creditors; and

   (f)     the draft order sanctioning the Scheme,

(the documents referred to in subparagraphs (a) to (f) being the "**Documents**").

4.2     Further, the Company intends to commence an ancillary proceeding to the Scheme in the United States of America (the "**Chapter 15 Proceeding**") under Chapter 15 of the U.S. Bankruptcy Code (the "**Bankruptcy Code**"), before a United States Bankruptcy Court (the "**U.S. Bankruptcy Court**").

4.3     In connection with the Chapter 15 Proceeding, the Company must appoint a foreign representative as defined in Section 101(24) of the Bankruptcy Code.  The Company proposes to appoint Ignacio Javier Gonzalez Delgadillo as its foreign representative  in connection with the Chapter 15 Proceeding (the "**Foreign Representative**").

5.      **CONSIDERATION OF THE DOCUMENTS AND THE FOREIGN REPRESENATIVE APPOINTMENT**

5.1     The Director has considered, in detail, whether it is in the Company's best interests and to the Company's commercial benefit to:

   (a)     issue the Application and proceed with the Scheme;

   (b)     approve the Documents and authorise the Director to execute those which are to be signed by the Company;

   (c)     authorise JGRR to provide the Convening Witness Statement on behalf of the Company;

   (d)     authorise JGRR to provide any further witness statements in relation to the Scheme on behalf of the Company; and

   (e)     appoint the Foreign Representative,

(the "**Resolutions**")

5.2     After due and careful consideration of the Resolutions and all of the circumstances relating thereto the Director is of the opinion that:

2

(i)     the Company would be approving the Resolutions in good faith;

(ii)    the Company is acting for the purpose of carrying on its business;

(iii)   there are reasonable grounds for believing that approving the Resolutions would benefit the Company;

(iv)   the Company will directly and indirectly benefit thereby;

(v)    the approval of the Resolutions by the Company would promote the success of the Company for the benefit of its members as a whole; and

(vi)   entering into the Documents and approving the Resolutions would not contravene any law or regulation applicable to it, any provision of the memorandum and articles of association of the Company or any agreement or instrument binding on, or any obligations of, the Company.

## 6.    RESOLUTIONS

### 6.1    Documents

(a)    It being in the best interests of the Company and its creditors, the Resolutions be approved.

### 6.2    Foreign Representative Appointment

(a)    It being in the best interests of the Company and its creditors, the Company approves the appointment of the Foreign Representative  and authorises the Foreign Representative to perform any and all actions as necessary on the Company's behalf in connection with the Chapter 15 Proceeding.

### 6.3    Miscellaneous

(a)    The Director, be and is hereby authorised to do all such other acts which may in his opinion be necessary or incidental, to ensure that the Restructuring, the Scheme and the Resolutions are implemented (including, without limitation, executing and delivering any document) and that the Director be and is hereby authorised to sign (or in the case of a deed to execute as a deed) and deliver any documents on behalf of the Company which in the Director's opinion is necessary or incidental for the purposes of carrying out the Restructuring, the Scheme and the Resolutions.

(b)    The Director be and is hereby authorised to take all steps necessary to ensure completion of the matters referred to in these resolutions.

(c)    Any and all actions previously or hereafter taken in the name and on behalf of the Company by the Director in connection with or related to any of the matters referred to in these resolutions be, and hereby is affirmed, approved and ratified in all respects as the acts and deeds of the Company.

*[Signature page to follow]*

3

**IN WITNESS WHEREOF,** the undersigned have executed these written resolutions as of the day and year first above written.

Mega Newco Limited

By: _____

Name:  Ignacio Javier Gonzalez Delgadillo
Title:    Director

**<u>Exhibit G</u>**

**Deed of Release**

**DATED _____2024**


**BETWEEN**



**(1)    THE SCHEME COMPANY**

**(2)    THE ISSUER**

**(3)    THE EXISTING NOTES TRUSTEE**

**(4)    THE INFORMATION AGENT**

**(5)    THE CASH SETTLEMENT AGENT**

**(6)    THE NEW NOTES SETTLEMENT AGENT**

**(7)    THE HOLDING PERIOD ESCROW AGENT**

**(8)    THE SCHEME CREDITORS**



---

**DEED OF RELEASE**

---

**THIS DEED IS MADE ON _____ 2024**

**BETWEEN:**

1.   **MEGA NEWCO LIMITED**, a company incorporated under the laws of England and Wales, with its registered office at Suite 1, 7th Floor 50 Broadway, London, United Kingdom, SW1H 0DB and registered number 15986024 (the "**Scheme Company**");

2.   **OPERADORA DE SERVICIOS MEGA, S.A. DE C.V., SOFOM, E.R.**, a company incorporated under the laws of Mexico, with its office at Av. Patria 1501, Jardines Universidad, 45110 Zapopan, Jalisco, Mexico (the "**Issuer**");

3.   **WILMINGTON TRUST, NATIONAL ASSOCIATION**, in its capacity as trustee under the Existing Notes Indenture (the "**Existing Notes Trustee**");

4.   **KROLL ISSUER SERVICES LIMITED**, a private company incorporated in England and Wales with registered number 5098454, whose registered office is at The Shard, 32 London Bridge Street, London, United Kingdom, SE1 9SG (or any successor in title) in its capacity as information agent in relation to the Scheme (the "**Information Agent**")

5.   **KROLL ISSUER SERVICES LIMITED**, in its capacity as settlement agent in relation to the Scheme (the "**Cash Settlement Agent**");

6.   **UMB BANK, N.A.**, in its capacity as a settlement agent in respect of the New Notes (the "**New Notes Settlement Agent**");

7.   **OPERADORA DE SERVICIOS MEGA, S.A. DE C.V., SOFOM, E.R.**, in its capacity as escrow agent under the Holding Period Escrow Agreement (the "**Holding Period Escrow Agent**"); and

8.   **THE SCHEME CREDITORS**, acting by the Company pursuant to the authority conferred upon the Scheme Company by the Scheme Creditors under clause 4.1 (*Scheme Company's Authority to Execute the Implementation Documents*) and clause 6 (*Releases*) of the Scheme Document,

each an "**Party**" and together the "**Parties**".

**WHEREAS:**

(A)   The Scheme Company proposed a scheme of arrangement under Part 26 of the Companies Act 2006 in relation to its liabilities under the US$500,000,000 8.250% senior notes due 11 February 2025 issued by the Issuer and guaranteed by the Scheme Company (the "**Scheme**").

(B)   The Scheme has become effective in accordance with its terms.

(C)   Pursuant to clause 4.1 (*Scheme Company's Authority to Execute the Implementation Documents*) and clause 6 (*Releases*) of the Scheme Document, the Scheme Company is authorised by the Scheme Creditors to execute this Deed on behalf of each of the Scheme Creditors and to provide the releases set out herein in favour of the Released Parties.

(D)   Pursuant to clause 4.2 (*Undertaking Transaction Parties' Authority*) and clause 6 (*Releases*) of the Scheme Document, the Undertaking Transaction Parties are

2

authorised and instructed by the Scheme Creditors to execute the Implementation Documents (including this Deed) and provide the releases set out herein to the Released Parties.

(E)    The Parties hereto have agreed to enter into and execute and deliver this Deed on the terms set out below.

(F)    It is intended that this document takes effect as a deed notwithstanding the fact that a Party may only execute this document under hand.

**IT IS AGREED** as follows:

**1    DEFINITIONS AND INTERPRETATION**

Capitalised terms used in this Deed and not defined herein shall have meanings ascribed to them in the Scheme Document (as defined below).

1.1    **In this Deed:**

"**Adviser Released Parties**" means the persons or entities listed at Schedule 2 (*Adviser Released Parties*) to this Deed.

"**Company Parties**" means the Scheme Company and the Issuer.

"**Connected Parties**" means, in relation to a person, any of its current and former Affiliates or Related Entities, and each such person's and its Affiliates' and Related Entities' (and their Affiliates') current and former officers, managers, directors, predecessors, successors, assigns, principals, employees, agents, managed accounts or funds, management companies, fund advisers, investment managers or advisors (and any entity and its Affiliates which: (i) is managed or advised by such person's investment manager or advisor; or (ii) such person manages or advises in its capacity as investment manager or advisor), advisory board members, financial advisers, partners, accountants, attorneys, investment bankers, consultants, representatives and other professionals, each in their capacity as such.

"**Dispute**" has the meaning given to it in Clause 13.2.1 (*Governing Law*).

"**Group Member**" means the Issuer, the Scheme Company and each other member of the Group.

"**Released Parties**" means the Adviser Released Parties, the Transaction Released Parties, the Company Parties and each such person's Connected Parties.

"**Scheme Default**" means a "Default" (as such term is defined in the Existing Notes Indenture) which has occurred and is continuing under the Existing Notes Indenture prior to the Restructuring Effective Date, which is either the subject of a waiver (whether under the Lock-Up Agreement, the Scheme Document or otherwise) or which is caused by, or is a consequence of, cancelling the Existing Notes and/or the Scheme and/or the Restructuring and/or any necessary steps taken in relation to the implementation thereof (whether occurring before, on or after the Restructuring Effective Date).

"**Scheme Document**" means the composite document between the Scheme Company and Scheme Creditors containing, among other things, the terms of the Scheme (including all appendices, schedules and annexures thereto) in the form sanctioned by the Court pursuant to the Companies Act 2006.

3

"**Security**" means a mortgage, charge, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Transaction Released Parties**" means the persons or entities listed in Schedule 1 *(Transaction Released Parties)* to this Deed.

1.2 **Construction**

In this Deed, unless the context otherwise requires or otherwise expressly provides for:

1.2.1 references to clauses and schedules are references to clauses of, and schedules to, this Deed;

1.2.2 references to the Scheme Company or any other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees;

1.2.3 references to a person include references to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

1.2.4 references to a statute or statutory provision include references to the same as subsequently modified, amended, supplemented or reenacted from time to time;

1.2.5 references to an agreement, deed or document shall be deemed also to refer to such agreement, deed or document as amended, supplemented, restated, verified, replaced and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto;

1.2.6 references to an agreement, deed or document shall include any schedules, annexes and appendices to such agreement, deed or document;

1.2.7 the singular includes the plural and vice versa and words importing one gender shall include all genders;

1.2.8 "including" or "include" means including or include without limitation;

1.2.9 "or" is not exclusive; and

1.2.10 headings to clauses are for ease of reference only and shall not affect the interpretation of this Deed.

**2 WAIVER AND RELEASE**

2.1 **Restructuring Waiver and Release**

Subject to clause 3 (*Limitation*) below, with effect on and from, and subject to the occurrence of, the Restructuring Effective Date and in consideration for the rights conferred on each Party pursuant to the Scheme and the Restructuring, each of the Parties, without recourse, liability, representation or warranty, for and on behalf of itself and on behalf of its Connected Parties (and, in the case of a Scheme Creditor, on behalf of any person to whom it may have transferred its Scheme Claim after the Record Date), irrevocably, unconditionally, fully and absolutely, to the fullest extent permitted by law, waives, releases and discharges all Liabilities of each Released Party and each and every Claim which each such Party and its Connected Parties (and, in the case of a Scheme Creditor, on behalf of any person to whom it may have transferred its Scheme Claim after the Record Date) may have against any Released Party, in each case, arising

4

out of or in connection with any act or omission by any Released Party occurring prior to the Restructuring Effective Date relating to the preparation, negotiation, sanction, execution or implementation of the Lock-Up Agreement, the Scheme, the Implementation Steps, the Implementation Documents and/or the Restructuring (but, for the avoidance of doubt, not including any Liabilities arising out of the Scheme Claims, the Existing Notes or the Existing Indenture).

2.2      **Scheme Waiver and Release**

The release of the Scheme Claims under Clause 6.2 (*Releases*) of the Scheme Document is the primary release of the Scheme Claims in accordance with the terms of the Scheme (which, for the avoidance of doubt, includes effecting the release of any Scheme Claims which may be held, at any time, by each of the Company Parties in respect of the Existing Notes, in each case, arising directly or indirectly out of, or resulting from, any Implementation Step being taken in accordance with the terms of the Implementation Deed). In addition, for the avoidance of doubt and subject to clause 3 (*Limitation*) below, with effect on and from, and subject to the occurrence of, the Restructuring Effective Date, each of the Parties, for and on behalf of itself and on behalf of its Connected Parties, irrevocably, unconditionally, fully and absolutely, to the fullest extent permitted by law, waives, releases and discharges:

2.2.1    any rights, title and interest it has in the Scheme Claims; and

2.2.2    all Liabilities of each Released Party and each and every Claim which such Party or its Connected Parties may have against any Released Party, in each case, arising out of or in connection with:

i.      the Scheme Claims; and/or

ii.     the Existing Notes and the Existing Indenture.

2.3      **Scheme Defaults**

Subject to clause 3 (*Limitation*) below, with effect on and from, and subject to the occurrence of, the Restructuring Effective Date, pursuant to the releases in clause 2.1 (*Restructuring Waiver and Release*) and clause 2.2 (*Scheme Waiver and Release*) of this Deed, each of the Scheme Creditors and the Existing Notes Trustee hereby acknowledges and agrees that:

2.3.1    each and every Scheme Default is hereby fully and finally waived;

2.3.2    each and every right of any Scheme Creditor or the Existing Notes Trustee to take any action in respect of a Scheme Default is fully and finally released; and

2.3.3    any actions taken by a Released Party in connection with the Lock-Up Agreement, the Restructuring, the Scheme and/or the Implementation Documents shall not constitute a breach of, or an event of default under, the Existing Notes or the Existing Notes Indenture.

**3        LIMITATION**

The releases, waivers and discharges effected by the terms of clause 2 (*Waiver and Release*) shall not extend to any Claims by any Party in respect of:

3.1      any Liability of any Adviser Released Party or any auditor of any Company Party arising under a duty of care to such Adviser Released Party's or auditor's client or arising under a duty of care to another person which has been specifically and expressly accepted or acknowledged in

5

writing by that Adviser Released Party or auditor;

3.2    any Liability or Claim (or any remedy in respect thereof) arising or resulting from fraud or gross negligence by any Released Party;

3.3    any Liability of a Party arising under the Scheme and/or any of the Implementation Documents which may arise or accrue in relation to acts, omissions and/or circumstances occurring after the Restructuring Effective Date;

3.4    any rights or remedies of any Party in respect of any Allowed Proceedings; or

3.5    the New Note Purchase and Placement Agreement, the New Notes Indenture and the New Notes Mexican Trust Agreement.

## 4    COVENANT NOT TO SUE

4.1    Without prejudice to clause 2 (*Waiver and Release*) and subject to clause 3 (*Limitation*) above, each Party hereby irrevocably covenants with each other Party for the benefit of each of the Released Parties or their respective Connected Parties, on and from, and subject to the occurrence of, the Restructuring Effective Date, to the extent permitted by law, not to commence, take or continue or support any person commencing, taking or continuing or instruct, direct or authorise any person to commence, take or continue any Proceedings, other than Allowed Proceedings, against any Released Party or their respective Connected Parties in respect of any Liability or Claim of the relevant Released Parties or their respective Connected Parties which are purported to be released by this Deed.

4.2    In the event that any waiver, release or discharge given under the Scheme Document or this Deed in favour of a Released Party is found by a court of competent jurisdiction to be unenforceable, each Party agrees that Clause 4.1 above shall nonetheless continue to apply so that it shall not (and shall not instruct, encourage or support any other person to) bring or join any Proceedings (other than Allowed Proceedings) against that Released Party relating to the intended subject matter of such waiver, release or discharge.

## 5    REPRESENTATIONS AND WARRANTIES

Each Party represents and warrants to each other Party on the date of this Deed, that the obligations expressed to be assumed by it in this Deed are legal, valid, binding and enforceable obligations and the entry into and performance by it of the transactions contemplated by this Deed, does not and will not conflict with any law or regulation applicable to it or its constitutional documents or any agreement or instrument binding on it or any of its assets.

## 6    FURTHER ASSURANCE

Each Party and Scheme Creditor will, at the request and cost of the Company Parties, do all such things and enter into and execute all such deeds, documents, memoranda, agreements, notices or instruments as may be reasonably necessary and as soon as reasonably practicable to give full effect to the provisions of this Deed.

## 7    RESERVATION OF RIGHTS

7.1    Except as expressly provided in this Deed, this Deed does not amend, vary or waive any Party's rights or remedies under any of the Lock-Up Agreement, the Existing Notes Indenture, the Scheme Document or any Implementation Document or any other document or agreement.

6

7.2    Except as expressly agreed in this Deed, each of the Parties fully reserves any and all rights it may have that are unaffected by this Deed.

7.3    No course of dealing or the failure of any person to enforce any of the provisions of this Deed shall in any way operate as a waiver of such provisions and shall not affect the right of such person thereafter to enforce each and every provision of this Deed in accordance with its terms.

**8    SPECIFIC PERFORMANCE**

8.1    Without prejudice to any other remedy available to any Party, the obligations under this Deed may, subject to applicable law, be the subject of specific performance by the Parties. Each Party agrees and acknowledges for the benefit of each other Party that:

8.1.1    damages may not be an adequate remedy for any breach of the terms of this Deed by any Party; and

8.1.2    specific performance and/or relief to compel performance are appropriate remedies for any such breach and any such remedies shall not be exclusive but shall be cumulative and in addition to any other remedies available to any Party, whether under this Deed or otherwise.

**9    ASSIGNMENT**

9.1    None of the rights or obligations under this Deed may be assigned or transferred without the written consent of the other Parties.

9.2    This Deed shall be binding on all persons to whom:

9.2.1    any Scheme Creditor or the Existing Notes Trustee transfers or assigns a Scheme Claim after the Record Time and who is recognised by the Scheme Company in accordance with Clause 9.6 (Assignments or Transfers) of the Scheme Document; and

9.2.2    any other Party transfers or assigns their rights pursuant to this Deed on or after the date of this Deed.

**10    MISCELLANEOUS**

10.1    If any provision of this Deed is or becomes invalid, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions shall not be affected or impaired in any way.

10.2    This Deed may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Deed.

10.3    Failure by one or more persons ("**Non Signatories**") to execute this Deed on the date hereof will not invalidate the provisions of this Deed as between the Parties who do execute this Deed. Such Non Signatories may execute this Deed on a subsequent date and will thereupon become bound by its provisions.

10.4    If at any time there shall be a conflict between the provisions of this Deed and the provisions of the Scheme, the provisions of the Scheme shall prevail.

10.5    This Deed is not, and shall not be represented or construed by any Party as, an admission of liability or wrongdoing by any Party, any Party's Related Party or any other person or entity.

7

**11      AMENDMENTS AND WAIVERS**

Notwithstanding any provision of this Deed, any term of this Deed may be amended or waived only with the prior written consent of all Parties.

**12      THIRD PARTY RIGHTS**

12.1    Subject to Clause 12.2 below, the Contracts (Rights of Third Parties) Act 1999 shall not apply to this Deed and no rights or benefits expressly or impliedly conferred by this Deed shall be enforceable under that Act against the Parties to this Deed by any other person.

12.2    Any Released Party (excluding those Released Parties that have entered into this Deed and who therefore shall have the rights accruing hereunder) shall have the right to enforce the relevant terms of this Deed by reason of the Contracts (Rights of Third Parties) Act 1999.

**13      GOVERNING LAW AND JURISDICTION**

13.1    **Governing law**

This Deed and any non-contractual claims arising out of or in connection with it shall be governed by and construed in accordance with English law.

13.2    **Enforcement**

13.2.1    The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Deed (including a dispute relating to the existence, validity or termination of this Deed or any non-contractual obligation arising out of or in connection with this Deed) (a "**Dispute**").

13.2.2    The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

8

**SCHEDULE 1**

**TRANSACTION RELEASED PARTIES**

1. The Issuer.

2. The Scheme Company.

3. Kroll Issuer Services Limited in its capacities as Information Agent and Cash Settlement Agent.

4. Wilmington Trust, National Association in its capacity as Existing Notes Trustee.

5. UMB Bank, N.A. in its capacity as New Notes Settlement Agent.

6. The Issuer in its capacity as Holding Period Escrow Agent.

7. The Depository Trust Company ("**DTC**") in its capacity as depositary under the Existing Indenture in respect of the Existing Notes.

8. Cede & Co. in its capacity as nominee for DTC and as Registered Holder.

9. Each Scheme Creditor.

10. Each member of the Ad Hoc Group.

**SCHEDULE 2**

**ADVISER RELEASED PARTIES**

1.  Cleary Gottlieb Steen & Hamilton LLP.

2.  Mijares, Angoitia, Cortés y Fuentes.

3.  Houlihan Lokey, Inc.

4.  Blink Capital Solutions.

5.  414 Capital Inc.

6.  Tom Smith KC.

7.  Jamil Mustafa.

8.  Latham & Watkins LLP.

9.  Sainz Abogados.

10. Tecnologias Cuentas por Cobrar S.A.P.I. de C.V.

11. Reed Smith LLP.

12. Any of the foregoing's directors, officers, members, representatives, partners, employees, agents, affiliated partnerships (and the partners and employees of such affiliated partnerships), affiliates, Subsidiaries or holding companies (and the directors, officers, members, representatives, employees and agents of those affiliates, Subsidiaries or holding companies).

13. Any local or specialist counsel engaged by any of the foregoing on their own behalf or on behalf of their client(s) or by the client(s) directly in connection with all or any matters concerning or related to the Group, the Scheme and the Restructuring.

## Exhibit H

**English Scheme Proceeding Draft Sanction Order**

CLAIM NO. CR-2024-006908

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**INSOLVENCY AND COMPANIES LIST (ChD)**

**IN THE MATTER OF MEGA NEWCO LIMITED**

**AND IN THE MATTER OF THE COMPANIES ACT 2006**

**Before the Honourable [•]**

**[13] December 2024**

---

### ORDER

---

**UPON THE APPLICATION OF** Mega Newco Limited whose registered office is at Suite 1, 7th Floor 50 Broadway, London, United Kingdom, SW1H 0DB and registered number 15986024 (the "**Scheme Company**"), by Part 8 Claim Form dated 14 November 2024 (the "**Claim Form**") in respect of its proposed scheme of arrangement (the "**Scheme**") proposed pursuant to Part 26 of the Companies Act 2006 (the "**Companies Act**");

**AND UPON** the Court having made an order dated and sealed on 21 November 2024 (the "**Convening Order**") permitting the Scheme Company to convene a meeting of certain of its creditors (the "**Scheme Creditors**") on [11] December 2024 (the "**Scheme Meeting**");

**AND UPON** the Scheme Meeting having been held on [11] December 2024 to consider the Scheme Meeting, the terms of which are contained in the Scheme Document annexed hereto at Schedule A;

**AND UPON** the Court having read the Claim Form, the First Witness Statement of Mr José Guillermo Romo Romero dated 18 November 2024, the First Witness Statement of Mr Alessandro Zorza dated 18 November 2024, the First Witness Statement of Mr Chase Kaniecki dated 18 November 2024, the Second Witness Statement of Mr José Guillermo Romo Romero dated [11] December 2024, and the Second Witness Statement of Mr Alessandro Zorza dated [11] December 2024, the Scheme Document and the Explanatory Statement dated 21 November 2024 made pursuant to Section 897 of the Companies Act;

**AND UPON** each of the Issuer, the Existing Notes Trustee, the New Notes Trustee, the Information

Agent, the Settlement Agent, and Holding Period Escrow Agent undertaking to be bound by the Scheme and to perform those actions which each are required to perform in accordance with the terms of the Scheme;

**AND UPON** hearing Mr Tom Smith KC and Mr Jamil Mustafa, Counsel for the Scheme Company;

**IT IS HEREBY ORDERED AND DIRECTED THAT:**

1      The Scheme in respect of the Scheme Company as set forth in Schedule A hereto is hereby sanctioned pursuant to Part 26 of the Companies Act.

2      This Order be filed by the Scheme Company with the Registrar of Companies in England and Wales as soon as reasonably practicable.

**Service of the order**

The Court has provided a sealed copy of this Order to the serving party: Cleary Gottlieb Steen & Hamilton LLP, 2 London Wall Place, London, England EC2Y 5AU (email: team-mega_restructuring-cgshonly@cgsh.com).  *Ref: P Lyadnova; J Armshaw*

**SCHEDULE A**

**SCHEME DOCUMENT**

## Exhibit I

**Notice List**

| No. | Notice Party Name | Notice Party Address |
|---|---|---|
| 1. | MEGA NEWCO LIMITED | Suite 1, 7th Floor 50 Broadway, London, United Kingdom, SW1H 0DB<br>Attn: Ignacio Gonzalez<br>Email: Ignacio.Gonzalez@gfmega.com |
| 2. | OPERADORA DE SERVICIOS MEGA, S.A. DE C.V., SOFOM, E.R. | Av. Patria 1501, Jardines Universidad, 45110 Zapopan, Jalisco, México<br>Attn: Ignacio Gonzalez<br>Email: Ignacio.Gonzalez@gfmega.com |
| 3. | WILMINGTON TRUST, NATIONAL ASSOCIATION | 50 South Sixth Street, Suite 1290, Minneapolis, MN 55402, United States of America<br>Attn: Barry Ihrke<br>Email: barry.irhke@usbank.com |
| 4. | UMB BANK, N.A. | 100 William Street, Suite 1850, New York, NY 10038, United States of America<br>Attn: Ray Haniff<br>Email: Ray.haniff@umb.com |
| 5. | CLEARY GOTTLIEB STEEN & HAMILTON LLP | 2 London Wall Place, London EC2Y 5AU, England<br>Attn: Polina Lyadnova<br>Email: plyadnova@cgsh.com |
| 6. | MIJRARES, ANGOITIA, CORTÉS Y FUENTES | Javier Barros Sierra 540, 4to piso, Park Plaza I, Colonia Santa Fe, Alcaldía Álvaro Obregón, C.P. 01210, Ciudad de México, México<br>Attn: José Pellón Martínez<br>Email: jjpellon@macf.com.mx |
| 7. | LATHAM & WATKINS LLP | 99 Bishopsgate, London EC2M 3XF, United Kingdom<br>Attn: Jonathan Ifeanyichukwu Akinluyi<br>Email: Jonathan.Akinluyi@lw.com |
| 8. | SAINZ ABOGADOS | Blvd. Manuel Ávila Camacho 24 - Piso 21 Lomas de Chapultepec 11000 CDMX, México<br>Attn: Alejandro Sainz<br>Email: asainz@sainzmx.com |
| 9. | TECNOLOGIAS CUENTAS POR COBRAR S.A.P.I. DE C.V. | Blvd. Adolfo Lopez Mateos 2235, Piso 8, Col. Flor de Marfa, Alvaro Obregon, 0171 o, CDMX, México<br>Attn: Marvin Palavicini<br>Email: mpalavicini@cxc.com.mx |
| 10. | REED SMITH LLP | 1201 North Market Street<br>Suite 1500<br>Wilmington, DE 19801-1163, United States of America<br>Attn: Kurt F. Gwynne; Jason D Angelo<br>Email: KGwynne@ReedSmith.com; JAngelo@reedsmith.com |
| 11. | CIBANCO, S.A., INSTITUCION DE BANCA MULTIPLE | Plaza Campos Elíseos 1, Calz. Gral. Mariano Escobedo 595, Polanco V section, Miguel Hidalgo, CDMX, 11560, México<br>Attn: Delegado Fiduciario a cargo del CIB/4475<br>Email: instruccionesmexico@cibanco.com; creus@cibanco.com; nmejia@cibanco.com |

| 12. | **HOLLAND & KNIGHT LLP** | Holland & Knight LLP, 787 Seventh Avenue, 31st Floor, New York, New York 10019, United States of America<br>Attn: Michael Fruchter<br>Email: Michael.Fruchter@hklaw.com |
| --- | --- | --- |