David H. Botter
Thomas S. Kessler
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza,
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Mega Newco Limited,[1]<br><br>Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No. 24-12031 (MEW) |

**DECLARATION OF POLINA LYADNOVA**
**IN SUPPORT OF VERIFIED PETITION UNDER CHAPTER 15 FOR**
**RECOGNITION OF A FOREIGN MAIN PROCEEDING AND RELATED RELIEF**

I, Polina Lyadnova, declare under penalty of perjury as follows to the best of my knowledge,

information and belief:

1.     I am a solicitor duly admitted to practice in England and Wales and a partner in the

law firm of Cleary Gottlieb Steen & Hamilton LLP ("Cleary"), located at 2 London Wall,

London, EC2Y 5AU, United Kingdom.  I submit this declaration (the "Declaration") in support

of the *Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and*

*Related Relief* (together with the Form of Voluntary Petition filed contemporaneously

---

[1]     The last four digits of Mega NewCo's England and Wales company registration number are 6024.  The
location of Mega NewCo's registered office is Suite 1, 7th Floor 50 Broadway, London, United Kingdom, SW1H 0DB.

herewith, the "Petition") filed in the above-captioned chapter 15 case.[2]    The Petition seeks, among other relief, Chapter 15 recognition of a scheme of arrangement (the "Scheme") under Part 26 of the Companies Act 2006 of the United Kingdom (the "Companies Act") proposed by Mega Newco Limited (the "Mega NewCo"), a private limited company incorporated in England and Wales, to its Scheme Creditors (as defined in paragraph 6 below), to the extent that such Scheme is duly approved by the requisite majority of affected creditors and sanctioned by the Business and Property Courts of the High Court of Justice, sitting in London, England (the "High Court"), all in accordance with applicable English law.

2.    As of the date hereof, a meeting of creditors to consider the proposed Scheme has been convened by order of the High Court on November 21, 2024, and the Scheme remains subject to sanction by the High Court.  The Scheme has been commenced via issuance of the Scheme PSL (as defined in paragraph 14 below) on October 31, 2024, and the initial court filing in its respect was done on November 14, 2024, with the proceedings now bearing the title "IN THE MATTER OF MEGA NEWCO LIMITED" with High Court claim number CR-2024-006908 (the "English Scheme Proceeding").  To date, Cleary has advised Mega NewCo on the Scheme.

3.    Mega NewCo was incorporated in England and Wales as a private limited company, which is a corporation under English law.  Mega NewCo is a wholly-owned subsidiary of Operadora de Servicios Mega, S.A. de C.V., SOFOM, E.R., (the "Parent"), a company incorporated under the laws of Mexico (together with Mega NewCo and its other direct and indirect subsidiaries, the "Group").  The Parent is the issuer of 8.250% Senior Notes due February

---

[2]    Capitalized terms used not defined herein shall have the meaning ascribed in, as applicable, *the Petition and the Declaration of Ignacio Javier Gonzalez Delgadillo in Support of Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief* (the "Foreign Representative Declaration") filed contemporaneously herewith.

2025 (the "Existing Notes") pursuant to an indenture dated February 11, 2020 as amended pursuant to supplemental indentures dated March 30, 2021 and November 1, 2024 (the "Existing Notes Indenture"), by and among the Parent and Wilmington Trust, National Association, as trustee (the "Existing Notes Trustee"). Mega NewCo provided a guarantee in respect of the Existing Notes pursuant to a deed poll dated October 31, 2024 (the "Deed Poll") governed by English law whereby Mega NewCo (i) agreed to be bound by all the terms and conditions of the Existing Notes Indenture as if it were an original party thereto and (ii) acknowledged that it will be jointly and severally liable with the Parent for all obligations and liabilities under the Existing Notes Indenture. Mega NewCo and the Parent also entered into a deed of contribution on October 31, 2024 (the "Deed of Contribution") governed by English law whereby Mega NewCo agreed to pay to the Parent by way of contribution an amount that is equal to Mega NewCo's share of the amount of any payment made by the Parent in respect of any obligation under the Existing Notes.

4.      In addition, on November 1, 2024, Mega NewCo executed the Second Supplemental Indenture (the "Second Supplemental Indenture") pursuant to which it acceded to the Existing Notes Indenture as a guarantor. The Second Supplemental Indenture is governed by New York law.

5.      Following execution of the Deed of Contribution, the Parent has a right of contribution against Mega NewCo in respect of payments made under the Existing Notes.

6.      As set forth in more detail in the Petition, the Scheme is intended to implement the proposed restructuring of the Parent's and Mega NewCo's obligations owed to the holders of the Existing Notes (the "Scheme Creditors") under the Existing Notes Indenture, as long as the requisite majorities of the Scheme Creditors vote for the Scheme and certain conditions precedent

are satisfied.    The Scheme forms part of a wider restructuring of the existing debt obligations of certain entities in the Group.    Pursuant to the Scheme, the Existing Notes held by the Scheme Creditors will be canceled (and all rights and obligations of the parties thereunder shall be terminated) and will be exchanged for (a) cash in USD at 45% of those Existing Notes' par value plus any interest accrued and unpaid thereon (the "Redemption Option"), or (b) for new shares in the Parent (with the same rights as the Parent's existing shares) (the "Equity Option") at par for a price per share (being USD 23.83) determined based on a report prepared by an independent valuer, *provided that* the current controlling shareholders of the Parent retain at least 75% of the Parent's capital post such conversion.  Scheme Creditors will also have the option to subscribe for new notes of the Parent (the "New Notes") to satisfy the terms of a new refinancing facility the Parent entered into on September 18, 2024 with Banco Nacional de Comercio Exterior, S.N.C, as more fully described in the Foreign Representative Declaration.

7.    In this Declaration, after describing my background and qualifications, I provide a description of English law and practice relevant to this Court's consideration of the Petition.    I also wish to advise this Court of the procedures and schedule of events relating to the Scheme underway with respect to Mega NewCo.

8.    In preparing this Declaration, I have reviewed the Petition and relevant provisions of the Companies Act, the Insolvency Act 1986 of the United Kingdom, and other relevant provisions of English law as I consider may relate to chapter 15 and other aspects of U.S. bankruptcy law.

## PROFESSIONAL BACKGROUND AND QUALIFICATIONS

9.    Relevant aspects of my legal background are as follows: I earned a legal specialist degree from Moscow State University of International Relations and a master's degree in international finance from King's College, University of London.    I am a partner in the

restructuring practice of Cleary, and I am qualified to practice law in England and Wales (Solicitors' Regulatory Authority No. 559371)[3].

10.     I have been a practicing attorney concentrating in a broad range of national and cross-border restructuring and insolvency work since 2003, and I regularly publish articles on insolvency and restructuring issues in legal journals and periodicals.   I have experience acting for major debtor corporations, bondholders, equity sponsors, and senior lenders, among others, in a significant number of formal insolvency proceedings, out-of-court restructurings, and other related matters, often with an international element.   In particular, I have considerable experience in matters related to English insolvency law and have advised a number of debtor companies on the proposal of schemes of arrangement to their creditors under the Companies Act.

11.     I, together with other partners and associates in my firm, have been advising the Parent and its subsidiaries, including Mega NewCo, on all legal aspects of the Group's current restructuring, conduct of the Scheme and the extraterritorial effects, and recognition of the same since the beginning of 2024 [4].

**STATEMENTS ON ENGLISH LAW AND PRACTICE**

12.     A scheme of arrangement is a proceeding under the laws of England and Wales that allows a company to effect compromises or arrangements, including by way of restructuring debt liabilities, with their members (i.e., shareholders) or creditors (or any class of them).   One of the uses for schemes of arrangement is the restructuring of debts of companies that are in financial distress, even if those companies are not, in fact, insolvent or in a formal insolvency process. Schemes are particularly useful in circumstances in which hold-out creditors seek an advantage as

---

[3]     https://www.sra.org.uk/consumers/register/person/?sraNumber=559371.
[4]     The information concerning the Scheme provided herein is drawn either from public documents or from my personal knowledge.  Furthermore, I have not relied on any confidential attorney-client communications or on confidential documents prepared in anticipation of litigation.

against similarly-ranked creditors in work-out negotiations, as they enable companies and their creditors in certain instances to obtain court sanction to effect restructuring measures without having to obtain approval from 100% of affected creditors.   Such schemes of arrangement are often referred to as "creditor schemes" to distinguish them from schemes relating to shareholders (often referred to as "member schemes").   As the Scheme proposed by Mega NewCo in the English Scheme Proceeding relates only to a class of its creditors, the remainder of this Declaration will refer to schemes only in that context.

13.    Sections 895 to 899 of the Companies Act permit a "compromise or arrangement" (commonly, a "scheme of arrangement" or "scheme") to be proposed between a company and its creditors or any class of them.   Attached hereto as **Exhibit A** is a true copy of Sections 895 to 899 of the Companies Act.   A scheme must be a genuine and effective arrangement or compromise.  There must be some advantage gained by those creditors of the company that are subject to the scheme that compensates them for the scheme's alteration of their rights (*quid pro quo*).  A proposal that simply seeks to expropriate the rights of creditors cannot be a compromise or arrangement within the meaning of the Companies Act.

14.    A creditor scheme can be initiated by the debtor company applying to the High Court in England for permission to convene a meeting of the relevant creditors whose rights will be affected by the creditor scheme (commonly known as "scheme creditors") to consider and vote on whether to approve the creditor scheme.   The hearing to consider this application is commonly referred to as the "convening hearing."   In accordance with the Practice Statement of the High Court dated as of June 26, 2020, the debtor should give notice of the intended promotion of the scheme to all such scheme creditors so as to give them the opportunity to attend the initial hearing to raise any objections related to the proposed classification of the affected scheme creditors or

any issues relating to the jurisdiction of the High Court to hear the scheme.   In this case, on or about October 31, 2024, Kroll Issuer Services Limited (the "Information Agent") via the clearing systems of DTC, Euroclear Bank S.A./N.V., and/or Clearstream Banking S.A. provided a Practice Statement Letter relating to the Scheme (the "Scheme PSL") to the Scheme Creditors.     The Scheme PSL was also made available via information service of the Singapore Exchange (SGX), on which the Existing Notes are listed, via a website set up by the Information Agent for the purpose of the Scheme as well as via the Parent's website.   The Scheme PSL notified creditors of their right to attend court hearings regarding, and raise objections to, the Scheme.   A copy of the Scheme PSL is attached hereto as **Exhibit B**.

15.      Classification of the affected scheme creditors is an important consideration for the High Court.   Each class of creditors included within the scheme is required to approve the scheme. The class test is based on similarity or dissimilarity of legal rights of the scheme creditors against the debtor company, both as they exist before the scheme and pursuant to the terms of the scheme. The class test is not based upon a similarity of economic interests or objectives.   Creditors whose rights are so dissimilar that they cannot consult together with a view to their common interest must be placed into separate classes for voting purposes and must be given separate meetings to consider and vote on the scheme.

16.      In the present case, the rights of the Scheme Creditors against Mega NewCo and the Parent are the same and will be compromised pursuant to the Scheme in the same way. Indeed, each Scheme Creditor's rights against Mega NewCo are identical under the terms of the Existing Notes Indenture, and pursuant to the Scheme, each of the Scheme Creditors will receive the same options to elect the Redemption Option, Equity Option, or to participate in the New Notes, the terms of which will be the same with respect to each holder thereof.   Accordingly, the

Scheme has only one class of Scheme Creditors and only one meeting of Scheme Creditors (the "Scheme Meeting") will be convened.

17.     The Scheme has specific provisions with respect to certain sanctioned persons. In essence, a sanctioned person is any person, or any person who acts on behalf of or at the direction of a person: (i) who is subject to US, UN, EU (or EU member states) and/or UK economic or financial sanctions (the "Sanctions"); (ii) located, ordinarily resident in or organized under the laws of countries subject to comprehensive Sanctions; or (iii) with whom Mega NewCo, the Parent, the Ad Hoc Group and/or their respective advisers, or certain intermediaries, trustees, and agents involved in the restructuring cannot deal or otherwise engage without breaching Sanctions. Existing Noteholders who are sanctioned persons will not be able to participate in the voting on the Scheme and further will not be able to make their elections as a result of Sanctions, and thus, the Redemption Option will be automatically applied to their Existing Notes. Nonetheless, this does not affect the class composition. Any Existing Noteholder who is or acts for, on behalf of, or at the direction of a sanctioned person receives the same rights under the Scheme; however, it may be restricted in their ability to enjoy those rights. The reason they cannot enjoy those rights is because of a characteristic personal to them, namely that they are subject to applicable Sanctions to which they would be subject irrespective of the Scheme. That personal characteristic has no bearing on class composition.

18.     When deciding whether to give permission to convene the creditors' meetings, the High Court will also consider whether it has jurisdiction over the scheme company. Section 895(2)(b) of the Companies Act defines those companies that can be subject to a scheme of arrangement. It provides that for the purposes of sections 895 to 899 of the Companies Act, a "company" means "any company liable to be wound up under the Insolvency Act 1986." Mega

NewCo is a company that was formed and registered under the Companies Act.    Part IV of the Insolvency Act 1986 provides the statutory basis pursuant to which companies that are formed and registered under the Companies Act can be wound up by the English courts, and Mega NewCo is such a company.    Accordingly, the English courts have *prima facie* jurisdiction to wind Mega NewCo up.

19.    Finally, the High Court will also consider whether there is any reason why it should not exercise its discretion to order the convening of the requested meetings, for example, by reference to reasons of public policy.

20.    The convening hearing took place before the High Court on November 21, 2024. The High Court granted the relief sought by Mega NewCo, (a) ordering that it convene the meeting of its Scheme Creditors on December 11, 2024 to consider and vote on the Scheme and (b) approving the appointment of the Foreign Representative.    A copy of the order made by the High Court at the convening hearing is attached hereto as **Exhibit C**.

21.    All Scheme Creditors were allowed to attend the convening hearing and raise their objections (however, none have done so).

22.    Since permission to convene the scheme meetings was granted by the High Court, on November 21, 2024, Mega NewCo sent notice of the Scheme Meeting and an explanatory statement (providing the background to and explaining the terms of the Scheme, including the Releases (as defined below)) to all Scheme Creditors.

23.    Section 897 of the Companies Act sets out what information must be contained in the explanatory statement.    The explanatory statement must contain a sufficient explanation of the effect of the compromise or arrangement for a typical creditor whose claim is being affected by the terms of the scheme to make a reasonable decision about whether or not to support the

scheme.

24.     After an appropriate period approved by the High Court, the meetings of scheme creditors will be held.   Here, the Scheme Meeting is to be held on or around December 11, 2024 (i.e., 20 days after the notice of the meeting and explanatory statement were circulated to the Scheme Creditors, which is a period of time typically observed in creditor schemes, unless a scheme is urgent, in which case this period may be shortened, with the High Court's permission). All Scheme Creditors are entitled to attend the Scheme Meeting and ask questions about the Scheme.  For a scheme of arrangement to become effective, a simple majority in number representing at least 75% in value of claims held by Scheme Creditors present and voting (including by way of proxy) at the Scheme Meeting must vote in favor of the scheme.

25.     The voting tallies are not required to be scrutinized or confirmed by an independent third party (it being the duty of the chairperson to report to the High Court on the outcome of the relevant meeting), but in this case, they will be scrutinized by the Information Agent.   I (or in my absence or if, for any reason, I am not able to act, James Armshaw, the associate in my team) will chair the Scheme Meeting.

26.     If the meeting results in the approval of the Scheme by the requisite majority of the Scheme Creditors (75% by value and majority by number of those who are present and voting on the Scheme), Mega NewCo will apply for the High Court to sanction the Scheme at a further hearing of the High Court (commonly known as the "sanction hearing").    The explanatory statement is required to include the proposed date for the sanction hearing (in this case, December 13, 2024), and the High Court will publish the hearing times of cases heard before it on its website. Scheme Creditors and other interested persons may appear in person or by counsel and be heard, raise objections, and present evidence at the sanction hearing.

27.     The sanction hearing is not a mere formality.   The High Court has discretion as to whether to sanction the Scheme, and it can hear arguments at this stage both from the Scheme Creditors whose rights would be overtly affected by the Scheme and from other persons whose rights were not overtly affected but who claim they would be prejudiced by the Scheme if it were sanctioned.   In particular, the High Court will examine whether (a) the Companies Act requirements have been satisfied; (b) the Scheme Creditors subject to the Scheme were fairly represented by those who attended the meeting, and the requisite majorities are acting in good faith and are not coercing the minority in order to promote interests that are collateral or different to those of the class of Scheme Creditors in general; and (c) the arrangement is such that an intelligent and honest man, a member of the class of Scheme Creditors concerned and acting in respect of his interest, might reasonably approve.

28.     When considering whether to sanction the Scheme, the High Court will not substitute its own commercial view on the terms of the Scheme for the views of the Scheme Creditors, as the High Court considers that such commercial decisions are best made by those whose commercial interests are at stake, but the High Court is concerned as to whether the terms are such that Scheme Creditors could reasonably approve them.   If the High Court thinks that ulterior motives influenced the approval, it may decide not to sanction the Scheme.   However, if the Scheme appears to the High Court to be ostensibly fair, the High Court will not otherwise judge its commercial merit.   Scheme Creditors have the right to appeal orders of the High Court, including orders in respect of sanctioning the Scheme within a certain period of time following the sanction hearing and are requested to raise the possibility of the appeal with the judge prior to the sanction order being made.

29.     Throughout implementation of the Scheme, the sole director of the Scheme

11

Company, Mr. Ignacio Javier Gonzalez Delgadillo, is authorized, subject to the terms of the Scheme, to administer the Restructuring of Mega NewCo in connection with the Scheme and must continue to comply with his duties as a director provided by the Companies Act (as in force and amended from time to time).

30.    If sanctioned by the High Court, the Scheme will become effective once a certified copy of the High Court's order approving the Scheme has been submitted to the Registrar of Companies for England and Wales, and in accordance with the provisions of the Scheme itself. Each of the Scheme Creditors, the Parent, and Mega NewCo will be bound by the Scheme, whether or not a particular Scheme Creditor participated in the Scheme Meeting or voted in favor of the Scheme.   In the present case, if the Scheme Creditors vote to approve the Scheme at the Scheme Meeting, then it is proposed that the sanction hearing will take place on or around December 13, 2024.

31.    It is well established that a company may, through a scheme, cause the release of third-party rights and obligations that are reasonably connected to the scheme and the facts and circumstances giving rise to it.  In accordance with the applicable case law, the High Court will only consider the release of claims that:

a)    are closely connected with Scheme Creditors' rights as creditors against the scheme company;

b)    are personal and not proprietary rights;

c)    if exercised and leading to a payment by the third-party guarantor, would result in a reduction of Scheme Creditors' claims against the company; and

d)    are "necessary and ancillary" to the Scheme (which would almost always exclude the release of liabilities arising from fraud or willful misconduct).

32.     These stringent tests ensure that the ability to release third-party claims through a scheme is appropriately circumscribed, unlikely to be exploited or abused, and within the jurisdiction of the High Court.  In this case, these tests are met.  Here, each Scheme Creditor will release (pursuant to the Scheme) any and all claims against Mega NewCo and each of the following (in each case, in their capacities as such):

*Transaction Released Parties*

- the Parent;

- Mega NewCo;

- Kroll Issuer Services Limited in its capacities as Information Agent and Cash Settlement Agent;

- Wilmington Trust, National Association in its capacity as Existing Notes Trustee;

- UMB Bank, N.A. in its capacity as New Notes Settlement Agent;

- The Parent in its capacity as Holding Period Escrow Agent;

- The Depository Trust Company ("<u>DTC</u>") in its capacity as depositary under the Existing Indenture in respect of the Existing Notes;

- Cede & Co. in its capacity as nominee for DTC and as Registered Holder;

- Each Scheme Creditor; and

- Each member of the Ad Hoc Group;

*Adviser Released Parties*

- Cleary Gottlieb Steen & Hamilton LLP;

- Mijares, Angoitia, Cortés y Fuentes;

- Houlihan Lokey, Inc;

- Blink Capital Solutions;

- 414 Capital Inc;

- Tom Smith KC;

- Jamil Mustafa;

- Latham & Watkins LLP;

- Sainz Abogados;

- Tecnologias Cuentas por Cobrar S.A.P.I. de C.V.;

- Reed Smith LLP;

- Any of the foregoing's directors, officers, members, representatives, partners, employees, agents, affiliated partnerships (and the partners and employees of such affiliated partnerships), affiliates, Subsidiaries, or holding companies (and the directors, officers, members, representatives, employees, and agents of those affiliates, Subsidiaries, or holding companies); and

- Any local or specialist counsel engaged by any of the foregoing on their own behalf or on behalf of their client(s) or by the client(s) directly in connection with all or any matters concerning or related to the Group, the Scheme, and the Restructuring,

in connection with the finance documents in respect of the Existing Notes (collectively, the "Existing Notes Finance Documents"), the Scheme Creditors' claims against Mega NewCo and the Parent in connection with the Existing Notes Finance Documents, the negotiation and implementation of the Scheme, and the Group's restructuring (the "Releases"). The Scheme Creditors do not, by virtue of the Releases, waive their rights or remedies under the Scheme or the documents that implement the Group's restructuring, and do not waive their claims arising out of fraud or willful misconduct by any Released Party.

33.     The Releases proposed by the Scheme are necessary and fundamental to the restructuring embodied in the Scheme and the broader restructuring the Scheme supports.  Mega NewCo will be authorized by the Scheme to enter into and deliver the Scheme and the Deed of Release (as a deed, if applicable) on behalf of each Scheme Creditor.  The threshold for Mega NewCo being authorized by Scheme Creditors to do so is the approval by a majority in number (i.e., more than 50%) representing at least 75% in value of the Scheme Creditor (or each class of

creditors) present and voting, either in person or by proxy at the Scheme Meeting.  Scheme

Creditors are advised of the effect of the Releases in the Explanatory Statement and are advised

that the specific purpose of the Scheme on which they are being asked to vote will provide for

(among other things) the grant of a power of attorney to the Parent and Mega NewCo to

irrevocably and unconditionally authorize them to enter into the Scheme and the Deed of Release.

In other words, all Scheme Creditors subject to the Releases will have notice of the Releases, the

ability to vote on the Scheme, and an opportunity to object to the High Court.

34.    The Scheme shall, with effect from, and subject to the occurrence of, the

Restructuring Effective Date, satisfy, waive, and release, fully and absolutely, all claims of

Scheme Creditors.  The waivers and Releases under the Deed of Release are limited in scope to

liabilities that a Released Party has or may have to a Scheme Creditor in relation to, or arising

out of, or in connection with, the preparation, negotiation, or implementation of the Scheme and

the specific steps described in the Scheme for its implementation.  Such Releases will prevent

Scheme Creditors from initiating proceedings against a Released Party in respect of those

liabilities but shall not apply in respect of certain excluded liabilities described therein (including,

but not limited to, liabilities arising from fraud, gross negligence, or willful misconduct).  Mega

NewCo considers that the inclusion of these waivers and Releases in the Scheme and the scope

of such waivers and Releases are, in each case, customary and appropriate in the context of the

Scheme.  These Releases are an integral part of the implementation of the Scheme, providing a

mechanism for the Scheme Creditors to effect the release the claims of Scheme Creditors against

the Parent as well as Mega NewCo in exchange for the Scheme Creditors receiving their Scheme

consideration.  If the Releases provided by the Scheme and Deed of Release were not

implemented, this would undermine its core purpose to extinguish the claims of the Scheme

Creditors under the Existing Notes in exchange for receipt of their Scheme consideration.  The

Releases are therefore necessary to give commercial effect to the compromise in the Scheme.

Importantly, when determining whether to grant the Sanction Order, the High Court was directed

specifically to consider these same facts and circumstances at the Convening Hearing of the

Scheme.

[<em>Remainder of Page Intentionally Left Blank</em>]

## **CONCLUSION**

I declare under penalty of perjury under the laws of the United States of America that the foregoing

is true and correct to the best of my knowledge, information, and belief.

Executed on this day of November 25, 2024

London, United Kingdom

_____

Polina Lyadnova
Partner, Cleary Gottlieb Steen & Hamilton L

**<u>Exhibit A</u>**

**Sections 895 to 899 of the Companies Act**

*Changes to legislation:* Companies Act 2006, Part 26 is up to date with all changes known to be in force on or before 06 November 2024. There are changes that may be brought into force at a future date. Changes that have been made appear in the content and are referenced with annotations. (See end of Document for details) View outstanding changes



# Companies Act 2006

## 2006 CHAPTER 46

### PART 26

### [F1ARRANGEMENTS AND RECONSTRUCTIONS: GENERAL]

**Textual Amendments**

F1    Pt. 26 heading substituted (26.6.2020) by Corporate Insolvency and Governance Act 2020 (c. 12), s. 49(1), **Sch. 9 para. 35(2)** (with ss. 2(2), 5(2))

**Modifications etc. (not altering text)**

C1    Pt. 26 power to apply (with modifications) conferred (1.8.2014) by Co-operative and Community Benefit Societies Act 2014 (c. 14), **s. 118(1)**(2)154 (with Sch. 5)

C2    Pts. 1-39 modified (31.12.2020) by Regulation (EC) No. 2157/2001, Art. AAA1(3) (as inserted by The European Public Limited-Liability Company (Amendment etc.) (EU Exit) Regulations 2018 (S.I. 2018/1298), regs. 1, **97** (with regs. 140-145) (as amended by S.I. 2020/523, regs. 1(2), 5(a)-(f)); 2020 c. 1, Sch. 5 para. 1(1))

C3    Pts. 26, 26A applied (with modifications) (E.W.) (15.3.2024) by The Water Industry (Special Administration) Regulations 2024 (S.I. 2024/205), regs. 2(2), **55-63** (with reg. 64)

C4    Pt. 26 applied (6.4.2008) by S.I. 2001/1228, Sch. 6 paras. 5, 6 (as amended by The Companies Act 2006 (Consequential Amendments etc) Order 2008 (S.I. 2008/948), art. 3(1), **Sch. 1 para. 223(4)** (with arts. 6, 11, 12))

C5    Pt. 26 applied (6.4.2008) by 2000 c. 8, ss. 105(5) (as substituted by The Companies Act 2006 (Consequential Amendments etc) Order 2008 (S.I. 2008/948), art. 3(1), **Sch. 1 para. 211(1)** (with arts. 6, 11, 12))

C6    Pts. 1-39 (except for Pt. 7 and ss. 662-669), 45-47 extended (12.5.2011) by The Companies Act 2006 (Consequential Amendments and Transitional Provisions) Order 2011 (S.I. 2011/1265), art. 5(1), **Sch. 1 para. 2**

C7    Pt. 26 applied (with modifications) (E.W.S.) (6.4.2014) by The Industrial and Provident Societies and Credit Unions (Arrangements, Reconstructions and Administration) Order 2014 (S.I. 2014/229), arts. 1, 2(3), **Sch. 2** (as amended (1.8.2014) by The Co-operative and Community Benefit Societies and Credit Unions (Arrangements, Reconstructions and Administration) (Amendment) Order 2014 (S.I. 2014/1822), arts. 1(2), **6**)

---

*Changes to legislation:* Companies Act 2006, Part 26 is up to date with all changes known to be in force on or before
06 November 2024. There are changes that may be brought into force at a future date. Changes that have been made
appear in the content and are referenced with annotations. (See end of Document for details) View outstanding changes

---

*Application of this Part*

**895    Application of this Part**

(1) The provisions of this Part apply where a compromise or arrangement is proposed
between a company and—

    (a)    its creditors, or any class of them, or

    (b)    its members, or any class of them.

(2) In this Part—

        "arrangement" includes a reorganisation of the company's share capital by
the consolidation of shares of different classes or by the division of shares into
shares of different classes, or by both of those methods; and

        "company"—

    (a)    in section 900 (powers of court to facilitate reconstruction or
amalgamation) means a company within the meaning of this Act, and

    (b)    elsewhere in this Part means any company liable to be wound up under
the Insolvency Act 1986 (c. 45) or the Insolvency (Northern Ireland)
Order 1989 (S.I. 1989/2405 (N.I. 19)).

(3) The provisions of this Part have effect subject to Part 27 (mergers and divisions of
public companies) where that Part applies (see sections 902 and 903).

---

**Modifications etc. (not altering text)**

**C8**    Ss. 895-900 applied (with modifications) (1.10.2009) by The Limited Liability Partnerships
(Application of Companies Act 2006) Regulations 2009 (S.I. 2009/1804), regs. 2, **45** (as amended:
(26.6.2020) by The Limited Liability Partnerships (Amendment etc.) Regulations 2020 (S.I.
2020/643), reg. 1(1), **Sch. 3 para. 2(3)(a)(b)(c)** (which amending S.I. is revoked (16.2.2021) by
S.I. 2021/60, reg. 1(1), **2**); and (16.2.2021) by The Limited Liability Partnerships (Amendment etc.)
Regulations 2021 (S.I. 2021/60), reg. 1(1), **Sch. 3 para. 2(2)(3)** (with reg. 4(2))))

---

*Meeting of creditors or members*

**896    Court order for holding of meeting**

(1) The court may, on an application under this section, order a meeting of the creditors
or class of creditors, or of the members of the company or class of members (as the
case may be), to be summoned in such manner as the court directs.

(2) An application under this section may be made by—

    (a)    the company,

    (b)    any creditor or member of the company,

    [**F2**(c)    if the company is being wound up, the liquidator, or

    (d)    if the company is in administration, the administrator.]

[**F3**(3) Section 323 (representation of corporations at meetings) applies to a meeting of
creditors under this section as to a meeting of the company (references to a member
of the company being read as references to a creditor).]

[**F4**(4) This section is subject to section 899A (moratorium debts, etc).]

*Changes to legislation:* Companies Act 2006, Part 26 is up to date with all changes known to be in force on or before 06 November 2024. There are changes that may be brought into force at a future date. Changes that have been made appear in the content and are referenced with annotations. (See end of Document for details) View outstanding changes

**Textual Amendments**

**F2**  S. 896(2)(c)(d) substituted (6.4.2008) for s. 896(2)(c) and preceding word by The Companies Act 2006 (Consequential Amendments etc) Order 2008 (S.I. 2008/948), art. 3(1), **Sch. 1 para. 249(2)** (with arts. 6, 11, 12)

**F3**  S. 896(3) added (6.4.2008) by The Companies Act 2006 (Consequential Amendments etc) Order 2008 (S.I. 2008/948), art. 3(1), **Sch. 1 para. 249(3)** (with arts. 6, 11, 12)

**F4**  S. 896(4) inserted (26.6.2020) by Corporate Insolvency and Governance Act 2020 (c. 12), s. 49(1), **Sch. 9 para. 35(3)** (with ss. 2(2), 5(2))

**Modifications etc. (not altering text)**

**C8**  Ss. 895-900 applied (with modifications) (1.10.2009) by The Limited Liability Partnerships (Application of Companies Act 2006) Regulations 2009 (S.I. 2009/1804), regs. 2, **45** (as amended: (26.6.2020) by The Limited Liability Partnerships (Amendment etc.) Regulations 2020 (S.I. 2020/643), reg. 1(1), **Sch. 3 para. 2(3)(a)(b)(c)** (which amending S.I. is revoked (16.2.2021) by S.I. 2021/60, reg. 1(1), **2**); and (16.2.2021) by The Limited Liability Partnerships (Amendment etc.) Regulations 2021 (S.I. 2021/60), reg. 1(1), **Sch. 3 para. 2(2)(3)** (with reg. 4(2))))

**C9**  S. 896 restricted (24.3.2022) by Commercial Rent (Coronavirus) Act 2022 (c. 12), **ss. 25(2)(c)**, 31(4) (with s. 30)

**897    Statement to be circulated or made available**

(1) Where a meeting is summoned under section 896—

    (a)    every notice summoning the meeting that is sent to a creditor or member must be accompanied by a statement complying with this section, and

    (b)    every notice summoning the meeting that is given by advertisement must either—

        (i) include such a statement, or

        (ii) state where and how creditors or members entitled to attend the meeting may obtain copies of such a statement.

(2) The statement must—

    (a)    explain the effect of the compromise or arrangement, and

    (b)    in particular, state—

        (i) any material interests of the directors of the company (whether as directors or as members or as creditors of the company or otherwise), and

        (ii) the effect on those interests of the compromise or arrangement, in so far as it is different from the effect on the like interests of other persons.

(3) Where the compromise or arrangement affects the rights of debenture holders of the company, the statement must give the like explanation as respects the trustees of any deed for securing the issue of the debentures as it is required to give as respects the company's directors.

(4) Where a notice given by advertisement states that copies of an explanatory statement can be obtained by creditors or members entitled to attend the meeting, every such creditor or member is entitled, on making application in the manner indicated by the notice, to be provided by the company with a copy of the statement free of charge.

*Changes to legislation:* Companies Act 2006, Part 26 is up to date with all changes known to be in force on or before 06 November 2024. There are changes that may be brought into force at a future date. Changes that have been made appear in the content and are referenced with annotations. (See end of Document for details) View outstanding changes

(5) If a company makes default in complying with any requirement of this section, an offence is committed by—

    (a)   the company, and

    (b)   every officer of the company who is in default.

This is subject to subsection (7) below.

(6) For this purpose the following are treated as officers of the company—

    (a)   a liquidator or administrator of the company, and

    (b)   a trustee of a deed for securing the issue of debentures of the company.

(7) A person is not guilty of an offence under this section if he shows that the default was due to the refusal of a director or trustee for debenture holders to supply the necessary particulars of his interests.

(8) A person guilty of an offence under this section is liable—

    (a)   on conviction on indictment, to a fine;

    (b)   on summary conviction, to a fine not exceeding the statutory maximum.

---

**Modifications etc. (not altering text)**

C8   Ss. 895-900 applied (with modifications) (1.10.2009) by The Limited Liability Partnerships (Application of Companies Act 2006) Regulations 2009 (S.I. 2009/1804), regs. 2, **45** (as amended: (26.6.2020) by The Limited Liability Partnerships (Amendment etc.) Regulations 2020 (S.I. 2020/643), reg. 1(1), **Sch. 3 para. 2(3)(a)(b)(c)** (which amending S.I. is revoked (16.2.2021) by S.I. 2021/60, reg. 1(1), **2**); and (16.2.2021) by The Limited Liability Partnerships (Amendment etc.) Regulations 2021 (S.I. 2021/60), reg. 1(1), **Sch. 3 para. 2(2)(3)** (with reg. 4(2))))

---

**898    Duty of directors and trustees to provide information**

(1) It is the duty of—

    (a)   any director of the company, and

    (b)   any trustee for its debenture holders,

to give notice to the company of such matters relating to himself as may be necessary for the purposes of section 897 (explanatory statement to be circulated or made available).

(2) Any person who makes default in complying with this section commits an offence.

(3) A person guilty of an offence under this section is liable on summary conviction to a fine not exceeding level 3 on the standard scale.

---

**Modifications etc. (not altering text)**

C8   Ss. 895-900 applied (with modifications) (1.10.2009) by The Limited Liability Partnerships (Application of Companies Act 2006) Regulations 2009 (S.I. 2009/1804), regs. 2, **45** (as amended: (26.6.2020) by The Limited Liability Partnerships (Amendment etc.) Regulations 2020 (S.I. 2020/643), reg. 1(1), **Sch. 3 para. 2(3)(a)(b)(c)** (which amending S.I. is revoked (16.2.2021) by S.I. 2021/60, reg. 1(1), **2**); and (16.2.2021) by The Limited Liability Partnerships (Amendment etc.) Regulations 2021 (S.I. 2021/60), reg. 1(1), **Sch. 3 para. 2(2)(3)** (with reg. 4(2))))

*Changes to legislation:* Companies Act 2006, Part 26 is up to date with all changes known to be in force on or before
*06 November 2024. There are changes that may be brought into force at a future date. Changes that have been made*
*appear in the content and are referenced with annotations. (See end of Document for details) View outstanding changes*

*Court sanction for compromise or arrangement*

**899    Court sanction for compromise or arrangement**

(1) If a majority in number representing 75% in value of the creditors or class of creditors
or members or class of members (as the case may be), present and voting either in
person or by proxy at the meeting summoned under section 896, agree a compromise
or arrangement, the court may, on an application under this section, sanction the
compromise or arrangement.

[**F5**(1A) Subsection (1) is subject to section 899A (moratorium debts, etc).]

(2) An application under this section may be made by—

(a)    the company,

(b)    any creditor or member of the company,

(c)    if the company is being wound up or an administration order is in force in
relation it, the liquidator or administrator.

[**F6**(c)    if the company is being wound up, the liquidator, or

(d)    if the company is in administration, the administrator.]

(3) A compromise or [**F7**arrangement] sanctioned by the court is binding on—

(a)    all creditors or the class of creditors or on the members or class of members
(as the case may be), and

(b)    the company or, in the case of a company in the course of being wound up,
the liquidator and contributories of the company.

(4) The court's order has no effect until a copy of it has been delivered to the registrar.

**F8**(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**Textual Amendments**

**F5**    S. 899(1A) inserted (26.6.2020) by Corporate Insolvency and Governance Act 2020 (c. 12), s. 49(1),
**Sch. 9 para. 35(4)(a)** (with ss. 2(2), 5(2))

**F6**    S. 899(2)(c)(d) substituted (6.4.2008) for s. 899(2)(c) and preceding word by The Companies Act 2006
(Consequential Amendments etc) Order 2008 (S.I. 2008/948), art. 3(1), **Sch. 1 para. 250(2)** (with arts.
6, 11, 12)

**F7**    Word in s. 899(3) substituted (12.5.2011) by The Companies Act 2006 (Consequential Amendments
and Transitional Provisions) Order 2011 (S.I. 2011/1265), **art. 28(3)**

**F8**    S. 899(5) omitted (26.6.2020) by virtue of Corporate Insolvency and Governance Act 2020 (c. 12), s.
49(1), **Sch. 9 para. 35(4)(b)** (with ss. 2(2), 5(2))

**Modifications etc. (not altering text)**

**C8**    Ss. 895-900 applied (with modifications) (1.10.2009) by The Limited Liability Partnerships
(Application of Companies Act 2006) Regulations 2009 (S.I. 2009/1804), regs. 2, **45** (as amended:
(26.6.2020) by The Limited Liability Partnerships (Amendment etc.) Regulations 2020 (S.I.
2020/643), reg. 1(1), **Sch. 3 para. 2(3)(a)(b)(c)** (which amending S.I. is revoked (16.2.2021) by
S.I. 2021/60, reg. 1(1), 2); and (16.2.2021) by The Limited Liability Partnerships (Amendment etc.)
Regulations 2021 (S.I. 2021/60), reg. 1(1), **Sch. 3 para. 2(2)(3)** (with reg. 4(2))))

**C10**    S. 899 applied (with modifications) (N.I) (14.11.2008)The Insolvency (Company Arrangement or
Administration Provisions for an Industrial and Provident Society) Order (Northern Ireland) 2008
(S.R. 2008/445), **art. 2**

*Changes to legislation:* Companies Act 2006, Part 26 is up to date with all changes known to be in force on or before 06 November 2024. There are changes that may be brought into force at a future date. Changes that have been made appear in the content and are referenced with annotations. (See end of Document for details) View outstanding changes

**C11**    S. 899 applied (with modifications) (23.11.2009) by The Scottish and Northern Ireland Banknote Regulations 2009 (S.I. 2009/3056), reg. 29, **Sch. 1 para. 3**

*[F9Special cases*

**Textual Amendments**

**F9**    S. 899A and cross-heading inserted (26.6.2020) by Corporate Insolvency and Governance Act 2020 (c. 12), s. 49(1), **Sch. 9 para. 35(5)** (with ss. 2(2), 5(2))

**899A    Moratorium debts, etc**

(1) This section applies where—

    (a)    an application under section 896 in respect of a compromise or arrangement is made before the end of the period of 12 weeks beginning with the day after the end of any moratorium for the company under Part A1 of the Insolvency Act 1986 or Part 1A of the Insolvency (Northern Ireland) Order 1989 (S.I. 1989/2405 (N.I. 19)), and

    (b)    the creditors with whom the compromise or arrangement is proposed include any relevant creditors (see subsection (2)).

(2) In this section "relevant creditor" means—

    (a)    a creditor in respect of a moratorium debt, or

    (b)    a creditor in respect of a priority pre-moratorium debt.

(3) The relevant creditors may not participate in the meeting summoned under section 896.

(4) For the purposes of section 897 (statement to be circulated or made available)—

    (a)    the requirement in section 897(1)(a) is to be read as including a requirement to send each relevant creditor a statement complying with section 897;

    (b)    any reference to creditors entitled to attend the meeting summoned under section 896 includes a reference to relevant creditors.

(5) The court may not sanction the compromise or arrangement under section 899 if it includes provision in respect of any relevant creditor who has not agreed to it.

(6) In this section—

        "moratorium debt"—

    (a)    in the case of a moratorium under Part A1 of the Insolvency Act 1986, has the same meaning as in section 174A of that Act;

    (b)    in the case of a moratorium under Part 1A of the Insolvency (Northern Ireland) Order 1989, has the same meaning as in Article 148A of that Order;

        "priority pre-moratorium debt"—

    (a)    in the case of a moratorium under Part A1 of the Insolvency Act 1986, has the same meaning as in section 174A of that Act;

    (b)    in the case of a moratorium under Part 1A of the Insolvency (Northern Ireland) Order 1989, has the same meaning as in Article 148A of that Order.]

**<u>Exhibit B</u>**

**Scheme PSL**

**THIS LETTER REQUIRES YOUR IMMEDIATE AND URGENT ATTENTION AS IT RELATES TO THE SCHEME OF ARRANGEMENT PROPOSED BY MEGA NEWCO LIMITED THAT WILL BE CONSIDERED BY THE COURT AT THE CONVENING HEARING, WHICH IS EXPECTED TO TAKE PLACE ON OR AFTER 21 NOVEMBER 2024.**

**THIS LETTER AND ANY DOCUMENT RELATED HERETO IS NOT, AND SHOULD NOT BE CONSTRUED AS, AN OFFER OF, OR AN INVITATION OR INDUCEMENT TO ENGAGE IN INVESTMENT ACTIVITY IN RELATION TO, ANY SECURITIES. THIS LETTER IS ONLY DIRECTED AT AND MADE AVAILABLE TO, AND ANY MATTERS DESCRIBED HEREIN WILL ONLY BE ENGAGED WITH, SCHEME CREDITORS AND PERSONS WHO HAVE AN INTEREST IN THE EXISTING NOTES. THE EXISTING NOTES MAY NOT BE SOLD, ISSUED OR TRANSFERRED IN ANY JURISDICTION TO OR FROM ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR INVITATION OR SOLICITATION IN SUCH JURISDICTION, OR IN CONTRAVENTION OF THE APPLICABLE LAW. THE EXISTING NOTES OR THE NEW NOTES HAVE NOT AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED. THE EXISTING NOTES AND THE NEW NOTES HAVE NOT BEEN AND WILL NOT BE REGISTERED WITH THE MEXICAN NATIONAL SECURITIES REGISTRY (*REGISTRO NACIONAL DE VALORES*) (THE "RNV"), MAINTAINED BY THE MEXICAN NATIONAL BANKING AND SECURITIES COMMISSION (*COMISIÓN NACIONAL BANCARIA Y DE VALORES*) (THE "CNBV"), AND, THEREFORE, NOR THE EXISTING NOTES NOR THE NEW NOTES MAY BE OFFERED OR SOLD PUBLICLY IN MEXICO. THE INFORMATION CONTAINED HEREIN HAS NOT BEEN REVIEWED OR AUTHORIZED BY THE CNBV.**

**ANY STEPS TAKEN IN RESPECT OF THE SCHEME AND THE RESTRUCTURING MUST BE IN COMPLIANCE WITH ALL APPLICABLE SANCTIONS LAWS AND REGULATIONS, INCLUDING SECURING ANY NECESSARY LICENCES AND APPROVALS FROM COMPETENT SANCTIONS AUTHORITIES.**

**SCHEME CREDITORS MUST RELY ON THEIR OWN EXAMINATIONS OF THE TERMS OF THE SCHEME, INCLUDING THE MERITS AND RISKS INVOLVED.**

**SCHEME CREDITORS SHOULD SEEK THEIR OWN INDEPENDENT FINANCIAL, LEGAL AND TAX ADVICE IMMEDIATELY FROM THEIR FINANCIAL, LEGAL AND/OR TAX ADVISOR.**

**MEGA NEWCO LIMITED**
**Suite 1, 7th Floor 50 Broadway London SW1H 0DB**

**(Registered under the laws of England and Wales with Company Number 15986024)**

**PRACTICE STATEMENT LETTER**

| | |
|---|---|
| **To:** | Wilmington Trust, National Association, as trustee under the Existing Notes Indenture (the "**Existing Notes Trustee**") |
| | All persons who are the ultimate beneficial owners of the Existing Notes (the "**Existing Noteholders**") |
| | The Depository Trust Company as the depositary in respect of certain of the Existing Notes ("**DTC**") |
| | Cede & Co. in its capacity as the registered holder of the global note with respect to the Existing Notes as nominee for DTC (the "**Registered Holder Nominee**") |
| **With a copy to:** | Kroll Issuer Services Limited as information agent of the Scheme Company (the "**Information Agent**") |

31 October 2024

---

**THIS LETTER CONCERNS MATTERS WHICH MAY AFFECT YOUR LEGAL RIGHTS AND ENTITLEMENTS AND YOU MAY THEREFORE WISH TO TAKE APPROPRIATE LEGAL ADVICE ON ITS CONTENTS**

---

Dear Sir/Madam

**Proposed scheme of arrangement in relation to Mega Newco Limited (the "Scheme Company") under Part 26 of the UK Companies Act 2006**

1. **PURPOSE OF THIS LETTER**

1.1     The Scheme Company is proposing the Scheme with the Scheme Creditors in order to facilitate the implementation of a financial restructuring in respect of itself and the Group of which it forms a part.

1.2     This Practice Statement Letter (the "**Letter**") is sent to you pursuant to and in accordance with the Practice Statement issued by the Court.

1.3     The Scheme will alter the rights of Scheme Creditors, including in respect of certain claims that Scheme Creditors may have against the Scheme Company. You are being contacted as the Scheme Company believes that you are a Scheme Creditor entitled to vote on the Scheme. For further information about what constitutes a Scheme Creditor, please refer to paragraph 3.1 below.

2

1.4    In accordance with the Practice Statement, the purpose of this Letter is to inform you:

    (a)    that the Scheme Company intends to formally propose the Scheme to the Scheme Creditors;

    (b)    of the background to and purpose and effect of the Scheme;

    (c)    that the Scheme Company intends to apply at a Convening Hearing to be held on or around 21 November 2024 for an order from the Court to convene a meeting of the Scheme Creditors for the purposes of considering and, if thought fit, approving the Scheme (the "**Scheme Meeting**");

    (d)    of the intended composition of a single class of Scheme Creditors for the purpose of voting on the Scheme at the Scheme Meeting;

    (e)    of the basis on which the Scheme Company considers that the Court has jurisdiction in relation to the Scheme;

    (f)    of your right to attend the Convening Hearing and the subsequent Sanction Hearing;

    (g)    of the matters to be addressed at the Convening Hearing, including any Scheme Issues (as defined below);

    (h)    of the next steps and actions required of the Scheme Creditors; and

    (i)    of how you may make further enquiries about the Scheme.

1.5    This Letter is being sent to the Information Agent so that the Information Agent can make the Letter available to Scheme Creditors by:

    (a)    distributing it to Scheme Creditors via the Clearing Systems; and

    (b)    making it available at the Scheme Website that may be accessed at https://deals.is.kroll.com/grupomega . If any Scheme Creditors have difficulty accessing the Scheme Website, please contact the Information Agent using the contact details set out in Section 16 (*Contact Details*).

1.6    This Letter is also being sent to the Existing Notes Trustee in its capacity as notes trustee under the Existing Notes Indenture by email.

1.7    The time, date and location of the Scheme Meeting will be confirmed in the Explanatory Statement, which, provided that the Court gives its permission to convene the Scheme Meeting, will be circulated to Scheme Creditors shortly after the Convening Hearing. The Scheme Documents will further explain how the Scheme Creditors may vote at the Scheme Meeting and provide additional details of the terms of the Scheme.

1.8    All Scheme Creditors, other than any Existing Noteholder that is prohibited from voting their Existing Notes by applicable law or regulation (including as a result of being a Sanctioned Noteholder) (a "**Non-Voting Existing Noteholder**"), will be entitled to vote at the Scheme Meeting.

1.9    Scheme Creditors should seek professional advice if they have any concerns about the matters set out in this Letter. For any concerns which relate to the jurisdiction of the Court or constitution of the Scheme Meeting, or any concerns that may affect the conduct of the Scheme Meeting, Scheme Creditors should contact the Information Agent as soon as possible using the contact details set out in Section 16 (*Contact Details*).

1.10    Capitalised terms in this Letter shall have the meanings given to them under, and general terms shall be construed in accordance with, Schedule 1 (*Definitions*) of this Letter unless, in either case, inconsistent with the subject or context.

***If you have assigned, sold or otherwise transferred your interests in the Existing Notes or you intend to do so before the Record Time, you should forward a copy of this Letter to the person to whom you have or will have assigned, sold or otherwise transferred such interests.***

## 2.    WHAT IS A SCHEME OF ARRANGEMENT

2.1    A scheme of arrangement is a statutory procedure provided for under Part 26 of the Act allowing a company to enter into a compromise or arrangement with its creditors (or classes of creditors) and for the terms of that compromise or arrangement to bind non-consenting or dissenting minority creditors. The Scheme being proposed is a creditors' scheme and so no further references are made below to the position of members under Part 26 of the Act.

2.2    If the Court is satisfied at the Convening Hearing that the Court has jurisdiction in relation to the proposed Scheme and that the proposed class or classes of Scheme Creditors for voting purposes have been correctly constituted and that there is no obvious "roadblock" to the Scheme being sanctioned, then the Court will order the Scheme Meeting for the relevant class or classes of creditors to be convened.

2.3    The Convening Hearing will take place on 21 November 2024 and Scheme Creditors will be informed of the precise time and location of the Convening Hearing via the Information Agent (and the details will also be made available via the Scheme Website), the Clearing Systems, and Singapore Exchange Securities Trading Limited ("**SGX-ST**") (the exchange on which the Existing Notes are listed) as soon as the details have been confirmed by the Court.

2.4    The Scheme Company will draw any relevant issues raised by any Scheme Creditor to the Court's attention at the Convening Hearing. Scheme Creditors have the right to attend the Convening Hearing themselves or through counsel and to make representations at the Convening Hearing, although they are not obliged to do so.

2.5    A scheme of arrangement will take effect between a company and its creditors (or classes of creditors) and become binding on all the creditors to whom it applies if:

(a)    the scheme is approved by a majority in number (i.e. more than 50 per cent.) representing at least 75 per cent. in value of the creditors (or each class of creditors) present and voting, either in person or by proxy at the relevant scheme meeting;

(b)    at the sanction hearing, the scheme is subsequently sanctioned by the Court under section 899 of the Act; and

(c)      a copy of the order sanctioning the scheme is delivered to the Registrar of Companies for England and Wales for registration.

2.6      If a scheme of arrangement becomes effective, it will bind the scheme company and all scheme creditors according to its terms, including those scheme creditors who did not vote on the scheme (including because they are a Non-Voting Existing Noteholder) or who voted against it.

2.7      The Scheme Company considers that the time period from the publication of this Letter until the anticipated date of the Convening Hearing is adequate time for the Scheme Creditors to consider the Letter.

**3.      WHO IS ENTITLED TO VOTE AND WHOSE RIGHTS ARE AFFECTED BY THE SCHEME?**

3.1      The Scheme will alter the rights of Scheme Creditors. Existing Noteholders (meaning any holder of an ultimate economic or beneficial interest as principal in the Existing Notes, including through an Account Holder, broker or other intermediary) at the Record Time will be Scheme Creditors for the purposes of this Letter.

3.2      If the Scheme is sanctioned by the Court and the sanction order is duly delivered to the Registrar of Companies such that the Scheme becomes effective, all Scheme Creditors (including those who do not vote in favour of the Scheme and those who do not vote at all (including because they are a Non-Voting Existing Noteholder)) and the Scheme Company will be bound by its terms.

**4.      BACKGROUND TO THE SCHEME COMPANY AND THE GROUP**

4.1      The Issuer is a *sociedad anónima de capital variable* (variable capital stock corporation), *sociedad financiera de objeto múltiple, entidad regulada* (regulated multiple purpose corporation) organized under the laws of Mexico is a company incorporated and existing under the laws of Mexico and with registered main address at Av. Patria 1501, Jardines Universidad, 45110 Zapopan, Jalisco, Mexico.

4.2      The Scheme Company is a private company limited by shares incorporated in England and Wales under registered number 15986024 and with registered address at First Floor Templeback, 10 Temple Back, Bristol, BS1 6FL, United Kingdom. The Scheme Company has no substantial operations of its own. The Scheme Company is a direct subsidiary of the Issuer.

4.3      The Group is a leading Mexican regulated multiple purpose financial provider, based in Guadalajara, Jalisco, with more than 20 years of operating experience. It specialises in four main business lines: leases, lending, auto loans and factoring. In addition to its headquarters located in Guadalajara, the Group has other branches throughout Mexico, located in Mexico City, Puebla, Querétaro, and Leon, and one additional office located in San Diego, California.

4.4      The Group offers leases for machinery and equipment (including computer numerical control (CNC) machines and bending machines), transportation vehicles (including cargo and passenger vehicles) and other capital assets used in a variety of industries in Mexico. The Group also provides financing to small and medium-sized businesses for the acquisition of durable goods and equipment (such as greenhouses and macro-tunnels), as well as liquidity and financing solutions for their working capital needs. The Group's auto loans business line is based in San Diego, California, and specializes in loans for the purchase of pre-owned personal vehicles.

5

4.5      The Group's operations are regulated by the CNBV and CONDUSEF.

**5.      DEBT STRUCTURE OF THE GROUP**

5.1      The purpose of the Scheme is to implement a restructuring of the Existing Notes as part of the wider Restructuring. Further details on the Existing Notes are as follows:

(a)      The Issuer and the Scheme Company are liable in respect of the Existing Notes being the 8.250 per cent. senior notes due 11 February 2025 issued by the Issuer pursuant to an indenture dated 11 February 2020, between amongst others, the Issuer and the Existing Notes Trustee (as amended or supplemented from time to time).

(b)      The Existing Notes rank equally with the unsecured indebtedness of the Issuer (except those obligations preferred by operation of law) and will be senior to any subordinated indebtedness of the Issuer.

(c)      The Scheme was incorporated on 30 September 2024 in preparation for proposing the Scheme. On 31 October 2024, the Scheme Company executed a deed poll, pursuant to which (i) it agreed to be bound by all the terms and conditions of the Existing Notes Indenture as if it were an original party thereto and (ii) it acknowledged that it will be jointly and severally liable with the Issuer for all obligations and liabilities under the Indenture. Following execution of the Deed Poll, the Scheme Creditors have the right to claim against the Scheme Company in respect of any obligations under the Existing Notes.

(d)      The Scheme Company and the Issuer (together, the "**Companies**") entered into a deed of contribution on 31 October 2024 (the "**Deed of Contribution**"), pursuant to which the Scheme Company has irrevocably and unconditionally agreed to pay to the Issuer by way of contribution an amount that is equal to the Scheme Company's share of the amount of any payment made by the Issuer in respect of any obligation under the Existing Notes. Following execution of the Deed of Contribution, the Issuer has a right of contribution against the Scheme Company in respect of payments made under the Existing Notes.

(e)      The guarantee and obligations under the Deed of Contribution provided by the Scheme Company are unsecured and rank equally with unsecured indebtedness of the Scheme Company and are senior to all subordinated indebtedness of the Scheme Company (except those obligations preferred by operation of law).

(f)      The net proceeds from the Existing Notes were used for general corporate purposes.

(g)      As at 31 October 2024 the aggregate principal amount outstanding under the Existing Notes is approximately US$350,958,000. Certain Related Party Existing Noteholders control approximately US$28,069,000 in principal amount of the outstanding Existing Notes.

5.2      The Group is also financed by the following third-party indebtedness:

(a)      *Cebures*

(i)      The Issuer is the issuer of the Mexican law governed Ps. 3,000,000,000 floating rate senior notes (*certificados bursátiles*) due 2027 (the Cebures) pursuant to the terms of the relevant global title governing the Cebures.

6

(ii)   The net proceeds from the issuance of the Cebures were used to finance and invest in sustainable projects, in accordance with the 2021 Green Bond Principles, 2021 Social Bond Principles and 2021 Sustainability Bond Guidelines set forth by the International Capital Markets Association.

(iii)  As at 31 October 2024, the aggregate amount outstanding under the Cebures (including principal and accrued interest) was Ps. 3,000,000,000, equivalent to approximately US$150,000,000 calculated using an exchange rate of Ps. 20 per U.S. dollar.

(iv)   As at the date of this Letter, the Issuer has a number of defaults outstanding under the Cebures, including cross default resulting from defaults across the Issuer's indebtedness, unauthorized change of auditor, delay or failure to comply with certain reporting obligations and information requirements, and failure to comply with certain financial ratios. For further details see Section 6 (*Background to the Restructuring*) paragraph 6.7.

(b)   *Bilateral Facilities*

(i)   *Mexican Facilities*

(1)   The Mexican Facilities comprise eight (8) facilities, each with a different lender. These are working capital facilities and term loans, some of which are secured by pledges over certain lease contracts of the Issuer.

(2)   The Mexican Facilities comprise the following facility agreements:

A.   Credit Agreement dated 26 May 2017, as amended on 4 September 2018, 20 May 2020, 5 August 2020 and 27 May 2021, between the Issuer and HSBC México with a drawn balance as at 30 June 2024 of MXN$1,262,183,479.90 (approximately US$63,109,174.00), and a final repayment date of 31 May 2029, subject to automatic renewals of one-year periods upon each anniversary thereof conditioned upon the compliance with certain requirements;

B.   Promissory Note dated 13 September 2024 issued by the Issuer in favour of HSBC Mexico for a principal amount of MXN200,000,000 (approximately US$10,000,000), and a final repayment date of 12 November 2024;

C.   Credit Agreement dated 21 May 2013, as amended on 19 December 2014, 15 July 2016, 30 November 2016, 16 June 2017, 27 June 2018 and 20 November 2020, between the Issuer and Scotiabank, with a drawn balance as at 30 June 2024 of MXN58,674,333.12 (approximately US$2,933,716.66), and a final repayment date in February 2026;

7

D.      Credit Agreement dated 12 August 2014, as amended on 23 November 2018, 1 November 2019 and 10 March 2023, between the Issuer and Bancomext, with a drawn balance as at 30 June 2024 of MXN960,929,466.93 (approximately US$48,046,473.35), and a final repayment date of 30 September 2029;

E.      Credit Agreement dated 12 August 2019 between the Issuer and Banco del Bajío, with a drawn balance as at 30 June 2024 of MXN67,784,099.96 (approximately US$3,389,205.00), and a final repayment date of 12 August 2029;

F.      Credit Agreement dated 7 January 2022 between the Issuer and Banco Santander, with a drawn balance as at 30 June 2024 of MXN40,590,901.97 (approximately US$2,029,545.10), and a final repayment date of 7 January 2027;

G.      Credit Agreement dated 30 August 2022 between the Issuer and Banco INVEX, with a drawn balance as at 30 June 2024 of MXN165,530,168.23 (approximately US$8,276,508.41), and a final repayment date in September 2026; and

H.      Credit Agreement dated 22 August 2022 between the Issuer and Huruma, with a drawn balance as at 30 June 2024 of EUR8,000,000 (approximately US$10,394,560), and a final repayment date of 22 August 2025.

(3)      As at 30 June 2024, the aggregate amount outstanding under the Mexican Facilities was approximately Ps. 2,556,506,331.36, equivalent to approximately US$127,825,316.57.

(ii)    *International Facilities*

(1)      The International Facilities comprise twelve (12) facilities, each with a different lender. These are primarily used by the Issuer to extend credit to its customers.

(2)      The International Facilities comprise of the following facility agreements and term loans:

A.      A term loan facility agreement dated 8 November 2021 between BlueOrchard and the Issuer providing for:

i.    US$10,000,000 term loan amortising over 48 months; and

ii.    US$10,000,000 term loan amortising over 48 months,

8

with an aggregate drawn balance as at 30 June 2024 of US$11,442,980.

B.    term loan dated 28 June 2021 between Micro, Small & Medium, Enterprises Bonds and the Issuer, with a drawn balance as at 30 June 2024 of MXN115,000,000 (approximately US$5,750,000) and a final repayment date of 1 July 2024;

C.    term loan dated 30 December 2021 between Symbiotics acting with respect to its SEB Microfinance Fund VII and the Issuer with a drawn balance as at 30 June 2024 of MXN20,200,000 (approximately US$1,010,000) and a final repayment date of 24 June 2024;

D.    amortising term loan dated 30 December 2021 between Symbiotics acting with respect to its Global Financial Inclusion Fund and the Issuer with a drawn balance as at 30 June 2024 of MXN10,100,000 (approximately US$505,000) and a final repayment date of 30 December 2024;

E.    amortising term loan dated 30 December 2021 between Symbiotics acting with respect to its Global Microfinance Fund and the Issuer with a drawn balance as at 30 June 2024 of MXN20,200,000 (approximately US$1,010,000) and a final repayment date of 30 December 2024;

F.    US$2,000,000 amortising term loan dated 24 March 2021 between responsAbility and the Issuer, with a drawn balance as at 30 June 2024 of US$400,000 and a final repayment date of 2 April 2024;

G.    amortising term loan facility agreement dated 17 September 2021 and amended on 29 March 2023 between Eco-Business Fund and the Issuer providing for:

    i.    US$15,000,000 term loan amortising over 18 months with a drawn balance as at 30 June 2024 of US$7,500,000; and

    ii.    US$15,000,000 term loan amortising over 18 months with a drawn balance as at 30 June 2024 of US$7,500,000;

H.    US$20,000,000 credit facility dated 31 January 2022 between PROPARCO and the Issuer, with a drawn balance as at 30 June 2024 of US$20,000,000 and a final repayment date of 30 July 2025. In July 2024, PROPARCO transferred the loan to Cleardusk;

9

I.      credit facility dated 2 November 2021, as amended on 6 November 2023, between Triodos and the Issuer, with an outstanding amount of US$8,600,000, and a final repayment date of 19 September 2026;

J.      credit facility dated 5 December 2018, as amended and restated on 6 November 2023, between Legal Owner Triodos B.V. as owner of Triodos Fair Share Fund and the Issuer, with an outstanding amount of US$ 5,000,000, and a final repayment date of 6 November 2028,

K.      US$15,000,000 amortising term loan facility dated 26 March 2021 and amended on 23 June 2022 between Global Climate Partnership Fund and the Issuer, with a drawn balance as at 30 June 2024 of US$14,500,000 and a final repayment date of 30 March 2026; and

L.      US$2,500,000 term loan facility dated 30 March 2021, between Microfinance Enhancement Facility SA, SICAV-SIF (managed by ResponsAbility Investments AG) and the Issuer, with a drawn balance as at 30 June 2024 of US$500,000 and a final repayment date of 2 April 2024.

(3)     As at 30 June 2024, the aggregate amount outstanding under the International Facilities was approximately US$83,717,980.

5.3     The Scheme will only impact the Existing Notes and does not propose to compromise any claims of any holders under the Cebures, creditors under the Mexican Facilities or the International Facilities. Amendments and waivers under the terms of the Cebures, Mexican Facilities and the restructuring of the International Facilities will form part of the Restructuring and will be a condition precedent to implementation of the Scheme and vice versa (as described at Section 7 (*Overview of the Restructuring and the Scheme*) below).

## 6.      BACKGROUND TO THE RESTRUCTURING

*Challenges to the Group's business*

6.1     Despite the Issuer's efforts to comply with its financial obligations, adverse economic conditions beyond the Group's control have impaired the Issuer's business and caused significant operational challenges, which has resulted in the Group facing severe liquidity constraints.

6.2     Numerous factors have contributed to this impairment, (i) the global economic impact of the COVID-19 pandemic, (ii) reduced funding sources, (iii) a mismatch between the maturities of assets and liabilities, and (iv) obligations related to currency hedges on the U.S. Dollar-denominated debt .

To explain some of the above factors in turn:

(a)  **Global Economy**: the global economy has recently experienced a period of volatility and has been adversely affected by a worldwide increase in inflation, loss of confidence in the financial sector, disruptions in the credit markets, reduced business activity, and erosion of consumer confidence. Rising inflationary pressures in the aftermath of the COVID-19 crisis have set the tone for the U.S. Federal Reserve, and central banks around the world, to tighten their monetary policies at a fast pace throughout 2022 and 2023;

(b)  **Sector Headwinds and Sources of Funding:** the non-banking financial sector in Mexico has faced significant headwinds in recent years. Several companies in the sector have seen their ability to meet their payment obligations compromised, leading to diminished investor confidence in the sector. Credito Real, Tangelo, Alpha Credit, and Unifin, previous leaders in in the sector, all have pursued restructuring processes. Despite the Group's strong portfolio and robust risk management practices, funding sources have been severely diminished. This situation is further worsened by a rising interest rate environment, where potential refinancing options for the Group's debt have become exceedingly expensive;

(c)  **Mismatch between Maturities:** historically, the sector was funded through bullet-maturity loans, which created a mismatch between the maturity schedules of the institutions' loan portfolios and the maturity dates of their debt. This forced companies to constantly seek refinancing for these bullet loans to alleviate the timing discrepancy between cash receipts and debt repayment. When the Group encountered this common industry challenge, it was unable to successfully refinance its international notes due to the previously mentioned sector headwinds; and

(d)  **Dollar Exposure:** the Group has funded its operations through debt issuance in foreign currency, and implemented a hedging strategy to mitigate the impact of USD/MXN exchange rate fluctuations. However, in the past few years, market conditions were such that the appreciation of the Mexican Peso against the US Dollar triggered multiple margin calls on the Group's derivative positions, further pressuring the company's liquidity.

*Existing Notes Failed Consent Solicitation*

6.3   In light of the Existing Notes Maturity Date, on 13 October 2023, the Issuer launched an offer to exchange its Existing Notes for a combination of newly issued notes due 2028 and cash consideration of US$70 million, to be distributed pro rata amongst participants depending on the noteholder participation levels. The newly issued notes would have amended debt covenant ratios, interest rate payment mechanics and redemption provisions vis-à-vis the Existing Notes. The exchange offer was conditional upon the participation of more than 50% of the holders of principal amount of Existing Notes outstanding and the funding of a US$70 million intercompany loan by the Issuer's controlling shareholder (for purposes of funding the cash portion of the exchange consideration). Concurrently with the offer to exchange and to incentivize the holders to participate, the Issuer solicited consents to amend and remove substantially all of the restrictive covenants in the Existing Notes. However, less than 35% of the Existing Noteholders participated in the exchange offer and so the required threshold was not met of more than 50% of the holders of the principal amount of the Existing Notes outstanding. Therefore, on 13 November 2023, the Issuer terminated the exchange offer.

*Liquidity constraints*

11

6.4    A decrease of cash receipts has severely impacted the Group's cash flow. At 30 June 2024, the Group had cash and cash equivalents of Ps. $670,282,842.32 (approximately US$33,514,142), approximately US$29,261,250.65 less than in comparison to 30 June 2023.

6.5    As a result of the abovementioned factors, the Issuer has defaulted on certain of its indebtedness, as further elaborated below.

6.6    In addition, the Group is projected to have insufficient funds to repay the Existing Notes (including accrued and Unpaid Interest and additional amounts (if any) thereon) in full on the Existing Notes Maturity Date.

*Defaults*

6.7    As at the date of this Letter, there are a number of outstanding defaults under the Existing Notes, the International Facilities, the Mexican Facilities and the Cebures and certain defaults may be triggered by launching of the Scheme and the Chapter 15 Petition. These include:

   (a)    default for failure to pay principal, interest or any other amounts;

   (b)    defaults as a consequence of delays in the delivery of financial statements;

   (c)    defaults in relation to the appointment of the Issuer's auditor;

   (d)    breaches of financial ratios;

   (e)    defaults triggered by the Issuer's commencement of negotiations with creditors and/or in relation to the Scheme and related proceedings;

   (f)    defaults in reporting obligations and information requirements; and

   (g)    cross-defaults.

*Steps taken by the Group*

6.8    The Group has taken steps to stabilise its liquidity position and manage its long-term debt obligations by undertaking the Restructuring, including the Scheme.

*Negotiations in relation to the Restructuring*

6.9    On 12 August 2024, the Issuer announced that, following a strategic review of its capital structure, it was in the process of engaging with its creditors.

6.10    On 23 August 2024, the Issuer entered into a non-disclosure agreement with the Ad-Hoc Group of certain holders of the Existing Notes, who collectively hold approximately 28.2% of the Existing Notes, to facilitate discussions regarding the Scheme.

6.11    As at the date of this Letter, the Companies have in principle agreed terms with the Ad-Hoc Group (subject to customary conditions, including obtaining the necessary international committee approvals).

6.12    The Companies intend to enter into a lock-up agreement (the "**Lock-Up Agreement**") with, amongst others, the Ad-Hoc Group shortly following the date of this Letter. Once the Ad-Hoc Group have executed the Lock-Up Agreement, the Companies intend to open it for accession by all Existing Noteholders.

6.13    Further details of the Lock-Up Agreement are set out in section 8.

*International Facilities and Mexican Facilities Negotiations*

6.14    By 22 July 2024, the Issuer had in place confidentiality arrangements with all of the International Facilities Lenders to facilitate discussions regarding the Restructuring.

6.15    As of the date of this Letter, the International Facilities Lenders have provided their in principle agreement to the terms of the restructuring of the International Facilities (subject to agreeing the security package and customary conditions, including obtaining the necessary internal committee approvals, conducting limited due diligence, and agreeing final definitive documents).

6.16    The Issuer plans to obtain waivers of any events of default that may have occurred under the Mexican Facilities and consents, to the extent necessary, to permit the implementation of the Restructuring.

6.17    The restructuring of the International Facilities and any waivers and consents required under the Mexican Facilities are condition precedents to implementation of the Scheme and vice versa.

*Cebures Restructuring Negotiations*

6.18    The Issuer is currently engaged in discussions with the holders of the Cebures to obtain waivers in relation to the outstanding defaults under the Cebures and amend the terms of the Cebures as necessary to permit implementation of the Restructuring.

6.19    Between 9 September and 12 September 2024, the Issuer entered into non-disclosure agreements with certain holders of the Cebures to facilitate discussions regarding the Restructuring.

6.20    The waivers and amendments in relation to the Cebures are a condition precedent to implementation of the Scheme and vice versa.

**7.    OVERVIEW OF THE RESTRUCTURING AND THE SCHEME**

*Objectives of the Restructuring*

7.1    The Scheme Company considers that the Restructuring, of which the Scheme will form an integral part, will:

(a)    mitigate the risk of any member of the Group having to file for any formal insolvency or bankruptcy proceedings, on a protective basis or otherwise;

(b)    leave in place a more sustainable capital structure, providing the Group with a strengthened balance sheet and a level of debt that it is capable of servicing going forward;

(c)    provide necessary liquidity for the Group to allow it to continue to rebuild its business and operations; and

13

(d)     allow the Group to obtain new funding to finance its ongoing working capital requirements.

7.2     The key aspects of the Restructuring are described below.

*Overview of the Restructuring*

7.3     The Restructuring will cover (i) the Existing Notes, (ii) the Cebures and (iii) the International Facilities.

7.4     **Treatment of Existing Notes**

(a)     Any Existing Notes owned, held or controlled by, on behalf of or where the relevant holder acts at the direction of a Sanctioned Person on or prior to completion of the Restructuring, shall be restructured on terms such that no Sanctioned Person may receive any funds or economic resources or any other benefit pursuant to the restructuring and always in accordance with Sanctions, including obtaining guidance or authorization by the relevant Sanctions Authorities, as is agreed to be necessary between the legal advisors to the Companies and the Ad-Hoc Group for the purposes of implementing the Restructuring, including a valid license from the U.S. Department of the Treasury's Office of Foreign Assets Control ("**OFAC**").

(b)     Existing Noteholders shall be entitled to elect (by 5:00 p.m. (New York time) on 9 December 2024 (being the "**Voting Instruction Deadline**")) one of the following two options in respect of their Existing Notes:

  (i)     under the first option (the "**Redemption Option**"), the Companies will discharge all liabilities under relevant holder's Existing Notes (including any accrued and unpaid interest) in full on or before the Restructuring Effective Date for cash in USD at 45% of those Existing Notes' par value; or

  (ii)     under the second option (the "**Equity Option**"), liabilities under the relevant holder's Existing Notes (including any accrued and unpaid interest) shall be, on or before the Restructuring Effective Date, assigned to the Issuer and such liabilities shall be converted into new voting shares in the Issuer (with the same rights as the Issuer's existing shares) at par at a ratio to be determined on the basis of an agreed enterprise valuation (to be set out in a report prepared for the Issuer by 414 Capital Inc.), provided that the current controlling shareholders maintain control over the Issuer,

in each case, redemption and/or exchange shall be made in full and final discharge of the Companies' obligations under the Existing Notes.

(c)     On and from the Restructuring Effective Date, the Existing Notes and any documentation relating thereto shall be cancelled and be of no effect.

(d)     The cash consideration paid or payable by the Companies pursuant to the Redemption Option shall be funded out of the proceeds of the New Refinancing Facility, New Notes and/or the Companies' own cash.

(e)     The Redemption Option shall be deemed to automatically apply to (1) any Existing Notes in respect of which no election has been made by the holders thereof within the prescribed time period; and (2) any Existing Notes owned, held or controlled by or on behalf of a Sanctioned Person, provided that in such case, the amount paid to redeem those Existing Notes shall be paid to and shall be held by the Issuer in its capacity as escrow agent (the "**Escrow Agent**") on the terms set out below so as to ensure compliance with Sanctions.

(f)     To the extent the amount of Existing Notes in respect of which Equity Option has been elected is such that the aggregate amount of new voting shares in the Issuer's will be such that the current controlling shareholders' ownership in the Issuer is at or below 75% of the Issuer's voting share capital, the Redemption Option will be applied to the relevant proportion of the Existing Notes automatically on a pro rata basis amongst the electing holders of the relevant Existing Notes to ensure that the amount of new voting shares in the Issuer issued to third parties will be such that the current controlling shareholders' ownership in the Issuer is at 75% of the Issuer's voting share capital following the Restructuring Effective Date.

(g)     To be eligible to elect the Equity Option, Existing Noteholders shall provide Sanctions related representations and confirmations confirming that they are not and they do not act on behalf or at the direction of a Sanctioned Person and provide customary representations with respect to their status for the purposes of any applicable securities laws.

7.5     **New Refinancing Facility**

In connection with the restructuring the Issuer entered into on 18 September 2024 a new secured facility agreement (as amended, the "**New Refinancing Facility**") with Bancomext.

7.6     **New Notes**

(a)     Pursuant to the terms of the New Refinancing Facility, the Issuer is obliged to obtain additional funding (to enable the Restructuring of its existing debt, incur restructuring related expenses as well as for origination purposes) from other sources in the total amount of Ps.1,227,000,000 (or its equivalent in other currencies) (the "**New Notes Base Amount**").

(b)     To satisfy the additional funding requirement the Issuer will issue new notes on or before the Restructuring Effective Date (the "**New Notes**").  The New Notes will be issued in three tranches: Tranche 1 (the "**Tranche 1 New Notes**"), Tranche 2 (the "**Tranche 2 New Notes**") and Tranche 3 (the "**Tranche 3 New Notes**").

(c)     **Tranche 1 New Notes:**

(i)     Tranche 1 New Notes will be subscribed for cash by (i) the existing creditors of the Issuer other than holders of the Existing Notes, (ii) affiliates of existing creditors of the Issuer and/or (iii) third parties.  The Issuer is in the process of offering commitments in respect of Tranche 1 (persons who commit will receive a 2% commitment fee).

(d)     **Tranche 2 New Notes:**

15

(i)     Eligible holders of the Existing Notes will be entitled to subscribe to the Tranche 2 New Notes for cash pro rata to their holding of the Existing Notes. Every holder of the Existing Notes who elects to subscribe for the Tranche 2 New Notes (each, a "**Participating New Noteholder**") will receive, in exchange of part of the Existing Notes equal to the amount of the Tranche 2 New Notes subscribed for cash and in addition to the Tranche 2 New Notes subscribed for cash, the Tranche 2 New Notes at an exchange ratio of 3.5 to 1, such that for every dollar of cash used to subscribe to the Tranche 2 New Notes a Participating New Noteholder will receive:

    (1)     1 dollar of principal amount of the Tranche 2 New Notes (in exchange for cash); and

    (2)     3.5 dollars of principal amount of the Tranche 2 New Notes (in exchange of its Existing Notes); and

    (3)     1 dollar of the principal amount of its Existing Notes will be extinguished.

(ii)    Following this, the relevant holder will be entitled to elect the Redemption Option or Equity Option (as detailed below) in relation to the remaining portion of its Existing Notes only.

(iii)   The holders of the Existing Notes will be required to confirm their election to subscribe to the Tranche 2 New Notes by a specified election date to be no earlier than the date on which a notice of the Scheme Meeting has been distributed by the Scheme Company and no later than the Voting Instruction Deadline.

(iv)    Each Participating New Noteholder shall:

    (1)     provide Sanctions related representations and confirmations confirming that they are not and they do not act on behalf or at the direction of a Sanctioned Person and subscription to and their receipt of New Notes and payment by them for the New Notes are in compliance with Sanctions;

    (2)     provide customary representations with respect to their status for the purposes of any applicable securities laws; and

further, the minimum subscription amount shall be no less than USD200,000.

(v)     **Tranche 2 New Notes Backstop Commitment**

    (1)     The Companies are in the process of arranging for the members of Ad-Hoc Group (collectively, the "**Backstop Parties**") to provide a backstop commitment to backstop in cash an amount of Tranche 2 New Notes equal to the amount of the USD equivalent of the New Notes Base Amount less (a) the principal amount of Tranche 1 New Notes committed, (b) the aggregate principal amount of Tranche 2 New Notes actually subscribed for by the Participating New Noteholders, and (c) the aggregate principal amount of Existing Notes converted into the Issuer's equity pursuant to the Equity Option.

16

(2)    The Issuer may elect not to draw down on the backstop commitments to the extent the additional funding requirement under the New Refinancing Facility is satisfied through other means.

(3)    The Backstop Parties will be entitled to a backstop fee of 5% of the total amount of their backstop commitment payable upon issuance of the New Notes (the "**Backstop Fee**").

(e)    **Tranche 3 New Notes**

See paragraph 7.7 regarding the International Facilities below.

## 7.7   International Facilities

(a)    International Facilities Lenders will have an option (exercisable up to the New Notes Election Deadline) to:

(i)    under the first option (the "**Cash-Out Option**"), have all liabilities under the relevant International Facility (including any accrued and unpaid interest) discharged, on or before the Restructuring Effective Date, in cash in the currency of the relevant International Facility at 47.5% of par value in full and final discharge of the Issuer's obligations under the relevant International Facility;

(ii)    under the second option (the "**Amendment Option**"), have principal payment terms under the relevant International Facility, with effect from the Restructuring Effective Date, amended such that each and every principal repayment instalment that has fallen due or will fall due under the relevant International Facility from (and including) December 2023 until (and including) December 2026 shall be deferred and become due and payable 11 full months from the original due date of the relevant instalment; *provided* that any repayment instalments that would, as a result of this deferral, fall due prior to the Restructuring Effective Date, shall only become payable, and shall be paid, on the first interest payment date immediately following the Restructuring Effective Date. Any repayment instalments falling due under the relevant International Facility after (and excluding) December 2026 shall be payable on their original due date; or

(iii)    under the third option (the "**New Notes Option**") and subject to customary representations with respect to their status for the purposes of any applicable securities laws, have liabilities under the relevant International Facility (including any accrued and unpaid interest) exchanged, on or before the Restructuring Effective Date, at par for Tranche 3 New Notes in full and final discharge of the Company's obligations under the relevant International Facility, provided that:

(1)    the New Notes Option may be exercised in respect of all or part of the liabilities in the relevant International Facility with the remaining amount, where exercised in respect of part of such liabilities, to be treated, at the election of the relevant lender, per the terms of the Cash-Out Option or Amendment Option; and

17

        (2)      the total principal amount of the Tranche 3 New Notes to be issued to all electing lenders under the International Facilities to be subject to a specified cap and shall be distributed on a pro rata basis amongst the electing lenders with the remaining amount of liabilities of such lenders being treated, at the election of the relevant lender, per the terms of the Cash-Out Option or Amendment Option.

(b)      Claims under the International Facilities retained following the Restructuring under the Amendment Option will be secured over certain residual rights the Issuer will have following repayment of other debt.

## 7.8    Cebures

(a)      Any defaults outstanding under the Cebures shall be fully and finally waived and the terms of the Cebures shall be amended as necessary to permit implementation of the Restructuring (including incurrence of the New Refinancing Facility and issuance of New Notes).

(b)      Claims under the Existing Cebures will be secured over certain residual rights the Issuer will have following repayment of other debt..

(c)      Each holder of the Cebures will receive, on or before the Restructuring Effective Date, a waiver fee.

*Further Details of the Restructuring*

7.9    Further detailed information with respect to the Restructuring will be set out in the Explanatory Statement.

## 8.    LOCK-UP AGREEMENT

8.1    The Scheme Company, the Issuer, the Ad-Hoc Group and the Related Party Existing Noteholders (acting by the Issuer's controlling shareholder) are in the final stages of negotiating the Lock-up Agreement to support the implementation of the Scheme and intend to sign it shortly following the date of this Letter.

8.2    The Lock-up Agreement will  be made available to all Scheme Creditors on the Scheme Website shortly following by the Scheme Company, the Issuer, the Ad-Hoc Group and the Related Party Existing Noteholders (and in advance of the Convening Hearing) and an announcement publicising the Lock-up Agreement will  be distributed to Existing Noteholders through the Scheme Website, the Issuer's Website, Clearing Systems and SGX-ST.

8.3    All Scheme Creditors who are not Sanctioned Persons will be able to become party to the Lock-up Agreement any time before the Scheme Meeting by completing an accession deed in the form scheduled to the Lock-up Agreement and delivering accession deed to the Issuer in accordance with the terms of the Lock-up Agreement.

8.4    Under the terms of the Lock-up Agreement, each of the parties will undertake to:

18

(a)     use all reasonable endeavours to implement the steps necessary to implement the Scheme, including providing information and executing documents;

(b)     in the case of the Consenting Noteholders, not to take any enforcement action against the Group; and

(c)     use reasonable endeavours to implement the Scheme as soon as reasonably practicable, and to enter into negotiations with a view to agreeing the necessary restructuring documents in a form anticipated by the term sheet for the Scheme.

8.5    Under the terms of the Lock-up Agreement, each Existing Noteholder who is a party to the Lock-up Agreement prior to the Scheme Meeting and votes in favour of the Scheme shall be entitled to receive a fee in an amount equal to 1% of the aggregate principal amount of Existing Notes held by such Consenting Noteholder and subject to the Lock-up Agreement (the "**Lock-up Fee**"), which shall be paid by the Scheme Company to such Consenting Noteholder on the Restructuring Effective Date.

## 9.    VOTING ON THE SCHEME

9.1    The Existing Noteholders are contingent creditors of the Scheme Company, whose economic interests will be affected by the Scheme, and therefore constitute creditors of the Scheme Company for the purposes of Part 26 of the Companies Act.

9.2    The Existing Noteholders (other than any Non-Voting Existing Noteholder) as at the Record Time, as the beneficial owners of the Existing Notes, will be entitled to vote at the Scheme Meeting in respect of the Scheme, except where any Existing Noteholder is prohibited from voting their Existing Notes by applicable law or regulation (including as a result of being a Sanctioned Person).

9.3    As will be set out in more detail in the Explanatory Statement, any Scheme Creditors wishing to vote on the Scheme will be required to submit (or ensure that their Account Holder submits on their behalf) a validly completed Account Holder Letter to the Information Agent such that it is received by the Information Agent by no later than the Voting Instruction Deadline:

(a)     evidence their claims in respect of the Scheme; and

(b)     vote, or appoint a proxy to vote on their behalf, at the Scheme Meeting (and give the necessary confirmations, including as to eligibility and that the representative and/or proxy is not a Sanctioned Person, in order to vote).

9.4    In order to be eligible to vote at the Scheme Meeting, each Scheme Creditor will be required to, among other things, provide certain confirmations as to their eligibility. In particular, each Scheme Creditor will be required to confirm, among other things, that they are not and are not acting on behalf of or at the direction of a Sanctioned Person. For the avoidance of doubt, Scheme Creditors who are not Sanctioned Persons that hold their Existing Notes through a Sanctioned Person or Sanctioned Custodian will not be considered a Sanctioned Person.

## 10.    CONSEQUENCES IF THE SCHEME IS NOT SUCCESSFUL

10.1    If the Scheme is not sanctioned the most likely alternative scenario is as follows:

(a)     the Restructuring cannot be implemented;

19

(b)     the Lock-up Agreement will terminate on the occurrence of the Restructuring Longstop Time (unless the Restructuring Longstop Time is extended in accordance with the terms of Lock-up Agreement); and

(c)     on termination of the Lock-up Agreement, the holders of the Existing Notes will be able to take enforcement actions on the basis of the outstanding default under the Existing Notes.

10.2    Given these circumstances and the Issuer and the Scheme Company's deteriorating liquidity position, there would be insufficient time to seek, and it is most unlikely that the Issuer and the Scheme Company would be able to obtain, the requisite level of creditor consent to implement any alternative transaction outside of an insolvency. Moreover, no alternative transaction currently exists for creditors to approve and implement and given the extensive period of time that management has spent seeking funding for the Group, the board of directors of the Scheme Company considers it highly unlikely that the Issuer and the Scheme Company would be able to secure alternative funding to repay the Existing Notes on or prior to the Existing Notes Maturity Date.

10.3    The directors of the Issuer and the Scheme Company are therefore of the view that, if the Restructuring fails to be implemented, it is likely that the Issuer would cease to function as a going concern, resulting in it becoming necessary to place the Issuer and other members of the Group into an insolvency process.

10.4    In any event, the directors of each of the Issuer and the Scheme Company believe that the Restructuring, as it is proposed to be implemented, is in the best interests of the Group and its stakeholders as a whole as it would provide a better result for the Group and its stakeholders (including the Scheme Creditors) than that which would be achieved through an insolvency process.

*Estimated Outcomes for Scheme Creditors*

10.5    The Group's Financial Advisors are preparing reports analysing:

(a)     the likely recoveries for Scheme Creditors if the Scheme is not successful (i.e. in an insolvency); and

(b)     the relative value of the Redemption Option and the Equity Option.

10.6    These reports will be appended to the Explanatory Statement.

## 11.    PROPOSED CLASS CONSTITUTION OF SCHEME CREDITORS

*Applicable principles*

11.1    For the purposes of voting on the Scheme, if the rights of Scheme Creditors affected by the Scheme are so different or would be affected so differently by the Scheme as to make it impossible for them to consult together with a view to their common interest, they must be divided into separate classes, based on their rights (going in and coming out of the Scheme) and the treatment of such rights, for the purposes of voting on the Scheme and separate voting meetings must be held for each class of creditors.

20

11.2    Under the terms of the Practice Statement, it is the responsibility of the Scheme Company to formulate the class or classes of creditors for the purpose of convening properly constituted meetings to consider and, if thought fit, vote in favour and approve the Scheme.

11.3    In the context of the most likely alternative to the Scheme, the Scheme Company has considered the present rights of the Scheme Creditors against the Scheme Company in the absence of the Scheme and the rights of the Scheme Creditors under the Scheme as proposed. Having taken legal advice (privilege in respect of which has not been waived), the Scheme Company has concluded that the Scheme Creditors constitute a single class for the purposes of voting on the Scheme.

11.4    The Scheme Company considers that the rights of the Scheme Creditors are not so dissimilar as to make it impossible for them to consult together with a view to their common interest in respect of the Scheme. The Scheme Company has made particular reference to the following factors and features of the Scheme in conducting this analysis:

(a)    the rights of Existing Noteholders;

(b)    the optionality afforded to Existing Noteholders under the Scheme;

(c)    the Scheme Creditors' entitlement to accede to the Lock-up Agreement;

(d)    the Scheme Creditors' entitlement to participate in the New Notes;

(e)    the position of the Backstop Parties;

(f)    the costs coverage arrangement as regards the Ad-Hoc Group Counsel;

(g)    the position of Existing Noteholders that are Sanctioned Persons; and

(h)    the position of the Related Party Existing Noteholders.

*Existing Notes*

11.5    The Scheme Company considers that the existing rights of the Existing Noteholders are materially the same, since they are all holders of the same Existing Notes, as issued by the Issuer and guaranteed by the Scheme Company, and therefore they each benefit from exactly the same rights against the Scheme Company.

11.6    In addition, if the Scheme becomes effective and the transactions contemplated by it are implemented, the rights conferred on the Scheme Creditors will be the same, in that all Scheme Creditors will receive consideration as part of the Scheme, with each Scheme Creditor being given the same right to elect the Redemption Option or the Equity Conversion Option in relation to their Existing Notes.

*Optionality*

11.7    As part of the Scheme, Scheme Creditors will be entitled to make certain elections in respect of their Existing Notes such that, if they make different elections, the Scheme will not result in an equivalent outcome for all Scheme Creditors. Certain Scheme Creditors who do not make an election or do not submit a validly completed Account Holder Letter by the Voting Instruction Deadline or who are Sanctioned Persons will be entitled to the Redemption Option. Given that all

21

election options are available to all Scheme Creditors on an equal basis (to the extent permitted by law and/or Sanctions), meaning that the rights afforded to each Scheme Creditor in respect of the election options are identical, the Scheme Company has concluded that this does not fracture the class.

*Lock-up Agreement*

11.8    Certain Existing Noteholders will be party to the Lock-up Agreement at the date of the Scheme Meeting whilst other Existing Noteholders will not. The Scheme Company does not consider that this means all Existing Noteholders cannot consult together with a view to their common interests. The Scheme Company notes the following:

(a)    it is well established that entry by creditors into a lock-up or voting agreement under which those creditors agree to vote in favour of a proposed scheme of arrangement will not in and of itself fracture the class for voting purposes;

(b)    each Scheme Creditor (excluding any Sanctioned Noteholder) is entitled to accede to the Lock-up Agreement prior to the Scheme Meeting and therefore become entitled to receive the Lock-up Fee as a Consenting Noteholder; and

(c)    those Existing Noteholders who are party to the Lock-up Agreement are treated under the Scheme in the same manner as those who are not party to that agreement, in that they will all have the same option to choose the consideration they receive under the Scheme by electing either the Redemption Option or the Equity Option.

11.9    The Issuer and the Scheme Company have agreed that any Scheme Creditor (excluding any Sanctioned Persons) that accedes to the Lock-up Agreement before the Scheme Meeting and votes in favour of the Scheme at the Scheme Meeting will be entitled to receive payment of the Lock-up Fee on the Restructuring Effective Date. In this regard, the Scheme Company considers that the Lock-up Fee does not fracture the class because:

(i)    the Scheme Company will invite all Existing Noteholders to accede to, or procure the accession to, the same arrangement by issuing a notice to all Existing Noteholders via the Clearing Systems, the Issuer's Website, SGX-ST and informing them that a copy of the Lock-up Agreement, and instructions for accession, are available at the Scheme Website and from the Information Agent;

(ii)    Scheme Creditors will be entitled to accede to the Lock-Up Agreement up until the date of the Scheme Meeting – therefore, the right to accede to the Lock-up Agreement will be open to all Existing Noteholders for a significant period of time; and

(iii)    the quantum of the Lock-up Fee is not so material in the context of the total amounts of the claims of the Scheme Creditors, the consideration under the Scheme and the likely recoveries in the alternative scenario absent the Scheme, such that it is unlikely that a Scheme Creditor would be influenced in its decision to vote for or against the Scheme by the existence of the Lock-up Fee.

11.10   The Scheme Company considers this minor additional benefit to be appropriate and beneficial in order to secure support for the Scheme from the Scheme Creditors, and thereby facilitate the delivery of a restructuring solution and maximise the prospects of a successful outcome by

22

providing the Scheme Company with visibility over the levels of creditor support for the Scheme in advance of voting at the Scheme Meeting.

*Scheme Creditors' entitlement to participate in the New Notes*

11.11   All Existing Noteholders will be offered the right to subscribe, on a pro rata basis, to the Tranche 2 New Notes.

11.12   There might be Non-Eligible Participating New Noteholders who may be precluded by applicable securities laws or regulation from receiving the New Notes.

11.13   The Scheme Company has concluded that the fact that certain Scheme Creditors may be precluded by applicable securities law or regulation from receiving the New Notes will not fracture the class. Any such Scheme Creditor will have the same legal rights as other Scheme Creditors in relation to the Scheme. The fact that certain Scheme Creditors are precluded from receiving the New Notes is a consequence of their personal characteristics, which should not be relevant to class composition. The Scheme Company notes that the identity of such persons can change at any time, including before or after the Scheme take effect.

*The position of the Backstop Parties*

11.14   The Backstop Parties will agree to backstop the Tranche 2 New Notes in exchange for the Backstop Fee of 5% of the total amount of their backstop commitment. The Scheme Company has concluded that the terms of the Backstop Fee payable to the Backstop Parties does not have an impact on classification of Scheme Creditors for the purposes of the Scheme. This is because the Backstop Fee is payable in return for a commercial service reasonably required by the Companies and the level of fee is consistent with market fees for this service.

*Tranche 1 New Notes*

11.15   The Tranche 1 New Notes will be subscribed for by a person who is not an Existing Noteholder and are therefore irrelevant to class composition for the Scheme.

*Cost Coverage*

11.16   Under the Lock-up Agreement, the Issuer and Scheme Company have agreed to pay the fees, costs and expenses reasonably incurred by the Ad-Hoc Group Counsel in connection with the implementation of the Scheme and the Restructuring. Payment of these fees, costs and expenses is not conditional on the Scheme being sanctioned. All such fees, costs and expenses incurred by the Ad-Hoc Group Counsel have been so incurred solely in connection with the negotiation, preparation and implementation of the Scheme and the Restructuring and accordingly would not have arisen if the Restructuring was not to take place. The Scheme Company notes that it is well established that the provision of such fees, costs and expenses, which does not confer any net benefit on the relevant Scheme Creditors, as is accordingly the case here, does not fracture a class.

*Noteholders that are Sanctioned Persons*

11.17   The Scheme Company has considered whether the fact that certain Scheme Creditors are precluded by applicable Sanctions from voting on the Scheme, electing the Redemption Option or Equity Option or participating in the New Notes will fracture the class. Scheme Creditors that are or act

on behalf of or under the direction of Sanctioned Persons will not be able to vote or make any elections on the Scheme. In principle, any such Scheme Creditor will have the same legal rights as other Scheme Creditors to cast votes on the Scheme but their personal characteristics, which are not relevant to the analysis of class composition, make it unlawful for them to exercise the right to vote. The Scheme Company notes that the identity of such persons can change at any time, including before or after the Scheme Meeting.

11.18    The Scheme Company has therefore concluded that the fact that certain Scheme Creditors are not permitted to vote on the Scheme, make an election to receive the Redemption Option or the Equity Option or participate in the New Notes as a consequence of applicable Sanctions will not fracture the class. Scheme Creditors who are Sanctioned Persons will receive cash pursuant to the Redemption Option with the cash proceeds being placed into the Escrow Account.

*Related Party Existing Noteholders*

11.19    The Scheme Company has concluded that the Related Party Existing Noteholders should form a single class with other Existing Noteholders. The fact that the Related Party Existing Noteholders are related to the Issuer is immaterial since all Existing Noteholders have the same rights against the Scheme Company under the Existing Notes and pursuant to the Scheme they would have the same rights to elect between the Redemption Option and the Equity Conversion Option. Overall, the Related Party Existing Noteholders' rights are not so dissimilar as to make it impossible for them to consult together with other Existing Noteholders with a view to the common interest of the class. To the extent that the Related Party Existing Noteholders have a different interest, then this a matter for the Court's discretion to sanction the Scheme at the Sanction Hearing.

*Conclusion*

11.20    Having considered the rights of Existing Noteholders and the likely alternative to the Scheme, the Scheme Company has concluded that it does not consider the differences in rights between any of the Scheme Creditors to be sufficiently material so as to fracture the class.

11.21    Accordingly, it is proposed that:

    (a)    Scheme Creditors vote in a single class on the Scheme; and

    (b)    one meeting of the Scheme Creditors be convened for the purposes of considering and, if the Scheme Creditors think fit, approving the Scheme.

## 12.    JURISDICTION AND RECOGNITION

*Jurisdiction*

12.1    The Scheme Company considers that the Court has jurisdiction in relation to the Scheme under Part 26 of the Act for the following reasons:

    (a)    the Scheme Company is a private company limited by shares incorporated under the laws of England and Wales and is therefore a "company" for the purposes of Part 26 of the Act;

    (b)    the Scheme is a "compromise or arrangement" between the Scheme Company and the Scheme Creditors; and

(c)     the Scheme Company acceded as a guarantor in respect of the Existing Notes, specifically by assuming all rights and obligations of a guarantor under the Existing Notes Indenture and Existing Notes. Further, the Scheme Company and the Issuer entered into the Deed of Contribution. The Deed of Contribution created a right of contribution by the Issuer against the Scheme Company, in respect of any payments made by the Issuer under the Existing Notes. As such, the Scheme Company is in substance liable as a joint primary obligor in respect of the Existing Notes.

12.2   Given the foregoing, there is jurisdiction in relation to the Scheme. Further, as a matter of the Court's discretion, there is a sufficient connection with the jurisdiction.

*Recognition*

12.3   The Scheme Company will seek recognition of the Scheme under Chapter 15 of the U.S. Bankruptcy Code, and will seek permanent relief in the United States Bankruptcy Court for the Southern District of New York (or such other appropriate forum determined by the Scheme Company) enjoining Scheme Creditors from commencing or continuing any action or proceeding against any member of the Group or their successors in interests that are inconsistent with the Scheme in the United States.

12.4   To seek recognition of the Scheme in the United States, the Scheme Company, through its foreign representative to be appointed in accordance with the Scheme Company's bylaws (the "**Foreign Representative**"), will file a petition (the "**Chapter 15 Petition**") in the United States Bankruptcy Court for the Southern District of New York (the "**U.S. Bankruptcy Court**") seeking an order (i) recognising the Scheme as a foreign proceeding under Chapter 15 of Title 11 of the United States Code and (ii) providing that the Scheme and the Sanction Order are entitled to full force and effect in the United States in accordance with their terms for recognition and enforcement of the Scheme (and any order sanctioning the Scheme) under Chapter 15 of Title 11 of the United States Code (the "**FFE Order**").

12.5   Notice requirements under the U.S. Bankruptcy Code and Federal Rules of Bankruptcy Procedure require that parties in interest receive at least 21 days' notice of the hearing on the Foreign Representative's petition for recognition of the Scheme and motion seeking the entry of the FFE Order (the "**Chapter 15 Hearing**"). The Foreign Representative may file the Chapter 15 Petition prior to the date of the Sanction Hearing, so that the Chapter 15 Hearing may be scheduled immediately thereafter. This would allow the entry of the FFE Order, if granted by the U.S. Bankruptcy Court, to occur shortly after the entry of the Sanction Order.

12.6   The Scheme Company will obtain and file with the Court in advance of the Convening Hearing:

(a)     an opinion from an independent expert on Mexican law that the Scheme is likely to be recognised and given effect in Mexico, being the jurisdiction in which the Issuer is incorporated and a jurisdiction in which the Group has material assets; and

(b)     an opinion from an independent expert on certain matters of U.S. Federal law and New York law including whether the Scheme is likely to be recognised by the United States Bankruptcy Court for the Southern District of New York (or such other appropriate forum determined by the Scheme Company) as a 'foreign proceeding' under Chapter 15 of the U.S. Bankruptcy Code and, if sanctioned, will be given full force and effect in the United States.

13.    **SCHEME CREDITOR ISSUES**

13.1   As noted above, the Convening Hearing will take place on 21 November 2024, at which the Scheme Company will draw any relevant issue raised by Scheme Creditors to the Court's attention. Scheme Creditors have the right to attend the Convening Hearing in person or through counsel (unless otherwise precluded from doing so by applicable Sanctions or other applicable law or regulation) and make representations at the Convening Hearing.

13.2   This Letter is intended to provide the Scheme Creditors with sufficient notice of, and information regarding, the Scheme, so that, should they wish to raise any issues that relate to the jurisdiction of the Court to sanction the Scheme, or argue that the proposal outlined above for convening the Scheme Meeting is inappropriate, or to raise any other issue in relation to the constitution of the Scheme Meeting or which might otherwise affect the conduct of such Scheme Meeting, they may attend and be represented before the Court at the Convening Hearing, although no Scheme Creditor is obliged to do so.

13.3   The Scheme Creditors should be aware that the Court has indicated that issues which may arise as to the constitution of the Scheme Meeting or which otherwise affect the conduct of the Scheme Meeting or which affect the jurisdiction of the Court to sanction the Scheme or which, apart from issues of merits and fairness, might constitute a reason for the Court not to sanction the Scheme (the "**Scheme Issues**"), should be raised at the Convening Hearing. By virtue of this Letter, the Scheme Creditors are afforded an opportunity to raise any Scheme Issues. If they do not do so, while the Scheme Creditors will still be able to appear and raise objections at the Sanction Hearing, the Court is likely to expect them to show good reason why they did not previously raise the Scheme Issues. The Scheme Creditors are therefore strongly encouraged to raise any Scheme Issues prior to or at the Convening Hearing.

13.4   The Sanction Hearing is anticipated to be held on 13 December 2024. Further details will be made available to the Scheme Creditors by announcement via the Scheme Website, the Issuer's website, the Clearing Systems and the SGX-ST.

13.5   The Existing Noteholders should take advice from their legal and other professional advisors if they have any concerns in relation to the matters set out in this Letter. The Explanatory Statement will include further details in relation to the Scheme.

13.6   If any Scheme Creditor wishes to raise any Scheme Issues, they should write to Cleary Gottlieb Steen & Hamilton LLP, legal counsel to the Scheme Company, setting out their concerns as soon as practicable and in advance of the Convening Hearing using the contact details at Section 16 (*Contact Details*).

14.    **COMMUNICATIONS IN RESPECT OF THE SCHEME**

14.1   The Information Agent has set up the Scheme Website accessible by the Scheme Creditors via https://deals.is.kroll.com/grupomega  to disseminate information about the Scheme and to facilitate the implementation of the Scheme.

14.2   Information and documents relating to the Scheme will be available on the Scheme Website. The Scheme Creditors will be able to view, print and download the Scheme Documents from the Scheme Website once they have registered online.

14.3    Any Scheme Creditors wishing to register online should do so via the Scheme Website and should contact the Information Agent using the details set out at Section 16 (*Contact Details*) below if they have any queries about the registration process.

## 15.    NEXT STEPS

15.1    As noted above, the Convening Hearing will take place on 21 November 2024 in the Insolvency and Companies List (ChD) of the Business and Property Courts of the High Court of Justice of England and Wales, 7 Rolls Building, Fetter Lane, London, EC4A 1NL, United Kingdom. Scheme Creditors will be notified in advance if there is a change to the proposed dates.

15.2    At the Convening Hearing, the Court will consider whether or not to make an order convening the Scheme Meeting. In so doing, the Court will consider:

(a)    the purpose and effects of the Scheme;

(b)    whether it has jurisdiction in relation to the Scheme; and

(c)    the proposed class composition for the Scheme Meeting.

*Scheme Documents*

15.3    If the Court gives permission to convene the Scheme Meeting to vote on the Scheme, the Scheme Company will notify the Scheme Creditors in accordance with the direction of the Court of the time, date and venue of the Scheme Meeting, set out how the Scheme Creditors may vote at that meeting and provide further detail of the terms of the proposed Scheme. In particular, the Scheme Creditors should expect to receive the following documents, subject to compliance with applicable Sanctions:

(a)    a notice convening the Scheme Meeting;

(b)    the Explanatory Statement relating to the Scheme and summarising the terms of the Scheme;

(c)    the Scheme, which will be appended to the Explanatory Statement;

(d)    an Account Holder Letter containing, among other things, the forms and documents that the Scheme Creditors will need to (or procure their Account Holder on their behalf to) validly complete and submit in order to vote at or to appoint a proxy to attend the Scheme Meeting, which will be appended to the Explanatory Statement;

(e)    the New Notes documentation;

(f)    the Implementation Deed;

(g)    the Escrow Agreement between the Scheme Company, the Information Agent and the Escrow Agent; and

(h)    any documentation which may accompany the foregoing,

(together, the "**Scheme Documents**").

15.4    The Scheme Documents will be made available to the Scheme Creditors by the Information Agent, including via the Scheme Website. If any amendments or modifications are made to the Scheme Documents, then such amended or modified documents will also be made available to Scheme Creditors on the Scheme Website.

*Required Licences*

15.5    In connection with the Scheme and the Restructuring, the Issuer applied for a licence from OFAC on 30 September 2024. The Scheme Company and the Issuer do not expect to apply for any other licences or authorisations pursuant to Sanctions other than a licence from OFAC. If there is a change in the applicable Sanctions, the Scheme Company will notify Scheme Creditors via the Scheme Website.

15.6    If, in advance of the Scheme Meeting, the Issuer does not receive any Required Licence on terms that would authorise the Scheme Company to proceed with the Scheme Meeting, the Scheme Company will defer the Scheme Meeting until such time as the Required Licence has been received on terms that would authorise the Scheme Company to proceed with the Scheme Meeting. The Scheme Company will notify Scheme Creditors of any extensions to the time and date of the Scheme Meeting via the Scheme website, the Issuer's website, the Clearing Systems and the SGX-ST.

*Scheme Meeting*

15.7    Assuming that the Court orders that the Scheme Meeting be convened by the Scheme Company and the Scheme Company receives any Required Licences necessary for the Scheme Meeting, the Scheme Meeting is proposed to be held on or after 12 December 2024. As soon as it has been scheduled, the date and time of the Scheme Meeting will be confirmed by announcement via the Scheme Website, the Issuer's website, the Clearing Systems and the SGX-ST.

15.8    Any Scheme Creditor wishing to attend the Scheme Meeting should submit (or ensure that its Account Holder submits on its behalf) a validly completed Account Holder Letter to the Information Agent by the Voting Instruction Deadline.

15.9    The Scheme Company considers that the Scheme is necessary to implement the restructuring of the Existing Notes, and the sole director of the Scheme Company considers that the Scheme and the Restructuring are in the best interests of the Scheme Creditors, the Group and its stakeholders. For this reason, all Scheme Creditors are encouraged to support the Scheme.

*Anticipated process and timeline*

15.10    The timeline of key dates is as follows:

| Key date | Steps |
| --- | --- |
| 21 November 2024 | Convening Hearing |
| On or after 21 November 2024 | Distribution of the Explanatory Statement and invitation to submit Account Holder Letters, and notice of the time and date of the Scheme Meeting |
| On or after 12 December 2024 | Scheme Meeting |

| On or after 13 December 2024 | Sanction Hearing |
|---|---|

*Subject to receipt of any Required Licences.*

## 16.    CONTACT DETAILS

If you have any questions in relation to this Letter or the Scheme, please contact the Information Agent and/or the English legal counsel to the Scheme Company, Cleary Gottlieb Steen & Hamilton LLP, using the contact details below:

**Kroll Issuer Services Limited**, as information agent of the Scheme Company
The Shard, 32 London Bridge Street
London, England, SE1 9SG
Telephone: + 44 20 7704 0880
Email: grupomega@is.kroll.com
Scheme Website: https://deals.is.kroll.com/grupomega
Attention: Alessandro Zorza

**Cleary Gottlieb Steen & Hamilton LLP**, as English legal counsel to the Scheme Company
2 London Wall Place
London, England, EC2Y 5AU
Email: team-mega_restructuring-cgshonly@cgsh.com

Yours faithfully

.................................
Ignacio Javier Gonzalez Delgadillo
Authorised Signatory of the Scheme Company

**Schedule 1**

**Definitions**

"**Account Holder**" means the holder of a book-entry interest in the Existing Notes.

"**Account Holder Letter**" means the letter to be signed by an Account Holder or Existing Noteholder (as applicable) in order to vote at the Scheme Meeting.

"**Act**" means the UK Companies Act 2006 (as amended from time to time).

"**Ad-Hoc Group**" means the ad-hoc group of Existing Noteholders advised by the Ad-Hoc Group Counsel and whose members hold approximately 28.2% of the Existing notes as at the date of this Letter.

"**Ad-Hoc Group Counsel**" means Latham & Watkins LLP and Sainz Abogados.

"**Amendment Option**" has the meaning given to it in paragraph 7.7(a)(ii).

"**Backstop Fee**" has the meaning given to it in paragraph 7.6(d)(v)(3).

"**Backstop Parties**" has the meaning given to it in paragraph 7.6(d)(v)(1).

"**Banco del Bajío**" means Banco del Bajío S.A., Institución de Banca Múltiple.

"**Banco INVEX**" means Banco INVEX, S.A., Institución de Banca Múltiple, INVEX Grupo Financiero.

"**Banco Santander**" means Banco Santander (México), S.A., Institución de Banca Múltiple, Grupo Financiero Santander México.

"**Bancomext**" means Banco Nacional de Comercio Exterior.

"**Bilateral Facilities**" means the International Facilities and the Mexican Facilities.

"**BlueOrchard**" means BlueOrchard Microfinance Fund.

"**Cash-Out Option**" has the meaning given to it in paragraph 7.7(a)(i).

"**Cebures**" means the Issuer's peso-denominated Notes (*certificados bursatiles*) due 2027 identified with ticker GFMEGA 22X.

"**Chapter 15 Hearing**" has the meaning given to it in paragraph 12.5.

"**Chapter 15 Petition**" has the meaning given to it in paragraph 12.4.

"**Cleardusk**" means Cleardusk Partners LP.

"**Clearing System**" means DTC, Clearstream or Euroclear (as applicable), together, the "**Clearing Systems**".

"**Clearstream**" means Clearstream Banking, S.A., or any successor thereof.

30

"**CNBV**" means the Mexican Securities and Banking Comission (Comisión Nacional Bancaria y de Valores).

"**Companies**" means the Scheme Company and the Issuer.

"**CONDUSEF**" the Mexican Commission for the Protection and Defense of Financial Services Users (*Comisión Nacional para la Protección y Defensa de los Usuarios de Servicios Financiera*).

"**Consenting Noteholder**" means each Existing Noteholder which has executed and delivered an Existing Noteholder Accession Deed to the Issuer in accordance with the terms of the Lock-up Agreement.

"**Convening Hearing**" means a hearing of the Court to be held on or around 30 October 2024, at which the Scheme Company will apply to the Court for permission to convene the Scheme Meeting.

"**Court**" means the High Court of England and Wales.

"**Deed of Contribution**" has the meaning given to it in paragraph 5.1(d).

"**Deed Poll**" has the meaning given to it in paragraph 5.1(c).

"**DTC**" means the Depository Trust Company, its nominees and their respective successors and assigns, or such other depositary institution hereinafter appointed by the Scheme Company.

"**Eco-Business Fund**" means Eco-Business Fund S.A., SICAV-SIF acting in respect of Eco-Business Fund – Eco-Business I Sub-Fund.

"**Escrow Agent**" means the Issuer, in its capacity as agent under the Escrow Agreement.

"**Escrow Agreement**" means the escrow agreement to be entered into on or prior to the Scheme Effective Date between the Scheme Company, the Information Agent and the Escrow Agent.

"**Escrow Period**" means the period from the Scheme Effective Date until the Escrow Period Expiry Date.

"**Escrow Period Expiry Date**" means 5.00 p.m. (New York time) on the date falling 365 days after the Scheme Effective Date.

"**Equity Option**" has the meaning given to it in paragraph 7.47.4(b)(ii).

"**Euroclear**" means Euroclear Bank S.A./N.V. or any successor thereof.

"**Existing Notes**" means the 8.250 per cent. senior notes due 11 February 2025 (ISIN: USP73699BH55) issued by the Issuer and guaranteed by the Scheme Company pursuant to the Existing Notes Indenture.

"**Existing Noteholders**" means all persons who are the ultimate beneficial owners of the Existing Notes.

"**Existing Noteholder Accession Deed**" means the accession deed in the form scheduled to the Lock-up Agreement.

"**Existing Notes Indenture**" means the indenture originally dated 11 February 2020 as amended pursuant to supplemental indentures dated 30 March 2021 in relation to the Existing Notes and made between the Issuer as issuer and the Existing Notes Trustee as notes trustee (as amended or supplemented from time to time).

31

"**Existing Notes Maturity Date**" means 11 February 2025.

"**Existing Notes Trustee**" means Wilmington Trust, National Association, as notes trustee under the Existing Notes Indenture.

"**Explanatory Statement**" means an explanatory statement relating to the Scheme and summarising the terms of the Scheme.

"**FFE Order**" has the meaning given to it in paragraph 12.4.

"**FIRA**" means Fondo Especial para Financiamientos Agropecuarios (FIRA).

"**Foreign Representative"** has the meaning given to it in paragraph 12.4.

"**Global Climate Partnership Fund**" means Global Climate Partnership Fund SA., SICAV-SIF.

"**Group**" means the Issuer and its direct and indirect subsidiaries from time to time, including the Scheme Company.

"**Group's Financial Advisors**" means Houlihan Lokey, Inc. and Blink Capital Solutions.

"**HSBC Mexico**" means HSBC México, S.A., Institución de Banca Múltiple, Grupo Financiero HSBC.

"**Huruma**" means Huruma Fund S.C.A. SICAR-EuSEF /Huruma SV S.a.r.l (GAWA).

"**Implementation Deed**" means the restructuring implementation deed which shall be entered into on or around the Scheme Effective Date setting out principal implementation steps of the Restructuring.

"**Information Agent**" means Kroll Issuer Services Limited as information agent of the Scheme Company.

"**International Facilities**" means the various bilateral unsecured loan facilities made available to the Issuer.

"**International Facilities Lenders**" means the lenders under the International Facilities.

"**Issuer**" means Operadora de Servicios Mega, S.A. de C.V., SOFOM, E.R., a company incorporated under the laws of Mexico, with its registered office at Av. Patria 1501, Jardines Universidad, 45110 Zapopan, Jalisco, Mexico.

"**Letter**" means this practice statement letter.

"**Lock-up Agreement**" means the lock-up agreement to be entered into between the Issuer, the Scheme Company, the Consenting Noteholders and the Related Party Existing Noteholders (acting by the controlling shareholder of the Issuer) and opened for accession by the Existing Noteholders.

"**Lock-up Fee**" has the meaning given to it in paragraph 8.5

"**Mexican Facilities**" means certain Mexican law governed secured and unsecured credit facilities, comprising term loans and working capital facilities made available to the Issuer by lenders in Mexico.

"**Micro, Small & Medium Enterprises Bonds**" means Micro, Small & Medium Enterprises Bonds S.A. acting on behalf of its COMPARTMENT "ONE".

"**New Notes**" has the meaning given to it in paragraph 7.6(b).

"**New Notes Base Amount**" has the meaning given to it in paragraph 7.6(a).

"**New Notes Election Deadline**" means 5:00 p.m. (New York time) on 2 December 2024, being the latest time and date for receipt of Account Holder Letters by the Information Agent in order for Existing Noteholders' voting instructions to be taken into account for the purpose of the Scheme Meeting.

"**New Notes Option**" has the meaning given to it in paragraph 7.7(a)(iii).

"**New Refinancing Facility**" has the meaning given to it in paragraph 7.3.

"**Non-Eligible Participating New Noteholder**" means any Participating New Noteholder who is not an Eligible Person or who provides confirmations in their Account Holder Letter which appear to be incorrect or cannot be independently verified by the Scheme Company in its sole discretion (acting reasonably) or the Information Agent.

"**Non-Voting Existing Noteholder**" has the meaning given to it in paragraph 1.8

"**OFAC**" the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC).

"**Participating New Noteholder**" has the meaning given to it in paragraph 7.6(d)(i).

"**Practice Statement**" means the Practice Statement (Companies: Scheme of Arrangement under Part 26 and Part 26A of the Companies Act 2006) issued on 26 June 2020 by the Court.

"**PROPARCO**" means Société de Promotion et de Participation pour la Coopération Économique S.A. (PROPARCO).

"**Record Time**" means the date and time by which the Scheme Creditors' entitlements to vote on the Scheme shall be assessed, being 5:00 p.m. (New York time) on 24 November 2024.

"**Redemption Option**" has the meaning given to it in paragraph7.4 7.4(b)(i).

"**Registered Holder Nominee**" means Cede & Co. in its capacity as the registered holder of the global note with respect to the Existing Notes as nominee for DTC.

"**Registrar of Companies**" means the registrar of companies for England and Wales as described in section 1060 of the Companies Act 2006.

"**Related Party Existing Noteholders**" means certain of the Existing Noteholders who are related to the Issuer and control US$28,069,000 of the Existing Notes principal amount, as at the date of this Letter.

"**Required Licences**" means any authorisations from competent Sanctions Authorities that the Scheme Company may determine in their sole and absolute discretion may be required in connection with, and to implement, the Scheme and the Restructuring, which term shall include certain licences as may be required in advance of the Scheme Meeting.

"**ResponsAbility**" means ResponsAbility SICAV (Lux) acting for its sub-fund responsAbility SICAV (Lux) Agriculture Fund.

"**Restructuring**" means the restructuring of certain financial indebtedness of the Scheme Company as described in section 7 of this Letter.

"**Restructuring Effective Date**" means the date on which the Scheme Company notifies the Scheme Creditors and the other affected stakeholders that the Restructuring has been implemented (in accordance with the Scheme and the Implementation Deed).

"**Restructuring Longstop Time**" means:

(a) 11:59 p.m. (London time) on 28 February 2025; or

(b) such later time as may be agreed in writing between the Issuer and the Majority Consenting Creditors (as defined in the Lock-Up Agreement),

being the latest time by which the Restructuring Effective Date shall occur.

"**Sanction Hearing**" means the court hearing following the Scheme Meeting whereby the Scheme Creditors will have the opportunity to raise objections to the Scheme, which shall occur on or after 13 December 2024, provided that, the Court grants an order at the Convening Hearing to convene the Scheme Meeting and a licence from OFAC has been granted.

"**Sanctioned Country**" means a country or territory that is subject to comprehensive Sanctions (currently, Crimea, Cuba, Iran, North Korea, Syria, and those portions of the Donetsk People's Republic or Luhansk People's Republic regions (and such other regions) of Ukraine over which any Sanctions Authority imposes comprehensive Sanctions).

"**Sanctioned Custodian**" means a custodian that is a Sanctioned Person.

"**Sanctioned Person**" means a person that is:

(a) listed on any Sanctions List, or is otherwise the target of any Sanctions (including, without limitation, by reason of ownership, control or agency (as such terms are defined by the relevant Sanctions or Sanctions Authority) by or with one or more persons listed on a Sanctions List);

(b) located or ordinarily resident in or organized under the laws of any Sanctioned Country; or

(c) with which the Company, the Ad-Hoc Group, the Company's advisors or the Ad-Hoc Group's advisors, the Trustee or any Agent is prohibited pursuant to any Sanctions from dealing or otherwise engaging pursuant to any Sanctions in any transaction contemplated by the terms of the Existing Notes, the Existing Notes Indenture and/or the restructuring,

(d) whose Existing Notes are held through any securities depositary with which the Company, the Ad-Hoc Group, the Company's advisors or the Ad-Hoc Group's advisors, the Trustee or any Agent is prohibited from dealing or otherwise engaging in any transaction pursuant to any Sanctions contemplated by the terms of the Existing Notes and/or the Existing Notes Indenture and/or the Company's proposed restructuring, but only if the dealing or other engagement in respect of the Existing Notes of such Noteholder in connection with the restructuring (and excluding for the avoidance of doubt any payments by the Company made through the clearing systems) are required to be conducted through such securities depositary,

34

provided that "**Sanctioned Person**" will exclude those that are solely identified on, or otherwise solely subject to the restrictions under, the 'Sectoral Sanctions Identifications List' of the U.S. Department of the Treasury's Office of Foreign Assets Control or any equivalent list maintained by any other Sanctions Authority, provided that such restrictions would not in any other way restrict or prohibit transactions, activities or other dealings contemplated in connection with this Term Sheet.

"**Sanctions**" means economic or financial sanctions, laws, regulations or trade embargoes or similar measures implemented, administered or enforced by any of the Sanctions Authorities.

"**Sanctions Authority**" means:

    (a)  the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") and the U.S. Department of State or Commerce;

    (b)  the United Nations Security Council;

    (c)  the European Union or any member state thereof, or any governmental authority of the same; or

    (d)  the United Kingdom (or any governmental authority of the same, including without limitation in respect of the United Kingdom, His Majesty's Treasury and the Department for Business and Trade).

"**Sanctions List**" means any of the lists of specifically designated persons or entities (or equivalent) maintained by a Sanctions Authority, each as amended, supplemented or substituted from time to time.

"**Scheme**" means the scheme of arrangement pursuant to Part 26 of the Companies Act 2006 between the Scheme Company and the Scheme Creditors.

"**Scheme Company**" means Mega Newco Limited, a company incorporated under the laws of England and Wales and registered under number 15986024 and with its registered address at Suite 1, 7th Floor 50 Broadway London SW1H 0DB.

"**Scheme Creditors**" means together, the Existing Notes Trustee, the Registered Holder Nominee and the Existing Noteholders, as at the Record Time, including each of their transferees, assignees and successors after the Record Time.

"**Scheme Documents**" has the meaning given to it in paragraph 15.3 of this Letter.

"**Scheme Effective Date**" means the date on which the Scheme Company files the Sanction Order at the UK Registrar of Companies.

"**Scheme Issues**" has the meaning given to it in paragraph 13.3 of this Letter.

"**Scheme Meeting**" means the meeting of certain of the Scheme Creditors for the purpose of considering and, if thought fit, approving the Scheme.

"**Scheme Website**" means the website set up for the Scheme Creditors by the Information Agent at described at section 16.

"**Scotiabank**" means Scotiabank Inverlat, S.A., Institución de Banca Múltiple Grupo Financiero Scotiabank Inverlat.

"**SGX-ST**" means Singapore Exchange Securities Trading Limited.

"**Symbiotics**" means Symbiotics Sicav (Lux).

"**Tranche 1 New Notes**" has the meaning given to it in paragraph 7.6(b).

"**Tranche 2 New Notes**" has the meaning given to it in paragraph 7.6(b).

"**Tranche 3 New Notes**" has the meaning given to it in paragraph 7.7(a)(iii).

"**Triodos**" means Triodos Custody B.V., (in its capacity as legal owner of Triodos Fair Share Fund, Triodos SICAV II- Triodos Microfinance Fund AS and Triodos Investment Management B.V.).

"**U.S. Bankruptcy Court**" has the meaning given to it in paragraph 12.4.

"**Voting Instruction Deadline**" means 5:00 p.m. (New York time) on 9 December 2024, being the latest time and date for receipt of Account Holder Letters by the Information Agent in order for Existing Noteholders' voting instructions to be taken into account for the purpose of the Scheme Meeting.