David H. Botter
Thomas S. Kessler
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Mega Newco Limited,[1]<br><br>Debtor in a Foreign Proceeding | Chapter 15<br><br>Case No. 24-12031 (MEW) |

**DECLARATION OF IGNACIO JAVIER GONZALEZ
DELGADILLO IN SUPPORT OF VERIFIED PETITION
UNDER CHAPTER 15 FOR (I) RECOGNITION OF FOREIGN
PROCEEDING, (II) RECOGITION OF FOREIGN REPRESENTATIVE,
(III) RECOGNITION OF SANCTION ORDER AND RELATED SCHEME
AND (IV) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

I, Ignacio Javier Gonzalez Delgadillo (the "Petitioner" or the "Foreign Representative"), pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America as follows:

1. I am over the age of 18 and, if called upon, could testify to all matters set forth in this statement, except for those portions specified as being otherwise.

2. I am a duly appointed officer at Mega Newco Limited ("Mega" or the "Debtor") and, as set forth below, the duly-appointed foreign representative for the purposes of this Chapter

---

[1] The last four identifying digits of the registered number are 6024 and with registered address at Suite 1, 7th Floor 50 Broadway London SW1H 0DB, United Kingdom.

15 Case, which is filed by Mega in respect of the scheme of arrangement proceeding (the "English Scheme Proceeding") in the High Court Of Justice Business And Property Courts Of England and Wales (the "English Court") pursuant to Pursuant to Part 26 of the Companies Act 2006, as modified (the "Companies Act") of the laws of the England and Wales.

3. I submit this declaration (the "Declaration") in support of the (a) *Verified Petition for (i) Recognition of Foreign Proceeding, (ii) Recognition of Foreign Representative, (iii) Recognition of Sanction Order and Related Scheme and (iv) Related Relief under Chapter 15 of the Bankruptcy Code* (the "Verified Petition" and, together with the *Official Form Petition*, the "Petition")[2] and (b) the *Application Pursuant to Federal Rules of Bankruptcy Procedure 2002 and 9007 for Order Scheduling Hearing and Specifying Form and Manner of Service of Notice, and Granting Related Relief* (the "Notice Procedures Motion" and, together with the Verified Petition, the "First Day Pleadings").

4. I make this declaration on the basis of documentation I have reviewed and facts known to me through my work as officer and foreign representative of the Debtor. Where relevant information has been provided to me by others, the information is true to the best of my knowledge and belief. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## BACKGROUND

**A.    General Background and History**

    i. *Overview*

---

[2] All capitalized terms used but not defined herein shall have the meaning ascribed to them in the Verified Petition.

1. Mega is a private company incorporated in England and Wales and is a direct subsidiary of the Parent (together with the Parent and the other subsidiaries of the Parent, the "Group"). Mega has no substantial operations of its own.

2. The Group is a leading Mexican regulated multiple purpose financial provider, based in Guadalajara, Jalisco, with more than 20 years of operating experience. It specializes in four main business lines: leases, lending, auto loans, and factoring. In addition to its headquarters located in Guadalajara, the Group has other branches throughout Mexico, located in Mexico City, Puebla, Querétaro, and Leon, and one additional office located in San Diego, California.

3. The Group offers leases for machinery and equipment, transportation vehicles (including cargo and passenger vehicles), and other capital assets used in a variety of industries in Mexico. It also provides financing to small and medium-sized businesses for the acquisition of durable goods and equipment (such as greenhouses and macro-tunnels), as well as liquidity and financing solutions for their working capital needs. The Group's auto loans business line is based in San Diego, California, and specializes in loans for the purchase of pre-owned personal vehicles. The Group's operations are regulated by the *Comisión Nacional Bancaria y de Valores*, the National Banking and Securities Commission, and supervised by *The Bank of Mexico*, Mexico's central bank.

4. Mega is an obligor under the Existing Notes (as defined herein), that are denominated in U.S. dollars.

**B.    Mega's Capital Structure**

   i. *Mega's Liabilities*[3]

---

[3]    For the avoidance of doubt, nothing herein constitutes or shall be construed as an admission of any purported liability with respect to any obligation, including financial indebtedness or claims, for which the Debtor reserves all rights and defenses.

3

      a. Existing Notes

5.      The Parent and, as discussed more below, Mega, are liable in respect of certain notes with an interest rate of 8.250%, due February 11, 2025, issued by the Parent pursuant to an indenture dated 11 February 2020 (as supplemented, the "Existing Notes Indenture"), between amongst others, the Parent and Wilmington Trust, National Association (the "Existing Notes Trustee") in its capacity as trustee under the Existing Notes Indenture (the "Existing Notes" as amended or supplemented from time to time).  The Existing Notes are governed by New York law.

6.      As of October 31, 2024, the aggregate principal amount outstanding under the Existing Notes was USD 350,758,000.  Certain Existing Noteholders who are related to the Parent control USD 28,069,000 in principal amount of the outstanding Existing Notes.

7.      The Existing Notes rank equally with the unsecured indebtedness of the Parent (except those obligations preferred by operation of law) and are senior to any subordinated indebtedness of the Parent.

8.      Mega was incorporated on September 30, 2024 in preparation for proposing the Scheme.  On October 31, 2024, Mega executed a deed poll (the "Deed Poll") and on November 1, 2024, the second supplemental indenture (the "Second Supplemental Indenture") to the Indenture, pursuant to which (i) it agreed to be bound by all the terms and conditions of the Existing Notes as if it were an original party thereto and (ii) it acknowledged that it will be jointly and severally liable with the Parent for all obligations and liabilities under the Existing Notes.  The Deed Poll is governed by English law and the Second Supplemental Indenture is governed by New York law (the law governing the Indenture and the Existing Notes).  Following execution of the Deed Poll and the Second Supplemental Indenture, all creditors under the Existing Notes (the "Scheme Creditors") have the right to claim against Mega in respect of any obligations under the Existing Notes.

4

9. Further, Mega and the Parent entered into a deed of contribution on October 31, 2024 (the "Deed of Contribution"), pursuant to which Mega has irrevocably and unconditionally agreed to pay to the Parent, by way of contribution, an amount that is equal to Mega's share of the amount of any payment made by the Parent in respect of any obligation under the Existing Notes. Following execution of the Deed of Contribution, the Parent has a right of contribution against Mega in respect of payments made by it under the Existing Notes.

10. The guarantee and obligations under the Deed of Contribution provided by Mega are unsecured and rank equally with unsecured indebtedness of Mega and are senior to all subordinated indebtedness of Mega (except those obligations preferred by operation of law).

**C.    Events Precipitating Commencement of the English Scheme Proceeding**

   i. *Financial Distress*

11. Despite the Parent's efforts to comply with its financial obligations, adverse economic conditions beyond the Group's control have impaired the Parent's business and caused significant operational challenges, which has resulted in the Group facing severe liquidity constraints.

12. Numerous factors have contributed to this impairment. The global economy has recently experienced a period of volatility and has been adversely affected by a worldwide increase in inflation, loss of confidence in the financial sector, disruptions in the credit markets, reduced business activity, and erosion of consumer confidence. Rising inflationary pressures in the aftermath of the COVID-19 crisis have set the tone for the U.S. Federal Reserve, and central banks around the world, to tighten their monetary policies at a fast pace throughout 2022 and 2023.

13. The non-banking financial sector in Mexico has faced significant headwinds in recent years. Several companies in the sector have seen their ability to meet their payment

5

obligations compromised, leading to diminished investor confidence in the sector. Crédito Real, Tangelo, Alpha Credit, and Unifin all have pursued restructuring processes. Despite the Group's strong portfolio and robust risk management practices, funding sources have been severely diminished. This situation was further worsened by the rising interest rate environment, where potential refinancing options for the Group's debt became exceedingly expensive.

14.     Historically, the sector was funded through bullet-maturity loans, which created a mismatch between the maturity schedules of the institutions' loan portfolios and the maturity dates of their debt. This forced companies to constantly seek refinancing for these bullet loans to alleviate the timing discrepancy between cash receipts and debt repayment. When the Group encountered this common industry challenge, it was unable to successfully refinance its USD notes due to the previously mentioned sector headwinds.

15.     The Group has funded its operations through debt issuance in foreign currency and implemented a hedging strategy to mitigate the impact of USD/MXN exchange rate fluctuations. However, in the past few years, market conditions were such that the appreciation of the Mexican Peso against the U.S. Dollar triggered multiple margin calls on the Group's derivative positions, further pressuring the Group's liquidity.

    ii.  *Restructuring Process*

16.     Due to these macro and micro economic factors, which led to, in part, defaults under the Existing Notes, Mega has undertaken a restructuring via the English Scheme Proceeding, as supported by this proceeding. Once consummated, the restructuring will mitigate the risk of any member of the Group having to file for any formal insolvency or bankruptcy proceedings, on a protective basis or otherwise; leave in place a more sustainable capital structure, providing the Group with a strengthened balance sheet and a level of debt that it is capable of servicing going forward; provide necessary liquidity for the Group to allow it to continue to rebuild its business

6

and operations; and allow the Group to obtain new funding to finance its ongoing working capital requirements.

### D. The Current English Scheme Proceeding and Foreign Representative Appointment

17. The key terms of the Scheme, which is part of a larger restructuring being effectuated by the Parent, are described below.

      i. *New Refinancing Facility*

18. In connection with the restructuring, the Parent entered into, on September 18, 2024, a new secured facility agreement (the "New Refinancing Facility") with Banco Nacional Bancomext de Comercio Exterior. The proceeds of the New Refinancing Facility will be drawn down by the Parent contemporaneously with the issuance of the New Notes (as described below). The proceeds of the New Refinancing Facility will be used to fund the cash payments to be made to creditors as part of the restructuring (including payments to be made to Scheme Creditors pursuant to the Redemption Option (as described below)).

      ii. *New Notes*

19. Pursuant to the terms of the New Refinancing Facility, the Parent is obliged to obtain additional funding (to enable the restructuring of its existing debt, incur restructuring related expenses as well as for origination purposes) from other sources in the total amount of Ps.1,227,000,000 (or its equivalent in other currencies) (for the purposes of the commitments related to New Notes agreed to be equal to USD 61,237,630 (using the USD/MXN exchange rate as of November 6, 2024)) (the "New Notes Base Amount").

20. To satisfy the additional funding requirement the Parent will issue new notes on or before the Restructuring Effective Date in accordance with the Implementation Deed (the "New Notes").

i.  Tranche 1:
   a)  Tranche 1 in the amount of USD 10,000,000 will be subscribed in full for cash by an Affiliate of existing creditors of the Parent (the "Participating T1 New Noteholder") pursuant to a commitment letter entered into between the Parent, Mega and the Participating T1 New Noteholder on November 11, 2024. The Participating T1 New Noteholder will be entitled to a 2% commitment fee based on the amount of its commitment (fee may be deducted from the subscription amount of the relevant person).

ii. Tranche 2:
   a)  Each eligible holder of the Existing Notes will be entitled to subscribe by validly submitting their New Notes Election Form by the Election Deadline (as defined herein) (each such subscribing eligible holder, a "Participating T2 New Noteholder") in cash for New Notes in an amount equal to its pro rata portion of an aggregate amount of Tranche 2 in the amount of USD 51,237,630, such amount being the "Total Cash Component", calculated by reference to such Participating T2 New Noteholder's holding of Existing Notes as a proportion of the aggregate holdings of Existing Notes held by all holders of the Existing Notes at the Record Date being that Participating T2 New Noteholder's "New Notes Subscription Amount". The minimum Tranche 2 New Notes Subscription Amount shall be such that as a result of the cash subscription and the New Notes Roll-Up (described below) the relevant Participating T2 New Noteholder receives New Notes in a principal amount at least equal to USD 150,000.
   b)  Such Participating T2 New Noteholder shall also receive, in exchange for the amount of Existing Notes equal to its New Notes Subscription Amount, an additional amount of New Notes at an exchange ratio of 3.5 New Notes for every 1 Existing Note.
   c)  Accordingly, for every U.S. dollar of cash used by a Participating T2 New Noteholder to subscribe for the New Notes that Participating T2 New Noteholder will receive:
      1.  1 U.S. dollar of principal amount of New Notes (in exchange for cash); and
      2.  3.5 U.S. dollars of principal amount of New Notes (in exchange for its Existing Notes); and
      3.  1 U.S. dollar of the principal amount of Existing Notes held by the relevant Participating T2 New Noteholder will be extinguished,(the "New Notes Roll-Up").

8

21. Each Participating T2 New Noteholder will be entitled to elect the Redemption Option or Equity Option (as detailed below) in relation to the remaining unexchanged portion of its Existing Notes only.

22. The holders of the Existing Notes are requested to confirm their election to subscribe for the New Notes by the Voting Instruction Deadline, 5:00 p.m. (New York time) on December 9, 2024 (the "Voting Instruction Deadline").  However, Scheme Creditors' elections to participate in New Notes will only become binding on the Election Deadline.

23. In order to be eligible to be a Participating T2 New Noteholder, each holder of the Existing Notes shall (i) provide representations and confirmations confirming that they are not and they do not act on behalf or at the direction of a Sanctioned Person and subscription to and their receipt of New Notes and payment by them for the New Notes are in compliance with Sanctions; and (ii) provide customary representations with respect to their status for the purposes of any applicable securities laws.

iii. *Tranche 2 New Notes Backstop Commitment*

24. Members of an ad hoc group of holders of the Existing Notes (the "Ad Hoc Group" and the members thereof, the "Backstop Parties"), who collectively hold approximately 28.2% of the Existing Notes provided, pursuant to a commitment letter dated November 11, 2024, a commitment to backstop in cash an amount of New Notes equal to the Total Cash Component *less* (a) the aggregate principal amount of New Notes elected to be subscribed for by the Participating T2 New Noteholders, and (b) the aggregate principal amount of Existing Notes elected to be converted into the Parent's equity pursuant to the Equity Option.  The Parent may elect not to draw down on the backstop commitments to the extent the additional funding requirement under the New Refinancing Facility is satisfied through other means.

25. Each Backstop Party's individual backstop commitment will be on a pro rata basis calculated by reference to that Backstop Party's holding of Existing Notes as a proportion of the aggregate holdings of Existing Notes held by all the Backstop Parties as of the date of the backstop commitment letter.

26. Each Backstop Party shall be entitled to a backstop fee of 5% of its pro rata share of the backstop commitment ("Backstop Fee"), regardless of whether the backstop commitment is used in full or in part only. The backstop fee shall be payable to each Backstop Party at the time of issuance of the New Notes and may be deducted from the amount payable by that Backstop Party to subscribe for its allocation of New Notes (either as a Participating T2 New Noteholder or pursuant to the backstop commitment).

    iv. *Treatment of Existing Notes*

27. Existing Noteholders shall be entitled to elect by the election deadline (5:00 p.m. (EST) on December 16, 2024, the "Election Deadline") one of the following two options in respect of their Existing Notes:

    a. under the Redemption Option, the Parent and Mega will discharge all liabilities under relevant holder's Existing Notes (including any accrued and unpaid interest) in full on or before the Restructuring Effective Date for cash in USD at 45% of those Existing Notes' par value (inclusive of accrued and unpaid interest, such cash amount being the "Cash Entitlement"); or
    b. under the Equity Option (the "Equity Option"), liabilities under the relevant holder's Existing Notes (including any accrued and unpaid interest) shall be, on or before the Restructuring Effective Date, assigned to the Parent and such liabilities shall be converted into New Shares in the Parent (with the same rights as the Parent's existing shares) at par for a price per share (being USD 23.83) determined by the Parent's board of directors and approved by the Parent's shareholders based on report prepared for the Parent by 414 Capital Inc.; *provided that* the current controlling shareholders of the Parent retain at least 75% of the Parent's share capital post such conversion, in each case, redemption and/or exchange shall be made in full and final discharge of Mega's and the Parent's obligations under the Existing Notes.

28. On and from the Restructuring Effective Date, the Existing Notes and any documentation relating thereto shall be cancelled and be of no effect.

29. The cash consideration paid or payable by Mega and the Parent pursuant to the Redemption Option shall be funded out of the proceeds of the New Refinancing Facility, New Notes and/or Mega's and the Parent's own cash.

30. The Redemption Option shall be deemed to automatically apply to (1) any Existing Notes in respect of which no election has been made by the holders thereof by the Election Deadline; and (2) any Existing Notes owned, held or controlled by or on behalf of a Sanctioned Person, provided that in such case, the amount paid to redeem those Existing Notes shall be paid to and shall be held by the Parent in its capacity as the Holding Period Escrow Agent on the terms set out below so as to ensure compliance with Sanctions.

31. To the extent the amount of Existing Notes in respect of which Equity Option has been elected is such that the aggregate amount of New Shares in the Parent will be such that the current controlling shareholders' ownership in the Parent is at or below 75% of the Parent's voting share capital, the Redemption Option will be applied to the relevant proportion of the Existing Notes automatically on a pro rata basis amongst the electing holders of the relevant Existing Notes to ensure that the amount of New Shares in the Parent issued to third parties will be such that the current controlling shareholders' ownership in the Parent is at 75% of the Parent's voting share capital following the Restructuring Effective Date.

32. To be eligible to elect the Equity Option, Existing Noteholders must provide customary representations with respect to their status for the purposes of any applicable securities laws.

33. Pursuant to the terms of the Scheme and the English Scheme Proceeding, no Sanctioned Person may receive any funds or economic resources or any other benefit pursuant to the restructuring and always in accordance with Sanctions, including obtaining guidance or

11

authorization by the relevant Sanctions Authorities, as is agreed to be necessary between the legal advisors to Mega and the Parent and the Ad Hoc Group for the purposes of implementing the restructuring, including a valid license from OFAC.

> v. *Scheme Consideration*

34. The final amounts of the relevant Scheme Consideration for each Existing Noteholder, and the formulae underlying such amounts will be as set out in the Allocations Spreadsheet, which the Information Agent will complete promptly after the Election Deadline.

> vi. *Holding Period Escrow*

35. To the extent that any Cash Entitlements are attributable to Non-Eligible Existing Noteholders, such Cash Entitlements shall instead be transferred to the Holding Period Escrow Agent to be held in escrow (the "Holding Period Escrow").

36. Any Scheme Creditor, who is a Sanctioned Person, may deliver evidence to Mega showing that it is eligible to receive the Cash Entitlement and has ceased to be a Sanctioned Person. Upon Mega being sufficiently satisfied that such Scheme Creditor is entitled to receive (and Mega and the Holding Period Escrow Agent become entitled to make) the relevant distribution in compliance with applicable Sanctions, Mega shall instruct the Holding Period Escrow Agent to transfer to such Scheme Creditor (subject always to compliance with Sanctions) the Cash Entitlement.

37. At any time before the first anniversary of the Restructuring Effective Date (the "Holding Period Escrow Expiry Date"), upon any Non-Eligible Existing Noteholder delivering sufficient evidence to the Parent (as determined by the Parent in its sole and absolute discretion) showing that it is not or is no longer subject to Sanctions and/or is or becomes entitled to receive (and the Parent and the Holding Period Escrow Agent are or become entitled to make) the relevant distribution in compliance with Sanctions and provides such other representations and

confirmations as may be required to confirm its eligibility, the Holding Period Escrow Agent shall transfer to such holder (subject always to compliance with Sanctions) the cash amount attributable to such Non Eligible Holder.

38. To the extent that, prior to the Holding Period Escrow Expiry Date, a Non-Eligible Existing Noteholder provided a confirmation that it is a Sanctioned Person, the Holding Period Escrow Agent will continue to hold the monies attributable to such holder's Existing Notes and at any time after the Holding Period Escrow Expiry Date and upon such holder delivering sufficient evidence to the Parent (as determined by the Parent in its sole and absolute discretion) showing that it is no longer subject to Sanctions and/or becomes entitled to receive (and the Parent and the Holding Period Escrow Agent become entitled to make) the relevant distribution in compliance with Sanctions (subject always to a perpetuity period of 20 years following the Restructuring Effective Date and within no more than two months after the relevant Sanctions being lifted or the Non-Eligible Existing Noteholder otherwise ceasing to be subject to Sanctions or becoming entitled to receive (and the Parent and Holding Period Escrow Agent becoming entitled to make) (the "<u>SP Holding Period</u>") the relevant distribution in compliance with Sanctions), the Holding Period Escrow Agent shall transfer to such holder (subject always to compliance with Sanctions) the Cash Entitlement attributable to such Holder.

39. The Holding Period Escrow Agent will hold the cash amounts transferred to it pursuant to the Scheme in accordance with the Holding Period Escrow Agreement.

40. On and from the Holding Period Escrow Expiry Date or, if applicable the last day of the SP Holding Period, to the extent that any cash amounts comprised in the Holding Period Escrow has not been validly claimed or received by the relevant Scheme Creditor in accordance with the Holding Escrow Period Agreement, that Scheme Creditor's entitlement to receive cash

13

amounts comprised in the Holding Period Escrow shall be cancelled and the corresponding cash amounts shall be transferred by the Holding Period Escrow Agent to the Parent to be used at the Parent's discretion.

> vii. *English Scheme Proceeding*

41. The Scheme is an integral part of a broader restructuring of Parent's debt which, although not directly occurring in the Scheme, is premised on the transactions contemplated by the Scheme. Much like a proceeding under Chapter 11 of the Bankruptcy Code, the Scheme is necessary to enable approval of the modifications of the Existing Notes embodied in the restructuring without requiring the unanimous consent of the Existing Noteholders. The Scheme will permit the cram-down of non-participating or dissenting creditors if the majorities set forth in Part 26 of the Companies Act vote to approve the Scheme.

42. Mega filed the CPR Part 8 Claim Form to commence the English Scheme Proceeding on November 14, 2024. A hearing (the "Convening Hearing") occurred on November 21, 2024, pursuant to which an order of the English Court (the "Convening Order") was issued convening a meeting ("Scheme Meeting") of the Scheme Creditors for the purpose of considering and, if thought fit, approving the Scheme. The Scheme Meeting will occur on December 11, 2024. At the Scheme Meeting, Scheme Creditors will be able to attend in person or through counsel and make representations, although they are not obligated to do so. Scheme Creditors can raise issues as to the jurisdiction of the English Court to sanction the Scheme or to raise any other issue in relation to the constitution of the Scheme Meeting or which might otherwise affect the conduct of such Scheme Meeting ("Creditor Issues"). While Scheme Creditors can raise Creditor Issues at a later court hearing to sanction the Scheme anticipated to be held on or around December 13, 2024 (the "Sanction Hearing"), the English Court would expect them to show good reason why they did not raise such issues at the Convening Hearing.

43. Following registration of the order of the English Court at the Sanction Hearing with the UK Registrar of Companies, a Scheme Document will become effective and an Implementation Deed will be entered into to give effect to the principal steps of the Scheme. In addition, a deed of release will be entered into by, among others, the Parent, Mega and the Released Parties[4] and will provide waivers and releases limited in scope to liabilities that a Released Party has or may have to a Scheme Creditor in relation to, or arising out of or in connection with, the preparation, negotiation, or implementation of the Scheme and the specific steps described in the Scheme for its implementation (the "Deed of Release"). *See* Exhibit G. The Scheme contains a release of any and all claims of the Scheme Creditors subject to the Scheme (in essence being claims under the Existing Notes) against the Parent and Mega. In addition, the Scheme will, among other things, contain provisions preventing Scheme Creditors from exercising any rights, remedies, powers or discretions in contradiction of the provisions of the Scheme (including any action to commence any enforcement or other legal process against any member of the Group).

44. Pursuant to a duly executed resolution of appointment issued by Mega's sole director dated November 15, 2024 (the "Resolution"), the Foreign Representative has been (i) appointed to act as the foreign representative of Mega's English Scheme Proceeding for purposes

---

[4] The Released Parties include (i) Mega, (ii) the Parent in all capacities, (iii) the Existing Notes Trustee in its capacity as trustee under the Existing Notes Indenture (as defined herein), (iv) DTC in its capacity as depository under the Existing Notes Indenture, (v) Kroll Issuer Services Limited, in its capacity as information and settlement agent in relation to the Scheme, (vi) Cede & Co. in its capacity as nominee for the DTC as a registered holder of a global note in respect of the Existing Notes, (vii) UMB Bank, N.A. in its capacity as the New Notes Settlement Agent, (viii) the Scheme Creditors, (ix) each member of the Ad Hoc Group (as defined herein), and (x) the Advisor Released Parties (as defined in the Deed of Release). The Released Parties also include any of the Released Parties' current and former Affiliates or Related Entities (as defined in the Deed of Release), and each such person's and its Affiliates' and Related Entities' (and their Affiliates') current and former officers, managers, directors, predecessors, successors, assigns, principals, employees, agents, managed accounts or funds, management companies, fund advisers, investment managers or advisors (and any entity and its Affiliates which: (i) is managed or advised by such person's investment manager or advisor; or (ii) such person manages or advises in its capacity as investment manager or advisor (the "Affiliates")), advisory board members, financial advisers, partners, accountants, attorneys, investment bankers, consultants, representatives and other professionals, each in their capacity as such.

of this Chapter 15 Case pursuant to the Convening Order,[5] and (ii) authorized to commence this Chapter 15 Case.

**E.      Connections to the United States**

45.     The Existing Notes Indenture, which governs the Existing Notes that will be compromised under the Scheme, is governed by New York law. The Debtor also has assets in the United States in the form of interests in a $300,000 retainer with the office of Cleary Gottlieb Steen & Hamilton LLP, which is being held in a client trust account located in New York (the "Retainer Account").

**F.      Need for Chapter 15 Relief**

46.     The English Scheme Proceeding and the Scheme comport with the Companies Act and, as I am advised by U.S. counsel, satisfy the requirements for recognition and enforcement under chapter 15 of the Bankruptcy Code. Recognition of the English Scheme Proceeding, enforcement of the Scheme and the Sanction Order within the territorial jurisdiction of the United States will be critical components to implement the Scheme without disruption or the threat of adverse actions by dissenting creditors against the Debtor or its assets in the United States. Without assistance from this Court, the Scheme could be fundamentally undermined to the detriment of all parties in interest. I believe that the interests of all Scheme Creditors are aligned with the Debtor in obtaining recognition of the English Scheme Proceeding, and enforcement of the Scheme within the territorial jurisdiction of the United States to ensure that the Scheme is implemented successfully.

47.     As foreign representative of the Debtor, I have directed our United States counsel, Cleary Gottlieb Steen & Hamilton LLP, to seek the relief sought by the First Day Pleadings. All

---

[5]  See Exhibit E of the Verified Petition.

certified documents, statements, lists and documents required under chapter 15 of the Bankruptcy Code and the Bankruptcy Rules have been filed contemporaneously herewith.

## NO PENDING U.S. BANKRUPTCY CASES FILED BY THE DEBTOR

48. The Debtor does not have a pending petition with the Bankruptcy Court for relief under chapter 15 other than the Verified Petition, or any other chapter of title 11 of the United States Code.

## NO OTHER PENDING FOREIGN PROCEEDINGS OR PERSONS AUTHORIZED TO ADMINISTER FOREIGN PROCEEDINGS

49. I am not aware of any pending foreign proceeding, as that term is defined in section 101(23) of the Bankruptcy Code, other than the English Scheme Proceeding, nor any persons, other than myself, authorized to administer any pending foreign proceeding of the Debtor.

## PARTIES TO LITIGATION IN THE UNITED STATES

50. Mega is not a party to any litigation in the United States as of the date of the commencement of the Chapter 15 Case.

## CORPORATE OWNERSHIP STATEMENT PURSUANT TO BANKRUPTCY RULES 1007(a)(4) and 7007.1

51. The following disclosure identifies for the Court any corporation, other than a governmental unit, that directly or indirectly owns 10% or more of any class of the Debtor's equity interests:

    a. 100% of Mega's equity is directly owned by the Parent.

Executed at Guadalajara, Jalisco, Mexico
Dated: November 25, 2024

Respectfully Submitted,

_____
Ignacio Javier Gonzalez Delgadillo
Director
Mega Newco Limited
Judicial and Authorized Foreign
Representative of the Debtor