David H. Botter, Esq.
Thomas S. Kessler, Esq.
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Attorneys for the Foreign Representative*
*of Mega Newco Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Mega Newco Limited,[1]<br><br>Debtor in a Foreign Proceeding | Chapter 15<br><br>Case No. 24-12031 (MEW) |

**STATEMENT OF THE FOREIGN REPRESENTATIVE**
**REGARDING THE STATUS OF THE ENGLISH SCHEME PROCEEDING**

I, Ignacio Javier Gonzalez Delgadillo (the "Petitioner" or the "Foreign Representative"),

pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United

States of America as follows:

1.     I am the duly-appointed foreign representative in the scheme of arrangement

proceeding (the "English Scheme Proceeding")[2] of Mega Newco Limited ("Mega" or "Debtor")

in the High Court Of Justice Business And Property Courts of England and Wales (the "English

Court") pursuant Part 26 of the Companies Act 2006, as modified (the "Companies Act"), and

---

[1]     The last four identifying digits of the registered number are 6024 and with registered address at Suite 1, 7th Floor 50 Broadway London SW1H 0DB, United Kingdom.

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the *Verified Petition for (I) Recognition of Foreign Proceeding, (II) Recognition of Foreign Representative, (III) Recognition of Sanction Order and Related Scheme and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code, ECF No. 2,* (the "Verified Petition").

respectfully submit this statement (the "Statement") regarding the status of the English Scheme Proceeding.

2.        I am over the age of 18, and I make this declaration on the basis of documentation I have reviewed and facts known to me through my work as the sole director at Mega.  Where relevant information has been provided to me by others, the information is true to the best of my knowledge and belief.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

### Update Regarding English Scheme Proceeding

3.        On January 24, 2025, Mega filed the *Supplemental Motion to the Verified Petition for Entry of Order Extending Automatic Stay to Non-Debtor Parent* (the "Supplemental Motion") (ECF No. 15).  The Supplemental Motion explained that there was a delay in receipt of a license from the U.S. Office of Foreign Asset Control (such license the "OFAC License") which could cause a delay in the English Scheme Proceeding and necessitating an interim stay of enforcement proceedings against Mega's parent company.  However, on January 29, 2025, the OFAC license was received, allowing the English Scheme Proceeding to move forward.  As such, the Mega has now withdrawn the Supplemental Motion.  *See* ECF No. 19.

4.        The Scheme Meeting occurred on February 3, 2025.  75.9% of Scheme Creditors (in value and excluding Sanctioned Persons excluded from voting pursuant to the order made by the Court at the Scheme's Convening Hearing) attended the Scheme Meeting.  100% of present and voting Scheme Creditors voted in favor of the resolution to approve the Scheme.  As a result, the Scheme met the required creditor support threshold, i.e., approval by 75% in value of Scheme Creditors present and voting at the Scheme Meeting.

5.      On February 5, 2025, the English Court held the Sanction Hearing.  No objections were received and the English Court sanctioned the Scheme.  In advance of the Sanction Hearing, the Debtor filed a summary of the arguments it intended to make to support its request that the English Court sanction the Scheme (the "Skeleton Argument").  A copy of the Skeleton Argument is attached hereto as Exhibit A.

6.      The final Sanction Order was entered by the English Court and filed with the Companies House on February 5, 2025.  It is attached hereto as Exhibit B.

Executed in Guadalajara, Jalisco, Mexico
on February 5, 2025

/s/ Ignacio Javier Gonzalez Delgadillo
Ignacio Javier Gonzalez Delgadillo
Director
Mega Newco Limited
Judicial and Authorized Foreign
Representative of the Debtor

## **Exhibit A**

**Skeleton Argument**

Claim No. CR-2024-006908

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**INSOLVENCY AND COMPANIES LIST (ChD)**

**IN THE MATTER OF MEGA NEWCO LIMITED**

**AND IN THE MATTER OF THE COMPANIES ACT 2006**

---

**SKELETON ARGUMENT ON BEHALF OF THE SCHEME COMPANY**

---

**Hearing time estimate:** 2 hours

**Pre-reading time estimate:** 2-3 hours

**Bundle references are set out in the form {tab/page}.**

**Suggested pre-reading:** the second witness statement of Mr José Guillermo Romo Romero dated 3 February 2025 (**Romero 2**);[1] the second witness statement of Mr Alessandro Zorza dated 3 February 2025 (**Zorza 2**);[2] and the Chairperson's Report.[3]

Prior to the Convening Hearing, it is understood that the Court also read the first witness statement of Mr José Guillermo Romo Romero dated 18 November 2024 (**Romero 1**);[4] the expert report of Mr Daniel Glosband dated 18 November 2024 (**Glosband 1**);[5] and the expert report of Mr José Gabriel Mendoza González dated 18 November 2024 (**González 1**).[6] The key points arising from Romero 1, Glosband 1 and González 1 are identified below.

**INTRODUCTION**

1.    This skeleton argument is filed on behalf of Mega Newco Limited (the **Scheme Company**) for the sanction hearing on 5 February 2025. The Scheme Company seeks

---

[1] {D7/56-68}.
[2] {D8/69-79}.
[3] {U47/2596-2618}.
[4] {D4/12-39}.
[5] {E9/80-127}.
[6] {E10/128-141}.

an order sanctioning a scheme of arrangement (the **Scheme**) between it and certain of its creditors (the **Scheme Creditors**) under Part 26 of the Companies Act 2006 (**CA 2006**).

2.    The Scheme Company is incorporated in England and Wales. It is a direct subsidiary of Operadora de Servicios Mega, S.A. de C.V., SOFOM, E.R. (the **Issuer**), which is a company incorporated in Mexico.[7]

3.    The Scheme Company is an obligor in respect of notes originally issued by the Issuer, which have a coupon of 8.25% and a maturity date of 11 February 2025 (the **Existing Notes**). The Existing Notes are governed by New York law. The purpose of the Scheme is to implement a restructuring of the Existing Notes, and the Scheme Creditors are the ultimate beneficial owners of the Existing Notes.  The Scheme will be implemented as part of a wider restructuring (the **Restructuring**).

4.    The Issuer is the parent of the group of companies of which the Scheme Company forms part (the **Group**). The Group is a leading Mexican financial services provider, headquartered in Guadalajara, Jalisco, with branches across Mexico and an additional office located in San Diego, California.

5.    As explained below, the Group is facing severe liquidity constraints, and the Issuer has defaulted on several of its debts, including the Existing Notes. The Group has insufficient monies to repay the Existing Notes in full when they mature on 11 February 2025.

6.    If the Scheme and wider Restructuring fail, then it is highly likely that the Issuer and other companies within the Group, including the Scheme Company, will be forced to enter insolvent liquidation.[8] The expected returns for Scheme Creditors in that eventuality are likely to be materially worse than under the Scheme.

7.    At the hearing on 21 November 2024 (the **Convening Hearing**), Meade J made an order convening a single meeting of Scheme Creditors to consider, and if thought fit, approve the Scheme (the **Scheme Meeting**) (the **Convening Order**)[9] and gave a

---

[7] Romero 1, para.18 {D4/16}.
[8] Romero 1, para. 54 {D4/26}.
[9] {B2/4-8}.

2

judgment explaining his reasons for making the Convening Order (the **Convening Judgment**).[10] The Scheme Meeting took place on 3 February 2025, following two adjournments on 11 December 2024 and 22 January 2025. The adjournments were necessary because the Scheme Company had not yet received a licence from the US Department of the Treasury's Office of Foreign Asset Control (**OFAC**), which was required to allow voting at the Scheme Meeting. A licence was received from OFAC on 29 January 2025 (the **OFAC Licence**).

8.    At the Scheme Meeting, the Scheme was unanimously approved by those present and voting (in person or by proxy). There is no indication that any Scheme Creditor intends to attend the Sanction Hearing or opposes the order for sanction sought.

## BACKGROUND

### The Group

9.    The Group offers leases for machinery, equipment, transportation vehicles and other capital assets used in a variety of industries in Mexico. It also provides financing to small and medium-sized businesses to acquire durable goods and equipment, in addition to liquidity and financing solutions for their working capital needs. The Group's auto loans business is based in San Diego, California, and provides loans for the purchase of pre-owned personal vehicles.[11]

### The Group's financing arrangements

10.    The Group's financing arrangements include:

10.1   the Existing Notes. As at 31 October 2024, the aggregate principal amount outstanding under the Existing Notes was approximately US$350,758,000;[12]

10.2    floating rate senior notes due 2027 issued by the Issuer (the **Cebures**). The aggregate amount outstanding under the Cebures (including principal and accrued interest) is equivalent to approximately US$150,000,000;

---

[10] {W49/2621-2624}.
[11] Explanatory Statement, Part 2, para. 1.4 {F11.2/166}.
[12] Explanatory Statement, Part 2, para. 4.2 {F11.2/168}

3

10.3    eight secured and unsecured credit facilities, comprising term loans and working capital facilities, between the Issuer and various lenders in Mexico and governed by Mexican law (the **Mexican Facilities**). The aggregate amount outstanding under the Mexican Facilities (including principal and accrued interest) is equivalent to approximately US$127,000,000; and

10.4    twelve additional facilities, comprising facility agreements and term loans, between the Issuer and various international lenders primarily used to extend credit to customers (the **International Facilities**; together with the Mexican Facilities, the **Bilateral Facilities**). As at 30 June 2024, the aggregate amount outstanding under the International Facilities (including principal and accrued interest) was approximately US$83,000,000.

11.    The only liabilities subject to the Scheme itself are the liabilities in respect of the Existing Notes (the **Scheme Liabilities**). Amendments and waivers under the terms of the Cebures and Mexican Facilities, and the restructuring of the International Facilities, will form part of the wider Restructuring and are conditional on the implementation of the Scheme and vice versa.[13] As to the Existing Notes:[14]

11.1    These were originally issued pursuant to an indenture dated 11 February 2020 (the **Existing Notes Indenture**), between, *inter alios*, the Issuer and Wilmington Trust, National Association (the **Existing Notes Trustee**).

11.2    The Existing Notes Indenture is governed by New York law.

11.3    The Existing Notes are constituted by a global note, the registered holder of which is Cede & Co (the **Registered Holder Nominee**) as nominee for the Depositary Trust Company (**DTC**).

11.4    The Existing Notes are unsecured and rank equally with the Issuer's other unsecured indebtedness.

11.5    As explained below, the Scheme Company is an obligor in respect of the Existing Notes.

---

[13] Explanatory Statement, Part 2, para. 4.10 {F11.2/170}.
[14] Romero 1, paras. 29-34 {D4/18-19}; Explanatory Statement, Part 2, para. 4.2 {F11.2/167-168}.

12.   As mentioned above, the Scheme Creditors comprise the holders of the ultimate beneficial interests in the Existing Notes (the **Existing Noteholders**). They are contingent creditors of the Scheme Company, since they have the right to call for definitive notes in identified circumstances.[15]

**The Scheme Company**

13.   The Scheme Company was incorporated on 30 September 2024 for the purpose of the Scheme and has no substantive business operations of its own.[16] It became an obligor in respect of the Existing Notes in the following circumstances:

13.1  On 31 October 2024, the Scheme Company executed a deed poll, pursuant to which it agreed to be bound by the terms of the Existing Notes Indenture and acknowledged that it would be jointly and severally liable for all liabilities under the Existing Notes Indenture (the **Deed Poll**). The Deed Poll is governed by English law.

13.2  On the same date (31 October 2024), the Scheme Company and Issuer entered a deed of contribution (the **Deed of Contribution**), pursuant to which the Scheme Company irrevocably and unconditionally agreed to pay the Issuer an amount equal to 50% of any payment made by the Issuer under the Existing Notes. The Deed of Contribution is also governed by English law.

13.3  As a result of the Deed of Contribution, if any of the Scheme Creditors were to pursue the Issuer in respect of payments due under the Existing Notes, the Issuer would have a 'ricochet' claim for a contribution against the Scheme Company. The existence of a ricochet claim means that, for the purposes of the Scheme, it is necessary to include a 'third party release' of the Scheme Creditors' claims against the Issuer (in addition to their claims against the Scheme Company). The use of a deed of contribution for these purposes is not novel and has been approved by the Court: see, e.g., _Re Swissport Fuelling Limited_ [2020] EWHC 3413 (Ch) at [66]-[73] _per_ Trower J, where the use of a deed of contribution was held to be appropriate after hearing adversarial argument; and _Re E D & F Man_

---

[15] Section 2.07(c) of the Existing Notes Indenture {Q39/1207-1209}. See also sections 3.22 and 6.06 of the Existing Notes Indenture {Q39/1239-1243} {Q39/1253}.
[16] Explanatory Statement, Part 2, para. 1.2 {F11.2/166} and para. 4.2 {F11.2/167}.

_Holdings Limited_ [2022] EWHC 687 (Ch) at [65]-[66] _per_ Trower J, amongst many other cases.

13.4   As noted above, the Existing Notes are governed by New York law. On 1 November 2024, the Scheme Company executed a second supplemental indenture (the **Second Supplemental Indenture**), governed by New York law pursuant to which the Scheme Company acceded to the Existing Notes Indenture as a guarantor. Unlike the Deed Poll, the Second Supplemental Indenture is a contractual accession of the Scheme Company as a guarantor in accordance with the terms of the Existing Notes. Thus, there can be no doubt that the Scheme Company is liable for the Existing Notes.

13.5   Mr Glosband has confirmed that the Scheme Company's assumption of obligations in respect of the Existing Notes under the terms of the Second Supplemental Indenture was effective as a matter of New York law. [17]

## (A)   The Group's financial difficulties

14.   The Group's liquidity has recently become severely constrained due to adverse economic conditions beyond its control which have impaired its business and caused significant operational challenges: [18]

14.1   a period of volatility in the global economy, characterised by a worldwide increase in inflation, loss of confidence in the financial sector, disruptions in credit markets, reduced business activity and dented consumer confidence;

14.2   the non-banking financial sector in Mexico has faced significant headwinds in recent years, diminishing both investor confidence in the sector and funding sources at a time of rising interest rates, with the consequence that the Group's options to refinance its debt have become extremely expensive; and

14.3   the Group has funded its operations by issuing debt in US dollars, but the appreciation of the Mexican Peso against the US dollar has triggered multiple

---

[17] Glosband 1, para. 11 {E9/86-87}.
[18] Explanatory Statement, Part 3, para. 1.1 {F11.3/171}.

margin calls on the Group's derivative positions, squeezing the Group's liquidity.[19]

15.    The Group's cashflow has suffered as a result. The Issuer has defaulted in respect of certain of its obligations under the Existing Notes, the Bilateral Facilities and the Cebures.[20] The Group further anticipates that it will have insufficient funds to repay the Existing Notes on their maturity date of 11 February 2025.[21]

**(B)    Engagement with the Scheme Creditors**

16.    On 12 August 2024, the Issuer announced it was in the process of engaging with its creditors.[22] Subsequently, the Issuer entered into a non-disclosure agreement with an *ad hoc* group of Existing Noteholders, holding collectively c.28.2% of the Existing Notes (the **AHG**) to facilitate discussions regarding the Scheme.[23]

17.    On 11 November 2024, the Issuer, Scheme Company and the AHG entered into a lock-up agreement (the **Lock-up Agreement**). As to this:

17.1    The Lock-up Agreement was made available to all Scheme Creditors on the "**Scheme Website**".[24] All Scheme Creditors (who are not Sanctioned Persons) could accede to the Lock-up Agreement.[25]

17.2    An announcement publicising the entry into the Lock-up Agreement and the proposed Scheme was distributed to Existing Noteholders through the Scheme Website, the Issuer's website (the **Issuer Website**), DTC, Clearstream Banking S.A. and Euroclear Bank S.A./N.V. (together, the **Clearing Systems**) and the SGX-ST.[26]

---

[19] Romero 1, para. 38 {D4/20-21}; Explanatory Statement, Part 3, para. 1.3 {F11.3/171}.
[20] Romero 1, para. 39 {D4/21-22}; Explanatory Statement, Part 3, para. 1.8 {F11.3/172}.
[21] Explanatory Statement, Part 3, para. 1.7 {F11.3/172}.
[22] Explanatory Statement, Part 3, para. 2.2 {F11.3/173}.
[23] Explanatory Statement, Part 3, para. 2.3 {F11.3/173}.
[24] Established by the Information Agent, Kroll Issuer Services Limited.
[25] Explanatory Statement, Part 3, para. 2.6 {F11.3/173}.
[26] Explanatory Statement, Part 3, para. 2.5 {F11.3/173}.

17.3   Scheme Creditors could accede to the Lock-Up Agreement at any time before the Scheme Meeting.[27] (Scheme Creditors who sign up to the Lock-up Agreement are referred to as **Consenting Noteholders**.)

**(C)**   <u>**The Comparator**</u>

18.   As Trower J explained in <u>*Re E D & F Man Holdings Ltd*</u> [2022] EWHC 687 (Ch) at [39]:

> "*In my view, the court should recognise that the directors are normally in the best position to identify what will happen if a scheme or restructuring plan fails. Where the evidence appears on its face to reflect a rational and considered view of the company's board, the court will require sufficient reason for doubting that evidence*."

19.   Mr Romero, who is a director of the Issuer and an authorised representative of the Scheme Company,[28] explains that if the Scheme is not sanctioned:

19.1   the Restructuring will not be implemented;

19.2   the Scheme Company and the Issuer will almost immediately default on the Existing Notes;

19.3   the Lock-up Agreement will terminate on the Longstop Date (28 February 2025) or could be terminated by the requisite majority of the consenting noteholders; and

19.4   upon termination of the Lock-up Agreement, the Existing Noteholders will be at liberty to take enforcement action due to the outstanding defaults under the Existing Notes.[29]

20.   In these circumstances, and in light of the extensive prior engagement with the Group's creditors, Mr Romero considers that it is unlikely the Group would secure the necessary creditor support to implement an alternative transaction outside of an insolvency, and

---

[27] Explanatory Statement, Part 3, para. 2.6 {F11.3/173}.
[28] Romero 1, para. 1 {D4/12}.
[29] Romero 1, para.52 {D4/25}.

unlikely that the Group would be able to secure alternative funding to repay the Existing Notes.[30]

21. Accordingly, if the Scheme is not sanctioned, and the wider Restructuring (which is conditional on the sanction of the Scheme and vice versa) is not implemented, then it is likely that the Issuer would cease to operate as a going concern, and it would be necessary to place the Issuer, the Scheme Company and other Group companies into insolvency proceedings. These proceedings would involve an insolvent liquidation in the case of the Scheme Company, and the Mexican equivalent for the Issuer and other Group companies.[31] This scenario is the comparator to the Scheme (the **Comparator**).

22. A liquidation analysis was appended to the Explanatory Statement (the **Liquidation Analysis**).[32] The Liquidation Analysis shows that in the Comparator, Existing Noteholders have an estimated recovery rate of 30.79% in respect of their unsecured claims, which will likely not be realised for a significant period of time. That prospective return in the Comparator compares unfavourably with the likely returns (both in amount as well as timing) under the Scheme.

**THE RESTRUCTURING**

**The Scheme**

23. The key features of the Scheme[33] are as follows:

23.1 The Existing Noteholders will have an option to accept either a haircut on their Existing Notes or a debt for equity swap (up to a certain cap). Specifically, Existing Noteholders will be entitled to elect to:

23.1.1 receive a cash amount equal to 45% of their Existing Notes in discharge of the Scheme Company and Issuer's liabilities under that holder's Existing Notes (the **Redemption Option**); or

---

[30] Romero 1, para. 53 {D4/26}.
[31] Romero 1, para. 54 {D4/26}.
[32] Given that the Scheme is unopposed and was approved by 100% of those voting at the Scheme Meeting, no formal expert report under CPR Part 35 has been obtained in respect of the Liquidation Analysis.
[33] See the Scheme Document at {J31/902-938}.

9

      23.1.2  have liabilities under their Existing Notes assigned to the Issuer on or before the Restructuring Effective Date and converted into new voting shares in the Issuer, at a price of US$23.83 per share (as determined on the basis of an equity valuation report prepared by 414 Capital), provided that the current controlling shareholders of the Issuer retain 75% of the Issuer's share capital (the **Equity Option**; together with the Redemption Option, the **Scheme Consideration Options**).

23.2  Under the Scheme Consideration Options, the redemption or exchange (as applicable) will be in full and final discharge of the Issuer and the Scheme Company's liabilities under the Existing Notes, which will be cancelled on the Restructuring Effective Date.

23.3  Scheme Creditors may submit or amend their elections between the Scheme Consideration Options up until 5pm New York time on 6 February 2025 (the **Election Deadline**). If any Existing Noteholder fails to make an election by the Election Deadline, they will be deemed to have opted for the Redemption Option.[34]

24.    Any Existing Noteholders who are or act for, on behalf of, or at the direction of a "**Sanctioned Person**" will not be able to make their elections (as a result of sanctions legislation), and the Redemption Option will be automatically applied to their Existing Notes.[35]

25.    The Explanatory Statement defines the concept of a Sanctioned Person.[36] In essence, a Sanctioned Person is any person, or any person who acts on behalf of or at the direction of a person: (i) who is subject to US, UN, EU (or EU Member State) and/or UK economic or financial sanctions (**Sanctions**); (ii) located, ordinarily resident in or organised under the laws of countries subject to comprehensive Sanctions; or (iii) with whom the Scheme Company, the AHG and/or their respective advisers, or the Existing Notes Trustee or any Agent cannot deal or otherwise engage with in relation to either

---

[34] Explanatory Statement, Part 3, para. 3.11 {F/177}.
[35] Explanatory Statement, Part 3, para. 3.11 {F/177}.
[36] Explanatory Statement, Part 8 {F11.8/231}.

the Existing Notes or the implementation of the Restructuring without breaching Sanctions.

26.    The Scheme Company previously estimated that Sanctioned Persons hold c.40.3% of the Existing Notes.[37] Four Scheme Creditors who the Scheme Company believes are Sanctioned Persons, and who hold approximately 30.17% of the Existing Notes, submitted Account Holder Letters indicating that they did not propose to attend the Scheme Meeting or appoint any individual as their proxy or representative to attend the Scheme Meeting on their behalf. They have not presented any objections to the Scheme and in fact elected the Redemption Option in their Account Holder Letters.[38] The Scheme Company's understanding is that these four Scheme Creditors support the Scheme. The Scheme Company does not have any further information with respect to the status of the remaining c.10% of the Existing Notes previously estimated to be held by the Sanctioned Persons.[39]

27.    Under the Scheme, the amount to be paid to redeem Existing Notes held by the Sanctioned Persons will be held in escrow until such time as they are no longer subject to Sanctions (as further described below).

**The New Refinancing Facility**

28.    In connection with the Restructuring, the Issuer entered into a new secured facility agreement with Bancomext on 18 September 2024 (the **New Refinancing Facility**). The purpose of the New Refinancing Facility is to fund cash payments to be made as part of the Restructuring, including payments to made pursuant to the Redemption Option.[40]

29.    Under the terms of the New Refinancing Facility, the Issuer must obtain additional funding. To that end, the Issuer will issue new notes on or before the Restructuring Effective Date (the **New Notes**) in three tranches. The second tranche (the **Tranche 2 New Notes**) will be available to Existing Noteholders. They will be entitled, but not

---

[37] Romero 1, para. 46 {D4/23}.
[38] Romero 2, para. 33 {D7/64}.
[39] Romero 2, para. 34 {D7/64}.
[40] Romero 1, para. 51 {D4/25}.

obliged, to subscribe for the Tranche 2 New Notes for cash *pro rata* to their holding of Existing Notes.

30.    There will be an additional incentive for the Existing Noteholders who elect to participate in the Tranche 2 New Notes. In particular, where an Existing Noteholder subscribes for Tranche 2 New Notes, that Existing Noteholder will exchange an equivalent amount of Existing Notes for Tranche 2 New Notes at a ratio of 3.5 to 1. The relevant Existing Noteholder will then be able to elect either the Redemption or Equity Option in respect of the balance of its Existing Notes under the Scheme.

31.    Some members of the AHG have agreed to provide a backstop commitment in respect of the Tranche 2 New Notes (the **Backstop Parties**) for which service they shall receive a cash backstop fee of 5% of the total amount of their backstop commitment payable upon issuance of the New Notes (the **Backstop Fee**).

32.    Existing Noteholders who are, or act on behalf of or at the direction of, a Sanctioned Person, are not entitled to participate in the Tranche 2 New Notes.

### General Terms / Mechanics

#### Scheme Company Authority

33.    The Scheme grants the Scheme Company the authority, on behalf of all Scheme Creditors, to enter into certain documents and instruments necessary to implement the Restructuring (the "*Implementation Documents*" as defined in the Scheme Document.[41]

#### Customary releases

34.    Under the terms of the Scheme Document, the Scheme Company is granted authority to execute the Deed of Release on behalf of Scheme Creditors.[42]

35.    The Scheme and the Deed of Release provide for the release of the claims of the Existing Noteholders against the Issuer and the Scheme Company. Although the Issuer is not itself proposing the Scheme, it is well-established that the Court has jurisdiction to sanction a scheme which includes a release against third party obligors. This practice

---

[41] Scheme Document, Clause 4.1 {J31/918-920}.
[42] Scheme Document, Clause 6.1 {J31/929}.

has been applied by the Court for several years. See _Re Lehman Brothers International (Europe)_ [2009] EWCA Civ 1161 at [63] per Patten LJ:

> "_It seems to me entirely logical to regard the court's jurisdiction as extending to approving a scheme which varies or releases creditors' claims against the company on terms which require them to bring into account and release rights of action against third parties **designed to recover the same loss**. The release of such third party claims is merely ancillary to the arrangement between the company and its own creditors_."

36. This principle followed a line of authorities (in England and abroad) which reached the same conclusion: see e.g. _Re T&N Ltd (No 4)_ [2007] Bus LR 1411 at [53] per David Richards J, where the third party release was held to be essential to the operation of the scheme.

37. Applying this principle, it has frequently been held that a scheme can include a release of the creditors' claims against another obligor within the same corporate group: see e.g. _Re La Seda de Barcelona SA_ [2010] EWHC 1364 (Ch) at [19]-[23] per Proudman J. That is so even if the scheme company has acceded to the finance documents for the sole purpose of proposing the scheme: see _Re Gategroup Guarantee Ltd_ [2021] BCC 549 at [163] per Zacaroli J, where the company became an obligor by executing a deed poll shortly before the convening hearing.

38. In addition, the Deed of Release provides for customary releases of any claims which the Scheme Creditors may have against the professional advisers to the Scheme Company, the directors of the Scheme Company and other involved in the Scheme, provided that the release only extends to claims arising out of any act or omission undertaken in connection with the negotiation and implementation of the Scheme and/or Restructuring.[43] It is common practice to include these releases and the Court has held that they fall within the concept of a compromise or arrangement under Part 26 of the CA 2006: see, e.g., _Re Noble Group Ltd (No.2)_ [2019] 2 BCLC 548 at [20]-[30] _per_ Snowden J.

## Deed of Undertaking

39. Key parties whose participation is required to implement the Scheme and/or Restructuring have executed and delivered a Deed of Undertaking in favour of the

---

[43] Deed of Release, Clause 2.1 {J31.1/942-943}.

Scheme Company and Scheme Creditors , agreeing and undertaking to, in summary: (i) execute the Implementation Documents to which they are a party; and (ii) promptly perform all such acts and things as may be necessary for the purpose of giving effect to Implementation Documents.[44]

## International Facilities and Cebures

40.    The Scheme forms part of a wider Restructuring, conditional on the implementation of the Scheme, pursuant to which:

    40.1    The International Facilities Lenders have the option to elect to have:[45]

        40.1.1    all liabilities discharged under the relevant International Facility on or before the Restructuring Effective Date in cash at 47.5% of par value (the **International Facilities Redemption Option**);

        40.1.2    the principal payment terms of the relevant International Facility amended, so that every instalment of principal that has fallen due or will fall due from December 2023 until December 2026 shall be deferred and become due and payable 11 months from the original due date in 17 equal monthly instalments and secured over certain residual rights of the Issuer (the **International Facilities A&E Option**); or

        40.1.3    liabilities under the relevant International Facility exchanged, on or before the Restructuring Effective Date, for Tranche 3 New Notes at par (the **International Facilities Lenders New Notes Option**). The issuance of Tranche 3 New Notes will be subject to a cap of US$30,000,000, and to the extent that the aggregate amount of Tranche 3 New Notes exceeds that amount, they will be distributed *pro rata* amongst participating lenders, and any remaining amounts of their liabilities will, at their election, be subject to the International Facilities Redemption or A&E Options.[46]

    40.2    As regards the Cebures, it has been agreed that:

---

[44] Deed of Undertaking, Clause 2.1 {J31/918}.
[45] Explanatory Statement, Part 3, para. 3.14 {F11.3/177-178}.
[46] Explanatory Statement, Part 3, para. 3.14 {F11.3/177-178}.

40.2.1  any defaults under the Cebures will be fully and finally waived, in return
for which each holder will receive a waiver fee on the Restructuring
Effective Date;

40.2.2  the terms of the Cebures shall be amended as necessary to implement the
Restructuring; and

40.2.3  claims under the Cebures will be secured over certain residual rights of
the Issuer.[47]

## Lock-up Fee

41.  Each Existing Noteholder that acceded to the Lock-up Agreement before the Scheme
Meeting and votes in favour of the Scheme will receive a fee in an amount equal to 1%
of the aggregate principal amount of Existing Notes they hold (the **Lock-up Fee**). The
Lock-up Fee will be paid by the Scheme Company to the Consenting Noteholders on or
before the Restructuring Effective Date.[48]

## Outcomes under the Scheme

42.  A slide deck prepared by Houlihan Lokey was appended to the Explanatory Statement
(the **HL Analysis**).[49] The HL Analysis explains that Scheme Creditors have the option
to choose to cash out their Existing Notes at 45% of their value under the Redemption
Option or exchange them for equity in the Issuer at a price of US$23.83 a share, which
provides an estimated nominal recovery of 55.54% of their Existing Notes. However,
the HL Analysis rightly acknowledges that the value of the shares will be difficult, if
not impossible, to realise in the near term. Accordingly, the HL Analysis opines that the
Redemption Option offers a better outcome. Both these options nevertheless compare
favourably with the likely returns for Scheme Creditors in the Comparator (an
estimated recovery rate of 30.79% which will likely not be realised for a significant
period of time).

---

[47] Explanatory Statement, Part 3, paras 3.15-3.16 {F11.3/178}.
[48] Explanatory Statement, Part 3, para. 2.8 {F11.3/173}.
[49] {G/367-379}. Given that the Scheme is unopposed and was approved by 100% of those voting at the Scheme
Meeting, no formal expert report under CPR Part 35 has been obtained in respect of the HL Analysis.

## DEVELOPMENTS SINCE THE CONVENING HEARING

### Distribution of the Scheme Documents

43. At the Convening Hearing on 21 November 2024, Meade J made an order giving the Scheme Company permission to convene a single meeting of Scheme Creditors to vote on the Scheme (the Scheme Meeting).

44. As is customary, the Convening Order required notification of the Scheme Creditors of the Scheme Meeting and dissemination of the Scheme Documents in advance of the Scheme Meetings. The Scheme Company has complied with these obligations:

    44.1 the Notice of the Scheme Meeting was sent, and the Explanatory Statement was first distributed, to Scheme Creditors on 21 November 2024;

    44.2 the Explanatory Statement was sent on 21 November 2024;

    44.3 on 29 November 2024, the Scheme Company distributed a supplementary explanatory statement (the **First Supplementary Explanatory Statement**) which clarified certain information requested from Scheme Creditors in the New Notes Election Form, and distributed the final form of certain of the Implementation Documents (in line with the summaries of their key terms already provided in the original Explanatory Statement); and

    44.4 on 9 December 2024, a further supplementary explanatory statement (the **Second Supplementary Explanatory Statement**) was circulated which dealt with some minor amendments to the Scheme Document, Deed of Release and the Implementation Deed as a result of comments from the Existing Notes Trustee.

### The Scheme Meeting

45. The Scheme Meeting took place on 3 February 2025, following two adjournments on 11 December 2024 and 22 January 2025. As mentioned above, the adjournments were necessary because the Scheme Company had not received the OFAC Licence (which was required to allow voting at the Scheme Meeting). The OFAC Licence was received on 29 January 2025.

46. A total of 53 Scheme Creditors attended the Scheme Meeting in person or by proxy. The voting turnout was 75.9% by value (excluding the Sanctioned Creditors from the

16

denominator, given that they were excluded from voting pursuant to the Convening Order: see below). If the Sanctioned Persons were to be added to the denominator, then the voting turnout would be 53%.

47.     The Scheme was unanimously approved by the Scheme Creditors voting at the Scheme Meeting.

**Developments in the wider Restructuring**

48.     There have been further developments pursuant to the Group's engagement with its creditors outside of the Scheme with respect to the wider Restructuring since the convening hearing:

 48.1  Cebures: the holders of the Cebures approved all of the waivers, consents and amendments required to implement the Restructuring, subject to a condition subsequent that the Restructuring Effective Date occurs by 28 February 2025 (extendable if necessary).[50]

 48.2  International Facilities: all the International Facilities Lenders and the Issuer executed an override agreement on 28 December 2024, which provided that: (a) all the International Facilities Lenders agreed to grant all waivers and amendments required to complete the Restructuring; and (b) provided their respective elections between the International Facilities A&E Option, the International Facilities New Notes Option, or the International Facilities Redemption Option. The waivers are subject to the Scheme Effective Date and the maturity extensions will take effect on the Restructuring Effective Date.[51]

 48.3  Mexican Facilities: negotiations with the Mexican Facilities Lenders in relation to the required waivers and amendments are ongoing. The Mexican Facilities Lenders are still progressing their internal approvals process, however, none of them have raised any concerns regarding the waivers or amendments.[52]

 48.4  New Refinancing Facility: the Issuer has almost finalised the required conditions precedent to the funding of the New Refinancing Facility with Bancomext and

---

[50] Romero 2, para. 41 {D7/65}.
[51] Romero 2, para. 42 {D7/66}.
[52] Romero 2, para. 43 {D7/66}.

expects to be able to deliver a notice of borrowing to Bancomext shortly after the Sanction Hearing.[53]

## THE SANCTION HEARING

49.    Section 899(1) CA 2006 provides:

"*If a majority in number representing 75% in value of the creditors or class of creditors or members or class of members (as the case may be), present and voting either in person or by proxy at the meeting summoned under section 896, agree a compromise or arrangement, the court may, on an application under this section, sanction the compromise or arrangement.*"

50.    In <u>Re AGPS Bondco plc</u> [2024] Bus LR 745 at [122]-[128], Snowden LJ explained that it is "*almost invariably*" appropriate for a Part 26 scheme to be sanctioned where the requisite statutory majority is achieved:

"*As David Richards J explained in Telewest [2005] 1 BCLC 772, para 21, under Part 26 the question of whether it is "fair" to impose a scheme upon the dissenting minority within a class is answered by applying a limited rationality test to the majority vote within that class. The court does not impose its own view of the commercial merits of the scheme, but asks a more limited question in relation to each class of whether the compromise or arrangement embodied in the scheme is one that "an intelligent and honest man, a member of the class concerned and acting in respect of his interest, might reasonably approve".*

***Almost invariably, under Part 26 this question is answered by the very fact of the vote in favour at each class meeting. The confidence that the court reposes in the decision of each class meeting in such circumstances is reinforced by the fact that the decision in favour of the scheme is the decision of an enhanced majority of 75% in value, rather than just a simple majority, of those who voted at the class meeting.*** *Moreover, the greater the majority in favour at the class meeting, the greater confidence that the court can have that the scheme is in the interests of the class in question.*" (emphasis added)

(At [124]*ff*, Snowden LJ identified various matters that might lead the Court to depart from the majority vote – e.g. if the classes were not properly constituted, or if the majority creditors were not properly representative of the class, or if the Explanatory Statement was inadequate. As explained below, no such difficulties arise in the present case.)

---

[53] Romero 2, para. 44 {D7/66}.

51.   In the passage set out above, Snowden LJ referred to the well-known decision of David Richards J in <u>*Re Telewest Communications (No. 2) Ltd*</u> [2005] BCC 36 at [20]-[22]:

> "*The classic formulation of the principles which guide the court in considering whether to sanction a scheme was set out by Plowman J in Re National Bank Ltd [1966] 1 All ER 1006 at 1012, [1966] 1 WLR 819 at 829 by reference to a passage in Buckley on the Companies Acts (13th edn, 1957) p 409, which has been approved and applied by the courts on many subsequent occasions:*
>
> *'In exercising its power of sanction the court will see, first, that the provisions of the statute have been complied with; secondly, that the class was fairly represented by those who attended the meeting and that the statutory majority are acting bona fide and are not coercing the minority in order to promote interests adverse to those of the class whom they purport to represent, and thirdly, that the arrangement is such as an intelligent and honest man, a member of the class concerned and acting in respect of his interest, might reasonably approve. The court does not sit merely to see that the majority are acting bona fide and thereupon to register the decision of the meeting; but at the same time the court will be slow to differ from the meeting, unless either the class has not been properly consulted, or the meeting has not considered the matter with a view to the interests of the class which it is empowered to bind, or some blot is found in the scheme.'*
>
> *This formulation in particular recognises and balances two important factors. First, in deciding to sanction a scheme under s 425, which has the effect of binding members or creditors who have voted against the scheme or abstained as well as those who voted in its favour, the court must be satisfied that it is a fair scheme. It must be a scheme that 'an intelligent and honest man, a member of the class concerned and acting in respect of his interest, might reasonably approve'. That test also makes clear that the scheme proposed need not be the only fair scheme or even, in the court's view, the best scheme. Necessarily there may be reasonable differences of view on these issues. The second factor recognised by the above-cited passage is that in commercial matters members or creditors are much better judges of their own interests than the courts. Subject to the qualifications set out in the second paragraph, the court 'will be slow to differ from the meeting'.*"

52.   In <u>*Re KCA Deutag UK Finance Plc*</u> [2020] EWHC 2977 (Ch) at [16], Snowden J (as he then was) summarised the questions for the Court to consider at the sanction hearing for a scheme of arrangement:

> "*i)  Has there been compliance with the statutory requirements?*
>
> *ii)  Was the class fairly represented and did the majority act in a bona fide manner and for proper purposes when voting at the class meeting?*
>
> *iii)  Is the scheme one that an intelligent and honest man, acting in respect of his interests, might reasonably approve?*

> *iv)  Is there some other 'blot' or defect in the scheme?*
>
> *In the case of a scheme with international elements there is also the question of whether the court will be acting in vain if it sanctions the scheme. This requires some consideration of whether the scheme will be recognised and given effect in other relevant jurisdictions.*"

53.    The subsections that follow address each of these questions in turn.

**Compliance with the statute**

54.    As Mellor J explained in *Re Nostrum Oil & Gas Plc* [2022] EWHC 2249 (Ch) at [20]:

> "*The question of whether the provisions of the statute have been complied with can be subdivided as follows: (i) was the class properly constituted; (ii) was there compliance with the terms of the convening order (including in particular whether the scheme creditors received an adequate explanatory statement); and (iii) were the statutory majorities obtained?*"

Class Composition

55.    Meade J considered the issue of class composition at the convening hearing and ordered that there be a single meeting of Scheme Creditors.

56.    In *Re Light S.A.* [2024] EWHC 2733 (Ch), Trower J explained at [22] that:

> "*It is not the court's practice to reconsider on its own initiative class issues which have been determined at the convening hearing, unless a Scheme Creditor wishing to raise a class issue did not attend at that stage and can show good reason for not having done so.*"

57.    No Scheme Creditor is expected to appear at the sanction hearing to challenge class composition. Meade J was, in any event, correct to order a single Scheme Meeting. The Scheme Creditors in the present case all have the same debt and are conferred the same rights under the Scheme (although Sanctioned Persons cannot enjoy those rights in the same way by virtue of their personal characteristic of being sanctioned). This conclusion reflects a consistent line of case law: see *Re Nostrum Oil & Gas plc* [2022] EWHC 1646 (Ch) at [40] per Meade J; *Re Praesidiad Ltd* [2023] EWHC 2745 (Ch) at [31] per Sir Alastair Norris; *Re CFLD (Cayman) Investment Ltd* [2022] EWHC 3496 (Ch) at [24] per Michael Green J; and *Re Veon Holdings BV* [2022] EWHC 3473 (Ch) at [52]-[53] per Zacaroli J.

Compliance with the Convening Order (and section 897 CA 2006)

58.    As explained above, the Scheme Company complied with its notification and dissemination obligations under the Convening Order. Further, the requisite statutory majorities by number and value of Scheme Creditors were obtained at the Scheme Meeting.

59.    The Convening Order included a direction that Sanctioned Persons not be permitted to vote on the Scheme. Meade J noted that, if any Sanctioned Persons disagreed with this direction, then they were entitled to appear at the Sanction Hearing and make submissions to that effect: see the Convening Judgment at [8]-[13].

60.    The Scheme Company does not anticipate any Sanctioned Person will attend the Sanction Hearing and make those or similar submissions. Moreover, four Sanctioned Persons holding c.30% of the Existing Notes confirmed they will not attend the Scheme Meeting, either in person or by proxy, but nonetheless elected the Redemption Option in their Account Holder Letters.[54] This indicates that they support the Scheme. The status of the remaining 10% of Existing Notes previously thought to be held by Sanctioned Persons is unknown.[55] But even if the holders of the remaining 10% had voted against the Scheme, the statutory majorities would still have been obtained.

61.    For completeness, the annex of this skeleton argument explains in further detail why Meade J was right to direct that the Scheme Creditors should not vote at the Scheme Meeting. However, in light of the points set out above, it is unnecessary for the Court to address this issue any further.

**Fair representation and bona fides**

62.    The second question for the Court to consider at the sanction hearing has two parts. First, the Court must be satisfied that the majority which attended the meeting fairly represented the class. Second, it must be satisfied that in exercising their voting rights, the majority acted bona fide and did not coerce the minority to promote interests adverse to those of the class the majority purported to represent.

---

[54] Romero 2, para. 33 {D7/64}.
[55] Romero 2, para. 34 {D7/64-65}.

63.  In the present case, it is plain that the majority fairly represented the class and acted bona fide in the interests of the class.

64.  The turnout at the meeting was relatively high (75.9% of those entitled to vote), at least in comparison to other noteholder schemes. Even if the Sanctioned Persons are included in the denominator, the turnout was 53% in value. In any event, as Zacaroli J stated in *Re Instant Cash Loans Ltd* [2019] EWHC 2795 (Ch) at [29], "*a low turnout is not in itself a reason to refuse to sanction a scheme*". For example, in *Re Osiris Insurance Ltd* [1991] 1 BCLC 182, the turnout was very low by number (35 out of 971) and relatively low in value (41%). Neuberger J said at 189:

> "*It is true that the numbers of those who voted was pretty small compared to the number of those entitled to vote, but that is by no means unusual in the context of votes at meetings called pursuant to s 425. In any event, that does not call into question the fact that not a single scheme creditor thought it right to vote against the scheme. Furthermore, if one looks at the value of the scheme claims held by those who voted, they did represent a substantial proportion of those entitled to vote*."

65.  Applying these authorities, the turnout at the Scheme Meeting clearly is not a cause for any concern.

66.  There is nothing to suggest that those who attended and voted in favour of the Scheme did so predominantly because of any special interest adverse to the class interest. It should be noted that Existing Noteholders related to the Issuer control US$28,069,000 of the Existing Notes (the **Related Party Noteholders**), which is less than 10% of the Existing Notes.[56] However, given that the Scheme was unanimously approved by those voting at the Scheme Meeting, this does not present any cause for concern. Even if all of the Related Party Existing Noteholders did not vote (or voted against the Scheme), the Scheme would still have achieved the requisite statutory majority: cf. *Re Lehman Brothers International (Europe) (in administration)* [2019] Bus LR 1012 at [89] and [103] per Hildyard J.

**Fairness**

67.  The third question at the sanction hearing is often described as whether the scheme of arrangement is 'fair'. All that fairness requires (and means) in the present context is that

---

[56] Explanatory Statement, Part 2, para. 4.2(h) {11.2/168}.

the Scheme is one that "*an intelligent and honest man, a member of the class concerned and acting in respect of his interest, might reasonably approve*" (see above).

68.  The starting point is that, since the requisite statutory majorities voted in favour of the Scheme, there is a strong presumption that the Scheme is fair. Indeed, the Court will "*almost invariably*" sanction a Part 26 scheme in these circumstances (per Snowden LJ in *Re AGPS*). Similarly, in *Re English, Scottish, and Australian Chartered Bank* [1893] 3 Ch 385 at 409, Lindley LJ said:

> "*If the creditors are acting on sufficient information and with time to consider what they are about, and are acting honestly, they are, I apprehend, much better judges of what is to their commercial advantage than the Court can be. I do not say it is conclusive, because there might be some blot in a scheme which had passed that had been unobserved and which was pointed out later. While, therefore, I protest that we are not to register their decisions, but to see that they have been properly convened and have been properly consulted, and have considered the matter from a proper point of view, that is, with a view to the interests of the class to which they belong and are empowered to bind, the court ought to be slow to differ from them. It should do so without hesitation if there is anything wrong; but it ought not to do so, in my judgment, unless something is brought to the attention of the court to show that there has been some material oversight or miscarriage.*"

69.  In the present case, the Scheme has been unanimously approved by those voting at the Scheme Meeting. It is easy to see why they have done so, since the Scheme provides a considerably better outcome than the projected returns in a liquidation. Given the outcome at the Scheme Meeting, and in the absence of any opposition, it is difficult to see how there could be any suggestion that the Scheme is unfair.

70.  It is necessary to address four specific points.

71.  Firstly, the payment of the Lock-up Fee to those creditors who acceded to the Lock-up Agreement does not give rise to any unfairness. As Miles J observed in *Re PGS ASA* [2021] EWHC 222 (Ch) at [22]: "*it is well established that there is nothing inherently unfair about offering a (properly disclosed) consent fee in connection with a scheme*".

72.  Secondly, the payment of the Backstop Fee is not unfair. The Backstop Fee is in consideration for a commercial service provided by the Backstop Parties and is at a market rate. Other cases have held that payment of such a fee does not give rise to any unfairness: see *Hilding Anders International AB* [2023] EWHC 2291 (Ch) at [45] *per*

Richard Smith J; _Re Codere Finance 2 (UK) Ltd_ [2021] 2 BCLC 428 at [21]-[25] _per_
Falk J.

73.    Thirdly, all Scheme Creditors had the opportunity to participate in the Tranche 2 New
Notes on a _pro rata_ basis (although Sanctioned Persons could not take advantage of that
opportunity as a result of being subject to Sanctions). Accordingly, no unfairness arises
in connection with the Tranche 2 New Notes: see, e.g., _Re ED&F Man Treasury
Management Plc_ [2020] EWHC 2505 (Comm) at [27] _per_ Meade J.

74.    Fourthly, the Scheme treats the Sanctioned Persons fairly. Under the Scheme, the cash
amount attributable to Sanctioned Persons will be transferred to an escrow agent (the
**Holding Period Escrow Agent**) who will hold that amount in escrow.[57] The Holding
Period Escrow Agent will hold the cash attributable to Sanctioned Persons from the
Restructuring Effective Date until the earlier of: (a) the date two months after the
relevant Sanctions were lifted or they are otherwise entitled to receive (and so the
Issuer and Holding Period Escrow Agent entitled to transfer) the cash to them in
compliance with Sanctions; and (b) 20 years after the anniversary of the Restructuring
Effective Date.[58]

75.    The Holding Period Escrow Agent will release the cash attributable to a Sanctioned
Person before the end of the 20-year period provided that they provide sufficient
evidence that the relevant Sanctions were lifted or that they are otherwise entitled to
receive (and so the Issuer and Holding Period Escrow Agent entitled to transfer) the
cash to them in compliance with Sanctions within two months of the Sanctions being
lifted or their otherwise becoming entitled to receive (and the Issuer and Holding Period
Escrow Agent becoming entitled to transfer) the cash.[59]

76.    In _Re Nostrum Oil & Gas Plc_ [2022] EWHC 2249 (Ch), Mellor J held, at [35]-[37], that
a comparable holding structure within the scheme of arrangement in that case was fair:

> "_I must consider the treatment of the Sanctions Disqualified Persons. As I
> have indicated, those Persons will not be entitled to receive the Scheme
> Consideration (including any Lock-Up Fee) for as long as they remain subject
> to sanctions. The Scheme Consideration will be held for them on bare trust_

---

[57] Romero 1, para. 46 {D4/24}.
[58] Holding Period Escrow Deed, definitions of "_SP Holding Period_" {H23/797}, "_SP Holding Period Expiry
Date_" {H23/797} and Clause 2.5 {H23/800-801}.
[59] Holding Period Escrow Deed, Clause 2.4(b) {H23/800} and Clause 2.5(c) {H23/801}.

> *('the Holding Period Trust'). If or when they cease to be a Sanctions Disqualified Person in the future, such a person will then have 60 days to claim the Scheme Consideration from the Holding Period Trust.*
>
> *Mr Allison submitted that this structure is simply an instance of a broader concept that has been used in many noteholder schemes. He points out that there have been many regulatory reasons why a noteholder may be unable to receive the scheme consideration and to deal with such situations, it is common for noteholder schemes to include some form of holding trust in which the scheme consideration can be held until such time as the noteholder can lawfully receive it. He points to a recent example in Re Haya Holco 2 Plc [2022] EWHC 1079 (Ch) per Marcus Smith J. at [72(3)]. I accept his submission.*
>
> *Furthermore, I am satisfied that the holding trust structure does not place the Sanctions Disqualified Persons at any greater disadvantage than the constraints they already face under the sanctions legislation. Accordingly, I accept that the Holding Period Trust structure is a fair and proper way to deal with the situation of the Sanctions Disqualified Persons.*"

(See also the other authorities referred to in paragraph 56 above, where the same approach was taken.)

77.  The holding trust structure in <u>*Nostrum*</u> mirrors the escrow arrangements in the present case which are fair for the same reasons. Sanctioned Persons' inability to participate in the Tranche 2 New Notes also does not give rise to any unfairness because their inability to participate is not a result of the design of the Scheme but rather a consequence of the effect of Sanctions to which they would be subject irrespective of the Scheme.

**<u>No 'blot'</u>**

78.  The Court must be satisfied that there is no 'blot' on the Scheme. As explained by Snowden J in <u>*Re Co-operative Bank Plc*</u> [2017] EWHC 2269 (Ch) at [22]:

> "*The term "blot" is generally understood to refer to some technical or legal defect in the scheme, for example, that it does not work according to its own terms, or that it would infringe some mandatory provision of law.*"

79.  There is plainly no such blot in the present case.

80.  In particular, no blot arises from the fact that the Scheme Company was incorporated for the specific purpose of acceding as a guarantor to the Existing Notes and promoting the Scheme. This is an example of what Newey J described as "*good forum shopping*"

in *Re Codere Finance (UK) Ltd* [2015] EWHC 3778 (Ch). In *Codere*, a Spanish company acquired a newly formed English company that acceded as a co-obligor to certain notes, which the English scheme of arrangement sought to compromise. Newey J held at [18]-[19]:

> "*In a sense, of course ... what is sought to be achieved in the present case, is forum shopping. Debtors are seeking to give the English court jurisdiction so that they can take advantage of the scheme jurisdiction available here and which is not widely available, if available at all, elsewhere. Plainly forum shopping can be undesirable. That can potentially be so, for example, where a debtor seeks to move his COMI with a view to taking advantage of a more favourable bankruptcy regime and so escaping his debts.* **In cases such as the present, however, what is being attempted is to achieve a position where resort can be had to the law of a particular jurisdiction, not in order to evade debts but rather with a view to achieving the best possible outcome for creditors. If in those circumstances it is appropriate to speak of forum shopping at all, it must be on the basis that there can sometimes be good forum shopping.**
>
> *In the particular circumstances of this case, I cannot see that the fact that the company has been acquired only recently, and with a view to invoking the scheme jurisdiction, should cause me, in the exercise of my discretion, to decline to sanction the scheme. For reasons I have already touched on, the scheme appears to be very much in the interests of the group's creditors. I bear in mind in that context the fact that it was devised following close consultation with creditors; the overwhelming level of support that it has enjoyed from creditors; the fact that no creditor has opposed the scheme; the lack of alternatives available to the group in other jurisdictions; and the fact that, on the evidence, my declining to sanction the scheme could cause the group and its creditors a loss of value of around &euro;600 million, by any standards a large sum.*" (emphasis added)

81.    The present case is another example of "*good forum shopping*". Mr Romero explains why it is in the best interests of the Scheme Creditors to pursue the restructuring through the Scheme rather than an alternative process in either Mexico or the United States (which are the jurisdictions within which the Group operates):[60]

    81.1    Mr Romero gives three reasons why the Scheme is preferable to a restructuring through a Mexican insolvency process:

---

[60] Romero 1, paras 69-70 {D4/33}

81.1.1    First, it is not possible to restructure only certain debts (*i.e.,* just the Existing Notes) within such a process.[61]

81.1.2    Second, an insolvency process in Mexico would be a lengthy process and the Scheme will facilitate a better recovery for Scheme Creditors given the flexibility and speed of the process.

81.1.3    Third, as the Scheme is not an insolvency process, it will allow the Issuer to obtain the New Refinancing Facility from Bancomext "*who would otherwise unlikely provide the financing under the New Refinancing Facility*".[62]

81.2    Mr Romero also explains that, while implementation of the Restructuring through a Chapter 11 process in the United States would achieve the same result as the Scheme, the Scheme will have the additional benefits of:

81.2.1    reducing the financial burden on the Scheme Company in undertaking the Restructuring; and

81.2.2    securing the New Refinancing Facility from Bancomext who would be unlikely to provide that financing within an insolvency process.[63]

82.    Following *Codere*, there are numerous cases in which a company has been incorporated in England and acceded to the finance documents as a guarantor for the specific purpose of enabling a scheme of arrangement to be promulgated. The present case falls into the same well-established category.

**International effectiveness**

83.    Before sanctioning the Scheme, the Court will need to be satisfied that it will not be acting in vain if it does so. To that end, it must be satisfied that there is a real prospect that the Scheme will be recognised and given effect in other relevant jurisdictions. In *Re DTEK Energy BV* [2021] EWHC 1551 (Ch), Norris J explained the principles governing the Court's approach to the question of international effectiveness, which

---

[61] Romero 1, para. 69 {D4/33}.
[62] Romero 1, para. 69 {D4/33}
[63] Romero 1, para. 70 {D4/33}.

Trower J recently summarised in *Re Light SA* [2024] EWHC 2733 (Ch) at [40] in the following terms:

> "…(i) *the court will not grant relief which has no substantive effect and will require to be satisfied that the scheme will achieve its purpose; (ii), this means that there must be evidence that the scheme will achieve a substantial purpose in the key jurisdictions in which the company has liabilities or assets; (iii) certainty is not required but admissible and credible evidence that the court is not acting in vain must be provided. It must show a real or reasonable prospect that the scheme will be recognised and given effect.*"

84.    In the present case there is, at the very least, a real prospect that the Scheme will be given effect in the two key jurisdictions in which the Group operates and has assets, namely Mexico and the United States:

84.1    As regards recognition and effectiveness in Mexico, where the Issuer is incorporated and the Group has material assets, the Scheme Company relies on the independent expert report of José Gabriel Mendoza González. Mr González expresses the view that "*if the Scheme is sanctioned by an English Court and the foreign representative of the Scheme Company files a proper request, it is* **very likely** *that the Mexican Insolvency Courts recognize the Schemes as a non-principal proceeding in an ancillary proceeding, and give effect to the restructuring of the Existing Notes pursuant to the terms of the Scheme (including the release of the Issuer from its obligations thereunder)*"[64] (emphasis added).

84.2    It is a Restructuring Condition that the Scheme Company obtains recognition of the Scheme under Chapter 15 of the US Bankruptcy Code and permanent relief in the US Bankruptcy Court for the SDNY preventing Scheme Creditors from taking actions against any member of the Group contrary to the Scheme. The Scheme Company has appointed Mr Ignacio Javier Gonzalez Delgadillo as its Foreign Representative to file a petition seeking recognition and permanent relief to that effect (the **Chapter 15 Petition**). On 25 November 2024, the Foreign Chapter 15 Petition was filed, and it is due to be heard on 7 February 2025.[65]

---

[64] González 1, p. 10 {E10/137}.
[65] Romero 2, para. 49 {D7/49}.

28

84.3    In addition, the Scheme Company relies on the independent expert report of Daniel Glosband.[66] The clear conclusion reached by Mr Glosband is that "*it is likely the [Scheme] would be recognized as a foreign main proceedings under Chapter 15 of the US Bankruptcy Code and the Additional Relief manifesting enforcement of the Scheme...would be granted, and, as a result of that, the Scheme is likely to be given full force and effect in the United States*".

85.    Aside from the expert evidence, the Court can take comfort from the fact that there are no known dissenting creditors: cf. <u>*Re KCA Deutag UK Finance Plc*</u> [2020] EWHC 2977 (Ch) at [33] *per* Snowden J.

86.    In all these circumstances, there is plainly a real prospect that the Scheme will be recognised and given effect in relevant foreign jurisdictions.

## CONCLUSION

87.    For all these reasons, the Court is respectfully asked to make an order sanctioning the Scheme in the terms sought.

**DAVID ALLISON KC**

**RYAN PERKINS**

**3 February 2025**

**South Square**

---

[66] {E9/80-127}.

29

**ANNEX**

1. For the reasons set out below, Meade J was right to direct at the Convening Hearing that the Sanctioned Persons were not entitled to vote at the Scheme Meeting.

2. The Existing Notes are "*funds*" for the purposes of the UK Sanctions Regulations: see section 60 of the Sanctions and Anti-Money Laundering Act 2018.

3. The key provision is Regulation 11 of the Russia (Sanctions) (EU Exit) Regulations 2019 (SI 2019/855) (the **UK Sanctions Regulations**),[67] which prohibits any form of dealing with funds owned, held or controlled by a designated person. Pursuant to Regulation 11(4), a person deals with "*funds*" if that person: "*(a) uses, alters, moves, transfers or allows access to the funds; (b) deals with the funds in any other way that would result in a change in volume, amount, location, ownership, possession, character or destination; or (c) makes any other change, including portfolio management, that would enable use of the funds.*"

4. In *Re Praesidiad Ltd* [2024] 1 BCLC 506, Sir Alastair Norris held (after hearing adversarial argument) that any attempt by a designated person under the UK Sanctions Regulations to vote at the scheme meeting would infringe Regulation 11. It is necessary to set out Sir Alastair Norris's reasoning in full:

> "*34. If there is to be a single class meeting the proposal is that Bank GPB shall not be entitled to vote at it. Bank GPB says that this is an infringement of its rights and is not warranted by the Sanctions Regulations. In a run of recent cases it has been accepted that a creditor subject to the Sanctions Regulations cannot vote at a scheme meeting: Re Nostrum Oil and Gas (supra); Re CFLD (Cayman) Investment Ltd [2022] EWHC 3496 (convening); Re VEON BV [2022] EWHC 3473 (convening); Re SGB-Smit GmbH [2023] EWHC 1067 (convening). These are all cases where the Sanctions Regulation was drawn to the attention of the Court by the applicant company but was not the subject of contrary argument. That said, the applicant company was in each case represented by experienced specialist Counsel well aware of their duty to the Court. In particular, the decision in VEON was that of a very experienced judge before whom Mr Allison KC appeared, and he tells me that the issues were fully explained to the judge in the context of a contest over class composition (advanced by Mr Bayfield KC). Although not bound by these decisions, I would nonetheless be inclined not to depart from them, not least because in schemes such as these it is important for there to be consistency at*

---

[67] Regulation 11 and other relevant provisions of the UK Sanctions Regulations are helpfully summarised in *Hellard v OJSC Rossiysky Kredit Bank* [2024] EWHC 1783 (Ch) at [21]-[43].

*first instance, so that companies and their creditors know where they stand
and can conduct their negotiations and formulate their schemes accordingly.*

*35. But in the instant case Bank GPB has argued that there should be a
different outcome, submitting that it should be entitled to vote at the scheme
meeting in order to oppose the scheme (unless allowed to participate in the
Lock-up arrangements). The Bank relies upon the decision of a strong Court
of Appeal in Cayman (Sir Jack Beatson JA, Sir Richard Field JA and the Hon
Dennis Morrison JA) upholding the decision of Justice Segal (an experienced
judge of the Grand Court): Re Palladyne International Asset Management BV
(CICA Appeal No.5 of 2019). The case did not concern the Sanctions
Regulations but materially similar regulations concerning Libya. The votes
attaching to the shares in Palladyne companies (which were frozen assets)
were used to dismiss and appoint directors and to change the names of
companies. In broad terms the question was whether the making of such
resolutions and appointing and removing directors was either (a) to "deal
with" frozen "funds" or "economic resources", that is to "use" or to "deal
with" the frozen shares by the exercise of voting right, or (b) to "allow access
to" the frozen assets of the company or to make a change that "would enable
use" of those assets. The Court of Appeal upheld the view of the Grand Court
that they did not.*

*36. Focusing upon the words of the relevant sanctions provision, the Court of
Appeal held (a) (at [71]) that "dealing with" funds meant using them "as a
financial asset or instrument" so that not all exercises of the rights attaching
to funds fell within the scope of the sanction; (b) (at [73]) that the term "use"
was affected by the character of a share as a tradable financial asset and must
be construed in the light of that characteristic; and (c) (at [81]) "use" was to
be interpreted to include activity which touches or concerns monetary value or
generates financial return but to exclude activity which does not. The voting to
change the name of the company or to appoint or remove directors did not
affect the characteristic of a share as a tradable financial asset. The Court
further held (at [76]) that the relevant "use" must have an effect on the
"volume, amount, location, ownership, possession, character or [the]
destination of the shares". Since the removal or appointment of directors or a
change in the company's name did not have any such effect the use of votes to
achieve those objectives was not a relevant "use" of frozen assets. Because
they had to consider all possible breaches of the sanctions provision the Court
of Appeal also considered whether the passing of the resolutions constituted
"access to" the frozen funds or made changes that would "enable use" of the
funds. The Court held (at [98] and [105]) that they did not because the
sanctions provision did not prohibit "preparatory steps" but only a change to
the funds whose use would be enabled as a result of that change.*

*37. The decision of the Cayman Court of Appeal is not, of course, binding
upon me but is entitled to proper respect. I do not intend to undertake an
analysis of it or to decide the extent to which it correctly states the law of
England and Wales (not least because of its very late introduction into the
instant case). I shall confine myself to addressing the arguments which Bank
GPB advance based upon it.*

31

*38.   Those arguments were (a) the exercise of a vote is not a "dealing with" or "use of" an economic interest: (b) the vote was simply a "preparatory act" which did not itself affect "the volume, amount, location, ownership, possession, character or destination" of the frozen economic interest or its characteristic as a tradable financial asset.*

*39.   I do not accept argument (a). Palladyne was about the use of the votes attaching to an economic interest to affect a matter of internal governance. Votes cast at a scheme meeting do not relate to the internal governance of Bank GPB but to the rights which Bank GBP and other creditors have and will have against the Company. The object of the resolutions put to the scheme meeting affects the loan participation in the SFA as a tradable financial asset and are designed to change the amount and character of that asset (by converting part to equity, by altering its ranking, by changing its amount and by changing its maturity). Those are all matters which could not be achieved by ordinary negotiation between the Company and Bank GPB and the other SFA creditors without multiple breaches of the Sanctions Regulations; and it makes no difference that the changes are to be brought about by following a statutory process.*

*40.   I do not accept argument (b). It is correct that the actual legal changes to the economic interest of Bank GPB will not occur until the implementation of the scheme following its sanction by the Court. But I do not think that it is permissible to "salami slice" the single statutory process and to say that a vote cast for or against the scheme is merely "a preparatory act". The existence of a proposal for a scheme and its likely level of support affects the market value of the debt throughout the process (not merely at its conclusion). Nor do I think it right that a sanctioned lender's ability to vote at a scheme meeting should be dependent upon how it intends to vote i.e. that the lender should permitted to vote if it intends to vote against the scheme and to preserve its economic interest in its existing form, but not if it intends to vote in favour of the scheme and to support changes to that economic interest. What is needed is a clear rule which is capable of straightforward application by the chairman of the meeting and which gives the voting power to those who, in the real world, are actually able to "deal with" and "use" their funds as seems to them best in their commercial interests. Whether cast for or against the scheme the votes of Bank GPB form part of the corpus of votes that determine the characteristics of the SFA as a tradable financial asset.*

*41.   Thus, I am not persuaded that I should depart from the views of my brother and sister judges: I agree with the proposed direction that Bank GPB (and any other sanctioned lender) may not vote at the scheme meeting.*"

5.   In the subsequent case of *Hellard v OJSC Rossiysky Kredit Bank* [2024] EWHC 1783 (Ch), Mr Nicholas Thompsell (then sitting as a Deputy Judge of the High Court) held that a sanctioned creditor was entitled to exercise voting rights in a creditors' decision procedure in a bankruptcy. The Deputy Judge did not cite *Re Praesidiad*, and it is plain that the two cases are distinguishable.

6. The key point in *Hellard* was that the creditors' decision procedure was not capable of changing the character of the debts in any way. As the Deputy Judge explained at [144]:

> "… *there is the point that the debts themselves remain unaffected by the use of voting rights, pending payment of any dividend and eventual discharge of the bankruptcy and therefore the use of a vote cannot be seen as a dealing with debts as funds within the meaning of any of paragraphs (a) (b) or (c) of Regulation 11(4). Neither can I see, except in one scenario, how the result of any voting would have the effect mentioned in paragraph (c) that it "makes any other change … that would enable use" of the underlying debt"* …"

7. The Deputy Judge made it clear that a different analysis would apply to the exercise of voting rights which related to a proposal for the payment of cash (which was the one exception to which he referred at [144]). See [145]:

> "*The exception would be a vote to approve a distribution (dividend) in the Bankruptcy if that was the necessary step to cause a designated person or a person owned or controlled by a designated person, to obtain the funds*."

8. Thus, the Deputy Judge expressly accepted that a designated person could not vote to approve a resolution to approve a dividend or distribution in a bankruptcy. That is plainly right.

9. It must follow that a designated person is also prohibited from voting *against* a resolution which has the effect of facilitating a distribution or changing the character of a debt. Put simply, it cannot be right that the sanctions analysis depends on whether the vote is marked 'yes' or 'no': see the analysis of Sir Alastair Norris in *Re Praesidiad* at [40], quoted above.

10. In the present case, the resolution considered at the Scheme Meeting was to approve the Scheme. The Scheme will have the effect of converting the Existing Notes into immediate cash entitlements (or equity, depending on the option selected by the relevant Scheme Creditor). This is equivalent to a resolution which operates to approve a dividend or a distribution in a bankruptcy. Thus, applying both *Re Praesidiad* and *Hellard*, it is plain that designated persons are not permitted to vote on the Scheme.

11. Moreover, whatever the position may be in the UK, it is clear beyond argument that the US and EU sanctions regimes prohibit the exercise of voting rights:

11.1    As to the EU, see the discussion in _Hellard_ at [135] (quoting the European Commission's guidance that voting rights cannot be exercised by designated persons).

11.2    As to the US, see the witness statement from Mr Chase Kaniecki, a partner in the Washington DC Office of Cleary, Gottlieb Steen & Hamilton LLP (solicitors for the Scheme Company).[68]

11.3    In practice, substantially the same persons have been designated under the sanctions legislation in the UK, EU and US. Thus, as a practical matter, it is effectively impossible to hold a scheme meeting at which designated persons are entitled to vote, since this could involve the commission of a criminal or administrative offence in the EU and the US by the Scheme Company and its officers and advisers. If the Part 26 procedure is to be useful at all, then the practical realities need to be borne in mind. A scheme company cannot fairly be required to hold a meeting which places it, its officers and advisers at risk of being fined or imprisoned.

12. For all these reasons, Meade J was right to direct at the Convening Hearing that the Sanctioned Persons were not entitled to vote at the Scheme Meeting.

---

[68] {D6/50-55}.

**<u>Exhibit B</u>**

**Final Sanction Order**

05 Feb 2025

CLAIM NO. CR-2024-006908

CR-2024-006908

IN THE HIGH COURT OF JUSTICE

BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES

INSOLVENCY AND COMPANIES LIST (ChD)

IN THE MATTER OF MEGA NEWCO LIMITED

AND IN THE MATTER OF THE COMPANIES ACT 2006

Before the Honourable Mr Justice Meade

5 February 2025

---

## ORDER

---

**UPON THE APPLICATION OF** Mega Newco Limited whose registered office is at Suite 1, 7th Floor 50 Broadway, London, United Kingdom, SW1H 0DB and registered number 15986024 (the "**Scheme Company**"), by Part 8 Claim Form dated 14 November 2024 (the "**Claim Form**") in respect of its proposed scheme of arrangement (the "**Scheme**") proposed pursuant to Part 26 of the Companies Act 2006 (the "**Companies Act**");

**AND UPON READING** the evidence filed;

**AND UPON HEARING** Mr David Allison KC and Mr Ryan Perkins, Counsel for the Scheme Company;

**IT IS HEREBY ORDERED AND DIRECTED THAT:**

1    The Scheme in respect of the Scheme Company as set forth in Schedule A hereto is hereby sanctioned pursuant to Part 26 of the Companies Act.

2    An office copy of this Order shall be filed by the Scheme Company with the Registrar of Companies in England and Wales as soon as reasonably practicable.

**Service of the order**

The Court has provided a sealed copy of this Order to the serving party: Cleary Gottlieb Steen & Hamilton LLP, 2 London Wall Place, London, England EC2Y 5AU (email: team-mega_restructuring-cgshonly@cgsh.com). *Ref: P Lyadnova; J Armshaw*

**SCHEDULE A**

**SCHEME DOCUMENT**

Claim No. CR-2024-006908

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**INSOLVENCY AND COMPANIES LIST (ChD)**


**IN THE MATTER OF MEGA NEWCO LIMITED**

**– and –**

**IN THE MATTER OF THE COMPANIES ACT 2006**


**SCHEME OF ARRANGEMENT**

(Pursuant to Part 26 of the Companies Act 2006)

– between –


**Mega Newco Limited**

– and –

**The Scheme Creditors**

as defined herein

**TABLE OF CONTENTS**

1.      Definitions and Interpretation ............................................................................... 1

2.      Application of the Scheme and the Scheme Effective Date ..................................... 15

3.      Consideration .......................................................................................................... 15

4.      Grant of Authority to Execute the Implementation Documents .............................. 15

5.      Scheme Mechanics.................................................................................................. 19

6.      Releases .................................................................................................................. 26

7.      Ratifications and Confirmations .............................................................................. 26

8.      Modifications of the Scheme or Waiver of the Scheme Conditions........................ 28

9.      General Scheme Provisions ..................................................................................... 28

10.     Costs....................................................................................................................... 33

11.     Stamp Duty Indemnity ............................................................................................ 33

12.     Announcements ....................................................................................................... 33

13.     Governing Law and Jurisdiction.............................................................................. 33

Schedule 1      Deed of Release ................................................................................... 35

Schedule 2      Implementation Deed............................................................................ 36

Schedule 3      Note Purchase and Placement Agreement .............................................. 37

1.      **Definitions and Interpretation**

1.1     **Definitions**

In this Scheme, the following expressions will have the following meaning:

"**Account Holder**" means any person recorded directly in the records of a Clearing System as holding an interest in any Existing Notes in an account with the relevant Clearing System either for its own account or on behalf of its client, including members of, or participants and account holders in, the Clearing Systems;

"**Account Holder Letter**" means the account holder letter to be made available with the Explanatory Statement;

"**Ad Hoc Group**" means the means the Ad Hoc group of Existing Noteholders, represented by the Ad Hoc Group Advisors;

"**Ad Hoc Group's Advisors**" means Latham & Watkins (London) LLP, Sainz Abogados and Tecnologias Cuentas por Cobrar;

"**Affiliate**" means with respect to a person, any other person who, directly or indirectly, is in control of, or is controlled by, or is under common control with, such person and for the purposes of this definition, "**control**" will mean the power, direct or indirect, to:

(a)     vote on more than 50 per cent. of the securities having ordinary voting power for the election of directors of such person; or

(b)     direct or cause the direction of the management and policies of such person whether by contract or otherwise;

"**Agents**" means the Information Agent, the Cash Settlement Agent, the New Notes Settlement Agent and the Holding Period Escrow Agent.

"**Allocations Spreadsheet**" means the confidential allocations spreadsheet prepared by the Information Agent for the Scheme Company and its advisors documenting (among other distributions and payments) the final (i) Scheme Consideration Entitlements, comprising (A) the New Shares Entitlements; and (B) the Cash Entitlements; and (ii) the New Notes Entitlements, if applicable, in each case for each Scheme Creditor, as calculated in accordance with Clause 5.3 (*Calculation of Scheme Creditor Entitlements*) of this Scheme;

"**Allowed Proceedings**" means any Proceeding by a Scheme Creditor in respect of an Excluded Scheme Claim;

"**Applicable Procedures**" means, with respect to any transfer of beneficial interest in the Existing Notes and the New Notes, the rules and procedures of the relevant Clearing System(s) that apply to such transfer;

"**Backstop Commitment**" means the commitment by each Backstop Party to subscribe for New Notes as set out in the Backstop Commitment Letter;

"**Backstop Commitment Letter**" means the commitment letter entered into between the Backstop Parties, the Scheme Company and the Issuer on 11 November 2024;

"**Backstop Parties**" means each Scheme Creditor that has entered into the Backstop Commitment Letter;

"**Bankruptcy Event**" means:

1

(a)    the entry by a court of competent jurisdiction of: (i) a decree or order for relief in respect of any member of the Group in an involuntary case or proceeding under any Bankruptcy Law or (ii) a decree or order (A) adjudging any member of the Group a bankrupt or insolvent, (B) approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of, or in respect of, any member of the Group under any Bankruptcy Law, (C) appointing a Custodian of any member of the Group or of any substantial part of the property of any member of the Group, or (D) ordering the winding-up or liquidation of the affairs of any member of the Group, and in each case, the continuance of any such decree or order for relief or any such other decree or order unstayed and in effect for a period of 60 consecutive calendar days; or

(b)    (i) the commencement by any member of the Group of a voluntary case or proceeding under any Bankruptcy Law or of any other case or proceeding to be adjudicated a bankrupt or insolvent, (ii) the consent by any member of the Group to the entry of a decree or order for relief in respect of any member of the Group in an involuntary case or proceeding under any Bankruptcy Law or to the commencement of any bankruptcy or insolvency case or proceeding against any member of the Group, (iii) the filing by any member of the Group of a petition or answer or consent seeking reorganization or relief under any Bankruptcy Law, (iv) the consent by any member of the Group to the filing of such petition or to the appointment of or taking possession by a Custodian of any member of the Group or of any substantial part of the property of any member of the Group, (v) the making by any member of the Group of an assignment for the benefit of creditors, (vi) the admission by any member of the Group in writing of its inability to pay its debts generally as they become due, (vii) the approval by stockholders of any member of the Group of any plan or proposal for the liquidation or dissolution of any member of the Group, (viii) the declaration of *concurso mercantil* or *quiebra* by the Company, and (ix) the taking of corporate action by any member of the Group in furtherance of any action referred to in clauses (i) through (viii) above,

excluding any arrangement, reorganisation or restructuring pursued in order to implement the Restructuring in accordance with the terms of this Scheme and the Implementation Documents, including, but not limited to, this Scheme and any Chapter 15 Proceeding;

"**Bankruptcy Law**" means Title 11, U.S. Code or any similar U.S. federal, state or non-U.S. law for the relief of debtors, including the Mexican *Ley de Concursos Mercantiles*;

"**Book Entry Interest**" means beneficial interest in a Global Note (as defined in the Existing Notes Indenture) held by or through members of, or participants and account holders in, the Clearing Systems and held through and shown on, and transferred only through, records maintained in book entry form by the Clearing Systems;

"**Business Day**" means a day (other than a Saturday or Sunday or any other day on which banking institutions are authorised or required by law to close) on which banks are open for general business in London, New York and Mexico (*provided that* the availability of internet banking shall not constitute being open for general business);

"**Cash Entitlement**" means, in respect of each Redemption Option Scheme Creditor, its entitlement to receive, as consideration under this Scheme, cash in such amount as calculated in accordance with Clause 5.3(a)(ii)(A) of this Scheme;

"**Cash Settlement Agent**" means Kroll Issuer Services Limited, a private company incorporated in England and Wales with registered number 05098454, whose registered office is at The Shard, 32 London Bridge Street London, England, SE1 9SG (or any successor in title) in its capacity as cash settlement agent in relation to this Scheme;

"**Cash Settlement Escrow Account**" means the account in the name of the Cash Settlement Agent into which:

2

(a)      each Participating T2 New Noteholder shall fund its Subscription Amount;

(b)      the Participating T1 New Noteholder shall fund its New Notes commitment; and

(c)      each Backstop Party shall fund its allocation of the Backstop Commitment,

in each case in accordance with the Implementation Steps;

"**Cash Settlement Escrow Agreement**" means the escrow agreement to be entered into between the Issuer, the Scheme Company and the Cash Settlement Agent in relation to the Cash Settlement Escrow Account, in the form agreed between the Group's Counsels and the Ad Hoc Group's Advisors and made available on the Scheme Website;

"**Chapter 15 Proceeding**" means a proceeding under chapter 15 of title 11 of the United States Code;

"**Claim**" means, in relation to a person, any claim, allegation, cause or right of action, proceeding, suit or demand made against the person concerned, however it arises and whether it is present or future, fixed or ascertained, actual or contingent;

"**Clearing Systems**" means DTC, Clearstream Banking S.A. or Euroclear Bank SA/NV (as applicable to the relevant Account Holder) and its nominees and successors, acting through itself or a depositary and any other system designed for similar or analogous proceedings;

"**Companies Act**" means the UK Companies Act 2006;

"**Confirmations**" has the meaning given to it in Clause 5.9(a)(iii);

"**Connected Parties**" means, in relation to a person, any of its current and former Affiliates or Related Entities, and each such person's and its Affiliates' and Related Entities' (and their Affiliates') current and former officers, managers, directors, predecessors, successors, assigns, principals, employees, agents, managed accounts or funds, management companies, fund advisors, investment managers or advisors (and any entity and its Affiliates which: (i) is managed or advised by such person's investment manager or advisor; or (ii) such person manages or advises in its capacity as investment manager or advisor), advisory board members, financial advisors, partners, accountants, attorneys, investment bankers, consultants, representatives and other professionals, each in their capacity as such;

"**Court**" means the High Court of Justice of England and Wales;

"**Custodian**" means any receiver, trustee, assignee, liquidator, *conciliador*, *síndico*, *sequestrator* or similar official under any Bankruptcy Law;

"**Deed of Release**" means the deed of release and waiver substantially in the form set out in Schedule 1 (*Deed of Release*) of this Scheme to be entered into on or about the date of this Scheme amongst, inter alia, the Scheme Company, the Issuer, the Existing Notes Trustee, the Agents and the Scheme Creditors (acting by the Scheme Company pursuant to the authority conferred upon the Scheme Company by the Scheme Creditors under the Scheme Document);

"**Designated Recipient**" means any person (who is not a Sanctioned Person) appointed by a Scheme Creditor (provided that such Scheme Creditor is not a Sanctioned Person) under an Account Holder Letter and/or New Notes Election Form which is validly completed and submitted to the Information Agent on behalf of that Scheme Creditor prior to the Election Deadline, to (i) receive that Scheme Creditor's Scheme Consideration Entitlements, and/or (ii) fund and/or receive that Scheme Creditor's New Notes Entitlement, if it is a Participating T2 New Noteholder, pursuant to the terms of this Scheme and the Implementation Deed; *provided that* if either (A) that Scheme Creditor's Scheme Consideration Entitlement comprises New Shares; and/or (B) that Scheme Creditor is a Participating T2 New Noteholder with a New Notes Entitlement, then such person must also not be a Disqualified Person;

"**Disqualified Person**" means a person who is:

(a)     resident or located or domiciled in, or subject to the laws of, any jurisdiction where the offer to issue to, the sale or subscription, the exercise or other form of acceptance by, the delivery of or possession by, such person of any New Shares or New Notes and/or the possession or distribution of any offering material prepared in relation thereto is prohibited by law or regulation or would, or would be likely to, result in the Scheme Company or any of its Affiliates being required to comply with any filing, registration, disclosure or onerous requirement in such jurisdiction (as may be determined by the Scheme Company in its sole discretion); or

(b)     resident, located or domiciled in any Member State of the European Economic Area ("**EEA**") or in the United Kingdom ("**UK**"), and is not a "Qualified Investor" within the meaning of Article 2 of Regulation (EU) 2017/1129, as amended (including as it forms part of United Kingdom domestic law pursuant to the European Union (Withdrawal) Act 2018, as amended, the "**Prospectus Regulation**") as further set out in the Account Holder Letter, and with respect to whom the Scheme Company or the Issuer, acting in their sole discretion, has determined that an offer to such a person would not constitute either an offer (i) to no more than 149 natural or legal persons (other than Qualified Investors) in each Member State of the EEA or in the UK, or (ii) where the denomination per unit received by such person would amount to at least EUR 100,000; or

(c)     none of the following: (i) a QIB (within the meaning of Rule 144A under the US Securities Act), (ii) an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3), (7), (8), (9), (12) or (13) of Regulation D under the US Securities Act, or (iii) a non-US Person acquiring New Shares and/or New Notes in an offshore transaction (within the meaning of Regulation S under the US Securities Act).

"**DTC**" means The Depository Trust Company;

"**DTC Instruction**" means the written order in accordance with the Applicable Procedures and the Implementation Steps directing the Registered Holder Nominee to cancel the Existing Notes;

"**Election Deadline**" means 5.00 p.m. (New York time) on the third (3rd) Business Day following the date of the Scheme Meeting.

"**Enforcement Action**" means:

(a)     the acceleration of any sum payable under the Existing Notes Indenture or the making of any declaration that any sum payable under the Existing Notes Indenture is due and payable or payable on demand;

(b)     the making of any demand against the Scheme Company under the guarantee or any surety provided under the Existing Notes Indenture;

(c)     the suing for, commencing or joining of any legal or arbitration proceedings against the Scheme Company (including in its capacity as guarantor under the Existing Notes Indenture) or the Issuer to recover any sums payable under the Existing Notes Indenture;

(d)     exercising (or causing the Existing Notes Trustee to exercise) any other enforcement remedies set forth in the Existing Notes Indenture, including the making of any demand against any the Scheme Company as the guarantor in respect of the Existing Notes Indenture;

(e)    exercising (or causing the Existing Notes Trustee to exercise) any other enforcement remedies at law or in equity with respect to the Existing Notes or the guarantee granted by the Scheme Company in respect of the Existing Notes; and

(f)    petitioning for, applying for, or voting for any Insolvency Proceeding in respect of the Scheme Company or the Issuer,

except that the taking of any action falling within paragraphs (a) to (f) above which is necessary (but only to the extent necessary) to preserve the validity, existence or priority of claims in respect of the Existing Notes, including the registration of such claims before any court or governmental authority and the bringing, supporting or joining of proceedings to prevent any loss of the right to bring, support or join proceedings by reason of applicable limitation periods shall not constitute Enforcement Action;

"**Equity Option**" means the option for a Scheme Creditor to elect that all of its Scheme Claims are finally discharged in full by Liabilities in respect of the Existing Notes held by it being assigned to the Issuer in consideration for a number of New Shares equal to the Settlement Amount divided by USD23.83 (being the price per share determined by the Issuer's board of directors and approved by the Issuer's shareholders based on the Equity Valuation Report converted into USD using the FX Rate); *provided that* if the total number of New Shares required to be issued to all Scheme Creditors electing the Equity Option (other than a Related Party Existing Noteholder) exceeds the Equity Option Cap, the Issuer shall be required to issue to such Scheme Creditors only the number of New Shares constituting the Equity Option Cap (distributed amongst such Scheme Creditors pro rata to their Settlement Amounts) and the Redemption Option shall apply to the part of the Settlement Amount in respect of which no New Shares are allocated;

"**Equity Option Cap**" means the number of New Shares that can be issued pursuant to the Equity Option such that following the issuance the controlling shareholder of the Issuer retains no less than 75% of the Issuer's issued share capital, being 2,793,049 of New Shares;

"**Equity Option Scheme Creditor**" means each Scheme Creditor that elects to receive the Scheme Consideration pursuant to the Equity Option under its Account Holder Letter;

"**Equity Valuation Report**" means the report dated 17 November 2024 prepared for the Issuer by 414 Capital Inc. regarding the equity value of the Issuer;

"**Excluded Scheme Claim**" means any Claim which arises:

(a)    as a result of the failure by any person to comply with, or perform its obligation(s) under, the Lock-Up Agreement, this Scheme or an Implementation Document;

(b)    under the Scheme and/or any Implementation Document which may arise or accrue in relation to acts, omissions, events and/or circumstances occurring, or which are done after the Restructuring Effective Date;

(c)    from fraud or gross negligence by a Released Party;

(d)    in respect of any Liability of the Scheme Company (including in its capacity as guarantor under the Existing Notes Indenture) or the Issuer to the Existing Notes Trustee for compensation and/or indemnity or otherwise to the Existing Notes Trustee in its capacity as such pursuant to the Existing Notes Indenture;

(e)    under or in respect of any fees payable to any of the Ad Hoc Group's Advisors;

(f)    under or in respect of any Scheme Creditor's obligations under this Scheme; or

(g)    under or in respect of any New Shares, the New Notes and/or the transaction documentation relating to the New Notes, including the New Notes Mexican Trust Agreement;

"**Existing Noteholder**" means any person that is the ultimate beneficial owner of the Existing Notes;

"**Existing Notes**" means the 8.250 per cent. senior notes due 11 February 2025 (ISIN: USP73699BH55) issued by the Issuer and guaranteed by the Scheme Company pursuant to the Existing Notes Indenture;

"**Existing Notes Indenture**" means the indenture originally dated 11 February 2020 as amended pursuant to supplemental indentures dated 30 March 2021 and 1 November 2024 in relation to the Existing Notes and made between the Issuer as issuer and the Existing Notes Trustee as notes trustee (as amended or supplemented from time to time);

"**Existing Notes Trustee**" means Wilmington Trust, National Association, as notes trustee under the Existing Notes Indenture;

"**Explanatory Statement**" means the explanatory statement dated 21 November 2024 relating to this Scheme which was required to be issued to the Scheme Creditors, together with this Scheme, pursuant to section 897 of the Companies Act;

"**FX Rate**" means the USD / MXN exchange rate of 20.0367 Ps per USD.

"**Group**" means the Issuer and its direct and indirect subsidiaries from time to time, including the Scheme Company;

"**Group's Counsels**" means Cleary Gottlieb Steen and Hamilton LLP and Mijares Angoitia Cortés y Fuentes, S.C.;

"**Group's Advisors**" means the Group's Counsels and Group's Financial Advisors;

"**Group's Financial Advisors**" means Houlihan Lokey, Inc. and Blink Capital Solutions;

"**Holding Period**" means the period from the Restructuring Effective Date until the Holding Period Escrow Expiry Date.

"**Holding Period Escrow Agent**" means the Issuer in its capacity as escrow agent under the Holding Period Escrow Agreement;

"**Holding Period Escrow Agreement**" means the escrow agreement to be entered into on or prior to the Restructuring Effective Date between the Scheme Company, the Information Agent and the Holding Period Escrow Agent, in the form agreed between the Group's Counsels and the Ad Hoc Group's Advisors and made available on the Scheme Website;

"**Holding Period Escrow Expiry Date**" means 5.00 p.m. (New York time) on the date falling 365 days after the Restructuring Effective Date;

"**Holding Period Escrow Party**" has the meaning given to it in Clause 5.9(a) of this Scheme;

"**Implementation Deed**" means the agreement to be entered into by, amongst others, the Scheme Company, the Issuer, the Agents, and the Scheme Creditors in accordance with the terms of this Scheme, governing the implementation of the Restructuring, in the form attached to this Scheme at Schedule 2 (*Implementation Deed*);

"**Implementation Documents**" means each of the following documents in the form agreed pursuant to the terms of the Implementation Deed:

(a)    the Implementation Deed and any ancillary documents referred to therein;

(b)      the documentation required to issue the New Shares, including the form of New Shares nominative certificates;

(c)      the documentation required to issue the New Notes, including:

(i)      the Note Purchase and Placement Agreement;

(ii)     the New Notes Indenture;

(iii)    New Notes Mexican Trust Agreement;

(d)      the Deed of Release;

(e)      the New Notes Settlement Agreement;

(f)      the Cash Settlement Escrow Agreement;

(g)      the Holding Period Escrow Agreement; and

(h)      any other document, agreement, deed, instrument of transfer, resolution, consent, undertaking, certificate, notice or form that is designated as an Implementation Document pursuant to the Implementation Deed, which is scheduled to, referred to in and/or contemplated in any Implementation Document or is otherwise necessary or reasonably desirable to support, facilitate, implement or otherwise give effect to the Restructuring or which is referred to in, or contemplated by, and in the forms agreed to in accordance with the terms of the Lock-Up Agreement and the Implementation Deed;

"**Implementation Steps**" has the meaning given to it in the Implementation Deed;

"**Information Agent**" means Kroll Issuer Services Limited, a private company incorporated in England and Wales with registered number 05098454, whose registered office is at The Shard, 32 London Bridge Street London, England, SE1 9SG (or any successor in title) in its capacity as information agent in relation to this Scheme;

"**Insolvency Proceeding**" means any corporate action or legal proceedings taken in relation to:

(a)      a Mexican *concurso mercantil*, the suspension of payments, a moratorium of any indebtedness, winding-up, bankruptcy, liquidation, dissolution, administration, receivership, administrative receivership, judicial composition or reorganisation (by way of voluntary arrangement, scheme or otherwise) with respect to the Scheme Company or the Issuer;

(b)      a composition, conciliation, compromise or arrangement with the creditors generally of the Scheme Company or the Issuer or an assignment by the Scheme Company or the Issuer of its assets for the benefit of its creditors generally or the Scheme Company or the Issuer becoming subject to a distribution of its assets;

(c)      the appointment of a Mexican *conciliador*, liquidator, receiver, administrator, administrative receiver, compulsory manager or other similar officer in respect of the Scheme Company or the Issuer or any of its assets; or

(d)      any procedure or step in any jurisdiction analogous to those set out in paragraphs (a) to (c) above, and

excluding, for the avoidance of doubt, the Scheme, or any ancillary or parallel proceedings thereto, including, but not limited to, any proceedings to implement or effect cross-border or parallel recognition or implementation of the Restructuring or of the Scheme to the extent required or desirable;

"**International Facilities**" has the meaning given to this term in the Explanatory Statement.

7

"**Issuer**" means Operadora de Servicios Mega, S.A. de C.V., SOFOM, E.R., a company incorporated under the laws of Mexico, with its registered office at Av. Patria 1501, Jardines Universidad, 45110 Zapopan, Jalisco, Mexico;

"**Liability**" means any debt, liability or obligation whatsoever, whether it is present, future, prospective or contingent, whether or not its amount is fixed or undetermined, whether or not it involves the payment of money or the performance of an act or obligation, and whether it arises at common law, in equity or by statute, in England and Wales or in any other jurisdiction, or in any other manner whatsoever, but such expression does not include any liability which is barred by statute or is otherwise unenforceable or arises under a contract which is void or, being voidable, has been duly avoided, and "**Liabilities**" will be construed accordingly;

"**Lock-Up Agreement**" means the lock-up agreement (including the term sheet appended at Schedule 2 (*Restructuring Terms*) thereto) between, among others, the Scheme Company, the Issuer and certain Existing Noteholders, dated 11 November 2024;

"**Lock-Up Fee**" means, in relation to a Locked-Up Noteholder, such amount as is equal to 1 per cent. of the aggregate principal amount of that Locked-Up Noteholder's Locked-Up Notes and excluding (for the avoidance of doubt) any Existing Notes sold, transferred, assigned or otherwise disposed of by that Locked-Up Noteholder after the date of the Scheme Meeting;

"**Lock-Up Fee Entitlement**" means the entitlement of each Locked-Up Noteholder to its Lock-Up Fee;

"**Locked-Up Noteholder**" means each Existing Noteholder that is party to the Lock-Up Agreement as at the date of the Scheme Meeting;

"**Locked-Up Notes**" means at any time, in relation to a Locked-Up Noteholder, the aggregate principal amount of all Existing Notes held by that Locked-Up Noteholder as at the Voting Instruction Deadline;

"**Longstop Date**" means:

(a)     11.59 p.m. (London time) on 28 February 2025; or

(b)     such later time as may be agreed in writing between the Issuer and the Majority Consenting Creditors (as defined in the Lock-Up Agreement) or, following the Scheme Effective Date, the Majority Scheme Creditors, subject to approval by the Majority International Lenders;

"**Majority International Lenders**" means lenders under the International Facilities, who in aggregate hold 50% or more of the participations in the International Facilities (by value).

"**Majority Scheme Creditors**" means Scheme Creditors (other than Sanctioned Persons) whose holdings of the Existing Notes constitute at the relevant time more than 50 per cent. of the aggregate principal amount of the Existing Notes held at the relevant time by the Scheme Creditors (other than Sanctioned Persons), excluding the Existing Notes Trustee and the Registered Holder Nominee;

"**New Notes**" means the new notes to be issued by the Issuer on or before the Restructuring Effective Date in accordance with the terms of the Scheme and to be governed by the New Notes Indenture;

"**New Notes Cash Cap**" means USD 51,237,630;

"**New Notes Election Form**" means the New Notes election form to be made available with the Explanatory Statement;

"**New Notes Entitlement**" means in respect of any Participating T2 New Noteholder, its entitlement to subscribe for and receive New Notes in such amount as is calculated in accordance with Clause 5.3(a)(i) of this Scheme;

"**New Notes Indenture**" means the indenture to be entered into by the Issuer and the New Notes Indenture Trustee pursuant to the Note Purchase and Placement Agreement governing the terms of the New Notes in the form agreed between the Group's Counsels and the Ad-Hoc Group's Advisors and made available on the Scheme Website;

"**New Notes Indenture Trustee**" means UMB BANK, N.A., in its capacity as trustee under the New Notes Indenture;

"**New Notes Mexican Trustee**" means CIBanco, S.A., Institución de Banca Múltiple,  in  its capacity  as Mexican trustee pursuant to the New Notes Mexican Trust Agreement;

"**New Notes Mexican Trust Agreement**" means the Mexican trust agreement to be entered into by the New Notes Mexican Trustee, the Issuer and the New Notes Indenture Trustee in accordance with the New Notes Indenture in the form agreed between the Group's Counsels and the Ad-Hoc Group's Advisors and made available on the Scheme Website.

"**New Notes Settlement Agent**" means UMB BANK, N.A., in its capacity as settlement agent in respect of the New Notes;

"**New Notes Settlement Agreement**" means the settlement agreement to be entered into between the Issuer, the Scheme Company and the New Notes Settlement Agent in relation to the settlement and delivery of the New Notes, in the form agreed between the Group's Counsels and the Ad Hoc Group's Advisors and made available on the Scheme Website;

"**New Shares**" means the voting shares in the Issuer (with the same rights as the Issuer's existing shares) to be issued on or before the Restructuring Effective Date in accordance with the terms of the Scheme.

"**New Shares Entitlement**" means, in respect of each Equity Option Scheme Creditor, its entitlement to receive as consideration under this Scheme, New Shares in such amount as calculated in accordance with Clause 5.3(a)(ii)(B) of this Scheme;

"**Non-Electing Scheme Creditor**" means each Scheme Creditor that does not make any valid election in relation to the Equity Option or Redemption Option under the Scheme (including as a result of being a Sanctioned Person);

"**Note Purchase and Placement Agreement**" means the note purchase and placement agreement to be entered into in accordance with the Implementation Deed in relation to the placement of the New Notes to certain New Note purchasers, including the Participating T2 New Noteholders, in the form attached to this Scheme at Schedule 3 (*Note Purchase and Placement Agreement*);

"**Participating T2 New Noteholder**" means each holder of the Existing Notes who elects to subscribe for the New Notes by validly submitting the New Notes Election Form on or before the Election Deadline and who accedes (or whose Designated Recipient, if applicable, accedes) to the Note Purchase and Placement Agreement in its capacity as such; *provided that* such holder (and its Designated Recipient, if applicable) is not a Disqualified Person nor a Sanctioned Person and *further provided that* a holder of the Existing Notes shall only be entitled to subscribe for the New Notes to the extent that (i) the principal amount of New Notes constituting its New Notes Entitlement would at least equal US$150,000 and integral multiples of US$1,000 thereafter (rounded down to the nearest US$1,000) or it designates a Designated Recipient to receive its New Notes Entitlement who, together with any other New Notes Entitlements it is entitled to, would receive New Notes with a principal amount at least equal

9

to US$150,000 and integral multiples of US$1,000 thereafter (rounded down to the nearest US$1,000);

"**Proceeding**" means any process, action or other legal proceeding (including, without limitation, any demand, arbitration, alternative dispute resolution, judicial review, adjudication, execution, seizure, distraint, forfeiture, re-entry, lien, enforcement of judgment or enforcement of any security) in any jurisdiction whatsoever;

"**Record Date**" means 5.00 p.m. (New York time) on 2 December 2024;

"**Redemption Option**" means the option for a Scheme Creditor to elect that all of its Scheme Claims are finally settled and discharged in full in exchange for payment by the Issuer of an amount in cash in USD equal to 45% of the Settlement Amount of such Scheme Creditor;

"**Redemption Option Scheme Creditor**" means each:

(a)     Scheme Creditor that elects the Redemption Option under its Account Holder Letter;

(b)     Non-Electing Scheme Creditor;

(c)     a Scheme Creditor that by operation of the Equity Option Cap is allocated Redemption Option in respect of part of its Settlement Amount, but only in respect of such part;

(d)     Scheme Creditor that is or becomes a Disqualified Person as at the date on which the Scheme Consideration is required to be paid pursuant to the Implementation Deed; and

(e)     Scheme Creditor that is or becomes a Sanctioned Person as at the date on which the Scheme Consideration is required to be paid pursuant to the Implementation Deed;

"**Registered Holder Nominee**" means Cede & Co. in its capacity as the registered holder of the global note with respect to the Existing Notes as nominee for DTC;

"**Registrar of Companies**" means the registrar of companies for England and Wales, as described in section 1060 of the Companies Act 2006;

"**Related Entity**" means, in relation to an entity (the "**First Entity**"), an entity (or any of its Affiliates) which is managed or advised by the same investment manager or investment advisor as the First Entity (or its Affiliates) or by a different investment manager or investment advisor which is an Affiliate of the investment manager or investment advisor of the First Entity (or its Affiliates);

"**Related Party Existing Noteholder**" means certain Existing Noteholders who are related to the Issuer.

"**Released Parties**" has the meaning given to it in the Deed of Release;

"**Relevant Default**" has the meaning given to it in the Lock-Up Agreement;

"**Restructuring**" means the financial restructuring of the Group relating to the financial obligations of the Scheme Company and the Issuer, including in respect of the Existing Notes and certain other indebtedness of the Issuer, as more fully detailed in Part 3 of the Explanatory Statement;

"**Restructuring Effective Date**" means the time at which the Scheme Company notifies Scheme Creditors (via the Information Agent) and the Existing Notes Trustee that all conditions set out in the Implementation Deed have been fulfilled or waived in accordance with the terms of this deed and all of the conditions precedent under the Implementation Documents have been fulfilled or waived in accordance with their terms and the Restructuring is implemented and has become effective in accordance with the Implementation Deed following the occurrence of each of the Implementation Steps;

"**Sanctioned Country**" means a country or territory that is subject to comprehensive Sanctions (currently, Crimea, Cuba, Iran, North Korea, Syria, and those portions of the Donetsk People's Republic or Luhansk People's Republic regions (and such other regions) of Ukraine over which any Sanctions Authority imposes country or territory wide comprehensive Sanctions).

"**Sanctioned Custodian**" means an Account Holder, an intermediary or custodian that is a person falling under paragraphs (a) to (c) of the definition of a Sanctioned Person;

"**Sanctioned Person**" means a person that is:

(a)     listed on any Sanctions List, or is otherwise the target of any Sanctions (including, without limitation, by reason of ownership, control or agency (as such terms are defined by the relevant Sanctions or Sanctions Authority) by or with one or more persons listed on a Sanctions List);

(b)     located or ordinarily resident in or organized under the laws of any Sanctioned Country;

(c)     with which the Issuer, the Ad Hoc Group, the Issuer's advisors or the Ad Hoc Group's Advisors, the Existing Notes Trustee, the New Notes Indenture Trustee, the New Notes Mexican Trustee or any Agent in respect of the Restructuring or the Existing Notes is prohibited pursuant to any Sanctions from dealing or otherwise engaging in any transaction contemplated by the terms of the Existing Notes, the Existing Notes Indenture, the Scheme, the Implementation Documents and/or the Restructuring;

(d)     whose Existing Notes are held through a Sanctioned Custodian, but only if the dealing or other engagement in respect of the Existing Notes of such Scheme Creditor in connection with the Scheme or the Restructuring (and excluding for the avoidance of doubt any payments by the Issuer made through the Clearing Systems) are required to be conducted through such Sanctioned Custodian; or

(e)     acting on behalf of or at the direction of a person falling within paragraphs (a) through (d) above,

provided that "**Sanctioned Person**" will exclude those that are solely identified on, or otherwise solely subject to the restrictions under, the 'Sectoral Sanctions Identifications List' of the U.S. Department of the Treasury's Office of Foreign Assets Control or any equivalent list maintained by any other Sanctions Authority, provided that such restrictions would not in any other way restrict or prohibit transactions, activities or other dealings contemplated in connection with the Scheme or the Restructuring;

"**Sanctions**" means economic or financial sanctions, laws, regulations or trade embargoes or similar measures implemented, administered or enforced by any of the Sanctions Authorities;

"**Sanctions Authority**" means:

(a)     the U.S. Department of the Treasury's Office of Foreign Assets Control and the U.S. Department of State;

(b)     the United Nations Security Council;

(c)     the European Union or any member state thereof, or any governmental authority of the same; or

(d)     the United Kingdom (or any governmental authority of the same, including without limitation in respect of the United Kingdom, His Majesty's Treasury and the Department for Business and Trade);

"**Sanctions Licence Requirements**" means any requirements of (i) the license to be granted in relation to the Restructuring by the U.S. Department of the Treasury's Office of Foreign Assets

Control; and (ii) the General Licence – Bond amendments and restructurings for non-Designated Persons (INT/2023/2824812) issued by the Office of Financial Sanctions Implementation of His Majesty's Treasury;

"**Sanctions List**" means any of the lists of specifically designated persons or entities (or equivalent) maintained by a Sanctions Authority, each as amended, supplemented or substituted from time to time;

"**Scheme**" means the scheme of arrangement proposed pursuant to Part 26 of the Companies Act between the Scheme Company  (in its capacity as the guarantor under the Existing Notes Indenture) and the Scheme Creditors (as creditors of the Scheme Company) in the form set out herein, with or subject to any modification, addition or condition which the Court may think fit to approve or impose, as appropriate in accordance with the terms of this Scheme and Clause 8 (*Modifications of the Scheme or Waiver of the Scheme Conditions*);

"**Scheme Claim**" means any Claim in respect of any Liability of the Scheme Company (including in its capacity as guarantor under the Existing Notes Indenture or otherwise in respect of the Existing Notes) or the Issuer, owed to any of the Scheme Creditors and/or the Existing Notes Trustee arising directly or indirectly out of or in relation to the Existing Notes Indenture as a result of an obligation or Liability of the Scheme Company or the Issuer incurred, or as a result of an event occurring or an act done, on or before the Restructuring Effective Date, and together with any Claim previously held by a Scheme Creditor which may be owed to the Scheme Company (including in its capacity as guarantor under the Existing Notes Indenture or otherwise in respect of the Existing Notes) and the Issuer in each case, directly or indirectly out of, or which otherwise results from, the Restructuring or any Implementation Step being taken in accordance with the terms of the Implementation Deed (including, for the avoidance of doubt, any interest accruing on, or accretions arising in respect of, such Claims up to and including the Restructuring Effective Date) other than an Excluded Scheme Claim;

"**Scheme Company**" means Mega Newco Limited, a company incorporated under the laws of England and Wales and registered under number 15986024 and with its registered address at Suite 1, 7th Floor 50 Broadway London SW1H 0DB;

"**Scheme Conditions**" means:

(a)     the occurrence of the Scheme Registration Time;

(b)     confirmation being received from HM Revenue & Customs that the Scheme Sanction Order is not subject to stamp duty;

(c)     notification by the Scheme Company to the Scheme Creditors (via the Information Agent) and the Existing Notes Trustee that the foregoing conditions set out at (a) – (b) have been fulfilled or waived in accordance with Clause 8 (*Modifications of the Scheme or Waiver of the Scheme Conditions*) of the Scheme;

"**Scheme Consideration**" has the meaning given to it in Clause 5.1 (*Entitlement to Scheme Consideration*);

"**Scheme Consideration Entitlement**" means in respect of each Scheme Creditor, its entitlement to receive its Cash Entitlement and/or its New Shares Entitlement;

"**Scheme Creditor Entitlements**" means any New Notes Entitlements and Scheme Consideration Entitlements of a Scheme Creditor;

"**Scheme Creditors**" means the Existing Noteholders, the Existing Notes Trustee and the Registered Holder Nominee;

"**Scheme Effective Date**" means the date on which the Scheme Registration Time occurs and the Scheme Company notifies the Scheme Creditors (via the Information Agent) and the Existing Notes Trustee that each of the Scheme Conditions has been fulfilled or waived in accordance with Clause 8 (*Modifications of the Scheme or Waiver of the Scheme Conditions*);

"**Scheme Meeting**" means any meeting of the Scheme Creditors convened with the permission of the Court pursuant to section 896 of the Companies Act to consider, and if thought fit, to approve this Scheme, including any adjournment thereof;

"**Scheme Registration Time**" means the time at which a certificated copy of the Scheme Sanction Order is delivered to the Registrar of Companies for registration;

"**Scheme Sanction Hearing**" means the hearing at which the Court issues the Scheme Sanction Order;

"**Scheme Sanction Order**" means an order of the Court sanctioning this Scheme under section 899 of the Companies Act;

"**Scheme Standstill**" has the meaning given to it in Clause 9.1(a) of this Scheme;

"**Scheme Website**" means the website set up for the Scheme Creditors by the Information Agent at https://deals.is.kroll.com/grupomega;

"**Settlement Amount**" means, in respect of a Scheme Creditor, an aggregate amount of principal of the Existing Notes held by such Scheme Creditor as at the Record Date (i) *less* the Subscription Amount; and (ii) *plus* accrued and unpaid interest thereon as at the relevant date of payment or delivery of the Scheme Consideration pursuant to the Implementation Deed, as the case may be.

"**Settlement Funds Flow**" has the meaning given to it in the Implementation Deed;

"**SP Holding Period**" means, with respect to a Holding Period Escrow Party that is a Sanctioned Person, the period of 60 days commencing from the date that such Holding Period Escrow Party ceases to be a Sanctioned Person or on which such Holding Period Escrow Party becomes entitled to receive (and the Issuer and the Holding Period Escrow Agent become entitled to make) distributions of the funds held in the Holding Period Escrow in compliance with Sanctions, but in any event not exceeding 20 years following the Restructuring Effective Date;

"**Subscription Amount**" has the meaning given to it in Clause 5.3(a)(i)(A) of this Scheme;

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same);

"**Total New Notes Commitments**" means the total aggregate amount of New Notes that Scheme Creditors elect to subscribe for by validly submitting New Notes Election Forms;

"**Trustees**" means the Existing Notes Trustee, any New Notes Mexican Trustee and any New Notes Indenture Trustee;

"**Undertaking**" means an undertaking from any Undertaking Transaction Party, dated on or before the date of the Scheme Sanction Hearing to, amongst other things, be bound by, and perform the terms of, this Scheme and the Implementation Documents to which it is a party insofar as they relate to it;

"**Undertaking Transaction Party**" means the Issuer, each Agent and each of the Trustees;

"**US Securities Act**" means the US Securities Act of 1933, as amended; and

13

"**Voting Instruction Deadline**" means 5.00 p.m. (New York time) on 9 December 2024.

1.2    In this Scheme, unless the context otherwise requires or otherwise expressly provides:

(a)    to the extent that there is any conflict or inconsistency between the terms of this Scheme and the Explanatory Statement, the terms of this Scheme will prevail;

(b)    references to Clauses and Schedules are references to the Clauses of, and Schedules to, this Scheme and a reference to "this Scheme" includes a reference to each of the Schedules to this Scheme;

(c)    the Agents, the Trustees, the Scheme Company or any other person will be construed as to include its successors in title, permitted assigns and permitted transferees;

(d)    references to a person include references to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

(e)    references to a statute or statutory provision include the same as subsequently modified, amended, supplemented or re-enacted from time to time;

(f)    references to an agreement, deed or document will be deemed also to refer to such agreement, deed or document as amended, supplemented, restated, verified, replaced and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto, provided that such amendment, supplement, restatement, verification, replacement and/or novation has, to the extent it relates to an Implementation Document or this Scheme, been made in accordance with the terms of such Implementation Document and/or this Scheme (as applicable);

(g)    references to an agreement, deed or document will include any schedules, annexes and appendices to such agreement, deed or document;

(h)    references to (or to any specified provision of) this Scheme will be construed as references to this Scheme as in force for the time being;

(i)    the singular includes the plural and vice versa and words importing one gender will include all genders;

(j)    "including" or "include" means including or include without limitation;

(k)    "or" is not exclusive;

(l)    headings to Clauses and Schedules are for ease of reference only and will not affect the interpretation of this Scheme;

(m)    unless otherwise stated, all references in this Scheme to times are to London time;

(n)    where any amount is specified in this Scheme (including in any definition) in respect of any Scheme Consideration or New Notes, that amount is subject to rounding in accordance with the terms of this Scheme;

(o)    any references to any Scheme Consideration or New Notes being issued or delivered to a Scheme Creditor shall be treated for all purposes as references to that person being issued with or delivered directly, or indirectly through one or more intermediaries, the relevant Scheme Consideration or New Notes in accordance with the rules and procedures of the Clearing System;

(p)    references to Existing Notes being held by an Existing Noteholder shall be treated for all purposes as references to the Book Entry Interest or Book Entry Interests held by the relevant Existing Noteholder;

14

(q)     "$", "US$" or "USD" means the US dollar, the lawful currency for the time being of the United States of America; and

(r)     "MXN" means the Mexican Pesos, the lawful currency for the time being of the United Mexican States.

## 2.      Application of the Scheme and the Scheme Effective Date

2.1     The compromises and arrangements effected by this Scheme will:

(a)     apply to all Scheme Claims and bind all Scheme Creditors (and each of their respective successors and assigns) and the Scheme Company;

(b)     subject to the terms of its respective Undertaking, bind each Undertaking Transaction Party (and its respective successors and assigns); and

(c)     bind each other person that has undertaken to be bound by the terms of this Scheme and their respective successors and assigns.

2.2     Subject to Clause 2.4 below and Clause 9.2 (*Termination*), the terms of this Scheme will become effective and binding on the Scheme Effective Date.

2.3     The Scheme Company shall promptly notify the Scheme Creditors that the Scheme Effective Date has occurred and promptly thereafter shall execute and deliver the Implementation Deed based on the authorities granted to it pursuant to this Scheme.

2.4     The arrangements effected by this Scheme shall apply to all Scheme Creditors and all of their respective rights, title and interests to Scheme Claims and will be subject to the compromises and arrangements set out in this Scheme pursuant to the terms of the Implementation Deed and at the time specified for the relevant Implementation Step in such Implementation Deed.

## 3.      Consideration

The authorities, instructions, undertakings, releases (including the releases given pursuant to the Deed of Release), ratifications, and waivers given by the Scheme Creditors in favour of the Scheme Company (including its capacity as guarantor of the Existing Notes Indenture), the Issuer and the Released Parties, where applicable, are given by each Scheme Creditor in consideration of the rights provided to each Scheme Creditor under this Scheme and pursuant to the Implementation Documents and by the Existing Notes Trustee pursuant to the Scheme Sanction Order and the instruction given to it pursuant to Clause 4.2(a) (*Undertaking Transaction Parties' Authority*).

## 4.      Grant of Authority to Execute the Implementation Documents

4.1     **Scheme Company's Authority to Execute the Implementation Documents**

(a)     On and from the Scheme Effective Date, each Scheme Creditor (on its own behalf and on behalf of any Designated Recipient), other than the Existing Notes Trustee, in consideration for its rights accruing to it under this Scheme hereby irrevocably authorises, appoints and instructs the Scheme Company acting reasonably (acting by its directors, officers or other duly appointed representatives) as its true and lawful agent and attorney (and as agent and attorney of such person to whom such Scheme Creditor has assigned or transferred any of its Scheme Claims where such transfers are recognised by the Scheme Company in accordance with Clause 9.6 (*Assignments or Transfers*)) to, for and on behalf of each such Scheme Creditor:

15

(i)       Enter into, execute and deliver (whether as a deed or otherwise) for and on behalf of each such Scheme Creditor each Implementation Document to which the Scheme Creditors (or any of them) are (or is) expressed to be a party;

(ii)     agree on its behalf any amendments to the Implementation Documents to which such Scheme Creditor is expressed to be a party, which the Scheme Company deems (acting reasonably and in good faith) to be:

     (A)    necessary or reasonably desirable to give effect to, or reflect the terms of, this Scheme and/or the transactions to be entered into in order to effect the Restructuring; or

     (B)    necessary to correct any manifest error (that could reasonably be expected to be considered such by all of the parties to that Implementation Document); or

     (C)    minor or technical in nature and, in each case would not (i) impose any additional obligation on, nor (ii) materially, adversely or disproportionately affect the rights of, any of the Scheme Creditors in any manner that is not otherwise contemplated by this Scheme or the Implementation Documents;

(iii)    agree on its behalf any amendments to the Implementation Documents to which such Scheme Creditor is expressed to be a party that the Scheme Company may, acting reasonably and in good faith, deem necessary or desirable in order to:

     (A)    ensure that the information and categories of information contained or referred to in any formula, schedule, annex or similar, lists of parties, signature blocks, parties' provision, notice details, bank account details, legal entity names or registration numbers, blanks or placeholders in any Implementation Documents reflect the correct relevant information and categories of information as of the applicable date;

     (B)    insert the Scheme Consideration Entitlements, the New Notes Entitlements, the Lock-Up Fee Entitlements and any other relevant allocations of the Scheme Creditors where required in the Implementation Documents, in each case as calculated in accordance with the terms of this Scheme and the Implementation Deed;

     (C)    subject to the approval rights set forth in Clause 8 (*Modifications of the Scheme or Waiver of the Scheme Conditions*), take into account any modification of, or addition to, this Scheme and/or the Implementation Documents approved or imposed by the Court in accordance with that Clause 8 (*Modifications of the Scheme or Waiver of the Scheme Conditions*);

     (D)    ensure that the Implementation Documents are duly executed and delivered in accordance with the Implementation Deed; and/or

     (E)    ensure that the Implementation Documents are legal, valid, binding and enforceable upon the parties to them in accordance with this Scheme and the Implementation Deed,

provided in each case that the Implementation Documents shall (where applicable) otherwise remain substantially in the forms appended to the Explanatory Statement or, if later, made available on the Scheme Website, and

further provided that such amendments do not directly or indirectly materially change any right or obligation of or impose an additional obligation (by reference to such rights or obligations as are contemplated at the date of the Explanatory Statement) on any Scheme Creditor and do not materially adversely affect a Scheme Creditor;

(iv)     enter into, execute and deliver (whether as a deed or otherwise) for and on behalf of such Scheme Creditor, any document, notice or instruction (including giving instructions to the Trustees and the Agents) as may be necessary or reasonably desirable (acting reasonably and in good faith) to give effect to the instruction under this Clause 4 (*Grant of Authority to Execute the Implementation Documents*); and

(v)      enter into, execute and deliver (whether as a deed or otherwise) any other document and give any other notice, confirmation, consent, order, instruction (including giving instructions to the Trustees and the Agents) or direction, or take any other action, as may be necessary in the discretion of the Scheme Company (acting reasonably), to release all Scheme Claims (in accordance with and at the times set out in, the Implementation Deed) and/or to otherwise give effect to this Scheme, the Implementation Steps, the Implementation Documents and/or the Restructuring, provided in each case that any such document:

(A)     is consistent in all material respects with the terms of the Lock-Up Agreement and the Implementation Deed; and

(B)     would not (i) impose any additional obligation on, nor (ii) materially, adversely or disproportionately affect the rights of, any of the Scheme Creditors in any manner that is not otherwise contemplated by this Scheme or the Implementation Documents.

(b)     Notwithstanding anything to the contrary in this Scheme:

(i)     the documents referred to above (other than the Implementation Deed) will only be released and delivered from escrow and become effective in accordance with their respective terms and as provided for in, and in accordance with the terms of, the Implementation Deed, whereupon they will become unconditionally and irrevocably binding on all Scheme Creditors and each of the other parties thereto;

(ii)     the releases contained in the Deed of Release shall only become effective at the time set out in the Implementation Deed which shall not, for the avoidance of doubt, occur prior to the occurrence of the Restructuring Effective Date; and

(iii)    the Scheme Company shall use all reasonable endeavours, insofar as practicable, to ensure that the calculations, allocations and entitlements in respect of each individual Scheme Creditor be kept confidential to that individual Scheme Creditor.

## 4.2    Undertaking Transaction Parties' Authority

(a)     Subject to Clause 2.4 (*Application of the Scheme and the Scheme Effective Date*) and Clause 9.2 (*Termination*) and pursuant to the Undertaking executed by the applicable Undertaking Transaction Party (if applicable), on and from the Scheme Effective Date, each Scheme Creditor (on behalf of itself and, if applicable, its Designated Recipient), other than the Existing Notes Trustee, hereby authorises and instructs:

(i) each Undertaking Transaction Party to enter into, execute and deliver (whether as a deed or otherwise) and perform, each Implementation Document to which it is expressed to be a party; *provided that* such Implementation Documents (other than the Implementation Deed) will only become effective in accordance with their respective terms and as provided in, and in accordance with the terms of, the Implementation Deed, whereupon they will become unconditionally and irrevocably binding on all such Undertaking Transaction Parties and each of the other parties thereto;

(ii) each Undertaking Transaction Party, to take all steps and do all other things necessary or reasonably desirable (acting reasonably and in good faith) to give effect to the Restructuring and otherwise to enter into, execute and deliver (whether as a deed or otherwise) all such documents that the Scheme Company or the relevant Undertaking Transaction Party reasonably considers necessary to give effect to the Restructuring, without limitation to the generality of the foregoing; *provided that*:

(A) any such documents will not become effective prior to the Restructuring Effective Date (unless, in accordance with the terms of the Implementation Deed, it is necessary for them to become effective earlier in order to effect the Restructuring), whereupon they will be unconditionally and irrevocably binding on all such Undertaking Transaction Parties and each of the other parties thereto; and

(B) any such document is consistent with the Lock-Up Agreement and the Implementation Deed;

(iii) each Undertaking Transaction Party to authorise, appoint and instruct the Scheme Company to perform the obligations of that Undertaking Transaction Party under this Clause 4.2(a) (*Undertaking Transaction Parties' Authority*) to implement the Scheme; and

(iv) each Undertaking Transaction Party to act and rely, without further verification, on any written instruction from the Scheme Company (acting on behalf of all Scheme Creditors pursuant to the authority granted to it under Clause 4.1(a) (*Scheme Company's Authority to Execute the Implementation Documents*)) to take any action referred to in this Clause 4.2(a) (*Undertaking Transaction Parties' Authority*) or Clause 7.5 (*Further Assurance*) which instruction certifies that any such action required of such Undertaking Transaction Party is in compliance with such provision(s), this Scheme and the Implementation Deed; and

(v) the Existing Notes Trustee to give and make the ratifications, releases, undertakings and other matters referred to in Clause 6 (*Releases*) and Clause 7 (*Ratifications and Confirmations*) at the time specified for the corresponding Implementation Step in the Implementation Deed.

(b) Each Undertaking Transaction Party shall have no liability to the Scheme Company, any Scheme Creditor, any of its or their respective Affiliates or any Connected Parties of any of them for any action taken, document executed or any inaction or omission by it pursuant to the authorisation and instruction set out in Clause 4.2(a) (*Undertaking Transaction Parties' Authority*) or in relying and acting on any instruction given to it in accordance with this Scheme, except as a result of its fraud, gross negligence or wilful misconduct.

## 4.3    Undertaking of the Company and the Scheme Company

Each of the Issuer and the Scheme Company undertakes to, and shall procure that any other relevant entity in the Group shall, take all steps and enter into, execute, deliver and perform all such documents, agreements, notices, confirmations, consents and orders as are necessary or reasonably desirable to give effect to this Scheme or the Restructuring, including the Implementation Documents and the documentary conditions precedent to them, in accordance with the terms thereof and in compliance with applicable Sanctions laws and the Sanctions Licence Requirements.

4.4    **Nature of Authorities and Obligations**

(a)    The authorities, appointments and instructions granted in this Clause 4 (*Grant of Authority to Execute the Implementation Documents*) will be treated, for all purposes whatsoever and without limitation, as having been granted by deed and the Scheme Company will be entitled to delegate the authority granted and conferred by this Clause 4 (*Grant of Authority to Execute the Implementation Documents*) to any duly authorised officer of the Scheme Company or any other member of the Group as it may consider necessary or reasonably desirable (acting reasonably and in good faith) to implement the Scheme.

(b)    Each Scheme Creditor will be bound by and will comply with, each of its obligations under each Implementation Document provided that it has been executed by the Scheme Company on its behalf in accordance with this Clause 4 (*Grant of Authority to Execute the Implementation Documents*).

(c)    The appointment of the Scheme Company under Clause 4.1 (*Scheme Company's Authority to Execute the Implementation Documents*) as agent:

(i)    is independent from the appointment of the Scheme Company under such clause as attorney; and

(ii)    will be effective in spite of any defect in the appointment as attorney and *vice versa*.

(d)    The authorities, appointments and instructions granted in this Clause 4 (*Grant of Authority to Execute the Implementation Documents*) shall automatically expire on the earlier of:

(i)    the termination of the Scheme under Clause 9.2 (*Termination*);

(ii)    on the Restructuring Effective Date (save, in respect of any actions or steps required to be taken following the Restructuring Effective Date in accordance with the Implementation Deed);

(iii)    the Longstop Date; and

(iv)    in relation to each Implementation Document, the date on which that Implementation Document is fully executed by each party to it.

5.    **Scheme Mechanics**

5.1    **Entitlement to Scheme Consideration**

By virtue of and in accordance with this Scheme, the Implementation Deed and the Implementation Documents (subject to each becoming effective in accordance with their respective terms and, in the case of the Implementation Documents other than the Implementation Deed, the terms of the Implementation Deed), and subject to the other provisions of this Scheme, in consideration for releasing their Scheme Claims:

(a)    each Redemption Option Scheme Creditor (or its Designated Recipient) will be entitled to the rights and benefits allocated to a Redemption Option Scheme Creditor under this Scheme and the Implementation Documents, and will accordingly be entitled to receive its Cash Entitlement; and

(b)    each Equity Option Scheme Creditor (or its Designated Recipient) will be entitled to the rights and benefits allocated to an Equity Option Scheme Creditor under this Scheme and the Implementation Documents, and will accordingly be entitled to receive its New Shares Entitlement,

(this Clause 5.1(a) and (b) above, together, the "**Scheme Consideration**").

5.2    **Entitlement to New Notes**

By virtue of and in accordance with this Scheme, the Implementation Deed and the Implementation Documents (each of which shall become effective in accordance with the Implementation Steps set out in the Implementation Deed), and subject to the other provisions of this Scheme and the Implementation Documents, each Participating T2 New Noteholder (and/or its Designated Recipient, if applicable) will be entitled to the rights and benefits allocated to a Participating T2 New Noteholder under the Note Purchase and Placement Agreement and the Implementation Documents and will therefore be entitled to subscribe for and receive (or designate a Designated Recipient to subscribe for and receive) its New Notes Entitlement and, subject to compliance with its funding obligation in relation to its New Notes Entitlement in accordance with the Note Purchase and Placement Agreement, shall be issued an amount of New Notes equal to its New Notes Entitlement.

5.3    **Calculation of Scheme Creditor Entitlements**

(a)    The Scheme Creditor Entitlements of each Scheme Creditor shall be calculated in accordance with this Clause 5.3(a) and the amounts of such entitlements so calculated shall be recorded in the Allocations Spreadsheet:

(i)    the New Notes Entitlement of each Participating T2 New Noteholder shall be equal to:

(A)    the principal amount of the New Notes such Participating T2 New Noteholder elects to subscribe for in cash pursuant to the New Notes Election Form validly delivered on or before the Election Deadline, but in any event not exceeding its pro rata portion of the New Notes Cash Cap calculated on the basis of such Participating T2 New Noteholder's holding of the Existing Notes as at the Record Date and subject to Clause 5.4, such amount being that Participating T2 New Noteholder's "**Subscription Amount**"; plus

(B)    principal amount of the New Notes equal to the Subscription Amount multiplied by 3.5,

*provided that*:

(1)    a Participating T2 New Noteholder shall only be entitled to receive (or have its Designated Recipient receive) the New Notes Entitlement if such Participating T2 New Noteholder (or its Designated Recipient) complies with its funding obligations in respect of its Subscription Amount and otherwise subject to the terms and conditions of the Note Purchase and Placement Agreement; and

20

(2)    New Notes will be issued in minimum denominations of US$150,000 and US$1,000 increments thereafter and rounded down to the nearest multiple of US$1,000.

(ii)    The Scheme Consideration Entitlement of each Scheme Creditor shall be calculated on the following basis:

(A)    each Redemption Option Scheme Creditor's Cash Entitlement shall be equal to:

(1)    such Redemption Option Scheme Creditor's Settlement Amount multiplied by

(2)    0.45.

(B)    each Equity Option Scheme Creditor's New Shares Entitlement shall be equal to:

(1)    such Equity Option Scheme Creditor's Settlement Amount divided by

(2)    USD23.83;

*provided that*:

(I)    To the extent that the amount of an Equity Option Scheme Creditor's New Shares Entitlement is not a whole number, any fractional entitlement shall be rounded down to the nearest whole New Share; and

(II)    if the total number of New Shares required to be issued to all Equity Option Scheme Creditors (other than a Related Party Existing Noteholder) exceeds the Equity Option Cap, then:

the Equity Option Scheme Creditor's New Shares Entitlement shall be equal to its pro rata share of the Equity Option Cap calculated by reference to the Settlement Amounts of all Equity Option Scheme Creditors (other than a Related Party Existing Noteholder); and

the Redemption Option shall apply to the part of the Equity Option Scheme Creditor's Settlement Amount in respect of which no New Shares are allocated.

(b)    Following the population of the Allocation Spreadsheet in accordance with Clause 5.3(a) above, the Scheme Company (or the Group's Advisors on its behalf) shall deliver a copy of the proposed final version of the Allocation Spreadsheet to the Ad Hoc Group's Advisors.

## 5.4    Backstop Commitment

If the Scheme Company and the Issuer resolve to call upon the Backstop Commitment, the Issuer and the Scheme Company will send a New Notes Funding Notice to each of the Backstop Parties (with a copy to the Information Agent) no later than three Business Days following the Election Deadline and the relevant New Notes Entitlement of that Backstop Party (also being a Participating T2 New Noteholder) shall be increased by taking into account any Subscription

Amount that is actually subscribed for by the Backstop Parties pursuant to the Backstop Commitment Letter.

5.5    **Payment of Lock-Up Fee**

In accordance with the Implementation Steps set out in the Implementation Deed, each Scheme Creditor that is a Locked-Up Noteholder will be entitled to receive and shall (unless the Scheme Creditor is, or becomes prior to the relevant payment date, a Sanctioned Person) be paid, at the time specified in the Implementation Deed, its Lock-Up Fee Entitlement in cash (subject to and in accordance with the terms of the Lock-Up Agreement, including the condition that such Existing Noteholder votes in favour of the Scheme at the Scheme Meeting) and each such Scheme Creditor's Lock-Up Fee Entitlement will be set out in the Settlement Funds Flow to be agreed between the Ad Hoc Group's Advisors and the Group's Advisors in accordance with the Implementation Deed.

5.6    **Receipt of Scheme Creditor Entitlements and Appointment of a Designated Recipient**

(a)    The procedure and timing for the issuance of each Scheme Creditor's Scheme Consideration Entitlement, each Participating T2 New Noteholder's New Notes Entitlement and each Locked-Up Noteholder's Lock-Up Fee Entitlement shall be as set out in the Implementation Deed and, in particular, in the corresponding Implementation Step.

(b)    Each Scheme Creditor:

(i)    shall only receive its Scheme Consideration Entitlement in accordance with the terms of the Implementation Deed if:

(A)    it has duly elected to do so by validly completing, executing and delivering to the Information Agent an Account Holder Letter (including, without limitation, making all relevant elections) by the Election Deadline;

(B)    it has, to the extent such Scheme Creditor is due to receive New Shares, delivered all "know your customer" information;

(C)    it is able to give the Confirmations and the Scheme Company (acting reasonably and in good faith) considers such Confirmations to be correct and accurate;

(D)    it is, to the extent such Scheme Creditor is due to receive New Shares, not a Disqualified Person; and

(E)    it is not a Sanctioned Person;

(ii)    shall only receive its respective New Notes Entitlement in accordance with the terms of the Implementation Deed:

(A)    it has duly elected to do so by validly completing, executing and delivering to the Information Agent a New Notes Election Form (including, without limitation, making all relevant elections and providing all "know your customer" information required to be delivered thereunder) by the Election Deadline;

(B)    it is able to give the Confirmations and the Scheme Company (acting reasonably and in good faith) considers such Confirmations to be correct and accurate;

22

(C)     it (and if applicable its Designated Recipient) complies with its obligations under the Note Purchase and Placement Agreement;

(D)     to the extent that its New Notes Entitlement is comprised of New Notes with a principal amount at least equal to US$150,000 and integral multiples of US$1,000 thereafter (rounded down to the nearest US$1,000) or it designates a Designated Recipient to receive its New Notes Entitlement, who together with any other New Notes Entitlements it is entitled to, would receive New Notes with a principal amount at least equal to US$150,000 and integral multiples of US$1,000 thereafter (rounded down to the nearest US$1,000);

(E)     it is not a Disqualified Person; and

(F)     it is not a Sanctioned Person.

(iii)   will be entitled to appoint a Designated Recipient to receive its Scheme Consideration and/or to fund and/or receive the New Notes under and in accordance with its Account Holder Letter and/or New Notes Election Form, as the case may be; *provided that*:

(A)     each of the following relevant parties has validly completed, executed and delivered to the Information Agent an Account Holder Letter and/or a New Notes Election Form by the Election Deadline:

(1)     the Scheme Creditor, in order to make such election; and

(2)     its Designated Recipient; and

(B)     such Designated Recipient has validly completed, executed and delivered any and all such documents and agreements (including proxies and powers of attorney) and has provided all such other information as may be required or requested of it to enable the issuance of the relevant Scheme Consideration and/or New Notes to it in accordance with the Implementation Steps and has acceded to the Note Purchase and Placement Agreement.

(c)     No Scheme Creditor or other person will have any entitlements to Scheme Consideration or New Notes other than pursuant to this Clause 5 (*Scheme Mechanics*) of this Scheme.

## 5.7     Discrepancies in the Scheme Creditor Entitlements and the New Notes Entitlements

Where there is any discrepancy between a Scheme Creditor's Scheme Creditor Entitlements (a) as calculated in accordance with Clause 5.3(a) (*Calculation of Scheme Creditor Entitlements*) of this Scheme, and (b) as set out in the Allocation Spreadsheet, such allocations and/or entitlements as calculated in accordance with the provisions of Clause 5.3(a) (*Calculation of Scheme Creditor Entitlements*) shall prevail.

## 5.8     Existing Notes Cancellation

In accordance with the Implementation Steps set out in Implementation Deed and the other Implementation Documents:

(a)     the Scheme Company shall, on behalf of each Scheme Creditor, pursuant to the authority granted under Clause 4.1 (Scheme *Company's Authority to Execute the Implementation Documents*), execute and deliver (or have the Issuer execute and deliver) to DTC, via the Existing Notes Trustee, the DTC Instruction in accordance with the Implementation Deed to direct DTC to:

23

(i)     instruct the Clearing Systems to debit the Book Entry Interests relating to the Existing Notes from the custody account of each Scheme Creditor (or its Account Holder, as applicable); and

(ii)    authorise the cancellation of the Book Entry Interests in respect of the Existing Notes

and, the Existing Notes Trustee, the Scheme Company and the Issuer shall take such further steps as are prescribed by and in accordance with the Implementation Deed and subject to its terms;

(b)    the Existing Notes shall be cancelled, such cancellation to be binding on all Scheme Creditors;

(c)    no Scheme Creditor or any other person will have any further claims in respect of the Existing Notes (save in respect of any potential claim of the Existing Notes Trustee against the Issuer under the Issuer's indemnity in favour of the Existing Notes Trustee);

(d)    the Existing Notes Indenture shall be terminated and be of no further effect (save in respect of the Issuer's indemnity in favour of the Existing Notes Trustee);

(e)    the Existing Notes Trustee shall have no further duties or obligations under the Existing Notes Indenture; and

(f)    each Scheme Creditor will grant releases and covenants not to sue in favour of the Scheme Company, the Issuer and the Released Parties in accordance with Clause 6 (*Releases*).

5.9    **Holding Period Escrow**

(a)    If a Scheme Creditor:

(i)     is a Sanctioned Person;

(ii)    has not (or its Designated Recipient has not (as, and if, applicable)) delivered to the Information Agent a valid Account Holder Letter (including, without limitation, all "know your customer" information required to be delivered thereunder) by the Election Deadline;

(iii)   is unable (or its Designated Recipient is unable (as, and if, applicable)) to give the necessary confirmations included in the Account Holder Letter as to its eligibility to receive the Scheme Consideration (or any part of benefit thereof) (the "**Confirmations**"); or

(iv)    gives (or its Designated Recipient gives (as, and if, applicable)) any Confirmation or Confirmations which the Scheme Company (acting reasonably and in good faith) considers to be incorrect or inaccurate,

it shall be considered a "**Holding Period Escrow Party**" and its Scheme Consideration Entitlements and its Lock-Up Fee Entitlement (if applicable) to which it is entitled pursuant to Clause 5.1 (*Entitlement to Scheme Consideration*) and Clause 5.5 (*Payment of Lock-Up Fee*), respectively, will be distributed to the Holding Period Escrow Agent on the Restructuring Effective Date, to be held in escrow in accordance with the Holding Period Escrow Agreement.

(b)    The Holding Period Escrow Agent will hold the Scheme Consideration and any Lock-Up Fee issued to it in accordance with the terms of this Scheme and the Holding Period Escrow Agreement.

24

(c)     If, during the Holding Period, a Holding Period Escrow Party which is not a Sanctioned Person delivers a valid Account Holder Letter to the Information Agent (in respect of which, for the avoidance of doubt, the Scheme Company and the Holding Period Escrow Agent (in each of their sole discretion) consider the Confirmations therein to be accurate and correct) then, subject to and in accordance with the terms and conditions of the Holding Period Escrow Agreement, the Scheme Consideration and Lock-Up Fee (if applicable) issued to the Holding Period Escrow Agent for it as Holding Period Escrow Party will be, to the extent such distribution can be made in compliance with Sanctions, distributed to the relevant Holding Period Escrow Party.

(d)     To the extent that, during the Holding Period, a Holding Period Escrow Party provides a confirmation that it is a Sanctioned Person, the Holding Period Escrow Agent will continue to hold the monies attributable to such Holding Period Escrow Party's Scheme Consideration after the Holding Period Escrow Expiry Date, subject to paragraph (f) below.

(e)     Subject to paragraph (d) above, on the Holding Period Escrow Expiry Date, in accordance with the Holding Period Escrow Agreement:

    (i)     Any Holding Period Escrow Party which has not validly claimed or received its entitlement in accordance with the Holding Period Escrow Agreement and/or which has not been identified prior to the end of the Holding Period as a Sanctioned Person, will have no entitlement to receive the relevant portion of Scheme Consideration or Lock-Up Fee (if applicable) held by the Holding Period Escrow Agent; and

    (ii)     The Holding Period Escrow Agent will, subject to and in accordance with the Holding Period Escrow Agreement, in all instances provided that doing so would be in accordance with Sanctions or applicable laws and regulations:

        (A)     at the request of the Scheme Company distribute the relevant part of the Scheme Consideration and any Lock-Up Fee (if applicable) to the Scheme Company (or at the Scheme Company's direction to another member of the Group); or

        (B)     if the action described in paragraph (A) above cannot practicably be taken, retain the Scheme Consideration and any Lock-Up Fee in the Holding Period Escrow until such time as it becomes practicable to take such action in respect of such amounts (whereupon the Holding Period Escrow Agent shall take the relevant action).

(f)     Where a Holding Period Escrow Party ceases to be a Sanctioned Person or and/or otherwise becomes entitled to receive (and the Issuer and the Escrow Agent become entitled to make) the relevant distribution in compliance with Sanctions, after the Holding Period Escrow Expiry Date, in each case to the extent not prohibited by Sanctions:

    (i)     that Holding Period Escrow Party shall be entitled to claim their Scheme Consideration Entitlement and Lock-Up Fee Entitlement, if applicable, during the SP Holding Period applicable to that Holding Period Escrow Party; and

    (ii)     on and from the expiry of such SP Holding Period, to the extent that any Escrow Property has not been validly claimed by the relevant Holding Period Escrow Party in accordance with the Scheme, that Holding Period Escrow Party shall (except, for the avoidance of doubt in the circumstances described in sub-clause 5.9(e)(ii)(B)) have no entitlement to receive the Escrow Property previously held by the Holding Period Escrow Agent.

25

**6.      Releases**

6.1      In accordance with the Implementation Steps set out in the Implementation Deed, each Scheme Creditor shall, at the time set out in the Implementation Steps, irrevocably authorise and instruct the Scheme Company and the Existing Notes Trustee (acting by its directors, officers or other duly appointed representatives) on its own behalf and on behalf of the Scheme Creditors under the authority granted in Clause 4.1 (*Scheme Company's Authority to Execute the Implementation Documents*) to enter into, execute and deliver as a deed (or otherwise) on its behalf, the Deed of Release, which will become effective and unconditionally and irrevocably binding upon all Scheme Creditors (and any person who acquires any interest in a Scheme Claim after the Record Date) on, and subject to the occurrence of, the Restructuring Effective Date in accordance with the timing and sequencing set out in the Implementation Deed. The authority granted under this Clause 6.1 shall be treated, for all purposes whatsoever and without limitation, as having been granted by deed.

6.2      This Scheme shall, with effect from, and subject to the occurrence of, the Restructuring Effective Date, satisfy, waive and release, fully and absolutely, all Scheme Claims.

6.3      For the avoidance of doubt, and notwithstanding anything to the contrary in this Clause 6 (*Releases*) or the Deed of Release, nothing in this Clause 6 (*Releases*) or the Deed of Release shall release, waive or discharge any party from any obligation it may have under this Scheme or any Implementation Document with respect to any step or action required to be undertaken, or procured to be undertaken, by it on or following the Restructuring Effective Date, in accordance with the terms of this Scheme or such Implementation Documents.

**7.      Ratifications and Confirmations**

7.1      **General**

In consideration for the receipt of its Scheme Consideration (as applicable):

(a)      each Scheme Creditor hereby, on and from the Scheme Effective Date irrevocably ratifies and confirms everything which the Scheme Company (including in its capacity as guarantor under the Existing Notes Indenture) and the Issuer, and their respective directors, managers, officers or other duly appointed representatives and the Undertaking Transaction Parties may lawfully do or cause to be done or cause or purport to be done, in each case to the extent compliant with the terms of this Scheme and the Implementation Documents;

(b)      each Scheme Creditor hereby, on and from, and subject to the occurrence of, the Restructuring Effective Date, irrevocably:

(i)      confirms that its entitlement to and allocation of the Scheme Consideration is accepted in full and final settlement of all Scheme Claims as satisfied, waived and released on and subject to the terms of this Scheme; and

(ii)      undertakes to the Released Parties to treat all Scheme Claims as having been released fully and absolutely and, in the case of the Existing Notes, as having been cancelled, pursuant to Clause 5.8 (*Existing Notes Cancellation*) and the authority granted under Clause 4.1 (*Scheme Company's Authority to Execute the Implementation Documents*) and this Clause 7.1 (*General*), in each case in accordance with and subject to Clause 6 (*Releases*).

7.2      **Matters Relating to Undertaking Transaction Parties**

With effect from, and subject to the occurrence of, the Restructuring Effective Date, each Scheme Creditor acknowledges, confirms and irrevocably ratifies all actions taken by each

26

Undertaking Transaction Party pursuant to the Scheme, the Implementation Steps and/or any of the Implementation Documents including (without limitation):

(a)     each Undertaking Transaction Party having executed and delivered an Undertaking in connection with the Scheme;

(b)     the Existing Notes Trustee having agreed not to vote in relation to the Scheme; and

(c)     any steps taken or to be taken by the Existing Notes Trustee to effect the cancellation of the Existing Notes in accordance with the Implementation Steps and/or any of the Implementation Documents.

7.3     **Covenant Not to Sue**

(a)     Subject to Clause 6 (*Releases*) above, each Scheme Creditor and the Existing Notes Trustee both as a Scheme Creditor and pursuant to the instruction given to it as an Undertaking Transaction Party under Clause 4.2(a) (*Undertaking Transaction Parties' Authority*) hereby covenants with the Scheme Company (including in its capacity as guarantor under the Existing Notes Indenture), the Issuer and each Released Party for the benefit of the Released Parties and their respective Connected Parties, on and from, and subject to the occurrence of, the Restructuring Effective Date, not to commence, take or continue or support any person commencing, taking or continuing or instruct any person to commence, take or continue any Proceedings, other than Allowed Proceedings, against any Released Party or their respective Connected Parties in respect of any Liability of or Claim against the relevant Released Parties or their respective Connected Parties in relation to or in connection with or in any way arising out of the Scheme Claims.

(b)     For the avoidance of doubt, subject to any existing contractual restrictions, a Scheme Creditor may commence an Allowed Proceeding after the Restructuring Effective Date.

7.4     **Turnover**

(a)     Each Scheme Creditor shall hold on trust for the benefit of the Scheme Company, the Issuer, the Released Parties and/or any other member of the Group (as applicable) any recovery made against such person and received by such Scheme Creditor after the Restructuring Effective Date, pursuant to any Liability or Claim released pursuant to Clause 6 (*Releases*) above or the Deed of Release, in breach of Clause 7.3 (*Covenant Not to Sue*), and the Scheme Creditor will turn over any such recovery to the Scheme Company, the Issuer, the Released Parties and/or any other member of the Group (as applicable) promptly upon receipt without set-off, counterclaim or deduction unless required by law.

(b)     To the extent that the asset comprising the recovery cannot be held on trust by the relevant Scheme Creditor that received such recovery, such Scheme Creditor will pay to the Scheme Company, the Issuer, the Released Parties and/or any other member of the Group (as applicable) the Released Party an amount equal to that recovery promptly following a written demand being made by the relevant Scheme Company, Issuer, the Released Parties and/or any other member of the Group (as applicable) without set-off, counterclaim or deduction unless required by law.

(c)     For the avoidance of doubt, nothing in this Clause 7.4 (*Turnover*) shall require any Scheme Creditor to turnover any proceeds or other recovery arising as a result of an Allowed Proceeding.

7.5     **Further Assurance**

On and from the Scheme Effective Date, each Scheme Creditor undertakes to the Scheme Company, and the Scheme Company undertakes to each Scheme Creditor and its directors, officers and other duly appointed representatives, to provide such further assistance (at the sole cost of the Scheme Company) as may be reasonably required and reasonably requested by the Scheme Company or a Scheme Creditor (as applicable) to implement this Scheme and the Restructuring, provided that:

(a)    such actions are consistent with this Scheme, the Lock-Up Agreement, the Implementation Deed and the Implementation Documents; and

(b)    in each case the Scheme Company or Scheme Creditor (as applicable) must notify and consult in good faith, with (to the extent the Scheme Creditor or Scheme Company (as applicable) responds to the notice) the relevant Scheme Creditor or Scheme Company (as applicable) at least three (3) Business Days prior to the date on which any steps are required to be taken by the relevant Scheme Creditor or Scheme Company (as applicable) in accordance with this Clause 7.5.

## 8.    Modifications of the Scheme or Waiver of the Scheme Conditions

8.1    Subject to Clause 8.2 below, the terms of this Scheme (including the Scheme Conditions) can only be modified or waived with the prior written consent of the Scheme Company and the Majority Scheme Creditors.

8.2    The Scheme Company may, at any Court hearing to sanction this Scheme and to the extent practicable after consultation with the Ad Hoc Group's Advisors, consent on behalf of itself and all Scheme Creditors to any modification of, or addition to, or waiver of, this Scheme (including the Scheme Conditions) and/or any of the Implementation Documents or any terms and conditions which, in the case the Court may think fit to approve or impose which is necessary for the implementation of the Restructuring, *provided that* such modification, addition, term or condition or waiver, does not materially adversely affect the economic treatment, any legal right or material obligation or other interest of any Scheme Creditor under this Scheme or any other Implementation Document or impose any additional material obligation on a Scheme Creditor, as compared to the treatment of the Scheme Company or other Scheme Creditors under the Scheme or any Implementation Document, unless the affected Scheme Creditor consents to that modification.

## 9.    General Scheme Provisions

9.1    **Scheme Standstill**

(a)    With effect from the Scheme Effective Date and until the Restructuring Effective Date (or, if earlier, the date on which this Scheme terminates in accordance with Clause 9.2 (*Termination*)), no Scheme Creditor shall:

(i)    take any Enforcement Action;

(ii)    direct or encourage any other person to take any Enforcement Action; or

(iii)    vote, allow any proxy to vote or instruct another relevant person to vote (to the extent that it is legally entitled to instruct that person to vote), in favour of any Enforcement Action,

in respect of either (i) any Relevant Default, or (ii) any other default arising under the Existing Notes Indenture as a result of this Scheme, the Restructuring or the implementation thereof, each being a "**Scheme Standstill Default**" (the "**Scheme Standstill**").

(b)    The standstill in Clause 9.1 (*Scheme Standstill*) above is temporary and shall only apply to the Scheme Standstill Defaults until the termination of this Scheme in accordance with Clause 9.2 (*Termination*). Upon the termination of this Scheme, such standstill shall terminate and all rights and remedies which would have been available to the Scheme Creditors had the Scheme Standstill not been granted shall become immediately available and the Scheme Creditors will be immediately entitled to take and/or vote in favour of taking any Enforcement Action in respect of any of the Scheme Standstill Defaults.

9.2    **Termination**

(a)    This Scheme will terminate:

(i)    if the Restructuring Effective Date does not occur on or before the Longstop Date;

(ii)    if the Implementation Deed terminates in accordance with its terms (other than as a result of the occurrence of the Restructuring Effective Date); or

(iii)    upon the occurrence of a Bankruptcy Event,

and the terms of, and the obligations on the Scheme Company and the Scheme Creditors under or pursuant to, this Scheme shall lapse and the execution, delivery or release of any deed, document or agreement in accordance with, or pursuant to this Scheme will be rescinded (insofar as legally possible) and deemed never to have become effective, and all arrangements provided by this Scheme shall be of no effect and the rights and obligations of each relevant Scheme Creditor and the Scheme Company (including but not limited to those under the Existing Notes Indenture) will not be affected and will be reinstated and remain in full force and effect, such that each Scheme Creditor and the Scheme Company will be put back into the position it was in prior to the date on which such deed, document or agreement was executed, delivered or released (as applicable), and the Scheme Company and each Scheme Creditor will, and will if required instruct the Existing Notes Trustee to, and will use its best efforts to procure that any necessary other party will, execute such documents and perform such acts and things as may be necessary or desirable in order to do so.

(b)    If any of the Implementation Steps do not occur prior to the Longstop Date, or if any termination of this Scheme in accordance with Clause 9.2(a) (*Termination*) occurs, to the extent permitted by applicable law all Implementation Steps under or pursuant to the Implementation Deed and/or this Scheme, will not or will be deemed not to have occurred.

(c)    To the extent permitted by law, all relevant parties agree to take such steps as are necessary and/or desirable to reverse any such Implementation Steps that have already occurred in order to restore the parties to the position they were in before the Implementation Steps occurred, provided that no party shall be required to incur any material out-of-pocket costs or expenses.

9.3    **Effect of Termination**

Notwithstanding Clause 9.2 (*Termination*), the termination of this Scheme will not limit the effectiveness of Clause 1 (*Definitions and Interpretation*), Clause 9.1(b) (*Scheme Standstill*) Clause 9.2 (*Termination*), this Clause 9.3, Clause 10 (*Costs*) or Clause 13 (*Governing Law and Jurisdiction*).

9.4    **Provision of Information and Confidentiality**

(a)     Any Account Holder Letters and New Notes Election Forms submitted by or on behalf of Scheme Creditors and/or their Designated Recipients (as applicable) will be submitted in accordance with the instructions set out in the relevant Account Holder Letter or New Notes Election Form and will provide the Scheme Company and the Information Agent with such information as may be reasonably required to enable the Scheme Consideration Entitlements and the New Notes Entitlements to be calculated and issued, subject at all times to the confidentiality requirements set out in the Account Holder Letter and the New Notes Election Form.

(b)     Whether an Account Holder Letter has been validly completed shall be determined by the Information Agent at its discretion (acting reasonably), provided that, if the Information Agent determines that an Account Holder Letter has not been validly completed, it shall promptly prepare a written statement of its reasons for doing so and send that statement by electronic mail to the party that provided such Account Holder Letter.

9.5   **Record Date**

For the purposes of voting on this Scheme and calculating the Scheme Creditor Entitlements, all Scheme Claims will be determined by the Information Agent (on behalf of the Scheme Company) as at the Record Date.

9.6   **Assignments or Transfers**

(a)     The Scheme Company will be under no obligation to recognise any assignment or transfer of any Scheme Claims and/or any other rights, benefits or interests in the Existing Notes after the Record Date for the purposes of this Scheme (or the Scheme Consideration), other than any assignment or transfer which occurs pursuant to the Implementation Deed or any of the other Implementation Documents, and has no obligations hereunder to any person other than the Scheme Creditors, provided that, where the Scheme Company has received from the relevant parties notice in writing of such assignment or transfer prior to the Restructuring Effective Date, the Scheme Company may, in its sole discretion and subject to the production of such other evidence in relation to such assignment or transfer as it may reasonably request and subject further to any other terms and conditions which the Scheme Company may reasonably consider necessary, agree to recognise such assignment or transfer for the purposes of determining entitlements under this Scheme, subject always to Clause 9.6(c) below.

(b)     Each Scheme Creditor acknowledges and agrees that, in the event that any Scheme Creditor transfers or assigns a Scheme Claim in accordance with Clause 9.6(a) above, the Scheme Company may, on or prior to the Restructuring Effective Date, make such minor mechanical or technical amendments to the Implementation Documents, in each case to the extent necessary solely to reflect the change in ownership of a Scheme Claim. Each Scheme Creditor authorises the Scheme Company to consent to and enter into any amendment to the Deed of Release and the Implementation Documents which are made in accordance with this Clause 9.6(b).

(c)     Any assignee or transferee of interests in the Scheme Claims so recognised by the Scheme Company will be bound by the terms of this Scheme and the Implementation Documents as Scheme Creditors.

9.7   **Performance on Days other than a Business Day**

If any obligation is to be performed under the terms of this Scheme on a date other than a Business Day, the relevant obligation will be performed on the next Business Day.

9.8   **Exercise of Discretion**

Where, under or pursuant to any provision of this Scheme, a matter is to be determined by the Scheme Company, it will be determined by the directors of the Scheme Company in their discretion in such manner as they may consider fair and reasonable and after consultation with the Ad Hoc Group's Advisors. If any difficulty arises in determining any such matter either generally or in any particular case or in ensuring the result described above, it shall be resolved by consultation between the Group's Advisors and the Ad Hoc Group's Advisors, in such manner as the directors of the Scheme Company shall consider to be fair and reasonable and that decision shall, insofar as permitted by law, be final and binding on all concerned.

9.9 **Severability**

If at any time any provision of this Scheme is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of that provision under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision of this Scheme under the law of that jurisdiction will in any way be affected or impaired thereby.

9.10 **Notice**

(a) Any notice or other written communication to be given under or in relation to this Scheme (other than any Account Holder Letter or New Notes Election Form, which shall be delivered in accordance with the instructions contained therein) will be given in writing and will be deemed to have been duly given if it is delivered by hand, is posted on the Scheme Website (in relation to any notice or written communication to be given to the Scheme Creditors only) or is sent by email, courier or pre-paid first class post (or by air mail or international courier where it is delivered to a different country from that in which it is posted) as follows:

(i) in the case of a notice to be given to the Scheme Company, to:

| Address: | c/o Cleary Gottlieb Steen & Hamilton LLP |
| | 2 London Wall |
| | London, EC2Y 5AU |

| Attention: | Polina Lyadnova / David Botter |

| Email: | team-mega_restructuring-cgshonly@cgsh.com |

(ii) in the case of a notice to be given to the Existing Notes Trustee:

| Email: | bihrke@wilmingtontrust.com |

| Attention: | Barry Ihrke, Wilmington Trust National Association |

With a copy to Reed Smith at:

| Email: | kgwynne@reedsmith.com |
| | jangelo@reedsmith.com |
| | mross@reedsmith.com |

| Attention: | Kurt Gwynne, Jason Angelo and Michele Ross |

(iii) in the case of the Information Agent or Cash Settlement Agent:

| Address: | Kroll Issuer Services Limited |
| | The Shard |
| | 32 London Bridge Street |

|         | London<br>SE1 9SG |
|---------|-------------------|
| Attention: | Alessandro Zorza |
| Phone: | + 44 20 7704 0880 |
| Email: | grupomega@is.kroll.com |

(iv)   in the case of the Ad Hoc Group or the Ad Hoc Group's Advisors:

| Address: | Latham & Watkins (London) LLP<br>99 Bishopsgate<br>London, EC2M 3XF |
|----------|---------------------------------------------------------------------|
| Attention: | Bruce Bell and Pedro Rufino Carvalho |
| Email: | projectmaestro.lwteam@lw.com |

(v)   in the case of any other person, any address set forth for that person in any agreement entered into in connection with this Scheme.

(b)   Any notice or other written communication to be given under this Scheme (other than any Account Holder Letter or New Notes Election Form, which is to be delivered in accordance with the instructions contained therein) will be given in writing and will be deemed to have been served:

(i)   if delivered by hand or courier, on the Business Day of receipt, or if such receipt occurs after 5.00 p.m. in the place of receipt, the following Business Day;

(ii)   if delivered by email or electronically (including by way of posting on the Scheme Website), on the Business Day it is received (or, if posted on the Scheme Website, accessible) in readable form, or if such receipt occurs (or access is provided) after 5.00 p.m. in the relevant place, the following Business Day; and

(iii)   if sent by pre-paid first-class post (or airmail or international courier), on the second Business Day after posting if the recipient is in the country of dispatch, otherwise on the fifth (5th) Business Day after posting.

(c)   In proving service, it will be sufficient proof, in the case of a notice sent by pre-paid first-class post (or airmail or international courier), that the envelope was properly stamped, addressed and placed in the post.

(d)   The accidental omission to send any notice, written communication or other document in accordance with this Clause 9.10 or the non-receipt of any such notice by any Scheme Creditor, will not affect the provisions of any of this Scheme.

(e)   The Scheme Company will not be responsible for any:

(i)   non-receipt by a Scheme Creditor of any notices or other written communications, and the non-receipt of any such notice or other written communications by any Scheme Creditor will not impact the effectiveness of the notice or other written communication or otherwise affect the provisions of the Scheme; or

(ii)   loss or delay in the transmission of any notices or other documents posted by any Scheme Creditor, which shall be posted at the risk of such Scheme Creditor.

## 10.    Costs

10.1    The Scheme Company will pay in full all costs, charges, expenses and disbursements (including any applicable VAT) incurred by it in connection with the negotiation, preparation and implementation of this Scheme as and when they arise, including, but not limited to the costs of holding the meetings of Scheme Creditors as convened by the Court, the costs of obtaining the sanction of the Court and the costs of placing any notices (if any) required by this Scheme and any other costs that are provided for under the Implementation Deed.

10.2    The Scheme Company will pay in full all costs, charges, expenses and disbursements (including any applicable VAT) incurred by the advisors in connection with the negotiation, preparation and implementation of this Scheme, the Implementation Documents and the wider Restructuring, and any other costs that are provided for under the Implementation Deed, in accordance with the Settlement Funds Flow as at the time specified in the Implementation Deed.

## 11.    Stamp Duty Indemnity

11.1    The Scheme Company shall bear the cost of all stamp duty, stamp duty reserve tax, registration or similar Taxes payable as a result of the transfer of the New Shares and/or the issuance of the New Notes to the Scheme Creditors or their respective Designated Recipients, if applicable (or the Holding Period Escrow Agent, as the case may be).

11.2    The Scheme Company shall pay to a Scheme Creditor, Designated Recipient or the Holding Period Escrow Agent (as applicable) an amount equal to any stamp duty, stamp duty reserve tax, registration or similar Tax payable by such Scheme Creditor, Designated Recipient or the Holding Period Escrow Agent (as applicable) as a result of the Issuer failing to comply with its obligations under Clause 11.1 (*Stamp Duty Indemnity*) above.

## 12.    Announcements

Except as required by applicable law or regulation, the Scheme Company shall not, and shall procure that no other member of the Group will, make any public announcement regarding the Restructuring which names any Scheme Creditor (or from which the identity of a Scheme Creditor can be discerned) unless the contents of that announcement have been agreed by such Scheme Creditor, acting reasonably.

## 13.    Governing Law and Jurisdiction

13.1    This Scheme and any non-contractual obligations arising out of or in connection with this Scheme will be governed by, and construed in accordance with, the laws of England and Wales.

13.2    The Court shall have exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute which may arise out of or in connection with the Explanatory Statement or any provision of this Scheme, or the implementation thereof, or out of any action taken or omitted to be taken under this Scheme or any non-contractual obligations arising out of or in connection with this Scheme and, for such purposes the Scheme Creditors irrevocably submit to the jurisdiction of the Court. The parties expressly waive any other jurisdiction which they may be entitled to claim by reason of their present or future domicile or otherwise. For the avoidance of doubt, any claims by the Existing Notes Trustee under the Existing Notes Indenture in relation to the indemnification and reimbursement of the Existing Notes Trustee shall remain subject to the terms of the Existing Notes Indenture (including the jurisdiction and venue provisions set out in the Existing Notes Indenture).

13.3    Nothing in this Clause 13 will:

(a)     affect the validity of other provisions determining governing law and jurisdiction as between the Scheme Company and any of their Scheme Creditors in respect of any of the Existing Notes Indenture, any Implementation Document or any other agreement made between the Scheme Company and any of the Scheme Creditors, whether contained in any contract or otherwise; or

(b)     prevent the Scheme Company or Released Party from relying upon the provisions of the Scheme in any foreign court or in any foreign proceedings.

13.4    The terms of this Scheme and the obligations imposed on the Scheme Company and the Scheme Creditors (and, for the avoidance of doubt, those terms and obligations which may be construed as being imposed on any Undertaking Transaction Party) hereunder will take effect subject to any prohibition or condition imposed by law.

**Schedule 1**

**Deed of Release**

**DATED _____2024**


**BETWEEN**



**(1)    THE SCHEME COMPANY**

**(2)    THE ISSUER**

**(3)    THE EXISTING NOTES TRUSTEE**

**(4)    THE INFORMATION AGENT**

**(5)    THE CASH SETTLEMENT AGENT**

**(6)    THE NEW NOTES SETTLEMENT AGENT**

**(7)    THE HOLDING PERIOD ESCROW AGENT**

**(8)    THE SCHEME CREDITORS**

---

**DEED OF RELEASE**

---

**THIS DEED IS MADE ON _____ 2024**

**BETWEEN:**

1.  **MEGA NEWCO LIMITED**, a company incorporated under the laws of England and Wales, with its registered office at Suite 1, 7th Floor 50 Broadway, London, United Kingdom, SW1H 0DB and registered number 15986024 (the "**Scheme Company**");

2.  **OPERADORA DE SERVICIOS MEGA, S.A. DE C.V., SOFOM, E.R.**, a company incorporated under the laws of Mexico, with its office at Av. Patria 1501, Jardines Universidad, 45110 Zapopan, Jalisco, Mexico (the "**Issuer**");

3.  **WILMINGTON TRUST, NATIONAL ASSOCIATION**, in its capacity as trustee under the Existing Notes Indenture (the "**Existing Notes Trustee**");

4.  **KROLL ISSUER SERVICES LIMITED**, a private company incorporated in England and Wales with registered number 5098454, whose registered office is at The Shard, 32 London Bridge Street, London, United Kingdom, SE1 9SG (or any successor in title) in its capacity as information agent in relation to the Scheme (the "**Information Agent**")

5.  **KROLL ISSUER SERVICES LIMITED**, in its capacity as settlement agent in relation to the Scheme (the "**Cash Settlement Agent**");

6.  **UMB BANK, N.A.**, in its capacity as a settlement agent in respect of the New Notes (the "**New Notes Settlement Agent**");

7.  **OPERADORA DE SERVICIOS MEGA, S.A. DE C.V., SOFOM, E.R.**, in its capacity as escrow agent under the Holding Period Escrow Agreement (the "**Holding Period Escrow Agent**"); and

8.  **THE SCHEME CREDITORS**, acting by the Company pursuant to the authority conferred upon the Scheme Company by the Scheme Creditors under clause 4.1 (*Scheme Company's Authority to Execute the Implementation Documents*) and clause 6 (*Releases*) of the Scheme Document,

    each an "**Party**" and together the "**Parties**".

**WHEREAS:**

(A)  The Scheme Company proposed a scheme of arrangement under Part 26 of the Companies Act 2006 in relation to its liabilities under the US$500,000,000 8.250% senior notes due 11 February 2025 issued by the Issuer and guaranteed by the Scheme Company (the "**Scheme**").

(B)  The Scheme has become effective in accordance with its terms.

(C)  Pursuant to clause 4.1 (*Scheme Company's Authority to Execute the Implementation Documents*) and clause 6 (*Releases*) of the Scheme Document, the Scheme Company is authorised by the Scheme Creditors to execute this Deed on behalf of each of the Scheme Creditors and to provide the releases set out herein in favour of the Released Parties.

(D)  Pursuant to clause 4.2 (*Undertaking Transaction Parties' Authority*) and clause 6 (*Releases*) of the Scheme Document, the Undertaking Transaction Parties are

2

authorised and instructed by the Scheme Creditors to execute the Implementation Documents (including this Deed) and provide the releases set out herein to the Released Parties.

(E)    The Parties hereto have agreed to enter into and execute and deliver this Deed on the terms set out below.

(F)    It is intended that this document takes effect as a deed notwithstanding the fact that a Party may only execute this document under hand.

**IT IS AGREED** as follows:

**1    DEFINITIONS AND INTERPRETATION**

Capitalised terms used in this Deed and not defined herein shall have meanings ascribed to them in the Scheme Document (as defined below).

1.1    **In this Deed:**

"**Adviser Released Parties**" means the persons or entities listed at Schedule 2 (*Adviser Released Parties*) to this Deed.

"**Company Parties**" means the Scheme Company and the Issuer.

"**Connected Parties**" means, in relation to a person, any of its current and former Affiliates or Related Entities, and each such person's and its Affiliates' and Related Entities' (and their Affiliates') current and former officers, managers, directors, predecessors, successors, assigns, principals, employees, agents, managed accounts or funds, management companies, fund advisers, investment managers or advisors (and any entity and its Affiliates which: (i) is managed or advised by such person's investment manager or advisor; or (ii) such person manages or advises in its capacity as investment manager or advisor), advisory board members, financial advisers, partners, accountants, attorneys, investment bankers, consultants, representatives and other professionals, each in their capacity as such.

"**Dispute**" has the meaning given to it in Clause 13.2.1 (*Governing Law*).

"**Group Member**" means the Issuer, the Scheme Company and each other member of the Group.

"**Released Parties**" means the Adviser Released Parties, the Transaction Released Parties, the Company Parties and each such person's Connected Parties.

"**Scheme Default**" means a "Default" (as such term is defined in the Existing Notes Indenture) which has occurred and is continuing under the Existing Notes Indenture prior to the Restructuring Effective Date, which is either the subject of a waiver (whether under the Lock-Up Agreement, the Scheme Document or otherwise) or which is caused by, or is a consequence of, cancelling the Existing Notes and/or the Scheme and/or the Restructuring and/or any necessary steps taken in relation to the implementation thereof (whether occurring before, on or after the Restructuring Effective Date).

"**Scheme Document**" means the composite document between the Scheme Company and Scheme Creditors containing, among other things, the terms of the Scheme (including all appendices, schedules and annexures thereto) in the form sanctioned by the Court pursuant to the Companies Act 2006.

3

"**Security**" means a mortgage, charge, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Transaction Released Parties**" means the persons or entities listed in Schedule 1 *(Transaction Released Parties)* to this Deed.

1.2    **Construction**

In this Deed, unless the context otherwise requires or otherwise expressly provides for:

1.2.1    references to clauses and schedules are references to clauses of, and schedules to, this Deed;

1.2.2    references to the Scheme Company or any other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees;

1.2.3    references to a person include references to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

1.2.4    references to a statute or statutory provision include references to the same as subsequently modified, amended, supplemented or reenacted from time to time;

1.2.5    references to an agreement, deed or document shall be deemed also to refer to such agreement, deed or document as amended, supplemented, restated, verified, replaced and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto;

1.2.6    references to an agreement, deed or document shall include any schedules, annexes and appendices to such agreement, deed or document;

1.2.7    the singular includes the plural and vice versa and words importing one gender shall include all genders;

1.2.8    "including" or "include" means including or include without limitation;

1.2.9    "or" is not exclusive; and

1.2.10    headings to clauses are for ease of reference only and shall not affect the interpretation of this Deed.

**2    WAIVER AND RELEASE**

2.1    **Restructuring Waiver and Release**

Subject to clause 3 (*Limitation*) below, with effect on and from, and subject to the occurrence of, the Restructuring Effective Date and in consideration for the rights conferred on each Party pursuant to the Scheme and the Restructuring, each of the Parties, without recourse, liability, representation or warranty, for and on behalf of itself and on behalf of its Connected Parties (and, in the case of a Scheme Creditor, on behalf of any person to whom it may have transferred its Scheme Claim after the Record Date), irrevocably, unconditionally, fully and absolutely, to the fullest extent permitted by law, waives, releases and discharges all Liabilities of each Released Party and each and every Claim which each such Party and its Connected Parties (and, in the case of a Scheme Creditor, on behalf of any person to whom it may have transferred its Scheme Claim after the Record Date) may have against any Released Party, in each case, arising out of or in connection with any act or omission by any Released Party occurring prior to the Restructuring Effective Date relating to the preparation, negotiation, sanction, execution or

4

implementation of the Lock-Up Agreement, the Scheme, the Implementation Steps, the Implementation Documents and/or the Restructuring (but, for the avoidance of doubt, not including any Liabilities arising out of the Scheme Claims, the Existing Notes or the Existing Notes Indenture).

2.2     **Scheme Waiver and Release**

Subject to clause 3 (*Limitation*) below, the release of the Scheme Claims under Clause 6.2 (*Releases*) of the Scheme Document is the primary release of the Scheme Claims in accordance with the terms of the Scheme (which, for the avoidance of doubt, includes effecting the release of any Scheme Claims which may be held, at any time, by each of the Company Parties in respect of the Existing Notes, in each case, arising directly or indirectly out of, or resulting from, any Implementation Step being taken in accordance with the terms of the Implementation Deed). In addition, for the avoidance of doubt and subject to clause 3 (*Limitation*) below, with effect on and from, and subject to the occurrence of, the Restructuring Effective Date, each of the Parties, for and on behalf of itself and on behalf of its Connected Parties, irrevocably, unconditionally, fully and absolutely, to the fullest extent permitted by law, waives, releases and discharges:

2.2.1     any rights, title and interest it has in the Scheme Claims; and

2.2.2     all Liabilities of each Released Party and each and every Claim which such Party or its Connected Parties may have against any Released Party, in each case, arising out of or in connection with:

  i.     the Scheme Claims; and/or

  ii.    the Existing Notes and the Existing Notes Indenture.

2.3     **Scheme Defaults**

Subject to clause 3 (*Limitation*) below, with effect on and from, and subject to the occurrence of, the Restructuring Effective Date, pursuant to the releases in clause 2.1 (*Restructuring Waiver and Release*) and clause 2.2 (*Scheme Waiver and Release*) of this Deed, each of the Scheme Creditors and the Existing Notes Trustee hereby acknowledges and agrees that:

2.3.1     each and every Scheme Default is hereby fully and finally waived;

2.3.2     each and every right of any Scheme Creditor or the Existing Notes Trustee to take any action in respect of a Scheme Default is fully and finally released; and

2.3.3     any actions taken by a Released Party in connection with the Lock-Up Agreement, the Restructuring, the Scheme and/or the Implementation Documents shall not constitute a breach of, or an event of default under, the Existing Notes or the Existing Notes Indenture.

3     **LIMITATION**

The releases, waivers and discharges effected by the terms of clause 2 (*Waiver and Release*) shall not extend to any Claims by any Party in respect of:

3.1     any Liability of any Adviser Released Party or any auditor of any Company Party arising under a duty of care to such Adviser Released Party's or auditor's client or arising under a duty of care to another person which has been specifically and expressly accepted or acknowledged in writing by that Adviser Released Party or auditor;

5

3.2    any Liability or Claim (or any remedy in respect thereof) arising or resulting from fraud or gross negligence by any Released Party;

3.3    any Liability of a Party arising under the Scheme and/or any of the Implementation Documents which may arise or accrue in relation to acts, omissions and/or circumstances occurring after the Restructuring Effective Date;

3.4    any rights or remedies of any Party in respect of any Allowed Proceedings; or

3.5    the New Note Purchase and Placement Agreement, the New Notes Indenture and the New Notes Mexican Trust Agreement.

**4    COVENANT NOT TO SUE**

4.1    Without prejudice to clause 2 (*Waiver and Release*) and subject to clause 3 (*Limitation*) above, each Party hereby irrevocably covenants with each other Party for the benefit of each of the Released Parties or their respective Connected Parties, on and from, and subject to the occurrence of, the Restructuring Effective Date, to the extent permitted by law, not to commence, take or continue or support any person commencing, taking or continuing or instruct, direct or authorise any person to commence, take or continue any Proceedings, other than Allowed Proceedings, against any Released Party or their respective Connected Parties in respect of any Liability or Claim of the relevant Released Parties or their respective Connected Parties which are purported to be released by this Deed.

4.2    In the event that any waiver, release or discharge given under the Scheme Document or this Deed in favour of a Released Party is found by a court of competent jurisdiction to be unenforceable, each Party agrees that Clause 4.1 above shall nonetheless continue to apply so that it shall not (and shall not instruct, encourage or support any other person to) bring or join any Proceedings (other than Allowed Proceedings) against that Released Party relating to the intended subject matter of such waiver, release or discharge.

**5    REPRESENTATIONS AND WARRANTIES**

Each Party represents and warrants to each other Party on the date of this Deed, that the obligations expressed to be assumed by it in this Deed are legal, valid, binding and enforceable obligations and the entry into and performance by it of the transactions contemplated by this Deed, does not and will not conflict with any law or regulation applicable to it or its constitutional documents or any agreement or instrument binding on it or any of its assets.

**6    FURTHER ASSURANCE**

Each Party and Scheme Creditor will, at the request and cost of the Company Parties, do all such things and enter into and execute all such deeds, documents, memoranda, agreements, notices or instruments as may be reasonably necessary and within its power and as soon as reasonably practicable to give full effect to the provisions of this Deed; provided, however, that the Existing Notes Trustee shall not be required to do anything or execute any document that the Existing Notes Trustee believes may subject it to liability or expense.

**7    RESERVATION OF RIGHTS**

7.1    Except as expressly provided in this Deed, this Deed does not amend, vary or waive any Party's rights or remedies under any of the Lock-Up Agreement, the Existing Notes Indenture, the Scheme Document or any Implementation Document or any other document or agreement.

6

7.2     Except as expressly agreed in this Deed, each of the Parties fully reserves any and all rights it may have that are unaffected by this Deed.

7.3     No course of dealing or the failure of any person to enforce any of the provisions of this Deed shall in any way operate as a waiver of such provisions and shall not affect the right of such person thereafter to enforce each and every provision of this Deed in accordance with its terms.

**8       SPECIFIC PERFORMANCE**

8.1     Without prejudice to any other remedy available to any Party, the obligations under this Deed may, subject to applicable law, be the subject of specific performance by the Parties. Each Party agrees and acknowledges for the benefit of each other Party that:

8.1.1     damages may not be an adequate remedy for any breach of the terms of this Deed by any Party; and

8.1.2     specific performance and/or relief to compel performance are appropriate remedies for any such breach and any such remedies shall not be exclusive but shall be cumulative and in addition to any other remedies available to any Party, whether under this Deed or otherwise.

**9       ASSIGNMENT**

9.1     None of the rights or obligations under this Deed may be assigned or transferred without the written consent of the other Parties.

9.2     This Deed shall be binding on all persons to whom:

9.2.1     any Scheme Creditor or the Existing Notes Trustee transfers or assigns a Scheme Claim after the Record Time and who is recognised by the Scheme Company in accordance with Clause 9.6 (Assignments or Transfers) of the Scheme Document; and

9.2.2     any other Party transfers or assigns their rights pursuant to this Deed on or after the date of this Deed.

**10      MISCELLANEOUS**

10.1    If any provision of this Deed is or becomes invalid, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions shall not be affected or impaired in any way.

10.2    This Deed may be executed manually, electronically or digitally in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Deed.

10.3    Failure by one or more persons ("**Non Signatories**") to execute this Deed on the date hereof will not invalidate the provisions of this Deed as between the Parties who do execute this Deed. Such Non Signatories may execute this Deed on a subsequent date and will thereupon become bound by its provisions.

10.4    If at any time there shall be a conflict between the provisions of this Deed and the provisions of the Scheme, the provisions of the Scheme shall prevail.

10.5    This Deed is not, and shall not be represented or construed by any Party as, an admission of liability or wrongdoing by any Party, any Party's Related Party or any other person or entity.

7

**11      AMENDMENTS AND WAIVERS**

Notwithstanding any provision of this Deed, any term of this Deed may be amended or waived only with the prior written consent of all Parties.

**12      THIRD PARTY RIGHTS**

12.1     Subject to Clause 12.2 below, the Contracts (Rights of Third Parties) Act 1999 shall not apply to this Deed and no rights or benefits expressly or impliedly conferred by this Deed shall be enforceable under that Act against the Parties to this Deed by any other person.

12.2     Any Released Party (excluding those Released Parties that have entered into this Deed and who therefore shall have the rights accruing hereunder) shall have the right to enforce the relevant terms of this Deed by reason of the Contracts (Rights of Third Parties) Act 1999.

**13      GOVERNING LAW AND JURISDICTION**

13.1     **Governing law**

This Deed and any non-contractual claims arising out of or in connection with it shall be governed by and construed in accordance with English law.

13.2     **Enforcement**

13.2.1    The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Deed (including a dispute relating to the existence, validity or termination of this Deed or any non-contractual obligation arising out of or in connection with this Deed) (a "**Dispute**").

13.2.2    The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

13.2.3    For the avoidance of doubt, any Dispute by the Existing Notes Trustee under the Existing Notes Indenture in relation to the indemnification and reimbursement of the Existing Notes Trustee shall remain subject to the terms of the Existing Notes Indenture (including the jurisdiction and venue provisions set out in the Existing Notes Indenture).

## SCHEDULE 1

## TRANSACTION RELEASED PARTIES

1. The Issuer.

2. The Scheme Company.

3. Kroll Issuer Services Limited in its capacities as Information Agent and Cash Settlement Agent.

4. Wilmington Trust, National Association in its capacity as Existing Notes Trustee and in its other capacities under the Existing Notes Indenture.

5. UMB Bank, N.A. in its capacity as New Notes Settlement Agent.

6. The Issuer in its capacity as Holding Period Escrow Agent.

7. The Depository Trust Company ("**DTC**") in its capacity as depositary under the Existing Notes Indenture in respect of the Existing Notes.

8. Cede & Co. in its capacity as nominee for DTC and as Registered Holder.

9. Each Scheme Creditor.

10. Each member of the Ad Hoc Group.

## SCHEDULE 2

### ADVISER RELEASED PARTIES

1. Cleary Gottlieb Steen & Hamilton LLP.

2. Mijares, Angoitia, Cortés y Fuentes.

3. Houlihan Lokey, Inc.

4. Blink Capital Solutions.

5. 414 Capital Inc.

6. Tom Smith KC.

7. Jamil Mustafa.

8. Latham & Watkins LLP.

9. Sainz Abogados.

10. Tecnologias Cuentas por Cobrar S.A.P.I. de C.V.

11. Reed Smith LLP.

12. Any of the foregoing's directors, officers, members, representatives, partners, employees, agents, affiliated partnerships (and the partners and employees of such affiliated partnerships), affiliates, Subsidiaries or holding companies (and the directors, officers, members, representatives, employees and agents of those affiliates, Subsidiaries or holding companies).

13. Any local or specialist counsel engaged by any of the foregoing on their own behalf or on behalf of their client(s) or by the client(s) directly in connection with all or any matters concerning or related to the Group, the Scheme and the Restructuring.

*[EXECUTION BLOCKS TO BE INSERTED]*

**Schedule 2**

**Implementation Deed**

**DATED _____2024**


**BETWEEN**


**(1) MEGA NEWCO LIMITED**
**(AS THE SCHEME COMPANY)**

**(2) OPERADORA DE SERVICIOS MEGA, S.A. DE C.V., SOFOM, E.R.**
**(AS THE ISSUER)**

**(3) THE SCHEME CREDITORS**

**(4) THE INFORMATION AGENT**

**(5) THE CASH SETTLEMENT AGENT**

**(6) THE EXISTING NOTES TRUSTEE**

**(7) THE NEW NOTES SETTLEMENT AGENT**

**AND**

**(8) THE HOLDING PERIOD ESCROW AGENT**

_____


**IMPLEMENTATION DEED**


_____

# Table of Contents

1.  INTERPRETATION ................................................................................................2

2.  EFFECTIVENESS ..................................................................................................6

3.  EXECUTION OF THE IMPLEMENTATION DOCUMENTS ...................................6

4.  SCHEME COMPANY AUTHORITY TO EXECUTE ...........................................7

5.  INSTRUCTIONS ....................................................................................................7

6.  ALLOCATIONS AND DELIVERY OF SCHEME CONSIDERATION AND NEW
    NOTES TO SCHEME CREDITORS; SETTLEMENT FUNDS FLOW ..........................8

7.  RESTRUCTURING CONDITIONS ......................................................................10

8.  IMPLEMENTATION PRINCIPLES ....................................................................11

9.  IMPLEMENTATION STEPS ...............................................................................12

10. POST-COMPLETION STEPS ..............................................................................16

11. PARTICIPATING CREDITOR PERMITTED TRANSFERS ...............................16

12. LIMITATIONS .....................................................................................................16

13. INFORMATION AGENT .....................................................................................17

14. TERMINATION ....................................................................................................18

15. SCHEME COMPANY UNDERTAKING .............................................................19

16. REPRESENTATIONS AND WARRANTIES ......................................................19

17. SPECIFIC PERFORMANCE ................................................................................20

18. AMENDMENTS AND WAIVERS .......................................................................20

19. FURTHER ASSURANCE .....................................................................................21

20. INSTRUCTED PARTIES .....................................................................................21

21. MISCELLANEOUS ..............................................................................................22

22. ASSIGNMENT AND TRANSFER .......................................................................22

23. AGREEMENT .......................................................................................................23

24. NOTICES ..............................................................................................................23

25. GOVERNING LAW AND JURISDICTION .........................................................24

26. AGENT FOR SERVICE OF PROCESS ...............................................................25

Schedule 1     RESTRUCTURING CONDITIONS ................................................26

This Implementation Deed (the "**Deed**") is made on _____2024 by:

**(1)**    **MEGA NEWCO LIMITED,** a private company incorporated in England and Wales with registered number 15986024, whose registered office is at Suite 1, 7th Floor, 50 Broadway, London, United Kingdom, SW1H 0DB (the "**Scheme Company**");

**(2)**    **OPERADORA DE SERVICIOS MEGA, S.A. DE C.V., SOFOM, E.R.,** a *sociedad anónima de capital variable, sociedad financiera de objeto multiple, entidad regulada* organised and existing under the laws of the United Mexican States with its registered office at Av. Patria 1501, Jardines Universidad, 45110 Zapopan, Jalisco, Mexico (the "**Issuer**");

**(3)**    **THE SCHEME CREDITORS**, as defined in the Scheme Document (as defined below) acting by the Scheme Company pursuant to the authority conferred upon the Scheme Company by the Scheme Creditors under clause 4 (*Grant of Authority to Execute the Implementation Documents*) and clause 6 (*Releases*) of the Scheme Document and pursuant to the Sanction Order;

**(4)**    **KROLL ISSUER SERVICES LIMITED**, a private company incorporated in England and Wales with registered number 5098454, whose registered office is at The Shard, 32 London Bridge Street, London, United Kingdom, SE1 9SG (or any successor in title) in its capacity as the "**Information Agent**";

**(5)**    **KROLL ISSUER SERVICES LIMITED**, a private company incorporated in England and Wales with registered number 5098454, whose registered office is at The Shard, 32 London Bridge Street, London, United Kingdom, SE1 9SG (or any successor in title) in its capacity as a cash settlement agent under the Scheme (the "**Cash Settlement Agent**");

**(6)**    **WILMINGTON TRUST, NATIONAL ASSOCIATION** in its capacity as the "**Existing Notes Trustee**";

**(7)**    **UMB BANK, N.A.**, in  its  capacity  as a settlement agent in respect of the New Notes (the "**New Notes Settlement Agent**");

**(8)**    **OPERADORA DE SERVICIOS MEGA, S.A. DE C.V., SOFOM, E.R.**, in its capacity as escrow agent under the Holding Period Escrow Agreement (the "**Holding Period Escrow Agent**"),

together, the "**Parties**" and each a "**Party**".

**Whereas:**

(A)    Certain members of the Group's financial creditors and other stakeholders have agreed to the terms of a restructuring of the Group and have agreed to support and facilitate the implementation of the Restructuring.

(B)    As part of the Restructuring, the Scheme Company has proposed a scheme of arrangement of the Scheme Company pursuant to Part 26 of the Companies Act 2006 (the "**Scheme**").

(C)    The Scheme Company is authorised, pursuant to the authority granted to it under the Scheme, to execute and deliver this Deed on behalf of each of the Scheme Creditors.

(D)    The purpose of this Deed is to formalise the steps and timing required to implement the Restructuring.

(E)    The Implementation Steps constitute the steps required to implement the Restructuring commencing on the Implementation Steps Commencement Date, and shall be implemented in the order set out in, and in accordance with the terms of, this Deed.

1

(F)     It is the intention of the Parties that this document be executed and take effect as a deed, notwithstanding the fact that a Party may only execute this document under hand.

**It is agreed** as follows:

1.      **INTERPRETATION**

1.1     **Definitions**

Capitalised terms used but not defined in this Deed shall have the meanings given to them in the Scheme Document and the following terms shall have the following meanings:

"**Authorisations**" means all relevant regulatory authorisations, consents, approvals, resolutions, licences, exemptions, determinations, filings, notifications, notarisations, permits or registrations of any applicable government regulatory authority or other similar body, stock exchange or court which may be required for the Restructuring;

"**Civil Procedure Rules**" means the Civil Procedure Rules 1998, as amended and/or supplemented from time to time;

"**Cleary**" means Cleary Gottlieb Steen & Hamilton LLP and its related partnerships and associations as international legal advisor to the Group;

"**Companies Act**" means the UK Companies Act 2006, as modified, amended or re-enacted from time to time;

"**Court**" means the High Court of Justice of England and Wales;

"**Effective Date**" is defined in Clause 2.1 (*Effectiveness*);

"**Execution Completion Notice**" means the notice to be issued and delivered in accordance with Clause 3.2 (*Execution of Documents*) of this Deed (in a form agreed between the Scheme Company, the Information Agent and Ad Hoc Group Advisors) confirming execution of all of the Implementation Documents;

"**Funding Confirmation Notice**" means the notice to be issued and delivered in accordance with Clause 9.3(a) of this Deed (in a form agreed between the Scheme Company, the Information Agent and Ad Hoc Group Advisors) confirming that all New Notes commitments have been funded into the Settlement Escrow;

"**Implementation Steps**" means each of the steps set out in Clause 9 (*Implementation Steps*);

"**Implementation Steps Commencement Date**" means the date on which the Implementation Steps are to commence as set out in the Implementation Steps Commencement Notice;

"**Implementation Steps Commencement Notice**" means the notice to be issued and delivered by the Information Agent in accordance with Clause 7.3 of this Deed (in a form agreed between the Scheme Company, the Information Agent and Ad Hoc Group Advisors) specifying the Implementation Steps Commencement Date;

"**Instructed Parties**" is defined in Clause 5.1 (*Instructions*);

"**MACF**" means Mijares Angoitia Cortés y Fuentes, S.C., Mexican legal counsel to the Group;

"**New Notes Funding Notice**" means a notice setting out the amount in cash payable by the relevant Participating T2 New Noteholder;

2

"**New Refinancing Facility**" means the Mexican law governed secured facility agreement between the Company and Banco Nacional de Comercio Exterior, S.N.C. dated 18 September 2024 (as amended from time to time) on the terms set out in the Explanatory Statement;

"**New Refinancing Facility Drawdown Notice**" means the drawdown notice in respect of the New Refinancing Facility pursuant to which the Issuer shall draw down the entire amount of the New Refinancing Facility;

"**Notice Parties**" means the Scheme Company, the Issuer, the Agents, the Trustees and the Ad Hoc Group Advisors;

"**Operational Account**" means the account in the name of the Cash Settlement Agent from which the Cash Settlement Agent shall settle payments pursuant to the Settlement Funds Flow;

"**Participating T1 New Noteholder**" means a person who subscribes for New Notes pursuant to a certain commitment letter with the Issuer and the Scheme Company dated on 11 November 2024 and who has acceded to the Note Purchase and Placement Agreement in its capacity as such;

"**Participating T3 New Noteholder**" means each lender under the International Facilities who elected to exchange the Liabilities owed to it (in full or in part) into New Notes and who has acceded to the Note Purchase and Placement Agreement in its capacity as such;

"**Related Entity**" means, in relation to an entity (the "**First Entity**"), an entity (or any of its Affiliates) which is managed or advised by the same investment manager or investment advisor as the First Entity (or its Affiliates) or by a different investment manager or investment advisor which is an Affiliate of the investment manager or investment advisor of the First Entity (or its Affiliates);

"**Relevant Jurisdiction**" means, in relation to a Party, its jurisdiction of incorporation and any jurisdiction in which it conducts business;

"**Reservations**" means:

(a)  the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to insolvency, reorganisation and other laws generally affecting the rights of creditors;

(b)  the time barring of claims under the Limitation Act 1980 and the Foreign Limitation Periods Act 1984, the possibility that an undertaking to assume liability for or indemnify a person against non-payment of UK stamp duty may be void and defences of set-off or counterclaim; and

(c)  similar principles, rights and defences under the laws of any Relevant Jurisdiction;

"**Restructuring Conditions**" means all of the conditions listed in Schedule 1 (*Restructuring Conditions*) to this Deed;

"**Restructuring Conditions Satisfaction Notice**" is the notice to be issued and delivered by the Scheme Company in accordance with Clause 7.1 (*Restructuring Conditions*) (in a form agreed between the Scheme Company, the Information Agent and Ad Hoc Group Advisors) confirming that all Restructuring Conditions have been satisfied or (to the extent permitted) waived;

"**Restructuring Effective Date Notice**" is the notice to be issued and delivered by the Scheme Company in accordance with Clause 9.6(a) (*Step 5 (Restructuring Effective Date)*) (in a form agreed between the Scheme Company, the Information Agent and Ad Hoc Group Advisors) confirming that the Restructuring Effective Date has occurred;

3

"**Scheme Consideration**" has the meaning given to it in the Scheme Document;

"**Scheme Document**" means the document setting out the terms and conditions of the Scheme to be approved by the requisite majorities of Scheme Creditors specified in section 899(1) of the Companies Act and sanctioned by the Court, substantially in the form attached at Appendix 1 (*The Scheme*) to the Explanatory Statement;

"**Settlement Funds Flow**" means the funds flow prepared by the Information Agent in connection with settlement of all the amounts payable by the Issuer in respect of the Restructuring including the amounts specified in Clause 6.4 (*Settlement Funds Flow*);

"**Termination Date**" means the date on which this Deed is terminated in accordance with Clause 14 (*Termination*);

"**Undertaking Transaction Party**" means the Issuer, each Agent and each Trustee;

"**United States**" or "**U.S.**" means the United States of America, its territories and possessions, any state of the United States of America and the District of Columbia; and

"**US Securities Act**" has the meaning given to such term in the Scheme Document.

1.2     **Construction**

(a)     In this Deed, save as otherwise provided:

(i)     the singular shall include the plural and *vice versa* (unless the context otherwise requires);

(ii)    a reference to a clause or schedule is a reference to a clause or schedule to this Deed and unless otherwise specified, a reference herein to "**this Deed**" includes a reference to each of the schedules to this Deed;

(iii)   the clause and schedule headings in this Deed are for ease of reference only and shall not affect the interpretation of this Deed;

(iv)    a reference in a schedule to a paragraph is, unless otherwise stated, a reference to a paragraph in that schedule or, where that schedule is split into parts, a reference to a paragraph in that part of that schedule;

(v)     a reference to a statute or provision of law is a reference to that statute or provision as extended, applied, amended or re-enacted from time to time and includes any subordinate legislation (as enacted, amended or extended) made under it;

(vi)    a reference to a regulation includes any regulation, rule, official directive, request or guideline (whether or not having the force of law but, if not having the force of law, being of a type with which any person to which it applies is accustomed to comply) of any governmental, inter-governmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organisation;

(vii)   a reference to any document or instrument is a reference to that document or instrument as amended, supplemented, novated, extended or restated from time to time;

(viii)  a reference to "**guarantee**" means any guarantee, letter of credit, bond, indemnity or similar assurance against loss or any obligation, direct or indirect, actual or contingent, to purchase or assume any indebtedness of any person or to make an investment in or loan to any person or to purchase assets of any

person where, in each case, such obligation is assumed in order to maintain or assist the ability of such person to meet its indebtedness;

(ix)     a reference to "**indebtedness**" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(x)      a reference to a "**person**" includes any individual, firm, company, corporation, unincorporated association, government, state or agency of a state or any association, trust, joint venture, consortium or other partnership (whether or not having a separate legal personality);

(xi)     a reference to any "**Party**" shall be construed so as to include its successors in title, permitted assigns and permitted transferees to, or of, its rights and/or obligations under the relevant documents;

(xii)    where the Scheme Company is stated to act "**for and on behalf of each Scheme Creditor**", it is acting as agent and attorney pursuant to the authority conferred on it by the Scheme;

(xiii)   the words "**include**" and "**including**" mean include and including without limitation;

(xiv)    a reference to any time of day is a reference to London time;

(xv)     "**$**", "**US$**" or "**USD**" means the U.S. dollar, the lawful currency for the time being of the United States of America; and

(xvi)    "**MX$**" or "**Pesos**" means the Mexican Pesos, the lawful currency for the time being of the United Mexican States.

(b)      Unless defined in this Deed, or unless a contrary indication appears in this Deed or unless the context in this Deed otherwise requires, any term or expression defined in the Scheme has the same meaning, interpretation and construction when used in this Deed.

## 1.3    Third Party Rights

(a)      Unless expressly set out herein, a person who is not a Party to this Deed has no right, whether under the Contracts (Rights of Third Parties) Act 1999 or otherwise, to rely on, enforce or to enjoy the benefit of any term of this Deed.

(b)      Notwithstanding any term of this Deed, the consent of any person who is not a Party to this Deed is not required to rescind or vary this Deed at any time.

## 1.4    Parties' Rights and Obligations

(a)      The obligations, liabilities, representations and warranties of each Party under this Deed are several. Failure by a Party to perform its obligations under this Deed shall not affect the obligations of any other Party under this Deed. No Party is responsible for the obligations of any other Party under this Deed.

(b)      The rights of each Party under or in connection with this Deed are separate and independent rights. Each Party may separately and independently enforce its rights under this Deed.

## 1.5    Execution by Scheme Creditors

Each Scheme Creditor is entering into this Deed in its capacity as a Scheme Creditor (by the Scheme Company on its behalf as authorised in accordance with the Scheme) and only in

respect of the Existing Notes which it holds and not in any other capacity or in respect of any other debt or other instrument.

1.6    **Relationship with Other Documents**

(a)    This Deed, the Scheme Document and each of the other Implementation Documents set out the Parties' entire understanding of the Restructuring and supersede any previous agreement between any of the Parties with respect to the Restructuring.

(b)    In the event of any inconsistency between this Deed and any of the Implementation Documents, the relevant Implementation Document shall prevail.

(c)    Unless expressly provided to the contrary in this Deed, this Deed does not modify, amend or waive the terms of the Lock-Up Agreement, which shall remain in full force and effect as between the parties thereto in accordance with its terms.

**2.    EFFECTIVENESS**

2.1    Subject to Clause 2.2, this Deed in its entirety will become effective and legally binding among the Parties, on and from the later of the dates (the "**Effective Date**") on which:

(a)    the Scheme Effective Date has occurred;

(b)    the Scheme Company (on its own behalf and on behalf of the Scheme Creditors pursuant to the Scheme, as applicable) has duly executed (with signatures being released) this Deed; and

(c)    each of the other Parties has duly executed (with signatures being released) this Deed.

2.2    This Deed shall only become effective and legally binding upon the Existing Notes Trustee upon delivery of the Restructuring Conditions Satisfaction Notice in accordance with this Deed (and the Existing Notes Trustee shall not be obliged to take any actions under this Deed until the Restructuring Conditions Satisfaction Notice has been delivered in accordance with this Deed).

**3.    EXECUTION OF THE IMPLEMENTATION DOCUMENTS**

3.1    As soon as reasonably practicable after the Effective Date and to the extent not already done:

(a)    each of the Parties (other than the Existing Notes Trustee) shall, subject to Clause 3.1(c) below, sign, but leave undated and not release, all Implementation Documents to which it is named as a signing party;

(b)    in respect of the Scheme Creditors, pursuant to the authority granted to the Scheme Company under clause 4 (*Grant of Authority to Execute the Implementation Documents*) and clause 6 (*Releases*) of the Scheme Document, the Scheme Company shall, on behalf of the Scheme Creditors (other than the Existing Notes Trustee), sign, but leave undated and not release, all Implementation Documents to which those Scheme Creditors are a party; and

(c)    each of the Parties shall deliver scanned or PDF copies of the original signed, but undated and unreleased, Implementation Document(s) to Cleary at team-mega_restructuring-cgshonly@cgsh.com and with (if required as a matter of law) such original signed, but undated, Implementation Document(s) to be delivered physically to Cleary's address specified in Clause 24 (*Notices*) promptly thereafter, in each case to be held pending release in accordance with this Deed.

3.2    Once all Implementation Documents have been executed and delivered to Cleary by each party thereto in accordance with Clause 2.2 and Clause 3.1, Cleary shall confirm the same to the Scheme Company, which shall procure that the Information Agent promptly serve (and the Information Agent shall promptly serve) a notice (the "**Execution Completion Notice**") on the Scheme Company and the Notice Parties confirming the same.

3.3    Where an Implementation Step refers to an Implementation Document being dated, released and delivered (as applicable) pursuant to the relevant Implementation Step, that Implementation Document shall be dated, deemed released and delivered (as applicable) at that time and in that sequence. Where an Implementation Document is not specifically referred to in an Implementation Step, that Implementation Document shall be dated and deemed released and delivered (as applicable) on the Restructuring Effective Date. In each case, each of the Parties (other than the Existing Notes Trustee) hereby irrevocably authorises Cleary to date, release and deliver (as applicable) the Implementation Document(s) to which they are a party on their behalf and to serve and accept delivery or service on their behalf of any Implementation Document(s) (and any other documents, notices or evidence expressly referred to in this Deed) required to be delivered by or to it subject to and in accordance with the terms of this Deed, without being required to obtain any further consents or authorisations from any Party or from any other person or entity, in each case, subject to and in accordance with the terms of this Deed.

3.4    The Parties agree that the form of any Implementation Document may be amended or updated:

(a)    prior to its execution, to complete missing or required information or to correct any manifest error; and

(b)    following its execution but prior to the release and dating of such document in accordance with the terms of this Deed, to complete any factual information as may be expressly required by this Deed or otherwise or to correct any manifest error (and, to the extent any such document is a deed governed by English law, the relevant Parties shall promptly re-execute such document in accordance with signing instructions provided by Cleary),

provided that any such amendment or update is in accordance with clause 4 (*Grant of Authority to Execute the Implementation Documents*) of the Scheme Document and that Cleary shall provide a copy of any Implementation Document that has been amended or updated to: (a) the parties thereto, and (b) the Ad Hoc Group Advisors as soon as reasonably practicable.

## 4.    SCHEME COMPANY AUTHORITY TO EXECUTE

Pursuant to the terms of clause 4 (*Grant of Authority to Execute the Implementation Documents*) of the Scheme Document, the Scheme provides that each Scheme Creditor (other than the Existing Notes Trustee) has irrevocably authorised the Scheme Company, and appointed the Scheme Company (acting by its directors, officers or other duly appointed representatives) as the true and lawful agent and attorney of each Scheme Creditor to enter into and execute (and deliver as a deed (if applicable)) the Implementation Documents to which the Scheme Creditors are party and such other documents as may be necessary in the discretion of the Scheme Company (acting reasonably) to give effect to the Implementation Steps, the Scheme, the Implementation Documents and the Restructuring, and provides that the Scheme Company (for and on behalf of each Scheme Creditor) shall execute and deliver this Deed.

## 5.    INSTRUCTIONS

5.1    The Scheme Company (for and on behalf of each Scheme Creditor) in accordance with the authority granted pursuant to clause 4.2 (*Undertaking Transaction Parties' Authority*) of the Scheme Document hereby irrevocably and unconditionally instructs each of the Agents and the

7

Trustees (the "**Instructed Parties**") to do any and all acts and take any and all steps as necessary to implement the Restructuring and the Implementation Steps and all other actions contemplated by this Deed, including, in the case of the New Notes Indenture Trustee, authenticating each New Noteholder's interest in the New Notes in the manner provided for in the New Notes Indenture, Note Purchase and Placement Agreement and the New Notes Settlement Agreement.

5.2    Each of the Instructed Parties:

   (a)    shall act in accordance with the instructions given in Clause 5.1 and pursuant to the Scheme Document (as applicable) and shall not be required to seek further instruction from the Scheme Company, the Scheme Creditors or any other Party in relation to such actions (but shall remain entitled to do so); and

   (b)    acknowledges that it shall not require any further indemnification beyond the relevant indemnity provisions under the Existing Notes Indenture, New Notes Indenture, New Notes Settlement Agreement and Cash Settlement Escrow Agreement, as applicable, all of which survive the Restructuring Effective Date and apply to the actions, steps or transactions anticipated by, or taken in connection with this Deed, the other Implementation Documents or the Restructuring.

5.3    Notwithstanding Clause 5.2, no provision hereof shall require the Existing Notes Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its obligations hereunder, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

5.4    Each Party acknowledges and agrees that, until this Deed is terminated in accordance with Clause 14 (*Termination*), the instructions given by each Party in accordance with Clauses 5.1 and 5.2 and pursuant to the Scheme Document (as applicable) or otherwise pursuant to this Deed cannot be revoked, that any attempt to revoke such instructions shall be of no effect and that the provisions of this Deed shall continue to apply to any action, the subject of such instructions notwithstanding such purported revocation.

5.5    Each Scheme Creditor acknowledges, confirms and irrevocably ratifies all actions taken, or to be taken, by the Information Agent and the Instructed Parties pursuant to the Scheme, this Deed and/or any of the Implementation Documents.

**6.    ALLOCATIONS AND DELIVERY OF SCHEME CONSIDERATION AND NEW NOTES TO SCHEME CREDITORS; SETTLEMENT FUNDS FLOW**

6.1    **Allocations Spreadsheet**

   (a)    The Allocations Spreadsheet shall set out each Scheme Creditor's applicable Scheme Creditor Entitlement comprising each Scheme Creditor's:

      (i)    New Notes Entitlement, if applicable; and

      (ii)    Scheme Consideration Election Entitlement (being its Cash Entitlement or its New Shares Entitlement, as applicable),

   in each case calculated in accordance with clause 5.3 (*Calculation of Scheme Creditor Entitlements*) of the Scheme Document.

   (b)    Within one (1) Business Day of the Election Deadline, the Information Agent shall prepare the Allocations Spreadsheet in accordance with the Scheme Document and this Clause 6 and in reliance upon the information provided to it:

      (i)    in validly completed and timely submitted:

(A)  Account Holder Letters; and

(B)  New Notes Election Forms;

(ii)  by DTC; and

(iii)  by the Scheme Company and/or its advisors.

(c)  For the avoidance of doubt:

(i)  the approval in writing of the Allocations Spreadsheet by the Scheme Company and the Ad Hoc Group Advisors on basis of paragraph (b) above shall be a Restructuring Condition; and

(ii)  no further amendments to the Allocations Spreadsheet shall be permitted without the written consent of the Scheme Company and the Ad Hoc Group Advisors.

6.2   **Delivery of Scheme Consideration and New Notes to Scheme Creditors**

The Parties (save for any Undertaking Transaction Party) acknowledge that each Scheme Creditor or its Designated Recipient shall only receive Scheme Consideration and/or New Notes in accordance with the Scheme. Accordingly, the Allocations Spreadsheet shall identify:

(a)  Scheme Creditors or their Designated Recipients that can receive Scheme Consideration and New Notes, as applicable;

(b)  Scheme Creditors or their Designated Recipients that are known to the Information Agent and who can receive their Scheme Consideration after the Restructuring Effective Date subject to:

(i)  the submission of a valid Account Holder Letter by that Scheme Creditor or Designated Recipient along with all of the evidence, information, representations, Confirmations, undertakings and any other documentation required to be provided therein (which the Scheme Company consider (in its sole discretion) to be accurate and correct); and

(ii)  that Scheme Creditor or Designated Recipient not being a Sanctioned Person; and

(c)  those Scheme Creditors who are either Sanctioned Persons or have not been identified to the Information Agent and whose share of the Scheme Consideration under the Redemption Option shall be transferred to the Holding Period Escrow Agent on the Restructuring Effective Date to be held under the Holding Period Escrow Agreement.

6.3   If a Scheme Creditor submits a validly completed Account Holder Letter to the Information Agent by the Election Deadline, that Scheme Creditor (or its respective Designated Recipient, if applicable) will receive its applicable share of the Scheme Consideration on or before the Restructuring Effective Date in accordance with this Deed. Any Sanctions Person or Non-Electing Scheme Creditor will have their share of the Scheme Consideration transferred to the Holding Period Escrow Agent to be held under the Holding Period Escrow Agreement unless or until such persons confirm their eligibility to the Scheme Company to receive their share of the Scheme Consideration in accordance with the Holding Period Escrow Agreement.

6.4   **Settlement Funds Flow**

(a)  Within one (1) Business Day of the Election Deadline, the Information Agent and the Cash Settlement Agent shall:

(i)      calculate all the amounts payable by the Issuer and/or the Scheme Company in respect of the Restructuring including:

    (A)      the Existing Trustee's fees, costs and expenses (including advisors' fees) and indemnities then accrued or incurred and the estimated fees, costs and expenses necessary to consummate the Restructuring;

    (B)      the Ad Hoc Group's costs and expenses, including advisors' fees (including the Ad Hoc Group's Advisors fees);

    (C)      the fees payable to:

        (1)      each Participating T1 New Noteholder under and in accordance with the relevant commitment letter;

        (2)      each Backstop Party under and in accordance with the Backstop Commitment Letter;

        (3)      each eligible Scheme Creditor in respect of its Lock-Up Fee Entitlement;

    (D)      each Redemption Option Scheme Creditor's Cash Entitlement;

    (E)      the cash entitlements payable to the lenders under the International Facilities; and

    (F)      the waiver fee due to the holders of the Issuer's Mexican law governed Ps. 3,000,000,000 Floating Rate Notes (*certificados bursátiles*); and

(ii)      prepare the Settlement Funds Flow reflecting the amounts payable in accordance with this Clause 6 and in reliance upon the information provided to it:

    (A)      in validly completed and timely submitted:

        (1)      Account Holder Letters; and

        (2)      New Notes Election Forms;

    (B)      by DTC; and

    (C)      by the Scheme Company and/or its advisors.

(b)      For the avoidance of doubt:

(i)      the approval in writing of the Settlement Funds Flow by the Scheme Company, the Ad Hoc Group Advisors and, with respect to the priority and amount payable under Clause (A) herein, the Existing Notes Trustee, shall be a Restructuring Condition; and

(ii)      no further amendments to the Allocations Spreadsheet shall be permitted without the written consent of the Scheme Company and the Ad Hoc Group Advisors.

## 7.    RESTRUCTURING CONDITIONS

7.1      None of the Implementation Steps shall occur unless and until the Scheme Company delivers a notice (the "**Restructuring Conditions Satisfaction Notice**") to the Information Agent, the

Cash Settlement Agent and the New Notes Settlement Agent confirming that all of the Restructuring Conditions have either been satisfied or (to the extent permitted) waived.

7.2    The Scheme Company shall deliver the Restructuring Conditions Satisfaction Notice to the Information Agent and the Cash Settlement Agent (with a copy to the Ad Hoc Group Advisors and the Existing Notes Trustee) promptly upon satisfaction or (to the extent permitted) waiver of all of the relevant Restructuring Conditions.

7.3    Upon receiving the Restructuring Conditions Satisfaction Notice, the Information Agent shall, on the same Business Day, serve a notice (the "**Implementation Steps Commencement Notice**") on the Notice Parties and the Trustees confirming the same and stating the date (the "**Implementation Steps Commencement Date**") on which the Implementation Steps shall be commenced (which shall be as soon as practicable following the date of the Restructuring Conditions Satisfaction Notice).

## 8.    IMPLEMENTATION PRINCIPLES

8.1    The Parties agree that each of the Implementation Steps shall be taken in the order described in Clause 9 (*Implementation Steps*), provided that:

(a)    none of the Implementation Steps shall take place unless all transactions contemplated by such Implementation Steps are capable of being completed in full;

(b)    the intention of the Parties is that either all of the Implementation Steps shall take place or none of them shall take place;

(c)    unless indicated to the contrary:

(i)    the items listed in relation to a particular Implementation Step shall occur sequentially in the order in which such items are indicated to occur within that Implementation Step (to the extent practicable); and

(ii)    each Implementation Step shall occur immediately following the previous Implementation Step;

(d)    all of the Implementation Steps are inter-conditional and no Implementation Step shall take place unless the prior Implementation Step has been completed in full (to the extent practicable) and all transactions contemplated within the following Implementation Steps remain capable of being completed in full;

(e)    unless an Implementation Step is expressed to take place simultaneously with a prior Implementation Step, each Implementation Step shall occur immediately following the prior Implementation Step (and, unless expressly stated in the applicable Implementation Step, without any requirement for any additional actions or steps to be undertaken by any Party); and

(f)    Clause 14 (*Termination*) shall apply to the extent that this Deed terminates or is terminated in accordance with its terms and some but not all of the Implementation Steps have been completed in full or in part.

8.2    Each Scheme Creditor's entitlement to the Scheme Consideration and New Notes set out in the Implementation Steps shall be calculated as set out in Clause 6 (*Allocations and Delivery of Scheme Consideration and New Notes to Scheme Creditors; Settlement Funds Flow*).

8.3    In the event that any Implementation Step does not occur at the time or on the date that it is specified to occur in Clause 9 (*Implementation Steps*), the Scheme Company, by notice to the Notice Parties sent within 1 Business Day of the Implementation Step failing to occur, may determine that the subsequent Implementation Steps will occur on the date and at the time set

11

out in such notice which shall be as soon as practicable after the time or date that such Implementation Step is specified to occur in Clause 9 (*Implementation Steps*), provided that the implementation of the subsequent Implementation Step would not impose any additional obligation on, nor materially, adversely or disproportionately affect the rights of any of the Scheme Creditors in any manner that is not already contemplated by the Scheme or the Implementation Documents.

8.4    For the purposes of the Implementation Steps, to the extent a Scheme Creditor validly designates a Designated Recipient in their Account Holder Letter or New Notes Election Form, any reference to such Scheme Creditor also denotes their Designated Recipient.

8.5    Each Party agrees that time is of the essence for the purposes of completing the Implementation Steps.

8.6    Each Party hereto, other than the Scheme Company or the Issuer:

(a)    will not be responsible for the adequacy, accuracy and/or completeness of any information (whether oral or written) supplied by the Scheme Company to the Scheme Creditors or any other person given in or in connection with the Restructuring, this Deed and any associated documentation or the transactions contemplated therein;

(b)    will not be responsible for the legality, validity, effectiveness, completeness, adequacy or enforceability of the Restructuring, this Deed or any other agreement, arrangement or documents entered into, made or executed in anticipation of or in connection with the Restructuring; and

(c)    will not be responsible for verifying any information provided by the Scheme Company to the Scheme Creditors or by the Scheme Creditors to the Parties in connection with implementation of this Deed (using reasonable endeavours and usual methods of transmission) has actually been received and/or considered by the Scheme Creditors.

## 9.    IMPLEMENTATION STEPS

9.1    Promptly on or following the Implementation Steps Commencement Date (as specified in the Implementation Steps Commencement Notice), each of the Implementation Steps shall occur in the order prescribed in this Deed.

9.2    **Step 1 (Pre-Funding)**

(a)    The Information Agent shall inform each Scheme Creditor of its entitlement to the Scheme Consideration as set out in the Allocation Spreadsheet.

(b)    The New Refinancing Facility Drawdown Notice shall be dated and become effective in accordance with its terms and the New Refinancing Facility shall be drawn down by the Issuer.

(c)    Not later than three (3) Business Days following the later of (x) the Election Deadline and (y) the Implementation Steps Commencement Date, the Issuer and the Scheme Company shall:

(i)    provide the New Notes Settlement Agent with all information reasonably necessary for it to ensure that the New Notes are eligible for settlement and clearance through the facilities of the DTC;

(ii)    deliver a New Notes Funding Notice to each Participating T2 New Noteholder identifying that Participating T2 New Noteholder's Subscription Amount (calculated in accordance with Clause 5.3(a)(i)(A) (*Calculation of Scheme Creditor Entitlements*) of the Scheme Document);

12

(iii)    deliver a New Notes Funding Notice to each Backstop Party identifying a Backstop Party's allocation of the Backstop Commitment in accordance with the Backstop Commitment Letter; and

(iv)    notify the Participating T1 New Noteholder of its funding requirement in respect of its New Notes commitment in accordance with the relevant commitment letter,

in each case, identifying the required deadline for such commitments to be funded into the Cash Settlement Escrow Account, such date to be no earlier than the later of (x) the 13th Business Day after the date on which the Issuer and the Scheme Company have delivered the New Notes Funding Notices to all relevant parties in accordance with paragraphs (i) to (iii) above; and (y) the date on which the proceeds of the New Refinancing Facility Proceeds are scheduled to be advanced to the Issuer pursuant to New Refinancing Facility Drawdown Notice (the "**Funding Deadline**").

(d)    The Note Purchase and Placement Agreement shall be finalised to reflect each Participating T2 New Noteholder's New Notes Entitled as set out in the Allocation Spreadsheet and shall be dated and become effective in accordance with its terms and the Information Agent shall notify each Participating T1 New Noteholder, Participating T2 New Noteholder and Participating T3 New Noteholder, as applicable, thereof.

### 9.3    Step 2 (New Share Issuance)

(a)    No later than on the Business Day immediately preceding the Funding Deadline, each Equity Option Scheme Creditor shall:

(i)    irrevocably, unconditionally and absolutely (and not only by way of security) assign and transfer all of its right, title and interest in the Existing Notes subject to the Equity Option held by it to the Issuer; and

(ii)    in consideration for the assignment and transfer to the Issuer pursuant to paragraph (i) above, shall have the right to receive (either directly or through its Designated Recipient) the New Shares calculated pursuant to the Equity Option as set out in the Allocations Spreadsheet.

(b)    No later than on the Business Day immediately preceding the Funding Deadline, the Issuer shall:

(i)    deliver individualized nominative outstanding share certificates documenting the issuance of the New Shares in favour of each Equity Option Scheme Creditor (or their Designated Recipient, as applicable) as set out in the Allocations Spreadsheet; and

(ii)    carry out the relevant annotations and entries in the Issuer's share registry.

(c)    The Issuer shall notify the lender under the New Refinancing Facility and the Existing Notes Trustee of completion of Step 2 no later than by the Funding Deadline.

### 9.4    Step 3 (Funding)

(a)    By the Funding Deadline:

(i)    each Participating T2 New Noteholder shall fund, in immediately available funds, its Subscription Amount (calculated in accordance with Clause 5.3(a)(i)(A) (*Calculation of Scheme Creditor Entitlements*) of the Scheme Document) into the Cash Settlement Escrow Account in accordance with its New Notes Funding Notice;

(ii)    the Participating T1 New Noteholder shall fund, in immediately available funds, its New Notes commitment into the Cash Settlement Escrow Account in accordance with the relevant commitment letter; and

(iii)    each Backstop Party shall fund, in immediately available funds, its allocation of the Backstop Commitment (if any) into the Cash Settlement Escrow Account in accordance with its New Notes Funding Notice (if any).

(b)    Upon receipt of the New Refinancing Facility proceeds into the Operational Account and all New Notes commitments set out in Clause 9.2(a) (*Implementation Steps; Step 1 (Pre-Funding)*) into the Cash Settlement Escrow Account, the Cash Settlement Agent shall issue a notice (the "**Funding Confirmation Notice**") confirming receipt of the same to the Notice Parties.

(c)    Immediately upon receipt of the Funding Confirmation Notice by the Information Agent, the below shall be implemented simultaneously:

(i)    the Cash Settlement Agent shall transfer all amounts standing to the credit of the Cash Settlement Escrow Account to the Operational Account;

(ii)

(1)    the New Notes Indenture and the New Notes Mexican Trust Agreement shall be dated and become effective in accordance with their terms;

(2)    the New Notes Mexican Trustee shall enter into an agreement with the master servicer in relation to the New Notes; and

(3)    a global note in respect of the New Notes shall be delivered to the Registered Holder Nominee in accordance with the Note Purchase and Placement Agreement, the New Notes Indenture and the New Notes Settlement Agreement;

(iii)    in accordance with the Note Purchase and Placement Agreement and the New Notes Settlement Agreement and subject to the relevant Participating T1 New Noteholder or Participating T2 New Noteholder complying with their obligations thereunder:

(A)    each:

(1)    Participating T1 New Noteholder shall receive the relevant amount of New Notes; and

(2)    Participating T2 New Noteholder shall receive the relevant amount of New Notes representing its New Notes Entitlement as set out in the Allocations Spreadsheet;

in consideration for, and subject to, complying with the funding obligation under this Clause 9.4 and in the case of Participating T2 New Noteholder in consideration for such Participating T2 New Noteholder irrevocably, unconditionally and absolutely (and not only by way of security) assigning and transferring to the Issuer all of its right, title and interest in the Existing Notes equal to its Subscription Amount in respect of the New Notes; and

(B)    each Participating T3 New Noteholder shall receive the relevant amount of New Notes that it is entitled to pursuant to the Note Purchase and Placement Agreement;

  (iv)  each Redemption Option Scheme Creditor shall hereby:

    (A)  irrevocably, unconditionally and absolutely (and not only by way of security) assign and transfer all of its right, title and interest in the Existing Notes subject to the Redemption Option held by it to the Issuer; and

    (B)  in consideration for the assignment and transfer to the Issuer pursuant to paragraph (A) above, have the right to receive its Cash Entitlement pursuant to the Redemption Option as set out in the Allocations Spreadsheet; and

  (v)  the Cash Settlement Agent shall make all payments (including all advisor fees and transaction costs) in accordance with the Settlement Funds Flow.

**9.5**  **Step 4 (Cancellation)**

By operation of this Clause 9.5, which shall require no action to be taken or approval to be given by any other Party:

(a)  the Scheme Company shall, on behalf of each Scheme Creditor, pursuant to the authority granted by Clause 4.1 (*Scheme Company's Authority to Execute the Implementation Documents*) of the Scheme Document, execute and deliver (or have the Issuer execute and deliver) via the Existing Notes Trustee, the DTC Instruction to DTC to:

  (i)  instruct the Clearing Systems to debit the Book Entry Interests relating to the Existing Notes from the custody account of each Scheme Creditor (or its Account Holder, as applicable); and

  (ii)  authorise the cancellation of the Book Entry Interests of the Existing Notes,

  and, if required by DTC, the Existing Notes Trustee shall agree to such cancellation;

(b)  the Issuer will provide a "null, void and worthless" letter and any indemnity required by DTC contemporaneously with the DTC Instruction;

(c)  the Issuer and, if required, the Existing Notes Trustee, shall take such other steps and deliver such other additional information or documentation which may be reasonably requested or required by DTC (except that the Existing Notes Trustee shall not be required to provide any indemnity to DTC) in accordance with Applicable Procedures to direct DTC to cancel all of the Existing Notes.

(d)  The Existing Notes Trustee shall not have any obligations under the Existing Notes Indenture following cancellation of the Existing Notes.

**9.6**  **Step 5 (Restructuring Effective Date)**

(a)  The Scheme Company shall issue a notice (the "**Restructuring Effective Date Notice**") to the Notice Parties confirming that the Restructuring Effective Date has occurred (in accordance with the terms of the Scheme Document).  The Existing Notes Trustee shall not have any obligation to provide a notice to the Scheme Creditors of the Restructuring Effective Date.

(b)  The Deed of Release shall become effective in accordance with its terms.

(c)  Upon receipt of the Restructuring Effective Date Notice, the Information Agent shall immediately post the Restructuring Effective Date Notice on the Scheme Website and distribute it to the Scheme Creditors.

10. **POST-COMPLETION STEPS**

Following issuance of the Restructuring Effective Date Notice, the Issuer shall make an announcement in the form agreed in advance by the Group's Counsels and the Ad Hoc Group Advisors.

11. **PARTICIPATING CREDITOR PERMITTED TRANSFERS**

The Scheme Company and the Information Agent are not under any obligation to recognise any assignment or transfer of any Scheme Claim after the Record Time, other than any assignment or transfer contemplated by the Scheme or this Deed, *provided that* the Scheme Company may in its sole discretion recognise such an assignment or transfer in accordance with clause 9.6 (*Assignments or Transfers*) of the Scheme Document and any acquired Scheme Claim shall be deemed to be binding on the transferee or by virtue of the Scheme Company having executed this Deed on its behalf in accordance with the terms of the Scheme Document.

12. **LIMITATIONS**

12.1    Nothing in this Deed shall:

(a)    require any member of the Group or a Scheme Creditor or their directors or officers, or any Affiliate or Related Entity thereof, to (whether by action or omission) breach, or procure the breach of:

(i)    any law or regulation or fiduciary duties or comparable liability concepts under applicable law (such as capital or liquidity maintenance rules for upstream collateral) or its constitutional documents;

(ii)    any order or direction of any relevant court or governmental, supervisory or regulatory body or any applicable securities laws; or

(iii)    to waive or forego the benefit of any applicable legal professional privilege;

(b)    restrict or attempt to restrict any officer of any member of the Group from complying with any legal obligation or any fiduciary duty of its directors or officers (reasonably taking into account the best interests of the relevant member of the Group) to file for commencement of, or commence Insolvency Proceedings in respect of that member of the Group;

(c)    require or attempt to require any Party to take any action, or omit to take any action, which is inconsistent with the Scheme or which would breach any legal or regulatory requirement beyond the control of that Party or any order or direction of any government, authority, regulatory body, stock exchange or listing authority or court of competent jurisdiction and which impediment cannot be avoided or removed by taking reasonable steps;

(d)    prevent any Scheme Creditor (or their respective Affiliates or Related Entities) from providing debt financing, equity capital, discretionary money management, corporate finance, investment banking, investment advisory, private management, risk management activities, arbitrage, and sales and trading activities, or other services (including advisory services), or from carrying on its activities in the ordinary course in each case which are independent from the transactions contemplated by this Deed and subject to appropriate information barriers and other policies being in place;

(e)    require any Party to bring or become party to any legal or arbitration proceedings (other than as expressly contemplated by this Deed or the Implementation Documents);

16

(f)     restrict, or attempt to restrict, any director or officer of any member of the Group from complying with any applicable securities laws in respect of any member of the Group;

(g)     require any Party to take or refrain from taking any action if doing so is, in the reasonable opinion of such person having obtained legal professional advice (including advice from internal counsel) and such other advice as the circumstances may require, reasonably likely to: (A) result in such Party or any officer, director or employee of that Party incurring personal liability or sanction due to a breach of its legal or fiduciary duties or obligations as officer, director or employee of that Party; or (B) result in a breach of law or statute binding on such Party;

(h)     prevent or restrict any Party from bringing proceedings or taking such action or steps as the Scheme Company, the Issuer and the Majority Consenting Noteholders consider reasonably necessary or desirable to implement or consummate the Restructuring, except as otherwise set forth in this Deed or the Implementation Documents;

(i)     prevent any Party from bringing legal proceedings against any person solely for the purpose of:

  (i)     obtaining injunctive relief (or any analogous remedy) to restrain any actual or putative breach of this Deed or the Implementation Documents; or

  (ii)     obtaining specific performance in respect of any obligations set out in this Deed or the Implementation Documents;

(j)     prevent or restrict any Scheme Creditor from bringing legal proceedings against any person in relation to an Excluded Scheme Claim; or

(k)     require any Scheme Creditor or Trustee to:

  (i)     incur any liability or out-of-pocket costs or expenses (unless the Scheme Company, the Issuer or any other member of the Group has advanced or (if acceptable to the Scheme Creditor or Trustee in its discretion) agreed in writing to meet those costs and expenses and it is in compliance with such agreement); or

  (ii)     (whether by action or omission) breach, or procure the breach of: (i) any law or regulation or comparable liability concepts under applicable law; or (ii) any order or direction of any relevant court or governmental, judicial, supervisory, banking, tax or regulatory body.

## 13.   INFORMATION AGENT

13.1    The Scheme Company has appointed the Information Agent, and the Information Agent shall be responsible for, among other things, preparing the Allocations Spreadsheet. The decision of the Information Agent in relation to such calculations and reconciliations shall be final (in the absence of manifest error) and may not be disputed by any Scheme Creditor and each Scheme Creditor hereby unconditionally and irrevocably waives and releases any claims which may arise against the Information Agent (save in the case of wilful misconduct, fraud or gross negligence) in each case in relation to the Information Agent's performance of its role in connection with the Restructuring.

13.2    The Information Agent is a party to this Deed solely in its capacity as Information Agent and its duties and functions under this Deed are solely mechanical and administrative in nature. The

other Parties are responsible for their own management functions and decisions relating to the performance of any duty or function by the Information Agent under this Deed.

13.3    The Information Agent:

(a)    will not be responsible for the adequacy, accuracy and/or completeness of any information (whether oral or written) supplied by the Scheme Creditors, any Trustee, the Scheme Company or any other person given in or in connection with the Restructuring, this Deed and any associated documentation or the transactions contemplated therein;

(b)    will not be responsible for the legality, validity, effectiveness, completeness, adequacy or enforceability of the Restructuring, this Deed or any other agreement, arrangement or document entered into, made or executed in anticipation of or in connection with the Restructuring; and

(c)    will not be responsible for verifying that any information provided to the Scheme Creditors (using reasonable endeavours and usual methods of transmission, such as email or post) has actually been received and/or considered by the Scheme Creditors.

13.4    Each Scheme Creditor acknowledges, confirms and irrevocably ratifies all actions taken, or to be taken, by the Information Agent pursuant to the Scheme, this Deed and/or any of the Implementation Documents.

## 14.    TERMINATION

14.1    This Deed will terminate automatically and without the need for any further action:

(a)    if the Restructuring Effective Date Notice does not occur on or before the Longstop Date;

(b)    the Scheme Company notifies the Notice Parties that, in the Scheme Company's reasonable opinion, there is no reasonable prospect of implementing the Restructuring;

(c)    upon the occurrence of a Bankruptcy Event; or

(d)    when the Restructuring Effective Date occurs.

14.2    In the event that this Deed is terminated pursuant to Clause 14.1(a) to 14.1(b) above, the Parties:

(a)    will be under no obligation to complete or procure the completion of any Implementation Step that has not been completed by that date;

(b)    shall, to the extent any funds, New Notes or New Shares have been received and are held by them pursuant to the Implementation Steps, hold such funds, New Notes or New Shares on trust for the benefit of the relevant other Party that held or controlled such funds, New Notes or New Shares immediately prior to the commencement of the Implementation Steps, and shall repay such funds or transfer such New Notes or New Shares to the relevant other Party as promptly as possible;

(c)    procure that any amounts held by the Settlement Escrow Agent are returned to the Participating T1 New Noteholder and Participating T2 New Noteholders (including Backstop Parties, if applicable) as promptly as possible;

(d)    agree that any deed, document or agreement executed, delivered or released in accordance with or pursuant to the Implementation Steps shall be rescinded (insofar as is legally possible) and deemed never to have become effective and each Party, to the extent legally and practically possible, shall be put back into the position it was in prior

to the date on which such deed, document or agreement was executed, delivered or released (as applicable);

(e)    use best endeavours to reverse the effect of any Implementation Step that has been completed by that date, such the Parties are in the same position that they would have been in had none of the Implementation Steps taken place; and

(f)    shall retain all of their rights, titles and interests, including all rights under the Existing Notes and the Existing Notes Indenture against each other Party as if the Scheme and/or any of the Restructuring Documents have not become effective.

14.3    If this Deed terminates, all Parties shall immediately be released from all of their undertakings and other obligations under this Deed, provided that such termination and release:

(a)    shall not limit or prejudice the rights of each Party against any other Party which have accrued or relate to breaches of the terms of this Deed at the time of or prior to termination; and

(b)    shall not limit the effectiveness of Clauses 1 (*Interpretation*), 5 (*Instructions*), 12 (*Limitations*), 13 (*Information Agent*), 14 (*Termination*), 17 (*Specific Performance*), 21 (*Miscellaneous*), 24 (*Notices*) and 25 (*Governing Law and Jurisdiction*) and, solely on and after the Restructuring Effective Date, Clauses 10 (*Post Completion Steps*) and 15 (*Scheme Company Undertaking*) and 19 (*Further Assurance*), the provisions of which shall continue to apply to each of the Parties.

## 15.    SCHEME COMPANY UNDERTAKING

15.1    The Scheme Company agrees that for so long as any of the New Notes are "restricted securities" (within the meaning of Rule 144(a)(3) under the US Securities Act of 1933, as amended (the "**US Securities Act**")) during any period in which it is neither subject to Section 13 or 15(d) of the US Securities Exchange Act of 1934, as amended, nor exempt from reporting pursuant to Rule 12g3-2(b) thereunder, it will provide to any holder or beneficial owner of such restricted securities or to any prospective purchaser of such restricted securities designated by such holder or beneficial owner, upon the request of such holder, beneficial owner or prospective purchaser, the information required to be provided by Rule 144A(d)(4) under the US Securities Act.

15.2    Notwithstanding Clause 1.3 (*Third Party Rights*), the undertaking of the Scheme Company in this Clause 15 is enforceable by any such holder, beneficial owner or prospective purchaser who is not a party to this Deed by virtue of the Contracts (Rights of Third Parties) Act 1999.

## 16.    REPRESENTATIONS AND WARRANTIES

Each Party (save for the Instructed Parties), severally and not jointly, represents and warrants to each other Party on the date of this Deed as follows:

(a)    it is duly incorporated (if a corporate person) or duly established (in any other case) and validly existing and (where applicable) in good standing under the laws of its jurisdiction of incorporation or formation;

(b)    it and, if applicable, the duly authorised attorney acting on its behalf, has all requisite power, authority and legal capacity to execute and deliver this Deed and to carry out the transactions contemplated by, and perform its obligations under, this Deed, the Implementation Documents to which it is a party and the Restructuring;

(c)    the execution, delivery and performance of this Deed and the Implementation Documents (including, for the avoidance of doubt, the Implementation Documents (as applicable)) by it and, if applicable, the duly authorised attorney acting on its behalf,

19

do not and shall not require any registration, filing, consent, approval, notice or other action to, with or by, any governmental authority, court or regulatory body for its obligations to be valid and binding on it, except as expressly provided in this Deed;

(d)    this Deed has been duly and validly executed and delivered by it and, if applicable, the duly authorised attorney acting on its behalf, and this Deed represents its legal, valid and binding obligations, enforceable against it in accordance with its terms, subject to any applicable Reservations;

(e)    as far as it is aware, the entry into and performance by it of, and the transactions contemplated by, this Deed do not and will not conflict with any law or regulation applicable to it or its constitutional documents or any agreement or instrument binding on it or any of its assets where such conflict would have a material adverse effect on its ability to implement or consummate the Restructuring or otherwise comply with the terms of this Deed; and

(f)    if, and to the extent, applicable, all Authorisations required for the performance by it of this Deed and the transactions contemplated by this Deed and the Implementation Documents and to make this Deed and the Implementation Documents admissible in evidence in its jurisdiction of incorporation and any jurisdiction where it conducts its business have been obtained or effected and are in full force and effect.

## 17.    SPECIFIC PERFORMANCE

Without prejudice to any other remedy available to any Party, the obligations under this Deed may, subject to applicable law, be the subject of specific performance by the Parties. Each Party agrees and acknowledges for the benefit of each other Party that:

(a)    damages may not be an adequate remedy for any breach of the terms of this Deed by any Party; and

(b)    specific performance and/or relief to compel performance are appropriate remedies for any such breach and any such remedies shall not be exclusive but shall be cumulative and in addition to any other remedies available to any Party, whether under this Deed or otherwise.

## 18.    AMENDMENTS AND WAIVERS

18.1    The Parties hereby agree that the Scheme Company may modify, add to or waive any provision of:

(a)    this Deed (including in relation to any of the Restructuring Conditions) with the prior written consent of the Majority Scheme Creditors (except in relation to (i) the Restructuring Condition requiring an order of the United States Bankruptcy Court for the Southern District of New York for recognition and enforcement of the Scheme (and the Scheme Sanction Order) under Chapter 15 of Title 11 of the United States Code) and (ii) Clauses (A) or 6.4(b)(i) hereof which shall require the prior written consent of the Existing Notes Trustee); and

(b)    prior to the Restructuring Effective Date, any of the Implementation Documents with the prior written consent of the Majority Scheme Creditors,

*provided that*:

(a)    such modification, addition, term or condition or waiver does not materially adversely affect, or impose any materially more onerous obligation on, the Scheme Company or Scheme Creditor, in the case of Scheme Creditors, as compared to the treatment of the

other Scheme Creditors under this Deed or any other Implementation Document (unless the Scheme Company or Scheme Creditor consents); and

(b)     such modification, addition, term or condition or waiver does not materially adversely affect, or impose any materially more onerous obligation on, any Undertaking Transaction Party under this Deed or any other Implementation Document (unless the relevant affected Undertaking Transaction Party consents to that modification, addition, term or condition or waiver).

18.2    Any amendment or waiver referred to in this Clause 18 shall become effective and binding on all Parties upon receipt of the requisite consents by the Information Agent.

18.3    The Information Agent shall promptly notify the Scheme Company of any such amendment or waiver to this Deed.

18.4    The Scheme Company shall promptly notify all other Parties of any such amendment or waiver to this Deed following receipt of the notification from the Information Agent in accordance with Clause 18.3 above.

## 19.    FURTHER ASSURANCE

On and from the effective date of this Deed, each Party (other than the Scheme Company) undertakes to the Scheme Company and its directors, officers and other duly appointed representatives and the Scheme Company undertakes to each other Party and such other Party's directors, officers and other duly appointed representatives, to provide such further assistance (at the cost of the Scheme Company) as may be reasonably required or requested by the Scheme Company, or as may be considered by the Scheme Company (in its sole discretion, acting reasonably) to be necessary or desirable, in each case, to implement the Scheme and the Restructuring, including the completion of any Implementation Step, provided that no Party shall be required to incur any out of pocket costs or expenses unless advance cost coverage has been provided to the satisfaction of the relevant Party. Notwithstanding any other provision of this Deed to the contrary, no Party is obliged to do or omit to do anything if it would constitute a breach of any law or regulation applicable to it or would subject such Party to liability (in its judgment).

## 20.    INSTRUCTED PARTIES

20.1    Each of the Instructed Parties is a party to this Deed solely in its capacity as Agent, and/or Trustee, as appropriate, and its role under this Deed is solely mechanical and administrative in nature.

20.2    None of the Instructed Parties will be liable to any person for any action taken by it or on its behalf (or any inaction) under or in connection with this Deed, save to the extent that such action directly amounts to fraud, gross negligence or wilful misconduct on its part.

20.3    Each Scheme Creditor acknowledges, confirms and irrevocably ratifies all actions taken, or to be taken, by each Instructed Party pursuant to the Scheme, this Deed and/or any of the Implementation Documents.

20.4    None of the Instructed Parties shall be personally liable for or on account of any statements, representations, warranties, covenants or obligations stated to be those of any Scheme Creditors or any other person affected or bound by this Deed.

20.5    Each of the Instructed Parties shall at all times be entitled to and may rely on any document, notice, consent, order, opinion or certificate given, issued or granted by any person or court that it reasonably believes to be genuine and correct pursuant to this Deed, any Implementation Document, or any other documents, notices or evidence referred to in this Deed or any

21

Implementation Document, without being under any obligation to enquire or otherwise determine whether any such notice, consent, order, opinion or certificate is adequate, accurate and/or complete and has been given or granted in accordance with any applicable laws or any contractually binding obligation and without being under any responsibility or being under any obligation to validate the legality, effectiveness, completeness, adequacy or enforceability of the Restructuring that is to be implemented as a consequences of this Deed.

20.6    Nothing in this Deed shall prejudice the rights, benefits, indemnities, immunities, entitlements and protections afforded to the Instructed Parties (as the case may be) under the Existing Notes Indenture, the New Notes Indenture, the New Notes Settlement Agreement and Cash Settlement Escrow Agreement or the Implementation Documents (as applicable).

## 21.    MISCELLANEOUS

21.1    If any sum is due or obligation is to be performed under the terms of this Deed on a day other than a Business Day, the relevant payment shall be made, or obligation performed, on the next Business Day.

21.2    This Deed is intended to bind and inure to the benefit of the Parties and their respective successors, assigns and transferees.

21.3    This Deed may be executed in any number of manual, electronic or digital counterparts and by the Parties hereto on separate counterparts. This has the same effect as if the signatures on the counterparts were on a single copy of this Deed.

21.4    Delivery of an executed counterpart of a signature page to this Deed by email shall be effective as due and sufficient delivery of a manually executed copy thereof. For all purposes of this Deed and any document to be signed or delivered in connection with or pursuant to this Deed, the words "execution," "signed," "signature," "delivery" and words of like import shall be deemed to include electronic signatures, deliveries or the keeping of records in electronic form, as the case may be, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery or the use of a paper-based recordkeeping system, as the case may be.

21.5    If at any time any provision of this Deed is or becomes illegal, invalid or unenforceable in any respect under any law or any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired. For the avoidance of doubt, in the event any provision of this Deed that is an Implementation Step is or becomes illegal, invalid or unenforceable in any respect under any law or any jurisdiction, the Parties agree that the other Implementation Steps remain inter-conditional on all such other Implementation Steps being completed in full or waived. Notwithstanding anything in this Deed to the contrary Restructuring Condition #12 shall not be severable from this Deed under any circumstance.

21.6    This Deed does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

## 22.    ASSIGNMENT AND TRANSFER

This Deed shall be binding on all persons to whom:

(a)    any Scheme Creditor transfers or assigns a Scheme Claim after the Record Time and who is recognised by the Scheme Company in accordance with clause 9.6 (*Assignments or Transfers*) of the Scheme Document; and

22

(b)     any other Party transfers or assigns their rights pursuant to this Deed on or after the date of this Deed.

## 23.    AGREEMENT

If this Deed is or becomes ineffective as a deed, it shall be binding on each of the Parties as if it were duly signed as an agreement and each Party hereby acknowledges the sufficiency of the consideration constituted by the mutual covenants and undertakings set out herein.

## 24.    NOTICES

24.1   Any communication made or received or any notice or confirmation to be provided under or in connection with this Deed may be made or received by a Party's Advisor on behalf of that Party, and, if so made or received, shall be deemed to be made or received by such Party.

24.2   Any notice or other written communication to be given under or in relation to this Deed shall be given in the English language by email to the addresses specified below.

24.3   The addresses for notices are as follows:

(a)     in the case of the Scheme Company:

Address:        c/o Cleary Gottlieb Steen & Hamilton LLP
2 London Wall
London, EC2Y 5AU

Attention:      Polina Lyadnova / David Botter
Email:          team-mega_restructuring-cgshonly@cgsh.com

(b)     in the case of the Issuer or the Holding Period Escrow Agent:

Address:        c/o Cleary Gottlieb Steen & Hamilton LLP
2 London Wall
London, EC2Y 5AU

Attention:      Polina Lyadnova / David Botter
Email:          team-mega_restructuring-cgshonly@cgsh.com

(c)     in the case of a Scheme Creditor: to the Information Agent (at the details set out below);

(d)     in the case of the Information Agent or the Cash Settlement Agent:

Email:          grupomega@is.kroll.com
Attention:      Alessandro Zorza

(e)     in the case of the Ad Hoc Group Advisors, to Latham & Watkins LLP:

Email:          PROJECTMAESTRO.LWTEAM@lw.com
Attention:      Pedro Rufino, Roderick Branch and Bruce Bell

(f)     in the case of a notice to be given to the Existing Notes Trustee:

Email:          bihrke@wilmingtontrust.com
Attention:      Barry Ihrke, Wilmington Trust National Association

With a copy to Reed Smith at:

|  |  |
|---|---|
| Email: | kgwynne@reedsmith.com |
| | jangelo@reedsmith.com |
| | mross@reedsmith.com |
| Attention: | Kurt Gwynne, Jason Angelo and Michele Ross |

With copies to:

|  |  |
|---|---|
| Address: | c/o Reed Smith LLP |
| | 1201 N Market St #1500 |
| | Wilmington, DE 19801 |

|  |  |
|---|---|
| Attention: | Kurt Gwynne / Jason D. Angelo |
| Email: | kgwynne@reedsmith.com |
| | jangelo@reedsmith.com |

(g) in the case of a notice to be given to the New Notes Settlement Agent:

|  |  |
|---|---|
| Email: | Ray.Haniff@umb.com |
| Attention: | Corporate Trust & Escrow Services |

24.4 Any notice or other written communication to be given under this Deed shall be deemed to have been served:

(a) in the case of any Party other than a Scheme Creditor, at the time of transmission of the relevant email; and

(b) in the case of Scheme Creditors only, when such notice or other written communication is published on the Scheme Website or, if sent by the Existing Notes Trustee, when transmitted to DTC.

24.5 The accidental omission to send any notice, written communication or other document in accordance with this Clause 24, or the non-receipt of any such notice by any Scheme Creditor, shall not affect the provisions of this Deed.

24.6 The Scheme Company and the Existing Notes Trustee will not be responsible for any non-receipt by a Scheme Creditor of any notices or other written communications, and the non-receipt of any such notice or other written communications by any Scheme Creditor will not impact the effectiveness of the notice or other written communication or otherwise affect the provisions of this Deed, provided in each case that such notice or other written communication was issued, transmitted or delivered (as applicable) in accordance with the terms of this Deed and the Implementation Documents (as applicable) and, to the extent relevant with respect to the Scheme Company, in accordance with market practice for the issuance, transmission or delivery of notices or other written communications in connection with a noteholder scheme of arrangement.

## 25. GOVERNING LAW AND JURISDICTION

25.1 This Deed and any non-contractual obligations arising out of or in connection with this Deed shall be governed by and construed in accordance with the laws of England and Wales.

25.2 The Parties irrevocably agree that the courts of England shall have exclusive jurisdiction to hear and determine any suit, action or proceeding and/or to settle any dispute which may arise out of or in connection with or in any way relate to this Deed, the Scheme and/or the Restructuring

and, for such purposes, irrevocably submit to the jurisdiction of the courts of England and Wales.

25.3 Each of the Parties irrevocably waives any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any suit, action or proceeding and/or any dispute which may arise out of or in connection with or in any way relate to this Deed, the Scheme and/or the Restructuring and agrees not to claim that any such court is not a convenient or appropriate forum and further irrevocably agrees that a judgment in respect of any such suit, action or proceedings and/or dispute brought in the courts of England shall be conclusive and binding upon it and may be enforced in the courts of any other jurisdiction. The parties expressly waive any other jurisdiction which they may be entitled to claim by reason of their present or future domicile or otherwise.

25.4 For the avoidance of doubt, any claims by the Existing Notes Trustee under the Existing Notes Indenture in relation to the indemnification and reimbursement of the Existing Notes Trustee shall remain subject to the terms of the Existing Notes Indenture (including the jurisdiction and venue provisions set out in the Existing Notes Indenture).

## 26. AGENT FOR SERVICE OF PROCESS

26.1 The Issuer, which is not an entity incorporated or established in England and Wales, shall at all times maintain an agent for service of process in England and for this purpose each Party that is a member of the Group irrevocably appoints the Scheme Company as its agent (being an "**agent**" in respect of its appointer).

26.2 Without prejudice to any other permitted mode of service, the Issuer agrees that service of any claim form, notice or other document for the purpose of any judicial, arbitral, administrative, regulatory or other action, claim or proceedings whatsoever commenced in England shall be duly served upon it if served on the respective agent appointed by it in any manner permitted by the Civil Procedure Rules, whether or not it is forwarded to the Party.

In Witness whereof, this document has been executed as a deed and is delivered and takes effect on the date first above written.

**Schedule 1**

**RESTRUCTURING CONDITIONS**

1.  Corporate authorisations approving the Restructuring for the Scheme Company and the Issuer, including:

1.1  Resolution by the Issuer's board of directors determining the price per New Share based on the Equity Valuation Report; and

1.2  The Issuer's shareholders' resolution approving the issuance of New Shares to allow the Equity Option to be exercised.

2.  The Scheme Effective Date has occurred.

3.  Evidence that all conditions precedent under the New Refinancing Facility have been satisfied or waived, other than any Implementation Steps having been undertaken.

4.  Evidence that all conditions precedent under sections 8 and 9 of the New Notes Purchase and Placement Agreement have been satisfied or waived, other than any Implementation Steps having been undertaken or any conditions precedent that can be only be met on or after the Funding Deadline.

5.  Completion of due diligence in respect and selection of the proposed collateral package subject to the New Notes Mexican Trust Agreement to the satisfaction of the Ad Hoc Group (acting reasonably) and agreement between the Company (acting by the Group's Advisors) and the Ad Hoc Group (acting by the Ad Hoc Group Advisors) (each acting reasonably) on any amendments to, and/or any additional provisions to be included in, the New Notes Indenture and the New Notes Mexican Trust Agreement by reference to such due diligence and selection of the collateral package.

6.  Evidence that any waivers and consents that are required under the Issuer's material contracts, including the Issuer's financing agreements with its Mexican lenders, as necessary, in respect of any existing defaults and the Restructuring, have been obtained (with effectiveness of waivers/consents only subject to the condition that the Scheme Effective Date occurs).

7.  Guidance or authorisation by Sanctions Authorities, as deemed required for the purposes of implementing the Restructuring, having been obtained, including a valid license from the OFAC and the restructuring being compliant with the requirements of General Licence – Bond amendments and restructurings for non-Designated Persons (INT/2023/2824812) issued by the Office of Financial Sanctions Implementation of His Majesty's Treasury.

8.  All Implementation Documents have become effective in accordance with their respective terms, other than those to take effect as part of the Implementation Steps.

9.  Evidence that the meetings to approve the waivers and amendments to the Issuer's Mexican law governed Ps. 3,000,000,000 Floating Rate Notes (*certificados bursátiles*) due 2027 have been held and the required votes duly passed (with effectiveness of waivers/amendments only subject to the condition that the Scheme Effective Date occurs).

10.  Override agreement setting out the terms specified in section 3 of Part 3 of the Explanatory Statement amongst the Issuer and each lender under the International Facilities having been signed and become effective (with effectiveness subject to the condition that the Scheme Effective Date occurs, certain implementation steps having occurred and all accrued and due interest thereon being paid in full) and elections by the lenders under the International Facilities having been made in respect of the options described in paragraph 3.14 of Section 3 of Part 3 of the Explanatory Statement.

26

11.    Holding Period Escrow Account (as defined in the Holding Period Escrow Agreement) has been opened by the Holding Period Escrow Agent.

12.    An order of the United States Bankruptcy Court for the Southern District of New York for recognition and enforcement of the Scheme (and the Scheme Sanction Order) under Chapter 15 of Title 11 of the United States Code.

13.    The Allocations Spreadsheet to be approved in writing by the Scheme Company and the Ad Hoc Group Advisors.

14.    The Settlement Funds Flow to be approved in writing by the Scheme Company and the Ad Hoc Group Advisors.

*[Signature pages to follow]*

**Schedule 3**

**Note Purchase and Placement Agreement**

**OPERADORA DE SERVICIOS MEGA, S.A. DE C.V., SOFOM, E.R.**

**Up to U.S.$[•]**

**8.000% Senior Secured Notes due [2030]**

**NOTE PURCHASE AND PLACEMENT AGREEMENT**

**[December] [•], [2024]**

**NOTE PURCHASE AND PLACEMENT AGREEMENT**

[•], [2024]

To: Each of the purchasers named in Schedule A

Ladies and Gentlemen:

Operadora de Servicios Mega, S.A. de C.V., SOFOM, E.R., a variable capital corporation, regulated multiple purpose financial company (*sociedad anónima de capital variable, sociedad financiera de objeto múltiple, entidad regulada*) (the "Company") incorporated under the laws of the United Mexican States ("Mexico") hereby agrees, subject to the terms and conditions stated herein, to issue to (i) the purchasers named in Section 1 of Schedule A (each a "Tranche 1 Notes Purchaser"); (ii) the purchasers named in Section 2 of Schedule A (each a "Tranche 2 Notes Purchaser"), and (ii) the purchasers named in Section 3 of Schedule A (each a "Tranche 3 Notes Purchaser", and , together with the Tranche 1 Notes Purchasers and the Tranche 2 Notes Purchasers, the "Note Purchasers"), the principal amount of 8.000% senior secured notes due [2030] in an aggregate principal amount set out opposite the name of such Note Purchaser in Schedule A hereto (the "Notes").

The Notes are to be issued under an indenture to be entered into (the "Indenture") between the Company and UMB Bank, National Association, as trustee, registrar, paying agent and transfer agent (the "Trustee"), a form of which is attached hereto as Schedule B. Capitalized terms used but not otherwise defined herein have the meanings set forth in the Indenture.

This placement is being made in the context of the scheme of arrangement pursuant to Part 26 of the U.K. Companies Act 2006 (the "Scheme") commenced on October 31, 2024 by Mega Newco Limited, a wholly-owned Subsidiary of the Company, in order to implement the Company's restructuring of its outstanding 8.250% Senior Notes due 2025 (the "Existing Notes") (the "Restructuring"), on terms set forth in the explanatory statement related to the Scheme dated on or about November [21], 2024 (the "Explanatory Statement"), the scheme document appended thereto (the "Scheme Document"), and the deed of implementation dated on or about the date of this Agreement, a copy of which is attached as Schedule C hereto (the "Implementation Deed", and together with the Explanatory Statement, the Scheme Document and any other document issued or entered into by the Company and its creditors in connection with the Scheme listed in Schedule D hereto, the "Restructuring Documents").

The placement of the Notes to the Note Purchasers will be made without registration under the U.S. Securities Act of 1933, as amended, and the rules and regulations thereunder (collectively, the "Act"), in reliance on exemptions from the registration requirements of the Act.

The Notes will be subject to the terms and conditions set forth in the Indenture. To secure the Company's obligations under the Notes, on or prior to the Settlement Date (as defined below), the Company will establish a trust to which the rights in respect of the Eligible Receivables (together with cash and other assets held from time to time in the Mexican Trust, the "Collateral") shall be contributed, pursuant to a trust agreement entered into by and among the Company, the Trustee, and CIBanco, S.A., Institución de Banca Múltiple, as the Mexican trust agent (the "Mexican Trustee"). The Mexican Trustee will hold the Collateral for the benefit of the Note Purchasers subject to the terms of a Mexican trust agreement to be entered into (the "Mexican Trust Agreement") between the Company and the Mexican Trustee, a form of which is attached hereto as Schedule B.

1

The Company hereby agrees with the Note Purchasers as follows:

1.      <u>Placement</u>.

(a)      Upon the basis of the representations and warranties and subject to the terms and conditions herein set forth, the Company agrees to issue and sell to the Tranche 1 Note Purchasers and the Tranche 2 Note Purchasers, and each of the Tranche 1 Note Purchaser and the Tranche 2 Note Purchasers, severally and not jointly, agrees to purchase from the Company the respective principal amount of the Notes set forth opposite such Note Purchaser's name in column 2 of the relevant section of Schedule A hereto (the "<u>Subscription Amount</u>") at a purchase price equal to the principal amount of such Notes payable in cash in U.S. dollars in accordance with the terms of this Agreement it being understood that, for purposes of this Section 1, such purchase by such Note Purchasers from the Company is being effected pursuant to Section 4(a)(2) of the Act.

(b)      Upon the basis of the representations and warranties and subject to the terms and conditions herein set forth, the Company agrees to issue to the Tranche 3 Note Purchasers, and each of the Tranche 3 Purchasers agrees to receive the respective principal amount of Notes set forth opposite such Tranche 3 Note Purchaser's name in Schedule A hereto, in exchange for the corresponding amount of liabilities owed by the Company to it under certain credit facilities between the Company and such Tranche 3 Note Purchaser (the "<u>Exchanged Debt</u>") pursuant to the elections made by the relevant Tranche 3 Note Purchaser under a certain override agreement dated on or about [December [•], 2024] (the "<u>Override Agreement</u>").  In consideration for the Company's issuance of the Notes pursuant hereto, each Tranche 3 Note Purchaser shall irrevocably, unconditionally and absolutely (and not only by way of security) assign and transfer all of its right, title and interest in the Exchanged Debt to the Company.

2.      <u>Additional Notes</u>.

In consideration for:

(a)      each Tranche 1 Note Purchaser purchasing the Notes pursuant hereto, the Company further agrees to issue additional Notes to each Tranche 1 Note Purchaser in an aggregate principal amount equal to the Notes purchased by each Tranche 1 Note Purchaser for cash *multiplied* by 0.42857143; and

(b)      a Tranche 2 Note Purchaser purchasing the Notes pursuant hereto, the Company further agrees to issue to such Tranche 2 Note Purchaser additional Notes in an aggregate principal amount equal to the Subscription Amount *multiplied* by 3.5. In consideration for the Company's issuance of the Notes pursuant to this Section 2, each Tranche 2 Note Purchaser shall irrevocably, unconditionally and absolutely (and not only by way of security) assign and transfer to the Company, all of its right, title and interest in the amount of the Existing Notes such Tranche 2 Note Purchaser holds equal to the Subscription Amount.

3.      <u>Global Notes</u>.

(a)      The Notes placed to the Note Purchasers in reliance on Regulation S (the "<u>Regulation S Notes</u>") will be delivered in the form of interest in one or more permanent global notes in registered form (the "<u>Regulation S Global Notes</u>"), which will be deposited with the Trustee as custodian for The Depository Trust Company ("<u>DTC</u>") for the respective accounts of the DTC participants for Euroclear Bank S.A./N.V. ("<u>Euroclear</u>") and Clearstream Banking, *société anonyme* ("<u>Clearstream</u>" and, together with DTC and Euroclear, the "<u>Clearing Systems</u>"), and registered in the name of Cede & Co., as nominee for DTC, pursuant to a letter of representations, to be dated on or before the Settlement Date (the "<u>DTC Agreement</u>").

(b)      The Notes placed to the Note Purchasers in reliance on Rule 144A under the Act (the "<u>144A</u>

Notes") shall be delivered in the form of interest in one or more permanent global securities in definitive form (the "Restricted Global Notes" and together with the Regulation S Global Notes, the "Global Notes") deposited with the Trustee as custodian for DTC and registered in the name of Cede & Co., as nominee for DTC, pursuant to the DTC Agreement.

(c)    The Regulation S Global Notes and the Restricted Global Notes shall be assigned separate CUSIP numbers.  The Restricted Global Notes shall include the applicable legend regarding restrictions on transfer set forth in the Indenture for the time period and upon the other terms set forth in the Indenture.

(d)    Until the termination of the distribution compliance period (as defined in Regulation S) with respect to the placement of the Notes, interests in the Regulation S Global Notes may be held only by the DTC participants for Euroclear and Clearstream.

(e)    Interests in the Global Notes will be held only in book-entry form through DTC, except in the limited circumstances described in the Indenture.

    4.    Payment and Delivery.

(a)    Payment of the purchase price for the Notes purchased by the Tranche 1 Note Purchasers and the Tranche 2 Note Purchasers pursuant to Section 1(a) hereof shall be made upon delivery of a funding notice by the deadline determined in accordance with the Implementation Deed (the "Settlement Date") to Kroll Issuer Services Limited, as cash settlement escrow agent, by wire transfer of immediately available funds to a bank account designated thereby.

(b)    All payments to be made to the Company hereunder shall be made (i) without condition or deduction for any counterclaim, defense, recoupment or setoff, except that the commitment fees payable under certain commitment letters entered into between the Company and certain of the Note Purchasers may be deducted from the purchase price payable by such Note Purchaser; and (ii) without withholding or deduction for or on account of any present or future taxes, duties or governmental charges whatsoever, unless such tax deduction is required by law, in which case the amount of the applicable payment due shall be increased to an amount which (after making any tax deduction) leaves an amount equal to the payment which would have been due if no tax deduction had been required.

(c)    Subject to the relevant Note Purchaser's compliance with paragraph (a) above and otherwise upon the basis of the relevant Note Purchaser's representations and warranties herein and subject to the terms and conditions herein set forth, the Company shall deliver (or cause to be delivered) interests in the respective Notes through the Clearing Systems in the respective amount to such Note Purchaser on the Settlement Date. Each relevant Note Purchaser shall deliver such documents and instructions as necessary for the Company to effect the delivery of the Notes.

(d)    A Tranche 2 Note Purchaser shall be entitled to designate a third party to receive the New Notes allocated to it pursuant to this Note Purchase and Placement Agreement in accordance with the Scheme Document (a "Designated Recipient").  A Designated Recipient shall accede to this Agreement and shall provide all the Note Purchaser's representations and warranties and shall otherwise be subject to the same terms and conditions that apply to a Note Purchaser.

    5.    Representations and Warranties of the Company.  The Company represents and warrants to and agrees with each of the Note Purchasers that, as of the date hereof and as of the Settlement Date:

(a)    the Company (including its agents and representatives) has not prepared, made, used, authorized, approved or referred to and will not prepare, make, use, authorize, approve or refer to any written

3

communication that constitutes an offer to sell or solicitation of an offer to buy the Notes other than the Restructuring Documents;

(b)        the Company has been duly incorporated and is validly existing as a variable capital corporation, regulated multiple purpose financial company (*sociedad anónima de capital variable, sociedad financiera de objeto múltiple, entidad regulada*) under the laws of Mexico, with requisite power and authority (corporate and other) to own, lease and operate its properties and conduct its business as currently being conducted, to execute and deliver this Agreement and to issue, sell and deliver the Notes as contemplated herein;

(c)        the Company is duly qualified to do business in each jurisdiction where such a requirement may be applicable, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.  For the purposes of this Agreement, the term "Material Adverse Effect" shall mean any material adverse effect (i) on the condition (financial or other), business, properties, results of operations or prospects of the Company and its Subsidiaries (as defined below) taken as a whole; or (ii) that would prevent or materially interfere with any of this Agreement, the Indenture, the Notes or the Mexican Trust Agreement;

(d)        (i) the Company has no subsidiaries (as defined under the Act) other than those entities listed on Schedule E hereto (collectively, the "Subsidiaries"); (ii) the Company owns, directly or indirectly, the issued shares of capital stock or membership interests in the equity of each of the Subsidiaries in the amounts set forth on Schedule E; (iii) each Subsidiary has been duly incorporated or organized and is validly existing as a corporation or a limited liability company, as applicable, under the laws of the jurisdiction of its incorporation or organization, with full corporate or limited liability company power and authority to own, lease and operate its properties and to conduct its business as currently being conducted; and (iv) each Subsidiary is duly qualified to do business in the jurisdiction of its incorporation or organization, except where the failure to be so qualified and in good standing (if not a Mexican entity and if applicable) would not, individually or in the aggregate, have a Material Adverse Effect;

(e)        the Notes will constitute senior secured general obligations of the Company and will rank effectively senior in right of payment to all of the Company's existing and future unsecured indebtedness up to the value of the Collateral, except for those obligations which are granted preferential treatment over the Notes under Mexican law;

(f)        neither the Company nor any of its "Affiliates" (as defined in Rule 501(b) of Regulation D under the Act ("Regulation D")), nor any person acting on its or their behalf, has, directly or indirectly, made offers or sales of any security, or solicited offers to buy any security, under circumstances that would require the registration of the Notes under the Act or applicable securities laws of any other jurisdiction;

(g)        neither the Company nor any of its Affiliates, nor any person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Rule 502(c) under Regulation D) in connection with any offer or sale of the Notes;

(h)        the Notes satisfy the eligibility requirements of Rule 144A(d)(3) under the Act;

(i)        neither the Company nor any of its Affiliates, nor any person acting on its or their behalf, has engaged in any "directed selling efforts" (as defined in Regulation S) with respect to the Notes;

(j)        the Company reasonably believes that there is no "substantial U.S. market interest" (as defined in Regulation S) in the Notes or in any class of the Company's debt securities; the Company is a "foreign issuer" as defined in Rule 902 under the Act;

(k)        the Mexican Trust Agreement has been duly authorized by the Company, and when executed and delivered on or before the Settlement Date, assuming due authorization, execution and delivery thereof by the other parties thereto, will each constitute a legal, valid, binding and enforceable obligation of the Company in accordance with its terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, liquidation, fraudulent transfer, reorganization, moratorium, *concurso mercantil, quiebra* or other similar laws relating to or affecting the rights and remedies of creditors or by general principles of equity;

(l)        the Indenture has been duly authorized by the Company, and when executed and delivered on or before the Settlement Date, assuming due authorization, execution and delivery thereof by the other parties thereto, will each constitute a legal, valid, binding and enforceable obligation of the Company in accordance with its terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, liquidation, fraudulent transfer, reorganization, moratorium, *concurso mercantil*, *quiebra* or other similar laws relating to or affecting the rights and remedies of creditors or by general principles of equity;

(m)        on the Settlement Date, the Notes will be in the form contemplated by the Indenture, have been duly authorized by the Company for issuance and sale pursuant to this Agreement and the Indenture and, when executed by the Company and authenticated by the Trustee in the manner provided in the Indenture and delivered against payment of the purchase price therefor as provided herein, will constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, liquidation, fraudulent transfer, reorganization, moratorium, *concurso mercantil*, *quiebra* or other similar laws relating to or affecting enforcement of the rights and remedies of creditors or by general principles of equity, and will be entitled to the benefits of the Indenture;

(n)        this Agreement has been duly authorized, executed and delivered by the Company;

(o)        (A) No stamp, registration, documentary, issuance, transfer or other similar taxes or duties ("**Stamp Taxes**") are payable in any jurisdiction including Mexico and the United States and no capital gains, income, withholding or other taxes are payable by or on behalf of the Note Purchasers to Mexico or any political subdivision or taxing authority thereof or therein in connection with  (i) the creation, issuance, sale or delivery by the Company of the Notes, (ii) the purchase by the Note Purchasers of the Notes in the manner contemplated by this Agreement, (iii) the execution and delivery or filing, as applicable, of this Agreement, the Notes, the Mexican Trust Agreement or the Indenture, or (iv) the consummation of the transactions contemplated by this Agreement, the Notes, the Indenture or the Mexican trust Agreement and, (B) the Note Purchasers will not be deemed to be resident or subject to taxation in Mexico solely by virtue of, the execution, delivery or performance of this Agreement.

(p)        The Company and its Subsidiaries (i) have paid all non-U.S., U.S. federal, state, local and other taxes (whether imposed directly or indirectly or through withholding) including any interest, additions to tax, or penalties applicable thereto except taxes being contested in good faith by appropriate proceedings (provided that adequate reserves have been established therefor in accordance with applicable generally accepted accounting principle) and (ii) have filed all tax returns required to be filed, each through the date hereof, except in the case of each (i) and (ii), where the failure to pay or file, as applicable, would not, individually or in the aggregate, have a Material Adverse Effect. There is no tax deficiency that has been, or could reasonably be expected to be, asserted against the Company or any of its Subsidiaries or any of their respective properties or assets except as would not, individually or in the aggregate, have a Material Adverse Effect.

(q)        neither the Company nor any of its Subsidiaries is in breach or violation of or in default under (nor has any event occurred which, with notice, lapse of time or both, would result in any breach or

violation of, constitute a default under, or give the holder of any indebtedness (or a person acting on such holder's behalf) the right to require the repurchase, redemption or repayment of all or a part of such indebtedness under) (i) its *estatutos sociales* (or charter or bylaws, as applicable), or (ii) any indenture, mortgage, deed of trust, bank loan or credit agreement or other evidence of indebtedness, or any license, lease, contract or other agreement or instrument to which it is a party or by which it or any of its properties may be bound or affected, or (iii) any U.S. or Mexican federal, state, local or foreign law, regulation, rule, decree, judgment or order applicable to it or any of its properties, except, in the cases of (ii) and (iii) only, if such violation, breach or default would not, individually or in the aggregate, have a Material Adverse Effect;

(r)    the execution and delivery and performance of obligations under any of the Indenture, this Agreement, the Notes, the Mexican Trust Agreement, the issuance and sale of the Notes and the consummation of the transactions contemplated therein and herein will not conflict with, result in any breach or violation of, or constitute a default under (or constitute any event which, with notice, lapse of time or both, would result in any breach or violation of, constitute a default under or give the holder of any indebtedness (or a person acting on such holder's behalf), the right to require the repurchase, redemption or repayment of all or a part of such indebtedness under) (i) its *estatutos sociales* (or charter or bylaws, as applicable) of the Company or any of its Subsidiaries, or (ii) any indenture, mortgage, deed of trust, bank loan or credit agreement or other evidence of indebtedness, or any license, lease, contract or other agreement or instrument to which the Company or any of its Subsidiaries is a party or by which any of them or any of their respective properties may be bound or affected, or (iii) any U.S. or Mexican federal, state, municipal, local or foreign law, regulation, rule, decree, judgment or order applicable to the Company or any of its Subsidiaries or any of their respective properties, except, in the case of (ii) above only if such conflict, violation, breach or default would not, individually or in the aggregate, have a Material Adverse Effect;

(s)    no approval, authorization, registration, consent or order of or filing with any federal, state, local or foreign governmental or regulatory commission, board, body, authority or agency is required in connection with the issuance and sale of the Notes or the consummation by the Company of the transactions contemplated in this Agreement or the Indenture, the Mexican Trust Agreement, except (i) such as have been obtained and made and will, as of the Settlement Date, be in full force and effect; (ii) as may be required under applicable state securities or "blue sky" laws or regulations, *provided* that the placement of the Notes is conducted as described herein; and (iii) the notice that the Company is required to provide to the Mexican National Banking and Securities Commission (*Comisión Nacional Bancaria y de Valores,* the "CNBV"), in connection with the issuance of the Notes and their terms, and (iv) the filing before the Mexican Tax Administration Service (*Servicio de Administración Tributaria*) of certain information related to the issuance of the Notes, which in the cases of (iii) and (iv) above does not affect the validity or enforceability of the Notes or this Agreement;

(t)    the Company is not, and immediately after giving effect to the transactions contemplated by this Agreement will not be, an "investment company" as such term is defined in the Investment Company Act of 1940, as amended (the "Investment Company Act");

(u)    The consolidated audited financial statements of the Company as of and for the year ended December 31, 2023, and the related notes thereto have been prepared in conformity with the General Provisions Applicable to Ancillary Credit Institutions, Exchange Houses, Credit Unions, Limited Purpose Financial Institutions and Regulated Multiple Purpose Financial Institutions (*Disposiciones de Carácter General Aplicables a los Almacenes Generales de Depósito, Casas de Cambio, Uniones de Crédito y Sociedades Financieras de Objeto Múltiple Reguladas*, or "Sofom GAAP") applied on a consistent basis during the periods involved (except as otherwise noted therein) and present fairly the financial position of the Company and its Subsidiaries as of the dates indicated and the results of their operations and the changes in their cash flows for the periods specified;

6

(v)      the Company and each of its Subsidiaries maintains a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorization, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with Sofom GAAP and to maintain accountability for assets, (iii) access to assets is permitted only in accordance with management's general or specific authorization, (iv) the recorded accountability for assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences, and (v) the internal control over financial reporting is adequate in all material respects;

(w)      neither the Company's auditors nor the audit committee of the Company have been advised of: (i) any significant deficiencies or material weaknesses in the design or operation of internal controls which could adversely affect the Company's or any Subsidiary's ability to record, process, summarize and report financial data; or (ii) any fraud that involves management or other employees who have a role in the Company's or any Subsidiary's internal controls; and since the date of the most recent evaluation of such disclosure controls and procedures, there have been no significant changes in internal controls or in other factors that could significantly affect internal controls, including any corrective actions with regard to significant deficiencies and material weaknesses;

(x)      assuming the accuracy of the Note Purchasers' representations and warranties contained in Section 6 of this Agreement, it is not necessary, in connection with the offer, issuance and sale of the Notes to or by the Note Purchasers in the manner contemplated by this Agreement, to register any of the Notes under the Act or to qualify the Indenture in respect of the Notes under the United States Trust Indenture Act of 1939, as amended;

(y)      neither the Company nor any of its Subsidiaries, directors or officers, nor, to the Company's knowledge, any agent, employee or Affiliate of the Company or any Subsidiary has (i) taken or will take any action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any "government official" (including any officer or employee of a government or government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office), to influence official action or secure an improper advantage or (ii) made any payment or taken any action, directly or indirectly, that violates, would have violated or would be in violation of any provision of any Mexican or other applicable law or regulation regarding illegal payments or corrupt practices, including the General Law for the National Anticorruption System (*Ley General del Sistema Nacional Anticorrupción*), the Mexican General Law of Administrative Responsibilities (*Ley General de Responsabilidades Administrativas*), the Federal Law of Responsibilities of Government Officials (*Ley Federal de Responsabilidades de los Servidores Públicos*) and the Mexican Federal Criminal Code (*Código Penal Federal*), the Bribery Act 2020 of the United Kingdom, the U.S. Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "FCPA") (in the case of the FCPA, if any of such persons had been or were subject to the FCPA, even if they are not currently so subject), and any applicable law or regulation implementing the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions or any other applicable anti-bribery or anti-corruption law (collectively, the "Applicable Unlawful Payment Laws"); and each of the Company, its Subsidiaries and, to the knowledge of the Company, their respective Affiliates have conducted their businesses in compliance with applicable anti-corruption laws, have instituted and maintain and will continue to maintain policies and procedures designed to promote and achieve compliance with such laws and with the representation and warranty contained herein and no part of the proceeds of the placement of the Notes will be used, directly or indirectly, in violation of the Applicable Unlawful Payment Laws;

(z)      under current laws and regulations of Mexico, all interest, principal, premium, if any, and

other payments due or made on the Notes may be paid by the Company to the holder thereof in U.S. dollars that may be freely transferred out of Mexico without the necessity of obtaining any governmental authorization in Mexico or any political subdivision or taxing authority thereof or therein;

(aa)      the operations of the Company and its Subsidiaries are, and have been, conducted at all times in material compliance with all applicable anti-money laundering laws of Mexico (including the Mexican Federal Law for Prevention and Identification of Transactions with Illegal Resources (*Ley Federal para la Prevención e Identificación de Operaciones con Recursos de Procedencia Ilícita*), the Mexican Federal Criminal Code, the United States (including applicable financial recordkeeping and reporting requirements, including, without limitation, those of Title 18 U.S. Code section 1956 and 1957, the Bank Secrecy Act, as amended by Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA Patriot Act") and the Currency and Foreign Transactions Reporting Act of 1970, as amended), and the anti-money laundering statutes of all other applicable jurisdictions where the Company and its Subsidiaries conduct business, applicable rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "Anti-Money Laundering Laws"), and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its Subsidiaries with respect to the Anti-Money Laundering Laws is pending or, to the best knowledge of the Company, threatened;

(bb)      (i) neither the Company nor any of its Subsidiaries, directors or officers, nor, to the Company's knowledge, any agent, employee or Affiliate of the Company or of its Subsidiaries, is an individual or entity ("Person") that is, or is controlled or 50% or more owned in the aggregate by, or is acting on behalf of, a Person that is:

(i)      the subject of any economic or financial sanctions, laws, regulations or trade embargoes or similar measures ("Sanctions") implemented, administered or enforced by (a) the U.S. Department of the Treasury's Office of Foreign Assets Control and the U.S. Departments of State or Commerce; (b) the United Nations Security Council; (c) the European Union or any member state thereof or any governmental authority of the same; or (d) the United Kingdom (or any governmental authority of the same, including, without limitation, in respect of the United Kingdom, His Majesty's Treasury and the Department for Business and Trade) (each, a "Sanctions Authority");

(ii)      located, organized or resident in a country or territory that is subject to or target of comprehensive Sanctions (currently, Crimea, Cuba, Iran, North Korea, Syria and those portions of the Donetsk People's Republic or Luhansk People's Republic regions (and such other regions) of Ukraine over which any Sanctions Authority imposes country or territory wide comprehensive Sanctions) (each, a "Sanctioned Country");

(iii)      a person with which dealings are otherwise restricted or prohibited pursuant to any Sanctions, including by reason of any relationship of ownership, control or agency with any person described in 3(z)(i)(1) or 3(z)(i)(2);

(ii) the Company will not, directly or indirectly, use the proceeds of the sale of the Notes, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint-venture partner or other Person:

(i)      to fund or facilitate any activities or business of or with any Person or in any country or territory that, at the time of such funding or facilitation, is the subject of any Sanctions broadly prohibiting or restricting dealings with such Person, country or territory; or

8

(ii)     in any other manner that will result in a violation of Sanctions by any Person (including any Person participating in the placement of the Notes, whether as a Note Purchaser, advisor or otherwise);

(iii)    except as otherwise described in the Restructuring Documents, the Company has not knowingly engaged in, is not now knowingly engaged in, and will not engage in, any dealings or transactions with any Person, or in any country or territory, that at the time of the dealing or transaction is or was the subject of Sanctions;

(cc)     the choice of laws of the State of New York as the governing law of this Agreement, the Notes and the Indenture is a valid choice of law under the laws of Mexico and should be honored by the courts of Mexico;

(dd)     this Agreement is and when executed and delivered, each of the Notes, the Indenture and the Mexican Trust Agreement will be, in proper legal form under the laws of Mexico for the enforcement thereof in Mexico against the Company, and to ensure the legality, enforceability or admissibility into evidence of this Agreement, the Notes, the Mexican Trust Agreement and the Indenture in Mexico, it is not necessary for any of this Agreement, the Notes, the Mexican Trust Agreement or the Indenture, as applicable, to be filed or recorded with any court or other authority in Mexico or that any stamp or similar tax or fee be paid in Mexico on or in respect of any of this Agreement, the Notes, the Mexican Trust Agreement or the Indenture other than court costs (including, without limitation, filing fees), except that in the event that any legal proceedings are brought to the courts of Mexico, a Spanish translation of the documents required in such proceedings, including this Agreement, prepared by a court-approved translator, would have to be approved by the court after the defendant had been given an opportunity to be heard with respect to the accuracy of the translation, and proceedings would thereafter be based upon the translated document;

(ee)     a final and conclusive judgment (not subject to appeal) of any court of the State of New York and any court of the United States of America, in each case located in the Borough of Manhattan, the City of New York for the payment of money rendered against the Company in respect of any of this Agreement, the Indenture, the Mexican Trust Agreement or the Notes would be recognized and enforced by the courts of Mexico; *provided*, *inter alios*, that (i) such judgment is final and obtained in compliance with the legal requirements of the jurisdiction of the court rendering such judgment and in compliance with all legal requirements in connection with the execution and delivery of and performance of obligations under any of this Agreement, the Notes, the Mexican Trust Agreement or the Indenture; (ii) such judgment is strictly for the payment of a certain sum of money and has been rendered in an *in personam* action (as opposed to an *in rem* action); (iii) service of process in the action has been served personally on the defendant or a duly appointed process agent (service by mail does not constitute personal service in Mexico); (iv) such judgment does not contravene Mexican law or public policy, international treaties or agreements binding upon Mexico or generally accepted principles of international law; (v) the applicable procedures under the laws of Mexico with respect to the enforcement of foreign judgments (including, but not limited to, the issuance of a letter rogatory by the competent authority of such jurisdiction requesting enforcement of such judgment as being final judgments, and the certification of such judgment as authentic by the corresponding authorities of such jurisdiction in accordance with the laws thereof) are complied with; (vi) the action in respect of which such judgment is rendered is not the subject matter of a lawsuit among the same parties pending before a Mexican court; (vii) the courts of such jurisdiction recognize the principles of reciprocity in connection with the enforcement of Mexican judgments in such jurisdiction; (viii) such judgment is final and non-appealable in the jurisdiction where obtained; and the Company is not aware of any reason why any of this Agreement, the Notes, the Mexican Trust Agreement or the Indenture and the enforcement in Mexico of a judgment in respect of any of the instruments or agreements executed for consummation of the transactions contemplated herein or therein would be contrary to public policy in Mexico or any political subdivision of Mexico; (ix) the judge or court rendering such judgment was competent to hear and issue a

9

judgment on the subject matter of the case in accordance with accepted principles of international law that are compatible with Mexican law; (x) if such judgment were enforced in Mexico, a Mexican court would apply Mexican procedural laws in such proceeding, as well as Mexican laws on statute of limitations and expiration (*prescripción y caducidad*) and (xi) there is no agreement entered into whereby the parties have agreed to submit to the jurisdiction of a court in Mexico for purposes of circumventing a foreign procedure;

(ff)     neither the Company nor any Subsidiary has immunity from jurisdiction of any court of (i) the United States or the State of New York or (ii) Mexico or any political subdivision thereof, or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise), with respect to itself or its property and assets or any of this Agreement, the Notes, the Mexican Trust Agreement or the Indenture or actions to enforce judgments in respect thereof;

(gg)     neither the Company nor any Subsidiary nor, to the knowledge of the Company, any of its or their respective directors, officers, Affiliates or controlling persons has taken, directly or indirectly, any action designed, or which has constituted or might reasonably be expected to cause or result in the stabilization or manipulation of the price of any security of the Company or to facilitate the sale or resale of the Notes;

(hh)     the Company (i) pursuant to Section 13 of this Agreement, has legally, validly, effectively, explicitly and irrevocably submitted and, pursuant to Section [11.05(b)] of the Indenture, will legally, validly, effectively and irrevocably submit, to the exclusive jurisdiction of any court of the State of New York and any court of the United States of America, in each case located in the Borough of Manhattan, the City of New York, or the domicile of each of the parties hereto, in respect of actions brought against any such party as a defendant, in respect of any suit or proceeding based on or arising under any of this Agreement, the Notes or the Indenture, as the case may be; (ii) has validly and irrevocably waived, or will validly and irrevocably waive, as the case may be, any objection to the laying of the venue of any such suit, action or proceeding brought in any such court; and (iii) pursuant to Section 13 of this Agreement, has legally, validly, effectively, explicitly and irrevocably designated, appointed and empowered, and pursuant to Section [11.05(c)] of the Indenture, will legally, validly, effectively, explicitly and irrevocably designate, appoint and empower, The Law Debenture Trust Corporation for service of process in any suit or proceeding based on or arising under this Agreement, the Notes or the Indenture, as the case may be, in any court of the State of New York and any court of the United States of America, in each case located in the Borough of Manhattan, the City of New York. The Company has legally, validly, effectively and irrevocably designated, appointed and empowered, including through a special, irrevocable power of attorney for lawsuits and collections (*pleitos y cobranzas*) in the presence of a Mexican notary public, and under an appointment and acceptance letter, The Law Debenture Trust Corporation as its agent for service of process in any suit or proceeding arising out of or related to this Agreement or the Indenture; and

(ii)     immediately after the Settlement Date, the Company and its Subsidiaries on a consolidated basis will be, Solvent. As used herein, the term "Solvent" means, with respect to any person on a particular date, that on such date (i) the fair market value of the assets of such person is greater than the total amount of liabilities (including contingent liabilities) of such person, (ii) the present fair salable value of the assets of such person is greater than the amount that will be required to pay the probable liabilities of such person on its debts as they become absolute and matured, (iii) such person is able to realize upon its assets and pay its debts and other liabilities, including contingent obligations, as they mature and (iv) such person does not have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

6.    Representations and Warranties of the Note Purchasers.  Each Note Purchaser, severally and

not jointly, represents and warrants to, and agrees with, the Company that:

(a)    it understands that the Notes have not been and will not be registered under the Act or with any securities regulatory authority of any state or other jurisdiction of the United States, that any offer and sale of the Notes to such Note Purchaser is being made in a transaction not involving any public offering and in reliance upon an exemption from the registration requirements of the Act;

(b)    its purchase and receipt of the Notes is lawful under the laws of the jurisdiction of its incorporation and the jurisdiction in which it operates (if different), and that such acquisition will not contravene any law, regulation or regulatory policy applicable to it;

(c)    (i) it is an institutional "accredited investor" within the meaning of Rule 501(a) of Regulation D or (ii) a QIB within the meaning of Rule144A(a)(1) or (iii) a non-US Person in an offshore transaction in reliance on Rule 903 of Regulation S, in each case, under the Act;

(d)    it has made its own independent investigation and appraisal of the business, results, financial condition, prospects, creditworthiness, status and affairs of the Company and its consolidated subsidiaries and, following such investigation and appraisal and the other due diligence that such Note Purchaser deemed necessary and subsequently conducted in connection with the purchase of the Notes, such Note Purchaser has made its own investment decision to acquire the Notes;

(e)    it is aware and understands that an investment in the Notes involves a considerable degree of risk and no U.S. federal or state or non-U.S. agency has made any finding or determination as to the fairness for investment or any recommendation or endorsement of any such investment, and that it has consulted with such financial, legal, tax, accounting and other advisors as it deemed necessary and adequate for that purpose;

(f)    neither it nor any of its Designated Recipients, directors or officers, nor, to its knowledge, any agent, employee or Affiliate, is an individual or entity ("Person") that is, or is controlled or 50% or more owned in the aggregate by, or is acting on behalf of, a Person that is:

(i)    the subject of any Sanctions implemented, administered or enforced by a Sanctions Authority;

(ii)    located, organized or resident in a Sanctioned Country;

(iii)    a person with which dealings are otherwise restricted or prohibited pursuant to any Sanctions, including by reason of any relationship of ownership, control or agency with any person described in 6(f)(i) or 6(f)(ii);

(g)    it acknowledges that the Company and its Affiliates and others will rely upon the truth and accuracy of the acknowledgements, representations, warranties and agreements contained in this Section 6 and agree that if any of the acknowledgements, representations, warranties and agreements made herein and in connection with acquiring the Notes is no longer accurate, such Note Purchaser shall promptly notify the Company;

(h)    it and any person acting on its behalf have all necessary consents and authorities to enable them to enter into the transactions contemplated hereby and to perform its obligations in relation thereto;

(i)    the entrance into the transactions contemplated by this Agreement and the performance of its obligations in relation thereto will not constitute or result in a breach or default under or conflict with (i) any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency,

11

or (ii) any agreement or other undertaking, to which they are a party or by which they are bound, and (iii) will not violate any provisions of the Note Purchaser's charter documents, including, without limitation, its incorporation or formation papers, bylaws, indenture of trust or partnership or operating agreement, as may be applicable, except in the case of (i) and (ii) only, for such breaches, defaults of conflicts as would not materially adversely impact such Note Purchaser's ability to perform its obligations under this Agreement;

(j)     it is financially sophisticated and has such knowledge and experience in financial and business matters that it is capable of evaluating the merits, risks and suitability of investing in the Notes; and

(k)     it understands that the Company is not, and none if its Affiliates, directors, officers, employees, advisors, agents or representatives is making any representation or warranties concerning any other information provided to or otherwise available to the Note Purchasers in connection with the issuance and sale of the Notes, including any current or projected financial information, except as specifically set forth in this Agreement, and the Note Purchasers are not relying on any such information in entering into the transactions hereunder.

7.     Certain Covenants of the Company.  The Company hereby agrees:

(a)     neither the Company nor any of its Affiliates, nor any person acting on its or their behalf, will engage in any form of general solicitation or general advertising (within the meaning of Rule 502(c) under Regulation D) in connection with any offer or sale of the Notes or in any manner involving a public offering within the meaning of the Act;

(b)     neither the Company nor any of its Affiliates, nor any person acting on its or their behalf, will engage in any "directed selling efforts" (as that term is defined in Regulation S) with respect to the Notes sold pursuant to this Agreement, and the Company and each person acting on its behalf will comply with the restrictions of Regulation S with respect to Notes sold pursuant thereto;

(c)     for so long as the Notes constitute "restricted securities" under Rule 144, the Company will not, and will not permit any of its Affiliates (as defined in Rule 144 under the Act) to resell any of the Notes that have been acquired by any of them, other than in a transaction exempt from the registration requirements under the Act if such transaction does not cause the holding periods under Rule 144 under the Act to be extended for other holders of the Notes;

(d)     before the completion of the sale of the Notes, not to, and not to permit any person acting on its behalf to, offer, sell or solicit offers to buy or otherwise negotiate in respect of any security (as defined in the Act), the offering of which security would be integrated with the sale of the Notes in a manner that would require the registration of any of the Notes under the Act;

(e)     to provide notice with respect to the placement of the Notes to the CNBV pursuant to Article 7 of the Mexican Securities Market Law and Articles 24 Bis, 24 Bis 1 and related Articles of the General Provisions Applicable to Securities Issuers and Other Participants in the Securities Market (*Disposiciones de Carácter General Aplicables a las Emisoras de Valores y Otros Participantes del Mercado de Valores*), and notice to the SAT of the principal terms and conditions applicable to the placement and the Notes; and

(f)     to indemnify and hold harmless the Note Purchasers against any Stamp Taxes, including any interest and penalties with respect thereto, in connection with (i) the creation, issuance, sale and delivery of the Notes, (ii) the purchase by the Note Purchasers of the Notes in the manner contemplated by this Agreement, (iii) the execution and delivery or filing, as applicable, of this Agreement, the Notes, the Mexican Trust Agreement or the Indenture, or (iv) the consummation of the transactions contemplated by

this Agreement, the Notes, the Indenture or the Mexican Trust Agreement.

8.   <u>Conditions of Note Purchasers' Obligations</u>.  The obligations of the Note Purchasers under this Agreement are subject to the following conditions:

(a)   the Scheme Effective Date (as defined in the Scheme Document) shall have occurred, and all of the Restructuring Conditions set forth in Schedule 1 of the Implementation Deed shall have been satisfied;

(b)   the Company shall have furnished to the Note Purchasers on the Settlement Date an opinion letter of Cleary Gottlieb Steen & Hamilton LLP, United States counsel for the Company, customary for private placement transactions as contemplated herein, including with respect to this Agreement, the Indenture and the Notes (which for the avoidance of doubt, will include a "no registration" opinion), addressed to the Note Purchasers, and dated as of the Settlement Date in form and substance reasonably satisfactory to each of the Note Purchasers;

(c)   the Company shall have furnished to the Note Purchasers on the Settlement Date an opinion letter of Mijares, Angoitia, Cortés y Fuentes, S.C., special Mexican counsel for the Company, customary for private placement transactions as contemplated herein, including with respect to this Agreement, the Indenture, the Mexican Trust Agreement and the Notes (which for the avoidance of doubt, will include a "no registration" opinion), addressed to the Note Purchasers, and dated as of the Settlement Date, in form and substance reasonably satisfactory to each of the Note Purchasers;

(d)   the Company shall have furnished to the Note Purchasers on the Settlement Date a certificate of its Chief Executive Officer and its Chief Financial Officer, dated as of the Settlement Date in the form attached as Exhibit A hereto;

(e)   the Company shall have furnished to the Note Purchasers on the Settlement Date a certificate of the Secretary of the Company's Board of Directors, dated as of the Settlement Date in the form attached as Exhibit B hereto;

(f)   on or prior to the Settlement Date, the Notes shall be eligible for clearance and settlement through the facilities of DTC;

(g)   on or prior to the Settlement Date, the Note Purchasers shall have received fully executed copies of each of the Indenture, the Notes and the Mexican Trust Agreement, which shall be in full force and effect;

(h)   no Event of Default (as defined in the Indenture) shall exist and be continuing immediately after giving effect to the issuance and sale of the Notes and the consummation of the other transactions contemplated in this Agreement;

(i)   on the Settlement Date, the Note Purchasers shall have received all documents and instruments necessary to establish that the Note Purchasers shall have perfected security interests in the Collateral and, if applicable, be in proper form for filing, subject to any post-closing exceptions set forth in the Indenture or Mexican Trust Agreement;

(j)   no stop order, restraining order or injunction shall have been issued, commenced or threatened with respect to the issuance or sale of the Notes or with respect to any of the transactions in connection with, or contemplated herein or any of the Restructuring Documents; and

13

(k)      all representations and warranties of the Company under Section 5 hereof being true and correct.

9.    Conditions of the Company's Obligations. The obligations of the Company under this Agreement are subject to all representations and warranties of each Note Purchaser under Section 6 hereof being true and correct.

10.    Effective Date.

(a)      Each Note Purchaser shall become a party to this Agreement upon the execution and delivery of an accession agreement, a form of which is attached hereto as Form Of NPPA Accession Agreement. (the "NPPA Accession Agreement"), which NPPA Accession Agreement must be delivered prior to the NPPA Effective Date in accordance with the procedures set out in the Explanatory Memorandum before the Election Deadline (as defined in the Scheme Document) and the Override Agreement.

(b)      This Agreement shall become effective (the "NPPA Effective Date") on the day on which the Company has executed and released this Agreement in accordance with the implementation steps set forth in the Implementation Deed.

(c)      If the sale to the Note Purchasers of the Notes, as contemplated by this Agreement, is not carried out for any reason, the Company shall not be under any obligation or liability under this Agreement, and the Note Purchasers shall be under no obligation or liability to the Company under this Agreement or to one another hereunder.

11.    Notices.  Except as otherwise herein provided, all statements, requests, notices and agreements shall be in writing or by telegram or facsimile and:

(a)      if to the Company:

Operadora de Servicios Mega, S.A. de C.V., SOFOM, E.R.
Av. Patria 1501, Jardines Universidad
45110 Zapopan
Jalisco, Mexico
Attention:        Guillermo Romo (guillermo.romo@gfmega.com)
                  Juan Jaime Petersen (juanjaime.petersen@gfmega.com)
                  Pedro Alberto Garabito Nava (pedro.garabito@gfmega.com)
                  Luis Enrique Regil (luis.regil@gfmega.com)
                  Maricruz Huerta (maricruz.huerta@gfmega.com)

With a copy to:

Cleary Gottlieb Steen & Hamilton LLP
2 London Wall Place
London EC2Y 5AU, England
Attention:        David Botter (dbotter@cgsh.com)
                  Polina Lyadnova (plyadnova@cgsh.com)

-and-

Mijares, Angoitia, Cortés y Fuentes, S.C.

14

Av. Javier Barros Sierra 540
Santa Fe, Zedec Sta Fé, Álvaro Obregón
01210 Ciudad de México, Mexico
Attention:        Ricardo Maldonado ([rmaldonado@macf.com.mx](mailto:rmaldonado@macf.com.mx))

-and-

Houlihan Lokey
10250 Constellation Blvd. 5th Floor
Los Angeles, CA 90067
Attention:        Jorge Villen ([jvillen@hl.com](mailto:jvillen@hl.com))

-and-

Blink Capital Solutions
Carr. México-Toluca 5420, Piso 9 Of. 903
La Rosita, El Yaqui, Cuajimalpa de Morelos
05320,
Attention:        Javier Nájera ([javier@blinkcs.mx](mailto:javier@blinkcs.mx))


  (b)      If to the Note Purchasers, to the addresses included in the relevant signatures pages, with a copy to:

Tranche 1 Note Purchaser and Tranche 2 Note Purchasers

Latham & Watkins LLP
99 Bishopsgate
London EC2M 3XF
United Kingdom

1271 Avenue of the Americas
New York, New York 10020
United States

Attention:        Pedro Rufino ([pedro.rufinocarvalho@lw.com](mailto:pedro.rufinocarvalho@lw.com))
                  Roderick Branch ([roderick.branch@lw.com](mailto:roderick.branch@lw.com))
                  Bruce Bell ([bruce.bell@lw.com](mailto:bruce.bell@lw.com))

-and-

Sainz Abogados
Torre del Bosque
Blvd. Manuel Ávila Camacho 24 - Piso 21
Lomas de Chapultepec
11000 CDMX
Attention:        Alejandro Sainz ([asainz@sainzmx.com](mailto:asainz@sainzmx.com))


Tranche 3 Note Purchasers

Dentons Europe LLP
One Fleet Place
London EC4P 4GD
United Kingdom
Attention:        Timothy Stubbs (timothy.stubbs@dentons.com)

12.    <u>Governing Law; Construction</u>.  This Agreement and any claim, counterclaim or dispute of any kind or nature whatsoever arising out of or in any way relating to this Agreement ("<u>Claim</u>"), directly or indirectly, shall be governed by, and construed in accordance with, the laws of the State of New York. The section headings in this Agreement have been inserted as a matter of convenience of reference and are not a part of this Agreement.

13.    <u>Submission to Jurisdiction</u>.  No Claim may be commenced, prosecuted or continued in any court other than any court of the State of New York and any court of the United States of America, in each case located in the Borough of Manhattan, the City of New York, or in the courts of the domicile of each of the parties hereto, in respect of actions brought against any such party as a defendant, which courts shall have exclusive jurisdiction over the adjudication of such matters, and each of the parties hereto consents and irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and personal service with respect thereto.  Each of the parties hereto hereby consents to personal jurisdiction, service and venue in any court in which any Claim arising out of or in any way relating to this Agreement is brought by any third party against any Note Purchaser.  Each of the parties hereto (each on its behalf and, to the extent permitted by applicable law, on behalf of its stockholders and Affiliates) irrevocably and unconditionally waives, to the extent permitted by applicable law, (i) any objection that it may now or hereafter have to the laying of venue of any such Claim, (ii) all right to trial by jury in any action, proceeding or counterclaim (whether based upon contract, tort or otherwise) in any way arising out of or relating to this Agreement, and (iii) any right to which it may be entitled, on account of place of residence or domicile. The Company agrees that a final judgment in any such action, proceeding or counterclaim brought in any such court shall be conclusive and binding upon the Company and may be enforced in any other courts to the jurisdiction of which the Company is or may be subject, by suit upon such judgment.  The Company hereby appoints, without power of revocation, The Law Debenture Trust Corporation as its agent to accept and acknowledge on its behalf service of any and all process that may be served in any action, proceeding or counterclaim in any way relating to or arising out of this Agreement.

14.    <u>Judgment Currency</u>.  The Company agrees to indemnify each Note Purchaser and each person, if any, who controls such Note Purchaser within the meaning of Section 15 of the Act or Section 20 of the Exchange Act, and each Note Purchaser agrees to indemnify the Company and each person, if any, who controls the Company within the meaning of Section 15 of the Act or Section 20 of the Exchange Act, to the greatest extent permitted under applicable law, against any loss incurred, as incurred, as a result of any judgment being given in connection with this Agreement, and any such judgment or order being paid in a currency (the "<u>Judgment Currency</u>") other than U.S. dollars as a result of any variation between (i) the spot rate of exchange in New York at which the Judgment Currency would have been convertible into U.S. dollars as of the date such judgment or order is entered, and (ii) the spot rate of exchange at which the indemnified person is first able (acting promptly) to purchase U.S. dollars with the amount of the Judgment Currency actually received by the indemnified party.  If, alternatively, the indemnified party receives a profit as a result of such currency conversion, it will return any such profit to the indemnifying person (after taking into account any taxes or other costs arising in connection with such conversion and repayment). The foregoing indemnity shall constitute a separate and independent, several and not joint, obligation of the Company and each Note Purchaser and shall continue in full force and effect notwithstanding any such judgment or order as aforesaid.  The term "spot rate of exchange" shall include any premiums and costs of exchange payable in connection with the purchase of, or conversion into, the relevant currency.

16

15.    <u>Survival</u>.  The respective representations, warranties and agreements of the Company and the Note Purchasers contained in this Agreement or made by or on behalf of the Company or the Note Purchasers pursuant to this Agreement or any certificate delivered pursuant hereto shall survive the delivery of and payment for the Notes and shall remain in full force and effect, regardless of any termination of this Agreement or any investigation made by or on behalf of the Company or the Note Purchasers, any of their respective partners, directors or officers or any person (including each partner, officer or director of such person) who controls any of the Note Purchasers within the meaning of Section 15 of the Act or Section 20 of the Exchange Act, or by or on behalf of the Company and each of its partners, directors, officers, employees or agents, or any person who controls the Company within the meaning of Section 15 of the Act or Section 20 of the Exchange Act.

16.    <u>Parties at Interest</u>.  The agreement herein set forth has been and is made solely for the benefit of the Note Purchasers, the Company, and their respective successors, assigns, heirs, personal representatives and executors and administrators.  No other person, partnership, association or corporation (including a purchaser, as such purchaser, from any of the Note Purchasers) shall acquire or have any right under or by virtue of this Agreement.

17.    <u>No Fiduciary Relationship</u>.  The Company hereby acknowledges that the Note Purchasers are acting solely as note purchasers in connection with the purchase and sale of the Company's securities. The Company further acknowledges that the Note Purchasers are acting pursuant to a contractual relationship created solely by this Agreement entered into on an arm's-length basis, and in no event do the parties intend that the Note Purchasers act or be responsible as a fiduciary to the Company, its management, stockholders or creditors, or any other person in connection with any activity that the Note Purchasers may undertake or have undertaken in furtherance of the purchase and sale of the Company's securities, either before or after the date hereof.  The Note Purchasers hereby expressly disclaim any fiduciary or similar obligations to the Company, either in connection with the transactions contemplated by this Agreement or any matters leading up to such transactions, and the Company hereby confirms its understanding and agreement to that effect.  The Company and the Note Purchasers agree that they are each responsible for making their own independent judgments with respect to any such transactions, and that any opinions or views expressed by the Note Purchasers to the Company regarding such transactions, including, but not limited to, any opinions or views with respect to the price or market for the Company's securities, do not constitute advice or recommendations to the Company.  The Company hereby waives and releases, to the fullest extent permitted by law, any claims that the Company may have against the Note Purchasers with respect to any breach or alleged breach of any fiduciary or similar duty to the Company in connection with the transactions contemplated by this Agreement or any matters leading up to such transactions.

18.    <u>Counterparts</u>.  This Agreement may be signed by the parties in one or more counterparts, each of which shall be deemed to be an original, and together shall constitute one and the same agreement among the parties. Counterparts may be delivered via facsimile, electronic mail (including any electronic signature covered by the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act, the Electronic Signatures and Records Act or other applicable law, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

19.    <u>Successors and Assigns</u>.  This Agreement shall be binding upon each of the parties hereto and their respective successors and assigns and any successor or assign of any substantial portion of the Company's and any of the Note Purchasers' respective businesses and/or assets.

[*The Remainder of this Page Intentionally Left Blank; Signature Page Follows*]

17

If the foregoing correctly sets forth the understanding between the Company and the several Note Purchasers, please so indicate in the space provided below for that purpose, whereupon this Agreement and your acceptance shall constitute a binding agreement between the Company and the Note Purchasers, severally.

Very truly yours,

OPERADORA DE SERVICIOS MEGA, S.A. DE C.V., SOFOM, E.R.

By: _____
Name:
Title:

By: _____
Name:
Title:

[*Signature Page to Notes Purchase and Placement Agreement*]

**Schedule A**

**Note Purchasers**

1.  **Tranche 1 Note Purchasers**

| Note Purchasers | Principal Amount of Notes Purchased For Cash | Aggregate Principal Amount of Notes Received[1] |
|---|---|---|
| [•] | U.S.$ [10,000,000] | U.S.$ 14,285,714.3 |

2.  **Tranche 2 Note Purchasers**

| Note Purchasers | Principal Amount of Notes Purchased For Cash | Aggregate Principal Amount of Notes Received[2] |
|---|---|---|
| [•] | U.S.$ [A] | U.S.$ [A*4.5] |
| [•] | U.S.$ [B] | U.S.$ [B*4.5] |

3.  **Tranche 3 Note Purchasers**

| Note Purchasers | Aggregate Principal Amount of Notes Issued |
|---|---|
| [•] | U.S.$ [•] |
| [•] | U.S.$ [•] |

---

[1] Includes both the amount of Notes purchased for cash and the additional Notes received pursuant to Section 2(a).

[2] Includes both the amount of Notes purchased for cash and the additional Notes received pursuant to Section 2(b).

**Schedule B**

**Indenture And Mexican Trust Agreement**

**OPERADORA DE SERVICIOS MEGA, S.A. DE C.V., SOFOM, E.R., as Issuer**

**AND**

**UMB Bank, N.A., as Trustee**

_____

**8.000% SENIOR SECURED NOTES DUE 2030**

**INDENTURE**

**Dated as of [●], 2025**

_____

# TABLE OF CONTENTS

**Page**

ARTICLE 1
DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01.    *Definitions* ................................................................................ 1
Section 1.02.    *Rules of Construction* .............................................................. 33

ARTICLE 2
THE NOTES

Section 2.01.    *Form and Dating* ....................................................................... 34
Section 2.02.    *Execution and Authentication* ................................................. 34
Section 2.03.    *Registrar and Paying Agent* ..................................................... 35
Section 2.04.    *Paying Agent to Hold Money in Trust* ..................................... 36
Section 2.05.    *CUSIP, ISIN and Common Code Numbers* ............................... 36
Section 2.06.    *Holder Lists* .............................................................................. 36
Section 2.07.    *Global Note Provisions* ............................................................ 37
Section 2.08.    *Legends* .................................................................................... 38
Section 2.09.    *Transfer and Exchange* ............................................................ 38
Section 2.10.    *Mutilated, Destroyed, Lost or Stolen Notes* ........................... 42
Section 2.11.    *Temporary Notes* ..................................................................... 42
Section 2.12.    *Cancellation* ............................................................................ 43
Section 2.13.    *Defaulted Interest* ................................................................... 43

ARTICLE 3
COVENANTS

Section 3.01.    *Payment of Notes* ..................................................................... 44
Section 3.02.    *Maintenance of Office or Agency* ............................................ 45
Section 3.03.    *Corporate Existence* ................................................................ 45
Section 3.04.    *Payment of Taxes* ..................................................................... 45
Section 3.05.    *Further Instruments and Acts* .................................................. 46
Section 3.06.    *Waiver of Stay, Extension or Usury Laws* ................................ 46
Section 3.07.    *Change of Control Triggering Event* ........................................ 46
Section 3.08.    *Limitation on Incurrence of Additional Indebtedness* ............ 47
Section 3.09.    *Limitation on Guarantees* ........................................................ 51
Section 3.10.    *Limitation on Restricted Payments* ......................................... 51
Section 3.11.    *Limitation on Asset Sales and Sales of Subsidiary Stock* ....... 54
Section 3.12.    *Limitation on Lease Securitizations and Receivables Transactions* ............ 57
Section 3.13.    *Limitation on Designation of Unrestricted Subsidiaries* ......... 57
Section 3.14.    *Limitation on Dividend and Other Payment Restrictions Affecting
                 Restricted Subsidiaries* ............................................................. 59
Section 3.15.    *Limitation on Layered Indebtedness* ........................................ 60
Section 3.16.    *Limitation on Liens* .................................................................. 61
Section 3.17.    *Limitation on Transactions with Affiliates* ............................. 61

i

# TABLE OF CONTENTS
(continued)

**Page**

Section 3.18.    *Conduct of Business* ............................................................ 63
Section 3.19.    *Reports to Holders* .............................................................. 63
Section 3.20.    *Listing* ................................................................................ 64
Section 3.22.    *Payment of Additional Amounts* ......................................... 65
Section 3.23.    *Guarantees* ......................................................................... 68
Section 3.24.    *Suspension of Covenants* ..................................................... 72

ARTICLE 4
SURVIVING ENTITY

Section 4.01.    *Merger, Consolidation and Sale of Assets* ........................... 73

ARTICLE 5
OPTIONAL REDEMPTION OF NOTES

Section 5.01.    *Optional Redemption* .......................................................... 76
Section 5.02.    *Election to Redeem* ............................................................. 76
Section 5.03.    *Notice of Redemption* ......................................................... 76
Section 5.04.    *Selection of Notes to Be Redeemed in Part* ......................... 77
Section 5.05.    *Deposit of Redemption Price* ............................................... 77
Section 5.06.    *Notes Payable on Redemption Date* ..................................... 78
Section 5.07.    *Unredeemed Portions of Partially Redeemed Note* ............... 78
Section 5.09.    *Optional Redemption Upon Equity Sales* ............................. 79
Section 5.10.    *No Limitation* ..................................................................... 79

ARTICLE 6
DEFAULTS AND REMEDIES

Section 6.01.    *Events of Default* ................................................................ 79
Section 6.02.    *Acceleration* ....................................................................... 81
Section 6.03.    *Other Remedies* .................................................................. 83
Section 6.04.    *Waiver of Past Defaults* ...................................................... 83
Section 6.05.    *Control by Majority* ............................................................ 83
Section 6.06     *Limitation on Suits* ............................................................. 83
Section 6.07.    *Rights of Holders to Receive Payment* ................................. 84
Section 6.08.    *Collection Suit by Trustee* ................................................... 84
Section 6.09.    *Trustee May File Proofs of Claim, etc.* ................................. 84
Section 6.10.    *Priorities* ............................................................................ 85
Section 6.11.    *Undertaking for Costs* ......................................................... 85

ARTICLE 7
TRUSTEE

Section 7.01.    *Duties of Trustee* ................................................................ 85

ii

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| Section 7.02. | *Rights of Trustee* | 87 |
| Section 7.03. | *Individual Rights of Trustee* | 89 |
| Section 7.04. | *Trustee's Disclaimer* | 89 |
| Section 7.05. | *Notice of Defaults* | 89 |
| Section 7.06. | *Reports by Trustee to Holders* | 89 |
| Section 7.07. | *Compensation and Indemnity* | 89 |
| Section 7.08. | *Replacement of Trustee* | 90 |
| Section 7.09. | *Successor Trustee by Merger* | 91 |
| Section 7.10. | *Eligibility; Disqualification* | 91 |
| Section 7.11. | *Preferential Collection of Claims Against Company* | 92 |
| Section 7.12. | *Appointment of Co-Trustee* | 92 |

ARTICLE 8

DEFEASANCE; DISCHARGE OF INDENTURE

| | | |
|---|---|---|
| Section 8.01. | *Legal Defeasance and Covenant Defeasance* | 93 |
| Section 8.02. | *Conditions to Defeasance* | 94 |
| Section 8.03. | *Application of Trust Money* | 96 |
| Section 8.04. | *Repayment to Company* | 96 |
| Section 8.05. | *Indemnity for U.S. Government Obligations* | 96 |
| Section 8.06. | *Reinstatement* | 97 |
| Section 8.07. | *Satisfaction and Discharge* | 97 |

ARTICLE 9

AMENDMENTS

| | | |
|---|---|---|
| Section 9.01. | *Without Consent of Holders* | 98 |
| Section 9.02. | *With Consent of Holders* | 99 |
| Section 9.03. | *Revocation and Effect of Consents and Waivers* | 100 |
| Section 9.04. | *Notation on or Exchange of Notes* | 100 |
| Section 9.05. | *Trustee to Sign Amendments and Supplements* | 101 |

ARTICLE 11

MISCELLANEOUS

| | | |
|---|---|---|
| Section 11.01. | *Notices* | 104 |
| Section 11.02. | *Certificate and Opinion as to Conditions Precedent* | 106 |
| Section 11.03. | *Statements Required in Certificate or Opinion* | 106 |
| Section 11.04. | *Rules by Trustee, Paying Agent and Registrar* | 106 |
| Section 11.05. | *Governing Law, etc.* | 106 |
| Section 11.06. | *No Recourse Against Others* | 108 |
| Section 11.07. | *Successors* | 108 |
| Section 11.08. | *Duplicate and Counterpart Originals* | 108 |
| Section 11.09. | *Severability* | 108 |

# TABLE OF CONTENTS
(continued)

**Page**

Section 11.10.    *Currency Indemnity* ...................................................................... 108
Section 11.11.    *Table of Contents; Headings* ........................................................ 109
Section 11.12.    *Force Majeure* ............................................................................. 109

EXHIBIT A        FORM OF NOTE

EXHIBIT B        FORM OF CERTIFICATE FOR TRANSFER PURSUANT TO
                 REGULATION S

EXHIBIT C        FORM OF CERTIFICATE FOR TRANSFER TO
                  QIB/INSTITUTIONAL ACCREDITED INVESTOR

EXHIBIT D        FORM OF CERTIFICATE FOR TRANSFER PURSUANT TO
                 RULE 144

EXHIBIT E         FORM OF CERTIFICATE FOR TRANSFER TO
                 QIB/INSTITUTIONAL ACCREDITED INVESTOR

INDENTURE, dated as of [●], 2025, among Operadora de Servicios Mega, S.A. de C.V., SOFOM, E.R., a variable capital corporation, regulated multiple purpose financial company (*sociedad anónima de capital variable, sociedad financiera de objeto múltiple, entidad regulada*) organized and existing under the laws of Mexico (the "**Company**") and UMB Bank, N.A., as Trustee (the "**Trustee**").

Each party agrees as follows for the benefit of the other parties and of the Holders of the Company's 8.000% Senior Secured Notes due 2030 issued hereunder.

## ARTICLE 1
### DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01.    *Definitions*.

"**Accounting Event**" means an event which shall be deemed to occur if the Company has received an Accounting Opinion stating that, as a result of a change in the accounting rules, methodology or official interpretations of the IASB or similar governing body having similar authority in Mexico, or the CNBV, after the issue date of a series of Capital Securities, such Capital Securities, in whole or in part, must not or must no longer be recorded as "equity" pursuant to *Sofom* GAAP as in effect in Mexico or any other accounting principles applicable to the Company in lieu of *Sofom* GAAP.

"**Accounting Opinion**" means an opinion of a recognized accounting firm of international standing, including any Mexican affiliate of such accounting firm.

"**Acquired Indebtedness**" means Indebtedness of a Person or any of its Subsidiaries existing at the time such Person becomes a Restricted Subsidiary or at the time it merges, consolidates or amalgamates with the Company or any of its Restricted Subsidiaries or is assumed in connection with the acquisition of assets from such Person; *provided* that such Indebtedness is not incurred in connection with, or in anticipation or contemplation of such merger, consolidation, amalgamation or acquisition. Such Indebtedness shall be deemed to have been Incurred at the time such Person becomes a Restricted Subsidiary or at the time it merges, consolidates or amalgamates with the Company or a Restricted Subsidiary or at the time such Indebtedness is assumed in connection with the acquisition of assets from such Person.

"**Additional Amounts**" has the meaning assigned to it in Section 3.23(a).

"**Additional Guarantor**" has the meaning assigned to it in Section 3.24(n).

"**Affiliate**" means, with respect to any specified Person, any other Person who directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person. The term "**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. For purposes of this definition, the terms "**controlling**," "**controlled by**" and "**under common control with**" have correlative meanings.

"**Affiliate Transaction**" has the meaning assigned to it in Section 3.17(a).

"**Agent**" means each of the Registrar, the Trustee, the Paying Agent, Authenticating Agent and any co-registrar or transfer agent appointed hereunder.

"**Agent Members**" has the meaning assigned to it in Section 2.07(b).

1

"**Applicable Procedures**" means, with respect to any transfer or exchange of or for beneficial interests in a Global Note, the rules and procedures of DTC, Euroclear and Clearstream Luxembourg, that apply to such transfer or exchange.

"**Asset Acquisition**" means:

(a)    an Investment by the Company or any Restricted Subsidiary in any other Person pursuant to which such Person will become a Restricted Subsidiary, or will be merged with or into the Company or any Restricted Subsidiary;

(b)    the acquisition by the Company or any Restricted Subsidiary of the assets of any Person (other than a Subsidiary of the Company) which constitute all or substantially all of the assets of such Person or comprises any division or line of business of such Person or any other properties or assets of such Person other than in the ordinary course of business; or

(c)    any Revocation with respect to an Unrestricted Subsidiary.

"**Asset Sale**" means any direct or indirect sale, disposition, issuance, conveyance, transfer, lease, assignment or other transfer, including a Sale and Leaseback Transaction (each, a "**disposition**"), by the Company or any Restricted Subsidiary of:

(a)    any Capital Stock of any Restricted Subsidiary (but not Capital Stock of the Company); or

(b)    any property or assets (other than cash or Cash Equivalents or Capital Stock of the Company) of the Company or any Restricted Subsidiary.

Notwithstanding the preceding, the following items shall not be deemed to be Asset Sales:

(i)    the disposition of all or substantially all of the assets of the Company and its Restricted Subsidiaries as permitted under Section 4.01;

(ii)    for purposes of Section 3.11 only, the making of a Restricted Payment permitted under Section 3.10 or any Permitted Investment;

(iii)    a disposition to the Company or a Guarantor, including a Person that is or will become a Guarantor immediately after the disposition;

(iv)    transactions that involve assets or Capital Stock of a Restricted Subsidiary having a Fair Market Value of less than U.S.$5.0 million (or the equivalent in other currencies) during the life of the Notes;

(v)    a transfer of assets between or among the Company and any Guarantor;

(vi)    an issuance or sale of Capital Stock by a Restricted Subsidiary of the Company to the Company or any Restricted Subsidiary;

(vii)    the disposition of accounts receivable and loans as permitted under Section 3.12;

(viii)    any sale or other disposition of inventory, goods, equipment or other assets in the ordinary course of business in the Company's leasing operations;

(ix)    the sale of delinquent loans to unaffiliated third parties;

(x)    any sale or other disposition of damaged, worn-out, obsolete or no longer useful assets or properties in the ordinary course of business;

(xi)    the sale of assets received by the Company or any of its Restricted Subsidiaries upon the foreclosure of a Lien in the ordinary course of business;

(xii)    the granting of Liens permitted under Section 3.16, and any disposition of the properties subject to such Liens as a result of any enforcement or foreclosure thereof;

(xiii)    the good faith surrender or waiver of contract rights or settlement, release or surrender of contract, tort or other claims or statutory rights in connection with a settlement in the ordinary course of business consistent with past practice; and

(xiv)    a disposition to a Restricted Subsidiary that is not a Guarantor from another Restricted Subsidiary that is not a Guarantor.

"**Asset Sale Offer**" has the meaning assigned to it in Section 3.11(c).

"**Asset Sale Offer Amount**" has the meaning assigned to it in Section 3.11(c).

"**Asset Sale Offer Notice**" means notice of an Asset Sale Offer which shall be delivered to each record Holder as shown on the Note Register within 20 days following the 365th day after the receipt of Net Cash Proceeds of any Asset Sale, with a copy to the Trustee which notice shall govern the terms of the Asset Sale Offer, and shall state:

(a)    the circumstances of the Asset Sale or Asset Sales, the Net Cash Proceeds which are included in the Asset Sale Offer, that an Asset Sale Offer is being made pursuant to Section 3.11, and that all Notes that are timely tendered shall be accepted for payment;

(b)    the Asset Sale Offer Amount and the Asset Sale Offer Payment Date;

(c)    that any Notes or portions thereof not tendered or accepted for payment shall continue to accrue interest;

(d)    that, unless the Company defaults in the payment of the Asset Sale Offer Amount with respect thereto, all Notes or portions thereof accepted for payment pursuant to the Asset Sale Offer shall cease to accrue interest from and after the Asset Sale Offer Payment Date;

(e)    that any Holder electing to have any Notes or portions thereof purchased pursuant to the Asset Sale Offer shall be required to surrender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the Paying Agent at the address specified in the notice prior to the close of business on the third Business Day preceding the Asset Sale Offer Payment Date;

(f)    that any Holder shall be entitled to withdraw such election if the Paying Agent receives, not later

3

than the close of business on the second Business Day preceding the Asset Sale Offer Payment Date, a facsimile transmission or letter, setting forth the name of the Holder, the principal amount of Notes delivered for purchase, and a statement that such Holder is withdrawing such Holder's election to have such Notes or portions thereof purchased pursuant to the Asset Sale Offer;

(g)     that any Holder electing to have Notes purchased pursuant to the Asset Sale Offer must specify the principal amount of Notes that is being tendered for purchase, which must be in minimum denominations of U.S.$150,000 and integral multiples of U.S.$1,000 in excess thereof;

(h)     that any Holder of Certificated Notes whose Certificated Notes are being purchased only in part will be issued new Certificated Notes equal in principal amount to the unpurchased portion of the Certificated Note or Notes surrendered, which unpurchased portion must have a minimum principal amount of U.S.$150,000 and integral multiples of U.S.$1,000 in excess thereof;

(i)     that the Trustee will return to the Holder of a Global Note that is being purchased in part, such Global Note with a notation on the schedule of increases or decreases thereof adjusting the principal amount thereof to be equal to the unpurchased portion of such Global Note; and

(k)     any other information reasonably necessary to enable any Holder to tender Notes and to have such Notes purchased pursuant to Section 3.11.

"**Asset Sale Offer Payment Date**" has the meaning assigned to it in Section 3.11(e).

"**Asset Sale Transaction**" means any Asset Sale and, whether or not constituting an Asset Sale, (a) any sale or other disposition of Capital Stock, (b) any Designation with respect to an Unrestricted Subsidiary and (c) any sale or other disposition of property or assets excluded from the definition of Asset Sale by clause (iv) of that definition.

"**Authenticating Agent**" has the meaning assigned to it in Section 2.02(d).

"**Authorized Agent**" has the meaning assigned to it in Section 11.05(c).

"**Bancomext Facility**" means that certain credit facility between the Company, as borrower, and Banco Nacional de Comercio Exterior, S.N.C. Institución de Banca de Desarrollo, as agent and lender, entered into on September 18, 2024, as amended, restated, supplemented or otherwise modified; *provided* that only Indebtedness in an aggregate principal amount of up to Ps.3,454,000,000 (plus any accrued and unpaid or capitalized interest or any fees payable thereunder) shall constitute Indebtedness under the Bancomext Facility, and only Liens securing Indebtedness up to such amount shall constitute Liens to secure the Bancomext Facility.

"**Bankruptcy Event of Default**" means:

(a)     the entry by a court of competent jurisdiction of:  (i) a decree or order for relief in respect of any Bankruptcy Party in an involuntary case or proceeding under any Bankruptcy Law or (ii) a decree or order (A) adjudging any Bankruptcy Party a bankrupt or insolvent, (B) approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of, or in respect of, any Bankruptcy Party under any Bankruptcy Law, (C) appointing a Custodian of any Bankruptcy Party or of any substantial part of the property of any Bankruptcy Party, or (D) ordering the winding-up or liquidation of the affairs of any Bankruptcy Party, and in each case, the continuance of any such decree or order for relief or any such other decree or order unstayed and in effect for a period of 60 consecutive calendar days; or

(b)        (i) the commencement by any Bankruptcy Party of a voluntary case or proceeding under any Bankruptcy Law or of any other case or proceeding to be adjudicated a bankrupt or insolvent, (ii) the consent by any Bankruptcy Party to the entry of a decree or order for relief in respect of any Bankruptcy Party in an involuntary case or proceeding under any Bankruptcy Law or to the commencement of any bankruptcy or insolvency case or proceeding against any Bankruptcy Party, (iii) the filing by any Bankruptcy Party of a petition or answer or consent seeking reorganization or relief under any Bankruptcy Law, (iv) the consent by any Bankruptcy Party to the filing of such petition or to the appointment or to taking possession by a Custodian of any Bankruptcy Party or of any substantial part of the Property of any Bankruptcy Party, (v) the making by any Bankruptcy Party of an assignment for the benefit of creditors, (vi) the admission by any Bankruptcy Party in writing of its inability to pay its debts generally as they become due, (vii) the approval by stockholders of any Bankruptcy Party of any plan or proposal for the liquidation or dissolution of any Bankruptcy Party, (viii) the declaration of *concurso mercantil* or *quiebra* by the Company, and (ix) the taking of corporate action by any Bankruptcy Party in furtherance of any action referred to in clauses (i) through (viii) above.

"**Bankruptcy Law**" means Title 11, U.S. Code or any similar U.S. federal, state or non-U.S. law for the relief of debtors, including the Mexican *Ley de Concursos Mercantiles*.

"**Bankruptcy Party**" means the Company or any of its Restricted Subsidiaries.

"**Bilateral Debt Refinancing Facilities**" means those certain bilateral facility agreements between the Company and certain lenders thereto existing as of the date hereof, as amended and supplemented pursuant to that certain override agreement dated as of [●], by and among the Company, the lenders party thereto and CiBanco, as collateral agent of such lenders, entered into in connection with the Debt Restructuring, in each case as amended, restated, supplemented or otherwise modified; *provided* that only Indebtedness in an aggregate principal amount of up to USD[●][3] (including the U.S. Dollar Equivalent of any such Indebtedness denominated in other currencies) (plus any accrued and unpaid or capitalized interest or any fees payable thereunder) shall constitute Indebtedness under the Bilateral Debt Refinancing Facilities, and only Liens securing Indebtedness up to such amount shall constitute Liens to secure the Bilateral Debt Refinancing Facilities.

"**Board of Directors**" means, as to any Person, the board of directors, management committee or similar governing body of such Person or any duly authorized committee thereof.

"**Board Resolution**" means, with respect to any Person, a copy of a resolution certified by the secretary or an assistant secretary of such Person to have been duly adopted by the Board of Directors of such Person and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"**Business Day**" means any day, other than a Saturday, Sunday, or any day on which banking institutions in New York City, New York, United States of America, Minneapolis, Minnesota, United States of America, London, United Kingdom, or Mexico City, Mexico are authorized or required by law or executive order to close.

"**Capital Securities**" means, with respect to the Company, any bonds, debentures, notes or other similar instruments of the Company (a) which are expressly subordinated in right of payment and in insolvency to the prior payment in full of any Note and any other Senior Indebtedness, (b) which either (i) have no final maturity date or (ii) have a scheduled maturity date of at least 10 years after the Issue Date, (c) the first scheduled principal payment in respect of which (pursuant to any redemption provision,

---

[3] **NTD:** To include the aggregate principal amount on the Issue Date.

amortization schedule or otherwise) may not occur until at least 12 months after the last scheduled principal payment of any note and any other Senior Indebtedness, (d) the principal of which may not be accelerated so long as any Note remains outstanding (except pursuant to a customary Bankruptcy Event of Default with respect to the Company), (e) are senior only to Capital Stock of the Company, (f) in respect of which interest may be deferred and cancelled, and (g) which, prior to their issuance, are provided equity-like treatment by at least two Rating Agencies pursuant to their respective rating criteria.

"**Capital Securities Redemption Event**" means, with respect to a series of Capital Securities, (a) an Accounting Event, (b) a Rating Methodology Event, (c) a Tax Deductibility Event, (d) a Withholding Tax Event or (e) any event similar to any of the foregoing clauses (a) through (d) pursuant to the terms of the relevant Capital Securities.

"**Capital Stock**" means:

(a)     with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, including each class of Common Stock and Preferred Stock of such Person;

(b)     with respect to any Person that is not a corporation, any and all partnership or other equity or ownership interests of such Person; and

(c)     any warrants, rights or options to purchase any of the instruments or interests referred to in clause (a) or (b) above.

"**Capitalization Ratio**" means, for any Person, as of any date of determination, the result (expressed as a percentage) obtained by dividing (x) Consolidated Net Worth of such Person by (y) Net Loan Portfolio of such Person.

"**Capitalized Lease Obligations**" means, as to any Person, the obligations of such Person under a lease that are required to be classified and accounted for as finance lease obligations under GAAP. For purposes of this definition, the amount of such obligations at any date will be the capitalized amount of such obligations at such date, determined in accordance with GAAP.

"**Cash Equivalents**" means:

(a)     marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof;

(b)     *Certificados de la Tesorería de la Federación (Cetes)* or *Bonos de Desarrollo del Gobierno Federal (Bondes)*, in each case, issued by the government of Mexico and maturing not later than one year after the acquisition thereof;

(c)     marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of

acquisition, having one of the two highest ratings obtainable from either S&P or Fitch or any successor thereto;

(d)    commercial paper maturing no more than one year from the date of creation thereof and, at the time of acquisition, having a rating of at least A-2 from S&P or at least F1 from Fitch;

(e)    demand deposits, certificates of deposit, time deposits or bankers' acceptances maturing within one year from the date of acquisition thereof issued by (i) any bank organized under the laws of the United States of America or any state thereof or the District of Columbia, (ii) any U.S. branch of a non-U.S. bank having at the date of acquisition thereof combined capital and surplus of not less than U.S.$500.0 million, or (iii) in the case of Mexican peso deposits, any of the five top-rated banks (as evaluated by an internationally recognized rating agency) organized under the laws of Mexico;

(f)    repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (e) above;

(g)    any other debt instruments having a rating of at least A-1 or AAA from S&P or F1 or AAA from Fitch with maturities of one year or less from the date of acquisition; and

(h)    investments in money market funds, which invest substantially all of their assets in securities of the types described in clauses (a) through (g) above.

"**Cebures**" means the Company's Peso-denominated Notes (*certificados bursátiles*) due 2027 identified with ticker GFMEGA 22X, as amended, restated, supplemented or otherwise modified; *provided* that only Indebtedness in an aggregate principal amount of up to Ps.[●][4] (plus any accrued and unpaid or capitalized interest or any fees payable thereunder) shall constitute Indebtedness under the Cebures, and only Liens securing Indebtedness up to such amount shall constitute Liens to secure the Cebures.

"**Certificated Note**" means any Note issued in fully registered certificated form (other than a Global Note), which shall be substantially in the form of Exhibit A, with appropriate legends as specified in Section 2.08 and Exhibit A.

"**Change of Control**" means the occurrence of one or more of the following events:

(a)    the Permitted Holders, collectively, cease to be the beneficial owner, directly or indirectly, of 50.1% or more of the total voting power of the Voting Stock of the Company in the aggregate (for the purposes of this clause, a Permitted Holder shall be deemed to beneficially own any Voting Stock of a specified entity held by a parent entity, if such Permitted Holder "beneficially owns" directly or indirectly, more than 50.1% of the voting power of the Voting Stock of such parent entity);

(b)    the Company consolidates with, or merges with or into, another Person, or the Company sells, conveys, assigns, transfers, leases or otherwise disposes of all or substantially all of the assets of

---

[4] **NTD:** To be filled in with the principal amount on the issue date.

the Company, determined on a consolidated basis, to any Person, other than a transaction where the Person or Persons that, immediately prior to such transaction "beneficially owned" the outstanding Voting Stock of the Company are, by virtue of such prior ownership, or Permitted Holders are, the "beneficial owners" in the aggregate of a majority of the total voting power of the then outstanding Voting Stock of the surviving or transferee person (or if such surviving or transferee Person is a direct or indirect wholly-owned subsidiary of another Person, such Person who is the ultimate parent entity), in each case whether or not such transaction is otherwise in compliance with this Indenture;

(c)     individuals who on the Issue Date constituted the Board of Directors of the Company, together with any new directors whose election by the Board of Directors or whose nomination for election by the stockholders of the Company was voted upon favorably by the Permitted Holders, cease for any reason to constitute a majority of the Board of Directors of the company then in office; or

(d)     the approval by the holders of Capital Stock of the Company of any plan or proposal for the liquidation or dissolution of the Company, whether or not otherwise in compliance with the provisions of this Indenture.

For purposes of this definition:

(a)     "**beneficial owner**" shall have the meaning specified in Rules 13d-3 and l3d-5 under the Exchange Act, except that any Person or Group shall be deemed to have "beneficial ownership" of all securities that such Person or Group has the right to acquire, whether such right is exercisable immediately, only after the passage of time or, except in the case of the Permitted Holders, upon the occurrence of a subsequent condition.

(b)     "**Person**" and "**Group**" shall have the meanings for "person" and "group" as used in Sections l3(d) and 14(d) of the Exchange Act; and

(c)     the Permitted Holders or any other Person or Group shall be deemed to beneficially own any Voting Stock of a corporation held by any other corporation (the "**parent corporation**") so long as the Permitted Holders or such other Person or Group, as the case may be, beneficially own, directly or indirectly, in the aggregate at least 50.1% of the voting power of the Voting Stock of the parent corporation.

"**Change of Control Triggering Event**" has the meaning assigned to it in Section 3.07.

"**Change of Control Triggering Event Notice**" means notice of a Change of Control Triggering Event Offer made pursuant to Section 3.07, which shall be (x) delivered to each record Holder as shown on the Note Register within 30 days following the date upon which a Change of Control Triggering Event occurred, with a copy to the Trustee, which notice shall govern the terms of the Change of Control Triggering Event Offer and shall state:

(a)     that a Change of Control Triggering Event has occurred, the circumstances or events causing such Change of Control Triggering Event and that a Change of Control Triggering Event Offer is being made pursuant to Section 3.07, and that all Notes that are timely tendered shall be accepted for payment;

(b)     the Change of Control Triggering Event Payment, and the Change of Control Triggering Event Payment Date;

8

(c)    that any Notes or portions thereof not tendered or accepted for payment shall continue to accrue interest;

(d)    that, unless the Company defaults in the payment of the Change of Control Triggering Event Payment with respect thereto, all Notes or portions thereof accepted for payment pursuant to the Change of Control Triggering Event Offer shall cease to accrue interest from and after the Change of Control Triggering Event Payment Date;

(e)    that any Holder electing to have any Notes or portions thereof purchased pursuant to a Change of Control Triggering Event Offer will be required to tender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the Paying Agent at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Triggering Event Payment Date;

(f)    that any Holder shall be entitled to withdraw such election if the Paying Agent receives, not later than the close of business on the second Business Day preceding the Change of Control Triggering Event Payment Date, a facsimile transmission or letter, setting forth the name of the Holder, the principal amount of Notes delivered for purchase, and a statement that such Holder is withdrawing such Holder's election to have such Notes or portions thereof purchased pursuant to the Change of Control Triggering Event Offer;

(g)    that any Holder electing to have Notes purchased pursuant to the Change of Control Triggering Event Offer must specify the principal amount of Notes that is being tendered for purchase, must be in minimum denominations of U.S.$150,000 and integral multiples of U.S.$1,000 in excess thereof;

(h)    that any Holder of Certificated Notes whose Certificated Notes are being purchased only in part will be issued new Certificated Notes equal in principal amount to the unpurchased portion of the Certificated Note or Notes surrendered, which unpurchased portion must have a minimum principal amount of U.S.$150,000 and integral multiples of U.S.$1,000 in excess thereof;

(i)    that the Trustee shall return to the Holder of a Global Note that is being purchased in part, such Global Note with a notation on Schedule A thereof adjusting the principal amount thereof to be equal to the unpurchased portion of such Global Note;

(j)    that, in the event that Holders of not less than 95% of the aggregate principal amount of the Outstanding Notes accept a Change of Control Triggering Event Offer and the Company or third party purchases all of the Notes held by such Holders, the Company shall have the right, upon prior notice, to redeem all of the Notes that remain outstanding in accordance with Section 3.07(g); and

(k)    any other information necessary to enable any Holder to tender Notes and to have such Notes purchased pursuant to Section 3.07.

"**Change of Control Triggering Event Offer**" has the meaning assigned to it in Section 3.07(b).

"**Change of Control Triggering Event Payment**" has the meaning assigned to it in Section 3.07(a).

"**Change of Control Triggering Event Payment Date**" has the meaning assigned to it in Section 3.07(b).

"**Clearstream Luxembourg**" means Clearstream Banking, *société anonyme*, or the successor to its securities clearance and settlement operations.

"**CNBV**" means the Mexican National Banking and Securities Commission (*Comisión Nacional Bancaria y de Valores*).

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" means all assets and properties (real and personal), including Eligible Receivables transferred to or otherwise held by the Mexican Trust upon which Liens have been granted to the Trustee to pay for and secure the Obligations pursuant to the Mexican Trust Agreement.

"**Collateral Ratio Requirement**" means that, as of any Measurement Date, (a) the Original Collateral Ratio is equal to or greater than 0.75 to 1:00, or (b) the Current Collateral Ratio is equal to or greater than 1.20 to 1.00.

"**Collateral Value**" means, as of any Measurement Date, the sum of:

(a)     the aggregate outstanding principal amount of all the Eligible Receivables held by the Mexican Trust,

(b)     the aggregate amount of the cash deposited in accounts held by the Mexican Trust, and

(c)     without duplication, the notional value of any Cash Equivalents held by the Mexican Trust which are considered Permitted Investments pursuant to the terms hereof and the terms thereof,

in each case of clauses (a) through (c) (inclusive), as of such Measurement Date and as set forth in the Monthly Report delivered by the Company in respect of such Measurement Date; *provided* that any such amount denominated in Pesos shall be converted into its U.S. Dollar Equivalent and expressed in U.S. Dollars for the purposes of this definition.

"**Common Stock**" of any Person means any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of such Person's common equity interests, whether outstanding on the Issue Date or issued after the Issue Date, and includes, without limitation, all series and classes of such common equity interests.

"**Company**" means the party named as such in the introductory paragraph to this Indenture and its successors and assigns, including any Surviving Entity.

"**Company Order**" has the meaning assigned to it in Section 2.02(c).

"**Consolidated Net Income**" means, with respect to any Person for any period, the aggregate net income (or loss) of such Person and its Subsidiaries (after deducting (or adding) the portion of such net income (or loss) attributable to minority interests in Subsidiaries of such Person) for such period on a consolidated basis, determined in accordance with GAAP; *provided* that there shall be excluded therefrom to the extent reflected in such aggregate net income (loss):

(a)     net after-tax gains or losses from Asset Sale Transactions or abandonments or reserves relating thereto;

10

(b)    net after-tax items classified as extraordinary gains or losses;

(c)    the net income (but not loss) of any Person, other than such Person and any Subsidiary of such Person (Restricted Subsidiary in the case of the Company); except that, solely for purposes of calculating Consolidated Net Income pursuant Section 3.10(a)(iii), Consolidated Net Income of the Company will include the Company's proportionate share of the net income of:

(i)    any Person acquired in a "pooling of interests" transaction accrued prior to the date it becomes a Restricted Subsidiary or is merged or consolidated with the Company or any Restricted Subsidiary; or

(ii)    a Surviving Entity prior to assuming the Company's obligations under this Indenture and the Notes pursuant to Section 4.01;

(d)    the net income (but not loss) of any Subsidiary of such Person (Restricted Subsidiary in the case of the Company) to the extent that (and only so long as) a corresponding amount could not be distributed to such Person at the date of determination as a result of any restriction pursuant to the constituent documents of such Subsidiary (Restricted Subsidiary in the case of the Company) or any law, regulation, agreement or judgment applicable to any such distribution;

(e)    any increase (but not decrease) in net income attributable to minority interests in any Subsidiary (Restricted Subsidiary in the case of the Company);

(f)    any gain (or loss) from foreign exchange translation or change in net monetary position;

(g)    any gains or losses (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of Indebtedness and Hedging Obligations; and

(h)    the cumulative effect of changes in accounting principles.

"**Consolidated Net Worth**" means, as of any date of determination, with respect to any Person, the consolidated stockholders' equity of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Company) as of the last day of the most recent fiscal quarter prior to such date of determination, prepared in accordance with GAAP, less (without duplication) amounts attributable to Disqualified Capital Stock of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Company).

"**Consolidated Tangible Assets**" means, as of any date of determination, the total assets of the Company and its Restricted Subsidiaries less Intangible Assets, in each case, determined on a consolidated basis as of the last day of the most recent fiscal quarter prior to such date of determination, prepared in accordance with GAAP.

"**Corporate Trust Office**" means the principal office of the Trustee at which at any time its corporate trust business shall be administered, which office at the date hereof is located at 100 William Street, Suite 1850, New York, NY10038; Attention: Operadora de Servicios Mega Administrator, or such other address as the Trustee may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Holders and the Company).

"**Covenant Defeasance**" has the meaning assigned to it in Section 8.01(c).

"**Credit Ratings Downgrade**" means the rating of the Company's long-term senior unsecured indebtedness is decreased by one or more rating notches by any Rating Agency during the period commencing on the announcement of a proposed transaction and ending 60 days following the consummation thereof, as expressly stated by the applicable Rating Agency to have been primarily the result of such transaction.

"**Cure Period**" has the meaning assigned to it in Section 3.18(b).

"**Currency Agreement**" means, in respect of any Person, any foreign exchange contract, currency swap agreement or other similar agreement as to which such Person is a party designed to hedge foreign currency risk of such Person.

"**Current Collateral Ratio**" means, as of any Measurement Date, the ratio of (a) the Collateral Value as of such Measurement Date to (b) the aggregate principal amount of all the Notes Outstanding as of such Measurement Date, after giving effect to any amortization, redemption or repurchase of the Notes on or prior to such Measurement Date.

"**Custodian**" means any receiver, trustee, assignee, liquidator, *conciliador*, *síndico*, *sequestrator* or similar official under any Bankruptcy Law.

"**Debt Restructuring**" means that certain restructuring of certain of the Company and its Subsidiaries' outstanding liabilities (partially conducted via the U.K. Scheme of Arrangement), and any and all actions taken by the Company and its Subsidiaries necessary to implement such restructuring as provided in the U.K. Scheme of Arrangement , including the Incurrence of Indebtedness and Incurrence of Liens as provided in such U.K. Scheme of Arrangement and the making of certain amendments to and/or waivers under certain Indebtedness of the Company and its Subsidiaries as provided in such U.K. Scheme of Arrangement.

"**Debt Service Payment Account**" has the meaning assigned to the term "*cuenta de Servicio de la Deuda*" in the Mexican Trust Agreement.

"**Debt Service Shortfall**" has the meaning assigned to it in Section 3.01(a).

"**Default**" means an event or condition the occurrence of which is, or with the lapse of time or the giving of notice or both would be, an Event of Default.

"**Defaulted Interest**" has the meaning assigned to it in paragraph 1 of the Reverse Side of the Form of Note contained in Exhibit A.

"**Designated Non-cash Consideration**" means the Fair Market Value of non-cash consideration used in a Permitted Business (other than securities) received by the Company or any of its Restricted Subsidiaries in connection with an Asset Sale that is designated as Designated Non-cash Consideration pursuant to an Officers' Certificate, setting forth the basis of such valuation, executed by the Chief Executive Officer or the Chief Financial Officer of the Company and delivered to the Trustee, less the amount of cash or Cash Equivalents received in connection with a sale of such Designated Non-cash Consideration.

"**Designation**" has the meaning set forth in Section 3.13(a).

"**Designation Amount**" has the meaning set forth in Section 3.13(a)(iii).

12

"**Disqualified Capital Stock**" means that portion of any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the holder thereof, in any case, on or prior to the final maturity date of the Notes; *provided*, *however*, that (x) Capital Stock representing the variable portion of such Capital Stock, shall not be deemed as Disqualified Capital Stock, and (y) any Capital Stock that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof the right to require such Person to purchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the final maturity of the Notes shall not constitute Disqualified Capital Stock if:

(a)     the "asset sale" or "change of control" provisions applicable to such Capital Stock are not materially more favorable to the holders of such Capital Stock than the terms applicable to the Notes and described under Sections 3.07 and 3.11; and

(b)     any such requirement only becomes operative after compliance with such terms applicable to the Notes, including the purchase of any Notes tendered pursuant thereto.

The amount of any Disqualified Capital Stock shall be equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price, but excluding accrued dividends, if any. The amount of any Disqualified Capital Stock that does not have a fixed redemption, repayment or repurchase price shall be calculated in accordance with the terms of such Disqualified Capital Stock as if such Disqualified Capital Stock were redeemed, repaid or repurchased on any date on which the amount of such Disqualified Capital Stock is to be determined pursuant to this Indenture; *provided*, *however*, that if such Disqualified Capital Stock could not be required to be redeemed, repaid or repurchased at the time of such determination, the redemption, repayment or repurchase price shall be the book value of such Disqualified Capital Stock as reflected in the most recent financial statements of such Person.

"**Distribution Compliance Period**" means, with respect to any Regulation S Global Note (or Certificated Note issued in respect thereof pursuant to Section 2.07(c)), the 40 consecutive days beginning on and including the later of (a) the day on which any Notes represented thereby are offered to persons other than distributors (as defined in Regulation S under the Securities Act) pursuant to Regulation S and (b) the issue date for such Notes.

"**DTC**" means The Depository Trust Company, its nominees and their respective successors and assigns, or such other depositary institution hereinafter appointed by the Company that is a clearing agency registered under the Exchange Act.

"**Eligibility Criteria**" has the meaning assigned to the term "*Criterios de Elegibilidad*" in the Mexican Trust Agreement.

"**Eligible Receivables**" means, as of any date of determination, the Receivables that comply with the Eligibility Criteria as of such date.

"**Eligible Subsidiary**" means a Restricted Subsidiary that is a Wholly-Owned Subsidiary of the Company or of a Guarantor that constitutes a "Significant Subsidiary" within the meaning of Rule 1.02(w) of Regulation S-X under the Securities Act but excluding any Subsidiary that is contractually restricted from acting as a Guarantor of the notes pursuant to an agreement in effect on the Issue Date; provided that, the aggregate amount of tangible assets of Restricted Subsidiaries that are not Eligible Subsidiaries must not exceed 15% of Consolidated Tangible Assets.

"**Equity Sale**" means an underwritten primary public offering for cash, after the Issue Date, of Qualified Capital Stock of the Company or of any direct or indirect parent of the Company (to the extent the proceeds thereof are contributed to the common equity of the Company).

"**Euroclear**" means Euroclear Bank S.A./N.V., as operator of the Euroclear System, or its successor in such capacity.

"**Event of Default**" has the meaning assigned to it in Section 6.01(a).

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

"**Fair Market Value**" means, with respect to any asset (including, without limitation, accounts receivable), the price (after deducting any liabilities relating to such assets) which could be negotiated in an arm's-length free market transaction, for cash, between a willing seller and a willing and able buyer, neither of which is under any compulsion to complete the transaction; *provided* that the Fair Market Value of any such asset (including, without limitation, accounts receivable) will be determined conclusively by the senior management of the Company acting in good faith.

"**Fitch**" means Fitch, Inc. and its successors and assigns.

"**GAAP**" means either (i) the accounting criteria established by the CNBV as applicable to the Company, including SOFOM GAAP, (ii) the Mexican Financial Reporting Standards (*Normas de Información Financiera*) issued by the Mexican Board for Financial Information Standards (*Consejo Mexicano de Normas de Información Financiera, A.C.*) or (iii) the International Financial Reporting Standards, in each case as in effect from time to time.

"**Global Note**" means any Note issued in fully-registered certificated form to DTC (or its nominee), as depositary for the beneficial owners thereof, which shall be substantially in the form of Exhibit A with appropriate legends as specified in Section 2.08 and Exhibit A.

"**Guarantee**" means any obligation, contingent or otherwise, including an *aval*, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person:

(a)     to purchase or pay, or advance or supply funds for the purchase or payment of, such Indebtedness of such other Person, whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise; or

(b)     entered into for purposes of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof, in whole or in part;

*provided* that "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  "Guarantee," when used as a verb, has a corresponding meaning.

"**Guaranteed Obligations**" has the meaning assigned to it in Section 3.24(a).

"**Guarantor**" means any successor obligor pursuant to Section 4.01 and any Eligible Subsidiary that provides a Note Guarantee unless and until such Guarantor is released from its Note Guarantee in accordance with this Indenture.

"**Hedging Obligations**" means the obligations of any Person pursuant to any Interest Rate Agreement or Currency Agreement.

"**Holder**" means the Person in whose name a Note is registered in the Note Register.

"**IASB**" means International Accounting Standards Board.

"**Incur**" means, with respect to any Indebtedness or other obligation of any Person, to create, issue, incur (including by conversion, exchange or otherwise), assume, Guarantee or otherwise become liable in respect of such Indebtedness or other obligation on the balance sheet of such Person (and "**Incurrence,**" "**Incurred**" and "**Incurring**" will have meanings correlative to the preceding).

"**Indebtedness**" means with respect to any Person, without duplication:

(a)    the principal amount (or, if less, the accreted value) of all obligations of such Person for borrowed money;

(b)    the principal amount (or, if less, the accreted value) of all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(c)    all Capitalized Lease Obligations of such Person;

(d)    all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations and all obligations under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the ordinary course of business that are not overdue by 180 days or more or are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted);

(e)    all letters of credit, banker's acceptances or similar credit transactions, including reimbursement obligations in respect thereof;

(f)    Guarantees and other contingent obligations of such Person in respect of Indebtedness referred to in clauses (a) through (e) above and clauses (h) through (j) below;

(g)    all Indebtedness of any other Person of the type referred to in clauses (a) through (f) which is secured by any Lien on any property or asset of such Person, the amount of such Indebtedness being deemed to be the lesser of the Fair Market Value of such property or asset or the amount of the Indebtedness so secured;

(h)    all obligations under Hedging Obligations of such Person;

(i)    to the extent not otherwise included in this definition, all liabilities required to be recorded on the consolidated balance sheet of such Person in accordance with GAAP in connection with a sale or other disposition of securitized receivables or other accounts receivables and related assets, including, without limitation, in connection with any Lease Securitization or Receivables Transaction; and

(j)        all Disqualified Capital Stock issued by such Person.

"**Indenture**" means this Indenture, as amended or supplemented from time to time, including the Exhibits hereto.

"**Institutional Accredited Investor**" means an institution that is an "accredited investor" as defined in Rule 501(A)(1), (2), (3), (7), (8), (9), (12) or (13) of Regulation D under the Securities Act, who is not also a QIB.

"**Institutional Accredited Investor Global Note**" has the meaning assigned to it in Section 2.01(f).

"**Intangible Assets**" means with respect to the Company and its Restricted Subsidiaries, all unamortized debt discount and expense, unamortized deferred charges, goodwill, patents, trademarks, service marks, trade names, copyrights and all other items which would be treated as intangibles on the balance sheet of the Company and its Restricted Subsidiaries prepared in accordance with GAAP.

"**Interest Payment Date**" means the stated due date of an installment of interest on the Notes as specified in the Form of Face of Note contained in Exhibit A.

"**Interest Rate Agreement**" of any Person means any interest rate protection agreement (including, without limitation, interest rate swaps, caps, floors, collars, derivative instruments and similar agreements) and/or other types of hedging agreements designed to hedge interest rate risk of such Person.

"**Investment**" means, with respect to any Person, any:

(a)        direct or indirect loan, advance or other extension of credit (including, without limitation, a Guarantee) to any other Person,

(b)        capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others) any other Person, or

(c)        any purchase or acquisition by such Person of any Capital Stock, bonds, notes, debentures or other securities or evidences of Indebtedness issued by, any other Person.

"**Investment**" will exclude accounts receivable, loans, leases, factoring or deposits arising in the ordinary course of business in connection with the Company's and its Subsidiaries' leasing and factoring operations in accordance with the Permitted Business of the Company and its Subsidiaries. "**Invest**," "**Investing**" and "**Invested**" will have corresponding meanings.

For purposes of Section 3.10, the Company shall be deemed to have made an "Investment" in an Unrestricted Subsidiary at the time of its Designation, which shall be valued at the Fair Market Value of the sum of the net assets of such Unrestricted Subsidiary at the time of its Designation and the amount of any Indebtedness of such Unrestricted Subsidiary or owed to the Company or any Restricted Subsidiary immediately following such Designation.  Any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of such transfer.  If the Company or any Restricted Subsidiary sells or otherwise disposes of any Capital Stock of a Restricted Subsidiary (including any issuance and sale of Capital Stock by a Restricted Subsidiary) such that, after giving effect to any such sale or disposition, such Restricted Subsidiary would cease to be a Subsidiary of the Company, the Company shall be deemed to have made an Investment on the date of any such sale or disposition equal to sum of the Fair Market Value of the Capital Stock of such former Restricted Subsidiary held by the Company or any

16

Restricted Subsidiary immediately following such sale or other disposition and the amount of any Indebtedness of such former Restricted Subsidiary Guaranteed by the Company or any Restricted Subsidiary or owed to the Company or any other Restricted Subsidiary immediately following such sale or other disposition.

"**Investment Grade Rating**" means a rating equal to or higher than (a) BBB- (or the equivalent) by Fitch or (b) BBB- (or the equivalent) by S&P, or, if either such entity ceases to rate the Notes for reasons outside of the control of the Company, the equivalent investment grade credit rating from any other Rating Agency.

"**Investment Return**" means, in respect of any Investment (other than a Permitted Investment) made after the Issue Date by the Company or any Restricted Subsidiary:

(a)     (x) the proceeds in cash and the Fair Market Value of property other than cash received by the Company or any Restricted Subsidiary upon the sale, liquidation or repayment of such Investment or, in the case of a Guarantee, the amount of the Guarantee upon the unconditional release of the Company and its Restricted Subsidiaries in full, less any payments previously made by the Company or any Restricted Subsidiary in respect of such Guarantee and (y) any dividends or distributions received by the Company or any Restricted Subsidiary from an Unrestricted Subsidiary, to the extent such amounts were not otherwise included in Consolidated Net Income;

(b)     in the case of the Revocation of the Designation of an Unrestricted Subsidiary, an amount equal to the lesser of:

(i)     the Company's Investment in such Unrestricted Subsidiary at the time of such Revocation;

(ii)     that portion of the Fair Market Value of the net assets of such Unrestricted Subsidiary at the time of Revocation that is proportionate to the Company's equity interest in such Unrestricted Subsidiary at the time of Revocation; and

(iii)     the Designation Amount with respect to such Unrestricted Subsidiary upon its Designation which was treated as a Restricted Payment; and

(c)     in the event the Company or any Restricted Subsidiary makes any Investment in a Person that, as a result of or in connection with such Investment, becomes a Restricted Subsidiary, the Fair Market Value of the Investment of the Company and its Restricted Subsidiaries in such Person, in the case of each of (a), (b) and (c), up to the amount of such Investment that was treated as a Restricted Payment under Section 3.10 less the amount of any previous Investment Return in respect of such Investment.

"**Issue Date**" means [●], 2025.

"**Lease Securitization**" means any securitization, factoring, discounting or similar financing transaction or series of transactions entered into by the Company or any of its Restricted Subsidiaries pursuant to which the Company or any of its Restricted Subsidiaries directly or indirectly through a Securitization Vehicle securitizes a pool of specified Receivables, Residual Interests, net interest margin securities or similar or related assets of the Company or any Restricted Subsidiary on terms that the Board of Directors has concluded are customary and market terms fair to the Company and its Restricted Subsidiaries and the proceeds of which are used for working capital, to repay any Senior Indebtedness of the Company, make capital expenditures in a Permitted Business, and/or purchase assets (other than current assets as determined in accordance with GAAP or Capital Stock) to be used by the Company or any

Restricted Subsidiary in a Permitted Business.

"**Legal Defeasance**" has the meaning assigned to it in Section 8.01(b).

"**Lien**" means any lien, mortgage, deed of trust, security trust, pledge, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof and any agreement to give any security interest); *provided* that the lessee in respect of a Capitalized Lease Obligation or Sale and Leaseback Transaction will be deemed to have Incurred a Lien on the property leased thereunder.

"**Management Incentive Plan**" means a management incentive plan of the Company in respect of the Company's Qualified Capital Stock, adopted by its Board of Directors and administered by its Board of Directors or a committee designated by its Board of Directors, as the same may be amended, supplemented or modified from time to time, together with any applicable award agreement issued thereunder; *provided* that such management incentive plan shall only constitute the "Management Incentive Plan" for purposes of this Indenture to the extent it is in respect of not more than 10% of the Company's Qualified Capital Stock, calculated on a fully-diluted basis.

"**Marketable Securities**" has the meaning ascribed to such term under GAAP.

"**Maturity Date**" means [●], 2030.

"**Measurement Date**" shall mean the last Business day of each calendar month.

"**Mexican Restructuring**" means any case or other proceeding against the Company or any Subsidiary with respect to it or its debts under any bankruptcy, *concurso mercantil*, *quiebra*, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, *conciliador*, liquidator, custodian or other similar official of it or any substantial part of its property.

"**Mexican Trust**" means the *Fideicomiso de Administración y Fuente de Pago* created pursuant to the Mexican Trust Agreement.

"**Mexican Trust Agreement**" means that certain trust agreement (*Contrato de Fideicomiso de Administración y Fuente de Pago*) dated as of [●], 2025 entered into by the Company, the Trustee and the Mexican Trustee, as amended, restated, supplemented and otherwise modified from time to time.

"**Mexican Trustee**" means CIBANCO, S.A., Institución de Banca Múltiple, in its capacity as trustee, or any of its successor from time to time under the Mexican Trust Agreement.

"**Mexico**" means the United Mexican States.

"**Monthly Report**" has the meaning assigned to the term "*Reporte Mensual*" in the Mexican Trust Agreement.

"**Net Cash Proceeds**" means, with respect to any Asset Sale, the proceeds in the form of cash or Cash Equivalents, including payments in respect of deferred payment obligations when received in the form of cash or Cash Equivalents received by the Company or any of its Restricted Subsidiaries from such Asset Sale, net of:

(a)    reasonable out-of-pocket expenses and fees relating to such Asset Sale (including, without limitation, legal, accounting and investment banking fees and sales commissions);

(b)    taxes paid or payable in respect of such Asset Sale after taking into account any reduction in consolidated tax liability due to available tax credits or deductions and any tax sharing arrangements;

(c)    repayment of Indebtedness secured by a Lien permitted under this Indenture that is required to be repaid in connection with such Asset Sale; and

(d)    appropriate amounts to be provided by the Company or any Restricted Subsidiary, as the case may be, as a reserve, in accordance with GAAP, against any liabilities associated with such Asset Sale and retained by the Company or any Restricted Subsidiary, as the case may be, after such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, but excluding any reserves with respect to Indebtedness.

"**Net Loan Portfolio**" means, as of any date of determination, for any Person, the net loan portfolio and net of guarantee deposits of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Company) as of the last day of the most recent fiscal quarter prior to such date of determination, prepared in accordance with GAAP.

"**Non-U.S. Person**" means a person who is not a U.S. person, as defined in Regulation S.

"**Note Custodian**" means the custodian with respect to any Global Note appointed by DTC, or any successor Person thereto, and shall initially be the Trustee.

"**Note Guarantee**" has the meaning assigned to it in Section 3.24(a).

"**Note Register**" has the meaning assigned to it in Section 2.03(a).

"**Notes**" means any of the Company's 8.000% Senior Secured Notes due 2030 issued and authenticated pursuant to this Indenture, the terms of which shall be substantially in the form of Exhibit A.

"**Obligations**" means, with respect to any Indebtedness, any principal, premium, interest (including, without limitation, Post-Petition Interest), Additional Amounts, penalties, fees, indemnifications, reimbursements, damages, and other liabilities payable under the documentation governing such Indebtedness, including in the case of the Notes, this Indenture.

"**OFAC**" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"**Officer**" means, when used in connection with any action to be taken by the Company or the Guarantors, the Chairman of the Board, the Chief Executive Officer, the Deputy Chief Executive Officer, the President, the Chief Financial Officer, any Vice President, the Treasurer, the General Counsel, the Controller or the Secretary of the Company or the Guarantors, respectively.

"**Officers' Certificate**" means, when used in connection with any action to be taken by the Company or the Guarantors, a certificate signed by two Officers or by an Officer and either an Assistant Treasurer or an Assistant Secretary of the Company or the Guarantors, respectively, and delivered to the Trustee.

"**Opinion of Counsel**" means a written opinion of counsel, who may be an employee of or counsel for the Company (except as otherwise provided in this Indenture) and which opinion shall be reasonably acceptable to the Trustee.

19

"**Original Collateral Ratio**" means, as of any Measurement Date, the ratio of: (a) the Collateral Value as of such Measurement Date to (b) $[●][5].

"**Outstanding**" means, as of the date of determination, all Notes theretofore authenticated and delivered under this Indenture, *except*:

(a)    Notes theretofore canceled by the Trustee or delivered to the Trustee for cancellation;

(b)    Notes, or portions thereof, for the payment, redemption or, in the case of an Asset Sale Offer or Change of Control Triggering Event Offer, purchase of which money in the necessary amount has been theretofore deposited with the Trustee or any Paying Agent (other than the Company or an Affiliate of the Company) in trust or set aside and segregated in trust by the Company or an Affiliate of the Company (if the Company or such Affiliate of the Company is acting as Paying Agent) for the Holders of such Notes; *provided* that, if Notes (or portions thereof) are to be redeemed or purchased, notice of such redemption or purchase has been duly given pursuant to this Indenture or provision therefor reasonably satisfactory to the Trustee has been made;

(c)    Notes which have been surrendered pursuant to Section 2.10 or Notes in exchange for which or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, other than any such Notes in respect of which there shall have been presented to the Trustee proof satisfactory to it that such Notes are held by a bona fide purchaser in whose hands such Notes are valid obligations of the Company; and

(d)    solely to the extent provided in Article 8, Notes which are subject to Legal Defeasance or Covenant Defeasance as provided in Article 8;

*provided*, *however*, that in determining whether the Holders of the requisite aggregate principal amount of the Outstanding Notes have given any request, demand, authorization, direction, notice, consent or waiver hereunder,

(i)    Notes held by or on behalf of Sanctioned Holders shall be disregarded and deemed not to be Outstanding; and

(ii)    Notes owned by the Company or any other obligor upon the Notes or any Affiliate of the Company or of such other obligor shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes which a Trust Officer of the Trustee actually knows to be so owned shall be so disregarded.  Notes so owned which have been pledged in good faith may be regarded as Outstanding if the pledge establishes to the satisfaction of the Trustee the pledgee's right to so act with respect to such Notes and that the pledgee is not the Company or any other obligor upon the Notes or any Affiliate of the Company or of such other obligor.

"**Paying Agent**" has the meaning assigned to it in Section 2.03(a).

"**Permitted Acquisition Indebtedness**" means Indebtedness of the Company to the extent such Indebtedness was (a) Indebtedness of a Subsidiary prior to the date on which such Subsidiary became

---

[5] **NTD:** To be filled in with the initial aggregate principal amount of Notes issued on the Issue Date.

a Restricted Subsidiary, (b) Indebtedness of a Person that was merged, consolidated or amalgamated into the Company, or (c) assumed in connection with the acquisition of assets from a Person; *provided* that on the date such Subsidiary became a Restricted Subsidiary or the date such Person was merged, consolidated or amalgamated into the Company or assumed in connection with an Asset Acquisition, as applicable, after giving pro forma effect thereto, (i) the Company would be permitted to incur at least U.S.$1.00 of additional Indebtedness pursuant to Section 3.08(a) or (ii) the Capitalization Ratio of the Company and its Restricted Subsidiaries would be equal to or greater than the Capitalization Ratio of the Company and its Restricted Subsidiaries immediately prior to such transaction.

"**Permitted Business**" means the business or businesses conducted by the Company and its Subsidiaries as of the Issue Date and any business related, ancillary or complementary thereto or otherwise arising out of those activities, including, without limitation, any activities relating to financial or operating lease transactions, factoring, securitizations, loan and credit transactions, loan financing, durable goods lending, other asset leasing and asset-based lending operations, auto loans, loans to small and medium-sized enterprises (SMEs) and other entities and individuals, the extension of group loans and other consumer goods and receivables financing services.

"**Permitted Holders**" means (i) José Guillermo Romo de la Peña, (ii) María Guadalupe Romero Fernandez, (iii) José Guillermo Romo Romero, (iv) a parent, brother or sister of an individual named in clauses (i), (ii) and (iii), (v) the lineal descendants of any person named in clauses (i), (ii), (iii) and (iv), (vi) the estate or any guardian, custodian or other legal representative of any individual named in clauses (i) through (v), (vii) any trust or other vehicle established principally for the benefit of any one or more of the individuals named in clauses (i) through (vi), and (viii) any Person, including investment funds, in which a majority of the Voting Stock is owned or controlled, directly or indirectly, by any one or more of the Persons named in clauses (i) through (vii).

"**Permitted Indebtedness**" has the meaning assigned to it in Section 3.08(b).

"**Permitted Investments**" means:

(a)    Investments by the Company or any Restricted Subsidiary in any Person that is, or that result in any Person becoming, immediately after such Investment, a Restricted Subsidiary or constituting a merger or consolidation of such Person into the Company or with or into a Restricted Subsidiary, except for a Guarantee of Indebtedness of a Restricted Subsidiary;

(b)    Investments by the Company, or any Restricted Subsidiary in the Company;

(c)    Investments in cash and Cash Equivalents;

(d)    any extension, modification or renewal of any Investments existing as of the Issue Date (but not Investments involving additional advances, contributions or other investments of cash or property or other increases thereof, other than as a result of the accrual or accretion of interest or original issue discount or payment-in-kind pursuant to the terms of such Investment as of the Issue Date);

(e)    Investments permitted pursuant to Section 3.17(b)(ii), Section 3.17(b)(iii) and Section 3.17(b)(v);

(f)     Investments received as a result of the restructuring, bankruptcy or reorganization (including the Debt Restructuring) of any Person, or taken in settlement of or other resolution of claims or disputes, and, in each case, extensions, modifications and renewals thereof;

(g)     Investments made by the Company or its Restricted Subsidiaries as a result of non-cash consideration permitted to be received in connection with an Asset Sale made in compliance with Section 3.11;

(h)     Investments in the form of Hedging Obligations permitted under Section 3.08(b)(iv);

(i)     Investments in a Person engaged in a Permitted Business; *provided* that any such Investment, taken together with all Investments made in reliance on this clause (i) since the Issue Date shall not exceed the sum of (1) (x) 2.5% of Consolidated Tangible Assets *plus* (y) U.S.$7.5 million, *plus* (2) returns received from Investments made under this clause (i); *provided*, *however*, that these returns (i) are not included in the Consolidated Net Income of the Company, (ii) are in the form of cash and (iii) do not exceed the amount of Investments in such Person made after the Issue Date in reliance on this clause (i). For the avoidance of doubt, Investments in or among Restricted Subsidiaries shall not be affected by this clause (i);

(j)     receivables owing to the Company or any Restricted Subsidiary if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms;

(k)     payroll, travel, entertainment, relocation and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(l)     loans or advances to employees in the ordinary course of business consistent with past practices of the Company or such Restricted Subsidiary;

(m)     Investments in any Person to the extent such Investments consist of prepaid expenses, negotiable instruments held for collection and lease, utility and workers' compensation, performance and other similar deposits made in the ordinary course of business by the Company or any Restricted Subsidiary;

(n)     payroll loans, durable goods loans, auto loans, small business loans, group loans and other loans (including loan portfolios) made or acquired by the Company in the ordinary course of business, including, without limitation, the acquisition of loans or loan portfolios from third parties;

(o)     Investments in any Person in connection with a Lease Securitization or Receivables Transaction; *provided* that such Investment in any such Person is in the form of a receivables financing facility, net interest margin securities or similar or related assets of the Company or any Restricted Subsidiary and transferred to such Person in

connection with a Lease Securitization or Receivables Transaction (including by way of transfers of receivables to any Person or Securitization Vehicle);

(p)     Investments made by the Company and/or any of its Subsidiaries to implement the Debt Restructuring; and

(q)     Investments made by the Mexican Trust pursuant to the Mexican Trust Agreement;

*provided*, *however*, that with respect to any Investment, the Company may, in its sole discretion, allocate all or any portion of any Investment and later reallocate all or any portion of any Investment to, one or more of the above clauses (a) through (o) so that the entire Investment would be a Permitted Investment.

"**Permitted Liens**" means any of the following:

(a)     Liens securing the Notes in accordance with the terms of this Indenture and the Mexican Trust Agreement;

(b)     statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen and other Liens imposed by law incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith;

(c)     Liens Incurred or deposits made in the ordinary course of business (x) in connection with workers' compensation, unemployment insurance and other types of social security, including any Lien securing letters of credit issued in the ordinary course of business consistent with past practice in connection therewith, or (y) to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(d)     Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(e)     Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Company or a Restricted Subsidiary, including rights of offset and set-off;

(f)     Liens securing Hedging Obligations that relate to Indebtedness that is Incurred in accordance with Section 3.08 and that are secured by the same assets as secure such Hedging Obligations;

(g)     (A) Liens existing on the Issue Date (other than Liens described in clauses (a) and (v)) and (B) Liens to secure any Refinancing Indebtedness which is Incurred to Refinance any Indebtedness which has been secured by a Lien permitted under Section

23

3.16 not incurred pursuant to clauses (j) and (k) below and which Indebtedness has been Incurred in accordance with Section 3.08; *provided* that such new Liens:

(i)     are no less favorable to the holders of Notes and are not more favorable to the lienholders with respect to such Liens than the Liens in respect of the Indebtedness being Refinanced, and

(ii)     do not extend to any property or assets other than the property or assets securing the Indebtedness Refinanced by such Refinancing Indebtedness (which, for the avoidance of doubt, shall not extend to the Collateral);

(h)     Liens securing Acquired Indebtedness Incurred in accordance with Section 3.08 not incurred in connection with, or in anticipation or contemplation of, the relevant acquisition, merger or consolidation; *provided* that:

(i)     such Liens secured such Acquired Indebtedness at the time of and prior to the Incurrence of such Acquired Indebtedness by the Company or a Restricted Subsidiary and were not granted in connection with, or in anticipation of, the Incurrence of such Acquired Indebtedness by the Company or a Restricted Subsidiary, and

(ii)     such Liens do not extend to or cover any property of the Company or any Restricted Subsidiary other than the property that secured the Acquired Indebtedness prior to the time such Indebtedness became Acquired Indebtedness of the Company or a Restricted Subsidiary and are no more favorable to the lienholders than the Liens securing the Acquired Indebtedness prior to the Incurrence of such Acquired Indebtedness by the Company or a Restricted Subsidiary;

(i)     purchase money Liens securing Purchase Money Indebtedness or Capitalized Lease Obligations Incurred to finance the acquisition or leasing of property of the Company or a Restricted Subsidiary used in a Permitted Business; *provided* that:

(i)     the related Purchase Money Indebtedness does not exceed the cost of such property and shall not be secured by any property of the Company or any Restricted Subsidiary other than the property so acquired, and

(ii)     the Lien securing such Indebtedness will be created within 365 days of such acquisition;

(j)     any pledge or deposit of cash or property in conjunction with obtaining surety and performance bonds and letters of credit required to engage in constructing on-site and off-site improvements required by municipalities or other governmental authorities in the ordinary course of business;

(k)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(l)    Liens encumbering customary initial deposits and margin deposits, and other Liens that are customary in the industry and incurred in the ordinary course of business securing Indebtedness under Hedging Obligations and forward contracts, options, futures contracts, futures options or similar agreements or arrangements designed to protect the Company and its Restricted Subsidiaries from fluctuations in interest rates;

(m)    Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; *provided* that any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor;

(n)    licenses of intellectual property in the ordinary course of business;

(o)    Liens to secure a defeasance trust to the extent such defeasance is otherwise permitted pursuant to the terms of this Indenture;

(p)    easements, rights-of-way, zoning and similar restrictions, reservations, restrictions or encumbrances in respect of real property or title defects that were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties (as such properties are used by the Company or its Restricted Subsidiaries) or materially impair their use in the operation of the business of the Company and its Restricted Subsidiaries;

(q)    judgment Liens not giving rise to an Event of Default so long as any appropriate legal proceedings that may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such legal proceedings may be initiated shall not have expired;

(r)    Liens on Capital Stock of an Unrestricted Subsidiary that secure Indebtedness or other obligations of such Unrestricted Subsidiary;

(s)    Liens Incurred on accounts receivable and/or related assets securing obligations under Lease Securitizations;

(t)    Liens Incurred on accounts receivable and/or related assets securing Indebtedness and any related obligations under Receivables Transactions, which Indebtedness is incurred and outstanding pursuant to Section 3.08(b)(xvi);

(u)    Liens on any property, assets, rights, accounts receivables or proceeds therefrom that are not required to be recorded as assets on the consolidated balance sheet of the Company in accordance with GAAP, in an aggregate amount not to exceed 10% of Consolidated Tangible Assets;

(v)    Liens securing the Bancomext Facility, the Bilateral Debt Refinancing Facilities [and the Cebures], and any other Liens Incurred to implement the Debt Restructuring (other than Liens described in clause (a)); and

25

(w)    Other Liens at any time outstanding securing obligations, including obligations under credit facilities, in an aggregate amount not to exceed 10% of Consolidated Tangible Assets.

"**Person**" means an individual, partnership, limited partnership, corporation, company, limited liability company, unincorporated organization, trust (*fideicomiso*) or joint venture, or a governmental agency or political subdivision thereof.

"**Post-Petition Interest**" means, to the extent applicable, all interest accrued or accruing after the commencement of any insolvency or liquidation proceeding (and interest that would accrue but for the commencement of any insolvency or liquidation proceeding) in accordance with and at the contract rate (including, without limitation, any rate applicable upon default) specified in the agreement or instrument creating, evidencing or governing any Indebtedness, whether or not, pursuant to applicable law or otherwise, the claim for such interest is allowed as a claim in such insolvency or liquidation proceeding.

"**Preferred Stock**" of any Person means any Capital Stock of such Person that has preferential rights over any other Capital Stock of such Person with respect to dividends, distributions or redemptions or upon liquidation.

"**Private Placement Legend**" has the meaning assigned to it in Section 2.08(b).

"**Purchase Money Indebtedness**" means Indebtedness Incurred for the purpose of financing all or any part of the purchase price, or other cost of construction or improvement of any property; *provided* that the aggregate principal amount of such Indebtedness does not exceed the lesser of the Fair Market Value of such property or such purchase price or cost, including any Refinancing of such Indebtedness that does not increase the aggregate principal amount (or accreted amount, if less) thereof as of the date of Refinancing.

"**QIB**" means any "qualified institutional buyer" (as defined in Rule 144A).

"**Qualified Capital Stock**" means any Capital Stock that is not Disqualified Capital Stock and any warrants, rights or options to purchase or acquire Capital Stock that is not Disqualified Capital Stock and that is not convertible into or exchangeable into Disqualified Capital Stock.

"**Qualified Merger Jurisdiction**" means (a) the United States, any State thereof or the District of Columbia; (b) any member state of the European Union; or (c) any other nation that has a sovereign debt rating from two Rating Agencies that is equal to or higher than the sovereign debt rating assigned to Mexico by such Rating Agencies.

"**Rating Agencies**" means (a) S&P and (b) Fitch or (c) if S&P or Fitch or both shall not make a rating of the Notes publicly available, a nationally recognized United States securities rating agency or agencies, as the case may be, selected by the Company, which shall be substituted for S&P or Fitch or both, as the case may be.

"**Rating Date**" means the earlier of the date of public notice of the occurrence of a Change of Control or of the entry into a definitive agreement contemplating a Change of Control.

A "**Rating Methodology Event**" shall be deemed to occur when the Company certifies in a notice to the Trustee that an amendment, clarification or change has occurred in the equity credit criteria of S&P or Fitch, which amendment, clarification or change results in a lower equity credit for a series of Capital Securities than the then respective equity credit assigned on the issue date of such Capital Securities,

26

or if equity credit is not assigned on such issue date, at the date when the equity credit is assigned for the first time.

"**Receivables**" means loans, other loan-related receivables, factoring and factoring-related receivables, leases and other lease-related receivables purchased or originated by the Company or any Restricted Subsidiary; *provided*, *however*, that for purposes of determining the amount of a Receivable at any time, such amount shall be determined in accordance with GAAP, consistently applied, as of the most recent practicable date.

"**Receivables Transaction**" means any securitization, factoring, discounting or similar financing transaction or series of transactions, including any debt facility, bridge loan (warehousing) or line of credit, entered into by the Company or any of its Restricted Subsidiaries (other than a Lease Securitization) pursuant to which the Company or any of its Restricted Subsidiaries may, sell, convey, assign or otherwise transfer to any Person, or may grant a security interest in, any specified Receivables, Residual Interests, net interest margin securities or similar or related assets of the Company or any Restricted Subsidiary.

"**Record Date**" has the meaning assigned to it in the Form of Face of Note contained in Exhibit A.

"**Redemption Date**" means, with respect to any redemption of Notes (including any Scheduled Redemption Date), the date fixed for such redemption pursuant to this Indenture and the Notes.

"**Refinance**" means, in respect of any Indebtedness, to issue any Indebtedness in exchange for or to refinance, replace, defease or refund such Indebtedness in whole or in part. "**Refinanced**" and "**Refinancing**" will have correlative meanings.

"**Refinancing Indebtedness**" means Indebtedness of the Company or any Restricted Subsidiary issued to Refinance any other Indebtedness of the Company or a Restricted Subsidiary so long as:

(a)    the aggregate principal amount (or initial accreted value, if applicable) of such new Indebtedness as of the date of such proposed Refinancing does not exceed the aggregate principal amount (or initial accreted value, if applicable) of the Indebtedness being Refinanced (plus the amount of any premium required to be paid under the terms of the instrument governing such Indebtedness and the amount of reasonable expenses incurred by the Company in connection with such Refinancing);

(b)    such new Indebtedness has:

(i)    a Weighted Average Life to Maturity that is equal to or greater than the Weighted Average Life to Maturity of the Indebtedness being Refinanced, and

(ii)    a final maturity that is equal to or later than the final maturity of the Indebtedness being Refinanced; and

(c)    if the Indebtedness being Refinanced is:

(i)    Indebtedness of the Company, then such Refinancing Indebtedness will be Indebtedness of the Company,

(ii)    Indebtedness of a Guarantor, then such Refinancing Indebtedness will be Indebtedness of

the Company and/or such Guarantor, and

(iii)    Subordinated Indebtedness, then such Refinancing Indebtedness shall be subordinate to the Notes and the Note Guarantees, at least to the same extent and in the same manner as the Indebtedness being Refinanced.

"**Refinancing of Capital Securities**" means the prepayment, exchange, refinancing, replacement, purchase, redemption, retirement, defeasance, refund or other acquisition for value of Capital Securities.

"**Registrar**" has the meaning assigned to it in Section 2.03(a).

"**Regulation S**" means Regulation S under the Securities Act (or any successor rule).

"**Relevant Jurisdiction**" has the meaning assigned to it in Section 3.23(a).

"**Regulation S Global Note**" has the meaning assigned to it in Section 2.01(e).

"**Resale Restriction Termination Date**" means, for any Restricted Note (or beneficial interest therein), one year (or such other period specified in Rule 144) from the Issue Date.

"**Residual Interests**" means (a) any residual interests in Lease Securitizations, Receivables Transactions, Securitization Securities or any other interests in Securitization Vehicles or (b) the residual value of any assets that are financed through Indebtedness Incurred in connection with a Lease Securitization or Receivables Transactions, regardless of whether required to appear on the face of the consolidated financial statements of such Person and its Subsidiaries in accordance with GAAP.

"**Restricted Note**" means any Note (or beneficial interest therein), until such time as:

(a)    the Resale Restriction Termination Date therefor has passed;

(b)    such Note is a Regulation S Global Note and the Distribution Compliance Period therefor has terminated; or

(c)    the Private Placement Legend therefor has otherwise been removed pursuant to Section 2.09(d) or, in the case of a beneficial interest in a Global Note, such beneficial interest has been exchanged for an interest in a Global Note not bearing a Private Placement Legend.

"**Restricted Payment**" has the meaning assigned to it in Section 3.10(a).

"**Restricted Subsidiary**" means any Subsidiary of the Company, which, at the time of determination, is not an Unrestricted Subsidiary.

"**Revocation**" has the meaning assigned to it in Section 3.13(c).

"**Rule 144**" means Rule 144 under the Securities Act (or any successor rule).

"**Rule 144A**" means Rule 144A under the Securities Act (or any successor rule).

"**Rule 144A Global Note**" has the meaning assigned to it in Section 2.01(d).

"**S&P**" means Standard & Poor's Ratings Services and its successors and assigns.

28

"**Sale and Leaseback Transaction**" means any direct or indirect arrangement with any Person or to which any such Person is a party providing for the leasing to the Company or a Restricted Subsidiary of any property, whether owned by the Company or any Restricted Subsidiary at the Issue Date or later acquired, which has been or is to be sold or transferred by the Company or such Restricted Subsidiary to such Person or to any other Person by whom funds have been or are to be advanced on the security of such Property.

"**Sanctioned Country**" means a country or territory that is subject to comprehensive Sanctions (currently, Crimea, Cuba, Iran, North Korea, Syria and those portions of the Donetsk People's Republic or Luhansk People's Republic regions (and such other regions) of Ukraine over which any Sanctions Authority imposes country or territory wide comprehensive Sanctions).

"**Sanctioned Holder**" means any Holder (a) that is listed on any Sanctions List, or is otherwise the target of any Sanctions (including, without limitation, by reason of ownership, control or agency (as such terms are defined by the relevant Sanctions or Sanctions Authority) by or with one or more persons listed on a Sanctions List); (b) located or ordinarily resident in or organized under the laws of any Sanctioned Country; (c) with which the Company, any of its Subsidiaries, the Trustee or any Agent is prohibited from dealing or otherwise engaging pursuant to any Sanctions in any transaction contemplated by the terms of the Notes and this Indenture; or (d) whose Notes are held through any securities depositary with which the Company, any of its Subsidiaries, the Trustee or any Agent is prohibited from dealing or otherwise engaging in any transaction pursuant to any Sanctions contemplated by the terms of the Notes and this Indenture, but only if the dealing or other engagement in respect of the Notes of such Holder are required to be conducted through such securities depositary. "**Sanctioned Holder**" shall exclude those Holders that are solely identified on, or otherwise subject to the restrictions under, the "Sectoral Sanctions Identifications List" of OFAC or any equivalent list maintained by any other Sanctions Authority.

"**Sanctions**" means economic or financial sanctions, laws, regulations or trade embargoes or similar measures implemented, administered or enforced by any of the Sanctions Authorities.

"**Sanctions Authority**" means (a) the U.S. Department of the Treasury's Office of Foreign Assets Control and the U.S. Departments of State or Commerce; (b) the United Nations Security Council; (c) the European Union or any member state thereof or any governmental authority of the same; or (d) the United Kingdom (or any governmental authority of the same, including, without limitation, in respect of the United Kingdom, His Majesty's Treasury and the Department for Business and Trade).

"**Sanctions List**" means any of the lists of specifically designated persons or entities (or equivalent) maintained by a Sanctions Authority, each as amended, supplemented or substituted from time to time.

"**Scheduled Redemption Date**" means each of the dates in which the Company shall redeem the applicable principal amount on the Notes as specified in Schedule B to the Notes; *provided* that if any such date is not a Business Day, then such day will not be a payment date and such Scheduled Redemption Date will be the next succeeding Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not), with no additional interest accruing on the applicable principal amount past such date.

"**SEC**" means the United States Securities and Exchange Commission.

"**Secured Indebtedness**" means any Indebtedness secured by a Lien upon the property or assets of the Company and/or its Restricted Subsidiaries.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended, or any successor

statute or statutes thereto.

"**Securitization Securities**" has the meaning assigned to it in the definition of "**Securitization Vehicle**".

"**Securitization Vehicle**" means (a) any Person (whether or not a Restricted Subsidiary of the Company) established for the purpose of issuing asset-backed securities of any kind or issuing any other Indebtedness (whether or not in the form of securities) backed by Receivables or Residual Interests ("**Securitization Securities**") and (b) any special purpose, bankruptcy remote Restricted Subsidiary of the Company or any of its Restricted Subsidiaries established in connection with the issuance of Securitization Securities and any other entity (or several entities) that serves as an intermediate entity between a Restricted Subsidiary, as the case may be, that initially purchases or originates Receivables or Residual Interests and an entity referred to in clause (a) regardless of whether such Restricted Subsidiary is an issuer of Securitization Securities; *provided* that in each case, such entity is an entity:

(a)    that does not engage in, and whose charter prohibits it from engaging in, any activities other than Lease Securitizations and any activity necessary, incidental or related thereto,

(b)    no portion of the Indebtedness or any other obligation, contingent or otherwise, of which

(i)    is Guaranteed by the Company or any Restricted Subsidiary of the Company,

(ii)    is recourse to or obligates the Company or any Restricted Subsidiary of the Company in any way (other than in respect of a Lien on any assets under leases, the Receivables of which are subject to a Lease Securitization), or

(iii)    subjects any property or asset of the Company or any Restricted Subsidiary of the Company, directly or indirectly, contingently or otherwise, to the satisfaction thereof (other than in respect of a Lien on any assets under leases, the Receivables of which are subject to a Lease Securitization),

(c)    with respect to which neither the Company nor any Restricted Subsidiary of the Company (other than an Unrestricted Subsidiary) has any obligation to maintain or preserve its financial condition or cause it to achieve certain levels of operating results;

*other than*, in respect of clauses (b) and (c), (x) pursuant to customary representations, warranties, covenants and indemnities entered into in connection with a Lease Securitization, and (y) any Guarantees by the Company or a Restricted Subsidiary of any Indebtedness of a Securitization Vehicle that would constitute Permitted Indebtedness or which would be permitted under Section 3.08.

"**Senior Indebtedness**" means the Notes (and any Note Guarantee thereof) and any other Indebtedness of the Company or a Guarantor that is not, pursuant to the instrument evidencing such Indebtedness, expressly subordinated in right of payment to the notes, or the relevant Note Guarantee.

"**Significant Subsidiary**" means a Subsidiary of the Company constituting a "Significant

Subsidiary" of the Company in accordance with Rule 1-02(w) of Regulation S-X under the Securities Act in effect on the date hereof.

"**SGX-ST**" means the Singapore Exchange Securities Trading Limited.

"**Sofom GAAP**" means, collectively, the accounting criteria prescribed by the CNBV in its General Provisions Applicable to Public Bonded Warehouses, Exchange Houses, Credit Unions and Regulated Multipurpose Financial Institutions (*Disposiciones de Carácter General Aplicables a los Almacenes Generales de Depósito, Casas de Cambio, Uniones de Crédito y Sociedades Financieras de Objeto Múltiple Reguladas* and *Disposiciones de carácter general aplicables a las Instituciones de Crédito*), as amended from time to time.

"**Special Record Date**" has the meaning assigned to it in Section 2.13(a).

"**Stated Maturity**" means, with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency unless such contingency has occurred).

"**Subordinated Indebtedness**" means, with respect to the Company or a Guarantor, any Indebtedness of the Company or a Guarantor that is, pursuant to the instrument evidencing such Indebtedness, expressly subordinated in right of payment to the notes, the relevant Note Guarantee or any other Senior Indebtedness, as the case may be.

"**Subsidiary**" means, with respect to any Person, any other Person (i) of which such Person owns, directly or indirectly, more than 50.0% of the voting power of the other Person's outstanding Voting Stock and (ii) that is required to be included in such Person's consolidated financial statements in accordance with GAAP .

"**Surviving Entity**" has the meaning assigned to it in Section 4.01(a)(i)(B).

"**Taxes**" has the meaning assigned to it in Section 3.23(a).

"**Taxing Authority**" has the meaning assigned to it in Section 3.23(a).

A "**Tax Deductibility Event**" shall be deemed to have occurred with respect to a series of Capital Securities if, as a result of a Tax Law Change (even if such change is not yet effective), payments of interest by the Company in respect of such Capital Securities are no longer, or within 90 calendar days of the date of any opinion of counsel provided pursuant to the indenture pursuant to which such Capital Securities were issued will no longer be, deductible in whole or in part for corporate income tax purposes in Mexico or any political subdivision or taxing authority thereof or therein affecting taxation, and the Company cannot avoid the foregoing by taking reasonable measures available to it.

"**Tax Law Change**" has the meaning assigned to it in Section 5.08(a).

"**Top-Up Collateral**" has the meaning assigned to it in Section 3.18(b).

"**Total Unencumbered Assets**" means, as of any date of determination, the total assets of the Company and its Restricted Subsidiaries determined on a consolidated basis (but excluding Intangible Assets, any deferred tax assets and accounts receivable (other than receivables subject to Lease

Securitizations)), in each case not securing any portion of Secured Indebtedness as of the last day of the most recent fiscal quarter prior to such date of determination, prepared in accordance with GAAP.

"**Total Unsecured Indebtedness**" means, as of any date of determination, the total outstanding principal amount of all Unsecured Indebtedness of the Company and its Restricted Subsidiaries determined on a consolidated basis as of the last day of the most recent fiscal quarter prior to such date of determination, prepared in accordance with GAAP.

"**Trust Indenture Act**" means the Trust Indenture Act of 1939, as amended, as in effect on the date of this Indenture (except as otherwise provided in this Indenture).

"**Trust Officer**" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee having direct responsibility for the administration of this Indenture or any officer of the Trustee to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject.

"**Trustee**" means the party named as such in the introductory paragraph of this Indenture until a successor replaces it in accordance with the terms of this Indenture and, thereafter, means the successor.

"**U.K. Court**" means the High Court of Justice of England and Wales.

"**U.K. Scheme of Arrangement**" means the U.K. scheme of arrangement initiated by Mega NewCo Limited, a Wholly-Owned Subsidiary of the Company, in respect of which a U.K. Court sanction order was made on December [●], 2024.

"**Unrestricted Subsidiary**" means any Subsidiary of the Company which:

(a) is Designated as an Unrestricted Subsidiary pursuant to Section 3.13 (which Designation may be revoked by a certificate of the Chief Financial Officer of the Company, subject to the provisions of Section 3.13); and

(b) at the time of such Designation (or at any time thereafter while such Subsidiary remains an Unrestricted Subsidiary):

(i) is not a creditor in respect of any Indebtedness of the Company or any Restricted Subsidiary; and

(ii) does not hold any Liens on any assets (including Intangible Assets) or Capital Stock of the Company or any Restricted Subsidiary.

"**Unsecured Indebtedness**" means any Indebtedness of the Company and/or its Restricted Subsidiaries other than Secured Indebtedness.

"**U.S. Dollar Equivalent**" means with respect to any monetary amount in a currency other than U.S. Dollars, at any time for determination thereof, the amount of U.S. Dollars obtained by converting such foreign currency involved in such computation into U.S. Dollars at the spot rate for the purchase of U.S. Dollars with the applicable foreign currency as published in *The Wall Street Journal* in the "Exchange Rates" column under the heading "Currency Trading" on the date that is two Business Days prior to such determination.

Except as described under Section 3.08, whenever it is necessary to determine whether the Company has complied with any covenant in this Indenture or a Default has occurred and an amount is expressed in a currency other than U.S. dollars, such amount will be treated as the U.S. Dollar Equivalent determined as of the date such amount is initially determined in such currency.

"**U.S. Dollars**" means such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts.

"**U.S. Government Obligations**" means direct obligations (or certificates representing an ownership interest in such obligations) of or guaranteed by the United States of America (including any agency or instrumentality thereof) for the payment of which the full faith and credit of the United States of America is pledged and which are not callable or redeemable at the issuer's option.

"**Voting Stock**" with respect to any Person, means securities of any class of Capital Stock of such Person entitling the holders thereof (whether at all times or only so long as no senior class of stock has voting power by reason of any contingency) to vote in the election of members of the Board of Directors (or equivalent governing body) of such Person.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years (calculated to the nearest one-twelfth) obtained by dividing:

(a)     the then outstanding aggregate principal amount or liquidation preference, as the case may be, of such Indebtedness into

(b)     the sum of the products obtained by multiplying:

(i)     the amount of each then remaining installment, sinking fund, serial maturity or other required payment of principal or liquidation preference, as the case may be, including payment at final maturity, in respect thereof, by

(ii)     the number of years (calculated to the nearest one-twelfth), which will elapse between such date and the making of such payment.

"**Wholly-Owned Subsidiary**" means, for any Person, any Subsidiary (Restricted Subsidiary in the case of the Company) of which all the outstanding Capital Stock (other than, in the case of a Subsidiary not organized in the United States, directors' qualifying shares or an immaterial amount of shares required to be owned by other Persons pursuant to applicable law) is owned by such Person and/or one or more Persons that satisfy this definition in respect of such Person (or a combination thereof).

"**Withholding Tax Event**" has the meaning assigned to it in Section 5.08(a).

Section 1.02.     *Rules of Construction*.  Unless the context otherwise requires:

(a)     a term has the meaning assigned to it;

(b)     an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(c)     "or" is not exclusive;

(d)     "including" means including without limitation;

(e)        words in the singular include the plural and words in the plural include the singular;

(f)        references to the payment of principal of the Notes shall include applicable premium, if any; and

(g)        references to payments on the Notes (including payments in connection with optional redemptions or mandatory offers to repurchase) shall include Additional Amounts payable on the Notes, if any.

ARTICLE 2
THE NOTES

Section 2.01.        *Form and Dating*.

(a)        The Notes are being originally placed by the Company pursuant to a note purchase and placement agreement, dated as of [●], 2024, among the Company and the purchasers thereto.  The Notes will be issued in fully-registered form, and only in denominations of U.S.$150,000 and integral multiples of U.S.$1,000 in excess thereof.  The Notes and the Trustee's certificate of authentication shall be substantially in the form of Exhibit A.

(b)        The terms and provisions of the Notes, the form of which is in Exhibit A, shall constitute, and are hereby expressly made, a part of this Indenture, and, to the extent applicable, the Company and the Trustee, by their execution and delivery of this Indenture expressly agree to such terms and provisions and to be bound thereby.  Except as otherwise expressly permitted in this Indenture, all Notes shall be identical in all respects.  Notwithstanding any differences among them, all Notes issued under this Indenture shall vote and consent together on all matters as one class.

(c)        The Notes may have notations, legends or endorsements as specified in Section 2.08 or as otherwise required by law, stock exchange rule or DTC rule or usage.  The Company and the Trustee shall approve the form of the Notes and any notation, legend or endorsement on them.  Each Note shall be dated the date of its authentication.

(d)        Notes originally placed to QIBs in reliance on Section 4(a)(2) under the Securities Act will be issued in the form of one or more permanent Global Notes (each, a "**Rule 144A Global Note**").

(e)        Notes originally placed to Institutional Accredited Investors in reliance on Section 4(a)(2) under the Securities Act, will be issued in the form of one or more permanent Global Notes (the "**Institutional Accredited Investor Global Note**").

(f)        Notes originally placed outside the United States of America in reliance on Regulation S will be issued in the form of one or more permanent Global Notes (each a "**Regulation S Global Note**").

Section 2.02.        *Execution and Authentication*.

(a)    An Officer of the Company shall sign the Notes for the Company by manual or facsimile signature.  If an Officer whose signature is on a Note no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

(b)    A Note shall not be valid until an authorized signatory of the Trustee manually or electronically authenticates the Note.  The signature of the Trustee on a Note shall be conclusive evidence that such Note has been duly and validly authenticated and delivered under this Indenture.

(c)    Other than the $[●] original principal amount of Notes issued on the Issue Date, no Notes may be executed, authenticated or delivered hereunder, except (i) as required to effect any transfer or exchange of Notes originally issued on the Issue Date in accordance with this Article 2 and (ii) pursuant to Section 2.10 hereof. In connection with any such new Notes issued in accordance with the immediately preceding sentence, the Trustee shall authenticate and make available for delivery Notes upon a written order of the Company signed by an Officer of the Company (the "**Company Order**").  A Company Order shall specify the amount of the Notes to be authenticated and the date on which the original issue of Notes is to be authenticated.

(d)    The Trustee may appoint an agent (the "**Authenticating Agent**") reasonably acceptable to the Company to authenticate the Notes.  Unless limited by the terms of such appointment, any such Authenticating Agent may authenticate Notes whenever the Trustee may do so.  Each reference in this Indenture to authentication by the Trustee includes authentication by the Authenticating Agent.

(e)    In case a Surviving Entity has executed an indenture supplemental hereto with the Trustee pursuant to Article 4, any of the Notes authenticated or delivered prior to such transaction may, from time to time, at the request of the Surviving Entity, be exchanged for other Notes executed in the name of the Surviving Entity with such changes in phraseology and form as may be appropriate, but otherwise identical to the Notes surrendered for such exchange and of like principal amount; and the Trustee, upon Company Order of the Surviving Entity, shall authenticate and deliver Notes as specified in such order for the purpose of such exchange.  If Notes shall at any time be authenticated and delivered in any new name of a Surviving Entity pursuant to this Section 2.02 in exchange or substitution for or upon registration of transfer of any Notes, such Surviving Entity, at the option of the Holders but without expense to them, shall provide for the exchange of all Notes at the time Outstanding for Notes authenticated and delivered in such new name.

Section 2.03.    *Registrar and Paying Agent*.

(a)    The Company shall maintain an office or agency in the Borough of Manhattan, City of New York or in Minneapolis, Minnesota, and, so long as the Notes are admitted to listing on the SGX-ST and to trading on the Official List of the SGX-ST and the rules of the SGX-ST so require, in Singapore (which office or agency may be an office of the Trustee or an affiliate of the Trustee), where Notes may be presented or surrendered for registration of transfer or for exchange (the "**Registrar**"), where Notes may be presented for payment (the "**Paying Agent**"), for the service of notices and demands to or upon the Company in respect of the Notes and this Indenture.  The Registrar shall keep a register of the Notes and of their transfer and exchange

35

(the "**Note Register**").  The Company may have one or more co-Registrars and one or more additional paying agents.  The term "**Paying Agent**" includes any additional paying agent.

(b)        The Company shall enter into an appropriate agency agreement with any Registrar, Paying Agent or co-Registrar not a party to this Indenture.  The agreement shall implement the provisions of this Indenture that relate to such agent.  The Company shall notify the Trustee of the name and address of each such agent.  If the Company fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.07.  The Company may act as Paying Agent, Registrar, co-Registrar or transfer agent.  Upon any proceeding under any Bankruptcy Law with respect to the Company or any Affiliate of the Company, if the Company or such Affiliate is then acting as Paying Agent, the Trustee shall replace the Company or such Affiliate as Paying Agent.

(c)        The Company initially appoints the Corporate Trust Office of the Trustee as one such office or agency of the Company as required by Section 2.03(a) and appoints the Trustee as Registrar, Paying Agent and agent (but, for the avoidance of doubt, not as Singapore Registrar or Singapore Paying Agent) for notices in connection with the Notes and this Indenture, until such time as another Person is appointed as such.

(d)        The Company may change the Paying Agent and the Registrar without notice to Holders.

Section 2.04.        *Paying Agent to Hold Money in Trust*.  The Company shall require each Paying Agent (other than the Trustee) to agree in writing that such Paying Agent shall hold in trust for the benefit of Holders or the Trustee all money held by such Paying Agent for the payment of principal of or interest on the Notes and shall notify the Trustee in writing of any Default by the Company or the Guarantors in making any such payment.  If the Company or an Affiliate of the Company acts as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it as a separate trust fund.  The Company at any time may require a Paying Agent (other than the Trustee) to pay all money held by it to the Trustee and to account for any funds disbursed by such Paying Agent.  Upon complying with this Section 2.04, the Paying Agent (if other than the Company) shall have no further liability for the money delivered to the Trustee.

Section 2.05.        *CUSIP, ISIN and Common Code Numbers*.  In issuing the Notes, the Company may use CUSIP, ISIN and Common Code numbers (if then generally in use) and, if so, the Trustee shall use CUSIP, ISIN and Common Code numbers in notices of redemption as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption shall not be affected by any defect in or omission of such numbers.  The Company will promptly notify the Trustee in writing of any initial CUSIP, ISIN and/or Common Code numbers and any change in the CUSIP, ISIN or Common Code numbers.

Section 2.06.        *Holder Lists*.  The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Holders. If the Trustee is not the Registrar, the Company shall furnish to the Trustee, in writing within seven days of each Record Date and at such other times as the Trustee may request in writing, a

list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Holders.

Section 2.07.    *Global Note Provisions.*

(a)    Each Global Note initially shall:  (i) be registered in the name of DTC or the nominee of DTC; (ii) be delivered to the Note Custodian; and (iii) bear the appropriate legends, as set forth in Section 2.08 and Exhibit A.  Any Global Note may be represented by more than one certificate.  The aggregate principal amount of each Global Note may from time to time be increased or decreased by adjustments made on the records of the Note Custodian, as provided in this Indenture.

(b)    Except as provided in (c)(iii), members of, or participants in, DTC ("**Agent Members**") shall have no rights under this Indenture with respect to any Global Note held on their behalf by DTC or by the Note Custodian, and DTC may be treated by the Company, the Trustee, the Paying Agent, the Note Custodian and the Registrar and any of their agents as the absolute owner of such Global Note for all purposes whatsoever.  Notwithstanding the foregoing, nothing herein shall (i) prevent the Company, the Trustee, the Paying Agent, the Note Custodian or the Registrar or any of their respective agents from giving effect to any written certification, proxy or other authorization furnished by DTC or (ii) impair, as between DTC and its Agent Members, the operation of customary practices of DTC governing the exercise of the rights of an owner of a beneficial interest in any Global Note.  The Holder of a Global Note may grant proxies and otherwise authorize any person, including Agent Members and persons that may hold interests through Agent Members, to take any action that a Holder is entitled to take under this Indenture or the Notes.

(c)    Except as provided in this Section 2.07(c), owners of beneficial interests in Global Notes will not be entitled to receive Certificated Notes in exchange for such beneficial interests.

(i)    Certificated Notes shall be issued to all owners of beneficial interests in a Global Note in exchange for such beneficial interests if DTC notifies the Company that it is unwilling or unable to continue as depositary for such Global Note or DTC ceases to be a clearing agency registered under the Exchange Act, at a time when DTC is required to be so registered in order to act as depositary, and in each case a successor depositary is not appointed by the Company within 90 days of such notice.  In connection with the exchange of an entire Global Note for Certificated Notes pursuant to this clause (i) of Section 2.07(c), such Global Note shall be deemed to be surrendered to the Trustee for cancellation, and the Company shall execute, and upon Company Order the Trustee shall authenticate and deliver to each beneficial owner identified by DTC in exchange for its beneficial interest in such Global Note, an equal aggregate principal amount of Certificated Notes of authorized denominations, and the Registrar shall register such exchanges in the Note Register.

(ii)    The owner of a beneficial interest in a Global Note will be entitled to receive Certificated Notes in exchange for such beneficial interest if an Event of Default has occurred and is continuing.  If an Event of Default has occurred and is continuing, upon receipt by the Registrar of instructions from Agent Members on behalf of the owner

of a beneficial interest in a Global Note directing the Registrar to exchange such beneficial owner's beneficial interest in such Global Note for Certificated Notes, subject to and in accordance with the Applicable Procedures, the Company shall promptly execute, and upon Company Order the Trustee shall authenticate and make available for delivery to such beneficial owner, Certificated Notes in a principal amount equal to such beneficial interest in such Global Note.

(iii)     If (x) an event described in Section 2.07(c)(i) occurs and Certificated Notes are not issued promptly to all beneficial owners or (y) the Registrar receives from a beneficial owner the instructions described in Section 2.07(c)(ii) and Certificated Notes are not issued promptly to any such beneficial owner, the Company expressly acknowledges, with respect to the right of any Holder to pursue a remedy pursuant to Section 6.06, the right of any beneficial owner of Notes to pursue such remedy with respect to the portion of the Global Note that represents such beneficial owner's Notes as if such Certificated Notes had been issued.

Section 2.08.     *Legends*.

(a)     Each Global Note shall bear the legend specified therefor in Exhibit A on the face thereof.

(b)     Each Restricted Note shall bear the private placement legend specified therefor in Exhibit A on the face thereof (the "**Private Placement Legend**").

Section 2.09.     *Transfer and Exchange*.

(a)     Subject to the Applicable Procedures, the following provisions shall apply with respect to any proposed transfer of a beneficial interest in a Rule 144A Global Note or an Institutional Accredited Investor Global Note that is a Restricted Note:

If (1) the owner of a beneficial interest in a Rule 144A Global Note or an Institutional Accredited Investor Global Note that is a Restricted Note wishes to transfer such interest (or portion thereof) to a Non-U.S. Person pursuant to Regulation S and (2) such Non-U.S. Person wishes to hold its interest in the Notes through a beneficial interest in the Regulation S Global Note, (x) upon receipt by the Note Custodian and Registrar of:

(i)     written instructions from the Holder of the Rule 144A Global Note or the Institutional Accredited Investor Global Note, as applicable, directing the Note Custodian and Registrar to credit or cause to be credited a beneficial interest in the Regulation S Global Note equal to the principal amount of the beneficial interest in the Rule 144A Global Note or the Institutional Accredited Investor Global Note to be transferred, as applicable; and

(ii)     a certificate in the form of Exhibit B from the transferor,

and (y) subject to the rules and procedures of DTC, the Note Custodian and Registrar shall increase the Regulation S Global Note and decrease the Rule 144A Global Note or the Institutional Accredited Investor Global Note, as applicable, by such amount in accordance with the foregoing.

(b)     If the owner of an interest in a Regulation S Global Note wishes to transfer such interest (or any portion thereof) to a QIB pursuant to Rule 144A or to an Institutional Accredited Investor prior to the expiration of the Distribution Compliance Period therefor, (x) upon receipt by the Note Custodian and Registrar of:

(i)     written instructions from the Holder of the Regulation S Global Note directing the Note Custodian and Registrar to credit or cause to be credited a beneficial interest in the Rule 144A Global Note or the Institutional Accredited Investor Note, as applicable, equal to the principal amount of the beneficial interest in the Regulation S Global Note to be transferred; and

(ii)     a certificate in the form of Exhibit C duly executed by the transferor,

and (y) subject to the rules and procedures of DTC, the Note Custodian and Registrar shall increase the Rule 144A Global Note or the Institutional Accredited Investor Note, as applicable, and decrease the Regulation S Global Note by such amount in accordance with the foregoing.

If (1) the owner of a beneficial interest in a Rule 144A Global Note that is a Restricted Note wishes to transfer such interest (or portion thereof) to an Institutional Accredited Investor, or if (2) the owner of a beneficial interest in a Institutional Accredited Investor Note that is a Restricted Note wishes to transfer such interest (or portion thereof) to a QIB, (x) upon receipt by the Note Custodian and Registrar of:

(i)     written instructions from the Holder of the Rule 144A Global Note or the Institutional Accredited Investor Note, as applicable, directing the Note Custodian and Registrar to credit or cause to be credited a beneficial interest in the Rule 144A Global Note or the Institutional Accredited Investor Note, as applicable, equal to the principal amount of the beneficial interest in the Rule 144A Global Note or the Institutional Accredited Investor Note to be transferred; and

(ii)     a certificate in the form of Exhibit E duly executed by the transferor,

and (y) subject to the rules and procedures of DTC, the Note Custodian and Registrar shall increase the Rule 144A Global Note or the Institutional Accredited Investor Note, as applicable, and decrease the Rule 144A Global Note or the Institutional Accredited Investor Note, as applicable, by such amount in accordance with the foregoing.

(c)     *Other Transfers*.  Any transfer of Restricted Notes not described above (other than a transfer of a beneficial interest in a Global Note that does not involve an exchange of such interest for a Certificated Note or a beneficial interest in another Global Note, which must be effected in accordance with applicable law and the Applicable Procedures, but is not subject to any procedure required by this Indenture) shall be made only upon receipt by the Registrar of such Opinions of Counsel, certificates and/or other information required by this Indenture in order to ensure compliance with the Securities Act or in accordance with Section 2.09(d).

(d)     *Use and Removal of Private Placement Legends*.  Upon the transfer, exchange or replacement of Notes (or beneficial interests in a Global Note) not bearing (or not required to bear upon such transfer, exchange or replacement) a Private Placement Legend, the Registrar shall exchange such Notes (or beneficial interests) for Notes (or beneficial interests in a Global Note) not bearing a Private Placement Legend.  Upon the transfer, exchange or replacement of

Notes (or beneficial interests in a Global Note) bearing a Private Placement Legend, the Registrar shall deliver only Notes (or beneficial interests in a Global Note) bearing a Private Placement Legend unless:

(i)        such Notes (or beneficial interests) are transferred pursuant to Rule 144 upon delivery to the Registrar of a certificate of the transferor in the form of Exhibit D and an Opinion of Counsel to the effect that no Registration is required under the Securities Act for the sales of the Notes pursuant to the exemption from registration provided by compliance with Rule 144;

(ii)        such Notes (or beneficial interests) are transferred, replaced or exchanged after the Resale Restriction Termination Date therefor; or

(iii)        in connection with such transfer, exchange or replacement the Registrar shall have received an Opinion of Counsel, certificates and such other evidence reasonably required by and satisfactory to it to the effect that neither such Private Placement Legend nor the related restrictions on transfer are required in order to maintain compliance with the provisions of the Securities Act.

The Private Placement Legend on any Note shall be removed at the request of the Holder on or after the Resale Restriction Termination Date therefor. The Holder of a Global Note bearing a Private Placement Legend may exchange an interest therein for an equivalent interest in a Global Note not bearing a Private Placement Legend (other than a Regulation S Global Note) upon transfer of such interest pursuant to any of clauses (i) through (iii) of this Section 2.09(d).

(e)        *Consolidation of Global Notes*.  Nothing in this Indenture shall provide for the consolidation of any Notes with any other Notes to the extent that they constitute, as determined pursuant to an Opinion of Counsel, different classes or issues of securities for U.S. federal income tax purposes.

(f)        *Retention of Documents*.  For so long as any Notes remain Outstanding, the Registrar shall retain copies of all letters, notices and other written communications received pursuant to this Article 2.  The Company shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable written notice to the Registrar.

(g)        *Execution, Authentication of Notes, etc*.

(i)        Subject to the other provisions of this Section 2.09, when Notes are presented to the Registrar or a co-Registrar with a request to register the transfer of such Notes or to exchange such Notes for an equal principal amount of Notes of other authorized denominations, the Registrar or co-Registrar shall register the transfer or make the exchange as requested if its requirements for such transaction, as set forth in this Indenture and the Notes, are met; *provided* that any Notes presented or surrendered for registration of transfer or exchange shall be duly endorsed or accompanied by a written instrument of transfer in form satisfactory to the Registrar or co-Registrar, duly executed by the Holder thereof or his attorney duly authorized in writing.  To permit registrations of transfers and exchanges and subject to the other terms and conditions of this Article 2,

40

the Company will execute and upon Company Order the Trustee will authenticate and make available for delivery Certificated Notes and Global Notes at the Registrar's or co-Registrar's request.

(ii)     No service charge shall be made to a Holder for any registration of transfer or exchange, but the Company and the Trustee may require payment of a sum sufficient to cover any transfer tax, assessments, or similar governmental charge payable in connection therewith (other than any such transfer taxes, assessments or similar governmental charges payable upon exchange or transfer pursuant to Section 3.07, Section 3.11, Section 4.01 or Section 8.05).

(iii)     The Registrar or co-Registrar shall not be required to register the transfer of or exchange of (x) any Note for a period beginning:  (A) 15 days before the delivery of a notice of an offer to repurchase or redeem Notes and ending at the close of business on the day of such delivery or (B) 15 days before an Interest Payment Date and ending on such Interest Payment Date; and (y) any Note selected for repurchase or redemption, except the unrepurchased or unredeemed portion thereof, if any.

(iv)     Prior to the due presentation for registration of transfer of any Note, the Company, the Trustee, the Paying Agent, the Registrar or any co-Registrar may deem and treat the person in whose name a Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Note and for all other purposes whatsoever, whether or not such Note is overdue, and none of the Company, the Trustee, the Paying Agent, the Registrar or any co-Registrar or the Note Custodian shall be affected by notice to the contrary.

(v)     All Notes issued upon any transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Notes surrendered upon such transfer or exchange.

(vi)     Subject to Section 2.08 and this Section 2.09, in connection with the exchange of a portion of a Certificated Note for a beneficial interest in a Global Note, the Trustee shall cancel such Certificated Note, and the Company shall execute, and upon Company Order the Trustee shall authenticate and make available for delivery to the exchanging Holder, a new Certificated Note representing the principal amount not so exchanged.

(h)     *No Obligation of the Trustee.*

(i)     The Trustee, Paying Agent and Registrar shall have no responsibility or obligation to any beneficial owner of an interest in a Global Note, Agent Members or any other Persons with respect to the accuracy of the records of DTC or its nominee or of Agent Members, with respect to any ownership interest in the Notes or with respect to the delivery to any Agent Member, beneficial owner or other Person (other than DTC) of any notice (including any notice of redemption) or the payment of any amount or delivery of any Notes (or other security or property) under or with respect to such Notes.  All notices and communications to be given to the Holders and all payments to be made to Holders

in respect of the Notes shall be given or made only to or upon the order of the registered Holders (which shall be DTC or its nominee in the case of a Global Note). The rights of beneficial owners in any Global Note shall be exercised only through DTC subject to the applicable rules and procedures of DTC. The Trustee in any capacity hereunder may rely and shall be fully protected in relying upon information furnished by DTC with respect to its Agent Members and any beneficial owners.

(ii)     The Trustee, Paying Agent and Registrar shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among Agent Members or beneficial owners in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

Section 2.10.     *Mutilated, Destroyed, Lost or Stolen Notes*.

(a)     If a mutilated Note is surrendered to the Registrar or if the Holder of a Note claims that the Note has been lost, destroyed or wrongfully taken, the Company shall execute and upon Company Order the Trustee shall authenticate and make available for delivery a replacement Note if the requirements set forth in this paragraph are met and the Holder satisfies any other reasonable requirements of the Trustee. If required by the Trustee or the Company, such Holder shall furnish an affidavit of loss and indemnity bond or other form of indemnification sufficient in the judgment of the Company and the Trustee to protect the Company, the Trustee, the Paying Agent, the Registrar and any co-Registrar from any loss that any of them may suffer if a Note is replaced, and, in the absence of written notice to the Company or the Trustee that such Note has been acquired by a protected purchaser, the Company shall execute and upon Company Order the Trustee shall authenticate and make available for delivery, in exchange for any such mutilated Note or in lieu of any such destroyed, lost or stolen Note, a new Note of like tenor and principal amount, bearing a number not contemporaneously Outstanding.

(b)     Upon the issuance of any new Note under this Section 2.10, the Company or the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and reasonable expenses of the Trustee) in connection therewith.

(c)     Every new Note issued pursuant to this Section 2.10 in exchange for any mutilated Note, or in lieu of any destroyed, lost or stolen Note, shall constitute an original additional contractual obligation of the Company and the Guarantors and any other obligor upon the Notes, whether or not the mutilated, destroyed, lost or stolen Note shall be at any time enforceable by anyone, and shall be entitled to all benefits of this Indenture equally and proportionately with any and all other Notes duly issued hereunder.

Section 2.11.     *Temporary Notes*. Until definitive Notes are ready for delivery, the Company may execute and upon Company Order the Trustee will authenticate and make

available for delivery temporary Notes.  Temporary Notes will be substantially in the form of definitive Notes but may have variations that the Company considers appropriate for temporary Notes.  Without unreasonable delay, the Company will prepare and execute and upon Company Order the Trustee will authenticate and make available for delivery definitive Notes.  After the preparation of definitive Notes, the temporary Notes will be exchangeable for definitive Notes upon surrender of the temporary Notes at any office or agency maintained by the Company for that purpose and such exchange shall be without charge to the Holder.  Upon surrender for cancellation of any one or more temporary Notes, the Company will execute and upon Company Order the Trustee will authenticate and make available for delivery in exchange therefor one or more definitive Notes representing an equal principal amount of Notes.  Until so exchanged, the Holder of temporary Notes shall in all respects be entitled to the same benefits under this Indenture as a Holder of definitive Notes.

Section 2.12.    *Cancellation*.  The Company at any time may deliver Notes to the Trustee for cancellation.  The Registrar and the Paying Agent shall forward to the Trustee any Notes surrendered to them for redemption, registration of transfer, exchange or payment.  The Trustee and no one else shall cancel and dispose of cancelled Notes in accordance with its policy of disposal or upon the written request of the Company return to the Company all Notes surrendered for redemption, registration of transfer, exchange, payment or cancellation.  The Company may not issue new Notes to replace Notes it has paid or delivered to the Trustee for cancellation for any reason other than in connection with a transfer or exchange upon Company Order.

Section 2.13.    *Defaulted Interest*.  When any installment of interest payable under the Notes becomes Defaulted Interest, such installment shall forthwith cease to be payable to the Holders in whose names the Notes were registered on the Record Date applicable to such installment of interest.  Defaulted Interest (including any interest on such Defaulted Interest) shall be paid by the Company as provided in Section 2.13(a) or Section 2.13(b).

(a)    The Company may elect to make payment of any Defaulted Interest (including any interest on such Defaulted Interest) to the Holders in whose names the Notes are registered at the close of business on a special record date for the payment of such Defaulted Interest (a "**Special Record Date**"), which shall be fixed in the following manner.  The Company shall notify the Trustee in writing of the amount of Defaulted Interest proposed to be paid and the date of the proposed payment, and at the same time the Company shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Trustee for such deposit prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Holders entitled to such Defaulted Interest as provided in this Section 2.13(a).  Thereupon the Trustee shall fix a Special Record Date for the payment of such Defaulted Interest, which shall be not more than 15 calendar days and not less than ten calendar days prior to the date of the proposed payment and not less than ten calendar days after the receipt by the Trustee of the notice of the proposed payment.  The Trustee shall promptly notify the Company of such Special Record Date and, in the name and at the expense of the Company, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be sent, delivered to each Holder at such Holder's address as it appears in the Note Register, not less than ten calendar days prior to such Special Record Date.  Notice of the proposed payment of such

Defaulted Interest and the Special Record Date therefor having been delivered as aforesaid, such Defaulted Interest shall be paid to the Holders in whose names the Notes are registered at the close of business on such Special Record Date and shall no longer be payable pursuant to Section 2.13(b).

(b)     Alternatively, the Company may make payment of any Defaulted Interest (including any interest on such Defaulted Interest) in any other lawful manner not inconsistent with the requirements of any securities exchange on which the Notes may be listed, and upon such notice as may be required by such exchange, if, after notice in writing given by the Company to the Trustee of the proposed payment pursuant to this Section 2.13(b) such manner of payment shall be deemed practicable by the Trustee. The Trustee shall in the name and at the expense of the Company cause prompt notice of the proposed payment and the date thereof to be delivered to each Holder at such Holder's address as it appears in the Note Register.

ARTICLE 3
COVENANTS

Section 3.01.     *Payment of Notes.*

(a)     The Company shall pay the principal of and interest (including Defaulted Interest) on the Notes in U.S. Dollars on the dates and in the manner provided in the Notes, this Indenture and the Mexican Trust Agreement. Prior to 10:00 a.m. (New York City time) on the Business Day prior to each Scheduled Redemption Date (including the Maturity Date) and Interest Payment Date, the Company shall cause the Mexican Trustee to deposit with the Paying Agent in immediately available funds U.S. Dollars sufficient to make cash payments due on such Scheduled Redemption Date and Interest Payment Date, as the case may be, pursuant to the terms of the Mexican Trust Agreement; *provided* that the Mexican Trustee shall no later than five Business Days prior to each Scheduled Redemption Date confirm that there are sufficient funds to cover any payment due on such Scheduled Redemption Date or Interest Payment Date, as applicable, pursuant to the Mexican Trust Agreement and in the event that the funds are less than the amount required to pay in full the principal and interest (including Defaulted Interest) due as of such Scheduled Redemption Date or Interest Payment Date, as the case may be (the "**Debt Service Shortfall**"), the Company shall, prior to 10:00 a.m. (New York City time) no later than the third Business Day prior to such Scheduled Redemption Date or Interest Payment Date, as the case may be, deposit with the Paying Agent in immediately available funds U.S. Dollars equal to such Debt Service Shortfall If the Company or an Affiliate of the Company is acting as Paying Agent, the Company or such Affiliate shall, prior to 10:00 a.m. (New York City time) on each Scheduled Redemption Date or Interest Payment Date, as the case may be, segregate and hold in trust U.S. Dollars sufficient to make cash payments due on such Scheduled Redemption Date or Interest Payment Date, as the case may be. Principal and interest shall be considered paid on the date due if on such date the Trustee or the Paying Agent (other than the Company or an Affiliate of the Company) holds in accordance with this Indenture U.S. Dollars designated for and sufficient to pay all principal and interest then due and the Trustee or the Paying Agent, as the case may be, is not prohibited from paying such money to the Holders on that date pursuant to the terms of this Indenture.

(b)        Any partial repayment, redemption, repurchase or cancellation of the principal amount of the Notes pursuant to the terms of this Indenture, shall reduce the principal amount due on succeeding Scheduled Redemption Dates on a dollar-for-dollar basis in the inverse order of their respective maturities. For the avoidance doubt, the amount of such partial repayment, redemption, repurchase or cancellation shall first reduce the principal amount due on the last Scheduled Redemption Date until reduced to zero, then shall reduce the principal amount due on the next-to-last Scheduled Redemption Date until reduced to zero and so forth.

(c)        Notwithstanding anything to the contrary contained in this Indenture, the Company may, to the extent it is required to do so by law, deduct or withhold income or other similar taxes imposed by the United States of America, Mexico or a Relevant Jurisdiction (as defined in Section 3.21) from principal or interest payments hereunder.

Section 3.02.        *Maintenance of Office or Agency.*

(a)        The Company shall maintain each office or agency required under Section 2.03. The Company shall give prompt written notice to the Trustee of any change in the location of any such office or agency.  If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee, and the Company hereby appoints the Trustee as its agent to receive all such presentations, surrenders, notices and demands.

(b)        The Company may also from time to time designate one or more other offices or agencies (in or outside of the City of New York) where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind any such designation; *provided*, *however*, that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in the City of New York or, so long as the Notes are admitted to listing on the SGX-ST and to trading on the Official List of the SGX-ST and the rules of the SGX-ST so require, in Singapore, for such purposes.  The Company shall give prompt written notice to the Trustee of any such designation or rescission and any change in the location of any such other office or agency.

Section 3.03.        *Corporate Existence.*  Subject to Article 4, the Company will do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence.

Section 3.04.        *Payment of Taxes.*  The Company will pay or discharge or cause to be paid or discharged, before the same shall become delinquent, all taxes (whether payable directly or as a withholding), assessments and governmental charges levied or imposed upon the Company or for which it is otherwise liable, or upon the income, profits or property of the Company; *provided*, *however*, that the Company shall not be required to pay or discharge or cause to be paid or discharged any such tax, assessment or charge whose amount, applicability or validity is being contested in good faith by appropriate proceedings and for which appropriate reserves, if necessary (in the good faith judgment of management of the Company), are being maintained in accordance with GAAP or where the failure to effect such payment will not be disadvantageous to the Holders.

Section 3.05.    *Further Instruments and Acts.*  The Company and the Guarantors will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper or as the Trustee may reasonably request to carry out more effectively the purpose of this Indenture.

Section 3.06.    *Waiver of Stay, Extension or Usury Laws.*  The Company covenants (to the fullest extent permitted by applicable law) that it will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury law or other law that would prohibit or forgive the Company from paying all or any portion of the principal of or interest on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Indenture.  The Company hereby expressly waives (to the fullest extent permitted by applicable law) all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 3.07.    *Change of Control Triggering Event.*

(a)    Upon the occurrence of a Change of Control (a "**Change of Control Triggering Event**"), each Holder will have the right to require that the Company purchase all or a portion (in minimum principal amounts of U.S.$150,000 and integral multiples of U.S.$1,000 in excess thereof) of the Holder's Notes at a purchase price equal to 101% of the principal amount thereof, plus accrued and unpaid interest and any Additional Amounts, if any, thereon through the date of purchase (the "**Change of Control Triggering Event Payment**").

(b)    Within 30 days following the date upon which the Change of Control Triggering Event occurred, the Company shall deliver a Change of Control Triggering Event Notice to each Holder, with a copy to the Trustee, offering to purchase the Notes as described above (a "**Change of Control Triggering Event Offer**").  The Change of Control Triggering Event Notice shall state, among other things, the purchase date, which must be no earlier than 30 days nor later than 60 days from the date the notice is delivered, other than as may be required by law (the "**Change of Control Triggering Event Payment Date**").

(c)    On the Change of Control Triggering Event Payment Date, the Company shall, to the extent lawful:

(i)    accept for payment all Notes or portions thereof properly tendered and not withdrawn pursuant to the Change of Control Triggering Event Offer;

(ii)    deposit with the Paying Agent funds in an amount equal to the Change of Control Triggering Event Payment in respect of all Notes or portions thereof so tendered; and

(iii)    deliver or cause to be delivered to the Trustee the Notes so accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions thereof being purchased by the Company.

(d)    If only a portion of a Note is purchased pursuant to a Change of Control Triggering Event Offer, a new Note in a principal amount equal to the portion thereof not purchased shall be issued in the name of the Holder thereof upon cancellation of the original Note (or appropriate adjustments to the amount and beneficial interests in a Global Note will be made, as appropriate).

(e)    The Company shall not be required to make a Change of Control Triggering Event Offer upon a Change of Control Triggering Event if (i) a third party makes the Change of Control Triggering Event Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Indenture applicable to a Change of Control Triggering Event Offer made by the Company and purchases all Notes properly tendered and not withdrawn under the Change of Control Triggering Event Offer, or (ii) notice of redemption has been given pursuant to Section 5.03, unless and until there is a default in payment of the applicable redemption price.

(f)    A Change of Control Triggering Event Offer may be made in advance of a Change of Control Triggering Event, and conditioned upon the occurrence of such Change of Control Triggering Event, if a definitive agreement is in place for the Change of Control at the time of making the Change of Control Triggering Event Offer.  Notes repurchased by the Company pursuant to a Change of Control Triggering Event Offer will have the status of Notes issued but not Outstanding or will be retired and canceled, at the option of the Company.  Notes purchased by a third party pursuant to Section 3.07(e) will have the status of Notes issued and Outstanding.

(g)    In the event that Holders of not less than 95% of the aggregate principal amount of the outstanding Notes accept a Change of Control Triggering Event Offer and the Company or a third party purchases all of the Notes held by such Holders, the Company shall have the right, on not less than 30 nor more than 60 days' prior notice, given not more than 30 days following the purchase pursuant to the Change of Control Triggering Event Offer described above, to redeem all of the Notes that remain outstanding following such purchase at a purchase price equal to the Change of Control Triggering Event Payment plus, to the extent not included in the Change of Control Triggering Event Payment, accrued and unpaid interest, if any, on the Notes that remain outstanding, to the Redemption Date (subject to the right of Holders on the relevant record date to receive interest due on the relevant interest payment date).

(h)    The Company shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other applicable securities laws and regulations in connection with the purchase of Notes in connection with a Change of Control Triggering Event Offer.  To the extent that the provisions of any securities laws or regulations conflict with this Section 3.07, the Company shall comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Indenture by doing so.

Section 3.08.    *Limitation on Incurrence of Additional Indebtedness*.

(a)    The Company shall not, and shall not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness, including Acquired Indebtedness, except that the Company may Incur Indebtedness, including Acquired Indebtedness, if, at the time of and immediately after giving pro forma effect to the Incurrence thereof and the

application of the proceeds therefrom, the Capitalization Ratio of the Company is greater than 13.50%.

(b)    Notwithstanding clause (a) above, the Company and its Restricted Subsidiaries, as applicable, may Incur the following Indebtedness ("**Permitted Indebtedness**"):

(i)    Indebtedness in respect of the Notes;

(ii)    Indebtedness (other than the Notes, the Bancomext Facility, the Bilateral Debt Refinancing Facilities and the Cebures) of the Company and its Subsidiaries in existence on the Issue Date;

(iii)    Guarantees by any Restricted Subsidiary of Indebtedness of the Company Incurred in accordance with this Section 3.08, which Guarantee is permitted under Section 3.09; *provided* that (i) if such Guarantee is of Subordinated Indebtedness then the Note Guarantee of such Guarantor shall be senior to such Guarantor's Guarantee of Subordinated Indebtedness and (ii) if such Restricted Subsidiary is not a Guarantor it shall simultaneously provide a Note Guarantee and become a Guarantor;

(iv)    Indebtedness Incurred under the Bancomext Facility, the Bilateral Debt Refinancing Facilities and the Cebures;

(v)    Hedging Obligations entered into by the Company and its Restricted Subsidiaries in the ordinary course of business and not for speculative purposes, including, without limitation, Hedging Obligations in respect of the Notes;

(vi)    intercompany Indebtedness between the Company and any Restricted Subsidiary or between any Restricted Subsidiaries; *provided* that:

(A)    if the Company or a Guarantor is the obligor on any such Indebtedness owed to a Restricted Subsidiary that is not a Guarantor, such Indebtedness must be expressly subordinated to the prior payment in full of all obligations under the Notes and this Indenture, in the case of the Company, or such Guarantor's Note Guarantee, in the case of any such Guarantor; *provided* that the Company, its parent companies (if any) and any Guarantor shall agree to vote such Indebtedness, or provide their consents in connection with such Indebtedness, in any Mexican Restructuring in a manner that is consistent with the vote of, or the consents provided by, the Holders of the Notes and other unaffiliated creditors of the same class as the Notes, and

(B)    in the event that at any time any such Indebtedness ceases to be held by the Company or a Restricted Subsidiary, such Indebtedness shall be deemed to be Incurred and not permitted by this clause (vi) at the time such event occurs;

(vii)    Indebtedness of the Company or any of its Restricted Subsidiaries arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (including daylight overdrafts paid in full by the close of

48

business on the day such overdraft was Incurred) drawn against insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within five Business Days of Incurrence;

(viii)    Indebtedness of the Company or any of its Restricted Subsidiaries represented by letters of credit for the account of the Company or any Restricted Subsidiary, as the case may be, in order to provide for judicial deposits required in connection with any judicial or administrative proceeding, provide security for workers' compensation claims, payment obligations in connection with self-insurance, health, disability or other employee benefits or similar requirements in the ordinary course of business;

(ix)    Indebtedness in respect of bid, performance, surety bonds or *fianzas* in the ordinary course of business for the account of the Company or any of its Restricted Subsidiaries, including Guarantees or obligations of the Company or any Restricted Subsidiary with respect to letters of credit and/or *fianzas* supporting such bid, performance or surety obligations (in each case other than for the payment of borrowed money);

(x)    Refinancing Indebtedness in respect of:

(A)    Indebtedness (other than Indebtedness owed to the Company or any Subsidiary of the Company) Incurred pursuant to clause (a) of this Section 3.08 (it being understood that no Indebtedness outstanding on the Issue Date is Incurred pursuant to such clause (a)), or

(B)    Indebtedness Incurred pursuant to clause (b)(i) and (b)(iv) of this Section 3.08 and other Indebtedness of the Company and its Restricted Subsidiaries outstanding on the Issue Date, other than Indebtedness otherwise specified under any of the other clauses of this definition of Permitted Indebtedness;

(xi)    Capitalized Lease Obligations and Purchase Money Indebtedness of the Company or any Restricted Subsidiary at any time outstanding in an aggregate principal amount not to exceed the greater of (x) U.S.$25.0 million (or the equivalent in other currencies) and (y) 5.0% of Consolidated Tangible Assets;

(xii)    Permitted Acquisition Indebtedness;

(xiii)    (A) Capital Securities and (B) any Refinancing of Capital Securities; *provided*, that (x) such Refinancing of Capital Securities is made as a result of the occurrence of a Capital Securities Redemption Event; or (y) a Credit Ratings Downgrade does not occur primarily as a result of a voluntary Refinancing of Capital Securities with the proceeds from Senior Indebtedness;

(xiv)    indemnification, adjustment of purchase price, earn-out or similar obligations, in each case, incurred or assumed in connection with the acquisition or disposition of any business or assets of the Company or any Restricted Subsidiary or

49

Capital Stock of a Restricted Subsidiary, other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or equity interests for the purposes of financing or in contemplation of any such acquisition; *provided* that (A) any amount of such obligations included on the face of the balance sheet of the Company or any Restricted Subsidiary shall not be permitted under this clause (xiv) and (B) in the case of a disposition, the maximum aggregate liability in respect of all such obligations outstanding under this clause (xiv) shall at no time exceed the gross proceeds actually received by the Company and the Restricted Subsidiaries in connection with such disposition;

(xv)     Indebtedness Incurred pursuant to Lease Securitizations;

(xvi)    Indebtedness Incurred pursuant to Receivables Transactions in an amount not to exceed 20% of Consolidated Tangible Assets; and

(xvii)   additional Indebtedness of the Company or any Restricted Subsidiary at any time outstanding in an aggregate principal amount not to exceed the greater of (x) U.S.$30.0 million and (y) 6.5% of Consolidated Tangible Assets.

(c)      For purposes of determining compliance with, and the outstanding principal amount of, any particular Indebtedness Incurred pursuant to and in compliance with this Section 3.08, (i) the outstanding principal amount of any item of Indebtedness will be counted only once, (ii) the amount of Indebtedness issued at a price that is less than the principal amount thereof shall be equal to the amount of the liability in respect thereof determined in accordance with GAAP, and (iii) Guarantees of, or obligations in respect of letters of credit or similar instruments relating to, Indebtedness which is otherwise included in the determination of any particular amount of Indebtedness will not be included. Accrual of interest, the accretion or amortization of original issue discount, the payment of regularly scheduled interest in the form of additional Indebtedness of the same instrument or the payment of regularly scheduled dividends on Disqualified Capital Stock in the form of additional Disqualified Capital Stock with the same terms shall not be deemed to be an Incurrence of Indebtedness for purposes of this Section 3.08; *provided* that any such outstanding additional Indebtedness or Disqualified Capital Stock paid in respect of Indebtedness Incurred pursuant to any provision of clause (b) of this Section 3.08 shall be counted as Indebtedness outstanding thereunder for purposes of any future Incurrence under such provision. For purposes of determining compliance with this Section 3.08, in the event that an item of proposed Indebtedness meets the criteria of more than one of the categories of Permitted Indebtedness described in clauses (b) above, or is entitled to be incurred pursuant to Section 3.08(a), the Company shall be permitted to classify such item of Indebtedness on the date of its incurrence and shall only be required to include the amount and type of such Indebtedness in one of the above clauses, although the Company may divide and classify an item of Indebtedness in one or more of the types of Indebtedness and may later re-divide or reclassify all or a portion of such item of Indebtedness in any manner that complies with this Section 3.08. Notwithstanding any other provision of this Section 3.08, the maximum amount of Indebtedness that the Company or any Restricted Subsidiary may incur pursuant to this Section 3.08 shall not be deemed to be exceeded as a result solely of fluctuations in exchange rates or currency values.

(d)    For purposes of determining compliance with any U.S. dollar denominated restriction on the Incurrence of Indebtedness where the Indebtedness Incurred is denominated in a different currency, the amount of such Indebtedness will be the U.S. Dollar Equivalent determined on the date of the Incurrence of such Indebtedness; *provided*, *however*, that if any such Indebtedness denominated in a different currency is subject to a Currency Agreement with respect to U.S. dollars covering all principal, premium, if any, and interest payable on such Indebtedness, the amount of such Indebtedness expressed in U.S. dollars will be provided in such Currency Agreement.  The principal amount of any Refinancing Indebtedness Incurred in the same currency as the Indebtedness being Refinanced will be the U.S. Dollar Equivalent of the Indebtedness Refinanced, except to the extent that (x) such U.S. Dollar Equivalent was determined based on a Currency Agreement, in which case the Refinancing Indebtedness will be determined in accordance with the preceding sentence, and (y) the principal amount of the Refinancing Indebtedness exceeds the principal amount of the Indebtedness being Refinanced, in which case the U.S. Dollar Equivalent of such excess will be determined on the date such Refinancing Indebtedness is Incurred.

(e)    Other than the Notes issued on the Issue Date, no additional Notes may be issued under this Indenture, except as provided in Section 2.02(c).

Section 3.09.    *Limitation on Guarantees*.

Subject to Section 3.24 below, the Company shall not permit any Restricted Subsidiary of the Company (other than a Guarantor) to Guarantee any Indebtedness of the Company, unless contemporaneously therewith (or prior thereto) effective provision is made to Guarantee all obligations under the Notes and the Indenture on an equal and ratable basis with such Guarantee for so long as such Guarantee remains effective, and in an amount equal to the amount of Indebtedness so Guaranteed.  Any Guarantee by any such Restricted Subsidiary of Subordinated Indebtedness of the Company will be subordinated and junior in right of payment to the contemporaneous Guarantee of the Notes by such Restricted Subsidiary.

Section 3.10.    *Limitation on Restricted Payments*.

(a)    The Company shall not, and shall not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, take any of the following actions (each, a "**Restricted Payment**");

(i)    declare or pay any dividend or return of capital or make any distribution on or in respect of shares of Capital Stock of the Company or any Restricted Subsidiary to holders of such Capital Stock, other than:

(A)    dividends or distributions payable in Qualified Capital Stock of the Company,

(B)    dividends or distributions payable to the Company and/or a Restricted Subsidiary, or

(C)    dividends, distributions or returns of capital made on a *pro rata* basis to the Company and its Restricted Subsidiaries, on the one hand, and

minority holders of Capital Stock of a Restricted Subsidiary, on the other hand (or on a less than *pro rata* basis to any minority holder);

(ii)    purchase, redeem or otherwise acquire or retire for value:

(A)    any Capital Stock of the Company, or

(B)    any Capital Stock of any Restricted Subsidiary held by an Affiliate of the Company (other than a Restricted Subsidiary) or any Preferred Stock of a Restricted Subsidiary, except for Capital Stock held by the Company or a Restricted Subsidiary or purchases, redemptions, acquisitions or retirements for value of Capital Stock on a *pro rata* basis from the Company and/or any Restricted Subsidiaries, on the one hand, and minority holders of Capital Stock of a Restricted Subsidiary, on the other hand, according to their respective percentage ownership of the Capital Stock of such Restricted Subsidiary;

(iii)    make any principal payment on, purchase, defease, redeem, prepay, decrease or otherwise acquire or retire for value, prior to any scheduled final maturity, scheduled repayment or scheduled sinking fund payment, as the case may be, any Subordinated Indebtedness or any Capital Securities (excluding (x) any intercompany Indebtedness owed to the Company and/or any Guarantor, (y) any intercompany Indebtedness between Restricted Subsidiaries that are not Guarantors, or (z) the purchase, repurchase or other acquisition of Indebtedness that is contractually subordinate or otherwise junior in right of payment to the Notes, purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case within one year of such date of purchase, repurchase or acquisition); or

(iv)    make any Investment (other than Permitted Investments).

(b)    Notwithstanding subsection (a) above, Section 3.10(a) does not prohibit:

(i)    the payment of any dividend or distribution or the consummation of any irrevocable redemption of Subordinated Indebtedness within 60 days after the date of declaration of such dividend or distribution or giving of the redemption notice, as the case may be, if the dividend, distribution or redemption would have been permitted on the date of declaration or notice pursuant to the preceding paragraph; *provided* that such redemption shall be included (without duplication for the declaration) in the calculation of the amount of Restricted Payments;

(ii)    the making of any Restricted Payment,

(A)    in the form of Qualified Capital Stock of the Company,

(B)    through the application of the net proceeds received by the Company from a substantially concurrent sale of Qualified Capital Stock of the Company or a contribution to the equity capital of the Company not representing an interest in Disqualified Capital Stock, in each case not received from a Subsidiary of the Company,

(C)    through the application of the net proceeds received by the Company from a substantially concurrent issuance or sale of Capital Securities, or

(D)    in connection with the administration of the Management Incentive Plan;

(iii)    the voluntary prepayment, exchange, refinancing, replacement, purchase, redemption, retirement, defeasance, refund or other acquisition for value of any Subordinated Indebtedness (A) in exchange for, or through the application of net proceeds of a substantially concurrent sale, other than to a Subsidiary of the Company, of Refinancing Indebtedness for such Subordinated Indebtedness, (B) in exchange for, or through the application of net proceeds of a substantially concurrent sale, other than to a Subsidiary of the Company, of Indebtedness Incurred pursuant to Section 3.08(a); *provided* that, with respect to this clause (ii), (x) no Default or Event of Default shall have occurred and be continuing at the time of or immediately after giving effect to the relevant transaction and (y) no Credit Ratings Downgrade shall have resulted from the relevant transaction, (C) in exchange for, or through the application of net proceeds of a substantially concurrent sale, other than to a Subsidiary of the Company, of Indebtedness Incurred pursuant to Section 3.08(b)(xi); *provided* that, with respect to this clause (C), no Default or Event of Default shall have occurred and be continuing at the time of or immediately after giving effect to the relevant transaction, or (D) in exchange for cash on hand (other than cash received as a result of the Incurrence of Indebtedness of the type specified in the foregoing clauses (A), (B) and (C)); *provided* that, with respect to this clause (D), (x) no Default or Event of Default shall have occurred and be continuing at the time of or immediately after giving effect to the relevant transaction and (y) no Credit Ratings Downgrade shall have resulted from the relevant transaction;

(iv)    repurchases by the Company of Common Stock of the Company or options, warrants or other securities exercisable or convertible into Common Stock of the Company from any current or former employees, officers, directors or consultants of the Company or any of its Subsidiaries or their authorized representatives upon the death, disability or termination of employment or directorship of such employees, officers or directors, or the termination of retention of any such consultants, in an amount not to exceed U.S.$2.0 million in any calendar year (with unused amounts in any calendar year being permitted to be carried over into succeeding calendar years up to a maximum of U.S.$2.0 million) plus the cash proceeds of key man life insurance policies received by the Company and its Restricted Subsidiaries;

(v)    the repurchase of Capital Stock deemed to occur upon the exercise of stock options or warrants to the extent such Capital Stock represents a portion of the exercise price of those stock options or warrants;

(vi)    if no Default or Event of Default shall have occurred and be continuing, the declaration and payment of regularly scheduled or accrued dividends or distributions to holders of any class or series of Disqualified Capital Stock of the Company or any Restricted Subsidiary issued on or after the Issue Date in accordance with Section 3.08;

(vii)    the repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness of the Company pursuant to and in accordance with the terms of a "change of control" covenant set forth in the indenture or other agreement pursuant to which such Subordinated Indebtedness is issued and such "change of control" covenant is substantially similar to Section 3.07; *provided* that the Company (or another Person) has repurchased all Notes required to be repurchased by the Company under Section 3.07 prior to the purchase, redemption or other acquisition or retirement for value of such Subordinated Indebtedness pursuant to the applicable "change of control" covenant; and

(viii)    if no Default or Event of Default shall have occurred and be continuing, the purchase by the Company of fractional shares arising out of stock dividends, splits or combinations or business combinations; *provided* that such purchases are not made for the purposes of circumventing the provisions of this Section 3.10.

Section 3.11.    *Limitation on Asset Sales and Sales of Subsidiary Stock.*

(a)    The Company shall not, and shall not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(i)    the Company or the applicable Restricted Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the Fair Market Value of the assets or Capital Stock sold or otherwise disposed of, and

(ii)    at least 75% of the consideration received for the assets or Capital Stock sold by the Company or the Restricted Subsidiary, as the case may be, in such Asset Sale shall be in the form of cash or Cash Equivalents received at the time of such Asset Sale.

For purposes of the immediately preceding clause (ii), each of the following will be deemed to be cash:

(A)    any liabilities that are included on the balance sheet of the Company or any Restricted Subsidiary (other than contingent liabilities and liabilities that are by their terms subordinated to the Notes) that are assumed by the transferee of any such assets and as a result of which the Company or such Restricted Subsidiary, as the case may be, are fully and unconditionally released from any further liability in connection therewith;

(B)    any securities, notes or other obligations or assets received by the Company or any such Restricted Subsidiary from such transferee that are converted by the Company or such Restricted Subsidiary into cash or Cash Equivalents within 180 days of the receipt thereof (subject to ordinary settlement periods), to the extent of the cash or Cash Equivalents received in that conversion;

(C)    the Fair Market Value of any Capital Stock of a Person engaged in a Permitted Business that will become, upon purchase, a Restricted Subsidiary or assets (other than current assets as determined in accordance with GAAP or

54

Capital Stock) to be used by the Company or any Restricted Subsidiary in a Permitted Business; and

(D)    any Designated Non-cash Consideration received by the Company or any of its Restricted Subsidiaries in such Asset Sale; *provided* that the aggregate Fair Market Value of such Designated Non-cash Consideration, taken together with the Fair Market Value at the time of receipt of all other Designated Non-cash Consideration received pursuant to this clause (D) less the amount of Net Proceeds previously realized in cash or Cash Equivalents from the sale of prior Designated Non-cash Consideration is less than the greater of (x) 4% of Consolidated Tangible Assets at the time of the receipt of such Designated Non-cash Consideration and (y) U.S.$20.0 million, in each case with the Fair Market Value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value;

*provided* that amounts received pursuant to clauses (A), (B) and (C) shall not be deemed to constitute Net Cash Proceeds for purposes of making an Asset Sale Offer.

(b)    The Company or such Restricted Subsidiary, as the case may be, may apply the Net Cash Proceeds of any such Asset Sale within 365 days thereof to:

(i)    repay any Senior Indebtedness of the Company, any Indebtedness secured by the assets subject to such Asset Sale or Indebtedness of any Restricted Subsidiary (in each case owing to a Person other than the Company or any Restricted Subsidiary and including, in each case without limitation, Capitalized Lease Obligations); *provided*, that

(A)    if the Senior Indebtedness to be repaid is Unsecured Indebtedness, the Company may only apply Net Cash Proceeds of the Asset Sale in compliance with this clause (i) so long as the Collateral Ratio Requirement set forth in clause (b) of the definition thereof was satisfied as of the Measurement Date immediately prior to such repayment; and

(B)    if the Senior Indebtedness to be repaid is the Notes, the Company shall, at its discretion, (1) commence an Asset Sale Offer pursuant to Section 3.11(c) below (and upon completion of such offer, the amount of Net Proceeds offered to be applied to repurchase the Notes shall be deemed to have been applied in accordance with this Section 3.11), or (2) repay, prepay, repurchase or redeem the Notes in accordance with Section 5.01 of this Indenture, and/or

(ii)    make capital expenditures in a Permitted Business, and/or

(iii)    purchase

(A)    assets (other than current assets as determined in accordance with GAAP or Capital Stock) to be used by the Company or any Guarantor in a Permitted Business,

(B)    all or substantially all of the assets of, or any Capital Stock of, a Person engaged in a Permitted Business if, after giving effect to any such acquisition, such Person is or becomes or such assets are contributed to a Guarantor, or

(C)    enter into a binding commitment with a Person, other than the Company or any of its Restricted Subsidiaries, to apply such Net Cash Proceeds pursuant to clause (ii) and/or (iii) above; *provided* that such binding commitment shall be subject only to customary conditions and the applicable purchase shall be consummated within 180 days following the expiration of the aforementioned 365-day period.

(c)    To the extent all or a portion of the Net Cash Proceeds of any Asset Sale are not applied within the 365 days of the Asset Sale as described in clauses (b)(i), (b)(ii) and/or (b)(iii) above, the Company shall make an offer to purchase Notes (the "**Asset Sale Offer**"), at a purchase price equal to 100.0% of the principal amount of the Notes to be purchased, plus accrued and unpaid interest thereon, to the date of purchase (the "**Asset Sale Offer Amount**"). The Company shall purchase pursuant to an Asset Sale Offer from all tendering Holders on a *pro rata* basis, and, at the Company's option, on a *pro rata* basis with the holders of any other Senior Indebtedness with similar provisions requiring the Company to offer to purchase the other Senior Indebtedness with the proceeds of Asset Sales, that principal amount (or accreted value in the case of Indebtedness issued with original issue discount) of Notes and the other Senior Indebtedness to be purchased equal to such unapplied Net Cash Proceeds. The Company may satisfy its obligations under this Section 3.11 with respect to the Net Cash Proceeds of an Asset Sale by making an Asset Sale Offer prior to the expiration of the relevant 365-day period.

(d)    The purchase of Notes pursuant to an Asset Sale Offer shall occur not less than 20 Business Days following the date thereof, or any longer period as may be required by law, nor more than 45 days following the 365th day following the Asset Sale (except in the case of clause (b)(iii)(C) in which case such period shall be extended for 180 days). The Company may, however, defer an Asset Sale Offer until there is an aggregate amount of unapplied Net Cash Proceeds from one or more Asset Sales equal to or in excess of U.S.$20.0 million. At that time, the entire amount of unapplied Net Cash Proceeds, and not just the amount in excess of U.S.$20.0 million, shall be applied as required pursuant to this Section 3.11. Pending application in accordance with this Section 3.11, Net Cash Proceeds may be applied to temporarily reduce revolving credit borrowings or Invested in Cash Equivalents.

(e)    Each Asset Sale Offer Notice shall be delivered to the record Holders as shown on the Note Register within 20 days following such 365th day, with a copy to the Trustee offering to purchase the Notes as described in this Section 3.11. Each Asset Sale Offer Notice shall state, among other things, the purchase date, which must be no earlier than 30 days nor later than 60 days from the date the notice is delivered, other than as may be required by law (the "**Asset Sale Offer Payment Date**"). Upon receipt of an Asset Sale Offer Notice, Holders may elect to tender their notes in whole or in part in minimum principal amounts of U.S.$150,000 and integral multiples of U.S.$1,000 in excess thereof in exchange for cash.

(f)    On the Asset Sale Offer Payment Date, the Company shall, to the extent lawful:

(i)        accept for payment all Notes or portions thereof properly tendered pursuant to the Asset Sale Offer;

(ii)       deposit with the Paying Agent funds in an amount equal to the Asset Sale Offer Amount in respect of all Notes or portions thereof so tendered; and

(iii)      deliver or cause to be delivered to the Trustee the Notes so accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions thereof being purchased by the Company.

(g)        To the extent Holders of Notes and holders of other Senior Indebtedness, if any, which are the subject of an Asset Sale Offer properly tender and do not withdraw Notes or the other Senior Indebtedness in an aggregate amount exceeding the amount of unapplied Net Cash Proceeds, the Company shall purchase the Notes and the other Senior Indebtedness on a *pro rata* basis (based on amounts tendered).  If only a portion of a Note is purchased pursuant to an Asset Sale Offer, a new Note in a principal amount equal to the portion thereof not purchased will be issued in the name of the Holder thereof upon cancellation of the original Note (or appropriate adjustments to the amount and beneficial interests in a Global Note will be made, as appropriate).  Notes (or portions thereof) purchased pursuant to an Asset Sale Offer shall be cancelled and cannot be reissued.

(h)        The Company shall comply with the requirements of Rule 14e-l under the Exchange Act and any other applicable securities laws in connection with the purchase of Notes pursuant to an Asset Sale Offer.  To the extent that the provisions of any applicable securities laws or regulations conflict with this Section 3.11, the Company shall comply with those laws and regulations and shall not be deemed to have breached its obligations under this Section 3.11 by doing so.

(i)        Upon completion of an Asset Sale Offer, the amount of Net Cash Proceeds will be reset at zero.  Accordingly, to the extent that the aggregate amount of Notes and other Indebtedness tendered pursuant to an Asset Sale Offer is less than the aggregate amount of unapplied Net Cash Proceeds, the Company and its Restricted Subsidiaries may use any remaining Net Cash Proceeds for any purpose not otherwise prohibited by this Indenture.

Section 3.12.    *Limitation on Lease Securitizations and Receivables Transactions*.

(a)        The Company and its Restricted Subsidiaries may sell, transfer or otherwise dispose of accounts receivable to a Securitization Vehicle; *provided* that:

(i)        the sale, transfer or other disposition is in connection with a Lease Securitization or a Receivables Transaction; and

(ii)       the aggregate consideration received in each such sale, transfer or other disposition is at least equal to the Fair Market Value of the receivables transferred.

Section 3.13.    *Limitation on Designation of Unrestricted Subsidiaries*.

(a)    The Company may designate after the Issue Date any Subsidiary of the Company as an "**Unrestricted Subsidiary**" under this Indenture (a "**Designation**") only if:

(i)    no Default or Event of Default shall have occurred and be continuing at the time of or immediately after giving effect to such Designation and any transactions between the Company or any of its Restricted Subsidiaries and such Unrestricted Subsidiary are in compliance with Section 3.17;

(ii)    at the time of and after giving effect to such Designation, the Company could Incur U.S.$1.00 of additional Indebtedness pursuant to Section 3.08(a); and

(iii)    the Company would be permitted to make an Investment at the time of Designation (assuming the effectiveness of such Designation and treating such Designation as an Investment at the time of Designation) as a Permitted Investment pursuant to clauses (i) and (o) of the "Permitted Investment" definition in an amount (the "**Designation Amount**") equal to the amount of the Company's Investment in such Subsidiary on such date;

(b)    At the time of such Designation and at all times thereafter, neither the Company nor any Restricted Subsidiary will:

(i)    provide credit support for, subject any of its property or assets (other than the Capital Stock of any Unrestricted Subsidiary) to the satisfaction of, or Guarantee, any Indebtedness of such Subsidiary (including any undertaking, agreement or instrument evidencing such Indebtedness);

(ii)    be directly or indirectly liable for any Indebtedness of such Subsidiary; or

(iii)    be directly or indirectly liable for any Indebtedness which provides that the holder thereof may (upon notice, lapse of time or both) declare a default thereon or cause the payment thereof to be accelerated or payable prior to its final scheduled maturity upon the occurrence of a default with respect to any Indebtedness of such Subsidiary, except for any non-recourse Guarantee given solely to support the pledge by the Company or any Restricted Subsidiary of the Capital Stock of such Subsidiary.

(c)    The Company may revoke any Designation of a Subsidiary as an Unrestricted Subsidiary (a "**Revocation**") only if:

(i)    no Default or Event of Default shall have occurred and be continuing at the time of and after giving effect to such Revocation; and

(ii)    all Liens and Indebtedness of such Unrestricted Subsidiary outstanding immediately following such Revocation would, if Incurred at such time, have been permitted to be Incurred for all purposes of this Indenture.

(d)    The Designation of a Subsidiary of the Company as an Unrestricted Subsidiary shall be deemed to include the Designation of all of the Subsidiaries of such Subsidiary unless otherwise designated by the Company pursuant to this Indenture.  All Designations and

Revocations must be evidenced by a certificate of the Chief Financial Officer of the Company, delivered to the Trustee certifying compliance with the preceding provisions.

Section 3.14.   *Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries.*

(a)      Except as provided in paragraph (b) of this Section 3.14, the Company shall not, and shall not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or permit to exist or become effective any encumbrance or restriction on the ability of any Restricted Subsidiary to:

(i)      pay dividends or make any other distributions on or in respect of its Capital Stock to the Company or any other Restricted Subsidiary or pay any Indebtedness owed to the Company or any other Restricted Subsidiary;

(ii)      make loans or advances to, or Guarantee any Indebtedness or other obligations of, or make any Investment in, the Company or any other Restricted Subsidiary; or

(iii)      transfer any of its property or assets to the Company or any other Restricted Subsidiary.

(b)      Paragraph (a) of this Section 3.14 shall not apply to encumbrances or restrictions existing under or by reason of:

(i)      applicable law rule, regulation or order;

(ii)      this Indenture or the Notes;

(iii)      the terms of any Indebtedness outstanding on the Issue Date, and any amendment, modification, restatement, renewal, restructuring, replacement or refinancing thereof; *provided* that any amendment, modification, restatement, renewal, restructuring, replacement or refinancing is not materially more restrictive, taken as a whole, with respect to such encumbrances or restrictions than those in existence on the Issue Date;

(iv)      customary non-assignment provisions of any contract and customary provisions restricting assignment or subletting in any lease governing a leasehold interest of any Restricted Subsidiary, or any customary restriction on the ability of a Restricted Subsidiary to dividend, distribute or otherwise transfer any asset which secures Indebtedness secured by a Lien, in each case permitted to be Incurred under this Indenture;

(v)      any instrument governing Acquired Indebtedness not Incurred in connection with, or in anticipation or contemplation of, the relevant acquisition, merger or consolidation, which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired;

(vi) customary restrictions with respect to a Restricted Subsidiary of the Company imposed pursuant to a binding agreement, which has been entered into for the sale or disposition of Capital Stock or assets of such Restricted Subsidiary; *provided* that such restrictions apply solely to the Capital Stock or assets of such Restricted Subsidiary being sold;

(vii) customary restrictions imposed on the transfer of copyrighted or patented materials;

(viii) an agreement governing Indebtedness of the Company or any Restricted Subsidiaries permitted to be Incurred subsequent to the date of this Indenture in accordance with Section 3.08; *provided* that the provisions relating to such encumbrance or restriction contained in such agreement are no more restrictive, taken as a whole, than those contained in the agreement referred to in Section 3.14(b)(iii) above;

(ix) purchase money obligations for property (including Capital Stock) acquired in the ordinary course of business and Capitalized Lease Obligations that impose restrictions on the property purchased or leased of the nature described in Section 3.14(a)(iii) above;

(x) Liens permitted to be incurred under Section 3.16 that limits the right of the debtor to dispose of the assets securing such Indebtedness;

(xi) provisions limiting the payment of dividends or the disposition or distribution of assets or property or transfer of Capital Stock in joint venture agreements, sale-leaseback agreements, limited liability company organizational documents and other similar agreements entered into in accordance with the terms of this Indenture and (a) in the ordinary course of business consistent with past practice or (b) with the approval of the Company's Board of Directors, which limitation is applicable only to the assets, property or Capital Stock that are the subject of such agreements;

(xii) restrictions on cash, Cash Equivalents, Marketable Securities or other deposits or net worth imposed by customers or lessors under contracts or leases entered into in the ordinary course of business consistent with past practice to secure trade payable obligations; and

(xiii) restrictions customarily granted in connection with any Lease Securitizations.

Section 3.15. *Limitation on Layered Indebtedness.* The Company shall not, and shall not permit any Guarantor to, directly or indirectly, Incur any Indebtedness that is subordinate in right of payment to any other Senior Indebtedness, unless such Indebtedness is expressly subordinate in right of payment to the Notes, or the Note Guarantee, as the case may be, to the same extent and on the same terms as such Indebtedness is subordinate to such other Senior Indebtedness; *provided* that the foregoing limitation shall not apply to distinctions between categories of Senior Indebtedness that exist by reason of any Liens arising or created in respect of some but not all such Senior Indebtedness.

Section 3.16.    *Limitation on Liens.*

(a)    Subject to clause (b) below, the Company shall not, and shall not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Liens of any kind (except for Permitted Liens) against or upon any of their respective properties or assets, whether owned on the Issue Date or acquired after the Issue Date, or any proceeds therefrom, to secure any Indebtedness or trade payables unless contemporaneously therewith effective provision is made to secure the Notes and all other amounts due under this Indenture, equally and ratably with such Indebtedness or other obligation (or, in the event that such Indebtedness is subordinated in right of payment to the Notes, prior to such Indebtedness or other obligation) with a Lien on the same properties and assets securing such Indebtedness or other obligation for so long as such Indebtedness or other obligation is secured by such Lien.

(b)    Notwithstanding anything to the contrary herein, the Company shall not, and shall not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Liens of any kind against or upon any Collateral, other than (i) pursuant to the Mexican Trust Agreement for the benefit of the Notes, or (ii) any Permitted Liens arising by application of Applicable Law that do not secure Indebtedness for borrowed money, do not materially interfere with the conduct of the business of the Company or any of their Restricted Subsidiaries and do not materially adversely affect the value of the subject property or materially impair the use thereof. For the avoidance of doubt, the Mexican Trust may not secure any series of Indebtedness other than the Notes.

Section 3.17.    *Limitation on Transactions with Affiliates.*

(a)    The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, enter into any transaction or series of related transactions (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service) with, or for the benefit of, any of its Affiliates (each an "**Affiliate Transaction**"), unless:

(i)    the terms of such Affiliate Transaction are not materially less favorable than those that could reasonably be expected to be obtained in a comparable transaction at such time on an arm's-length basis from a Person that is not an Affiliate of the Company;

(ii)    in the event that such Affiliate Transaction involves aggregate payments, or transfers of property or services with a Fair Market Value, in excess of U.S.$10.0 million, the terms of such Affiliate Transaction will be approved by a majority of the members of the Board of Directors of the Company (including a majority of the disinterested members thereof), the approval to be evidenced by a Board Resolution stating that the Board of Directors has determined that such transaction complies with the preceding provisions; and

(iii)    in the event that such Affiliate Transaction involves aggregate payments, or transfers of property or services with a Fair Market Value, in excess of U.S.$20.0 million, the Company must in addition obtain and deliver to the Trustee a favorable

61

written opinion from an internationally recognized investment banking or accounting firm as to the fairness of the transaction to the Company and its Restricted Subsidiaries from a financial point of view.

(b)    The provisions of Section 3.17(a) above will not apply to:

(i)    Affiliate Transactions with or among the Company and any Restricted Subsidiary or between or among Restricted Subsidiaries;

(ii)    reasonable fees and compensation paid to, and any indemnity provided on behalf of, officers, directors, employees, consultants or agents of the Company or any Restricted Subsidiary as determined in good faith by the Company's Board of Directors or senior management of the Company;

(iii)    Affiliate Transactions undertaken pursuant to any contractual obligations or rights in existence on the Issue Date and any amendment, modification or replacement of such agreement (so long as such amendment, modification or replacement is not materially more disadvantageous to the Company and its Restricted Subsidiaries or the Holders of the Notes, taken as a whole, than the original agreement as in effect on the Issue Date);

(iv)    any Restricted Payments made in compliance with Section 3.10 or any Permitted Investments;

(v)    loans and advances to officers, directors and employees of the Company or any Restricted Subsidiary for travel, entertainment, moving and other relocation expenses, in each case made in the ordinary course of business and not exceeding U.S.$2.0 million outstanding at any one time;

(vi)    any employment agreement, employee benefit plan, officer or director indemnification agreement or any similar arrangement entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business or consistent with past practice and payments pursuant thereto;

(vii)    any issuance of Capital Stock (other than Disqualified Capital Stock) of the Company to Affiliates of the Company or to any director, officer, employee or consultant of the Company, and the granting and performance of registration rights;

(viii)    transactions between the Company or any of its Restricted Subsidiaries and any Securitization Vehicle in the ordinary course of business in connection with Lease Securitizations; and

(ix)    transactions with customers, clients, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Indenture, which are fair to the Company or its Restricted Subsidiaries (as applicable), or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party.

Section 3.18.    *Collateral Ratio Requirement*.

(a)    Subject to clause (b) below, as of the Issue Date and as of each Measurement Date beginning on [●], 2025, the Company shall comply with the Collateral Ratio Requirement, as evidenced pursuant to the Monthly Report delivered with respect to such Measurement Date pursuant to the Mexican Trust Agreement (*provided* that for the avoidance of doubt, no such Monthly Report shall be delivered by the Company on the Issue Date).  For avoidance of doubt, the Collateral Coverage Requirement will be satisfied if the test under either clause (a) or clause (b) of the definition thereof is satisfied (or if both tests are satisfied).

(b)    If at any Measurement Date the Company fails to comply with the Collateral Ratio Requirement (including as a result of any of the Receivables comprising the Collateral failing to meet the Eligibility Criteria as of such Measurement Date), then the Company shall, within 25 Business Days after the applicable Measurement Date (the "**Cure Period**"), transfer additional Eligible Receivables or cash (the "**Top-Up Collateral**") to the Mexican Trust pursuant to the terms of the Mexican Trust Agreement (including any transfer, notice and registration requirements set forth therein), in each case, such that the Collateral Ratio Requirement (for avoidance of doubt, taking into account the Eligible Receivables after giving effect to the transfer of the Top-Up Collateral), as applicable, when retested as at the relevant Measurement Date, taking into account the transfer of such Top-Up Collateral to the Mexican Trust, is satisfied, as certified by the Company to the Trustee not later than the last day of the Cure Period.

(c)    For the avoidance of doubt, the Company's failure to comply with the Collateral Ratio Requirement will not be deemed to constitute a Default or Event of Default if the Company complies with its obligation set forth in clause (b) above to transfer Top-Up Collateral in accordance with the Mexican Trust Agreement within the applicable Cure Period such that the Collateral Ratio Requirement and/or Eligibility Criteria, as applicable, when retested as at the relevant Measurement Date, taking into account the Top-Up Collateral so transferred to the Mexican Trust, are satisfied, and the required certification by the Company is delivered to the Trustee not later than the last day of the Cure Period.

Section 3.19.    *Conduct of Business*.

The Company and its Restricted Subsidiaries shall not engage in any business other than a Permitted Business.

Section 3.20.    *Reports to Holders*.

(a)    So long as any of the Notes are outstanding, the Company shall furnish to the Trustee:

(i)    Within 120 days following the end of each of the Company's fiscal years, (A) information on the Capitalization Ratio, Consolidated Net Income, Consolidated Net Worth, Consolidated Tangible Assets, Net Loan Portfolio, Total Unencumbered Assets, Total Unsecured Indebtedness and Secured Indebtedness of the Company and its Restricted Subsidiaries as of and for such fiscal year and (B) information (presented in the English language) including sections titled "Consolidated Financial Information and

Other Information" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" that describes the financial condition and results of operations of the Company), and consolidated audited income statements, balance sheets and cash flow statements and the related notes thereto for the Company for the two most recent fiscal years in accordance with GAAP, which need not, however, contain any reconciliation to U.S. GAAP or otherwise comply with Regulation S-X under the Securities Act, together with an audit report thereon by the Company's independent auditors; and

(ii)    Within 60 days following the end of each of the first three fiscal quarters in each of the Company's fiscal years (beginning with the fiscal quarter ended March 31, 2020), (A) information on the Capitalization Ratio, Consolidated Net Income, Consolidated Net Worth, Consolidated Tangible Assets, Net Loan Portfolio, Total Unencumbered Assets, Total Unsecured Indebtedness and Secured Indebtedness of the Company and its Restricted Subsidiaries as of and for the fiscal quarter then ended and (B) quarterly reports containing unaudited balance sheets, statements of income, statements of shareholders equity and statements of cash flows and the related notes thereto for the Company on a consolidated basis, in each case as of and for the fiscal quarter then ended and the corresponding fiscal quarter in the prior fiscal year and prepared in accordance with GAAP, which need not, however, contain any reconciliation to U.S. GAAP or otherwise comply with Regulation S-X under the Securities Act, together with a "Management's Discussion and Analysis of Financial Condition and Results of Operations" section for such fiscal quarter and condensed footnote disclosure (in each case, presented in the English language).

(b)    None of the information provided pursuant to Section 3.19(a) above shall be required to comply with Regulation S-K as promulgated by the SEC. In addition, the Company shall furnish to the Holders of the Notes and to prospective investors, upon the requests of such Holders, any information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act so long as the Notes are not freely transferable under the Securities Act by Persons who are not "affiliates" under the Securities Act.

(c)    So long as the Notes are admitted to listing on the SGX-ST and to trading on the Official List of the SGX-ST and the rules of the SGX-ST so require, copies of such reports furnished to the Trustee shall also be made available at the specified office of the Paying Agent in Singapore.

(d)    Delivery of such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt thereof shall not constitute constructive or actual notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of the respective covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officers' Certificates).

Section 3.21.    *Listing*.

(a)    The Company will use its commercially reasonable efforts to obtain the listing of the Notes on the SGX-ST and the admission to trading on the Official List of the SGX-ST within

60 days following the Issue Date; *provided* that the failure by the Company to obtain such listing shall not constitute a Default or Event of Default so long as the Company has used commercially reasonable efforts to obtain such listing.

(b)    In the event that the Notes are admitted to listing, the Company will use its commercially reasonable efforts to maintain such admission to listing and trading; *provided* that if, as a result of any applicable rule, requirement or legislation the Company would be required to publish financial information either more regularly than it otherwise would be required to or according to accounting principles which are materially different from the accounting principles which the Company would otherwise use to prepare its published financial information, the Company may delist the Notes in accordance with the rules of the SGX-ST and seek an alternative admission to listing, trading and/or quotation for the Notes on a different section of the SGX-ST or on such other listing authority, stock exchange and/or quotation system recognized by the SEC as the Company may decide.

(c)    From and after the date the Notes are admitted to listing on the SGX-ST and to trading on the Official List of the SGX-ST and the rules of the SGX-ST so require, all notices to the Holders shall be published in English in accordance with Section 11.01(b).

Section 3.22.    *Maintenance of Ratings*. The Company shall use commercially reasonable efforts to obtain rating of the Notes by at least one Rating Agency within 3 months following the Issue Date. Thereafter, the Company shall use commercially reasonably efforts to maintain a rating of the Notes by at least one Rating Agency; *provided, however*, that, in the event that such Rating Agency (a) ceases to exist, (b) ceases to issue ratings of the type issued in respect of the Notes as of the Issue Date or (c) refuses or otherwise declines to provide a rating for the Notes (other than due to the Company's failure to (i) provide such Rating Agency with such reports and other information or documents, as such Rating Agency shall reasonably request to monitor and continue to assign ratings to the Notes, (ii) pay customary fees to such Rating Agency in connection therewith or (iii) take any other action reasonably requested by such Rating Agency in connection therewith) (and, in each of cases (a) through (c) above, the Company is unable to substitute another Rating Agency in place of such Rating Agency), the failure by the Company to obtain or maintain such rating shall not constitute a Default or Event of Default. For the avoidance of doubt, the Company shall not have any obligation to maintain any particular minimum rating or level of rating in respect of itself or the Notes.

Section 3.23.    *Payment of Additional Amounts*.

(a)    The Company and each of the Guarantors shall make such deduction or withholding, make payment of the amount so withheld to the Mexican taxing authorities or any other taxing authority in any other jurisdiction ("**Taxing Authority**") in which the Company (or the relevant Guarantor) is organized or resident for tax purposes (a "**Relevant Jurisdiction**") and pay such additional amounts ("**Additional Amounts**") to holders of the Notes, as may be necessary to ensure that the net amounts receivable and effectively received by such holders of the Notes after such withholding or deduction, shall equal the respective amounts of principal and interest which would have been receivable in respect of the Notes in the absence of such withholding or deduction of any taxes, duties, assessments or other similar governmental charges

("**Taxes**") imposed with respect to any payment of interest, any premium paid upon redemption of the Notes or principal by a Relevant Jurisdiction.

(b)      The Company and the Guarantors shall not pay Additional Amounts to any Holder for or solely on account of any of the following:

(i)      any Taxes imposed solely because at any time there is or was a connection between the Holder or beneficial owner of the Note (or between a fiduciary, settlor beneficiary, member or shareholder of such Holder, if such Holder is an estate, a trust, a partnership or a corporation), as the case may be, and the Relevant Jurisdiction (or any political subdivision or taxing authority thereof or therein), including such Holder or beneficial owner (A) being or having been a citizen or resident thereof for tax purposes, (B) being incorporated or organized therein, (C) maintaining or having maintained an office, permanent establishment, or branch, in all cases subject to taxation therein, or (D) being or having been present or engaged in a trade or business therein (other than the receipt of payments or the ownership or holding of a Note),

(ii)      any estate, inheritance, gift, sales, transfer, personal property or similar Tax imposed with respect to the Notes,

(iii)      any Taxes imposed solely because the Holder or any other person having a beneficial interest on the Notes fails to comply with any certification, information, identification or other reporting requirement concerning the nationality, residence for tax purposes or identity of the Holder or any beneficial owner of the Note, if compliance is required by statute, law, rule, regulation, officially published administrative practice of the taxing jurisdiction or by an applicable income tax treaty which is in effect and to which Mexico or any other Relevant Jurisdiction is a party, as a precondition to exemption from, or reduction in the rate of, such Tax and the Company (or the relevant Guarantor) has given the Holders notice at least 30 days prior to the first payment date with respect to which the Company (or the relevant Guarantor) shall apply this clause, that such Holders will be required to provide any such certification, information, identification or reporting requirement,

(iv)      any Taxes imposed on a payment by any tax authority other than Mexico or any other Relevant Jurisdiction,

(v)      any Taxes with respect to such Note presented for payment more than 30 days after the date on which the payment became due and payable or the date on which payment thereof is duly provided for and notice thereof given to the Holders, whichever occurs later, except to the extent that the holders of such Note would have been entitled to such Additional Amounts on presenting such Note for payment on any date during such 30-day period and there were no additional withholdings or deductions on account of Taxes as a result of such late presentment,

(vi)      any Taxes payable otherwise than by deduction or withholding from payments on the Notes or by direct payment by the Company or the Guarantors in respect of claims made against the Company or the Guarantors,

(vii)    any Taxes with respect to a payment on the Note to a Holder that is a fiduciary or partnership or a limited liability company or a person other than the sole beneficial owner of any such payment, to the extent that payment would be required by the laws of the Relevant Jurisdiction to be included in the income, for tax purposes, of a beneficiary or settlor with respect to the fiduciary, a member of that partnership, an interest holder in a limited liability company or a beneficiary or settlor with respect to such fiduciary, a member of such a partnership or limited liability company or the beneficial owner of the payment who would not have been entitled to the Additional Amounts had the beneficiary, settlor, member or beneficial owner been the holder of the Note,

(viii)    any Taxes imposed under Sections 1471 through 1474 of the Code and any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement between a non-U.S. jurisdiction and the United States with respect to the foregoing or any law, regulation or practice adopted pursuant to any such intergovernmental agreement (collectively, "**FATCA**"), or

(ix)    any combination of any of the foregoing.

(c)    The limitations on the Company's obligation to pay Additional Amounts set forth in Section 3.23(b)(iii) above shall not apply if:

(i)    the provision of the certification, information, identification or other reporting requirement described in such Section 3.23(b)(iii) would be materially more onerous, in form, in procedure or in the substance of information disclosed, to a Holder or beneficial owner of a Note, taking into account any relevant differences between U.S. and Mexican law, rule, regulation or administrative practice, than comparable information or other reporting requirements imposed under U.S. tax law (including the United States-Mexico income tax treaty), regulation and published administrative practice, or

(ii)    with respect to taxes imposed by Mexico or any political subdivision or taxing authority thereof or therein, Article 166, section II, subsection a), of the Mexican Income Tax Law (*Ley del Impuesto sobre la Renta*) (or a substantially similar successor of such Article) is in effect, unless the provision of the certification, information or reporting requirement described in Section 3.23(b)(iii) is expressly required by statute, rule or regulation to apply Article 166, section II, subsection a), of the Mexican Income Tax Law (or a substantially similar successor of such Article), the Company, or the relevant Guarantor, cannot obtain such certification, information or other evidence on its own through reasonable diligence, and the Company otherwise would meet the requirements for application of Article 166, section II, subsection a), of the Mexican Income Tax Law (or such successor of such Article).

(d)    Section 3.23(b)(iii) does not require, and shall not be construed as requiring, that a holder or beneficial owner certify that it is a non-Mexican pension or retirement fund or a non-Mexican financial institution, of any nature, register with, or provide information to, the Mexican Ministry of Finance and Public Credit (*Secretaría de Hacienda y Crédito Público*) or Mexican

Tax Administration Service (*Servicio de Administración Tributaria*) for the purpose of establishing eligibility for an exemption from, or a reduction of, Mexican withholding tax or take any other action.  The Company will remit the full amount of any Taxes withheld to the applicable Taxing Authority in accordance with applicable law.

(e)    Promptly upon written request, the Company and the Guarantors shall provide the Trustee with documentation satisfactory to the Trustee evidencing the payment of Mexican taxes in respect of which it has paid any Additional Amount.  The Company shall make copies of such documentation available to the Holders of the Notes or the Paying Agent upon written request.

(f)    Any reference in this Indenture or the Notes to principal, premium, interest or any other amount payable in respect of the Notes by the Company shall be deemed also to refer to any Additional Amount that may be payable with respect to that amount under the obligations referred to in this Section 3.23.

(g)    In the event that Additional Amounts actually paid with respect to the Notes pursuant to this Section 3.23 are based on rates of deduction or withholding of withholding taxes in excess of the appropriate rate applicable to the Holder or beneficial owner of such Notes, and as a result thereof such Holder or beneficial owner is entitled to make a claim for a refund or credit of such excess from the authority imposing such withholding tax, then such Holder shall, by accepting such Notes, be deemed to have assigned and transferred all right, title and interest to any such claim for a refund or credit of such excess to the Company.  However, by making such assignment, the Holder makes no representation or warranty that the Company will be entitled to receive such claim for a refund or credit and incurs no other obligation with respect thereto, including taking any action for such refund to be repaid.

(h)    In the event of any merger or other transaction described and permitted under Section 4.01, all references to Mexico, Mexican law or regulations, and Mexican taxing authorities under this Section 3.23 (other than Section 3.23(c) and Section 3.23(d) above) and under Section 5.08 shall be deemed to also include the relevant Qualified Merger Jurisdiction, the law or regulations of the relevant Qualified Merger Jurisdiction, and any taxing authority of the relevant Qualified Merger Jurisdiction, respectively.

(i)    The Company and each of the Guarantors each hereby covenants with the Trustee that it will endeavor to provide the Trustee with sufficient information about its operations or the Notes so as to enable the Trustee to determine whether or not it is obliged, in respect of any payments to be made by it pursuant to the Indenture or Notes, to make any withholding or deduction pursuant to an agreement described in Section 1471(b) of the Code or otherwise imposed pursuant to Sections 1471 through 1474 of the Code and any regulations, or agreements thereunder or official interpretations thereof or any intergovernmental agreement between the United States and another jurisdiction facilitating the implementation thereof (or any law implementing such an intergovernmental agreement) ("FATCA Withholding Tax"). The Trustee shall be entitled (without liability) to deduct FATCA Withholding Tax, and shall have no obligation to gross-up any payment hereunder or to pay any additional amount as a result of such FATCA Withholding Tax.

Section 3.24.    *Guarantees*.

(a)     Each Guarantor from time to time party hereto fully, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, jointly and severally with each other Guarantor, the full and punctual payment when due, whether at maturity, by acceleration, by redemption or otherwise, of any Obligations of the Company under this Indenture and the Notes (a "**Note Guarantee**"). Each Guarantor further agrees (to the extent permitted by law) that the Obligations of the Company under this Indenture and the Notes (the "**Guaranteed Obligations**") may be modified in any manner and may be extended or renewed, in whole or in part, without notice or further assent from it, and that it will remain bound under this Section 3.24 notwithstanding any modification, extension or renewal of any Guaranteed Obligation.

(b)     Each Guarantor from time to time party hereto waives presentation to, demand of payment from and protest to the Company of any of the Guaranteed Obligations and also waives notice of protest for nonpayment. Each Guarantor waives notice of any default under this Indenture, the Notes or the Guaranteed Obligations. The obligations of each Guarantor hereunder shall not be affected by (i) the failure of any Holder to assert any claim or demand or to enforce any right or remedy against the Company or any other Person under this Indenture, the Notes or any other agreement or otherwise; (ii) any extension or renewal of any thereof; (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (iv) the release of any security held by any Holder or the Trustee for the Guaranteed Obligations or any of them; (v) the failure of any Holder to exercise any right or remedy against any other Guarantor; or (vi) any change in the ownership of the Company.

(c)     Each Guarantor from time to time party hereto further agrees that its Note Guarantee herein constitutes a guarantee of payment when due (and not a guarantee of collection) and waives any right to require that any resort be had by the Trustee or any Holder to any security held for payment of the Guaranteed Obligations.

(d)     Each of the Guarantors from time to time party hereto, further expressly waives irrevocably and unconditionally:

(i)     any right it may have to require any Holder or the Trustee to first proceed against, initiate any actions before a court of law or any other judge or authority, or enforce or complete the enforcement of any rights or security (or apply as payment in respect of such security) or claim or compete for any claim for payment from the Company, any other Guarantor or any other Person (including any other guarantor) before initiating a claim or continuing to claim against it as guarantor under this Indenture or the Notes;

(ii)     any right to which it may be entitled to have the assets of the Company, any other Guarantor or any other Person (including any other guarantor) first be used, applied or depleted as payment of the Company's or such Guarantors' obligations hereunder, prior to any amount being claimed from or paid by the Guarantor hereunder;

(iii)     any right to which it may be entitled to have claims hereunder divided between the Guarantors or between the Guarantors and the Company;

(iv)    to the greatest extent applicable, the benefits of *orden*, *excusión*, *división*, *quita*, *novación*, *espera* and *modificación* and any right specified in articles 2813, 2814, 2815, 2817, 2818, 2820, 2821, 2822, 2823, 2827, 2836, 2840, 2846, 2847, 2848, and 2849 and any other related or applicable articles that are not explicitly set forth herein because of the Guarantor's knowledge thereof of the *Código Civil Federal* of Mexico, and the *Código Civil* of each State of Mexico. Each Guarantor represents that it is familiar with the contents of these articles, and other related articles, and agrees that such articles need not be reproduced herein.

(e)    Except as set forth in Section 3.24(b), Section 3.24(k) and Article 8, the obligations of each Guarantor from time to time party hereto shall not be subject to any reduction, limitation, impairment or termination for any reason (other than payment of the Guaranteed Obligations in full), including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Guarantor herein shall not be discharged or impaired or otherwise affected by the failure of the Trustee or any Holder to assert any claim or demand or to enforce any remedy under this Indenture, the Notes or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the Guaranteed Obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of such Guarantor or would otherwise operate as a discharge of such Guarantor as a matter of law or equity.

(f)    Each Guarantor from time to time party hereto further agrees that its Note Guarantee herein shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest on any of the Guaranteed Obligations is rescinded or must otherwise be restored by the Trustee or any Holder upon the bankruptcy or reorganization of the Company or otherwise.

(g)    In furtherance of the foregoing and not in limitation of any other right which any Holder or the Trustee has at law or in equity against each Guarantor by virtue hereof, upon the failure of the Company to pay any of the Guaranteed Obligations when and as the same shall become due, whether at maturity, by acceleration, by redemption or otherwise, each Guarantor from time to time party hereto promises to and will, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the Trustee any amount owed to it and to the Holders an amount equal to the sum of:

(i)    the unpaid amount of such Guaranteed Obligations then due and owing; and

(ii)    accrued and unpaid interest, if any, on such Guaranteed Obligations then due and owing (but only to the extent not prohibited by law);

*provided*, that any delay by the Trustee in giving such written demand shall in no event affect any Guarantor's obligations under its Note Guarantee.

(h)    Each Guarantor from time to time party hereto acknowledges and represents that (i) it will receive valuable direct or indirect benefits as a result of the entering into of this Indenture; (ii) it is not considered insolvent by virtue of having satisfied the criteria set forth in the Mexican *Ley de Concursos Mercantiles*; and (iii) it is not subject to *concurso mercantil* or *quiebra* proceedings and it has no reason to believe that any such proceeding may be initiated or that it will be declared in *concurso mercantil* or *quiebra*.

(i)    Subject to Section 3.24(j), each Guarantor from time to time party hereto further agrees that, as between such Guarantor, on the one hand, and the Trustee and the Holders, on the other hand:

(i)    the maturity of the Guaranteed Obligations may be accelerated as provided in this Indenture for the purposes of its Note Guarantee herein, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guaranteed Obligations; and

(ii)    in the event of any such declaration of acceleration of such Guaranteed Obligations, such Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by such Guarantor for the purposes of its Note Guarantee.

(j)    The obligations of each Guarantor from time to time party hereto hereunder will be limited to the maximum amount as shall, after giving effect to all other contingent and fixed liabilities of such Guarantor and after giving effect to any collections from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under its Note Guarantee or pursuant to its contribution obligations under this Indenture, result in the Guaranteed Obligations not constituting a fraudulent conveyance, fraudulent transfer or similar illegal transfer under applicable law.

(k)    Each Guarantor from time to time party hereto will be released and relieved of its obligations under its Note Guarantee in the event that:

(i)    a sale or other disposition (including by way of consolidation or merger) of the Guarantor or the sale or disposition of all or substantially all the assets of the Guarantor (other than to the Company or a Restricted Subsidiary) otherwise permitted by this Indenture;

(ii)    if the Note Guarantee was required pursuant to the terms of this Indenture, the cessation of the circumstances requiring the Note Guarantee,

(iii)    the designation in accordance with this Indenture of the Guarantor as an Unrestricted Subsidiary, or

(iv)    defeasance or discharge of the Notes, as provided in Section 8.01 and Section 8.07.

Notwithstanding anything to the contrary in this Indenture, any Restricted Subsidiary which is a Guarantor shall not be released from its Guarantee under this Indenture or the Mexican Trust Agreement

for the sole reason of it ceasing to be wholly-owned, directly or indirectly, by the Company unless (x) it is no longer a direct or indirect Subsidiary of the Company pursuant to a transaction permitted by the Indenture and (y) such disposition is a good faith disposition to a bona fide unaffiliated third party for fair market value and for a bona fide business purpose and not for the primary purpose of causing such release.

(l)     Each Guarantor from time to time party hereto that makes a payment or distribution under a Note Guarantee will be entitled to a contribution from each other Guarantor in a pro rata amount, based on the net assets of each Guarantor determined in accordance with GAAP.  The provisions in this Section 3.24(l) shall in no respect limit the obligations and liabilities of each Guarantor to the Trustee and the Holders and each Guarantor shall remain liable to the Trustee and the Holders for the full amount guaranteed by such Guarantor hereunder.

(m)     Each Guarantor agrees that it shall not be entitled to any right of subrogation in respect of any Guaranteed Obligations until payment in full in U.S. Dollars of all Guaranteed Obligations.  If any amount shall be paid to any Guarantor on account of such subrogation rights at any time when all of the Guaranteed Obligations shall not have been paid in full in U.S. Dollars, such amount shall be held by such Guarantor in trust for the Trustee and the Holders, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be turned over to the Trustee in the exact form received by such Guarantor (duly endorsed by such Guarantor to the Trustee, if required), to be applied against the Guaranteed Obligations.

(n)     The Company covenants and agrees that it shall cause any Subsidiary of the Company that becomes an Eligible Subsidiary at any time after the date hereof (an "**Additional Guarantor**"), to become a Guarantor on the same terms as provided in this Section 3.24 by executing a supplemental indenture hereto and providing the Trustee with an Officers' Certificate and Opinion of Counsel within 10 Business Days of the delivery of financial statements pursuant to Section 3.20 for the applicable fiscal quarter, and to comply in all respects with the provisions of this Indenture and the Notes; *provided, however*, that each Additional Guarantor will be automatically and unconditionally released and discharged from its obligations under such additional Note Guarantee only in accordance with Section 3.24(k).

Section 3.25.    *Suspension of Covenants*.

(a)     During any period of time that (i) the Notes have Investment Grade Ratings from both Rating Agencies and (ii) no Default or Event of Default has occurred and is continuing (the occurrence of the events described in the foregoing clauses (i) and (ii) being collectively referred to as a "**Covenant Suspension Event**", and the date on which such Covenant Suspension Event occurs being referred to as a "**Suspension Date**"), the Company and its Restricted Subsidiaries will not be subject to the provisions of Sections 3.08, 3.09, 3.10, 3.11, 3.12, 3.13, 3.14, 3.15, 3.18, 3.19 and 4.01(a)(ii) (collectively, the "**Suspended Covenants**").

(b)     In the event that the Company and its Restricted Subsidiaries are not subject to the Suspended Covenants for any period of time as a result of the foregoing, and on any subsequent date (the "**Reversion Date**") one of the Rating Agencies withdraws its Investment Grade Rating or downgrades its rating assigned to the Notes below an Investment Grade Rating, then the Company and its Restricted Subsidiaries will thereafter again be subject to the Suspended

Covenants.  The period of time between the Suspension Date and the Reversion Date is referred to as the "**Suspension Period**."  Notwithstanding that the Suspended Covenants may be reinstated, no Default or Event of Default will be deemed to have occurred as a result of a failure to comply with the Suspended Covenants during the Suspension Period (or upon termination of the Suspension Period or after that time based solely on events that occurred during the Suspension Period).

(c)      On the Reversion Date, all Indebtedness Incurred during the Suspension Period will be classified as having been Incurred pursuant to Section 3.08(a) or Section 3.08(b) (to the extent such Indebtedness would be permitted to be Incurred thereunder as of the Reversion Date and after giving effect to Indebtedness Incurred prior to the Suspension Period and outstanding on the Reversion Date).  To the extent such Indebtedness would not be so permitted to be Incurred pursuant to Section 3.08(a) or Section 3.08(b), such Indebtedness will be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under Section 3.08(b)(ii).  Calculations made after the Reversion Date of the amount available to be made as Restricted Payments under Section 3.10 will be made as though Section 3.10 had been in effect since the Issue Date and throughout the Suspension Period.

(d)      The Company shall notify the Trustee of the occurrence of any Suspension Date or Reversion Date within 10 Business Days of its occurrence.  After such notice of the occurrence of a Reversion Date, the Trustee shall assume the Suspended Covenants apply and are in full force and effect.

# ARTICLE 4
## SURVIVING ENTITY

Section 4.01.      *Merger, Consolidation and Sale of Assets.*

(a)      The Company shall not, in a single transaction or series of related transactions, consolidate or merge with or into any Person (whether or not the Company is the surviving or continuing Person), or sell, assign, transfer, lease, convey or otherwise dispose of (or cause or permit any Restricted Subsidiary to sell, assign, transfer, lease, convey or otherwise dispose of) all or substantially all of the Company's properties and assets (determined on a consolidated basis for the Company and its Restricted Subsidiaries), to any Person unless:

(i)      either:

(A)      the Company shall be the surviving or continuing Person, or

(B)      the Person (if other than the Company) formed by such consolidation or into which the Company is merged or the Person which acquires by sale, assignment, transfer, lease, conveyance or other disposition the properties and assets of the Company and of the Company's Restricted Subsidiaries substantially as an entirety (the "**Surviving Entity**"):

(1)      shall be a Person organized or formed and validly existing under the laws of Mexico or a Qualified Merger Jurisdiction, and

(2)    shall expressly assume, by supplemental indenture (in form and substance satisfactory to the Trustee), executed and delivered to the Trustee, the due and punctual payment of the principal of, and premium, if any, and interest on all of the Notes and the performance and observance of every covenant of the Notes and this Indenture on the part of the Company to be performed or observed and shall cause each Guarantor (including Persons that become Guarantors as a result of the transaction) to confirm by supplemental indenture that its Note Guarantee will apply for the Obligations of the Surviving Entity in respect of the Indenture and the Notes;

(ii)    immediately after giving effect to such transaction and the assumption contemplated by Section 4.01(a)(i)(B)(2) above (including giving effect on a pro forma basis to any Indebtedness, including any Acquired Indebtedness, Incurred in connection with or in respect of such transaction), the Company or such Surviving Entity, as the case may be:

(A)    will be able to Incur at least U.S.$1.00 of additional Indebtedness pursuant to Section 3.08(a), or

(B)    will have a Capitalization Ratio of not less than the Capitalization Ratio of the Company and its Restricted Subsidiaries immediately prior to such transaction;

(iii)    immediately before and immediately after giving effect to such transaction and the assumption contemplated by Section 4.01(a)(i)(B)(2) above (including, without limitation, giving effect on a pro forma basis to any Indebtedness, including any Acquired Indebtedness, Incurred and any Lien granted in connection with or in respect of the transaction), no Default or Event of Default shall have occurred or be continuing;

(iv)    if the Company is organized under Mexican law and merges with a corporation, or the Surviving Entity is, organized under the laws of a Qualified Merger Jurisdiction or the Company is organized under the laws of a Qualified Merger Jurisdiction and merges with a Person, or the Surviving Entity is, organized under the laws of Mexico, the Company or the Surviving Entity will have delivered to the Trustee an Opinion of Counsel from each of Mexico and the relevant Qualified Merger Jurisdiction to the effect that, as applicable:

(A)    the Holders of the Notes will not recognize income, gain or loss for income tax purposes under the laws of the relevant Qualified Merger Jurisdiction or Mexico as a result of the transaction and will be taxed in the holder's home jurisdiction in the same manner and on the same amounts (assuming solely for this purpose that no Additional Amounts are required to be paid on the Notes) and at the same times as would have been the case if the transaction had not occurred,

(B)    any payment of interest or principal under or relating to the Notes will be paid in compliance with any requirements under Section 3.21, and

74

(C)     no other taxes on income, including capital gains, will be payable by Holders of the Notes under the laws of Mexico or the relevant Qualified Merger Jurisdiction relating to the acquisition, ownership or disposition of the Notes, including the receipt of interest or principal thereon; *provided* that the Holder does not use or hold, and is not deemed to use or hold the Notes in carrying on a business in Mexico or the relevant Qualified Merger Jurisdiction, and

(v)     the Company or the Surviving Entity has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that the consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition and, if required in connection with such transaction, the supplemental indenture, comply with the applicable provisions of this Indenture and that all conditions precedent in this Indenture relating to the transaction have been satisfied.

(b)     For purposes of this Section 4.01, the transfer (by lease, assignment, sale or otherwise, in a single transaction or series of transactions) of all or substantially all of the properties or assets of one or more Restricted Subsidiaries of the Company, the Capital Stock of which constitutes all or substantially all of the properties and assets of the Company (determined on a consolidated basis for the Company and its Restricted Subsidiaries), shall be deemed to be the transfer of all or substantially all of the properties and assets of the Company.

(c)     The provisions of Section 4.01(a)(ii) above will not apply to:

(i)     any transfer of the properties or assets of a Restricted Subsidiary to the Company;

(ii)     any merger of a Restricted Subsidiary into the Company; or

(iii)     any merger of the Company into a Wholly-Owned Subsidiary of the Company created for the purpose of holding the Capital Stock of the Company.

(d)     Upon any consolidation, combination or merger or any transfer of all or substantially all of the properties and assets of the Company and its Restricted Subsidiaries in accordance with this Section 4.01, in which the Company is not the continuing corporation, the Surviving Entity formed by such consolidation or into which the Company is merged or to which such conveyance, lease or transfer is made will succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture and the Notes with the same effect as if such Surviving Entity had been named as such.  For the avoidance of doubt, compliance with this Section 4.01 will not affect the obligations of the Company (including a Surviving Entity, if applicable) under Section 3.07, if applicable.

(e)     Each Guarantor will not, and the Company will not cause or permit any Guarantor to, consolidate with or merge into, or sell or dispose of all or substantially all of its assets to, any Person (other than the Company) that is not a Guarantor unless:

(i)     such Person (if such Person is the surviving entity) assumes all of the obligations of such Guarantor in respect of its Note Guarantee by executing a

supplemental indenture and providing the Trustee with an Officers' Certificate and Opinion of Counsel, and such transaction is otherwise in compliance with the Indenture;

(ii)      such Note Guarantee is to be released as provided under Section 3.22; or

(iii)     such sale or other disposition of substantially all of such Guarantor's assets is made in accordance with Section 3.11.

ARTICLE 5
OPTIONAL REDEMPTION OF NOTES

Section 5.01.    *Optional Redemption*.  The Company may redeem the Notes, as a whole or from time to time in part, subject to the conditions and at the redemption prices specified in the form of Notes in Exhibit A.

Section 5.02.    *Election to Redeem*.  The Company shall evidence its election to redeem any Notes pursuant to Section 5.01 by a Board Resolution.

Section 5.03.    *Notice of Redemption*.

(a)      The Company shall give or cause the Trustee to give notice of redemption to Holders, in the manner provided for in Section 11.01, at least 30 but not more than 60 days prior to the Redemption Date delivered to each Holder of Notes to be redeemed at its registered address in accordance with the applicable procedures of DTC.  If the Company itself gives the notice, it shall also deliver a copy to the Trustee.

(b)      If either (i) the Company is not redeeming all Outstanding Notes, or (ii) the Company elects to have the Trustee give notice of redemption, then the Company shall deliver to the Trustee, at least 45 days prior to the Redemption Date (unless the Trustee agrees to a shorter period in writing), an Officers' Certificate requesting that the Trustee select the Notes to be redeemed and/or give notice of redemption and setting forth the information required by Section 5.03(c) (with the exception of the identification of the particular Notes, or portions of the particular Notes, to be redeemed in the case of a partial redemption).  If the Company elects to have the Trustee give notice of redemption, the Trustee shall give the notice in the name of the Company and at the Company's expense.

(c)      All notices of redemption shall state:

(i)      the Redemption Date,

(ii)     the redemption price and the amount of any accrued interest payable as provided in Section 5.06,

(iii)    whether or not the Company is redeeming all Outstanding Notes,

(iv)    if the Company is not redeeming all Outstanding Notes, the aggregate principal amount of Notes that the Company is redeeming and the aggregate principal amount of Notes that will be Outstanding after the partial redemption, as well as the

identification of the particular Notes, or portions of the particular Notes, that the Company is redeeming,

(v)     if the Company is redeeming only part of a Note, the notice that relates to that Note shall state that on and after the Redemption Date, upon surrender of that Note, the Holder will receive, without charge, a new Note or Notes of authorized denominations for the principal amount of the Note remaining unredeemed,

(vi)     that on the Redemption Date the redemption price and any accrued interest payable to the Redemption Date as provided in Section 5.06 will become due and payable in respect of each Note, or the portion of each Note, to be redeemed, and, unless the Company defaults in making the redemption payment, that interest on each Note, or the portion of each Note, to be redeemed, will cease to accrue on and after the Redemption Date,

(vii)     the place or places where a Holder must surrender the Holder's Notes for payment of the redemption price and any accrued interest payable on the Redemption Date, and

(viii)     the CUSIP, ISIN or Common Code number, if any, listed in the notice or printed on the Notes, and that no representation is made as to the accuracy or correctness of such CUSIP, ISIN or Common Code number.

Section 5.04.     *Selection of Notes to Be Redeemed in Part*.

(a)     If the Company is not redeeming all Outstanding Notes, the Trustee shall select the Notes to be redeemed in compliance with the requirements of the principal securities exchange or market, if any, on which the Notes are listed or, if the Notes are not then listed on a securities exchange or market, on a *pro rata* pass-through distribution of principal basis in accordance with DTC's applicable procedures.  The Trustee shall make the selection from the Outstanding Notes not previously called for redemption.  The Trustee shall promptly notify the Company in writing of the Notes selected for redemption and, in the case of any Notes selected for partial redemption, the principal amount of the Notes to be redeemed.  In the event of a partial redemption by lot, the Trustee shall select the particular Notes to be redeemed not less than 30 nor more than 60 days prior to the relevant Redemption Date from the Outstanding Notes not previously called for redemption subject to the applicable procedures of DTC.  No Notes of a principal amount of U.S.$150,000 or less may be redeemed in part and Notes of a principal amount in excess of U.S.$150,000 may be redeemed in multiples of U.S.$1,000 only.

(b)     For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to redemption of Notes shall relate, in the case of any Note redeemed or to be redeemed only in part, to the portion of the principal amount of that Note which has been or is to be redeemed.

Section 5.05.     *Deposit of Redemption Price*.  Prior to 10:00 a.m. New York City time on the Business Day prior to the relevant Redemption Date, the Company shall deposit with the Trustee or with a Paying Agent (or, if the Company is acting as Paying Agent, segregate and hold in trust as provided in Section 2.04) an amount of money in immediately available funds

77

sufficient to pay the redemption price of, and accrued interest on, all the Notes that the Company is redeeming on that date.

Section 5.06.   *Notes Payable on Redemption Date*.  If the Company, or the Trustee on behalf of the Company, gives notice of redemption in accordance with this Article 5, the Notes, or the portions of Notes, called for redemption, shall, on the Redemption Date, become due and payable at the redemption price specified in the notice (together with accrued and unpaid interest, if any, to the Redemption Date), and from and after the Redemption Date (unless the Company shall default in the payment of the redemption price and accrued interest) the Notes or the portions of Notes shall cease to bear interest.  Upon surrender of any Note for redemption in accordance with the notice, the Company shall pay the Notes at the redemption price, together with accrued interest, if any, to the Redemption Date (subject to the rights of Holders of record on the relevant record date to receive interest due on the relevant Interest Payment Date).  If the Company shall fail to pay any Note called for redemption upon its surrender for redemption, the principal shall, until paid, bear interest from the Redemption Date at the rate borne by the Notes.

Section 5.07.   *Unredeemed Portions of Partially Redeemed Note*.  Upon surrender of a Note that is to be redeemed in part, the Company shall execute, and the Trustee shall authenticate and make available for delivery to the Holder of the Note at the expense of the Company, a new Note or Notes, of any authorized denomination as requested by the Holder, in an aggregate principal amount equal to, and in exchange for, the unredeemed portion of the principal of the Note surrendered, *provided* that each new Note will be in a minimum principal amount of U.S.$150,000 or integral multiple of U.S.$1,000 in excess thereof.

Section 5.08.   *Optional Redemption for Changes in Withholding Taxes*.

(a)      If, as a result of any amendment to, or change in, the laws (or any rules or regulations thereunder) of a Relevant Jurisdiction, or any political subdivision or taxing authority or other instrumentality thereof or therein having the authority to tax, or any amendment to or change in the official interpretation or application of such laws, rules or regulations, which amendment to or change in such laws, rules or regulations becomes effective on or after the Issue Date and, if applicable, after the date such Relevant Jurisdiction becomes a Relevant Jurisdiction (which, in the case of a merger, consolidation or other transaction permitted and described under Section 4.01 shall be treated for this purpose as the date of such transaction) (a "**Tax Law Change**"), the Company (or the relevant Guarantor) has become obligated, or will become obligated, in each case after taking all reasonable measures to avoid this requirement, to pay Additional Amounts in excess of those attributable to a Mexican withholding tax rate of 4.9% with respect to payments of interest or amounts deemed interest under the Notes (a "**Withholding Tax Event**"), then, at the Company's option, all, but not less than all, of the Notes may be redeemed at any time on giving not less than 10 nor more than 60 days' notice, at a redemption price equal to 100% of the outstanding principal amount, plus accrued and unpaid interest and any Additional Amounts due thereon up to but not including the date of redemption; *provided*, *however*, that (x) no notice of redemption for tax reasons may be given earlier than 90 days prior to the earliest date on which the Company (or the relevant Guarantor) would be obligated to pay on the next Scheduled Redemption Date these Additional Amounts if a payment on the Notes were then due and (y) at the time such notice of redemption is given such obligation to pay such Additional Amounts remains in effect.

(b)      Prior to the publication of any notice of redemption pursuant to this Section 5.08, the Company shall deliver to the Trustee:

(i)      an Officer's Certificate signed by the Company's duly authorized representatives and an Opinion of Counsel stating that the Company is entitled to effect the redemption and setting forth a statement of facts showing that the conditions precedent to our right to redeem have occurred, and

(ii)      an Opinion of Counsel (which may be the Company's counsel) of recognized standing to the effect that the Company has or will become obligated to pay such Additional Amounts (in addition to Additional Amounts attributable to a 4.9% withholding tax on payments of interest) as a result of such change or amendment.

(c)      The Company will give notice to DTC pursuant to the provisions of Section 11.01 of any redemption the Company proposes to make at least 30 days (but not more than 60 days) before the Redemption Date.  Any notice of redemption delivered to the Trustee in accordance with this Section 5.08 shall be irrevocable.

Section 5.09.      *Optional Redemption Upon Equity Sales*.  At any time, or from time to time, on or prior to [•], 2028 the Company may, at its option, use the net cash proceeds of one or more Equity Sales to redeem up to 35% of the aggregate principal amount of the Notes issued under this Indenture at a redemption price equal to 108% of the principal amount thereof, plus accrued and unpaid interest to the date of redemption, plus Additional Amounts, if any; *provided* that:

(1)      after giving effect to any such redemption at least 65% of the aggregate principal amount of the Notes issued under this Indenture remains outstanding; and

(2)      the Company shall make such redemption not more than 90 days after the consummation of such Equity Sale.

Section 5.10.      *No Limitation*.  Notwithstanding the foregoing provisions of this Article 5, the Company and its Subsidiaries are not prohibited from acquiring the Notes by means other than a redemption, whether pursuant to a tender offer, open market purchase or otherwise.

## ARTICLE 6
### DEFAULTS AND REMEDIES

Section 6.01.      *Events of Default*.

(a)      Each of the following is an "**Event of Default**":

(i)      default in the payment when due of the principal of or premium, if any, on any Notes, including the failure to make a required payment to purchase Notes tendered pursuant to an optional redemption, Change of Control Triggering Event Offer or an Asset Sale Offer;

(ii)    default for 30 days or more in the payment when due of interest or Additional Amounts, if any, on any Notes;

(iii)    the failure to perform or comply with any of the provisions described under Section 4.01;

(iv)    the failure by the Company to satisfy the Collateral Coverage Requirement (for avoidance of doubt, including as a result of any of the Receivables comprising the Collateral failing to meet the Eligibility Criteria)  and such failure is not cured within the Cure Period pursuant to Section 3.18(b);

(v)    the failure by the Company or any Restricted Subsidiary to comply with any other covenant or agreement contained herein or in the Notes (not specified in clauses (i) through (iv) (inclusive) of this Section 6.01(a)) for 30 days or more after written notice of such failure to the Company from the Trustee or the Holders of at least 25% in aggregate principal amount of the Outstanding Notes;

(vi)    default by the Company or any Restricted Subsidiary that is a Significant Subsidiary under any Indebtedness which:

(A)    is caused by a failure to pay principal or premium, if any, or interest on such Indebtedness prior to the expiration of any applicable grace period provided in the instrument governing such Indebtedness on the date of such default; or

(B)    results in the acceleration of such Indebtedness prior to its Stated Maturity;

and, in each case, the principal or accreted amount of Indebtedness at the relevant time, aggregates U.S.$20.0 million or more;

(vii)    failure by the Company or any Restricted Subsidiary that is a Significant Subsidiary to pay one or more non-appealable final judgments against any of them, aggregating U.S.$20.0 million or more, which judgment(s) are not paid, discharged or stayed for a period of 60 days or more;

(viii)    a Bankruptcy Event of Default affecting the Company or any of its Restricted Subsidiaries that are Significant Subsidiaries;

(ix)    any Note Guarantee ceases to be in full force and effect, other than in accordance with the terms of this Indenture, or a Guarantor denies or disaffirms its obligations under its Note Guarantee; or

(x)    (i) any provision under the Mexican Trust Agreement is or shall have become invalid, illegal or unenforceable, or the Company contests the validity, legality or enforceability of, or repudiates any such provision in writing; or (ii) any Lien provided for under the Mexican Trust Agreement related to the Collateral shall cease to exist or cease to give the Trustee (on behalf of the Holders) a first priority perfected security

interest on the Collateral, for a period of 30 days or more after written notice of such event to the Company from the Trustee or the Holders of at least 25% in aggregate principal amount of the Outstanding Notes.

(b)    Upon becoming aware of any Default or Event of Default, the Company shall deliver to a Trust Officer of the Trustee written notice of any event which would constitute such Default or an Event of Default, its status and what action the Company is taking or proposes to take in respect thereof.  In addition, the Company is required to deliver to the Trustee, within 105 days after the end of each fiscal year, an Officers' Certificate indicating whether the signers thereof know of any Default or Event of Default that occurred during the previous fiscal year.  If a Default or Event of Default occurs, is continuing and notice of such Default or Event of Default has been delivered to a Trust Officer of the Trustee (pursuant to Section 7.02(g) hereof), the Trustee shall deliver to each Holder notice of the Default or Event of Default within 90 days after the receipt of notice of the occurrence thereof.  Except in the case of a Default or Event of Default in the payment of principal of, premium, if any, or interest on any Note, the Trustee may withhold notice if and so long as its Trust Officer in good faith determines that withholding notice is in the interests of the Holders.

Section 6.02.    *Acceleration*.

(a)    If an Event of Default (other than an Event of Default specified in Section 6.01(a)(vii) above with respect to the Company) shall occur and be continuing, the Trustee or the Holders of at least 25% in principal amount of Outstanding Notes may declare the unpaid principal of (and premium, if any) and accrued and unpaid interest on all the Notes to be immediately due and payable by notice in writing to the Company and the Trustee, in case of notice from Holders of at least 25% in principal amount of outstanding Notes, specifying the Event of Default and that it is a "notice of acceleration."  If an Event of Default specified in Section 6.01(a)(vii) above occurs with respect to the Company, then the unpaid principal of (and premium, if any) and accrued and unpaid interest on all the Notes shall become immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

(b)    If the Notes are accelerated or otherwise become due prior to their Stated Maturity, in each case, as a result of an Event of Default (including an Event of Default under clause (viii) of Section 6.01(a) hereof) (each an "**Acceleration Event**"), the amount of principal of and premium on the Notes that becomes due and payable shall equal 100% of the aggregate principal amount of the Notes plus applicable redemption premium as specified in the form of Notes in Exhibit A hereto at the time of such Acceleration Event (the "**Applicable Premium**"), as if such Acceleration Event were an optional redemption of the Notes accelerated or otherwise becoming due. Without limiting the generality of the foregoing, it is understood and agreed that if an Acceleration Event occurs, the Applicable Premium applicable with respect to an optional redemption of the Notes shall also be due and payable at the time of such Acceleration Event as though the Notes had been optionally redeemed in full at the time of such Acceleration Event and shall constitute part of the Obligations with respect to the Notes, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Holder's loss as a result thereof. If the Applicable Premium becomes due and payable, it shall be deemed to be principal of the Notes, and interest shall accrue on the full aggregate principal amount of the Notes (including the

Applicable Premium) from and after the occurrence of an Acceleration Event, including in connection with an Event of Default under clause (viii) of Section 6.01(a) hereof. The Applicable Premium payable above shall be presumed to be the liquidated damages sustained by each Holder of the Notes as the result of the acceleration of the Notes and the Company agrees that it is reasonable under the circumstances currently existing. The Applicable Premium shall also be payable in the event the Notes (and/or this Indenture) are satisfied, released or discharged by foreclosure (whether by power of judicial proceeding or otherwise), deed in lieu of foreclosure or by any other similar means. THE COMPANY EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION. The Company expressly agrees (to the fullest extent it may lawfully do so) that: (A) the Applicable Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Applicable Premium shall be payable notwithstanding the then prevailing market rates at the time acceleration occurs; (C) there has been a course of conduct between the Holders of the Notes and the Company giving specific consideration in this transaction for such agreement to pay the Applicable Premium; and (D) the Company shall be estopped hereafter from claiming differently than as agreed to in this paragraph. The Company expressly acknowledges that its agreement to pay the Applicable Premium to the Holders of the Notes as herein described is a material inducement to the Holders to purchase the Notes and consummate the Debt Restructuring.

(c)    At any time after a declaration of acceleration with respect to the Notes as described in Section 6.02(a), the Holders of a majority in principal amount of the Notes may rescind and cancel such declaration and its consequences:

(i)    if the rescission would not conflict with any judgment or decree;

(ii)    if all existing Events of Default have been cured or waived, except nonpayment of principal or interest that has become due solely because of the acceleration;

(iii)    to the extent the payment of such interest is lawful, interest on overdue installments of interest and overdue principal, which has become due otherwise than by such declaration of acceleration, has been paid; and

(iv)    if the Company has paid the Trustee its reasonable compensation and reimbursed and/or indemnified the Trustee for its reasonable expenses (including the fees and expenses of its counsel), disbursements, losses and advances.

No rescission shall affect any subsequent Default or impair any rights relating thereto.

Section 6.03.    *Other Remedies*.

(a)    If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal of and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

(b)    The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.  A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  No remedy is exclusive of any other remedy.  All available remedies are cumulative to the extent permitted by law. Nothing herein shall be deemed to require the Trustee to foreclose on or take possession of any Collateral prior to their performance of a risk audit to assess the risk and expense of exercising any remedy hereunder.

(c)    In addition to the right of acceleration set forth in Section 6.02, if an Event of Default occurs and is continuing under this Indenture, the Trustee shall, subject to the provisions contained in the Mexican Trust Agreement, upon written instructions from the Holders of the Notes representing at least a majority in aggregate principal amount of the Notes Outstanding, instruct the Mexican Trustee to exercise any remedies with respect to the Collateral, as are available under this Indenture, the Mexican Trust Agreement and at law. The Trustee shall not have any liability for any decline in value or loss realized as a result of the sale of the Collateral in accordance with the terms of this Indenture and the Mexican Trust Agreement.

Section 6.04.    *Waiver of Past Defaults*.

(a)    The Holders of at least a majority in principal amount of the Notes may waive any existing Default or Event of Default hereunder, and its consequences, except a default in the payment of the principal of, premium, if any, Additional Amounts or interest on any Notes or any amounts due and owing to the Trustee.

(b)    In the event of any Event of Default specified in Section 6.01(a)(v) above, such Event of Default and all consequences thereof (excluding, however, any resulting payment default) will be annulled, waived and rescinded, automatically and without any action by the Trustee or the Holders, if within 30 days after such Event of Default arose the Company delivers an Officers' Certificate to the Trustee stating that (x) the Indebtedness or Guarantee that is the basis for such Event of Default has been discharged or (y) the holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default or (z) the Default that is the basis for such Event of Default has been cured, it being understood that in no event shall an acceleration of the principal amount of the Notes as described above be annulled, waived or rescinded upon the happening of any such events.

Section 6.05.    *Control by Majority*.  Subject to all provisions of this Indenture and applicable law, the Holders of at least a majority in aggregate principal amount of the then Outstanding Notes may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee.

Section 6.06.    *Limitation on Suits*.

(a)    No Holder of any Notes shall have any right to institute any proceeding with respect hereto or with respect to the Notes or the Mexican Trust Agreement or for any remedy hereunder, or thereunder, unless:

(i)    such Holder gives to the Trustee written notice of a continuing Event of Default;

(ii)    Holders of at least 25% in principal amount of the then Outstanding Notes make a written request to pursue the remedy;

(iii)    such Holders of the Notes provide to the Trustee indemnity satisfactory to it;

(iv)    the Trustee does not comply within 60 days; and

(v)    during such 60-day period the Holders of a majority in principal amount of the Outstanding Notes do not give the Trustee a written direction which, in the opinion of the Trustee, is inconsistent with the request;

*provided* that a Holder of a Note may institute suit for enforcement of payment of the principal of and premium, if any, or interest on such Note on or after the respective due dates expressed in such Note.

Section 6.07.    *Rights of Holders to Receive Payment*.  Notwithstanding any other provision hereof (including, without limitation, Section 6.06), the right of any Holder to receive payment of principal (including Additional Amounts, if any) of or interest on the Notes held by such Holder, on or after the respective due dates, Redemption Dates or repurchase date expressed herein or the Notes, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder.

Section 6.08.    *Collection Suit by Trustee*.  If an Event of Default specified in Section 6.01(a)(i) and Section 6.01(a)(ii) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Company for the whole amount then due and owing (together with applicable interest on any overdue principal and, to the extent lawful, interest on overdue interest) and the amounts provided for in Section 7.07.

Section 6.09.    *Trustee May File Proofs of Claim, etc.*

(a)    The Trustee may (irrespective of whether the principal of the Notes is then due):

(i)    file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee and the Holders under this Indenture and the Notes allowed in any bankruptcy, insolvency, liquidation or other judicial proceedings relative to the Company or any Subsidiary of the Company or their respective creditors or properties; and

(ii)    collect and receive any moneys or other property payable or deliverable in respect of any such claims and distribute them in accordance with this Indenture.

The Trustee shall be entitled and empowered to participate as a member of any official committee of creditors appointed in such matter. Any receiver, trustee, liquidator, sequestrator (or other similar official) in any such proceeding is hereby authorized by each Holder to make such payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, taxes, disbursements and advances of the Trustee, its agent and counsel, and any other amounts due to the Trustee pursuant to Section 7.07.

(b)      Nothing in this Indenture shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10.      *Priorities*.  If the Trustee collects any money or property pursuant to this Article 6, it shall pay out the money or property in the following order:

FIRST:  to the Trustee and the Agents for amounts due under Section 7.07 (including legal costs and costs and expenses incurred in connection with any realization or enforcement of the Collateral taken in accordance with the terms of this Indenture and the Mexican Trust Agreement (including any costs of any receiver appointed pursuant to the this Indenture) but excluding any breakage costs), together with any unpaid fees of any Agent;

SECOND:  if the Holders proceed against the Company directly without the Trustee in accordance with this Indenture, to Holders for their collection costs;

THIRD:  to Holders for amounts due and unpaid on the Notes for principal, premium, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any, and interest, respectively; and

FOURTH:  to the Company or to such party as a court of competent jurisdiction shall direct.

The Trustee may, upon notice to the Company, fix a record date and payment date for any payment to Holders pursuant to this Section 6.10.

Section 6.11.      *Undertaking for Costs*.  In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.11 does not apply to a suit by the Trustee, a suit by the Company, a suit by a Holder pursuant to Section 6.07 or a suit by Holders of more than 10% in principal amount of Outstanding Notes.

ARTICLE 7
TRUSTEE

Section 7.01.      *Duties of Trustee*.

85

(a)      If an Event of Default has occurred and is continuing, the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of his own affairs.

(b)      Except during the continuance of an Event of Default:

(i)      the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)      in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.  However, in the case of any such certificates or opinions that by any provisions hereof are specifically required to be furnished to the Trustee, the Trustee shall examine such certificates and opinions to determine whether or not they conform to the requirements of this Indenture.

(c)      The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i)      this paragraph (c) does not limit the effect of paragraph (b) of this Section 7.01;

(ii)      the Trustee shall have no liability for any action or error of judgment made in good faith by it or any of its officers or employees,  unless it shall have been proved that the Trustee was negligent in ascertaining the pertinent facts; and

(iii)      the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to this Indenture.

(d)      The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Company.

(e)      Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(f)      No provision hereof shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(g)      Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article 7.

(h)      Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Company shall be sufficient if in writing and signed by an Officer of the Company.

(i)      The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order or direction of any of the Holders pursuant to the provisions of this Agreement, unless such Holders shall have offered to the Trustee security and/or indemnity reasonably satisfactory to it against the costs, expenses (including reasonable attorneys' fees and expenses) and liabilities which may be incurred by it in compliance with such request or direction.

Section 7.02.    *Rights of Trustee*.

Subject to Section 7.01

(a)      The Trustee may rely on any document reasonably believed by it to be genuine and to have been signed or presented by the proper person.  The Trustee need not investigate any fact or matter stated in the document.

(b)      Before the Trustee acts or refrains from acting at the direction of the Company, it may require an Officers' Certificate and an Opinion of Counsel.  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on an Officers' Certificate or Opinion of Counsel.

(c)      The Trustee may act through its attorneys and agents and shall not be responsible for the acts or omissions of any such agent appointed with due care.

(d)      The Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; *provided*, *however*, that the Trustee's conduct does not constitute willful misconduct or negligence (as finally determined by a court of competent jurisdiction).

(e)      The Trustee may consult with counsel of its selection, and the advice or opinion of counsel with respect to legal matters relating to this Indenture and the Notes shall be full and complete authorization and protection from liability in respect to any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

(f)      If the Trustee shall determine, it shall be entitled to examine the books, records and premises of the Company, personally or by agent or attorney, during reasonable business hours and upon reasonable notice.

(g)      The Trustee shall not be deemed to have notice of any Default or Event of Default (other than payment default under Section 6.01(a)(i) or (ii)) unless written notice of any event which is in fact such a Default or Event of Default is received by a Trust Officer of the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture.

(h)     The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, each of the Agents and each agent, custodian and other Person employed to act hereunder; *provided however*, in and during an Event of Default, only the Trustee, and not any Agent shall be subject to the prudent person standard.

(i)      The Trustee may request that the Company deliver an Officers' Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any Person authorized to sign an Officers' Certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

(j)      In no event shall the Trustee be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(k)     The permissive rights, powers and authorizations of the Trustee set forth herein shall not been construed as duties.

(l)      The Trustee will not be liable for any action it takes or omits in accordance with the direction of Holders pursuant to Section 6.05 hereof (other than the Trustee's negligence, willful misconduct or bad faith in the execution of such direction).

(m)    If at any time the Trustee is served with any arbitral, judicial or administrative order, judgment, award, decree, writ or other form of arbitral, judicial or administrative process which in any way affects this Indenture or the Notes or any part thereof or funds held by it (including, but not limited to, orders of attachment or garnishment or other forms of levies or injunctions), it shall be authorized to comply therewith in any manner as it or its legal counsel of its own choosing deems appropriate; and if the Trustee complies with any such arbitral, judicial or administrative order, judgment, award, decree, writ or other form of arbitral, judicial or administrative process, the Trustee shall not be liable to any of the parties hereto or to any other person or entity even though such order, judgment, award, decree, writ or process may be subsequently modified or vacated or otherwise determined to have been without legal force or effect (other than the Trustee's negligence, willful misconduct or bad faith in the execution of such compliance).

(n)     The Trustee shall not have any duty or responsibility in respect of (i) any recording, filing, or depositing of this Indenture or any other agreement or instrument, monitoring or filing any financing statement or continuation statement evidencing a security interest, the maintenance of any such recording, filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, or otherwise monitoring the perfection, continuation or perfection or the sufficiency or validity of any security interest in or related to the Collateral, (ii) the acquisition or maintenance of any insurance or (iii) the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Collateral.

(o)    The Trustee shall at no time have any responsibility or liability for or in respect to the legality, validity or enforceability of any Collateral or any arrangement or agreement between the Company and any other Person with respect thereto, or the perfection or priority of any security interest created in any of the Collateral or maintenance of any perfection and priority, or for or with respect to the sufficiency of the Collateral following an Event of Default.

Section 7.03.    *Individual Rights of Trustee*.  The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Company, the Guarantors or any of their Affiliates with the same rights it would have if it were not Trustee.  Any Paying Agent, Registrar or co-Registrar may do the same with like rights.  However, the Trustee must comply with Section 7.10 and Section 7.11.

Section 7.04.    *Trustee's Disclaimer*.  The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture, the Notes, the Collateral or the Mexican Trust Agreement, it shall not be accountable for the Company's use of the proceeds from the Notes, and it shall not be responsible for any statement of the Company in this Indenture or in the Notes other than the Trustee's certificate of authentication.

Section 7.05.    *Notice of Defaults*.  If a Default or Event of Default occurs and is continuing and notice of such is delivered to a Trust Officer of the Trustee pursuant to Section 7.02(g) hereof, the Trustee shall deliver to each Holder notice of the Default or Event of Default within 90 days after the occurrence thereof.  Except in the case of a Default or Event of Default in the payment of principal, premium, if any, or interest on any Note, the Trustee may withhold the notice if and so long as its Trust Officer in good faith determines that withholding the notice is in the interests of the Holders.

Section 7.06.    *Reports by Trustee to Holders*.  The Trustee shall comply with Section 313 of the Trust Indenture Act (with the exception of Section 313(d)) as if it were applicable to this Indenture.  The Company agrees to promptly notify the Trustee in writing whenever the Notes become listed on any stock exchange and of any delisting thereof.

Section 7.07.    *Compensation and Indemnity*.

(a)    The Company shall pay to the Trustee from time to time reasonable compensation for its acceptance of this Indenture and services hereunder as the Company and the Trustee shall from time to time agree in writing.  The Company shall pay the reasonable fees and expenses of the Trustee's counsel, incurred in the review, negotiation and delivery of this Indenture and related documentation, and in connection with any amendments or supplements hereto.  The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Company shall reimburse the Trustee upon request for all reasonable and duly documented or invoiced out-of-pocket expenses incurred or made by it, including costs of collection, costs of preparing and reviewing reports, certificates and other documents, costs of preparation and delivery of notices to Holders and reasonable fees and duly documented expenses of counsel retained by the Trustee, in addition to the compensation for its services.  Such expenses shall include the reasonable and duly documented compensation and expenses, disbursements and advances of the Trustee's agents, counsel, accountants and experts.

(b)    The Company and any Guarantors from time to time party hereto shall jointly and severally indemnify the Trustee against any and all loss, liability or expense (including reasonable attorneys' fees and duly documented expenses) incurred by it without negligence, willful misconduct or bad faith on its part in connection with the acceptance and administration of this trust, the performance of its duties hereunder and the exercise of its rights hereunder (including in respect of the Trustee's reliance on any certificate required to be delivered thereunder or on the failure by the Company to deliver such required certificate), including the costs and expenses of enforcing this Indenture (including this Section 7.07) and of defending itself against any claims (whether asserted by any Holder, the Company or otherwise).  The Trustee shall notify the Company promptly of any claim for which it may seek indemnity. Failure by the Trustee to so notify the Company shall not relieve the Company and the Guarantors of their obligations hereunder.  The Company may defend the claim and the Trustee may have separate counsel and the Company shall pay the reasonable fees and expenses of such separate counsel, *provided* that the Company shall not be required to pay such fees and expenses if it assumes the Trustee's defense and retains counsel reasonably satisfactory to the Trustee, and (ii) the Company shall not enter into any settlement with respect to any claim without the Trustee's prior written consent (which such consent shall not be unreasonably withheld or delayed). The Company need not reimburse any expense or indemnify against any loss, liability or expense incurred by the Trustee through the Trustee's own negligence, willful misconduct or bad faith, as determined by a competent court of appropriate jurisdiction in a final, non-appealable judgment.

(c)    To secure the Company's and Guarantors' payment obligations in this Section 7.07, the Trustee shall have a lien prior to the Notes on all money or property held or collected by the Trustee other than money or property held in trust to pay principal of and interest on particular Notes.  The Trustee's right to receive payment of any amounts due under this Section 7.07 shall not be subordinate to any other liability or Indebtedness of the Company.

(d)    The Company's and Guarantors' indemnification and payment obligations pursuant to this Section 7.07 shall survive the discharge of this Indenture and the resignation or removal of the Trustee.  When the Trustee incurs expenses after the occurrence of a Bankruptcy Event of Default, the expenses are intended to constitute expenses of administration under any Bankruptcy Law; *provided*, *however*, that this shall not affect the Trustee's rights as set forth in this Section 7.07 or Section 6.10.

Section 7.08.    *Replacement of Trustee.*

(a)    The Trustee may resign at any time by so notifying the Company.  The Holders of a majority in principal amount of the Outstanding Notes,  may remove the Trustee upon no less than thirty (30) days' notice by so notifying the Trustee and may appoint a successor Trustee reasonably acceptable to the Company.  The Company shall remove the Trustee if:

(i)    the Trustee fails to comply with Section 7.10;

(ii)    the Trustee is adjudged bankrupt or insolvent;

90

(iii)    a receiver or other public officer takes charge of the Trustee or its property; or

(iv)    the Trustee otherwise becomes incapable of acting.

(b)    If the Trustee resigns or is removed by the Company or by the Holders of a majority in principal amount of the Outstanding Notes and (in the case of a removal by Holders) such Holders do not reasonably promptly appoint a successor Trustee, or if a vacancy exists in the office of the Trustee for any reason (the Trustee in such event being referred to herein as the retiring Trustee), the Company shall promptly appoint a successor Trustee.

(c)    A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Company.  Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture.  The successor Trustee shall deliver a notice of its succession to Holders.  The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 7.07(c).

(d)    If a successor Trustee does not take office within 30 days after the retiring Trustee resigns or is removed, the retiring Trustee or the Holders of 10% in principal amount of the Outstanding Notes may petition, at the Company's expense, any court of competent jurisdiction for the appointment of a successor Trustee.

(e)    If the Trustee fails to comply with Section 7.10, any Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f)    Notwithstanding the replacement of the Trustee pursuant to this Section 7.08, the Company's obligations under Section 7.07 shall continue for the benefit of the retiring Trustee.

Section 7.09.    *Successor Trustee by Merger*.

(a)    If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business (including in its capacity as Trustee hereunder) or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee.

(b)    In case at the time such successor or successors to the Trustee shall succeed to the trusts created by this Indenture, any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name of any predecessor hereunder or in the name of the successor to the Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Trustee shall have.

Section 7.10.    *Eligibility; Disqualification*.

(a)    The Trustee shall at all times satisfy the requirements of Section 310(a) of the Trust Indenture Act as if it were applicable to this Indenture.  The Trustee shall have a combined capital and surplus of at least U.S.$50 million as set forth in its most recent published annual report of condition.  The Trustee shall comply with Section 310(b) of the Trust Indenture Act as if it were applicable to this Indenture; *provided*, *however*, that (a) for purposes of this Indenture, all references in Section 310(b) of the Trust Indenture Act to actions by or application to the SEC shall be deemed deleted and (b) there shall be excluded from the operation of Section 310(b)(1) of the Trust Indenture Act any indenture or indentures under which other securities or certificates of interest or participation in other securities of the Company are outstanding if the requirements for such exclusion set forth in Section 310(b)(1) of the Trust Indenture Act are met.

(b)    If the Trustee has or acquires a conflicting interest within the meaning of the Trust Indenture Act, the Trustee shall either eliminate such interest or resign, to the extent and in the manner provided by, and subject to the provisions of, the Trust Indenture Act.

Section 7.11.    *Preferential Collection of Claims Against Company*.  The Trustee shall comply with Section 311(a) of the Trust Indenture Act as if it were applicable to this Indenture, excluding any creditor relationship listed in Section 311(b) of the Trust Indenture Act.  A Trustee who has resigned or been removed shall comply with the requirements of Section 311(a) of the Trust Indenture Act to the extent indicated, as if it were applicable to this Indenture.

Section 7.12.    *Appointment of Co-Trustee*.

(a)    Notwithstanding any other provisions in this Indenture, at any time, solely for the purpose of meeting the legal requirements of any jurisdiction, the Trustee shall have the power and may execute and deliver all instruments necessary to appoint one or more Persons to act as separate trustee or trustees or as co-trustee or co-trustees, and to vest in such Person or Persons, in such capacity and subject to the other provisions of this Indenture, such powers, duties, obligations and rights as the Trustee may consider necessary or desirable.  No co-trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under this Indenture and no notice to Holders of Notes of the appointment of a separate trustee or co-trustee shall be required under this Indenture.

(b)    Every separate trustee or co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)    all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations shall be exercised and performed singly by such co-trustee, but solely at the direction of the Trustee;

92

(ii)      no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

(iii)      the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c)      Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees or co-trustees, as effectively as if given to each of them.  Every instrument appointing any separate trustee or co-trustee shall refer to this Indenture and the conditions of this Article 7.  Each separate trustee or co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, jointly with the Trustee, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection or rights (including the rights to compensation, reimbursement and indemnification hereunder) to, the Trustee.  Every such instrument shall be filed with the Trustee.

(d)      Any separate trustee or co-trustee may at any time constitute the Trustee or its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Indenture on its behalf and in its name.  If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Section 7.13.      *Exercise of Remedies.* Subject to the Mexican Trust Agreement, if any Event of Default occurs and is continuing, and if so directed by the Holders pursuant to Section 8.02, Section 8.05 or another section of this Indenture, then the Trustee shall, subject to it being indemnified and pre-refunded pursuant to this Indenture, instruct the Mexican Trustee to  foreclose on any or all of the Collateral in accordance with the Mexican Trust Agreement and applicable law and/or proceed to enforce any or all remedies available to it pursuant to the Mexican Trust Agreement or otherwise under applicable law  or to so direct the Mexican Trustee or to otherwise take any other action or exercise any other right or remedy of the Trustee under this Indenture or the Mexican Trust Agreement.

## ARTICLE 8
### DEFEASANCE; DISCHARGE OF INDENTURE

Section 8.01.      *Legal Defeasance and Covenant Defeasance.*

(a)      The Company may, at its option, at any time, elect to have either paragraph (b) or (c) of this Section 8.01 be applied to its obligations with respect to all outstanding Notes and all obligations of the Guarantors under the Note Guarantees upon compliance with the conditions set forth in Section 8.02.

(b)      Upon the Company's exercise under paragraph (a) of this Section 8.01 of the option applicable to this paragraph (b), the Company shall, subject to the satisfaction of the conditions set forth in Section 8.02, be deemed to have paid and discharged the entire indebtedness represented by the Outstanding Notes after the deposit specified in Section 8.02(a) (hereinafter, "**Legal Defeasance**").  For this purpose, Legal Defeasance means that the Company

shall be deemed to have paid and discharged the entire Indebtedness represented by the Outstanding Notes, which shall thereafter be deemed to be Outstanding only for the purposes of Section 8.03 and the other Sections of this Indenture referred to in clause (i) or (ii) of this paragraph (b), and to have satisfied all its other obligations under such Notes and hereunder (and the Trustee, on demand of and at the expense of the Company, shall execute proper instruments acknowledging the same), except for the following provisions, which shall survive until otherwise terminated or discharged hereunder:

   (i) the rights of Holders to receive payments in respect of the principal of, premium, if any, and interest on the Notes when such payments are due,

   (ii) the Company's obligations with respect to such Notes concerning issuing temporary Notes, registration of Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payments,

   (iii) the rights, powers, trust, duties, indemnities and immunities of the Trustee and the Company's and the Guarantor's obligations in connection therewith, and

   (iv) this Article 8.

  Subject to compliance with this Article 8, the Company may exercise its option under this paragraph (b) notwithstanding the prior exercise of its option under paragraph (c) of this Section 8.01.

  (c) Upon the Company's exercise under Section 8.01(a) of the option applicable to this subsection (c), the Company may, at its option and at any time, elect to have its obligations, subject to the satisfaction of the applicable conditions set forth in Section 8.02, released from obligations under the covenants (including, without limitation, the obligations set forth in Article 3 and the cross-acceleration provisions and judgment default provisions described under Section 6.01) (hereinafter, "**Covenant Defeasance**") and the Notes shall thereafter be deemed not Outstanding for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but shall continue to be Outstanding for all other purposes hereunder (it being understood that such Notes shall not be deemed Outstanding for accounting purposes). For this purpose, such Covenant Defeasance means that, with respect to the Outstanding Notes, the Company may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply shall not constitute a Default or an Event of Default with respect to the Notes under Section 6.01(a)(iii) (except in respect of a failure to perform under or comply with Section 4.01(a)(i), Section 6.01(a)(iv) or Section 6.01(a)(v)), but, except as specified above, the remainder hereof and such Notes shall be unaffected thereby.

  Section 8.02. *Conditions to Defeasance*. The Company may exercise its Legal Defeasance option or its Covenant Defeasance option only if:

  (a) the Company has irrevocably deposited with the Trustee, in trust, for the benefit of the Holders cash in U.S. Dollars, certain direct non-callable obligations of, or guaranteed by, the United States, or a combination thereof, in such amounts as will be sufficient without

reinvestment, in the opinion of a nationally recognized investment bank, appraisal firm or firm of independent public accountants, to pay the principal of, premium, if any, and interest (including Additional Amounts) on the Notes on the stated date for payment thereof or on the applicable redemption date, as the case may be;

(b)        in the case of Legal Defeasance, the Company has delivered to the Trustee an Opinion of Counsel from counsel in the United States reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) and independent of the Company to the effect that:

(i)        the Company has received from, or there has been published by, the U.S. Internal Revenue Service a ruling; or

(ii)        since the Issue Date, there has been a change in the applicable U.S. federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall state that, the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(c)        in the case of Covenant Defeasance, the Company has delivered to the Trustee an Opinion of Counsel in the United States reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) to the effect that the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(d)        in the case of Legal Defeasance or Covenant Defeasance, the Company has delivered to the Trustee:

(i)        an Opinion of Counsel from Mexican legal counsel reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) and independent of the Company to the effect that, based upon Mexican law then in effect, Holders will not recognize income, gain or loss for Mexican tax purposes, including withholding tax except for withholding tax then payable on interest payments due, as a result of Legal Defeasance or Covenant Defeasance, as the case may be, and will be subject to Mexican taxes on the same amounts and in the same manner and at the same times as would have been the case if such Legal Defeasance or Covenant Defeasance, as the case may be, had not occurred; or

(ii)        a ruling directed to the Trustee received from the tax authorities of Mexico to the same effect as the Opinion of Counsel described in clause (i) above;

(e)        no Default or Event of Default shall have occurred and be continuing on the date of the deposit pursuant to Section 8.02(a) (except any Default or Event of Default resulting from

the failure to comply with Section 3.08 as a result of the borrowing of the funds required to effect such deposit);

(f)    the Company has delivered to the Trustee an Officers' Certificate stating that such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under this Indenture or any other material agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound;

(g)    the Company has delivered to the Trustee an Officers' Certificate stating that the deposit was not made by the Company with the intent of preferring the Holders over any other creditors of the Company or any Subsidiary of the Company or with the intent of defeating, hindering, delaying or defrauding any other creditors of the Company or others;

(h)    the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel from counsel reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) and independent of the Company, each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance have been complied with; and

(i)    the Company has delivered to the Trustee an Opinion of Counsel from counsel reasonably acceptable to the Trustee and independent of the Company to the effect that the trust funds will not be subject to the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally.

Section 8.03.    *Application of Trust Money*.  The Trustee shall hold in trust all U.S. Dollars or U.S. Government Obligations (including in each case proceeds thereon) deposited with it pursuant to this Article 8.  It shall apply the deposited money and the U.S. Dollars from U.S. Government Obligations through the Paying Agent and in accordance with this Indenture to the payment of principal of and interest on the Notes.

Section 8.04.    *Repayment to Company*.

(a)    The Trustee and the Paying Agent shall promptly turn over to the Company upon written request any excess money or securities (including in each case proceeds thereon) held by them upon payment of all the obligations under this Indenture.

(b)    Subject to any applicable abandoned property law, the Trustee and the Paying Agent shall pay to the Company upon request any money held by them for the payment of principal of or interest on the Notes that remains unclaimed for two years, and, thereafter, Holders entitled to the money must look to the Company and the Guarantors for payment as general creditors.

Section 8.05.    *Indemnity for U.S. Government Obligations*.  The Company shall pay and shall indemnify the Trustee against any tax (other than tax on income resulting from the Trustee's services), fee or other charge imposed on or assessed against deposited U.S. Government Obligations or the principal and interest received on such U.S. Government

Obligations other than any such tax, fee or other charge which by law is for the account of the Holders.

Section 8.06.    *Reinstatement*.  If the Trustee or Paying Agent is unable to apply any U.S. Dollars or U.S. Government Obligations in accordance with this Article 8 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the obligations of the Company under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to this Article 8 until such time as the Trustee or Paying Agent is permitted to apply all such U.S. Dollars or U.S. Government Obligations in accordance with this Article 8; *provided*, *however*, that, if the Company has made any payment of principal of or interest on any Notes because of the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the U.S. Dollars or U.S. Government Obligations held by the Trustee or Paying Agent.

Section 8.07.    *Satisfaction and Discharge*.  This Indenture will be discharged and will cease to be of further effect (except as to surviving rights or registration of transfer or exchange of the Notes, as expressly provided for herein) as to all Outstanding Notes when:

(a)    either:

(i)    all the Notes theretofore authenticated and delivered (except lost, stolen or destroyed Notes which have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Company and thereafter repaid to the Company or discharged from such trust) have been delivered to the Trustee for cancellation; or

(ii)    all Notes not theretofore delivered to the Trustee for cancellation have become due and payable, and the Company has irrevocably deposited or caused to be deposited with the Trustee funds or certain direct, non-callable obligations of, or guaranteed by, the United States sufficient without reinvestment to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the Notes to the date of deposit, together with irrevocable instructions from the Company directing the Trustee to apply such funds to the payment of such Notes;

(b)    the Company has paid all other sums payable under this Indenture and the Notes by the Company; and

(c)    the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel stating that all conditions precedent under this Indenture relating to the satisfaction and discharge of this Indenture have been complied with.

# ARTICLE 9
## AMENDMENTS

Section 9.01.    *Without Consent of Holders*.

(a)    From time to time, the Company, the Guarantors and the Trustee may amend, waive or supplement this Indenture, the Mexican Trust or the Notes or a Note Guarantee without the consent of any Holder:

(i)    to cure any ambiguity, omission, defect or inconsistency;

(ii)    to provide for the assumption of the obligations of the Company under the Notes in the case of a merger or consolidation or sale of all or substantially all of the Company's assets, to the extent permitted under this Indenture;

(iii)    to provide for uncertificated Notes in addition to or in place of Certificated Notes; *provided*, *however*, that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code;

(iv)    to add guarantees with respect to the Notes or to secure the Notes;

(v)    to add to the covenants of the Company for the benefit of the Holders or to surrender any right or power herein conferred upon the Company;

(vi)    to comply with applicable requirements of the SEC;

(vii)    to comply with the requirements of any applicable securities depositary;

(viii)    to make any change that provides any additional rights or benefits to the Holders or that does not adversely affect the legal rights hereunder of any such Holder;

(ix)    to provide for a successor Trustee in accordance with the terms of this Indenture and the Mexican Trust Agreement;

(x)    to release any Guarantor in accordance with the terms of this Indenture;

(xi)    to convey, transfer, assign, mortgage or pledge to the Trustee as additional collateral for the Notes any property or assets, including when permitted or required by this Indenture or the Mexican Trust Agreement;

(xii)    to otherwise comply with any requirement of this Indenture; or

(xiii)    to make any other changes which do not adversely affect the rights of any of the Holders in any material respect.

(b)    In entering into any such amendment under this Section 9.01, the Trustee will be entitled to conclusively rely upon an Opinion of Counsel and Officers' Certificate, and shall have no liability whatsoever in reliance upon the foregoing.

(c)      After an amendment under this Section 9.01 becomes effective, the Company shall deliver to Holders a notice briefly describing such amendment.  The failure to give such notice to all Holders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.01.

Section 9.02.      *With Consent of Holders.*

(a)      The Company, the Guarantors and the Trustee may amend, waive or supplement this Indenture, the Mexican Trust Agreement, the Notes or a Note Guarantee with the consent of the Holders of a majority in principal amount of the then Outstanding Notes, except that, without the consent of each Holder affected, an amendment may not:

(i)      reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

(ii)      reduce the rate of or change or have the effect of changing the time for payment of interest, including Defaulted Interest, on any Notes;

(iii)      reduce the principal of or change or have the effect of changing the fixed maturity of any Notes, or change the date on which any Notes may be subject to redemption, or reduce the redemption price therefor;

(iv)      make any Notes payable in currency other than that stated in the Notes;

(v)      make any change in the provisions of this Indenture entitling each Holder to receive payment of principal of, premium, if any, and interest on such Note on or after the due date thereof or to bring suit to enforce such payment, or permitting Holders of a majority in principal amount of Notes to waive Defaults or Events of Default;

(vi)      amend, change or modify in any material respect any obligation of the Company to make and consummate a Change of Control Triggering Event Offer in respect of a Change of Control Triggering Event that has occurred or make and consummate an Asset Sale Offer with respect to any Asset Sale that has been consummated;

(vii)      make any change to Section 3.21 that adversely affects the rights of any Holder or amend the terms of the Notes in a way that would result in a loss of exemption from Taxes;

(viii)      make any change to the provisions of this Indenture or the Notes that adversely affects the ranking of the Notes;

(ix)      make any change in the provisions of this Indenture or the Mexican Trust Agreement dealing with the application of proceeds of Collateral that would adversely affect the Holders; and

(x)      eliminate or modify in any manner a Guarantor's obligation with respect to its Note Guarantee which adversely affects the holders of the Notes in any material respect, except as contemplated in this Indenture.

(b)      In addition, and subject to Section 10.02, without the consent of Holders of the Notes representing at least 75% of the Notes Outstanding, an amendment, supplement or waiver of this Indenture or the Mexican Trust Agreement may not release Liens on all or substantially all of the Collateral, or otherwise release any Collateral, in any manner adverse to the Holders, other than in accordance with this Indenture and the Mexican Trust Agreement.

(c)      It shall not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, supplement or waiver, but it shall be sufficient if such consent approves the substance thereof.  The Trustee will be entitled to rely on such evidence as it deems appropriate, including solely on an Opinion of Counsel and Officers' Certificate, and shall have no liability whatsoever in reliance upon the foregoing.

(d)      After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Company shall deliver to Holders a notice briefly describing such amendment, supplement or waiver.  The failure to give such notice to all Holders, or any defect therein, shall not impair or affect the validity of an amendment, supplement or waiver under this Section 9.02.

Section 9.03.      *Revocation and Effect of Consents and Waivers*.

(a)      A consent to an amendment, supplement or waiver by a Holder of a Note shall bind the Holder and every subsequent Holder of that Note or portion of the Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent or waiver is not made on the Note.  However, any such Holder or subsequent Holder may revoke the consent or waiver as to such Holder's Note or portion of the Note if the Trustee receives the notice of revocation before the date the amendment, supplement or waiver becomes effective.  After an amendment, supplement or waiver becomes effective, it shall bind every Holder, except as otherwise provided in this Article 9.  An amendment, supplement or waiver shall become effective upon receipt by the Trustee of the requisite number of written consents under Section 9.02.

(b)      The Company may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to give their consent or take any other action described above or required or permitted to be taken pursuant to this Indenture.  If a record date is fixed, then notwithstanding Section 9.03(a), those Persons who were Holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such Persons continue to be Holders after such record date.  No such consent shall be valid or effective for more than 90 days after such record date.

Section 9.04.      *Notation on or Exchange of Notes*.  If an amendment or supplement changes the terms of a Note, the Trustee may require the Holder of the Note to deliver it to the Trustee.  The Trustee may place an appropriate notation on the Note regarding the changed terms and return it to the Holder.  Alternatively, if the Company or the Trustee so determines, the

Company in exchange for the Note will execute and upon Company Order the Trustee will authenticate and make available for delivery a new Note that reflects the changed terms.  Failure to make the appropriate notation or to issue a new Note shall not affect the validity of such amendment or supplement.

Section 9.05.    *Trustee to Sign Amendments and Supplements*.  The Trustee shall sign any amendment, supplement or waiver authorized pursuant to this Article 9 if the amendment or supplement does not adversely affect the rights, duties, liabilities, indemnities or immunities of the Trustee.  If it does, the Trustee may but need not sign it.  In signing such amendment, supplement or waiver the Trustee shall be entitled to receive indemnity reasonably satisfactory to it and to receive, and (subject to Section 7.01 and Section 7.02) shall be fully protected in relying upon, an Opinion of Counsel and an Officers' Certificate stating that such amendment, supplement or waiver is authorized or permitted by this Indenture and that all conditions precedent to the execution of such amendment, supplement or waiver have been complied with and that such amendment, supplement or waiver is the legal, valid and binding obligation of the Company, enforceable in accordance with its terms, subject to customary exceptions.

ARTICLE 10

COLLATERAL AND SECURITY

Section 10.01.  *Mexican Trust Agreement.*

(a)    The due and punctual payment of the principal of, premium on, if any, and interest on the Notes when and as the same shall be due and payable, whether on an interest payment date, at maturity, by acceleration, repurchase, redemption or otherwise, and interest on the overdue principal of, premium on, if any, and interest (to the extent permitted by law), on the Notes and performance of all other obligations of the Company and the Guarantors to the Holders or the Trustee under this Indenture and the Notes, according to the terms hereunder or thereunder, are secured by a security interest in the Collateral as provided in this Indenture and the Mexican Trust Agreement. Each Holder, by its acceptance hereof, consents and agrees to the terms of the Mexican Trust Agreement as the same may be in effect or may be amended from time to time in accordance with their respective terms and ratifies and approves the Trustee's entry into the Mexican Trust Agreement to which it is a party and directs the Trustee to take such actions as agent and *comisionista* (under the terms of Articles 273, 274 and other applicable articles of the Mexican Commerce Code (*Código de Comercio*)) on its behalf and to perform its obligations and exercise its rights thereunder in accordance therewith. The Company shall do or cause to be done all such acts and things as may be necessary or proper, or as may be required by the provisions of this Indenture and the Mexican Trust Agreement, to assure and confirm to the Trustee the security interest in the Collateral contemplated hereby, by the Mexican Trust Agreement or any part thereof, as from time to time constituted, so as to render the same available for the security and benefit of this Indenture and of the Notes secured hereby, according to the intent and purposes herein expressed.

(b)    The Company shall take any and all actions reasonably required to cause the Mexican Trust Agreement to create and maintain, as security for the Obligations, a valid and enforceable perfected first priority Lien in and on all the Collateral, in favor of the Trustee for its

benefit  or  the benefit of Holders , superior to and prior to the rights of all third Persons and subject to no other Liens, in each case, other than Permitted Liens.

(c)    The Trustee is hereby directed to execute and deliver the Mexican Trust Agreement as representative and for the benefit of the Holders under the Mexican Trust Agreement, and to carry out or direct any other party, including but not limited to, the Mexican Trustee, to carry out any other actions that may be required by law or under the Mexican Trust Agreement, including with respect to the maintenance of the Collateral.

Section 10.02.    *Release of Collateral.*

(a)    Subject to clause (b) of this Section 10.02 and subject to the Mexican Trust Agreement, Collateral granted for the benefit of the Holders may be released from the Lien and security interest created by the Mexican Trust Agreement at any time or from time to time in accordance with the provisions of the Mexican Trust Agreement, or:

(i)    upon satisfaction and discharge of the Notes pursuant to Article 8;

(ii)    upon a Covenant Defeasance or Legal Defeasance of the Notes pursuant to Article 8;

(iii)    upon satisfaction and discharge of all outstanding Obligations; or

(iv)    in whole or in part, with the consent of the Holders of the requisite percentage of Notes in accordance with Article 9,

and, in each case, the Trustee shall take such actions as may be necessary to evidence the release of such Liens and security interest in accordance with the Mexican Trust Agreement, including, without limitation, delivering any instructions required or requested by the Mexican Trustee and directing the Mexican Trustee to make any filing before any governmental authorities; *provided that*, in each case, the Trustee shall be entitled to receive an Officer's Certificate stating that all conditions precedent to any such release contained in this Indenture and the Mexican Trust Agreement have been satisfied.

(b)    Subject to the terms of this Indenture and the Mexican Trust Agreement, (a) the Company shall be entitled to request the release or the re-transfer of any Collateral (other than cash) from the Mexican Trust to the Company and (b) any cash in the Mexican Trust shall be transferred to the Company on a monthly basis as provided in the Mexican Trust Agreement; *provided* that in the case of each of the foregoing clauses (a) and (b), no Default or Event of Default shall have occurred and be continuing under this Indenture at the time of such release or re-transfer, as applicable; and *provided further* that following such release or re-transfer, the Current Collateral Ratio is equal to or greater than equal to or greater than 1.20 to 1.00.

(c)    The release of any Collateral from the terms of this Indenture and the Mexican Trust Agreement shall not be deemed to impair the security under this Indenture in contravention of the provisions hereof if and to the extent the Collateral is released pursuant to the terms of the Mexican Trust Agreement.

Section 10.03.    *Debt Service Payment Account.* The Company has established a Debt Service Payment Account for the Notes pursuant to the Mexican Trust Agreement. Amounts shall be deposited into, withdrawn or transferred from the Debt Service Payment Account for the payment of the Notes in accordance with the terms of the Mexican Trust Agreement.

Section 10.04.    *Authorization of Receipt of Funds by the Trustee Under the Mexican Trust Agreement.*

(a)    Subject to the terms of the Mexican Trust Agreement, the Trustee is authorized to (i) upon direction from Holders of the Notes representing at least a majority in aggregate principal amount of the Notes Outstanding to direct the Mexican Trustee to enforce any terms of the Mexican Trust Agreement, and (ii) receive any funds in its capacity as beneficiary for the benefit of the Holders under the Mexican Trust Agreement, and to distribute such funds to the Holders to comply with the provisions, including the payment obligations under this Indenture.

(b)    Subject to the terms of the Mexican Trust Agreement, the Trustee (at the direction of Holders of the Notes representing at least a majority in aggregate principal amount of the Notes Outstanding) shall have the power to, or direct the Mexican Trustee to institute and maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Collateral by any acts that may be unlawful or in violation of the Mexican Trust Agreement or this Indenture, and such suits and proceedings as the Trustee, acting at the direction of Holders of the Notes representing at least a majority in aggregate principal amount of the Notes Outstanding, may deem expedient to preserve or protect its interests and the interests of the Holders in the Collateral.

Section 10.05.    *Termination of Security Interest.* Upon the full and final payment and performance of all Obligations of the Company in respect of this Indenture and the Notes or upon Legal Defeasance, Covenant Defeasance or satisfaction and discharge of this Indenture in accordance with Article 8, the Trustee shall, at the written request of the Company, deliver a certificate, which must be prepared by and at the expense of the Company, to the Mexican Trustee stating that such Obligations have been paid in full, and instruct the Mexican Trustee to release the Liens in respect of such Obligations pursuant to this Indenture and the Mexican Trust Agreement, as applicable.

ARTICLE 11

MISCELLANEOUS

Section 11.01.    *Notices*.

(a)    Any notice or communication shall be in writing and delivered in person, by telecopy or delivered as follows:

if to the Company or the Guarantors:

Operadora de Servicios Mega, S.A. de C.V. SOFOM, E.R.,
Avenida Patria 1501 Int. 102
Colonia Jardines Universidad
Zapopan, Jalisco, C.P. 45110
Attention: Chief Executive Officer and/or Chief Financial Officer

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10166
Facsimile:  (212) 225-2230 / (44) 20 7614-2355
Attention: David H. Botter and Polina Lyadnova

if to the Trustee:

UMB Bank National Association
Corporate Trust & Escrow Services
100 William Street
New York, NY 10038
Attention: Ray Haniff

If to the Mexican Trustee:

CIBanco, S.A., Institución de Banca Múltiple
Plaza Campos Elíseos 1, Calz. Gral. Mariano Escobedo 595,
Polanco V sección, Miguel Hidalgo
CDMX, 11560
Telephone: (52 55) 5063 3900
Attention: Delegado Fiduciario a cargo del CIB/4475

The Company, the Guarantors, or the Trustee by notice to the other may designate additional or different addresses for subsequent notices or communications.  Notices shall be deemed effective upon actual receipt.

In respect of this Indenture, the Trustee shall be authorized to accept electronic instructions, directions, reports, notices or other communications ("**Instructions**"); *provided* that the Company and Guarantors shall each provide to the Trustee an incumbency certificate listing officers with the authority to

provide such electronic instructions ("**Authorized Officers**") and containing specimen signatures of such Authorized Officers, which incumbency certificate shall be amended whenever a person is to be added or deleted from the listing.  If any of the Company or Guarantors elect to give the Trustee Instructions using electronic means and the Trustee in its discretion elects to act upon such Instructions, the Trustee's understanding of such Instructions shall be deemed controlling.  The Company and Guarantors each understand and agree that the Trustee cannot determine the identity of the actual sender of such Instructions and that the Trustee shall conclusively presume that directions that purport to have been sent by an Authorized Officer listed on the incumbency certificate provided to the Trustee have been sent by such Authorized Officer.  The Company and Guarantors shall each be responsible for ensuring that only Authorized Officers transmit such Instructions to the Trustee and that the Company and Guarantors and all Authorized Officers are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords and/or authentication keys upon receipt by the Company or Guarantors, respectively.  The Trustee shall have no liability for any losses, liabilities, costs or expenses incurred or sustained by any party as a result of such reliance upon or compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written Instruction. The Company and Guarantors each agree:  (i) to assume all risks arising out of the use of electronic means to submit Instructions to the Trustee, including without limitation the risk of the Trustee acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Company or Guarantors; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee immediately upon learning of any compromise or unauthorized use of the security procedures.

(b)     Any notice or communication delivered to the Company under the provisions herein shall constitute notice to the Guarantors.

(c)     From and after the date the Notes are admitted to listing on the SGX-ST and to trading on the Official List of the SGX-ST and the rules of the SGX-ST so require, all notices to Holders of Notes shall be published in English on the website of the SGX-ST, *www2.sgx.com*. The Company (and not the Trustee) shall have the sole responsibility for ensuring notices are sent in accordance with the requirements of the SGX-ST.

(d)     For so long as Notes in Global Form are outstanding, notices to be given to Holders will be given to the depositary in accordance with its applicable policies in effect from time to time.  If Notes are issued in individual definitive form, notices to be given to Holders will be deemed to have been given upon the delivery of such notices to Holders of the Notes at their registered addresses as they appear in the registrar's records.  Notices shall be deemed to have been given on the date of publication as set forth in Section 11.01(b) or, if published on different dates, on the date of the first such publication.  In addition, notices shall be delivered to Holders at their registered addresses.

(e)     Any notice or communication delivered to a registered Holder shall be delivered to the Holder at the Holder's address as it appears on the Note Register and shall be sufficiently given if so delivered within the time prescribed.

(f)     Failure to deliver a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.  If a notice or communication is delivered

in the manner provided above, it is duly given, whether or not the addressee receives it; *provided* that any notice or communication delivered to a party shall be deemed effective only upon actual receipt thereof by such party.

Section 11.02.    *Certificate and Opinion as to Conditions Precedent*.  Upon any request or application by the Company to the Trustee to take or refrain from taking any action under this Indenture, the Company shall furnish to the Trustee:

(a)    an Officers' Certificate in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(b)    an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

Section 11.03.    *Statements Required in Certificate or Opinion*.  Each certificate or opinion, including each Officers' Certificate or Opinion of Counsel with respect to compliance with a covenant or condition provided for in this Indenture shall include substantially:

(a)    a statement that the individual making such certificate or opinion has read such covenant or condition;

(b)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c)    a statement that, in the opinion of such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d)    a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with.

In giving an Opinion of Counsel, counsel may rely as to factual matters on an Officers' Certificate or on certificates of public officials.

Section 11.04.    *Rules by Trustee, Paying Agent and Registrar*.  The Trustee may make reasonable rules for action by, or a meeting of, Holders.  The Registrar and the Paying Agent may make reasonable rules for their functions.

Section 11.05.    *Governing Law, Waiver, etc.*

(a)    THIS INDENTURE AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY COURT OF THE STATE OF NEW YORK AND ANY COURT OF THE UNITED STATES OF AMERICA, IN EACH CASE LOCATED IN THE BOROUGH OF MANHATTAN, THE CITY OF NEW YORK. THE COMPANY HAS

APPOINTED AN AGENT FOR SERVICE OF PROCESS WITH RESPECT TO ANY ACTIONS BROUGHT IN THESE COURTS ARISING OUT OF OR BASED ON THE INDENTURE OR THE NOTES.  THE PARTIES HERETO AND THE HOLDERS OF ANY NOTES BY ACCEPTANCE THEREOF EACH HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS INDENTURE OR THE NOTES OR ANY TRANSACTION RELATED HERETO TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.

(b)     Each of the parties hereto:

(i)     agrees that any suit, action or proceeding against it arising out of or relating to this Indenture or the Notes, as the case may be, may be instituted in any court of the State of New York and any court of the United States of America, in each case located in the Borough of Manhattan, the City of New York;

(ii)     waives to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding, any claim that any suit, action or proceeding in such a court has been brought in an inconvenient forum and any right to which it may be entitled on account of its present or future place of residence or domicile;

(iii)     irrevocably submits to the jurisdiction of such courts in any suit, action or proceeding; and

(iv)     agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding and may be enforced in the courts of the jurisdiction of which it is subject by a suit upon judgment provided that service of process is effected upon the Company.

(c)     The Company has appointed Law Debenture Corporate Services Inc. with offices at 801 2nd Avenue, Suite 403, New York, NY 10017 as its authorized agent (the "**Authorized Agent**") upon whom all writs, process and summonses may be served in any suit, action or proceeding arising out of or based upon this Indenture or the Notes which may be instituted in any court of the State of New York and any court of the United States of America, in each case located in the Borough of Manhattan, the City of New York. The Company agrees that service of process upon the Authorized Agent to the address specified herein shall constitute personal service of such process on it in any such suit, action or proceeding. The Company hereby represents and warrants that the Authorized Agent has accepted such appointment and has agreed to act as said agent for service of process, and the Company agrees to take any and all action, including the filing of any and all documents, that may be necessary to continue each such appointment in full force and effect as aforesaid so long as the Notes remain outstanding.  The Company agrees that the appointment of the Authorized Agent shall be irrevocable so long as any of the Notes remain outstanding or until the irrevocable appointment by the Company of a successor agent in the City of New York, New York as its authorized agent for such purpose and the acceptance of such appointment by such successor.  Service of process upon the Authorized Agent shall be deemed, in every respect, effective service of process upon the Company. The Company has further empowered the Process Agent through a special, irrevocable power of

attorney (*poder especial irrevocable*) for lawsuits and collections (*pleitos y cobranzas*) in the presence of a Mexican notary public as its agent for service of process for any and all such writs, claims, process and summons arising out of or related to this Indenture.

(d)     To the extent that the Company has or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit or proceeding, from jurisdiction of any court or from set-off or any legal process (whether service or notice, attachment in aid or otherwise) with respect to itself or any of its property, the Company hereby irrevocably waives and agrees not to plead or claim such immunity in respect of their obligations under this Indenture or the Notes.

(e)     Nothing in this Section 11.05 shall affect the right of the Trustee or any Holder of the Notes to serve process in any other manner permitted by law.

Section 11.06.   *No Recourse Against Others*.   An incorporator, director, officer, employee, stockholder or controlling person, as such, of the Company or any Guarantor shall not have any liability for any obligations of the Company or any Guarantor under the Notes or this Indenture or for any claim based on, in respect of or by reason of such obligations or their creation.   By accepting a Note, each Holder waives and releases all such liability.   The waiver and release shall be part of the consideration for the issue of the Notes.

Section 11.07.   *Successors*.   All agreements of the Company in this Indenture and the Notes shall bind its successors.   All agreements of the Trustee in this Indenture shall bind its successors.

Section 11.08.   *Duplicate and Counterpart Originals*.   The parties may sign any number of copies of this Indenture, including in electronic *.pdf* format.   One signed copy is enough to prove this Indenture.   This Indenture may be executed in any number of counterparts, each of which so executed shall be an original, but all of them together represent the same agreement.

Section 11.09.   *Severability*.   In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 11.10.   *Currency Indemnity*.

(a)     The Company and the Guarantors shall pay all sums payable under this Indenture or the Notes solely in U.S. Dollars.   To the greatest extent permitted under applicable law, any amount that the Trustee or a Holder receives or recovers in a currency other than U.S. Dollars in respect of any sum expressed to be due to the Trustee or such Holder from the Company or any Guarantors shall only constitute a discharge of the Company or such Guarantor to the extent of the U.S. Dollar amount which the Trustee or such Holder is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make the purchase on that date, on the first date on which the Trustee or such holder is able to do so).   If the U.S. Dollar amount is less than the U.S. Dollar amount expressed to be due to the Trustee or such Holder under the Notes or this Indenture, to the greatest extent permitted under applicable law, the Company and the Guarantors shall indemnify and hold harmless the Trustee or such Holder against any loss sustained by it in making any such

purchase.  In any event, the Company and the Guarantors shall indemnify the Trustee or any such Holder against the cost of making any purchase of U.S. Dollars.  For the purposes of this Section 11.10, it shall be sufficient for the Trustee or such Holder to certify in a satisfactory manner that it would have suffered a loss had an actual purchase of U.S. Dollars been made with the amount received in that other currency on (x) the date of receipt or recovery or (y) if it was not practicable to make the purchase on that date, on the first date on which the Trustee or such Holder was able to do so.  In the case of (y), any such Holder shall also certify in a satisfactory manner the need for a change in the purchase date.

(b)     The indemnities of the Company and the Guarantors contained in this Section 11.10 to the extent permitted by law:  (i) constitute a separate and independent obligation from the other obligations of the Company and the Guarantors under this Indenture and the Notes; (ii) shall give rise to a separate and independent cause of action; (iii) shall apply irrespective of any indulgence granted by the Trustee or any Holder from time to time; and (iv) shall continue in full force and effect notwithstanding any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note.

Section 11.11.  *Table of Contents; Headings*.  The table of contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

Section 11.12.  *Force Majeure*.  In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, epidemics, pandemics, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

*[signature pages follow]*

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

OPERADORA DE SERVICIOS MEGA, S.A..
DE C.V., SOFOM, E.R.

By: _____
    Name:
    Title:

UMB BANK, NATIONAL ASSOCIATION,
as Trustee

By: _____
     Name:
     Title:

[*Signature Page to the Indenture*]

**EXHIBIT A**

**FORM OF NOTE**

*Include the following legend on all Global Notes:*

"THIS IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE REFERRED TO HEREINAFTER.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), NEW YORK, NEW YORK, TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF."

*If a Regulation S Note*:

**THE NOTE EVIDENCED HEREBY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THE NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER (1) REPRESENTS THAT IT, AND ANY ACCOUNT FOR WHICH IT IS ACTING, IS NOT A U.S. PERSON AND IS ACQUIRING THIS NOTE IN AN "OFFSHORE TRANSACTION" PURSUANT TO RULE 903 OR 904 OF REGULATION S AND EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO SUCH ACCOUNT, (2) AGREES FOR THE BENEFIT OF THE ISSUER THAT, ON OR PRIOR TO THE DATE (THE "RESALE RESTRICTION TERMINATION DATE") WHICH IS 40 DAYS AFTER THE LATER OF THE COMMENCEMENT OF THE OFFER OF THIS NOTE AND THE ISSUE DATE OF THIS NOTE (OR SUCH SHORTER PERIOD OF TIME PERMITTED BY REGULATION S UNDER THE U.S. SECURITIES ACT OR ANY SUCCESSOR PROVISION THEREUNDER) IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN EXCEPT (A) (I) TO THE ISSUER OR ANY SUBSIDIARY THEREOF, (II) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, (III) TO A NON-U.S. PERSON IN AN OFFSHORE TRANSACTION COMPLYING WITH THE REQUIREMENTS OF RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT OR (IV) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT (IF AVAILABLE), AND (B) IN**

ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES AND OTHER JURISDICTIONS, AND (3) AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS NOTE IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE RESPECTIVE MEANINGS GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT. AFTER THE RESALE RESTRICTION TERMINATION DATE, THIS NOTE AND ANY INTEREST HEREIN MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE U.S. SECURITIES ACT AND ALL APPLICABLE LAWS OF ANY OTHER JURISDICTION. PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH PARAGRAPH 2(IV) ABOVE, THE ISSUER AND THE TRUSTEE RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS, OR OTHER EVIDENCE SATISFACTORY TO EACH OF THEM AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT. THIS LEGEND SHALL ONLY BE REMOVED AT THE OPTION OF THE ISSUER.

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED WITH THE NATIONAL SECURITIES REGISTRY (REGISTRO NACIONAL DE VALORES) MAINTAINED BY THE MEXICAN NATIONAL BANKING AND SECURITIES COMMISSION (COMISIÓN NACIONAL BANCARIA Y DE VALORES, OR "CNBV"), AND MAY NOT BE OFFERED OR SOLD PUBLICLY IN MEXICO. HOWEVER, THIS NOTE MAY BE OFFERED OR SOLD IN MEXICO, ON A PRIVATE PLACEMENT BASIS, INVESTORS THAT QUALIFY AS INSTITUTIONAL OR ACCREDITED INVESTORS PURSUANT TO THE PRIVATE PLACEMENT EXEMPTION SET FORTH IN ARTICLE 8 OF THE MEXICAN SECURITIES MARKET LAW (LEY DEL MERCADO DE VALORES, OR "LMV") AND REGULATIONS THEREUNDER. THIS NOTE IS SOLELY RESPONSIBILITY OF THE ISSUER AND HAS NOT BEEN REVIEWED OR AUTHORIZED BY THE CNBV. AS REQUIRED UNDER THE LMV AND REGULATIONS THEREUNDER, THE ISSUER WILL NOTIFY THE CNBV OF THE TERMS AND CONDITIONS OF THE OFFERING OF THIS NOTE MADE OUTSIDE OF MEXICO. SUCH NOTICE WILL BE DELIVERED TO THE CNBV TO COMPLY WITH ARTICLE 7, SECOND PARAGRAPH, OF THE LMV AND REGULATIONS THEREUNDER, AND FOR STATISTICAL AND INFORMATIONAL PURPOSES ONLY, WHICH IS NOT A REQUIREMENT FOR THE VALIDITY OF THIS NOTE AND DOES NOT CONSTITUTE OR IMPLY A CERTIFICATION AS TO THE INVESTMENT QUALITY OF THIS NOTE, THE SOLVENCY, LIQUIDITY OR CREDIT QUALITY OF THE ISSUER. THE ACQUISITION OF THIS NOTE BY AN INVESTOR WHO IS A RESIDENT OF MEXICO WILL BE MADE UNDER SUCH INVESTOR'S OWN RESPONSIBILITY.

*If to a Restricted Note:*

THE NOTE EVIDENCED HEREBY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THE SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER OF THIS NOTE BY ITS ACCEPTANCE HEREOF (1) REPRESENTS THAT IT, AND ANY ACCOUNT FOR WHICH IT IS ACTING, (A) IS A

A-2

**"QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE U.S. SECURITIES ACT), (B) IS AN "ACCREDITED INVESTOR" WITHIN THE DEFINITION OF RULE 501(A)(1), (2), (3), (7), (8), (9), (12) or (13) OF REGULATION D UNDER THE SECURITIES ACT OR (C) IS NOT A U.S. PERSON AND IS ACQUIRING THIS NOTE IN AN "OFFSHORE TRANSACTION" PURSUANT TO RULE 903 OR 904 OF REGULATION S AND, WITH RESPECT TO (A) AND (B), EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO SUCH ACCOUNT, (2) AGREES FOR THE BENEFIT OF THE ISSUER THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN, EXCEPT (A) (I) TO THE ISSUER OR ANY SUBSIDIARY THEREOF, (II) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BECOME EFFECTIVE UNDER THE U.S. SECURITIES ACT, (III) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE U.S. SECURITIES ACT, (IV) IN AN OFFSHORE TRANSACTION COMPLYING WITH THE REQUIREMENTS OF RULE 903 OR RULE 904 OF REGULATION S UNDER THE U.S. SECURITIES ACT OR (V) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT (IF AVAILABLE), AND (B) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES AND OTHER JURISDICTIONS AND (3) AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS NOTE IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE RESPECTIVE MEANINGS GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT.**

**PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH PARAGRAPH 2A(V) ABOVE, THE ISSUER AND THE TRUSTEE RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT. THIS LEGEND SHALL ONLY BE REMOVED AT THE OPTION OF THE ISSUER.**

**THE NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED WITH THE MEXICAN NATIONAL SECURITIES REGISTRY (REGISTRO NACIONAL DE VALORES) MAINTAINED BY THE MEXICAN NATIONAL BANKING AND SECURITIES COMMISSION (COMISIÓN NACIONAL BANCARIA Y DE VALORES OR "CNBV"), AND, THEREFORE, MAY NOT BE OFFERED OR SOLD PUBLICLY IN MEXICO; HOWEVER THE NOTE MAY BE OFFERED AND SOLD IN MEXICO, ON A PRIVATE PLACEMENT BASIS, SOLELY TO INVESTORS THAT QUALIFY AS INSTITUTIONAL OR ACCREDITED INVESTORS, PURSUANT TO THE PRIVATE PLACEMENT EXEMPTION SET FORTH IN ARTICLE 8 OF THE MEXICAN SECURITIES MARKET LAW (LEY DEL MERCADO DE VALORES, OR "LMV") AND REGULATIONS THEREUNDER. WE WILL NOTIFY THE CNBV OF THE TERMS AND CONDITIONS OF THE OFFERING AND ISSUANCE OF THE NOTES OUTSIDE OF MEXICO. SUCH NOTICE WILL BE DELIVERED TO THE CNBV TO COMPLY WITH ARTICLE 7, SECOND PARAGRAPH, OF THE LMV AND FOR STATISTICAL AND INFORMATIONAL PURPOSES ONLY. THE DELIVERY TO, AND RECEIPT BY, THE CNBV OF SUCH NOTICE IS NOT A REQUIREMENT FOR THE VALIDITY OF THIS SECURITY AND DOES NOT CONSTITUTE OR IMPLY A CERTIFICATION AS TO THE INVESTMENT QUALITY OF THIS SECURITY OR OF THE SOLVENCY, LIQUIDITY OR CREDIT QUALITY OF THE ISSUER. THIS NOTE IS SOLELY RESPONSIBILITY OF THE ISSUER AND HAS NOT**

A-3

**BEEN REVIEWED OR AUTHORIZED BY THE CNBV. THE ACQUISITION OF THIS NOTE BY AN INVESTOR WHO IS A RESIDENT OF MEXICO WILL BE MADE UNDER SUCH INVERSTOR'S OWN RESPONSIBILITY**.

# FORM OF FACE OF NOTE

## OPERADORA DE SERVICIOS MEGA, S.A. DE C.V., SOFOM, E.R.

### 8.000% Senior Secured Note due 2030

No.[__]

Principal Amount U.S.$[_____]

*[If the Note is a Global Note include the following two lines:*
*as revised by the Schedule of Increases and*
Decreases in Global Note attached hereto]

CUSIP NO._____

ISIN NO._____

COMMON CODE_____

Operadora de Servicios Mega, S.A. de C.V., SOFOM, E.R., a corporation (*sociedad anónima de capital variable, sociedad financiera de objeto múltiple, entidad regulada*) (together with its successors and assigns, the "**Company**"), promises to pay to [_____], or registered assigns, the principal sum of U.S.$[_____] [*If the Note is a Global Note, add the following*, as revised by the Schedule of Increases and Decreases in Global Note attached hereto], in quarterly installments as specified in Schedule B hereto on each Scheduled Redemption Date, commencing [●], 2026, with the final installment due January 31, 2030.

| | |
|---|---|
| Interest Payment Dates: | [●],[●],[●] and [●].[6] |
| Scheduled Redemption Dates: | [●],[●],[●] and [●].[7] |
| Record Dates: | [●],[●],[●] and [●]. |

---

[6] **NTD:** To reflect quarterly payments.
[7] **NTD:** To reflect quarterly amortization payments.

A-5

Additional provisions of this Note are set forth on the other side of this Note.

OPERADORA DE SERVICIOS MEGA, S.A.
DE C.V., SOFOM, E.R.

By: _____

    Name:
    Title:

TRUSTEE'S CERTIFICATE OF
    AUTHENTICATION

Wilmington Trust, National Association, as
Trustee, certifies that this is one of the Notes
referred to in the Indenture.

By: _____

    Authorized Signatory

Date:_____

## FORM OF REVERSE SIDE OF NOTE

## OPERADORA DE SERVICIOS MEGA, S.A. DE C.V., SOFOM, E.R.

### 8.000% Senior Secured Note due 2030

Capitalized terms used but not defined herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1.    *Interest.*

Operadora de Servicios Mega, S.A. de C.V., SOFOM, E.R., a corporation (*sociedad anónima de capital variable, sociedad financiera de objeto múltiple, entidad regulada*) (and its successors and assigns under the Indenture hereinafter referred to, the "**Company**"), promises to pay principal on the Notes on the dates and in the percentage amounts of principal of the Notes as set forth in Schedule B hereto.

The Company promises to pay interest on the principal amount of this Note at the rate of 8.000% per annum. The Company will pay interest quarterly in arrears on each Interest Payment Date of each year commencing [●], 2025; *provided* that if any such Interest Payment Date is not a Business Day, then such payment shall be made on the next succeeding Business Day.  Interest on the Notes will accrue from the most recent date to which interest has been paid on the Notes or, if no interest has been paid, from [●], 2025.  The Company shall pay interest on overdue principal (plus interest on such interest to the extent lawful), at the rate borne by the Notes to the extent lawful.  Interest will be computed on the basis of a 360-day year of twelve 30-day months.  The redemption of Notes with unpaid and accrued interest to the Redemption Date will not affect the right of Holders of record on a record date to receive interest due on an interest payment date.

The Company shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and, to the extent such payments are lawful, interest on overdue installments of interest ("**Defaulted Interest**") without regard to any applicable grace periods at the rate shown on this Note, as provided in the Indenture.

All payments made by the Company in respect of the Notes will be made free and clear of and without deduction or withholding for or on account of any Taxes imposed or levied by or on behalf of any Taxing Authority, unless such withholding or deduction is required by law or by the interpretation or administration thereof.   In that event, the Company will pay to each Holder of the Notes Additional Amounts as provided in the Indenture subject to the limitations set forth in the Indenture.

2.    *Method of Payment.*

Prior to 10:00 a.m. (New York City time) on the Business Day prior to the date on which any principal of or interest on any Note is due and payable, the Company shall cause the Mexican Trustee to irrevocably deposit with the Paying Agent money sufficient to pay such principal and/or interest; provided that the Mexican Trustee shall no later than five Business Days prior to each Scheduled Redemption Date confirm that there are sufficient funds to cover any payment due on such Scheduled Redemption Date or Interest Payment Date, as applicable, pursuant to the Mexican Trust Agreement and in the event that the funds are less than the amount required to pay in full the principal and interest due as of such date, the Company shall, prior to 10:00 a.m. (New York City time) no later than to the third Business Day prior to such date, deposit with the Paying Agent money sufficient to cover such shortfall.  If the Company is acting as Paying Agent, the Company shall, prior to 10:00 a.m. (New York City time) on the date on which any principal of or interest on any Note is due and payable, segregate and hold in trust money

sufficient to pay such principal and/or interest.  The Company will pay interest (except Defaulted Interest) on the applicable Interest Payment Date to the Persons who are registered Holders of Notes at the close of business on the Record Date preceding the Interest Payment Date even if Notes are cancelled, repurchased or redeemed after the Record Date and on or before the relevant Interest Payment Date, except as provided in Section 2.13 with respect to Defaulted Interest.  Holders must surrender Notes to a Paying Agent to collect principal payments.  The Company will pay principal and interest in U.S. Dollars.

Payments in respect of Notes represented by a Global Note (including principal and interest) will be made by the transfer of immediately available funds to the accounts specified by DTC.  The Company will make all payments in respect of a Certificated Note (including principal and interest) by delivering a check to the registered address of each Holder thereof as set forth in the Note Register.

3.    *Paying Agent and Registrar.*

Initially, UMB Bank, National Association, the Trustee under the Indenture, will act as Trustee, Paying Agent and Registrar.  The Company may appoint and change any Paying Agent, Registrar or co-Registrar without notice to any Holder; *provided* that, as long as the Notes are admitted to listing on SGX-ST and to trading on the Official List of the SGX-ST and the rules of the SGX-ST so require, at least one paying agent in Singapore will be appointed and maintained where the Notes may be presented or surrendered for payment or redemption.  The Company may act as Paying Agent, Registrar or co-Registrar.

4.    *Indenture.*

The Company issued the Notes under an Indenture, dated as of [●], 2025 (as it may be amended or supplemented from time to time in accordance with the terms thereof, the "**Indenture**"), among the Company and the Trustee.  The terms of the Notes include those stated in the Indenture.  The Notes are subject to all such terms, and Holders are referred to the Indenture for a statement of those terms.  Each Holder by accepting a Note, agrees to be bound by all of the terms and provisions of the Indenture, as amended or supplemented from time to time.

The Notes are senior secured obligations of the Company and the Guarantors, secured under the Mexican Trust Agreement by the Collateral as described in the Indenture. The security over the Collateral and the rights of Holders shall be subject to the provisions of the Mexican Trust Agreement.

All Notes will be treated as a single class of securities under the Indenture.

The Indenture imposes certain limitations on, among other things, the ability of the Company and its Subsidiaries to:  Incur Additional Indebtedness, make Restricted Payments, incur Liens, make Asset Sales, enter into transactions with Affiliates, or consolidate or merge or transfer or convey all or substantially all of the Company's and its Subsidiaries' assets.

5.    *Redemption.*

Except as stated below, the Company may not redeem the Notes.

Prior to [●], 2028 (the "**Call Date**"), the Company may redeem the Notes at its option, in whole or in part, at any time and from time to time, at a redemption price (expressed as a percentage of principal amount and rounded to three decimal places) equal to the greater of:

(1)(a) the sum of the present values of the remaining scheduled payments of principal and interest thereon discounted to the redemption date (assuming the notes matured on the Call Date) on a semi-annual

basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus 50 basis points less (b) accrued and unpaid interest to the date of redemption, and

(2) 100% of the principal amount of the Notes to be redeemed,

plus, in either case, accrued and unpaid interest thereon plus any Additional Amounts to the redemption date.

On and after the Call Date, the Company will be entitled at its option to redeem all or a portion of the Notes at the following redemption prices, expressed as percentages of the principal amount thereof, if redeemed during the twelve-month period commencing on [●] of any year set forth below, plus any Additional Amounts then due, if any, plus accrued and unpaid interest thereon to the date of the redemption:

| Year | Percentage |
|------|------------|
| [●], 2028 through [●], 2029 | 104.00% |
| [●], 2029 and thereafter | 100.00% |

"**Treasury Rate**" means, with respect to any redemption date, the yield determined by the Company in accordance with the following two paragraphs.

The Treasury Rate shall be determined by the Company after 4:15 p.m., New York City time (or after such time as yields on U.S. government securities are posted daily by the Board of Governors of the Federal Reserve System), on the third business day preceding the redemption date based upon the yield or yields for the most recent day that appear after such time on such day in the most recent statistical release published by the Board of Governors of the Federal Reserve System designated as "Selected Interest Rates (Daily) - H.15" (or any successor designation or publication) ("H.15") under the caption "U.S. government securities–Treasury constant maturities–Nominal" (or any successor caption or heading) ("H.15 TCM"). In determining the Treasury Rate, the Company shall select, as applicable: (1) the yield for the Treasury constant maturity on H.15 exactly equal to the period from the redemption date to the Call Date (the "Remaining Life"); or (2) if there is no such Treasury constant maturity on H.15 exactly equal to the Remaining Life, the two yields – one yield corresponding to the Treasury constant maturity on H.15 immediately shorter than and one yield corresponding to the Treasury constant maturity on H.15 immediately longer than the Remaining Life – and shall interpolate to the Call Date on a straight-line basis (using the actual number of days) using such yields and rounding the result to three decimal places; or (3) if there is no such Treasury constant maturity on H.15 shorter than or longer than the Remaining Life, the yield for the single Treasury constant maturity on H.15 closest to the Remaining Life. For purposes of this paragraph, the applicable Treasury constant maturity or maturities on H.15 shall be deemed to have a maturity date equal to the relevant number of months or years, as applicable, of such Treasury constant maturity from the redemption date.

If on the third business day preceding the redemption date H.15 TCM or any successor designation or publication is no longer published, the Company shall calculate the Treasury Rate based on the rate per annum equal to the semi-annual equivalent yield to maturity at 11:00 a.m., New York City time, on the second business day preceding such redemption date of the United States Treasury security maturing on, or with a maturity that is closest to, the Call Date, as applicable. If there is no United States Treasury security maturing on the Call Date but there are two or more United States Treasury securities with a maturity date equally distant from the Call Date, one with a maturity date preceding the Call Date and one with a maturity date following the Call Date, the Company shall select the United States Treasury security with a maturity date preceding the Call Date. If there are two or more United States Treasury securities maturing on the Call Date or two or more United States Treasury securities meeting the criteria of the preceding sentence, the Company shall select from among these two or more United States Treasury securities the United States Treasury security that is trading closest to par based upon the average of the bid

A-9

and asked prices for such United States Treasury securities at 11:00 a.m., New York City time. In determining the Treasury Rate in accordance with the terms of this paragraph, the semi-annual yield to maturity of the applicable United States Treasury security shall be based upon the average of the bid and asked prices (expressed as a percentage of principal amount) at 11:00 a.m., New York City time, of such United States Treasury security, and rounded to three decimal places.

*Optional Redemption Upon Equity Sales.*  At any time, or from time to time, on or prior to [●], 2028, the Company may, at its option, use the net cash proceeds of one or more Equity Sales to redeem up to 35% of the aggregate principal amount of the Notes issued under the Indenture at a redemption price equal to 108% of the principal amount thereof, plus accrued and unpaid interest to the Redemption Date, plus Additional Amounts, if any; *provided* that:

(1) after giving effect to any such redemption at least 65% of the aggregate principal amount of the Notes issued under the Indenture remains outstanding; and

(2) the Company shall make such redemption not more than 90 days after the consummation of such Equity Sale.

"**Equity Sale**" means an underwritten primary public offering for cash, after the Issue Date, of Qualified Capital Stock of the Company or of any direct or indirect parent of the Company (to the extent the proceeds thereof are contributed to the common equity of the Company).

*Optional Redemption/or Changes in Withholding Taxes*.  If, as a result of any amendment to, or change in, the laws (or any rules or regulations thereunder) of a Relevant Jurisdiction, or any political subdivision or taxing authority or other instrumentality thereof or therein having the authority to tax, or any amendment to or change in the official interpretation or application of such laws, rules or regulations, which amendment to or change in such laws, rules or regulations becomes effective on or after the Issue Date and, if applicable, after the date such Relevant Jurisdiction becomes a Relevant Jurisdiction (which, in the case of a merger, consolidation or other transaction permitted and described under Section 4.01 of the Indenture, shall be treated for this purpose as the date of such transaction), the Company (or the relevant Guarantor) has become obligated, or will become obligated, in each case after taking all reasonable measures to avoid this requirement, to pay Additional Amounts in excess of those attributable to a Mexican withholding tax rate of 4.9% with respect to interest or amounts deemed interest payments under the Notes, then, at our option, all, but not less than all, of the Notes may be redeemed at any time on giving not less than 10 nor more than 60 days' notice, at a redemption price equal to 100% of the outstanding principal amount, plus accrued and unpaid interest and any Additional Amounts due thereon up to but not including the Redemption Date; *provided*, *however*, that (1) no notice of redemption for tax reasons may be given earlier than 90 days prior to the earliest date on which the Company (or the relevant Guarantor) would be obligated to pay these Additional Amounts if a payment on the Notes were then due and (2) at the time such notice of redemption is given such obligation to pay such Additional Amounts remains in effect.

Prior to the publication of any notice of redemption pursuant to this provision, the Company will deliver to the Trustee:

- a certificate signed by one of the Company's duly authorized representatives stating that the Company is entitled to effect the redemption and setting forth a statement of facts showing that the conditions precedent to the Company's right to redeem have occurred, and

- an opinion of legal counsel (which may be the Company's counsel) of recognized standing to the effect that the Company has or will become obligated to pay such Additional Amounts (in addition to Additional Amounts attributable to a 4.9% withholding tax on payments of interest) as a result of such change or amendment.

The Company will give notice to DTC pursuant to Section 5.03 of the Indenture of any redemption the Company proposes to make at least 30 days (but not more than 60 days) before the Redemption Date. This notice, once delivered by the Company to the Trustee, will be irrevocable.

*Optional Redemption Procedures*. In the event that less than all of the Notes are to be redeemed at any time, selection of Notes for redemption will be made by the Trustee in compliance with the requirements of the principal securities exchange or market, if any, on which Notes are listed or, if the Notes are not then listed on a securities exchange or market, on a *pro rata* pass-through distribution of principal basis in accordance with DTC's applicable procedures. No Notes of a principal amount of U.S.$150,000 or less may be redeemed in part and Notes of a principal amount in excess of U.S.$150,000 may be redeemed in multiples of U.S.$1,000 only.

Notice of any redemption will be delivered, at least 30 but not more than 60 days before the Redemption Date to each Holder of Notes to be redeemed at its registered address in accordance with the procedures of DTC. If Notes are to be redeemed in part only, the notice of redemption will state the portion of the principal amount thereof to be redeemed. For so long as the Notes are admitted to listing on SGX-ST and to trading on the Official List of the SGX-ST and the rules of the SGX-ST so require, the Company will cause notices of redemption also to be published as provided under Section 11.01 of the Indenture. A new Note in a principal amount equal to the unredeemed portion thereof (if any) will be issued in the name of the Holder thereof and delivered to such Holder upon cancellation of the original Note (or appropriate adjustments to the amount and beneficial interests in a Global Note will be made, as appropriate).

The Company will pay the redemption price for any Note together with accrued and unpaid interest thereon through the Redemption Date. On and after the Redemption Date, interest will cease to accrue on Notes or portions thereof called for redemption as long as the Company has deposited with the Paying Agent funds in satisfaction of the applicable redemption price pursuant to the Indenture. Upon redemption of any Notes by the Company, such redeemed Notes will be cancelled. In the case of any partial redemption, selection of the Notes for redemption will be made in accordance with Article 5 of the Indenture.

Notwithstanding the foregoing provisions of this Section 5, the Company and its subsidiaries are not prohibited from acquiring the Notes by means other than a redemption, whether pursuant to a tender offer, open market purchase or otherwise.

If the redemption date falls after a record date but on, or prior to, the corresponding interest payment date, the Company shall pay accrued interest to the Holder of record on the corresponding record date, which may or may not be the person who will receive payment of the redemption price (which will exclude such accrued interest).

6.    *Mandatory Repurchase Provisions.*

*Change of Control Triggering Event Offer*. Upon the occurrence of a Change of Control Triggering Event, each Holder of Notes will have the right to require that the Company purchase all or a portion (in minimum principal amounts of U.S.$150,000 and integral multiples of U.S.$1,000 in excess thereof) of the Holder's Notes at a purchase price equal to 101.0% of the principal amount thereof, plus accrued and unpaid interest thereon and any Additional Amounts, if any, through the date of purchase.

Within 30 days following the date upon which the Change of Control Triggering Event occurred, the Company must make a Change of Control Triggering Event Offer pursuant to a Change of Control Triggering Event Notice. As more fully described in the Indenture, the Change of Control Triggering Event Notice shall state, among other things, the Change of Control Triggering Event Payment Date, which must be no earlier than 30 days nor later than 60 days from the date the notice is delivered, other than as may be required by applicable law.

*Asset Sale Offer*. The Indenture imposes certain limitations on the ability of the Company and its Restricted Subsidiaries to make Asset Sales. In the event the proceeds from a permitted Asset Sale exceed certain amounts and are not applied as specified in the Indenture, the Company will be required to make an Asset Sale Offer to purchase, to the extent of such proceeds, Notes together with, at the option of the Company, certain other Indebtedness at 100% of the principal amount thereof, plus accrued interest (if any) to the Asset Sale Offer Payment Date, as more fully set forth in this Indenture.

7.      *Denominations; Transfer; Exchange.*

The Notes are in fully registered form without coupons, and only in minimum denominations of U.S.$150,000 and integral multiples of U.S.$1,000 in excess thereof. A Holder may transfer or exchange Notes in accordance with the Indenture. The Registrar may require a Holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes and fees required by law or permitted by the Indenture. The Registrar shall not be required to register the transfer or exchange of (x) any Note for a period beginning: (1) 15 days before the delivery of a notice of an offer to repurchase or redeem Notes and ending at the close of business on the day of such delivery or (2) 15 days before an Interest Payment Date and ending on such Interest Payment Date and (y) any Note selected for repurchase or redemption, except the unrepurchased or unredeemed portion thereof, if any.

8.      *Persons Deemed Owners.*

The registered Holder of this Note may be treated as the owner of it for all purposes.

9.      *Unclaimed Money.*

Subject to any applicable abandoned property law, if money for the payment of principal or interest remains unclaimed for two years, the Trustee or Paying Agent shall pay the money back to the Company at its request. After any such payment, Holders entitled to the money must look only to the Company and the Guarantors, if any, and not to the Trustee for payment.

10.     *Discharge Prior to Redemption or Maturity.*

Subject to certain conditions set forth in the Indenture, the Company at any time may terminate some or all of its obligations under the Notes and the Indenture if the Company deposits with the Trustee U.S. Dollars or U.S. Government Obligations for the payment of principal of and interest on the Notes to redemption or maturity, as the case may be.

11.     *Amendment, Waiver.*

Subject to certain exceptions set forth in the Indenture, (i) the Indenture or the Notes may be amended or supplemented with the written consent of the Holders of a majority in principal amount of the then Outstanding Notes and (ii) any default (other than with respect to nonpayment or in respect of a provision that cannot be amended or supplemented without the written consent of each Holder affected) or noncompliance with any provision may be waived with the written consent of the Holders of a majority in

aggregate principal amount of the then Outstanding Notes.

Subject to certain exceptions set forth in the Indenture, without the consent of any Holder, the Company, the Guarantors and the Trustee may amend or supplement the Indenture or the Notes to, among other things, cure any ambiguity, omission, defect or inconsistency; or to provide for the assumption of the obligations of the Company or the Guarantors under the Notes in the case of a merger or consolidation or sale of all on substantially all of the Company's or the Guarantors' assets to the extent permitted under the Indenture; or provide for uncertificated Notes in addition to or in place of Certificated Notes; *provided*, *however*, that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code; or to add guarantees with respect to the Notes or to secure the Notes; or to add to the covenants of the Company and/or the Guarantors for the benefit of the Holders or to surrender any right or power under the Indenture conferred upon the Company or the Guarantors; or to comply with applicable requirements of the SEC; or to comply with the requirements of any applicable securities depositary; or to make any change that provides any additional rights or benefits to the Holders or that does not adversely affect the legal rights under the Indenture of any such Holder and to provide for a successor Trustee in accordance with the terms of the Indenture; or to provide for a successor Trustee in accordance with the terms of this Indenture and the Mexican trust Agreement; or to release any Guarantor in accordance with the terms of the Indenture; or to otherwise comply with any requirement of the Indenture; or to convey, transfer, assign, mortgage or pledge to the Trustee as additional collateral for the Notes any property or assets, including when permitted or required by this Indenture or the Mexican Trust Agreement; or to make any other changes which do not adversely affect the rights of any of the Holders in any material respect.

Notwithstanding anything to the contrary set forth in the foregoing, without the consent of Holders of the Notes representing at least 75% in aggregate principal amount of the Notes Outstanding, an amendment, supplement or waiver of this Indenture or the Mexican Trust Agreement may not release Liens on all or substantially all of the Collateral, or otherwise release any Collateral, in any manner adverse to the Holders, other than in accordance with this indenture and the Mexican Trust Agreement.

12.    *Defaults and Remedies.*

If an Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of the Outstanding Notes may declare all the Notes to be due and payable immediately. Certain events of bankruptcy or insolvency are Events of Default which will result in the Notes being due and payable immediately upon the occurrence of such Events of Default.

If the Notes are accelerated or otherwise become due prior to their Stated Maturity, in each case, as a result of an Event of Default (including an Event of Default under clause (viii) of Section 6.01(a) of the Indenture), the amount of principal of and premium on the Notes that becomes due and payable shall equal 100% of the aggregate principal amount of the Notes plus applicable redemption premium as specified in this Notes at the time of such acceleration event, as if such acceleration event were an optional redemption of the Notes accelerated or otherwise becoming due.

Holders may not enforce the Indenture or the Notes except as provided in the Indenture. The Trustee may refuse to enforce the Indenture or the Notes unless it receives reasonable indemnity. Subject to certain limitations, Holders of a majority in principal amount of the Outstanding Notes may direct the Trustee in its exercise of any trust or power.  The Trustee may withhold from Holders notice of any continuing Default or Event of Default (except a Default or Event of Default in payment of principal or interest) if it determines that withholding notice is in their interest.

13.    *Trustee Dealings with the Company.*

Subject to certain limitations set forth in the Indenture, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with and collect obligations owed to it by the Company or its Affiliates and may otherwise deal with the Company or its Affiliates with the same rights it would have if it were not Trustee.

14.    *No Recourse Against Others.*

An incorporator, director, officer, employee, stockholder or controlling person, as such, of the Company or the Guarantors shall not have any liability for any obligations of the Company or the Guarantors under the Notes or the Indenture or for any claim based on, in respect of or by reason of such obligations or their creation.  By accepting a Note, each Holder waives and releases all such liability.  The waiver and release are part of the consideration for the issue of the Notes.

15.    *Authentication.*

This Note shall not be valid until an authorized signatory of the Trustee (or an Authenticating Agent) manually signs the certificate of authentication on the other side of this Note.

16.    *Abbreviations.*

Customary abbreviations may be used in the name of a Holder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entirety), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian) and U/GIM/A (=Uniform Gift to Minors Act).

17.    *CUSIP, ISIN or Common Code Numbers.*

The Company has caused CUSIP, ISIN or Common Code numbers to be printed on the Notes and has directed the Trustee to use CUSIP, ISIN or Common Code numbers in notices of redemption as a convenience to Holders.  No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

18.    *Governing Law.*

This Note shall be governed by, and construed in accordance with, the laws of the State of New York.

19.    *Currency of Account; Conversion of Currency.*

U.S. Dollars is the sole currency of account and payment for all sums payable by the Company and the Guarantors under or in connection with the Notes or the Indenture, including damages. The Company and the Guarantors, if any, will indemnify the Holders as provided in the Indenture in respect of the conversion of currency relating to the Notes and the Indenture.

20.    *Agent for Service; Submission to Jurisdiction; Waiver of Immunities.*

The Company has agreed that any suit, action or proceeding against the Company brought by any Holder or the Trustee arising out of or based upon the Indenture or the Notes may be instituted in

A-14

any court of the State of New York and any court of the United States of America, in each case located in the Borough of Manhattan, the City of New York. The Company has irrevocably submitted to the jurisdiction of such courts for such purpose and waived, to the fullest extent permitted by law, trial by jury, any objection they may now or hereafter have to the laying of venue of any such proceeding and any claim they may now or hereafter have that any proceeding in any such court is brought in an inconvenient forum and any right to which any of them may be entitled, on account of place of residence or domicile. The Company has appointed C T Corporation System with offices currently at 28 Liberty Street, New York, New York 10005, as its authorized agent upon whom all writs, process and summonses may be served in any suit, action or proceeding arising out of or based upon the Indenture or the Notes which may be instituted in any court of the State of New York and any court of the United States of America, in each case located in the Borough of Manhattan, the City of New York. To the extent that the Company has or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit or proceeding, from jurisdiction of any court or from set-off or any legal process (whether service or notice, attachment in aid or otherwise) with respect to itself or its property, the Company has irrevocably waived and agreed not to plead or claim such immunity in respect of its obligations under the Indenture or the Notes.

The Company will furnish to any Holder upon written request and without charge to the Holder a copy of the Indenture which has in it the text of this Note in larger type. Requests may be made to:

> Operadora de Servicios Mega, S.A. de C.V. SOFOM, E.R.
> Avenida Patria 1501 Int. 102
> Jardines Universidad, 45110
> Zapopan, Jalisco
> Attention: Chief Executive Officer and/or Chief Financial Officer

## ASSIGNMENT FORM

To assign this Note, fill in the form below:

I or we assign and transfer this Note to

_____

(Print or type assignee's name, address and zip code)

_____

(Insert assignee's Social Security or Tax I.D. Number)

and irrevocably appoint as agent to transfer this Note on the books of the Company.  The agent may substitute another to act for him.

Date:_____                    Your Signature:_____


Signature                                Guarantee:_____
(Signature must be guaranteed)

_____

Sign exactly as your name appears on the other side of this Note.

The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to Exchange Act Rule 17Ad-15.

A-16

*[To be attached to Global Notes only:]*

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE

The following increases or decreases in this Global Note have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Note Custodian |
| --- | --- | --- | --- | --- |

A-17

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Company pursuant to Section 3.07 or Section 3.11 of the Indenture, check either box:

☐                    ☐
**Section 3.07**        **Section 3.11**

If you want to elect to have only part of this Note purchased by the Company pursuant to Section 3.07 or Section 3.11 of the Indenture, state the principal amount (which must be in minimum principal amounts of U.S.$150,000 and integral multiples of U.S.$1,000 in excess thereof) that you want to have purchased by the Company:  U.S.$

Date:_____          Your Signature:_____

(Sign exactly as your name appears
on the other side of the Note)


Signature                    Guarantee:_____
(Signature must be guaranteed)


The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to Exchange Act Rule 17Ad-15.

A-18

SCHEDULE B

**Operadora de Servicios Mega, S.A. de C.V., SOFOM, E.R.**
**U.S.$ [●]  8.000% Senior Secured Notes due 2030**

PRINCIPAL INSTALLMENTS

Installments of principal will be payable quarterly on each Scheduled Redemption Date of each year beginning on [•], 2025, pro rata (subject to the procedures of the depositary for the Notes) to the Holder thereof on the immediately preceding Record Date in accordance with the following schedule:

| Scheduled Redemption Date[8] | Percentage of Original Principal Amount Payable | Amount Payable in U.S.$ |
|---|---|---|
| [●], 2025 | 1.25% | $[●] |
| [●], 2025 | 1.25% | $[●] |
| [●], 2025 | 1.25% | $[●] |
| [●], 2026 | 1.25% | $[●] |
| [●], 2026 | 2.50% | $[●] |
| [●], 2026 | 2.50% | $[●] |
| [●], 2026 | 2.50% | $[●] |
| [●], 2027 | 2.50% | $[●] |
| [●], 2027 | 5.00% | $[●] |
| [●], 2027 | 5.00% | $[●] |
| [●], 2027 | 5.00% | $[●] |
| [●], 2028 | 5.00% | $[●] |
| [●], 2028 | 7.50% | $[●] |
| [●], 2028 | 7.50% | $[●] |
| [●], 2028 | 7.50% | $[●] |
| [●], 2029 | 7.50% | $[●] |
| [●], 2029 | 8.75% | $[●] |
| [●], 2029 | 8.75% | $[●] |
| [●], 2029 | 8.75% | $[●] |
| [●], 2030 | 8.75% | $[●] |

(Maturity Date)*

---

[8] **NTD:** Timing of closing and first Scheduled Redemption Date to be confirmed.

\*        For the avoidance of doubt, the final installment shall be adjusted to account for the remaining principal amount of the Notes, if any, which shall be paid at 100% of the then- outstanding principal amount on [•], 2030.

**EXHIBIT B**

## FORM OF CERTIFICATE FOR TRANSFER
## PURSUANT TO REGULATION S

[Date]

[Trustee                                                                                          Name]
[Trustee                                                                                       Address]
Attention:  Operadora de Servicios Mega Trustee

Re:      8.000% Senior Secured Notes due 2030 (the "**Notes**") of Operadora de Servicios Mega, S.A. de C.V., SOFOM, E.R. (the "**Company**")

Ladies and Gentlemen:

Reference is hereby made to the Indenture, dated as of [●], 2025 (as amended and supplemented from time to time, the "**Indenture**"), among the Company and UMB, N.A. as Trustee. Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

In connection with our proposed sale of U.S.$_____ aggregate principal amount of the Notes [*in the case of a transfer of an interest in a 144A Global Note*:                          , which represent an interest in a 144A Global Note beneficially owned by] [*in the case of a transfer of an interest in an Institutional Accredited Investor Global Note*:                          , which represent an interest in a Institutional Accredited Investor Global Note beneficially owned by] the undersigned ("**Transferor**"), we confirm that such sale has been effected pursuant to and in accordance with Regulation S under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), and, accordingly, we represent that:

(a)      the offer of the Notes was not made to a person in the United States;

(b)      either (i) at the time the buy order was originated, the transferee was outside the United States or we and any person acting on our behalf reasonably believed that the transferee was outside the United States or (ii) the transaction was executed in, on or through the facilities of a designated off-shore securities market and neither we nor any person acting on our behalf knows that the transaction has been pre-arranged with a buyer in the United States;

(c)      no directed selling efforts have been made in the United States in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S, as applicable;

(d)      the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act; and

(e)      we are the beneficial owner of the principal amount of Notes being transferred.

In addition, if the sale is made during a Distribution Compliance Period and the provisions of Rule 904(b)(1) or Rule 904(b)(2) of Regulation S are applicable thereto, we confirm that such sale has been made in accordance with the applicable provisions of Rule 904(b)(1) or Rule 904(b)(2), as the case may be.

You and the Company are entitled to rely upon this letter and are irrevocably authorized to

B-1

produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.  Terms used in this letter have the meanings set forth in Regulation S.

Very truly yours,

[Name of Transferor]

By: _____
        Authorized Signature

**EXHIBIT C**

## FORM OF CERTIFICATE FOR TRANSFER
## TO QIB/INSTITUTIONAL ACCREDITED INVESTOR

[Date]

[Trustee                                                                                      Name]
[Trustee                                                                                    Address]
Attention:  Operadora de Servicios Mega Trustee

Re:      8.000% Senior Secured Notes due 2030 (the "**Notes**") of Operadora de Servicios Mega, S.A. de C.V., SOFOM, E.R. (the "**Company**")

Ladies and Gentlemen:

Reference is hereby made to the Indenture, dated as of [●], 2025 (as amended and supplemented from time to time, the "**Indenture**"), among the Company, UMB, N.A., as Trustee.  Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

This letter relates to U.S.$_____ aggregate principal amount of Notes, which represents an interest in a Regulation S Global Note beneficially owned by the undersigned (the "**Transferor**") to effect the transfer of such Notes in exchange for an equivalent beneficial interest  [*in the case of an interest in a Rule 144A Global Note:* Rule 144A Global Note][*in the case of an interest in an Institutional Accredited Investor Global Note*: Institutional Accredited Investor Global Note].

In connection with such request, and with respect to such Notes, the Transferor does hereby certify that such Notes are being transferred in accordance with [*in the case of an interest in a Rule 144A Global Note:* Rule 144A under the U.S. Securities Act of 1933 (the "**Securities Act**"), as amended ("Rule 144A")][*in the case of an interest in an Institutional Accredited Investor Global Note*: under Rule 501(A)(1), (2), (3), (7), (8), (9), (12) or (13) of Regulation D under the Securities Act], to a transferee that the Transferor reasonably believes is purchasing the Notes for its own account or an account with respect to which the transferee exercises sole investment discretion, and the transferee, as well as any such account, is [*in the case of an interest in a Rule 144A Global Note:* a "qualified institutional buyer" within the meaning of Rule 144A, in a transaction meeting the requirements of Rule 144A][*in the case of an interest in an Institutional Accredited Investor Global Note*: an "institutional accredited investor" within the meaning of Rule 501(A)(1), (2), (3), (7), (8), (9), (12) or (13) of Regulation D under the Securities Act] and in accordance with applicable securities laws of any state of the United States or any other jurisdiction.

You and the Company are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.

Very truly yours,

[Name of Transferor]

By: _____
       Authorized Signature

C-1

**EXHIBIT D**

## FORM OF CERTIFICATE FOR TRANSFER
## PURSUANT TO RULE 144

[Trustee                                                                               Name]
[Trustee                                                                            Address]
Attention:  Operadora de Servicios Mega Trustee

      Re:      8.000% Senior Secured Notes due 2030 (the "**Notes**") of Operadora de Servicios Mega, S.A. de C.V., SOFOM, E.R. (the "**Company**")

Ladies and Gentlemen:

      Reference is hereby made to the Indenture, dated as of [●], 2025 (as amended and supplemented from time to time, the "**Indenture**"), among the Company and UMB, N.A. as Trustee. Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

      In connection with our proposed sale of U.S.$_____ aggregate principal amount of the Notes [*in the case of a transfer of an interest in a 144A Global Note*:                        , which represent an interest in a 144A Global Note beneficially owned by] the undersigned ("**Transferor**"), we confirm that such sale has been effected pursuant to and in accordance with Rule 144 under the Securities Act.

      You and the Company are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.

Very truly yours,

[Name of Transferor]

By: _____
      Authorized Signature

D-1

**EXHIBIT E**

## FORM OF CERTIFICATE FOR TRANSFER
## FROM/TO INSTITUTIONAL ACCREDITED INVESTORS

[Trustee                                                                                          Name]
[Trustee                                                                                        Address]
Attention:  Operadora de Servicios Mega Trustee

Re:    8.000% Senior Secured Notes due 2030 (the "**Notes**") of Operadora de Servicios Mega, S.A. de C.V., SOFOM, E.R. (the "**Company**")

Ladies and Gentlemen:

Reference is hereby made to the Indenture, dated as of [●], 2025 (as amended and supplemented from time to time, the "**Indenture**"), among the Company and UMB, N.A., as Trustee. Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

This letter relates to U.S.$_____ aggregate principal amount of Notes [*in the case of an interest in a Rule 144A Global Note:* which represents an interest in a Rule 144A Global Note beneficially owned by][*in the case of an interest in an Institutional Accredited Investor Global Note*: which represents an interest in an Institutional Accredited Investor Global Note beneficially owned by] the undersigned (the "**Transferor**") to effect the transfer of such Notes in exchange for an equivalent beneficial interest in the [*in the case of an interest in a Rule 144A Global Note:* Rule 144A Global Note][*in the case of an interest in an Institutional Accredited Investor Global Note*: Institutional Accredited Investor Global Note].

In connection with such request, and with respect to such Notes, the Transferor does hereby certify that such Notes are being transferred in accordance with [*in the case of an interest in a Rule 144A Global Note:* Rule 144A under the U.S. Securities Act of 1933 (the "**Securities Act**"), as amended ("Rule 144A")][*in the case of an interest in an Institutional Accredited Investor Global Note*: under Rule 501(A)(1), (2), (3), (7), (8), (9), (12) or (13) of Regulation D under the Securities Act], to a transferee that the Transferor reasonably believes is purchasing the Notes for its own account or an account with respect to which the transferee exercises sole investment discretion, and the transferee, as well as any such account, is [*in the case of an interest in a Rule 144A Global Note:* a "qualified institutional buyer" within the meaning of Rule 144A, in a transaction meeting the requirements of Rule 144A][*in the case of an interest in an Institutional Accredited Investor Global Note*: an "institutional accredited investor" within the meaning of Rule 501(A)(1), (2), (3), (7), (8), (9), (12) or (13) of Regulation D under the Securities Act] and in accordance with applicable securities laws of any state of the United States or any other jurisdiction.

You and the Company are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.

Very truly yours,

[Name of Transferor]

By: _____
        Authorized Signature

**Schedule C**

**Implementation Deed**

**Schedule D**

**Restructuring Documents**

**Schedule E**

**List Of Subsidiaries**

1.  HORSESHOE CORPORATION

2.  MEZCAL CORPORATION

3.  Mega, L.P.

4.  Mega Newco Limited

*CGSH Draft 11.17.24*

**Exhibit A**

## FORM OF OFFICERS' CERTIFICATE

Reference is made to the Notes Purchase and Placement Agreement dated [December [●], 2024], between Operadora de Servicios Mega, S.A. de C.V., SOFOM, E.R., a variable capital corporation, regulated multiple purpose financial company (*sociedad anónima de capital variable, sociedad financiera de objeto múltiple, entidad regulada*) (the "Company") incorporated under the laws of the United Mexican States and the Note Purchasers named therein (the "Purchase Agreement"), in connection with the issuance of the Company's 8.000% Senior Secured Notes due [2030]. Capitalized terms used herein without definition shall have the respective meanings ascribed to them in the Purchase Agreement.

Each of the undersigned, on behalf of the Company, hereby certify pursuant to Section 8(d) of the Purchase Agreement that as of the date hereof:

1.      Each of the undersigned have carefully reviewed the Restructuring Documents;

2.      The representations and warranties of the Company as set forth in the Purchase Agreement are true and correct as of the date hereof as if made on the date hereof;

3.      The Company has complied with all agreements and satisfied all conditions on its part to be performed or satisfied under the Purchase Agreement at or prior to the date hereof; and

4.      the conditions set forth in Section 8 of the Purchase Agreement have been met.

IN WITNESS WHEREOF, the undersigned has executed this Officers' Certificate on and as of the date first written above.

By:    _____
Name:  Ignacio Javier Gonzalez Delgadillo
Title:   Chief Executive Officer


By:    _____
Name:  Pedro Garabito
Title:   Finance Manager

**Exhibit B**

## FORM OF SECRETARY'S CERTIFICATE

[●], [2025]

   Reference is made to the Notes Purchase and Placement Agreement dated [December [●], 2024], between Operadora de Servicios Mega, S.A. de C.V., SOFOM, E.R., a variable capital corporation, regulated multiple purpose financial company (*sociedad anónima de capital variable, sociedad financiera de objeto múltiple, entidad regulada*) (the "Company") incorporated under the laws of the United Mexican States and the Note Purchasers named therein (the "Purchase Agreement"), in connection with the placement by the Company of U.S.$[●] aggregate principal amount of its 8.000% Senior Secured Notes due 20[30], (the "Notes"). Capitalized terms used and not otherwise defined herein shall have the meaning assigned to them in the Purchase Agreement.

   The undersigned, Mr. Ricardo Maldonado Yáñez, being the Secretary non-member of the Board of Directors of the Company does hereby certify that:

1. I am the duly elected, qualified and acting Secretary non-member of the Board of Directors of the Company and, in such capacity, have access to and authority to certify the books and records of the Company, as indicated at clause twenty four (24) of the by-laws of the Company;

2. Attached hereto as Exhibit A-1 are true and correct copies of the public deed number [●], dated as of [●], containing the resolutions by the Board of Directors of the Company (which resolutions have not been amended, rescinded or modified since their adoption and remain in full force and effect as of the date hereof), pertaining to the placement of the Notes pursuant to the Purchase Agreement, and all other documents related to the issuance of the Notes, including the Indenture, dated as of the date hereof (the "Indenture"), between the Company and UMB Bank, N.A., as trustee, the Notes and the Mexican Trust Agreement;

3. Attached hereto as Exhibit B-1 are true and correct copies of the public deed number [●], dated as of [●], containing the by-laws of the Company, as amended to the date hereof, in full force and effect on the date hereof; and no steps have been taken by the stockholders of the Company to authorize or effect any amendment or other modification to such by-laws, except for any necessary amendments in connection with the issuance of shares of capital stock pursuant to the Restructuring;

4. Attached hereto as Exhibit C-1 are true and complete copies of the public deeds number [●], dated as of [●], and number [●], dated as of [●], containing the powers of attorney granted by the Company authorizing its attorneys-in-fact to, among other things, execute the Purchase Agreement, the Indenture, the Notes, the Mexican Trust Agreement and all other documents related to the issuance of the Notes, which powers of attorney have not been amended, modified or revoked and remain in full force and effect as of the date hereof;

5. The Purchase Agreement, the Notes, the Mexican Trust Agreement and the Indenture have been duly executed and delivered on behalf of the Company in accordance with the resolutions and actions referred to in number 2 above;

6. To the extent of my duties, as of the date hereof (i) there is no cause for the dissolution or liquidation of the Company under Mexican law, and (ii) to the extent of my knowledge, no proceedings toward the

liquidation or dissolution of the Company have been notified to the Company, or are contemplated by the Company or threatened by others;

7.   The shareholders meetings' and board of directors' minute books of the Company made available to *Latham & Watkins LLP*, Sainz Abogados, Cleary Gottlieb Steen & Hamilton LLP and Mijares, Angoitia, Cortés y Fuentes, S.C., are the original shareholders meetings' and board of directors' minute books of the Company and are true and complete through the date hereof; and

8.   Each person below who, as a legal representative of the Company, signed, by facsimile or otherwise the Purchase Agreement or any other certificate or document delivered in connection with the selling of the Notes, was at the respective time(s) of such signing, duly elected or appointed, authorized, qualified and acting as such officer and the signatures of such persons below opposite to their names are their genuine signatures:

| Name | Office | Signature |
|------|--------|-----------|
| Ignacio Javier Gonzalez Delgadillo | Chief Executive Officer | _____ |
| Pedro Garabito | Finance Manager | _____ |

Cleary Gottlieb Steen & Hamilton LLP, Mijares, Angoitia, Cortés y Fuentes, S.C., Latham & Watkins LLP and Sainz Abogados are entitled to rely on this certificate in connection with the opinions that such firms are rendering pursuant to the Purchase Agreement.

Capitalized terms used but not defined herein shall have the respective meanings ascribed thereto in the Purchase Agreement.

IN WITNESS WHEREOF, I have hereunto signed my name below as of the date first set forth above.

By: _____
Name: Ricardo Maldonado Yáñez
Title: Secretary, non-member of the Board of Directors of Operadora de Servicios Mega, S.A. de C.V., SOFOM, E.R.

**Exhibit C**

# FORM OF NPPA ACCESSION AGREEMENT

To:     OPERADORA DE SERVICIOS MEGA, S.A. DE C.V., SOFOM, E.R. (the "**Company**")

From:   [*name of Note Purchaser*]

Date:   _____

Dear Sirs,

**Note Purchase and Placement Agreement dated _____ 2024 between, amongst others, the Company and the other note purchasers thereto (the "NPPA")**

We, [*name of Note Purchaser*] (the "**Note Purchaser**") of [*address/registered office*], agree for the benefit of each other Party to the NPPA to be a Note Purchaser under the NPPA and to be bound by the terms of the NPPA as a Note Purchaser with effect from the date of this NPPA Accession Agreement.

The Note Purchaser makes each of the representations and warranties in Section 6 of the NPPA on the date of this NPPA Accession Agreement to each of the other Parties to the NPPA.  If any of the representations and warranties made under this NPPA Accession Agreement is not true and correct, this NPPA Accession Agreement shall be void *ab initio*.

The aggregate principal amount of the Notes that the Note Purchaser will hold and the relevant details in relation to those Notes are as set out in the Confidential Annexure to this NPPA Accession Agreement.

**Notice details for the purposes of Section 11 (*Notices*) of the NPPA:**

Contact person:
Contact email:
Contact telephone:

This NPPA Accession Agreement shall be governed by the laws of the State of New York.

Section 12 (*Governing Law; Construction*) of the NPPA shall apply *mutatis mutandis* to this NPPA Accession Agreement.

**By:**    _____
**Name:**
**Title:**

E-D