David H. Botter, Esq.
Thomas S. Kessler, Esq.
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Attorneys for the Foreign Representative
of Mega Newco Limited*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| Mega Newco Limited,[1] | Case No. 24-12031 (MEW) |
| Debtor in a Foreign Proceeding | |

**NOTICE OF FILING OF DEMONSTRATIVE
FOR RECOGNITION AND ENFORCEMENT HEARING**

     **PLEASE TAKE NOTICE** that on November 25, 2024, the foreign representative and its affiliated debtor in this Chapter 15 Case ("Mega" or the "Debtor") filed the *Verified Petition for (i) Recognition of Foreign Proceeding, (ii) Recognition of Foreign Representative, (iii) Recognition of Sanction Order and Related Scheme and (iv) Related Relief under Chapter 15 of The Bankruptcy Code* (the "Verified Petition") (ECF No. 2) in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") with respect to the Debtor which attached a proposed order as Exhibit A thereto (the "Proposed Order").

     **PLEASE TAKE FURTHER NOTICE** that, pursuant to direction from the Court, in advance of the hearing scheduled for February 7, 2024, at 11:00 A.M. (prevailing Eastern Time), at which the parties will present argument on the Verified Petition, Mega hereby files the demonstrative exhibit attached hereto as Exhibit A.

---

[1]     The last four identifying digits of the registered number are 6024 and with registered address at Suite 1, 7th Floor 50 Broadway London SW1H 0DB, United Kingdom.

Dated: February 6, 2025
    New York, New York

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: /s/ *Thomas S. Kessler*
    David H. Botter
    Thomas S. Kessler
    One Liberty Plaza
    New York, New York 10006
    T: 212-225-2000
    F: 212-225-3999
    (tkessler@cgsh.com)
    (dbotter@cgsh.com)

*Attorneys for the Foreign Representative
of Mega Newco Limited*

## Exhibit A



# CLEARY GOTTLIEB

## In re Mega Newco Limited, No. 24-12031

United States Bankruptcy Court for
the Southern District of New York

February 7, 2025

The Honorable Michael E. Wiles

Privileged and Confidential

# Table of Contents

Corporate Structure and Business Operations     3

Events Precipitating Commencement of the English Scheme Proceeding     6

Current English Scheme Proceeding     8

English Scheme Proceeding ss a Foreign Main Proceeding     12

Enforcement of the Sanction Order     16



# Corporate Structure and Business Operations



# Mega Group Structure



# Mega Group Business Overview and Relevant Debt Obligations[1]

Mega is a direct subsidiary of the Parent, with no substantial operations of its own.

The Group, based in Guadalajara, Jalisco, Mexico, is a leading multiple purpose financial provider, specializing in leases, lending, auto loans and factoring.

The Group operates across multiple locations in Mexico and has an office in San Diego, California.

The Group's operations are regulated by Mexico's Comisión Nacional Bancaria y de Valores and supervised by the Bank of Mexico.

Mega is a guarantor of $350 million of notes (the "Existing Notes") issued by the Parent (Operadora de Servicios Mega).
The Existing Notes mature on February 11, 2025.

[1] *See* Verified Petition ¶¶ 4-13; English Counsel Declaration ¶¶ 3-5.



# Events Precipitating Commencement of the English Scheme Proceeding



# Events Precipitating Commencement of the English Scheme Proceeding[1]

| | |
|---|---|
| **Finance**<br>WHY MEXICO'S SHADOW LENDERS HAVE FALLEN OUT OF FAVOUR WITH INVESTORS<br>October 10, 2022 | **LATINLAWYER**<br>**Banking Crises Lead to Dramatic Legislative Shift in Mexico**<br>20 October 2023 |

- The Mexican non-banking sector has been struggling since at least 2021.
  - In the last several years, multiple companies in the sector have undergone restructuring, including Crédito Real, Tangelo, Alpha Credit, and Unifin.

- This trend, combined with economic headwinds, has eroded customer confidence and led to reduced demand.

- As a result, the Group's funding sources have diminished, and necessary debt financing has become more expensive with higher interest rates.

- Necessary debt financing has also been challenging due to mismatched loan maturities and the inflationary interest environment.

- Hedging and foreign currency debt also have led to liquidity pressures due to an increase in margin calls.

- These factors all combined to necessitate the Group's comprehensive recapitalization and restructuring.
  - The Scheme comprises a central part of that overarching process, as it provides for the restructuring of the Existing Notes.

---

[1] *See* Verified Petition ¶¶ 14-18.



# Current English Scheme Proceeding



# Scheme Overview[1]

## New Refinancing Facility

- On September 18, 2024, the Parent entered into a new refinancing facility.

- The proceeds from the New Refinancing Facility will be used to fund cash payments to creditors as contemplated by the Scheme.

- The New Refinancing Facility will be drawn down at the same time as the issuance of the New Notes.

## New Notes Issuance

- The Parent will raise up to an additional $61,237,630 through the issuance of New Notes.

  - Tranche 1 ($10,000,000): Tranche 1 Notes will be purchased by an affiliate of existing creditors.

  - Tranche 2 (up to $51,237,630)[2]: Eligible holders of the Existing Notes can subscribe for New Notes pro rata to their holdings, with a minimum subscription amount of $150,000.

    - For every $1 of cash used to subscribe for Tranche 2 New Notes, subscribers will receive (a) $3.50 of Tranche 2 New Notes (for their cash contribution), and (b) $3.50 of Tranche 2 New Notes (in exchange for their Existing Notes)

## Backstop Commitment

- The Ad Hoc Group of Existing Noteholders (28.2% of total creditors) has committed to backstop the unsubscribed Tranche 2 New Notes pro rata to their holdings.

- Backstop Parties will receive a 5% fee for their commitment, regardless of the amount used.

## Treatment of Existing Notes

- Existing Noteholders were required to elect between two treatment options by February 6, 2025:

  - the Redemption Option (45% cash payment) or
  - the Equity Option (conversion into New Shares at USD 23.83 per share subject to equity cap).

- If no election is made by the deadline, the Redemption Option automatically applies.

  - 8.0% of Existing Noteholders elected the Equity Option and the rest either elected the Redemption Option or will receive the Redemption Option by default.

- Mega has received an OFAC license to effectuate the Scheme as sanctioned entities may be noteholders.

---

1 *See* Verified Petition ¶¶ 20-43; English Counsel Declaration ¶ 6.

2 $19,800,000 of the New Notes have been subscribed for and Mega has a backstop commitment for the remaining amount.

# English Scheme Proceeding Timeline [1]

Due to the economic challenges and defaults on the Existing Notes, Mega is restructuring its liabilities under Existing Notes through the English Scheme Proceeding to avoid insolvency, ensure liquidity for operations, and secure new funding for the purposes of restructuring and its working capital needs.



**November 14, 2024**
Mega filed the CPR Part 8 Claim Form to initiate the English Scheme Proceeding

**November 25, 2024**
Chapter 15 Filing

**November 21, 2024**
Convening Hearing held

**December 2, 2024**
Voting Record Date

**February 3, 2025**
Scheme Meeting

**February 5, 2025**
Sanction Hearing

OCT | NOV | DEC | JAN | FEB

[1] *See* Verified Petition ¶¶ 44-48; English Counsel Declaration ¶ 2.

# Status of English Scheme Proceeding

- The Convening Hearing occurred before the Business and Property Courts of the High Court of Justice.
  - Scheme Creditors were provided notice of the hearing and were permitted to attend and raise objections; no objections were made.
- The Scheme Meeting occurred on February 3, 2025.
  - 100% of those present and voting at the meeting voted in favor of the Scheme. 75.9% of Scheme Creditors attended by value of Scheme Claims entitled to vote and attend the meeting (i.e., excluding Sanctioned Persons who were excluded from voting).
- The Sanction Hearing occurred on February 5, 2025.
  - The skeleton argument was presented and the Sanction Order was approved by the Court.
- The English Court issued its order approving the Scheme on February 5, 2025, which is attached as Exhibit A to the Foreign Representative's Periodic Update of February 5, 2025 (ECF No. 21).



# English Scheme Proceeding is a Foreign Main Proceeding



# Mega and the Petitioner are Qualified and Duly Appointed

## Mega Qualifies as a Debtor [1]

- Mega is a corporation which qualifies as a "debtor" under section 1502(1).

- Mega has property in the U.S. as required under section 109(a) through its ownership of funds held in a New York bank account.

## The Petitioner Is the Duly Appointed "Foreign Representative" [2]

- Mr. Ignacio Javier Gonzalez Delgadillo was duly authorized by Mega's sole director and the English Court to act in the role of the foreign representative of Mega and to commence the chapter 15 case.

[1] *See* Verified Petition ¶¶ 56-58.
[2] *See* Verified Petition ¶¶ 59-61.

# English Scheme Proceedings are Considered "Foreign Proceedings"

**The English Scheme Proceeding meets all seven elements as required to be a "foreign proceeding" under section 1517(a):**

1.  It is a pending "proceeding" before the English Court. [1]

2.  It is judicial in nature because it requires court oversight, including approval from the English Court. [2]

3.  It is collective in nature because it addresses the rights and interests of all Mega creditors under the Existing Notes. [3]

4.  It is taking place in a foreign country, specifically in England and Wales, and is under the jurisdiction of the English Court. [4]

5.  It is governed by the U.K. Companies Act, which relates to the adjustment of debt. [5]

6.  The assets and affairs of Mega are under the supervision of the English Court. [6]

7.  The purpose of the Scheme is to reorganize, not liquidate, the company. [7]

---

[1] *See* Verified Petition ¶ 63.
[2] *See* Verified Petition ¶ 64; English Counsel Declaration ¶¶ 27-28.
[3] *See* Verified Petition ¶ 65; English Counsel Declaration ¶ 13.
[4] *See* Verified Petition ¶ 66.
[5] *See* Verified Petition ¶ 67; English Counsel Declaration ¶¶ 12, 13.
[6] *See* Verified Petition ¶ 68.
[7] *See* Verified Petition ¶ 69.

# The Debtor's COMI is in England and Wales

The English Scheme Proceeding is also the "foreign main proceeding" of the Debtor because it is pending in England and Wales, which is Mega's center of main interest ("COMI"). [1]

- Mega's registered office is in England, creating a presumption that its COMI is there.
    - Mega has no legal presence in any jurisdiction other than England.
- Mega's material contracts are governed by English Law.
    - Mega is party to the Deed Poll, Deed of Contribution, and the Standstill and Lock-Up Agreement, each of which are governed by English law.
- No party has objected to foreign main recognition, or claimed its COMI is elsewhere.

If not a foreign main proceeding, the Scheme should be recognized as a "foreign nonmain proceeding" because the same facts demonstrate that Mega has an "establishment" in England as required by Sections 1502(2), (5). [2]

[1] *See* Verified Petition ¶¶ 70-78.
[2] *See* Verified Petition ¶¶ 79-82.



# Enforcement of the Sanction Order



# The Scheme Meets the Procedural Fairness Standards Required by Section 1521

The English Scheme Proceeding meets the procedural fairness standard as it further requires:

- that all creditors have the right to appeal orders of the English Court, including orders in respect of sanctioning the Scheme within a certain period of time following the sanction hearing and are requested to raise the possibility of the appeal with the judge prior to the sanction order being made[1];

- the ability to object to the Scheme and challenge the treatment of their claims[2]; and

- equal treatment of creditor classes as there is only one class of creditors affected by the Scheme. [3]

---

[1] *See* Verified Petition ¶ 91; English Counsel Declaration ¶ 28.
[2] *See* Verified Petition ¶ 92; English Counsel Declaration ¶¶ 6, 26–28.
[3] *See* Verified Petition ¶ 91; English Counsel Declaration ¶ 16.

# Enforcement of the Scheme is Appropriate under Section 1521 of the Bankruptcy Code

Section 1521(a) grants broad discretion to courts to recognize and enforce foreign proceedings. Courts must ensure creditors' interests are sufficiently protected when granting relief, focusing on the procedural fairness of the foreign proceeding. This analysis turns on a general sense of fairness rather than any requirement that a foreign plan was confirmed in accordance with U.S. law. [1]

The English Scheme Proceeding meets the procedural fairness standard as it requires:

- **Access to Information**:   Creditors are entitled to receive broad access to information posted in multiple places to inform their vote. [3]
  - Scheme Creditors here had ample access to the Scheme documents, including explanatory statement providing background on the Scheme and its terms, as well as the releases sought by the Scheme.
  - Scheme Creditors also received advance notices of the Convening Hearing, the Scheme Meeting and the Sanction Hearing.
- **Substantial Creditor Support**:   Consensual creditor approval of the Scheme – a majority in number representing at least 75% in value of those present and voting. [2] No quorum requirements apply but votes needs to be representative of the class.
  - Mega's Scheme exceeded this threshold, receiving approval from all creditors in attendance (75.9% of Scheme Creditors (in value), who were entitled to vote, were in attendance).
- **Court Review and Approval**:   The Scheme must be approved by the English Court after hearing from any objecting parties
  - As indicated earlier, the English Court approved the Scheme and no objections were made.

Courts in this district have previously held enforcement of English schemes with similar procedures as proper under section 1521 of the Bankruptcy Code.

---

[1] *See* Verified Petition ¶¶ 89-90.
[2] *See* Verified Petition ¶ 91; English Counsel Declaration ¶ 33.
[3] *See* Verified Petition ¶ 91; English Counsel Declaration ¶ 14.

# Enforcement is Available as "Additional Assistance" under Section 1507

Section 1507(a) of the Bankruptcy Code provides that courts may provide "additional assistance" to a foreign representative under the Bankruptcy Code or other applicable U.S. law. Courts have considered requests under Section 1507(a) by reference to general principles of comity. Courts in the Second Circuit have examined several non-exhaustive factors, including (as applicable) whether[1]:

1. Creditors of the same class are treated equally with respect to asset distribution;
2. Creditors have the right to submit claims which, if denied, are subject to court adjudication;
3. Liquidators are required to give notice to potential claimants;
4. There are provisions for creditor meetings; and
5. The foreign country's insolvency laws favor their own citizens.

The English Scheme Proceeding meets the principles of comity as it requires or provides for:

1. Equal treatment for the single class of Scheme Creditors;[2]
2. The ability for Scheme Creditors to contest the treatment of their claims or the Scheme process generally;[3]
3. Ample notice to Scheme Creditors of the Scheme and all Scheme meetings and hearings;[4]
4. A Scheme Meeting at which Scheme Creditors can raise objections and vote on the Scheme;[5] and
5. No separate treatment for English creditors as distinct from non-English creditors.[6]

1. *See* Verified Petition ¶ 94; *Finanz AG Zurich v. Bano Economico S.A.*, 192 F.3d 240, 249 (2d Cir. 1999).
2. *See* Verified Petition ¶ 91, 94; English Counsel Declaration ¶ 16.
3. *See* Verified Petition ¶ 91; English Counsel Declaration ¶ 14.
4. *See* Verified Petition ¶ 94; English Counsel Declaration ¶ 14.
5. *See* Verified Petition ¶ 91; English Counsel Declaration ¶ 14.
6. *See* Verified Petition ¶ 91, 94; English Counsel Declaration ¶ 16.

# Proposed Releases under the Scheme and Chapter 15 Order

| Proposed Releases under the Scheme[1] | Proposed Releases under the Chapter 15 Order[2] |
|---|---|
| ▪ The Scheme and Deed of Release provide for releases of Scheme Creditor claims against certain parties, in order to ensure the seamless implementation of the Scheme.<br><br>▪ The released parties are also exculpated from liability for actions related to the Scheme, except in cases of gross negligence or fraud.<br><br>▪ The Scheme released parties: Mega, Parent, Kroll Issuer Services Limited, Wilmington Trust, National Association, UMB Bank, N.A., Depository Trust Company, Cede & Co., each Scheme Creditor, each member of the Ad Hoc Group, Cleary Gottlieb Steen & Hamilton LLP, Mijares, Angoitia, Cortés y Fuentes, Houlihan Lokey, Inc, Blink Capital Solutions, 414 Capital Inc, Tom Smith KC, Jamil Mustafa, Latham & Watkins LLP, Sainz Abogados, Tecnologias Cuentas por Cobrar S.A.P.I. de C.V. and Reed Smith LLP. | ▪ In consultation with the Office of the United States Trustee, and in order to resolve a potential objection, Mega requests the enforcement of a narrow release:<br><br>▪ The Chapter 15 Order would release only Mega and Parent for claims arising directly or indirectly from the Existing Notes and would exculpate only Mega and Parent from liability for actions related to the Scheme, except in cases of gross negligence or fraud.<br><br>▪ This limited release is crucial to the Scheme's operation and success. Without it, Parent could be subject to collection actions in respect of the Existing Notes which, if successful, would result in the assertion of claims against Mega (vitiating the central purpose of the Scheme). |

[1] *See* Verified Petition ¶ 97; English Counsel Declaration ¶ 32.
[2] *See* Revised Proposed Order.

# Non-Consensual Third-Party Releases in Chapter 15 (Pre-*Purdue*)

One of the long-established principles of Chapter 15 is that bankruptcy courts are permitted to approve foreign plans even where that same plan would be subject to challenge if it were proposed in a plenary Chapter 11 proceeding.

Courts have routinely enforced schemes and foreign plans of reorganization that allow the following, despite similar relief not available under Chapter 11:[1]

- violations of the absolute priority rule;
- waiver of jury trial rights; and
- non-consensual third-party releases.

Accordingly, before the Supreme Court's decision in *Purdue*, courts in this district would enforce non-consensual third-party releases in Chapter 15 proceedings, including those allowed by English schemes of arrangement.[2]

And, even in circuits where non-consensual third-party releases were not available in Chapter 11 pre-*Purdue*, Chapter 15 courts recognized that "availability in Chapter 11" was not the relevant test for assessing whether to enforce such releases in foreign plans.[3]

- For example, prior to the Supreme Court's decision in *Purdue* (but <u>after</u> the District Court had issued a decision holding non-consensual third-party releases were not authorized by Chapter 11), a bankruptcy judge in this district observed that "[p]rinciples of enforcement of foreign judgments in comity in Chapter 15 cases strongly counsel approval of enforcement in the United States of third-party, non-debtor releases and injunction provisions **even if those provisions could not be entered in a plenary Chapter 11 case**."[4]

[1] *See* Verified Petition ¶ 98; *In re Avanti*, 582 B.R. at 618.
[2] *See* Verified Petition ¶ 101; *In re Vitro S.A.B de C.V.*, 701 F.3d 1031, 1053 (5th Cir. 2012).
[3] *See* Verified Petition ¶ 100; *See In re Americanas, S.A.*, No. 23-10092, 2024 WL 3506637 (Bankr. S.D.N.Y. July 22, 2024); Order (I) Recognizing and Enforcing the Ancillary Order, (II) Approving the Procedure Governing Closing of Chapter 15 Cases and (III) Granting Ancillary Relief, *In re Nexii Bldg. Sols. Inc.*, No. 24-10026 (Bankr. D. Del. July 22, 2024), ECF No. 66.
4. *See* Verified Petition ¶ 101; See *In re Avanti Commc'ns. Grp.* PLC, 582 B.R. 603, 618 (Bankr. S.D.N.Y. 2018) ("[T]hird-party releases in Chapter 15 cases have received a different analysis than in chapter 11 cases, focusing primarily on the foreign court's authority to grant such relief."); *In re Vitro S.A.B de C.V.*, 701 F.3d 1031, 1053 (5th Cir. 2012) (acknowledging that Chapter 15's "heavy emphasis on comity" made it "not necessary, nor to be expected, that the relief requested by a foreign representative be identical to, or available under, United States law"); *In re Bd. of Dirs. of Multicanal S.A.*, 314 B.R. 486, 506 (Bankr. S.D.N.Y. 2004) ("[C]ases do not require that a distribution in a foreign proceeding match the distribution that would be available in a hypothetical U.S. case, or that U.S. creditors receive the precise recovery or treatment to which they would be entitled under Chapter 11").

# Granting of Releases in Chapter 15 (Post-*Purdue*)

> The Supreme Court's decision in *Harrington v. Purdue Pharma L.P.* ("*Purdue*") does not affect longstanding Chapter 15 principles and is specifically limited to the availability of non-consensual third-party releases under Chapter 11.

In *Purdue*, the Supreme Court held that the statutory text of Chapter 11 of the Bankruptcy Code did not contemplate reorganization plans with nonconsensual third-party releases.

- The Supreme Court was careful to ground its ruling on whether such releases were statutorily authorized under Chapter 11, expressly limiting its ruling to unavailability of releases only under Chapter 11, rather than as a matter of broad public policy.

- In announcing its ruling, the Court stated "[c]onfining ourselves to the question presented, we hold **only** that the bankruptcy code does not authorize a release and injunction that, **as part of a plan of reorganization under Chapter 11**, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants." [1]

- The Supreme Court also noted the Debtors in *Purdue* sought "an order discharging a broad sweep of present and future claims against [the Sacklers], including ones for fraud and willful injury."

Courts have continued to enforce foreign insolvency plans with materially similar third-party releases, as seen in *In re Americanas, S.A.* and *In re Nexii Bldg. Sols. Inc.,* reinforcing the possibility of enforcing such releases under Chapter 15. [2]

---

[1] *See* Verified Petition ¶ 99; *Purdue*, 144 S. Ct. at 2076.
[2] *See* Verified Petition ¶ 100.

# The Releases under the Scheme Should be Granted

The releases provided in the Scheme are vital to ensure a successful restructuring and ensure that creditors' claims against Mega and the Parent are extinguished, aligning with the approval of the English Court and supporting the core purpose of the Scheme to allow creditors to receive consideration.[1]

Scheme Creditors were advised of the releases and were able to vote against the Scheme if they objected to the potential releases.[2]  Scheme Creditors also were able to object to the releases before the English Court.

The releases were specifically mentioned and discussed at the Sanction Hearing.

Finally, as indicated earlier, the releases sought by Mega are surgically focused on only claims arising from the debt that is the subject of the Scheme—the Existing Notes.

Failure to release Existing Notes-related claims against Parent risks that, despite the time and effort poured into the Scheme process and the tens of millions in consideration that will be distributed as part of its implementation by the Parent, Mega will still be subject to claims arising from the Existing Notes (arising from potential judgments against Parent and resulting contribution claims). The Scheme consideration is coming from the Parent and a scheme promoted by the Parent would have been structured in the same way

[1] *See* Verified Petition ¶ 97; English Counsel Declaration ¶ 15, 33.
[2] *See* Verified Petition ¶ 102.



clearygottlieb.com

© 2024 Cleary Gottlieb Steen & Hamilton LLP. All rights reserved.

Throughout this presentation, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.